DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/31/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **16 CRIM 370** |
| | : | No. 16 Cr. |
| | : | |
| v. | : | Count 1: 18 U.S.C. § 1349 |
| | : | (Conspiracy to Commit Wire Fraud and |
| | : | Bank Fraud) |
| MATTHEW CONNOLLY and | : | |
| GAVIN CAMPBELL BLACK, | : | |
| | : | Counts 2-10: 18 U.S.C. §§ 1343 and 2 |
| Defendants. | : | (Wire Fraud) |
| | : | |

## SEALED INDICTMENT

THE GRAND JURY CHARGES THAT, AT ALL TIMES RELEVANT TO THIS
INDICTMENT:

### COUNT ONE
### 18 U.S.C. § 1349
### (Conspiracy to Commit Wire Fraud and Bank Fraud)

### GENERAL ALLEGATIONS

1. The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate
overseen by the British Bankers' Association ("BBA"), a trade association based in London,
United Kingdom, representing approximately 200 banks from more than 60 countries.

2. LIBOR was calculated every London business day by averaging the interest rates at
which designated banks ("Contributor Panel" banks) estimated that they could borrow unsecured
funds from other banks across ten currencies, including U.S. Dollar ("USD").  Contributor Panel
banks for each currency submitted their estimated borrowing rates for fifteen different borrowing
periods ("maturities" or "tenors"), ranging in length from overnight to one year, including
maturities of one month, three months, and six months (commonly referred to on paper as "1m,"

"3m," and "6m"). Thomson Reuters, acting as an agent for the BBA, received electronically the Contributor Panel banks' estimated interest rate submissions at or before approximately 11:10 a.m. in London. Among other currencies, Thomson Reuters received estimated interest rate submissions for the USD LIBOR from sixteen designated Contributor Panel banks. Each Contributor Panel bank's submission was prepared by bank employees referred to as "submitters" or "setters." Upon receipt of the sixteen Contributor Panel banks' USD LIBOR submissions, Thomson Reuters: (a) ranked the submissions from highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions to determine the official USD LIBOR setting (also referred to as the "fix") used to settle trades and as a reference rate for various financial products. This process was repeated for each different maturity or tenor. Contributor Panel banks' USD LIBOR submissions were between two and five decimal places, and the published USD LIBOR fix was rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") was one-hundredth of one percent (0.01 percent).

3. By 12:00 p.m. London time, Thomson Reuters published the averaged rates – or LIBORs – to, among others, Bloomberg LP network equipment, which thereafter transmitted the LIBORs to servers located in New York, New York and elsewhere. Thomson Reuters as a general matter, pursuant to service agreements with various clients, transmitted the rates to servers and traders of LIBOR-based financial products around the world, including to those located in New York, New York and elsewhere.

4. The published LIBORs were used as the basis for the pricing of fixed-income futures, options, swaps, forward rate agreements, and other derivative instruments. Interest rate swaps involved an agreement between counterparties to exchange payments in the future: one

2

counterparty paid a fixed rate while the other paid a variable rate.  Generally, the fixed rate was agreed upon at the outset by the counterparties and the variable rate was set at some point in the future.  Often times, the variable rate was based on a reference rate such as USD LIBOR.  The actual value of the contract could not be determined until the date on which the variable rate was set.  At that point, payment amounts were determined, and, depending on the value of the variable rate, one party made money and the other lost money.

5. Traders made predictions on where LIBORs would set in the future.  Traders, on behalf of their respective financial institutions, often entered into multiple derivatives contracts containing LIBORs as a rate based on those views.  Therefore, the profit and loss that flowed from those contracts was directly affected by the relevant LIBORs on certain dates.  If the relevant LIBORs moved in the direction favorable to the traders' position, the financial institution and the trader stood to benefit at the expense of their counterparties.  When the traders' predictions were wrong and LIBOR moved in an unfavorable direction, the traders and the financial institutions stood to lose money to their counterparties.

6. Because traders often took large derivative positions, even small movements in the LIBOR fix could result in large swings in profits or losses from trades.

7. USD LIBOR globally impacted transactions and financial products tied to USD LIBOR.  In addition to being used to price derivative products, financial institutions and other lenders in the United States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products.

8. A Contributor Panel bank's submission was to be an unbiased and honest estimate of that bank's borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBORs.

9. One of the USD LIBOR Contributor Panel banks was Deutsche Bank AG ("Deutsche Bank"), a financial institution and global financial services company headquartered in Frankfurt, Germany, with an affiliate in the United States that was insured by the Federal Deposit Insurance Corporation ("FDIC").

## The Defendants

10. From at least in or about January 2005 through in or about March 2008, defendant MATTHEW CONNOLLY worked as the Director of Deutsche Bank's Pool Trading Desk in New York, New York. In that position, CONNOLLY supervised Trader 1, Trader 6, and others. During that period, certain traders that CONNOLLY supervised traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR, the profitability of CONNOLLY's traders' trading positions depended on the direction in which USD LIBORs moved.

11. From at least in or about February 1997 through at least early 2015, defendant GAVIN CAMPBELL BLACK ("BLACK") worked as a Director on Deutsche Bank's Money Market Derivatives ("MMD") and Pool Trading Desks in London. During that period, BLACK traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR rate, the profitability of BLACK's trading positions depended on the direction in which USD LIBORs moved.

## Other Individuals and Organizations

12. Michael Ross Curtler ("Curtler") began working at Deutsche Bank in or around 1993. From at least in or about January 2003 through in or about February 2008, Curtler was a Director of Global Finance and FX Forwards ("GFFX") at Deutsche Bank's London desk, and sat near BLACK. From in or about February 2008 through at least 2012, Curtler worked as Managing

4

Director, Head of Global Finance/Pool Trading Desk, GFFX, in London. In his capacity as Managing Director, Curtler also served as the supervisor of LIBOR submission process. From at least in or about January 2003 through at least early 2011, Curtler was Submitter A's direct supervisor and sat directly adjacent to Submitter A on the trading floor, a few feet apart. During his time supervising Submitter A, Curtler served as Deutsche Bank's backup submitter for its USD LIBOR submissions to the BBA. From at least in or about January 2003 through at least in or about 2012, Curtler traded derivative products that referenced USD LIBOR. From in or about 2009, Curtler also began to supervise others who traded derivate products, including BLACK. Because these trades were settled based on the published USD LIBOR, the profitability of Curtler's trading positions depended on the direction in which USD LIBORs moved.

13. From at least in or about 2005 through at least in or about December 2012, Submitter A worked on Deutsche Bank's Pool Trading Desk in London, United Kingdom, and was supervised by Curtler. Submitter A was the primary submitter of Deutsche Bank's USD LIBOR submission to the BBA. While working on Deutsche Bank's Pool Trading Desk, Submitter A sat adjacent to Curtler and near BLACK and Trader 2.

14. From at least in or about January 2000 through in or about December 2012, Trader 1, worked as a Director and later as a Managing Director on Deutsche Bank's MMD desk in New York, New York. During that period, Trader 1 traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR, the profitability of Trader 1's trading positions depended on the direction in which USD LIBORs moved.

15. From at least in or about November 1999 through at least in or about March 2010, Trader 2 was a Director and Managing Director of MMD GFFX at Deutsche Bank. Beginning in

5

or about February 2006, Trader 2 became the Head of London's MMD. From in or about April 2009 through in or about February 2010, Trader 2 served as Managing Director, Head of MMD in London. In March, 2010, Trader 2 became the Global Head of MMD Trading and relocated to Deutsche Bank's Singapore office. While working on London's MMD desk, Trader 2 traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR, the profitability of Trader 2's trading positions depended on the direction in which USD LIBORs moved.

16. From at least in or about January 2000 through in or about July 2009, Trader 3 worked as an Associate and then a Vice President of Deutsche Bank's Pool Trading Desk in London. During that period, Trader 3 traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR, the profitability of Trader 3's trading positions depended on the direction in which USD LIBORs moved. From at least January 2005 through approximately January 2007, Trader 3 also acted as the back-up submitter of USD LIBOR to the BBA.

17. From at least in or about January 2000 through at least in or about 2011, Trader 4 worked as a Director on Deutsche Bank's Pool Trading Desk in Frankfurt, Germany. During that period, Trader 4 traded derivative products that referenced USD LIBOR, among other products. Because these trades were settled based on the published USD LIBOR, the profitability of Trader 4's trading positions depended on the direction in which USD LIBORs moved.

18. From at least in or about January 2000 through February 2008, Trader 5 worked as a Director on Deutsche Bank's Pool Trading Desk in London, and later as Head of Global Finance in Tokyo, Japan. Until in or about 2006, Trader 5 traded USD LIBOR referencing products and

6

submitted USD LIBOR at times.  Because these trades were settled based on the published USD LIBOR, the profitability of Trader 5's trading positions depended on the direction in which USD LIBORs moved.

19. From at least in or about January 2005 through in or about 2007, Trader 6 traded derivative products that referenced USD LIBOR, among other products, on Deutsche Bank's MMD desk in New York, New York. Because these trades were settled based on the published USD LIBOR, the profitability of Trader 6's trading positions depended on the direction in which USD LIBORs moved.

20. Interdealer brokers matched buyers and sellers in various financial product markets in exchange for commissions and, to facilitate that process, regularly communicated with traders at Contributor Panel banks, including Deutsche Bank.  Broker A was such an interdealer broker.

21. Bank A was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in Charlotte, North Carolina.

22. Bank B was a federal home loan bank within the definition of Title 18, United States Code, Section 20 and was headquartered in Pittsburgh, Pennsylvania.

23. Bank C was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in New York, New York, and wholly owned by Bank E, a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and headquartered in New York, New York.

24. Bank D was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in New York, New York.

## The Conspiracy

25. From at least in or about 2005 through at least in or about 2011, in the Southern District of New York and elsewhere, MATTHEW CONNOLLY and GAVIN CAMPBELL BLACK, the defendants, together with Curtler, Trader 1, Trader 2, Trader 3, Trader 4, Trader 5, Trader 6, and Submitter A, and others known and unknown to the Grand Jury, did knowingly and willfully, combine, conspire, confederate, and agree to commit certain offenses against the United States, that is:

(A) to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme, all affecting a financial institution; to wit, the defendants engaged in a scheme to manipulate and attempt to manipulate benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, by the dissemination, and submission, of false and fraudulent statements intended to influence and manipulate the benchmark interest rates to which the profitability of their interest rate derivative trades were tied, in violation of Title 18, United States Code, Section 1343; and

(B) to execute and attempt to execute a scheme and artifice to defraud a financial institution, as defined under 18 U.S.C. § 20 and 18 U.S.C. § 3293(2); and to

8

obtain and attempt to obtain moneys, funds, credits, assets, and other properties owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises; to wit, the defendants engaged in a scheme to manipulate and attempt to manipulate the benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, by the dissemination, and submission, of false and fraudulent statements intended to influence and manipulate the benchmark interest rates to which the profitability of their interest rate derivative trades, and the related profitability of interest rate derivative trades held by other financial institutions, were tied, in violation of Title 18, United States Code, Section 1344.

## The Scheme

26.   From at least in or about 2005 through at least in or about 2011, CONNOLLY and BLACK, the defendants, together with Curtler, Trader 1, Trader 2, Trader 3, Trader 4, Trader 5, Trader 6, and Submitter A, and others known and unknown to the Grand Jury, at times located in New York, New York, London, United Kingdom, and elsewhere, intending to manipulate and attempting to manipulate the benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, engaged in a scheme to obtain money and property by making false and fraudulent USD LIBOR submissions to the BBA for inclusion in the calculation of USD LIBOR representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the submissions reflected rates that were designed to benefit their trading positions.  The scheme had an effect on one or more financial institutions, within the meaning of Title 18, United States Code, Sections 20 and 3293(2).  The

conduct of the conspirators caused financial institutions to be susceptible to substantial risk of

loss and to suffer actual loss. In particular, 1) financial institutions, including but not limited to

Bank A, Bank B, Bank C, and Bank D, entered into trades throughout the relevant time period in

which their positions were opposite to those of the defendants and their co-conspirators, and 2)

Deutsche Bank conducted a substantial internal investigation, risked sustaining significant harm

to its commercial and financial reputation, and agreed to pay approximately $625 million in

penalties to the United States Department of Justice as a result of the conduct alleged in this

Indictment, and DB Group Services UK Limited, one of its subsidiaries, agreed to pay an

additional fine of approximately $150 million. Moreover, at all times material to this Indictment,

the defendants and their co-conspirators knew and foresaw that Deutsche Bank had

counterparties in the United States which had taken financial positions that would be negatively

affected by the scheme to manipulate the USD LIBOR benchmark interest rate. At all times

material to this Indictment, the defendants and their co-conspirators knew and foresaw that

entities in the United States were trading derivative swaps, the profitability of which was linked

to USD LIBOR.

## **Manners and Means**

27. In order to further the objects and goals of the conspiracy, CONNOLLY and

BLACK, the defendants, together with Curtler, Trader 1, Trader 2, Trader 3, Trader 4, Trader 5,

Trader 6, and Submitter A, and others known and unknown to the Grand Jury used the following

manners and means, among others:

> a. CONNOLLY, BLACK, Curtler, Trader 1, Trader 2, Trader 3, Trader 4, Trader 5,
> and Trader 6 were Deutsche Bank traders who entered into, or supervised those
> who did, derivative swap agreements the profitability of which was tied to the

10

USD LIBOR benchmark. These traders asked Deutsche Bank LIBOR submitters to make LIBOR submissions that were false (that is, borrowing estimates that were biased and dishonest) and fraudulent and which were designed to benefit traders' positions rather than making submissions that reflected an unbiased and honestly held estimate of the rate at which Deutsche Bank could borrow unsecured funds. Deutsche Bank USD LIBOR submitters – including Submitter A, Curtler, and Trader 3, when he was back-up submitter – accommodated those requests by making false and fraudulent USD LIBOR submissions that were designed to benefit the traders' positions rather than making submissions that reflected an unbiased estimate of the rate at which Deutsche Bank could borrow unsecured funds. At times, the Deutsche Bank LIBOR submitters also submitted rates that were designed to benefit their own trading positions.

b.  CONNOLLY directed Trader 1 to advise Curtler and Submitter A of any LIBOR-based derivative positions that traders in Deutsche Bank's New York office had so that Curtler and Submitter A could take those positions into account by making false and fraudulent USD LIBOR submissions that were designed to benefit the New York traders' positions rather than making submissions that reflected an unbiased and honest estimate of the rate at which Deutsche Bank could borrow unsecured funds.

c.  Curtler and Submitter A coordinated with CONNOLLY and BLACK, and with Trader 1, Trader 2, Trader 3, Trader 4, Trader 5, and Trader 6, and others, to take into account Deutsche Bank's financial interests tied to LIBOR when submitting its USD LIBOR rates on a particular day.

d.  At times, Submitter A accommodated requests by CONNOLLY and BLACK, and
    others, to manipulate Deutsche Bank's USD LIBOR submissions by making and
    causing false and fraudulent USD LIBOR submissions to be made. Sometimes
    Submitter A submitted rates at a specific level requested by the defendants and
    others and consistent with the requester's interests. Other times, Submitter A
    made a high or low USD LIBOR submission consistent with the direction
    requested by the defendants or other traders and consistent with the requester's
    interests. Yet other times, the defendants and their co-conspirators who had
    aligned, bank-wide trading positions expected and understood that Submitter A
    would make submissions in a direction that would benefit these bank-wide
    positions. Submitter A's manipulated submissions were intended to be subtle in
    movement in order to avoid detection.

e.  When Curtler acted as the back-up submitter, he accommodated requests from the
    defendants and their co-conspirators to manipulate Deutsche Bank's USD LIBOR
    submission to help their trading positions by causing false and fraudulent
    Deutsche Bank USD LIBOR submissions to be made. Curtler also took his own
    positions into consideration when submitting false and fraudulent Deutsche Bank
    USD LIBOR submissions. The defendants and their co-conspirators also
    expected and understood that Curtler used his knowledge and awareness of bank-
    wide trading positions to submit Deutsche Bank's USD LIBOR submission in a
    direction that would benefit these bank-wide positions. Curtler's manipulated
    submissions were intended to be subtle in movement in order to avoid detection.

12

f.  The manipulations and attempted manipulations of Deutsche Bank's USD LIBOR submissions and the published USD LIBOR rate were intended to benefit the trading positions of Deutsche Bank traders, including the defendants and their co-conspirators, and others and to the detriment of, among others, Deutsche Bank's counterparties to derivative contracts including, but not limited to, Bank A, Bank B, Bank C, and Bank D. The defendants and their co-conspirators discussed and coordinated their trading positions that referenced USD LIBOR, at times, maximizing their profits from the manipulated, false, and fraudulent USD LIBOR submissions.

g.  At all times relevant to this Indictment, CONNOLLY, BLACK, Curtler, Trader 1, Trader 2, and others shared the same bonus pool, meaning that their annual bonuses were drawn from the same financial pool designated to Deutsche Bank's MMD. The amount of their shared annual bonus pool was influenced by Deutsche Bank's GFFX Group's earnings, and thus CONNOLLY's, BLACK's, Curtler's, Trader 1's, Trader 2's, and others' trading profits from that year.

h.  At times relevant to this Indictment, Deutsche Bank traders, including BLACK and his co-conspirators asked and encouraged Submitter A to contact individuals outside of Deutsche Bank, including brokers and others, to push for USD LIBOR submissions by other Contributor Panel banks that would benefit their trading positions.

i.  At times relevant to this Indictment, BLACK and his co-conspirators discussed USD LIBOR submissions and manipulation with individuals at other Contributor Panel banks, including, but not limited to, Coöperatieve Centrale Raiffeisen-

13

Boerenleenbank B.A. ("Rabobank"), a Contributor Panel bank headquartered in Utrecht, the Netherlands with an FDIC-insured branch located in New York, New York.

## Overt Acts

28. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

29. April 1, 2005

a. On or about April 1, 2005, BLACK messaged Submitter A asking "COULD WE PLS HAVE A LOW 6MTH FIX TODAY OLD BEAN?"

b. Deutsche Bank's 6-month USD LIBOR submission on April 1, 2005 was 3.375 percent.

30. September 26-27, 2005

a. On or about September 26, 2005, Curtler solicited from BLACK and others: "libors any requests?"

b. BLACK responded, "HIGH FREES, LOW 1MUNF."

c. Curtler replied, "what levels?" asking how high BLACK wanted the 3-month USD LIBOR and how low BLACK wanted the 1-month USD LIBOR.

d. The next day, on or about September 27, 2005, Curtler again checked with all of the USD traders in London, asking, "libor requests?"

e. BLACK responded, "LOW 1MUNF....SAME AS YEST, 8375, U CAARNT."

f. Deutsche Bank's 1-month USD LIBOR submission on September 27, 2005 was 3.8375 percent.

31. November 24-25, 2005

a. On or about November 24, 2005, CONNOLLY, who was based in New York, New York, asked of Submitter A and Curtler that "3mo Libor be as high as possible Thursday and Friday if you see the market higher."

b. Submitter A responded, "we've gone in relatively neutral as a high 3s doesn't suit london at the moment. Hope that's ok."

c. Curtler responded separately to CONNOLLY's email, copying Submitter A, "[w]ho asked low, [BLACK] and [Trader 5]?"

d. CONNOLLY replied to Submitter A's earlier message, "Don't matter to me, may matter to OTC/rates NY…we will all find out I guess…"

e. Submitter A responded separately to Curtler, explaining that he "asked [BLACK] this morning so went neutral. It's fence sitting I know but better to try to keep both parties somewhat on-side."

f. Soon after this comment to Curtler, Submitter A wrote to CONNOLLY, copying Curtler, "I'll speak to [BLACK] again tmrw and see if we can get something sorted."

g. On or about November 24, 2005, Deutsche Bank's 3-month USD LIBOR submission was 4.400 percent, and on November 25, 2005, was 4.405 percent.

15

32. <u>November 28-29, 2005</u>

     a. On or about November 28, 2005, Curtler emailed CONNOLLY noting that "1mth over the turn is looking like 26-32 hahaha – anything either way from you guys? we are still short basis in 1 mth so lowere the better."

     b. CONNOLLY responded, "HAHAHAH, NEVER FAILS. WE WOULD PREFER IT HIGHER…WE HAVE ABOUT 15BB 1MO RECEIVES…THANKS, JUST ASKING IS VERY MUCH APPRECIATED…"

     c. Curtler jokingly replied, "will do like [Submitter A] then – ask, and do the opposite… let us know the days you rec, first fix tom will set the tone."

     d. The next day, on or about November 29, 2005, Curtler emailed CONNOLLY, "looking like 29 in 1mth libor – we went in 295 for u," indicating that he had accommodated CONNOLLY's request of the previous day.

     e. On or about November 29, 2005, Deutsche Bank's 1-month USD LIBOR submission was 4.295 percent.

33. <u>February 24, 2006</u>

     a. On or about February 24, 2006, Curtler received a message from a broker at Broker A with the subject line "LIBORS." In the text of the email, the broker wrote, "Mng Mike. libors 605 , 715 , 805 and 98."

     b. Curtler forwarded this email to BLACK, Trader 2, and Submitter A with the text "Push for 60 [Submitter A]."

     c. Trader 2 added, "or even 58 if u can. Coffee on me."

     d. Submitter A responded, "ok right now we're looking like 60.5 given what people are saying. Will work on it all morning."

e. Submitter A's 1-month USD LIBOR submission that day was 4.595 percent.

34. March 20, 2006

a. On or about March 20, 2006, Trader 1 emailed Submitter A and cc'd Curtler and CONNOLLY, "Regarding Mondays 3mLibor, MMD NY is receiving 3mL on USD 6.5 Bn so hoping for higher 3mL. Cheers."

b. Later that day, Submitter A responded to Trader 1 saying "[Trader 1] – have gone in at 4.94."

c. Trader 1 replied, "Thanks, [Submitter A]."

d. Deutsche Bank's 3-month USD LIBOR submission on March 20, 2006 was 4.94 percent.

35. April 11-12, 2006

a. On or about April 11, 2006, Trader 1 wrote to Submitter A, "FYI I am receiving 3mL on 5.5 Bn of the April 12 fixing so a higher 3m Libor on Wed morning would help me."

b. Submitter A responded, "I'm off today but I'll pass the message on to mike [Curtler]."

c. Submitter A then forwarded Trader 1's request to Curtler.

d. Deutsche Bank's 3-month USD LIBOR submission on April 12, 2006 was 5.075 percent.

36. May 17-18, 2006

a. On or about May 17, 2006, Trader 6 sent a request to Curtler asking, "Hi Mike, hope you've been well. If you can help we can use a high 3m fix tom."

17

b. Curtler responded, copying Submitter A, "[Trader 6], I'm off but [Submitter A] is your libor man [] [Submitter A] could you take a look at 3s libor in the morning for [Trader 6]."

c. Submitter A replied, "Will do chaps."

d. The following day, Submitter A wrote to Trader 6, "morning . . . I went in at 19+ for the 3m libor, as you'll see it almost manage to reach 19."

e. Deutsche Bank's 3-month USD LIBOR submission on May 18, 2006 was 5.195 percent.

37. July 20-21, 2006

a. On or about July 20, 2006, Trader 1 emailed Submitter A "FYI I'm short (paying 1mL) on 6 bn of the 1ml tomw in case you have a chance to make it lower."

b. Submitter A responded, "leave it with me on the 1m."

c. Deutsche Bank's 1-month USD LIBOR submission on July 21, 2006 was 5.375 percent.

38. September 26-28, 2006

a. On or about September 26, 2006, Trader 1 emailed Submitter A "I am paying 3ml (need a low fix) fixg Sep 27 and next day I am recvg 3mL/hoping for hi fix for the firsy Y/E 3mL. I have 8 bn each. Any help would be Greatly appreciated."

b. Deutsche Bank's 3-month USD LIBOR submission on September 27, 2006 was 5.365 percent, and on September 28, 2006 was 5.375 percent.

18

39. <u>November 28-29, 2006</u>

    a. On or about November 28, 2006, Trader 1 emailed Submitter A "Altho I don't have a huge 1mL fix tomw, I am paying 1mL on about 40bn throughout December so I was hoping for a low 1mL fix tomw to set the tone."

    b. On or about November 29, 2006, Submitter A told BLACK "looks like 1s libor is going to set at 35 today chaps. [Trader 1] wants me to go in lower."

    c. Because Bank B had an interest swap agreement with Deutsche Bank, the profitability of which was tied to LIBOR, Bank B was directly affected by the USD LIBOR rate on or about November 29, 2006.

    d. Deutsche Bank's 1-month USD LIBOR submission on November 29, 2006 was 5.345 percent.

40. <u>August 12-16, 2007</u>

    a. On or about August 12, 2007, CONNOLLY, after coordinating with Trader 1 who was out-of-town, emailed Submitter A, "If possible, we need in NY 1mo libor as low as possible next few days…tons of pays coming up overall…thanks!"

    b. Submitter A responded, "Will do our best Matt."

    c. Several days later, on or about August 15, 2007, Submitter A followed up saying "1m libor looking like 57 today matt."

    d. CONNOLLY replied, "Thanks [Submitter A], you are the man!"

    e. Deutsche Bank's 1-month USD LIBOR submission on August 15, 2007 was 5.530 percent.

    f. On or about August 16, 2007, Submitter A said, "1m libor looking like 53 at this point in time."

19

g. CONNOLLY replied, "Thanks [Submitter A]...luckily I think we reversed a lot of our fra's yest so I think we are ok now....cheers."

h. Deutsche Bank's 1-month USD LIBOR submission on August 16, 2007 was 5.500 percent.

41. September 26-27, 2007

a. On or about September 26, 2007, Trader 1 emailed Submitter A "FYI I am receiving 3mL (want it hi) on 6bn and paying 1mL (want it low) on 7bn of tomws fixings in case. I am also that same way most of oct."

b. Submitter A responded "Most of us in London want the same kind of fixings tmrw too."

c. Deutsche Bank's 3-month USD LIBOR submission on September 27, 2007 was 5.250 percent.

d. Deutsche Bank's 1-month USD LIBOR submission on September 27, 2007 was 5.110 percent.

42. October 18-19, 2007

a. On or about October 18, 2007, Trader 1 told Submitter A "FYI I am receiving 3mL (want high fixing) on 5bn tomw in case. Cheers."

b. Deutsche Bank's 3-month USD LIBOR submission on October 19, 2007 was 5.190 percent.

20

43. <u>December 13-18, 2007</u>

     a. On or about December 13, 2007, Trader 4 asked Curtler, "MC, I NEED YOUR HELP . . . IF IT SUITS YOU CAN WE PUT IN A HIGH LIBOR TILL NEXT TUESDAY IN THE 3 MTS?"

     b. Curtler responded, "ok."

     c. Trader 4 replied, "XXX."

     d. On December 14, 2007, Deutsche Bank's 3-month USD LIBOR submission was 4.97 percent, on December 17, 2007, was 4.97 percent, and on December 18, 2007, was 4.96 percent.

44. <u>May 15, 2008</u>

     a. In an email on or about May 15, 2008, BLACK asked Curtler, "Low 1mth today pls shag, paying on 18 bio."

     b. Curtler responded, "1m 50/51 3m 72/73 eff 2.05."

     c. On May 15, 2008, Deutsche Bank's 1-month USD LIBOR submission was 2.480.

45. <u>August 13, 2008</u>

     a. On or about August 13, 2008, Trader 1 told Submitter A to "strap on a pair and jack up the 3M. Hahahahaha."

     b. On or about August 13, 2008, Trader 1 told BLACK that he told Submitter A to "jack up the 3mL but [Submitter A] ignored me."

46. <u>August 28-29, 2008</u>

     a. On or about August 28, 2008, BLACK told Submitter A, "How about 4mth shag – we need to get that up to start the mkt rumbling about the size of 3mth."

21

b. On August 28 and 29, 2008, Deutsche Bank's 4-month USD LIBOR submission was 2.980 percent, and on August 29, 2008, was 3.000 percent.

47. September 26, 2008

a. In an email on or about September 26, 2008, Curtler told Submitter A to "Get 3s up and don't tell bookies ours."

b. Submitter A responded, "i am trying to get 3s up mate."

c. Because Bank A had an interest swap agreement with Deutsche Bank, the profitability of which was tied to LIBOR, Bank A was directly affected by the USD LIBOR rate on September 26, 2008.

48. March 17, 2010

a. On or about March 17, 2010, Trader 1 told Curtler he could get "more out of it" if 3-month LIBOR continued to move up.

(All in violation of Title 18, United States Code, Section 1349.)

## COUNTS TWO THROUGH TEN
### 18 U.S.C. § 1343
### (Wire Fraud)

49. The allegations as set forth in paragraphs 1 through 24 and 26 through 48 are hereby realleged as if set forth herein.

50. From at least in or around 2005 through at least in or around 2011, the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, MATTHEW CONNOLLY and GAVIN CAMPBELL BLACK, the defendants, together with others, known and unknown to the Grand Jury, did unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises,

would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all affecting a financial institution.

51. In furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which the profitability of certain trades were tied, the defendants, as described below, on or about the date specified for each count, did knowingly and willfully transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals, pictures, and sounds:

| Count | Defendant | Approximate Date | Wire Transmission | Description |
|-------|-----------|------------------|-------------------|-------------|
| 2 | CONNOLLY | August 15, 2007 | International electronic signal between New York, New York and London, United Kingdom | CONNOLLY and Submitter A discussed via electronic message the manipulation of Deutsche Bank's USD LIBOR submission. |
| 3 | CONNOLLY | August 16, 2007 | International electronic signal between New York, New York and London, United Kingdom | CONNOLLY and Submitter A discussed via electronic message the manipulation of Deutsche Bank's USD LIBOR submission. |
| 4 | BLACK | August 13, 2008 | International electronic signal from New York, New York to London, United Kingdom | Trader 1 communicated over Bloomberg chat with BLACK and told BLACK that Trader 1 had requested that Submitter A manipulate Deutsche Bank's USD LIBOR submissions. |
| 5 | CONNOLLY | January 2, 2007 | Interstate electronic signal and transfer of data from New York, New York to Pittsburgh, Pennsylvania | Wire transfer from Deutsche Bank in New York, New York, to Bank B in Pittsburgh, Pennsylvania, which was used to settle an interest rate swap contract that fixed on or about November 29, 2006. |

23

| 6 | BLACK | June 19, 2008 | International electronic signal and transfer of data from London, United Kingdom to New York, New York | Wire transfer from Deutsche Bank in London, United Kingdom, to Bank C in New York, New York, which was used to settle an interest rate swap contract that fixed on or about May 15, 2008. |
| 7 | CONNOLLY | November 1, 2007 | International electronic signal and transfer of data from London, United Kingdom to New York, New York | Wire transfer from Deutsche Bank in London, United Kingdom, to Bank D in New York, New York, which was used to settle an interest rate swap contract that fixed on or about September 27, 2007. |
| 8 | CONNOLLY | July 20, 2006 | International electronic signal and transfer of data from London, United Kingdom to New York, New York | The rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates – or LIBORs – were published via international wire. |
| 9 | CONNOLLY | September 27, 2007 | International electronic signal and transfer of data from London, United Kingdom to New York, New York | The rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates – or LIBORs – were published via international wire. |
| 10 | BLACK | May 15, 2008 | International electronic signal and transfer of data from London, United Kingdom to New York, New York | The rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates – or LIBORs – were published via international wire. |

(All in violation of Title 18, United States Code, Sections 1343 and 2.)

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. §§ 982(a)(2)(A) and 981(a)(1)(C))**

52. The allegations contained in the General Allegations Section and in Counts One through Ten of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which CONNOLLY and BLACK, the defendants, have an interest.

53. Upon conviction of any of the violations alleged in Counts One through Ten of this Indictment, CONNOLLY and BLACK shall forfeit all of their rights, titles and interests to the United States of any property, constituting or derived from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18, United States Code, Section 982(a)(2)(A).

54. Upon conviction of any of the violations alleged in Counts One through Ten of this Indictment, CONNOLLY and BLACK shall forfeit all of their rights, titles and interests to the United States of any property, constituting or derived from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

55. The property subject to forfeiture, pursuant to Forfeiture Allegations paragraphs 53 and 54 above, includes but is not limited to the sum of all proceeds the defendants derived from the offenses alleged in this Indictment.

56. If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

(1) cannot be located upon the exercise of due diligence,

(2) has been transferred or sold to, or deposited with a third person,

(3) has been placed beyond the jurisdiction of the Court,

25

(4) has been substantially diminished in value, or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable through Title 18, United States Code, Section 982(b) and the provisions of Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(In accordance with Title 18, United States Code, Section 982(a)(2)(A), Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth at Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461.)

Dated: 5/31/2016

A TRUE BILL

FOREPERSON

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division
United States Department of Justice

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
United States Department of Justice

CAROL L. SIPPERLY
Senior Litigation Counsel
ALISON L. ANDERSON
RICHARD A. POWERS
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

DANIEL M. TRACER
Trial Attorney
Antitrust Division
United States Department of Justice

26

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### Matthew Connolly and Gavin Campbell Black,

### Defendants.

### SEALED INDICTMENT

16 Cr.

(Title 18, United States Code, Sections 1349, 1343 and 2)

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division
U.S. Dept. of Justice

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
U.S. Dept. of Justice

5/31/10 - Filed Sealed Indictment
bc      A/W issued