UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>  v. )<br>) 16-cr-370 (CM)<br>MATTHEW CONNOLLY AND )<br>GAVIN BLACK, )<br>) **NOTICE OF EXPERT TESTIMONY**<br>  *Defendants*. )<br>) | |

NOTICE OF EXPERT TESTIMONY

  Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the United States gives notice of its intention to present the expert testimony of Dr. Thomas Youle, whom the government offers as an expert in the fields of industrial organization, applied microeconomics, and finance. Dr. Youle is presently an assistant professor in the Department of Economics at Dartmouth University.  A copy of Dr. Youle's Curriculum Vitae is attached as Exhibit A.  The United States hereby requests reciprocal expert discovery pursuant to Fed. R. Crim. P. 16(b)(1)(C).

  The United States anticipates that Dr. Youle will testify to the following:[1]

- An interest rate defines the price that a borrower pays to borrow money.  A "benchmark" interest rate serves as a point of reference that financial market participants use to, for example, calculate borrowing costs, define contractual payments, measure the value of assets and liabilities, form opinions about related interest rates, and predict future interest rate movements.  Because financial market participants rely on benchmark interest rates

---

[1] Unless otherwise specified, Dr. Youle's testimony will describe the time period at issue in the indictment.

to make decisions, however, a benchmark interest rate is useful to financial market participants only if it accurately characterizes borrowing costs.

- The London Interbank Offered Rate (LIBOR) is a collection of interest rate benchmarks across several currencies, including the U.S. Dollar, and borrowing durations, also known as "tenors." During the time period described in the indictment, LIBOR was overseen by a trade organization known as the British Bankers Association (BBA). For U.S. Dollar LIBOR, the BBA established a panel of sixteen large financial institutions, called "panel banks." Per the BBA's instructions, every London business day each U.S. Dollar panel bank submitted to Thomson Reuters—the BBA's agent for LIBOR—the "rate at which [that panel bank] could borrow finds, were [it] to do so, by asking for and then accepting inter-bank offers in reasonable market size just prior to 11am London time," for each of several specified tenors. After Thomson Reuters received each panel bank's daily submissions, it calculated the U.S. Dollar LIBOR, on a tenor-by-tenor basis, by eliminating the four highest and four lowest submissions, and averaging the remaining eight submissions. Thomson Reuters then published each day's U.S. Dollar LIBOR rates (also referred to as the "fix" or "fixing") throughout the world, including in the United States and, specifically, within the Southern District of New York.

- "Derivative" financial instruments (derivatives) are used by individuals and institutions, including panel banks, to speculate on interest rates and to hedge their exposures to interest rate risks. The value of many derivatives is contractually tied to the value of the U.S. Dollar LIBOR benchmark. From 2007-2010, many trillions of dollars of outstanding interest rate contracts were tied to U.S. Dollar LIBOR. In addition to being used to price derivative products, financial institutions and other lenders in the United

States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products.  Types of derivatives include forward rate agreements (FRAs), interest rate swaps (IRSs), and futures.

- A FRA is a contractual agreement between counterparties to exchange payments in the future: one counterparty pays a fixed rate while the other pays a variable rate.  Generally, the fixed rate is agreed upon at the outset by the counterparties and the variable rate is set at some point in the future.  Often times, the variable rate is based on a benchmark interest rate, such as U.S. Dollar LIBOR.  The actual value of the contract cannot be determined until the date—frequently called a "fixing" date—on which the variable rate is set.  After the variable rate is set, payment amounts are determined and, depending on the value of the variable rate, one counterparty makes money and the other counterparty loses money.  An IRS is the same as a FRA, except an IRS usually has multiple fixing dates and thus involves multiple payments between counterparties.

- While FRAs and IRSs are traded "over the counter" between individual traders and/or institutional traders, often (though not always) through a broker, a future is an exchange-traded instrument that is priced according to, among other things, market-driven predictions of the level of a floating interest rate, such as U.S. Dollar LIBOR, on a predetermined fixing date.  Derivatives are generally traded, whether over-the-counter or through an exchange, using telephones or internet-based messaging systems.

- During the time period described in the indictment, a potential for U.S. Dollar LIBOR manipulation—and counterparty harm—existed where a panel bank for U.S. Dollar LIBOR also traded derivatives tied to U.S. Dollar LIBOR.  A panel bank's daily U.S. Dollar LIBOR submissions—sent to Thomson Reuters by a panel bank employee known

as a "submitter"—were supposed to be unbiased and honest estimates of the bank's borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on U.S. Dollar LIBOR.  However, even a small change in a panel bank's submissions on a given day or over a period of time could affect the ultimate fix calculated by Thomson Reuters.  Therefore, if a panel bank's "traders"—bank employees who created, managed, and generally benefitted from the bank's derivative trading positions—could influence the submitter's U.S. Dollar LIBOR submissions from an unbiased and honest estimate of the bank's borrowing costs to favor their derivative trading positions, then those traders were in a position to inappropriately manipulate the U.S. Dollar LIBOR fix to their benefit at the expense of their counterparties.  And because traders often took large derivative positions, even small movements in the U.S. Dollar LIBOR fix could result in large swings in profits or losses from trades.  Moreover, even if a counterparty was, theoretically, perfectly hedged, other market participants would be harmed by successful manipulation of U.S. Dollar LIBOR.

Dated: November 29, 2017

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER<br>Acting Chief, Fraud Section<br>Criminal Division<br>United States Department of Justice | JEFFREY D. MARTINO<br>Chief, New York Office<br>Antitrust Division<br>United States Department of Justice |
| _____/s/_____<br>CAROL L. SIPPERLY<br>Assistant Chief<br>ALISON L. ANDERSON<br>RICHARD A. POWERS<br>Trial Attorneys<br>Criminal Division, Fraud Section<br>United States Department of Justice | _____/s/_____<br>MICHAEL T. KOENIG<br>Trial Attorney<br>Antitrust Division<br>United States Department of Justice<br>(202) 616-2165 |

4