HCE7CONH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 Cr. 370 (CM)

5    MATTHEW CONNOLLY
     and GAVIN CAMPBELL BLACK,
6
               Defendants.
7
     ------------------------------x
8                                        New York, N.Y.
                                         December 14, 2017
9                                        10:45 a.m.

10   Before:
                    HON. COLLEEN MCMAHON
11                                       District Judge

12
                         APPEARANCES
13
     JOON H. KIM
14        Acting United States Attorney for the
          Southern District of New York
15   BY:  ALISON ANDERSON
          RICHARD POWERS
16        MICHAEL KOENIG
          CAROL SIPPERLY (via telephone)
17            and
          D. BRITTAIN SHAW
18        CHRISTOPHER JACKSON
          JESSEE ALEXANDER-HOEPPNER
19        Assistant United States Attorneys

20   PAUL HASTINGS LLP
          Attorneys for Defendant Matthew Connolly
21   BY:  KENNETH BREEN
          PHARA GUBERMAN
22
     LEVINE LEE LLP
23        Attorneys for Defendant Gavin Campbell Black
     BY:  SETH LEVINE
24        SCOTT KLUGMAN
          MIRIAM ALINIKOFF
25        AARON KARP

1              (Case called)

2              (In open court)

3              MS. ANDERSON:  Alison Anderson, Richard Powers and

4    Michael Koenig for the government.  Appearing by phone is Carol

5    Sipperly.

6              MR. BREEN:  Ken Breen, John Nowak and Phara Guberman

7    for Matthew Connolly who is present here in court.

8              MR. LEVINE:  Seth Levine, Miriam Alinikoff and Scott

9    Klugman for Mr. Black, who is also here in the courtroom today.

10             THE COURT:  OK.  I didn't mean to drag the trial team

11   all the way up here to talk about scheduling other matters.

12   This is not gone the way I wanted it to, and I appreciate that

13   the government made extensive efforts to get Mr. Prange, and I

14   don't know, we may need Mr. Meaney any now, to be over here,

15   and I am very appreciative of that.  I am very appreciative of

16   that, but I had set aside time to do a full and complete

17   hearing over the course of these two days in December, knowing

18   that I had another trial to do between now and our current

19   trial date.

20             I certainly got a sense yesterday of what Mr. Levine

21   has in mind.  Mr. Levine, I think you should give me your

22   exhibits so I can become familiar with them.

23             MR. LEVINE:  We have them for you.

24             THE COURT:  And I spent a lot of time last night, when

25   I finally had time to think, thinking about his presentation.

1    And, Mr. Levine, it's all very interesting, and I think most of

2    it is besides the point.

3           You know, the government has a difficult burden here

4    because it's hard to prove a negative, but the government's

5    burden is to demonstrate that people were not exposed directly

6    or indirectly to your client's testimony, or that, if they

7    were, they had alternative ways of finding out exactly the same

8    thing.

9           It seems to me that the government -- is Mr. Weeks the

10   only person who testified in front of the grand jury that would

11   turn the indictment of Mr. Black?

12          MS. ANDERSON:  Yes, your Honor.

13          THE COURT:  He is?

14          MS. ANDERSON:  And to the extent if we are getting

15   into these issues, we would like to bring up the Kastigar team.

16          THE COURT:  I'm just asking you the question.  You're

17   the trial team.  You presented to the grand jury, right?

18          MS. ANDERSON:  We did.

19          THE COURT:  So presumably you are the people who can

20   answer that question.

21          MS. ANDERSON:  There is one witness and that was

22   special agent Weeks.

23          THE COURT:  One witness, and that was special agent

24   Weeks.

25           So, far be it from me to tie Mr. Levine's hands -- I

```
1   mean he has a client to protect, he has to do what he has to do

2   to protect his client -- but what I don't want to do is end up

3   turning this into a complete frolicking detour.

4           And while I must say, now that you all are here -- and

5   Ms. Sipperly is on the phone -- I'm not thrilled with the way

6   I've been treated by the trial team.  I'm not thrilled at being

7   given information that later has to be taken back by the

8   government, or isn't taken back by the government but turns out

9   to be demonstrably false --

10          MS. ANDERSON:  And, your Honor, we do think while

11  there were sort of cherry picked examples taken out of context,

12  we would like the opportunity obviously to respond to things

13  that were raised yesterday in regard to the prosecution team

14  briefing, and can deal with that separately and as a separate

15  issue.  We do think --

16          THE COURT:  It is a separate issue.

17          MS. ANDERSON:  And we plan to address it, obviously.

18          THE COURT:  Good.

19          So, let's talk about -- taint team, where are you?

20  You're back there somewhere.  Good morning.  Come on up here.

21          MS. SHAW:  Brittain Shaw on behalf of the United

22  States, accompanied by Christopher Jackson and Jesse

23  Alexander-Hoeppner, also trial attorneys for the United States.

24          THE COURT:  OK.  So, I want to say that correcting

25  mistakes is not what I consider to be rebuttal testimony, that
```

HCE7CONH

1    Mr. Levine is dealing with the record as it is.  You have put

2    in your affidavits.  OK?  We have an issue to be taken up with

3    the taint team dealing with paragraph 9 of Mr. Meaney's

4    affidavit -- or declaration.  Right?  We have to do that.  We

5    have to make sure that the declarations -- and this is a taint

6    team job -- the declarations that were filed under seal that

7    contain no grand jury material are promptly filed not under

8    seal.

9         We have Mr. Prange to deal with, and we have a date

10   for Mr. Prange.  And we have been alerted -- not that I needed

11   to be alerted -- that it's not going to be a 15 minute process.

12   Nothing with Mr. Levine is a 15 minute process.  Don't hang

13   your head; you're doing your job.

14        So, what else are we going to have to do?  Mr. Levine,

15   you have a book of exhibits presumably from which you intend to

16   argue, but presumably that you want to introduce into evidence.

17        MR. LEVINE:  Your Honor, for today what our plan

18   was -- we have made sure that the taint team has seen all the

19   things we put up on the screen or refer to and ask them to

20   check them to make sure there was no issues.

21        THE COURT:  Good.  I was going to suggest that it

22   would be helpful to me if I could spend my Christmas vacation

23   familiarizing myself with these materials.

24        MR. LEVINE:  Well, we're going to provide that to you

25   today.  With respect to additional exhibits and what else we're

HCE7CONH

1    going to present, we're obviously going to consider that.  We

2    obviously have some additional discovery-related issues here

3    that affects what we're going to put in.

4            I know that the taint team -- and I promised the taint

5    team I won't say anything about things that have not been

6    disclosed publicly or -- what I'm saying is we have an issue to

7    talk about today about what we do before our next appearance to

8    make sure that we have the materials that we need, and also

9    that for the materials that have been -- including some of the

10   materials I'm going to give you, your Honor --

11           THE COURT:  OK, that's an issue that doesn't involve

12   the trial team.

13           MR. LEVINE:  Yes, ma'am.

14           THE COURT:  All right.  So the trial team is here, and

15   Ms. Sipperly is on the phone, and presumably they have work to

16   do.  So the real issue for us, the trial team in the broadest

17   sense, is to figure out when we're going to try this case.  I

18   would still like to try it at the end of February.  I've got

19   everybody.  Mr. Breen is about to jump up.

20           MR. BREEN:  We won't have the five week window that

21   you want if we tried it in the end of February.  We start a

22   trial in Wilmington, picking a jury on March 5, starting with

23   opening statements on March 12.

24           THE COURT:  March 5?  That was not the date you gave

25   me.

1    MR. BREEN:  I gave you the March 12 date; that's when

2    opening statements are starting.  It's lasting six weeks, so it

3    does not give us the five week window that you asked for.

4        THE COURT:  It doesn't even give us a two week window.

5        MR. BREEN:  I've always thought the trial was going to

6    be shorter than that.

7        THE COURT:  I would hope the trial was going to be

8    shorter than that.  I would hope the trial was going to be

9    shorter, but I can't guarantee two weeks.  I don't think the

10   government can guarantee two weeks.  The government trial team

11   is shaking its head.

12       I don't know why I always have to take second place to

13   judges in other districts.

14       MR. BREEN:  I did my best to move it.  There is at

15   least 50 defense lawyers.

16       THE COURT:  I know you said there are 50 defense

17   lawyers.

18       OK.  Well, that's going to make life easy.  It's going

19   to make life easy.  Do we have a month, a window when

20   everybody -- I'm thinking.

21       MR. BREEN:  June 18.

22       THE COURT:  -- a two to three week case, and possibly

23   a week of deliberations, and a hurricane will happen in the

24   middle of it.  All right?  I mean that's what I'm trying to

25   account for.

1          MS. ANDERSON:  Your Honor, the government is ready to

2     go whenever, and obviously we think the sooner the better, but

3     other than that we're available.

4          MR. BREEN:  June 18, your Honor, is when you're back,

5     and that's what I would ask for.

6          THE COURT:  Mr. Levine?

7          MR. LEVINE:  If that's convenient for all the parties,

8     your Honor, that's fine with us.  Thank you, your Honor.

9          OK, that's it, show time, June 18.

10          Now, here is what that means:  I will honor the date

11     that Mr. Prange has given us, but what I would prefer is for us

12     to do the Kastigar hearing on the day that we were going to

13     pick a jury in this case, and the subsequent day, and that we

14     do the whole thing.  And hopefully our British friend and

15     possibly our British friends -- because I really think maybe I

16     need to hear from Mr. Meaney -- could accommodate us on that

17     date or week.  It just makes more sense than trying to do this

18     piecemeal.

19          If I can't get Mr. Prange any other way, then I will

20     stop the other trial, and I will do him if I have to, but that

21     would not be my preference.  My preference is at the end of

22     February -- and we could even start in the week before.  We

23     could start on the 21st of February.  We can start that early,

24     and that we do it, and that we do it from day to day until

25     concluded.

1          MS. ANDERSON:  And, your, Honor, just for scheduling

2     purposes, we would ask both that time is excluded and, if we're

3     going to have new filing, scheduling a date.

4          THE COURT:  Well, I'm going to have to redo the whole

5     schedule, but I assume that this is on consent, gentlemen.

6          MR. BREEN:  Yes, your Honor.

7          MR. LEVINE:  Of course, your Honor.

8          THE COURT:  So time is excluded until June 18.

9          Now I'll do it, I will figure out the revised schedule

10    and get it out.

11         I would appreciate it if the government could check

12    with our friends across The Pond, check with our friends across

13    The Pond and see if in the goodness of their hearts they could

14    come toward the end of February rather than in the middle of

15    January.

16         MS. SHAW:  We're happy to do so, your Honor.  And I do

17    have some understanding of Mr. Prange's schedule.  There may be

18    some conflict on those particular days, but if as your Honor

19    indicated there is leeway before or after, we will do our best

20    to get him here.

21         THE COURT:  Well, there is no leeway in the week

22    before.  But let's assume that we will be available for a

23    hearing from February 21 through March 2 -- and Mr. Breen can

24    then go to Delaware -- if we can get Mr. Prange and anybody

25    else we need to get during that period, it's just going to be

1    easier.  OK?

2             MS. SHAW:  We will do our best, your Honor.  Thank

3    you.

4             THE COURT:  Sorry for the delay.  And until the last

5    meeting that we all had, I was unaware of Mr. Breen's schedule

6    that is even worse than I thought.  OK?

7             Do I need the trial team for anything else?

8             MS. ANDERSON:  Not that we are aware of, no, nothing

9    from us.

10            MR. LEVINE:  Can I just ask with respect to the new

11   schedule that you're going to put in place.  Obviously the

12   schedule that was put in place previously was based on a very

13   compressed time window.  If we could, consistent with the --

14            THE COURT:  Will I be more civilized; is that what

15   you're asking?

16            MR. LEVINE:  I'm certainly not asking that question.

17   I would like to have a schedule that has a little more room --

18            THE COURT:  I will do what I think is a meaningful

19   adjustment to the schedule, Mr. Levine.

20            MR. LEVINE:  On the 3500 date, given the complexity of

21   the case, and to the extent there is additional 3500 and

22   Jencks, getting that earlier so we can do additional

23   investigation would be something we would be grateful for.

24   Thank you, your Honor.

25            THE COURT:  OK.  Anything else with the trial team?

1          MS. SIPPERLY:  No.  Before we excuse, we just want to

2    restate that the trial team in no way ever intended to say

3    anything that is contradictory, and we fully expect to explain

4    to the court what we said in the papers compared to what

5    e-mails have been shown.  And to the extent we want that

6    opportunity, we would want that opportunity sooner rather than

7    later to explain that.

8          THE COURT:  I rather expect that you will send me

9    something.

10         MS. SIPPERLY:  Thank you.

11         THE COURT:  OK.  Oh, and I have your other brief that

12   you filed, which I'm still expecting a response to, but...

13         MR. LEVINE:  Excuse me, your Honor.  When we were here

14   last time you instructed us that you were going to review it

15   and tell us what our response date was, and so you said you

16   wanted to look at it first.  He we did not put it in because

17   you specifically told us that's not how your wanted to proceed.

18         MS. ANDERSON:  And that's consistent with our memory

19   as well.

20         THE COURT:  I'm sorry.  I forgot that, and I can't

21   claim to have any memory.  I told you I have triage brain.

22         MR. LEVINE:  You know, certainly if the court would

23   like a response --

24         THE COURT:  Early January.

25         MR. LEVINE:  Thank you, your Honor.

1              MR. BREEN:  Thank you.

2              THE COURT:  Merry Christmas.

3              MR. LEVINE:  Your Honor, I would just like to make one

4    point.  If Ms. Sipperly wishes to put in a supplemental brief,

5    that's fine, obviously.  But I do note, your Honor, that in my

6    view the trial team here are witnesses.  If they want to make

7    additional statements here, that is supplementing the record

8    that has been closed by the government.  So, I'm not quite sure

9    why it is there is a supplemental brief that's appropriate.

10   They had their opportunity to put in their evidence.  I'm

11   trying, if you will, to deal with the taint team, and that

12   record is closed.

13             THE COURT:  I think what the trial team is proposing

14   to do is something in the manner of an apology.

15             MS. SIPPERLY:  Correct.

16             MS. ANDERSON:  And a clarification.  And I think we're

17   dealing with sort of separate issues.  We're not trying to

18   supplement any Kastigar issues.

19             THE COURT:  Mr. Levine's position -- which he made

20   very clear yesterday when you weren't here -- is that

21   everybody's credibility from the government is suspect because

22   things were told to me that turned out not to be true, and that

23   I should bring that to bear in deciding the Kastigar motion.

24   He has made that argument.  Have I heard that correctly?

25             MR. LEVINE:  Yes, your Honor.

1          THE COURT:  OK.  So, know that your credibility has

2     been called into question.

3          MS. ANDERSON:  We are acutely aware of it.  Thank you,

4     your Honor.

5          THE COURT:  All right.  Trial team, bye.

6          MR. LEVINE:  May I have two minutes to set up?

7          THE COURT:  Take the two minutes.

8          (Recess)

9          DEPUTY COURT CLERK:  Continued Kastigar hearing.  The

10     parties have previously given their appearances.

11          THE COURT:  The one thing I can promise you is that

12     when we actually do resume this for real at the end of February

13     I will be a lot more compos mentis than I was yesterday,

14     because I will have seen things; I will be familiar with

15     things; and I will be able to respond to things and to ask

16     intelligent questions.  That's always helpful, always helpful

17     if the judge has the record sometime before eight hours before

18     the hearing.

19          OK.  Mr. Levine, the floor is still yours.

20          MR. LEVINE:  I think there was one clarification that

21     the government wanted to make.

22          MS. SHAW:  Yes, your Honor.  As we had indicated in

23     one of our letters concerning the review of the SFO trial

24     transcripts, and as Ms. Connolly's declaration states, she is

25     continuing to review them page by page, notwithstanding her

1    extensive computer searches, which have revealed no mention.

2    So, that is ongoing, and we would expect -- or we would

3    anticipate filing a supplemental affidavit just to say I've

4    completed reading them page by page.

5            To that end, there may be additional poor souls

6    recruited to go assist reading page by page, so that there may

7    be additional very brief affidavits attesting as such.

8            Certainly, if your Honor was of the position that the

9    computer searches might even be more accurate than human eyes,

10   we would be happy to --

11           THE COURT:  I don't think they are more accurate than

12   human eyes, but if you had asked me whether I would have

13   thought they were sufficient, I would have thought they were

14   sufficient.

15           MS. SHAW:  I suppose I would ask if your Honor would

16   think that they would be sufficient, I could bring Ms. Connolly

17   home from the United Kingdom.

18           THE COURT:  The government does what the government

19   does.  It's entirely possible I have said too much about how

20   the government should prove its case.

21           MS. SHAW:  In any event, I wanted to --

22           THE COURT:  It's your call.

23           MS. SHAW:  Thank you, your Honor.

24           THE COURT:  OK.

25           MR. LEVINE:  Good morning, your Honor.  I hope this

1    does please the court.  I really don't have very much to say

2    today, and I would like to just make a couple housekeeping

3    points, and I do have one substantive point, and then I'd like

4    to talk about discovery, if that's acceptable to your Honor.

5         THE COURT:  Fine.

6         MR. LEVINE:  Thank you.

7         As I understand the state of play from yesterday, the

8    court has received in evidence all of the affidavits that have

9    been proffered so far by the government, and any objections go

10   to weight, not admissibility, and that's their case with

11   respect to Mr. Prange and potentially some poor person who is

12   reading transcripts in London.

13        I think the trial team has produced some of those

14   transcripts.  In any case, that's their case, that's what we

15   have, that's all that's been received into evidence.  I just

16   want that to be clear for the record so I know what their

17   presentation is.

18        THE COURT:  That's what they said.

19        MR. LEVINE:  OK, I just want it to be clear.

20        THE COURT:  I mean the one clarification that I needed

21   I got, which was that Mr. Weeks was the one and only -- agent

22   Weeks, sorry about that -- the one and only grand jury witness

23   against Mr. Black.  That's something I did not know until this

24   morning.

25        MR. LEVINE:  Speaking of the grand jury minutes, your

1   Honor, one of the issues that we have talked to the taint team

2   about, and I think come to an understanding about in part, is

3   that I think because the participants in the grand jury process

4   in addition to Mr. Weeks are all affiants or declarants, that I

5   would ask that the government -- and the government is not

6   disagreeing -- provide to the court the full minutes of the

7   grand jury presentation, not simply Mr. Weeks' testimony, as

8   there are statements that are being made by other affiants to

9   the grand jury, which I think at least we should have access to

10  frankly in this very unique circumstance.  The taint team has

11  declined on that but has said that they would provide it to

12  your Honor.

13          It seems to me something that should be done, and I

14  think it's important information, and we would ask to have an

15  opportunity to see it.  This is an indicted case.  There is, as

16  we understand it, nothing further that's going on in this grand

17  jury.  But you have statements of three of your declarants who

18  spoke directly to the grand jury, and I think I'm entitled to

19  their statements under 3500, and I also think it's relevant

20  information for the court to have even if you decide I

21  shouldn't have it.

22          MS. SHAW:  Your Honor --

23          THE COURT:  I thought I asked for the grand jury

24  minutes.  I thought I had.

25          MS. SHAW:  We had provided the testimony of agent

HCE7CONH

1    Weeks, as Mr. Levine said.  We're happy to provide the

2    colloquy.

3              THE COURT:  I would like the grand jury minutes.

4              MS. SHAW:  Very well, your Honor.

5              THE COURT:  Thank you.

6              MR. LEVINE:  And if I could --

7              THE COURT:  And, Mr. Levine, after I read them -- I'm

8    going back to pretending I'm a state court judge again.  That's

9    what I used to do for a living, I used to read grand jury

10   minutes all the time.  They were much less interesting than

11   these, I'm sure, but I did read them in every single case.  So,

12   I promise you that I will bear in mind your request, and I will

13   respond to it is after I have reviewed the grand jury minutes.

14             MR. LEVINE:  Thank you very much, your Honor.  I

15   appreciate it.

16             Additionally, your Honor, and in reviewing some

17   comments from yesterday, I wanted to see if we can also try to

18   cut down some of the testimony and lots of e-mails.  I might

19   put them in bulk.

20             But yesterday you made very clear -- this is in a

21   variety of places but especially on page 78 of the

22   transcript -- that any suggestion that this court had not

23   already concluded that there were -- and I'm quoting now from

24   page 78, line 7 to 9, you said that there is a very vast

25   difference between being a joint prosecution team and, as you

1  said, interacting on a daily, weekly and monthly basis.

2          THE COURT:  Which I don't know if it was daily, weekly

3  or monthly, but there was never any question.  I went back and

4  read my earliest decision yesterday afternoon -- that's one of

5  the things I did -- from last March.  There has never been any

6  question that there has been interaction for years on what

7  appears to be a fairly regular basis between the people who

8  were looking into this in England and the people who were

9  looking into this in the United States.  I don't think the

10  government has ever suggested otherwise.

11          MR. LEVINE:  Well, putting to the side -- I'm not

12  going to get into what they have.  And it would not be these

13  folks anyway; it would be the trial team.  But I think in

14  discussing this with the taint team, we are agreeing that not

15  only that the court has made a finding, but there is a

16  stipulation that there were contacts between -- well, there

17  were contacts between the Department of Justice and other

18  regulators in the United States on I think a daily, weekly,

19  monthly basis, and folks from the --

20          THE COURT:  We'll call it regular.

21          MR. LEVINE:  Well, your Honor --

22          THE COURT:  I strike daily, weekly, monthly, because I

23  have no evidence on which to base that.  But let's say there

24  were regular -- that was the point I was trying to make.

25          And, by the way, my findings of fact will be in an

1    opinion that will be at the end of this case, at the end of

2    this hearing, and not before.

3              MR. LEVINE:  Your Honor, I'm trying to tell you we

4    stipulated to this.

5              THE COURT:  Good, you're stipulating there was regular

6    contact.

7              MR. LEVINE:  We will stipulate to what you said, so I

8    would ask you to unstrike it and allow us to have that, because

9    otherwise I have to prove it up.

10             THE COURT:  You don't have to prove daily, weekly,

11   monthly.  The stipulation I'll bet is that there were regular

12   contacts.

13             MR. LEVINE:  No, it was actually to this line.  This

14   is the line we discussed, there were weekly, daily, contacts.

15   It's important to me.

16             THE COURT:  What do you want to stipulate to?

17             MS. SHAW:  To regular contacts, your Honor.  There was

18   not particular line of the hearing.

19             THE COURT:  Look, I'm not a witness.  I also, as you

20   know, when trying to induce people to talk to me tend to

21   hyperbole.  I do a whole variety of things to try to get people

22   to talk to me, but that is not a finding of fact.

23             MR. LEVINE:  No, I understand, your Honor.

24             THE COURT:  It's not.

25             MR. LEVINE:  I'm not trying to make it.  What I'm

1   trying to say to you is we can prove this up and put in --

2           THE COURT:  Whether it was regular or daily doesn't

3   make a whole hill of beans worth of difference to me as the

4   trier of fact.  It doesn't.  The point is made, the government

5   stipulates they were in continual contact with the regulators

6   in Great Britain.  OK, fine.

7           MR. LEVINE:  Who had access to Mr. Black's compelled

8   testimony.

9           THE COURT:  Correct, they were.  All right.  That

10  doesn't mean that they had access to Mr. Black's testimony, and

11  it doesn't mean that the regulators in Great Britain told them

12  about Mr. Black's testimony.

13          MR. LEVINE:  That's true, your Honor.

14          THE COURT:  Good, I'm glad we've gotten to that.

15          MR. LEVINE:  Well, but that having been stipulated,

16  here is my problem:  Your Honor has made it abundantly clear in

17  your opinion that with respect to Mr. Prange -- let's start

18  with him -- that every contact -- this is page 22, first full

19  paragraph, after talking about -- you said the government must

20  produce Prange for testimony under oath and identify questions

21  he asked during the King proffer.  Prange will have to identify

22  under oath the source other than Black for anything that he

23  asked King during the proffer, and either he or someone else

24  will also have to testify about his contacts with the

25  prosecution team prior to the presentation of the case to the

grand jury, so the court can rule out the possibility that he

inadvertently or not told the government something about

Mr. Black's compelled testimony which it was not already

independently aware.  As the D.C. Circuit said, this sort of

inquiry tends to be intrusive, must go line by line, which in

this particular situation means going step by step through

Prange's contacts with the government, with the prosecution

team.

Well, your Honor, I agree that that is exactly what

has to happen to the extent they want to prevent the finding

that they've failed to meet their burden on taint for

Mr. Prange.

But I also think, your Honor, that whether or not they

can show that for Mr. Prange, they have not shown that in the

evidence which we believe is closed with respect to any of the

other folks that I have presented to you that had contact with.

And the government acknowledges -- and we can argue about daily

or regularly, it doesn't matter.

The evidence in this proceeding is now closed.  Your

Honor gave another possible way the government could satisfy

you.  That was on page 24, where you said:  As the government

directly points out, any witness who testified before the grand

jury, who is expected to testify at trial, can overcome the

force of Black's hypothetical simply by testifying under oath

that she/he could not have been exposed to anything from

1    Black's testimony because she/he, one, did not review any

2    charging document in the case, two, did not attend any trial of

3    any case by the SFO or otherwise reviewed testimony to those

4    proceedings, and, three -- and most importantly for my

5    argument -- did not discuss the testimony or anything derived

6    therefrom from any person who has been identified as having

7    been exposed to it.  The Second Circuit's decision in United

8    States v. Nani, having made it clear that a witness can be

9    tainted even by talking to a person who is exposed to testimony

10   about the case.  Unfortunately, I do not accede to the

11   government's request that we avoid the time and expense in

12   that.

13           Your very unequivocal and clear words, your Honor,

14   were a rule book, an instruction guide to the taint team for

15   this Kastigar hearing.  You have been presented with no

16   affidavits that fulfill either of those standards.  In fact

17   you --

18           THE COURT:  It sounds like closing argument to me.

19           MR. LEVINE:  Well, your Honor, I'm simply pointing out

20   to you that as of right now the evidence is closed.

21   Mr. Prange, if the government wants to satisfy their burden,

22   they have to bring him.  But even before he gets here, your

23   Honor, it's my respectful submission that given that the

24   government has not even identified their trial witnesses in

25   these affidavits, given that none of the people from the

1    government have provided you any testimony at all about who

2    they spoke to -- with the exception of two affidavits that just

3    said we told the FCA not to do anything -- and given that you

4    have no information from people even that talked to King -- the

5    affidavits of five of the six people who spoke to King have

6    been submitted to you; they don't mention Mr. King's proffer.

7    So the government has closed other than Prange, and they

8    haven't satisfied what we say the standard is.  Therefore, I

9    don't see a reason right now --

10          THE COURT:  I do, because this is a hearing; this is

11   not the trial; and I just might let the government reopen.  OK?

12          So, I hear you.  I am not prepared to be

13   hypertechnical about this.  I think that the government needs

14   to take a look, because I thought through that opinion for a

15   very long time and very, very clearly.

16          And you may have been a little cavalier, but you can't

17   present your evidence after he presents his.  That's not how it

18   works.  And the fact that you want to listen to his and then

19   call your rebuttal doesn't make it rebuttal, and you need to

20   understand that.

21          I'm not intimately familiar with this record because I

22   got it the last second.  I need to read these affidavits again,

23   but they don't say very much possibly because there is not very

24   much to say.  And I don't want them to say things that are

25   extraneous.  I did say something about trial witnesses in the

1    opinion, and who they talked to, and who they didn't talk to,

2    and who they were exposed to, and ruling out that anybody that

3    they were exposed to who was tainted talks to them about things

4    that were in Mr. Black's testimony.  I mean these are the kinds

5    of things that happened in Rabobank.  They are the kinds of

6    screwy things that happened in Rabobank.

7            What else do you want to say, Mr. Levine?

8            MR. LEVINE:  Well, on this point, your Honor, we do

9    not think -- with the exception of Mr. Prange and these folks

10   in London doing reviews -- we respectfully request that you do

11   not allow the government to offer any other evidence.

12           THE COURT:  OK, I hear you.  And if you are unlucky

13   enough to find yourself some day in the Second Circuit and I

14   have allowed the government to put in other evidence, you

15   should certainly assign it as error.

16           MR. LEVINE:  Well, I hope that will not happen.

17           Your Honor, just two other points from yesterday that

18   I just want to make sure that I have been clear on, because I

19   think we may have talked past each other.  My fault, I'm sure.

20           Your Honor, you said yesterday you of course were not

21   going to hold the FCA and the SFO responsible for U.S. rules.

22   And I wanted to make clear to your Honor that not only do I not

23   disagree, but I agree with you a hundred percent about that.

24           I raise it for the simple reason.  The Allen

25   standard -- and I think in some of our discussions of UK law I

HCE7CONH

1   think we may have lost track of this, or at least perhaps my

2   feeling is we were losing track of it, is a rule that to me its

3   the constitutional equivalent of standard parental advice,

4   which is, I don't care what anybody else is doing; you should

5   do the right thing.

6          Here Allen is the constitutional version of that which

7   says we don't care what everybody else in the world does.  When

8   we bring a man to the United States and say to him he will

9   stand trial, he will follow our rules.  Whether that compelled

10  testimony was taken in Brooklyn, Manhattan or Timbuktu, it

11  doesn't matter.  And so I quite agree with you that we don't

12  care ultimately how the SFO and our friends in the United

13  Kingdom run their criminal justice system for these purposes.

14  We have to be satisfied that we have run our criminal justice

15  system in a way that's consistent with our most fundamental

16  rights, here our right against self-incrimination.

17         So, I had proffered to the court -- and I am happy to

18  provide the particular link -- about has the government

19  fulfilled its burden, it doesn't matter whether the evidence

20  was in London or it was here.  The burden on the government is

21  the same, namely Mr. Black needs to be treated as if he was

22  compelled in a federal grand jury here in this courthouse, and

23  I think it's a very important point that we can't lose sight

24  of.

25         So, you know, again we have no evidence in this

1    record, not one word about the standards, about the wall, about

2    the relationship between the taint team and the prosecution

3    team, and again, your Honor, that is a failure of proof.

4           THE COURT:  I do not think that is a failure of proof;

5    I think that is your defense.  I do not think that is a failure

6    of proof.  I do not think whether at main Justice they follow

7    the precepts of the U.S. Attorney's manual and set up taint

8    teams from different divisions that work in different buildings

9    or on different floors is ultimately the question that is

10   raised in this case.  It's just not the question that's raised

11   in this case.

12          The question raised in this case is has anybody who is

13   connected with this case -- a witness, a member of the trial

14   team, a grand jury witness -- been tainted by being exposed to

15   Mr. Black's testimony.

16          Your point, which I take, is that I should bear in

17   mind that the government may have been careless in how it

18   attempted to protect its trial team and those who interacted

19   with it from information that was tainted.  You made that

20   argument; I don't think I need to hear it again.  I know it's

21   out there.

22          MR. LEVINE:  And my narrow argument is that the

23   government has closed -- it's not a question of whether it

24   happened right or wrong.  That's not the issue.  The issue is

25   have they proven it didn't.

1          THE COURT:  That's not what --

2          MR. LEVINE:  They have to satisfy you that it didn't

3   happen, your Honor.

4          THE COURT:  Fine.  But guess what, it would be

5   rebuttal evidence, because they didn't have to prove the

6   details of the wall that they set up, or that they complied

7   with U.S. Attorney's manual or anything else.

8          If you wish to raise questions about that, then the

9   government can appropriately introduce rebuttal evidence.  And

10  if you don't like that ruling, do except to it.

11         MR. LEVINE:  Well, your Honor, can I ask if there is

12  no wall and the taint team has the transcript, and they have

13  not proven that there has been no taint with the rest of the

14  Department of Justice, and that's the record before you --

15         THE COURT:  That's not the record before me.  Members

16  of the trial team have declared on oath to this court as

17  witnesses and as officers of the court that they haven't seen

18  the transcript, that they haven't talked to anybody about the

19  transcript and that no one has talked to them about the

20  transcript.  That's the state of the record.

21         You have raised questions about whether that could

22  possibly be believed, given that you find the wall to be a

23  porous one.  I hear your argument.  It is something I will take

24  into account in assessing the credibility of the government's

25  witnesses.  But the government's burden in a Kastigar hearing

1   is not to prove that the wall that it set up met any particular

2   criteria.  The government's burden is to prove that the

3   relevant people were not exposed to the defendant's compelled

4   testimony.  That is the government's burden.

5            MR. LEVINE:  Can we take up discovery now, your Honor?

6            THE COURT:  Sure.

7            MR. LEVINE:  So we ask with respect to all of the

8   government's witnesses --

9            THE COURT:  I can't hear you.

10           MR. LEVINE:  I'm sorry, your Honor.  I don't want to

11   repeat what I said yesterday.  I thought we had an

12   understanding with the taint team.  There's a letter they sent

13   to me said we're abiding by our Jencks, Brady and Giglio

14   obligations, that they were going to produce it all.  There

15   were disagreements on two points, which is what they have to

16   give me I think from the people at the Department of Justice

17   and what they can redact.  I think they have to give me all of

18   it for all of their affiants, and I also think they have to not

19   redact things that they deem irrelevant.

20           And I understand the standard they're using for

21   irrelevance is whether or not they think it relates solely to

22   the Deutsche Bank LIBOR case as opposed to all of the other

23   LIBOR cases.  And on that point -- and I have argued this

24   before -- however, your Honor, today, if you would like, I am

25   happy to prove up to you why that distinction that has been

HCE7CONH

1    made -- and I have had to argue for so long about it -- is one

2    that I don't think that the government's prosecution team here

3    can any longer advance based on the grand jury testimony.

4            But if they want to concede it and just give us the

5    material -- and I will tell you why.  Because the question is

6    taint and the question is what their witnesses were talking

7    about.  And, as I pointed out to them, if Mr. Whoever is

8    talking to somebody on the trial team, and they're having a

9    conversation about a wide variety of issues, especially since

10   this investigation -- because we know we have our Antitrust

11   folks here -- two of these folks are from the Antitrust

12   Division -- they are looking at horizontal practices.

13           You know this argument, your Honor.  There is just no

14   way they should be redacting things because they think it

15   doesn't relate to Deutsche Bank LIBOR.  They shouldn't be doing

16   it in the main case, and they shouldn't be doing it here.  And

17   it's not what they told the grand jury about this

18   investigation.  And I'm happy to prove that up right now very

19   quickly.

20           THE COURT:  Fine, fine.

21           MR. LEVINE:  It is grand jury testimony that I'm going

22   to put up on the screen.  I mean it is Mr. Weeks, and it is

23   testimony that has been given to us in discovery and we're

24   allowed to use it.

25           THE COURT:  That's not the issue.  The issue is

HCE7CONH

1    whether there is anybody in the courtroom who should not be

2    exposed to it like members of the press?

3            Thank you, ma'am.  Who else?  I will have to ask you

4    to leave.  I'm sorry.  We will bring you right back in as soon

5    as possible.

6            Anybody else who is not on one of the defense teams?

7            (Pages 31 through 42 sealed)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Welcome back.

2          MR. LEVINE:  Your Honor, I really don't want to do

3  anymore today.  The only other thing I can address is next time

4  you have said that you're concerned about the extent of UK law

5  and what it bars and what it doesn't bar.

6          THE COURT:  No, I have no interest in UK law.  That's

7  not true.  I'm not concerned about it, and I have no interest

8  in it.  I accept that it's different than ours.

9          I have to say that the fact that it's different than

10  hours bears on whether I think regulators in statements to me

11  are careless or lying bastards.  I mean they operate under

12  different rules than we do.  And as familiar as our lawyers try

13  to make them with our rules, I have been -- I spent a

14  fascinating day last year on a panel, among other panels, with

15  a group of American judges and UK judges, talking about

16  terrorism cases, and the differences are extraordinary, and we

17  look at each other dumbfounded.  They don't understand us; we

18  don't understand them; and it works in our respective spheres

19  of influence.

20          I don't want to become an expert in UK law.  I think

21  you started this out correctly:  The issue here is whether our

22  government has managed to abide by our law, even though that

23  includes dealing with some people who are not themselves

24  subject to our law, but who as a courtesy have been asked to

25  take particular caution.

1          MR. LEVINE:  I won't trouble your Honor with any more

2    of that today.  I would like to reserve all the rest of our

3    examination of Mr. Prange.  I also think that in light of the

4    fact that we do think there is more discovery to get, we have

5    asked, given that Mr. Prange is coming here voluntarily, that

6    to the extent that he has materials, since he is coming to

7    court, that are relevant or he is going to rely on, we feel

8    those should be produced; or anybody else who they are going to

9    rely, or any witness who is bearing witness here, we think we

10   should get that.

11         On that score, there is one other issue.

12         THE COURT:  When are we going to deal with -- the

13   press is back in the room.  Are we going to deal with paragraph

14   9 at the renewed Kastigar hearing?

15         MR. LEVINE:  Your Honor, I think that obviously the

16   government will put in the rest of their case, and we may

17   certainly may address that with Mr. Prange or anybody else who

18   is here, or we may put something on about that in our case.

19         THE COURT:  OK.

20         MR. LEVINE:  The last thing is one issue -- regardless

21   of how the court resolves the current discovery issues -- it is

22   very clear that we have had yesterday references to the

23   refreshing of witnesses' recollections with documents.  Mr.

24   Curtler, for example --

25         THE COURT:  Well, he didn't say how his recollection

1    was refreshed; he just said that it was refreshed.

2          MR. LEVINE:  Absolutely right.  There are others where

3    it's clear they have been refreshed or they looked at materials

4    in preparing affidavits.

5          In fairness, for us not to have live witnesses and

6    have people have looked at materials, I think in fairness we

7    should get that material, because it goes directly to the

8    statement they've made -- that the statement was prepared with

9    documents.  That I think is basic fairness regardless of the

10   other issues.

11         MS. SHAW:  Your Honor, we can address that in our

12   brief.  We don't believe that there is a scenario that he

13   hasn't gotten materials.  We have provided voluminous materials

14   that agent Weeks relied on, and then I believe some of the

15   documents that --

16         THE COURT:  Well, I think your point was that the

17   Weeks exhibits is that these are alternative sources, that even

18   if he were tainted, he had an alternative source for everything

19   that he said to the grand jury line by line.

20         MS. SHAW:  Correct.  And I can't stand here today and

21   say that he didn't review those when he was preparing his

22   declaration, so to the extent that it refreshed his

23   recollection about where he got something --

24         THE COURT:  I look forward to receiving your brief.

25         MS. SHAW:  Thank you, your Honor.

HCE7CONH

1          THE COURT:  Now, we're not going to change the dates

2     again, right?  Right.

3          MR. BREEN:  Yes, your Honor.

4          THE COURT:  Promise?

5          MR. BREEN:  Yes.

6          MR. LEVINE:  We don't have a final date for the

7     Kastigar.  We have to hear from Mr. Prange about whether he can

8     come in February.

9          THE COURT:  Well, he is going to come in February.

10         MS. SHAW:  We will let the court know as soon as

11     possible about Mr. Prange's availability.

12         THE COURT:  Please, ASAP.  I will interrupt in January

13     if I have to but I'd rather not.

14         MS. SHAW:  Understood.

15         THE COURT:  OK.  Happy holidays to all.

16         (The following exhibits were relied on and reviewed by

17     the defense:  Defendant's Exhibits 190, 191, 192, 193, 201,

18     202, 99, 51, 54, 90, 82, 63, 38, 192, 107, 207, 208, 75, 97,

19     58, 132, and Government Exhibit 4A).

20         (Adjourned)

21

22

23

24

25