HCD7CONH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          16 Cr. 370 (CM)

 5   MATTHEW CONNOLLY
     and GAVIN CAMPBELL BLACK,
 6
                Defendants.
 7
     ------------------------------x
 8                                          New York, N.Y.
                                            December 13, 2017
 9                                          9:45 a.m.

10

11   Before:

12                     HON. COLLEEN MCMAHON
                                            District Judge
13

14                        APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     BY:  D. BRITTAIN SHAW
17        CHRISTOPHER JACKSON
          JESSEE ALEXANDER-HOEPPNER
18        Assistant United States Attorneys

19   PAUL HASTINGS LLP
          Attorneys for Defendant Matthew Connolly
20   BY:  KENNETH BREEN
          PHARA GUBERMAN
21

22   LEVINE LEE LLP
          Attorneys for Defendant Gavin Campbell Black
22   BY:  SETH LEVINE
          SCOTT KLUGMAN
23        MIRIAM ALINIKOFF
24        AARON KARP

25
```

1          (Case called)

2          (In open court)

3          MS. SHAW:  Brittain Shaw on behalf of the United

4  States.  With me at counsel table is trial attorney Christopher

5  Jackson, trial attorney Jesse Alexander-Hoeppner, and legal

6  assistants Claire Donohue and Martina Neeple.

7          THE COURT:  OK.

8          MR. LEVINE:  Good morning, your Honor.  Seth Levine,

9  Scott Klugman, Miriam Alinikoff and Aaron Karp for Mr. Black,

10  I'm very pleased, your Honor, Mr. Black has made the trip and

11  is here today; he's sitting on the end.  And also at counsel

12  table with us is Stephanie O'Connor, who is helping us, to the

13  extent we need it, with technical assistance today.

14          THE COURT:  OK, great.

15          MR. BREEN:  Good morning, your Honor.  Ken Breen and

16  Phara Guberman for Matt Connolly, who is with us here in the

17  courtroom.

18          THE COURT:  Hi, Mr. Breen.

19          MR. BREEN:  How are you.

20          THE COURT:  OK.  Since I think that we're going to end

21  up mostly talking about matters other than what we were

22  originally going to talk about -- and we have a lot of people

23  here who will be going home on an afternoon train -- will you

24  excuse me for one moment.

25          OK, so let me tell you where I am.  I would say I'm

1  woefully -- first of all, welcome to the taint team -- I'm

2  woefully unprepared because I got the exhibits to @agent Weeks'

3  affidavit like at 4:10 yesterday afternoon.  I had many other

4  things on the calendar and I have not reviewed them.

5      Now, what that means is that Mr. Levine is going to

6  get the first crack at shaping how I'm going to think about

7  them, but you should just be aware of that.

8      I have read all of the affidavits, most of which I was

9  able to print off.  If we're going to talk about grand jury

10 material, obviously we're going to have to do that in a closed

11 courtroom.  But good morning.

12     I assume that you are going to put in your affidavits,

13 your exhibits and you're going to rest.

14     MS. SHAW:  Yes, your Honor.

15     THE COURT:  That's at least what you told me in a

16 letter.

17     MS. SHAW:  Well, with respect to putting in the

18 affidavit, absolutely, your Honor.  As we indicated in our

19 letter, we were proceeding today by affidavit.  Clearly we're

20 not resting at this time because we still await Mr. Prange's

21 testimony in January.

22     THE COURT:  Correct.

23     MS. SHAW:  And certainly one can't predict -- I can

24 somewhat predict, but in any event we would still have the

25 opportunity to supplement following any cross or any case put

1    forward by the defendant.

2            THE COURT:  Well, I don't know, but perhaps you're not

3    familiar with the concept of resting.  One rests after one puts

4    forward one's case.  One's rebuttal case does not require that

5    one not rest after putting in one's case.

6            I agree you have the one witness in reserve who is

7    going to testify, and he's going to testify in January, because

8    that's when he can be here, and I am deeply grateful to our

9    British friends for freeing him up to come over in January, but

10   aside from that, as far as I'm concerned, based on what you've

11   told me, you're resting.  Whether you have a rebuttal case

12   after Mr. Levine does whatever he does, that's up to you.

13           MS. SHAW:  Yes, your Honor.  For today we're

14   proceeding by affidavits, and we would submit that the

15   affidavits, as your Honor had requested, attest that there has

16   been no exposure to any of the trial team, any former trial

17   attorneys, and no exposure to agent Weeks.  So, in addition,

18   special agent Weeks sets forth a legitimate independent basis

19   for each point in his grand jury testimony.

20           THE COURT:  Which I can't discuss in an open

21   courtroom.  I know he says it, and I just haven't gone through

22   the, I don't know, 500 pages of exhibits that didn't accompany

23   the affidavit but that arrived at 4:10 yesterday afternoon.

24           MS. SHAW:  Apologies, your Honor.

25           THE COURT:  OK, fine.  Mr. Levine, good morning.

1          MR. LEVINE:  Good morning, your Honor.  Thank you for

2    hearing us.

3          So, your Honor, obviously we're having a hearing

4    without a witness, so that's less dramatic than we had hoped,

5    but I think --

6          THE COURT:  This is not about drama, Mr. Levine.

7    Whatever else this is about, it's not about drama.

8          MR. LEVINE:  I think the issue for today is how you

9    would like me to proceed.  I understand the government has now

10    offered these affidavits.  The taint team and Mr. Black's

11    counsel, we worked hard together to work through things.  I am

12    happy to reserve all --

13          THE COURT:  What is it that -- putting Mr. Prange to

14    one side, what is it that you would do?  Are there some of

15    these folks whom you would like to cross-examine and you can

16    convince me that there is a reason to cross-examine them?

17          MR. LEVINE:  Well, your Honor, I think that there is a

18    couple of different issues in that respect.  Let me say the

19    following:  I believe that, first of all, Mr. Prange, or other

20    people from the FCA who I will talk about in a moment, are

21    central, as your opinion says, to understanding this, for the

22    simple reason that -- and this is something that frankly we are

23    going to get into with Mr. Prange and get into it today.

24          The premise of this hearing is the government has said

25    to you that there was a wall erected between the trial team at

HCD7CONH

1    least, members of the Department of Justice, other than my

2    friends that are sitting at the front table, and folks that had

3    access to Mr. Black's compelled testimony, whether that be in a

4    government organization or otherwise.

5         Your Honor, it's our contention -- and I don't think

6    there is anything to refute that -- that there has been not a

7    single piece of evidence proffered in the government's case to

8    you to establish such a wall.

9         THE COURT:  Now, Mr. Levine, how can you say that?  I

10   have 20 some odd -- 31 people who have sworn under oath,

11   declared on oath that they were behind a wall, that they were

12   in no manner, shape or form exposed to the testimony of

13   Mr. Black.

14        MR. LEVINE:  Well, I actually don't know that that's

15   what they say.  What they say mostly -- and there are some

16   differences, but they didn't read it, and they don't say

17   anything in fact, in any of these affidavits, whatsoever, not a

18   word, about who people talked to and what the interactions

19   were.

20        Now, Judge, I'm happy to do this today or can I do it

21   on the 22nd, but I will be happy to prove to your Honor that

22   the extent of the interaction between these agencies was not

23   what has previously been proffered to you as they didn't talk,

24   they issued settlements on the same day, they didn't share any

25   paperwork but they really weren't involved with each other.

HCD7CONH

1    That story -- which underlies this entire thing -- is false.

2         We now have many documents that prove that, and prove

3    that many of the representations that have been made to this

4    court about the nature of this "wall" are, to be kind,

5    inaccurate.

6         Now, I know the court has not had a chance to read

7    everything as closely, as you said.  There is not a single word

8    in these affidavits about the wall other than a reference in a

9    couple of affidavits -- Ms. Saulino, Ms. Anderson, who is on

10   the trial team -- that says there was a wall.

11        I know this court is quite aware that a wall

12   concept -- whether it's under legal rules or banking rules --

13   is under the ABO rules a screen -- which is how it's defined in

14   model rules -- is defined as something that isolates in that

15   case a lawyer from all information, and that is done commonly

16   through physical proximity, through --

17        THE COURT:  Lack of physical proximity.

18        MR. LEVINE:  -- lack of physical proximity, through

19   various other procedures and methods, to ensure that there is

20   no communication through a person that might have whether it's

21   a conflict or taint and someone else.  It's a common procedure;

22   I know the court is well aware of them.  Firms use them all the

23   time.

24        What that requires is a procedure.  It requires

25   notification.  It requires logging and notice of where

1    materials went.  It requires people being told not to

2    communicate.

3          What you have here is nothing in these affidavits

4    about lack of communication.  In fact, all you have from

5    Ms. Anderson and Ms. Saulino is that we told people at the FCA

6    to not tell us.

7          The reason you don't have anything, Judge, is because

8    there is no wall.  The only wall there is here is the

9    equivalent of the following gesture:  Don't tell me what you

10   know, as you sit next to me in meetings, on phone calls, in a

11   joint conference between the FCA, the SFO and the Department of

12   Justice, which a dozen DOJ folks went over, as we understand it

13   from the documents, and talked.  They have unbelievable numbers

14   of contacts, Judge, about everything in this case, and the only

15   thing you see is them telling Mr. Prange, well, let's structure

16   this investigation in a way that you can say you didn't tell me

17   anything.

18         Now, the government has every right to prove that

19   there is a wall, but there is no proof here of any wall

20   whatsoever.  There is a reference to it.  I have asked for

21   instructions.  I've asked for how did you physically separate

22   these people.  I don't believe that any of my friends at this

23   front table are going to stand up and tell you that Mr. Meaney,

24   Mr. Prange, Mr. Salame, Mr. King, the people that were involved

25   in the FCA and others, did not have regular contact with the

HCD7CONH

1    trial team and other members of the Department of Justice in

2    the United States, in London, that they had frequent meetings.

3         THE COURT:  And what difference would that make unless

4    there were some evidence that they shared the content of

5    Mr. Black's compelled testimony, which, by the way, I have

6    read?  That is one of the things I have read.

7         MR. LEVINE:  And I think, your Honor, that there is

8    such evidence that Mr. Prange -- and we will hear from him --

9    sat with Mr. King and debriefed him, having first -- contrary

10   to what you have been told -- I'm happy to show you the

11   documents -- exchanged documents with the government, planned

12   out how to do the King proffer, and they had constant contact

13   back and forth where they discussed every aspect of this case

14   and how to manage it, and how to manage each other's own

15   issues.

16        So, the notion that what you had here was two separate

17   teams that happened to just cross in the night and Mr. Prange

18   showed up in a room one day, these affidavits don't talk to you

19   about that at all.

20        THE COURT:  Well, one of the things that's occurred to

21   me -- and I would like it -- I will tell you what I would like

22   to do.  I would like to spend the next two hours with you, and

23   I would like -- and then possibly again tomorrow morning, if we

24   need to -- but I would like you to put in whatever documents,

25   and I would like you to explain to me what you think those

HCD7CONH

1    documents show.

2            MR. LEVINE:  Sure.

3            THE COURT:  But I accept as a given the fact that

4    there was communication between the Justice Department, the FCA

5    and the SFO in the course -- extensive communication -- in the

6    course of this investigation.

7            What has to be shown in order to demonstrate a

8    violation of Kastigar is that Mr. Black's compelled testimony

9    was the basis of some action taken by the government in

10   connection with the case against him here and there was no

11   independent source.

12           And I will tell you, having read Mr. Black's compelled

13   testimony, that I think for almost all points it will be fairly

14   easy for the government to demonstrate an independent force.

15   It's not like his story in his compelled testimony was so

16   different in any respect than the stories of other people who

17   proffered to the government, who have turned on your client and

18   intend to testify against him.

19           MR. LEVINE:  Well, your Honor, I guess I'd have to say

20   that one problem with that is that all those folks came in to

21   talk to the government after they heard my client's compelled

22   testimony.

23           THE COURT:  Not according to the list they gave me.

24   According to the list they gave me, one person came in to talk

25   after that.

HCD7CONH

1          MR. LEVINE:  Well, we think, your Honor, that

2     Mr. King's testimony and Mr. Curtler's testimony is in fact

3     tainted, and we think that, therefore, the grand jury

4     proceedings are tainted.

5          We think that Mr. -- and a lot of this frankly I

6     think, your Honor, is going to be more sensible to come in

7     through Mr. Prange, because you'll see it all.  But let me

8     raise with you another issue that came to our attention this

9     morning as I walked into the courtroom.

10          So, one of the things that we and the taint team have

11     done is we have demanded unsurprisingly discovery, and we have

12     had discovery provided to us.  One of the big issues obviously

13     we were looking for is not only Jencks Act material but Brady

14     and Giglio.

15          You have an affidavit before you, your Honor, from

16     Mr. Meaney from the FCA.  Well, there are a lot of problems

17     with Mr. Meaney's affidavit, in fact, problems that we would

18     suggest suggest it can't even be received by the court, along

19     with some of the other affidavits.  But that sort of pales in

20     comparison to the fact that I was handed a 302 -- or sent -- I

21     don't even have a copy of it, Judge.  I just have it on my

22     iPad -- which the taint team tells me was overlooked, which

23     recounts --

24          THE COURT:  Oh, there is Mr. Meaney's affidavit.

25          MR. LEVINE:  So Mr. Meaney has two things, your Honor.

HCD7CONH

1    If you recall, when the Kastigar motion was initially filed,

2    the government submitted to yo a letter from Mr. Meaney, and

3    then they also submitted to you an affidavit very recently.

4    The letter -- which I can put up on the screen, if you like --

5            THE COURT:  Sure.

6            MR. LEVINE:  -- was dated in August.

7            THE COURT:  I've got it.

8            MR. LEVINE:  So, this is the initial letter, but let

9    me just tell what you his 302 says.

10           If you look at this letter and you look at the second

11   paragraph, Judge -- and this is the letter that the government

12   told you you should not hold a Kastigar hearing because of,

13   because, after all, you have the letter and this is the FCA and

14   what's all this bother about -- well, Mr. Meaney told you in

15   the last line of the second paragraph, "We provided a copy of

16   Mr. Black's interview to the United Kingdom's Serious Fraud

17   Office on January 23, 2017."  He also told you in the beginning

18   of that paragraph, "We have not provided any compelled

19   testimony to Mr. Black other than a copy of his own transcript.

20   We have not provided Mr. Black's transcript to any other

21   Deutsche Bank's individuals apart from Mr. Black."  It seems

22   pretty categorical to me, your Honor.

23           He also told you on paragraph 4, that he hadn't even

24   provided a copy of Mr. Black's testimony to DOJ.  And he then

25   told you on the last page -- or he told Ms. Shaw -- that oh, by

HCD7CONH

1    the way, I understand this is to be submitted to a court, so I

2    know this is not some casual communication; this is serious

3    communication.  And the government relied on it.

4         Well, your Honor, if you actually look at Mr. Meaney's

5    affidavit that he put in the other day, it turns out there is a

6    lot of stuff in this letter that wasn't quite accurate.

7         For example, it is not true that the SFO was provided

8    the testimony in 2017.  In fact, based on both Mr. Meaney's new

9    affidavit and the SFO affidavit, which was also put in, they

10   provided that testimony way back in 2015, in fact before the

11   grand jury even met in this matter.

12        MS. SHAW:  Your Honor, may I just interject for a

13   moment?

14        THE COURT:  No, you may not.  You may make notes

15   because you're going to respond to this, but I want to go

16   through this argument about this document and this affidavit,

17   and then I will hear you.

18        MS. SHAW:  I understand, your Honor.  It's just this

19   document is under seal under the court's order, and I just

20   wanted to raise that since we're speaking in open court.

21        MR. LEVINE:  I apologize.

22        THE COURT:  Then we're going to have to clear the

23   courtroom.  I have to clear the courtroom.  Sorry.  We have a

24   bunch of documents that have grand jury material.  And the

25   first thing I will do is I will talk to them about whether this

HCD7CONH

1   has to remain under seal.

2         You can stay.  You have a client in this case.

3         MR. BREEN:  Yes.  But there are members of my team who

4   here as well.

5         THE COURT:  Everybody else has to go.

6         UNIDENTIFIED SPEAKER:  Your Honor, I'm an attorney

7   with Portfolio Media, Inc.

8         THE COURT:  Sir, you are here as a representative of

9   the press; you are not a party to the case.  I'm going to have

10  to ask you to leave while I conduct an inquiry.  Do you mind?

11        UNIDENTIFIED SPEAKER:  I will of course abide by any

12  and all of your Honor's directives.  I just wanted to state my

13  client's position that I understand the court has issued

14  sealing orders, that this is in connection with the sealing

15  orders the court has already issued.  As I understand, what is

16  about to happen is discussion about documents that are

17  currently filed under seal.  We ask that the courtroom be

18  promptly reopened as soon as all matters concerning --

19        THE COURT:  Oh, trust me, it will be.

20        UNIDENTIFIED SPEAKER:  And the last thing I will say

21  is we reserve all of our rights with regard to --

22        THE COURT:  And you reserve all of your rights.

23        UNIDENTIFIED SPEAKER:  Thank you so much.

24        THE COURT:  Now, Mr. Breen, the members of your team,

25  the member of Mr. Levine's team, are perfectly welcome to stay;

HCD7CONH

1      everybody else goes.

2              MR. BREEN:  Thank you, your Honor.

3              (Pages 16 through 20 are sealed)

 1          (In open court)

 2          THE COURT:  Welcome back.

 3          MR. LEVINE:  So, your Honor, I was directing your

 4   attention to this letter, which we can put back up.  This

 5   letter, I just want to orient the court, this letter came into

 6   as part of the initial Kastigar briefing, and I think there is

 7   no objection to this letter.

 8          MS. SHAW:  No.

 9          MR. LEVINE:  Thank you very much.  I want to be

10   careful and respectful here.

11          So, your Honor, you have this letter.  I would take it

12   that the FCA submitting a letter to this court would have been

13   quite careful in making sure that they were being scrupulously

14   accurate about what they told you.  It turns out that that

15   absolutely was not the case.

16          Mr. Meaney's affidavit makes perfectly plain -- as

17   does the affidavit from the SFO, which was put in also, which

18   is Government Exhibit 33 -- that in fact disclosure was made in

19   2015.  That is, as I said, important because the grand jury

20   here, of course, met in '16.  Therefore, the letter from the

21   FCA initially that the court had to deal with suggested at

22   least the possibility of taint of the grand jury might be more

23   remote because the disclosure occurred after the grand jury had

24   already met.  So, that's the first problem with the affidavit.

25          The affidavit also then goes on -- Mr. Meaney's

1   affidavit -- to talk about giving this testimony apparently to

2   a taint team at the SFO.  I have tried to check around a little

3   bit since we have the affidavit, and I'm not familiar with the

4   SFO having taint teams.  I could be wrong.

5          THE COURT:  Possibly they had to invent them for this

6   very matter.

7          MR. LEVINE:  They could, your Honor.  I noticed in the

8   affidavit 33 of Lois van der Skratten that she makes no mention

9   of a taint team whatsoever, and it's also curious that that is

10   a particularly American phrase, taint team.  So, I don't know

11   where that comes from or why the SFO would not have mentioned

12   that to your Honor.

13          THE COURT:  The government may be in some position to

14   enlighten us or Mr. Prange might be in some position to

15   enlighten us.

16          MR. LEVINE:  That's true, your Honor.

17          So, those problems, and the fact that --

18          THE COURT:  I note the inconsistency.

19          MR. LEVINE:  And also, your Honor, the fact that

20   Mr. Meaney when he prepared this letter to you didn't bother to

21   tell you that, hey, of course I provided this testimony to the

22   taint team.  While one might think is an oversight, given the

23   delicate diplomatic negotiations that have occurred to allow

24   this document to even be proffered to the court, and the fact

25   that it was being proffered in unsworn form, would have

suggested to me that the authors would have been careful,

because, after all, we're dealing with serious business here

about the rights of one of their own citizens.

        But that's not the only concern that I have about what

I think will be a theme of mine throughout this hearing, which

is not only is it not careful, it is not really consistent with

a full story of what has happened.

        But to finish off the "it's not careful" part, your

Honor, the affidavit of Mr. Meaney, the affidavit of Ms. von

der Skratten, the affidavit of Mr. Curtler the cooperator and

Mr. King are actually invalid under U.S. law.

        You ordered these folks to put in a sworn statement.

They are permitted under 1746 to put in a sworn statement,

substitute of a declaration, but the statute requires that they

attest that they are committing to the penalty of perjury under

the laws of the United States if they are signing the

declaration from without the United States.

        You will note on Mr. Meaney's declaration he uses no

such language.  Now, if this was an affidavit attaching some

documents by a lawyer, or a declaration attaching some

documents by a lawyer, or if this was not essentially being

proffered to you as a testimonial substitute, perhaps these

kinds of points could be simply ignored.

        THE COURT:  OK.  So, your problem is that Mr. Meaney

says only I declare under penalty of perjury that the foregoing

HCD7CONH

1    is true and correct.  That's offensive to you; that doesn't cut

2    it.

3            MR. LEVINE:  It doesn't.  The statute, your Honor,

4    says if a declaration is executed without the United States, I

5    declare, certify or verify under penalty of perjury and the

6    laws of the United States of America that the following is true

7    and correct.

8            THE COURT:  OK.  So, it's the omission of "under the

9    laws of the United States of America," so we should indict them

10   for 1001.

11           MR. LEVINE:  No, your Honor.  I'm not looking to

12   penalize Mr. Meaney at this point at least.  I am looking,

13   however, to point out to the court that we've got four

14   testimonial affidavits submitted from London that were

15   apparently the subject of great back and forth between our

16   nation and another, and after the declarations from cooperators

17   whose credibility is certainly at issue, and for whatever

18   reason Mr. Meaney's declaration, the SFO's declaration, doesn't

19   even conform with the law.

20           Now, I understand, your Honor, that those in other

21   contexts might not be the biggest points -- and they're not the

22   biggest points here -- but my point to you, Judge, is that this

23   business requires precision; it requires saying how do we cabin

24   and isolate information; and they're asking you to take the

25   word of a lot of folks that we don't know and you don't know

1  because they have letterhead from agencies and they carry

2  badges and they carry credentials.

3          Well, fair enough, they're entitled to do that, but

4  I'm not entitled and my client is not required to take the word

5  of folks when between the Department of Justice, the FCA and

6  the SFO, they can't file a proper declaration.  And if that

7  were the only issue, then I wouldn't be saying anything about

8  this, because it would be a technical issue.

9          But what is the explanation for why Mr. Meaney told

10  you in his letter that the transcripts weren't provided until

11  2017?

12          And I will ask you another question, your Honor, which

13  I think is more pertinent:  When did the United States

14  Department of Justice learn that Mr. Meaney's letter was

15  inaccurate in a material way?  And why didn't they tell you?

16  Why didn't they come to this court and say, you know what, Mr.

17  Meaney, he just made a mistake, he made a mistake, he should

18  have said 2015, we regret it, no big deal.  That's fine, people

19  make mistakes all the time.

20          But here I'm standing here today in a Kastigar

21  hearing -- which I had to win over the objections, the very

22  forceful objections of my friends in the front row -- and they

23  didn't tell you that their main person from the FCA got it

24  wrong.

25          That raises to me at least the question -- I'm not

HCD7CONH

1    attributing any intentionality.  I'm just saying that doesn't

2    give me great comfort that what has happened here is entirely

3    clear.

4          Now, this morning as I walked into court -- and I

5    appreciate that I got it at least while I was walking in, and

6    there isn't even a paper copy -- and because the court was so

7    gracious to allow us to have electronic devices, I have been

8    able to pull it up on my iPad -- a 302 report of Mr. Meaney who

9    apparently has been interviewed three times starting on

10   November 29, on December 1 and December 8 of this year.  I have

11   received no such report of an interview with him prior to his

12   submitting that letter, which surprises me a little bit,

13   because I would have thought that the United States would have

14   done something to verify the contents of a letter being

15   submitted to your Honor.  I have no information on that.

16         We have also asked for the notes of these meetings,

17   although Mr. Jackson has told me that they will consider it,

18   but that they're not in a position to provide those yet.  I

19   think the agent is sitting in the courtroom, and perhaps he has

20   them.

21         In this remarkable document, your Honor, it says that

22   during one of these meetings Meaney initially advised the FCA

23   provided the transcripts of Gavin Black's compelled testimony

24   to a lawyer at Slaughter and May -- I will leave her name out;

25   there is no reason for that -- who is Deutsche Bank's UK

27

counsel.  Meaney believed that the FCA began turning documents

over to the defense sometime late in 2014, but he was advised

he would attempt to find out the exact date the Black

transcript was given to this lawyer.

Well, your Honor, that was at the earliest November

29, 2017.  Months earlier, Mr. Meaney had told you this didn't

happen at all -- at all -- and he told you that it didn't

happen in 2017.

THE COURT:  Well, it tells me in this newest affidavit

he doesn't indicate that it happened.

MR. LEVINE:  Let me finish, because we have a turn in

the plot here.  There is then in the 302 -- and I just read it

quickly this morning -- additional interviews and additional

inquiries made.  Another member of the FCA is tasked to

actually go figure out who has this and when did we give it to

people.  And it turns out that they say in the end we didn't

give it to Slaughter and May; sorry I was wrong.  And they

reviewed some set of records.  In fact, they had to call

Slaughter and ask them.  They then also had to ask the Serious

Frauds Office when they got the transcript, because apparently

it wasn't clear to the FCA when they had given it.  And this

was all very confusing, this compelled testimony that only has

my client's constitutional rights in the balance.  Nobody seems

to know where it was.  And I can't tell you the end of the

document.

HCD7CONH

1        THE COURT:  And I must say I appreciate your most

2   recent statements but, remember, despite all the warnings that

3   come from the western side of the Pond to the eastern side of

4   the Pond, he has no such rights in England.

5        MR. LEVINE:  Well, your Honor, actually he does in the

6   following sense:  Compelled testimony in the United Kingdom by

7   the FCA is not admissible against Mr. Black in a criminal

8   proceeding in the United Kingdom.

9        So, their rules are a little different, but one of the

10  reasons that the FCA is able to compel, as has been explained

11  to us, is that it cannot be used against him in a criminal

12  proceeding.  So, while they do not have our Fifth Amendment the

13  way that we have it, it is compelled in the United Kingdom, and

14  it is compelled in a way that does actually grant Mr. Black

15  very substantive rights to not have criminal prosecution

16  brought against him based on this.  So, I do think, your Honor,

17  that that is an important point.

18        THE COURT:  OK.

19        MR. LEVINE:  My only point is we then encounter

20  another problem, which I'm going to come back to, which is

21  there are vast number of documents that were produced to me

22  that involve communications with the FCA, the SFO, with Paul

23  Weiss, that have enormous redactions, so I can't even figure

24  out what the communications are, because they will have a very

25  tantalizing title and then they're all redacted out.

1          I don't know what the end of the story here is with

2     Mr. Meaney.  I also know that when they submitted an affidavit

3     to you, your Honor -- turning to Mr. Meaney's affidavit -- just

4     a few days ago, they made no mention of the fact that Mr.

5     Meaney had made a statement to them after he submitted a letter

6     to you that basically says, oh, by the way, what I said before

7     wasn't true either about the date or about who got the stuff,

8     who got the transcript, so forgive me.

9          THE COURT:  Possibly they knew that you would tell me.

10          MR. LEVINE:  Well, except, your Honor, they put in

11     this declaration -- and I got this 302 this morning, and I

12     actually don't attribute ill motive to the taint team.  They

13     have told me it's an oversight; I accept their

14     representation -- but what I'm saying to you, Judge, is we

15     haven't even started yet with what happened here with this

16     information and how information was passed.  We've got the lead

17     person from the FCA, OK, sending you a letter that's inaccurate

18     in multiple ways, making a representation on the crucial issue

19     of who got this document.  It can't be casual.  He is being

20     called by two trial attorneys from the Department of Justice on

21     a matter that he has already made, as the government has told

22     you, an extraordinary submission, and it's just wrong.  I mean

23     wrong in the sense of inaccurate.

24          So the question I have for you -- and now I have an

25     affidavit which for some curious reason is not ascribed in the

HCD7CONH

1    appropriate way.  Now, I don't know if that is just simply an

2    oversight that nobody bothers to read the rules.  That could

3    be.

4              THE COURT:  I'm going to guess that's what it is.

5              MR. LEVINE:  It doesn't matter to me.  What matters to

6    me is this:  I've got somebody that says I can't even figure

7    out who we gave this thing to.  And I will show you the

8    Department of Justice own guidelines in the U.S. Attorney's

9    manual -- which is read by less people than perhaps it should

10   be -- talks about the need to isolate materials, and one of

11   their rules is you need to have the testimony of a compelled

12   person in a secure place.  What these affidavits say to me is

13   whatever happened here was ad hoc, not secured, and people

14   don't know what they're talking about.

15             Now, your Honor, I would certainly understand if

16   Mr. Meaney was called out of the blue by these folks, but he

17   wasn't.

18             THE COURT:  Mr. Levine, you aren't suggesting that the

19   FCA or the SFO in Great Britain are bound by rules of the

20   United States Department of Justice for how the United States

21   Department of Justice handles --

22             I'm sure that -- well, I'm not sure.  I'm not sure of

23   anything.  I would hope that the taint team which has a copy of

24   Mr. Black's testimony has it in a secure facility and that it

25   is not being stored in the same office as the office where the

HCD7CONH

1    trial team is working.  In that event, they would be complying

2    with the United States Attorney's manual.

3              So, I mean you have a wonderful fascinating habit of

4    introducing red herrings into this.

5              MR. LEVINE:  Well, your Honor, I think, first of all,

6    my understanding is that the taint team and the trial team are

7    not only in the fraud section, in the same building and

8    actually are not separated.

9              And one of the points I'm going to make to you is I

10   don't even understand today that this taint team -- the taint

11   team that I'm familiar with from my days in the office was you

12   generally had somebody in a different section who had a

13   different chain of command who didn't talk to you.

14             These guys are in the Bond building, working on cases

15   right now with the trial team, some of them involving Deutsche

16   Bank and the FCA.  There is no separation here at all.  That's

17   why I said there is no wall.

18             There is no wall either between the FCA and the

19   Justice Department, and there is no wall that I can see --

20   because they won't give me any information about it -- with

21   even this taint team.  These guys are colleagues.

22             I'm not accusing them of anything at all.  I'm just

23   saying the fraud section is doing the investigation of the

24   case, and therefore we're going to use the forfeiture section

25   to do the taint team, which I know in another situation I have

HCD7CONH

1    in the Eastern District that's how they're doing it.  We don't

2    have that here, Judge.

3            The reason I raise this -- and I respectfully don't

4    think it's a red herring -- is because what evidence is before

5    you about the operation of either this taint team or the

6    operation of the wall?

7            I will tell you -- and every brief that's been filed

8    in this matter from the taint team and from the prosecution

9    team is signed under the same supervisor.  She is one of the

10   affiants here.  Now, she is head of the fraud section, but

11   there is no separation that I can see.  If there is one, fine.

12   What is it?  Because I will tell you in the documents they

13   produced to us one of the members of this prosecution team is

14   currently investigating Deutsche Bank on another matter and

15   interacting with the FCA with two of the members of the trial

16   team.

17           Now I'm not suggesting for a second that there might

18   not be something in place, but when you look at what a screen

19   means -- certainly for a law firm who is familiar if you don't

20   screen people properly, you lose your client and get

21   disqualified -- this doesn't look like that.

22           So what I say as my first point, Judge -- and

23   following up on the Meaney affidavit -- is that you do not see

24   things this court should take confidence in because you're

25   following the procedures, the best practices that are

HCD7CONH

1    necessary, to support the finding of a robust and thorough

2    screen.  And if you can't be confident of that, then I would

3    respectfully suggest that the heavy burden here can't be met.

4         You say in your opinion, I believe on page 22, that

5    one of the reasons Mr. Prange needs to come here is he needs to

6    account for his contacts with the Department of Justice between

7    the time of the compelled testimony and the time of the grand

8    jury indictment, and for trial, first time for all time up

9    until and after the trial.

10        They can't do that -- and they haven't done it in any

11   of their affidavits -- because what they're going to tell you

12   is these people are talking all the time, and they're

13   interacting all the time, including discussing how they

14   structure interviews with people so Mr. Prange doesn't ask

15   questions that might get the compelled testimony out, even

16   though the government is going to be not there but hearing

17   about it later.

18        There is no wall at all.  And on that basis, on that

19   structural basis, I believe the court should find alone that

20   there is not any Kastigar protection.

21        So, when you say to me, you know, Mr. Levine, it's

22   just a silly declaration the guy said under oath, said under

23   penalty of perjury, you're right, Judge.  Is it going to be an

24   abuse of discretion if you let it in?  No, it's not.  But it

25   should very, very seriously make you think, I respectfully

submit, that what has happened here is that the guy in the FCA

can't even tell you when he gave the testimony, and he has said

on a call with an F.B.I. agent in the last two weeks, hey, we

gave this stuff to Slaughter and May, and then for some unknown

reason he has now changed his story again.

I've asked him for all the documents that refreshed

witnesses' recollection in this matter.  They told me I can't

have them because I can't have them.  OK, well, then under 612

I move that this affidavit shouldn't come in, because this guy

has clearly gone one way and then the other, he has told you

five different things that aren't true; they won't tell me what

refreshed his recollection; I don't think that this affidavit

has any competence because it's invalid; strike it.

So, I think that's the first point we would make, that

there is no evidence of a wall and there is no evidence that

this affidavit is not right.

Now, we will not get into right now Mr. Meaney's

statements about the relationship between Mr. Black's testimony

and the FCA notice.  I will say this though -- and I will show

this to you --

THE COURT:  Well, is it time for us to discuss that?

Because that material needs to remain under seal, we would

clear the courtroom and the press.

MR. LEVINE:  I would really like to -- I think --

THE COURT:  You want to wait.

1              MR. LEVINE:  Here is the problem I have, your Honor.

2     You offered me a hearing with Mr. Prange.  I don't think I

3     should have to try my case before I see somebody live.  Because

4     I am very concerned -- with all respect, and I'll show you

5     why -- that there has been a lot of representations made to

6     this court on a lot of topics that are just flat not true, and

7     I think it's going to change your view of how you look at all

8     of these affidavits.  This is the first one.

9              THE COURT:  I hear you.  And your argument is an

10     argument that I think goes to the weight.  I'm not going to

11     strike the affidavit.  You knew I was not going to strike the

12     affidavit.  But it goes to the weight, unquestionably goes to

13     the weight.

14              But I remind you that the Second Circuit in Allen

15     found a Kastigar violation because the key witness in front of

16     the grand jury testified that the only source of information

17     that he had about certain matters as to which he testified

18     before the grand jury apparently was the compelled testimony of

19     the two defendants.  It didn't rule that a wall was missing

20     bricks, or the failure to adhere strictly to the Federal Rules

21     of Evidence or to the U.S. Attorney's manual or anything like

22     that rose to the level of a Kastigar violation.

23              And I think you can take it on faith that whatever I'm

24     going to do, I'm not going to extend what the Second Circuit

25     held in Allen.  I'm bound by what the Second Circuit held in

1    Allen, but I'm not going to broaden that in any way.

2              So, I accept your argument insofar as it goes to the

3    weight.  I'm annoyed -- we will use that word -- by the fact

4    that there is an obvious inconsistency between information that

5    I was given by this individual Mr. Meaney last August and

6    information that I am being given by this individual Mr. Meaney

7    when he is now under oath in December, but it's an argument

8    that goes to the weight.  In the end what the government has to

9    establish is that nobody was in fact exposed --

10             MR. LEVINE:  Your Honor --

11             THE COURT:  -- even if the wall was just a hedge.

12             MR. LEVINE:  I don't think it was even that; I don't

13   think it exists at all.

14             But, look, your Honor, I hear what you're saying.  I

15   think everything I'm going to argue in this hearing fits very

16   comfortably within Allen which, of course, as your opinion

17   points out, there is direct taint, which is easier.  But here

18   we are talking about indirect taint.

19             THE COURT:  Yes, it's much easier.

20             MR. LEVINE:  And here, your Honor -- look, frankly, I

21   think if Mr. Meaney's affidavit is going to be taken, he should

22   have to come here and bear witness.  I think that the man has

23   told so many stories, I can't even keep track of them, and if

24   Mr. Meaney doesn't want to bear witness, I don't think the

25   court should take anything he has to say very seriously,

1    because he obviously doesn't care very much about what he says

2    to this court.

3          And I must say I am surprised -- unhappily surprised,

4    frankly -- to see that we have such a lack of -- at best a

5    total lack of care in preparing these things.  Whether I'm

6    right or wrong about taint doesn't matter.  We should not be

7    guessing about any of this.

8          I understand what the court's ruling is.  I don't

9    think that there is anything I'm asking for -- because here is

10   the problem.  Meaney, Prange, King, the whole bunch of them,

11   are in constant communication with DOJ.  And, your Honor -- and

12   I will get to this in a second -- they have made

13   representations to you about what those communications were.

14   And those representations are:  We didn't strategize, we did

15   not share settlement paperwork, we stayed away from compelled

16   kinds of information.  So, if those statements aren't true,

17   then the entire premise here begins to fall away.  And I think

18   that's in fact what is going to happen.

19         I'm going to address those things, but first I want to

20   address the cooperators, because they also have the same

21   problems with their affidavits.  And what is more troubling --

22   especially about Mr. Curtler's affidavit -- is that

23   Mr. Curtler's affidavit -- which is one of these sort of plain

24   vanilla nothing happened, I don't know anything -- he also

25   submitted a supplemental affidavit.  Have you seen that, Judge?

1    They submitted a supplemental declaration for Mr. Curtler last

2    night.  Have you seen that?

3              THE COURT:  No, I have not seen it.

4              MR. LEVINE:  Oh.  Well, I'm happy to hand one up to

5    you, if you'd like, your Honor.  May I approach?

6              THE COURT:  Yes.

7              MR. LEVINE:  This is Government's 4A.  We received it

8    yesterday evening quite late.

9              So, Mr. Curtler told you that, again, I haven't seen

10   anything, except I did review, I got the Hayes transcript, but

11   that's it, trust me on that.

12             His affidavit is also improperly ascribed.  But

13   apparently somehow miraculously last night Mr. Curtler got

14   refreshed; he actually had a copy of the trial transcript in

15   what is called a brokers trial in London.

16             This is paragraph 4.  We can put it up on the screen,

17   4A.  A lot of people are having some last-minute recollections

18   here.  And this affidavit -- also improperly ascribed -- tells

19   us that I have since had my recollection refreshed -- this is

20   paragraph 3 --

21             THE COURT:  Right, which means somebody told me.

22             MR. LEVINE:  -- with additional materials regarding

23   transcripts of one further trial.

24             Now, that sounds to me like somebody told me

25   something.  It's not that I found the transcript sitting in my

1  attic and I said, oh, gees, I can't believe I forgot this.

2  It's somebody came to me, said something to me, and I decided

3  to put in another affidavit to this court.

4        Now, I don't know what happened.  I have asked, as I

5  said, for any information that would reflect anybody, and I

6  have been told I am not entitled to that, for a witness that

7  I'm not able to cross-examine.

8        But, you know, Judge, that's just the beginning with

9  Mr. Curtler.  Because, let me tell you something, when Mr.

10  Curtler came into the Department of Justice -- after my client

11  testified -- the first thing he was told in his first interview

12  was something that I still frankly don't quite understand,

13  given our wall.  He was told by one of the members of the trial

14  team that he shouldn't tell the trial team anything he's

15  learned from the FCA, or thought that he got through open

16  source reporting.  And this going to be DX 51.  This, by the

17  way is also -- this is a 302.  It is also attached to

18  Mr. Weeks' testimony, but it's a 302 that has been disclosed.

19  I don't think there is any problem with it.  But if you can

20  bring up DX1, and if you would please highlight the last part

21  of the first paragraph.

22        THE COURT:  Yes.

23        MR. LEVINE:  OK.  So this is now October of 2015.  The

24  DOJ, the FCA, all settled with Deutsche Bank.  My client

25  doesn't get indicted until '16.  The Rabo issues are already

HCD7CONH

1   out there.  And the instructions for Mr. Powers are, hey,

2   buddy, just don't tell me; don't tell me what you know.

3          Now, if you're concerned -- because we already believe

4   that there is material that has tainted him out there, and that

5   they're litigating Rabo; they know there is a problem -- that's

6   not what a prosecutor says usually.  They say, gees, we better

7   have a taint team interview this guy to make sure that we don't

8   taint our case.  Because, you know what, we've already got a

9   problem with this issue.

10         According to affidavits submitted in the Rabo case but

11   not this case, starting no later than 2011 or 2012, the FCA was

12   given instructions by the Department of Justice on Kastigar --

13   so, years into the problem -- you're telling the guy, hey, just

14   don't tell me because, after all, it's magic; if you don't tell

15   me, then somehow it didn't happen.

16         How does one do that?  How does one divide one's mind

17   between what you know from the FCA and what you know from other

18   sources?  It's a little bit like, Judge, charging somebody for

19   being a derivatives trader who is told to trade derivatives and

20   at the same time having that same person be a submitter for

21   LIBOR where they're saying that if you come to work every day

22   and trade your derivatives and submit LIBOR you're a criminal.

23   Oh, that's what happened here, that's what they charged Mr.

24   Curtler with.  So, they want him to live up to a standard that

25   they say Mr. Curtler's failing to live up to is criminal.  But

HCD7CONH

 1    that's a case for another day.  That's their literal position

 2    here.

 3              So, why did he tell him don't tell us?  It gets worse.

 4    Because on their third proffer, which is DX54, second

 5    paragraph, they say, you know what, prior to the first meeting

 6    had with DOJ, and also prior to first communicating with his

 7    own attorneys, Curtler read press coverage related to the

 8    Deutsche Bank resolution with the United Kingdom's Financial

 9    Conduct Authority.  He also read the settlement statement with

10    Deutsche Bank.  He never read any witness statements associated

11    with the FCA's investigation.  Nothing he read ever caused him

12    to cooperate with the DOJ.  Not the FCA notice.  Not all of

13    these trials.  He just decided to do this out of the goodness

14    of his heart.

15              What did they do then?  Did they ask Mr. Curtler:

16    What else did you read?  We say the FCA notice is totally

17    tainted, so it doesn't matter.  What did you read?  Let's get a

18    taint team in here?  Let's talk to this guy and find out what

19    he knows and how he knows it?  Did they do a line-by-line

20    review to figure out what his information was?

21              They did nothing.  In fact, they did so much nothing

22    that they don't even tell you about that in Curtler's

23    affidavit.  You have a government cooperator, signed-up

24    agreement which we just got, pled guilty.  They submit an

25    affidavit to this court not telling you about this.  It's in my

1    brief.  They don't tell you about this?  They don't tell you

2    about being direct taint?  Who did he talk to in London after

3    he got these transcripts?  What information was he being

4    provided?  Who is the little birdie refreshing his

5    recollection?

6              This isn't a joke; this is serious business.  And the

7    government just submitted to you another affidavit.  They

8    didn't tell but this, your Honor, or have Mr. Curtler say, you

9    know, here is what I've done since 2013 to assure you that in

10   all of my communications they're pure.  Maybe he can say that;

11   maybe he can't.  But he hasn't.  And that's why I say again, is

12   this just lack of attention to detail?  Or as you said on page

13   24 of your opinion you've told people what they have to do:

14   Did not review any charging document.  Did not attend any

15   trial.  3, did not discuss the testimony or anything derived

16   from any person who has been identified as being exposed to it

17   OK.  Well, the FCA, this document -- and we're going to show

18   you why I know this document is compelled testimony -- is

19   exposed.  They know that.  They know it at the time.

20             THE COURT:  This document being?

21             MR. LEVINE:  The FCA notice, your Honor, the

22   settlement.

23             THE COURT:  Thank you.

24             MR. LEVINE:  And we will mark that in a second.

25             So, your Honor, again now we have a cooperator.  And,

1    look, Kastigar doesn't have a lot of law, but I do think,

2    Judge, we have a lot of experience with how we use cooperating

3    witnesses to establish facts.  We do it in affidavits, search

4    warrant affidavits, the government does it all the time.

5            And it is, of course the law in other contexts -- not

6    this context -- that if you were going to use a person that has

7    an agreement with the government, a person that has reason to

8    curry favor, that you disclose that fact in a candid way in the

9    affidavit, whether they be a cooperating witness or simply a

10   source, bolster their credibility, and allow the court to at

11   least have the benefit of knowing what is going on.

12           I don't believe in any of the exhibits that you're

13   going to look at, Judge, for Mr. Weeks or anyone else that the

14   government has informed this court -- who did not take Mr.

15   Curtler's plea -- what his deal is.

16           Now, you might decide to credit his affidavit

17   nonetheless -- and of course I'm not going to tell the court

18   what to do other than to suggest what I think might be the

19   might interpretation of the facts -- but I can sure say it

20   troubles my client and it troubles me that Mr. Curtler -- who

21   has enormous credibility problems in this case -- as they tell

22   you, Mr. Curtler had a different story before he talked to the

23   government, a different story before my client gave compelled

24   testimony.  And now that he has suddenly changed his tune, but

25   not very much, the government in my view has simply, you know,

HCD7CONH

1    put the arm on him to say, yeah, everything we did was wrong,

2    even though his evidence will show that he knew what he was

3    doing wasn't wrong, because it was completely endorsed by

4    everybody, that his actions were proper.

5          So, they're asking you to take his word for it --

6    yeah, Judge, I didn't see anything, I only saw the Hayes trial.

7    Oh, wait a second, I guess this supplemental affidavit also

8    just came to be last night, I should be grateful, instead of

9    Mr. Meaney who we got this morning.

10         I mean what is going on here?  Even if the government

11   contends to you, you know, we're still right about this, it

12   doesn't give the court and should not give the court any

13   confidence that we know what's going on here, because we don't.

14         What did this man look at?  What indirect taint?  You

15   told them what to say.  You literally wrote them an order and

16   said if you say the following three things, and you do it

17   reasonably credibly, you've got a good case to get rid of this

18   problem.  They didn't do it.  Where is that in Mr. Curtler's

19   affidavit?

20         So again -- and I happen to think that for a

21   cooperating witness who has massive credibility issues I think

22   caused by the government, but massive credibility issues

23   nonetheless -- I think having a proper affidavit that is

24   ascribed under the laws of this country would be a good thing.

25         Now, the government has said to you in a letter last

HCD7CONH

1      night that we should seal the courtroom because none of the

2      trial witnesses here are infected.  How do I know that?  I

3      don't have affidavits from the trial witnesses.  I don't even

4      know who they are some of them.

5             So, what are they talking about?  What we have with

6      Mr. Curtler is a situation that this court cannot find as a

7      matter of fact or law what influences have been put on him.

8             THE COURT:  Mr. Curtler is not going to testify at

9      trial?  I mean I thought he was one of the principal

10     cooperators.

11            MR. LEVINE:  He is.  He is absolutely testifying at

12     trial.

13            THE COURT:  OK.  He will have to be cross-examined in

14     connection with this hearing.  I mean he is a witness in this

15     case.

16            MR. LEVINE:  I understand.

17            THE COURT:  He is not some official from the

18     government of Great Britain.

19            MR. LEVINE:  I agree, your Honor.  My only point to

20     you is when we start going through these affidavits -- now with

21     Mr. King, we have a similar problem, and that's -- I think

22     that's government 8, your Honor.  We can put that up, if we

23     could.

24            Yeah, so, you know, Mr. King doesn't tell us anything.

25     He just said says, yeah, I didn't see it, I haven't looked at

1    any trials.  He doesn't talk about who he has talked about.  It

2    doesn't say who he has discussed it with, it doesn't say what

3    procedures have been applied.  He just says, yeah, I don't know

4    anything about that.  He doesn't even tell you, he doesn't even

5    disclose to you what happened with Mr. Prange when he was

6    debriefed by him.

7        Now, maybe he doesn't remember and it's hard for a

8    witness potentially to say how he was influenced.  The

9    government is skilled in doing that on their own.  But I don't

10   know, I don't see his affidavit tells you there is no taint.

11   It doesn't comply with your order on its face.

12       And I will say, your Honor, one of the reasons I was

13   so concerned, and I wrote you a letter about the government

14   resting, is because I absolutely object to them being able to

15   supplement these affidavits now, because I'm here, we're ready.

16   I wanted to go with Prange today.  I think it's very, very

17   prejudicial for us to have to do this in January when the trial

18   is in February, and it's not right after all this time that

19   they now come and say, hey, we want to fix these affidavits.

20   It's just not right.  I have asked you for an order on that,

21   but I wanted to point it out again now.

22       Also Mr. King doesn't tell you about the deal he has.

23   We just got it.  It's a nonpros.  He wasn't charged.  OK, fair

24   enough.  Where is that in this affidavit to give this court

25   some comfort that you understand the basis for the statements

HCD7CONH

1     he is making and what his possible motives are?  It's not in

2     here either.

3                Again, they're not telling you the whole story.  And

4     regardless of what the story is -- and I think that story is a

5     bad one -- candor, directness, is required in a Kastigar

6     hearing.

7                You know, I thought a lot over the last months about

8     why it is the courts always describe Kastigar as a heavy

9     burden.  It's a preponderance, that's the burden, which we

10    don't usually think of, at least us criminal lawyers.  And I

11    think the reason it's heavy is not because of the quantum of

12    evidence but because it is one of those instances where the

13    very weight of our system is on the government to justify that

14    something didn't happen that we believe very firmly in our

15    bones as Americans cannot happen, which is the breach of the

16    promise to be free from self-incrimination is truly an

17    important promise that we have.  And I think the reason courts

18    call it a heavy burden is because if in fact there is even a

19    chance that indirectly somebody's Fifth Amendment rights have

20    been compromised through the government's forcing people to

21    bend a knee and talk about themselves -- a concept which is

22    inimical to our version of liberty -- the government has a

23    heavy burden in the system to show in a serious and somber way

24    it didn't happen, we're OK.

25                That's why it's heavy.  It's not just heavy because of

HCD7CONH

1    who has to prove what.  It's heavy because it's a somber and

2    important responsibility.  And I think so far I've showed you I

3    don't see that that's been discharged.  And I'm not casting

4    aspersions.  I'm just saying this is serious business, and I

5    don't see here serious work to make this court comfortable.

6              THE COURT:  OK.  Sit down for a minute, Mr. Levine.

7    Sit down for a minute and let me hear from the government on

8    what has been said so far.

9              MS. SHAW:  Yes, your Honor.  First, we would agree

10   with the court with respect to where Allen has brought us,

11   which is not in a world where Kastigar taint is an airborne

12   pathogen.  There doesn't need to be a wall, as your Honor

13   indicated.  And we would submit that the filter system that is

14   in place has been more than adequate.

15             The fact that we are in the same office building is

16   not an adequate allegation to suggest that I go around reciting

17   Mr. Black's compelled testimony for all to hear, or that I give

18   access to my file cabinets to others.  That's just not what is

19   prescribed by Kastigar, and it's certainly not an allegation

20   that I think has any evidentiary weight here.

21             I did want to correct for the record what Mr. Levine

22   said about the FCA compelled testimony in UK law.  While it is

23   true that his compelled testimony under UK law from the FCA,

24   they can't use it directly against him in court, it is not the

25   same as immunity here where you can't use it indirectly.

1          THE COURT:  I understood that that is what Mr. Levine

2     was saying.  He said they were not determinant.  They are not

3     determinant.

4          MS. SHAW:  Very well, your Honor.

5          With respect to Mr. Meaney's declaration, we would

6     submit that the first one is not inconsistent but it is

7     incomplete and, you know, certainly it's an issue that goes to

8     weight.

9          I would submit that certainly these are events that

10    happened some time ago.  I can't attest to how the FCA conducts

11    their discovery files or records.  And I think your Honor aptly

12    pointed out they're not bound by the U.S. Attorney's manual.

13    Our role as the filter team is to go and get answers.  And I

14    think the declaration will certainly show you that we attempted

15    to get as much detail from Mr. Meaney and others as we could in

16    terms of dates.

17         I think your Honor has also noted that --

18         THE COURT:  I wish you had done that in August.

19         MS. SHAW:  Regrettably that did not happen, your

20    Honor.

21         THE COURT:  Right.

22         MS. SHAW:  In any event, all of the representations

23    counsel makes really are an attempt to get into this larger

24    argument that I understand he has raised with the trial team

25    about this joint prosecution and trial team and how this is

1  all, you know, one big prosecution team.  And it's my

2  understanding from the trial team -- and certainly I will defer

3  to your Honor -- that those two or the several attempts he has

4  made to raise this have not been successful.

5           But we're here because of one issue, and that is

6  whether there was any exposure to Mr. Black's compelled

7  testimony to any trial witness, to any prosecution team member.

8           THE COURT:  Grand jury witness.

9           MS. SHAW:  Yes, grand jury witness.  And we would

10  submit that on the affidavits there has been no exposure.  And

11  Mr. Prange's testimony in January will further bear that out.

12           We would also submit that the FCA warning notice does

13  not -- at least according to the -- and you will hear this from

14  Mr. Prange and I believe from Mr. Meaney's declaration also --

15           THE COURT:  Are we getting into that?  Because I

16  thought we were not getting into that.  I thought Mr. Levine

17  said paragraph 9 -- he could keep paragraph 9 off limits until

18  we could have a sealed hearing.

19           MS. SHAW:  That's fine.

20           THE COURT:  That was the one thing that would remain

21  sealed, paragraph 9.

22           MS. SHAW:  Of the warning notice?

23           THE COURT:  No, of Mr. Meaney's affidavit, which

24  discusses things about the warning label.  Right?  Am I right?

25           MR. LEVINE:  Yes, your Honor.

HCD7CONH

1     MS. SHAW:  In any event, all of the things that

2     counsel is emphasizing, this notion that these witnesses --

3     which it was never our intention -- it's my understanding the

4     court was well aware that there were cooperators in this case

5     from the trial team.

6          THE COURT:  Yes.

7          MS. SHAW:  So, it was certainly not filter team's

8     intention to not inform the court of that with those

9     declarations.  I thought that was well known.  And certainly we

10    had turned over the materials to defense.

11         THE COURT:  I have never seen the cooperation

12    agreements.  As Mr. Levine knows -- because I'm kind of

13    notorious for it in the building next door -- my motto is the

14    judge is always the last to know, and I am not ordinarily given

15    that information by the United States Attorney for this

16    District until 3500 material arrives.  And it hasn't arrived.

17         So, no, I don't know what their deals are; I didn't

18    know that Mr. King was nollied.  It is information that if I

19    decide that he doesn't have to be cross examined -- and I feel

20    rather differently about the cooperating witnesses than I do

21    than other people who have given affidavits -- but if I decide

22    that he were not have to be cross-examined, then I would

23    certainly want to know that about him; I would want to know

24    what his deal was.  Correct, it's a pertinent piece of

25    information.

1          MS. SHAW:  And certainly --

2          THE COURT:  Now I do, I know he has been nollied.

3          MR. LEVINE:  Nonpros.

4          MS. SHAW:  And certainly that information would come

5     out at trial, and Mr. Levine would have an opportunity --

6          THE COURT:  No, but you want me to accept his

7     affidavit now at this hearing.  This hearing is not the trial.

8     This hearing is this extra hoop that I am required to make you

9     jump through, and so it's got to come out here too.  This is

10    its own little mini trial.

11         MS. SHAW:  Correct.  And the affidavits that we put

12    forward show -- indicate on their face that there was no

13    exposure.  The allegations that counsel makes -- again

14    attempting to sort of create this cloud of misrepresentations

15    as though the trial team made misrepresentations to the court

16    about the interactions with the FCA -- is, as your Honor

17    pointed out, a red herring.  Nobody has said that nobody spoke

18    to the FCA and they wouldn't take calls; that's not the case.

19         THE COURT:  No, on the contrary, on the contrary, it's

20    been quite clear that for the last six years the FCA and the

21    United States Department of Justice have been working hand in

22    glove, that's quite clear.  That, as I read Allen, was not the

23    reason that the Second Circuit concluded there had been a

24    Kastigar violation.  I think the Second Circuit was perfectly

25    aware that there was extensive cooperation in the LIBOR

1    investigation between the FCA and the Justice Department.  I

2    don't recall that that was the reason or a reason assigned for

3    finding that there was a Kastigar violation.

4              MS. SHAW:  I agree, your Honor.  And, you know, I

5    would submit that the government is not in agreement with the

6    Allen decision.

7              THE COURT:  Well, I know you're not in agreement, but

8    there is nothing I can do about that.  I'm not sure where you

9    are in the process of trying to get rid of it, but I know you'd

10   like to get rid of it, but you aren't rid of it.

11             MS. SHAW:  Correct, your Honor.  I would note though,

12   however, one thing -- one of the many questions that the Allen

13   decision left open is the notion that Kastigar even applies in

14   this instance.

15             THE COURT:  Look, I understand that that's the

16   government's position.  I assume -- has the Circuit denied?  I

17   think the Circuit's denied.  Have you filed a cert petition?

18             MS. SHAW:  That matter is under consideration.  We're

19   considering all options.

20             THE COURT:  Well, you can't be very serious about your

21   argument if you didn't have a cert petition in the drawer ready

22   to file on the day when the Second Circuit told you no.  You

23   can't be very serious about the argument.

24             MS. SHAW:  I'm not at liberty to discuss deliberative

25   processes within the Justice Department, but it's my

1      understanding we have 90 days.

2              THE COURT:  Yes, that is the law, you have 90 days.

3      The rule is that you have 90 days.  When, by the way, will the

4      90 days run?

5              MS. SHAW:  Off the top of my head, I don't know the

6      day that the en banc --

7              THE COURT:  Does anyone know when the mandate came

8      down from the Second Circuit?  Because it's 90 days from the

9      date of the issuance of the mandate.

10             MS. SHAW:  I don't have the date of the mandate on the

11     top of my head, your Honor.

12             THE COURT:  Do you know, Mr. Levine?

13             Mr. Breen, do you happen to know?

14             MR. BREEN:  I don't, your Honor.

15             THE COURT:  OK, nobody cares but me.

16             MS. SHAW:  So, your Honor, with respect to counsel's

17     representations about the Meaney affidavit, again I --

18             THE COURT:  Well, you have to admit that you say there

19     is no inconsistency, that the first letter was incomplete.  I

20     would say were I to accept your representation -- which, by the

21     way, I do not -- woefully incomplete might be an adequate way

22     of describing the first letter.  Woefully incomplete.  I see an

23     inconsistency.

24             MS. SHAW:  Very well, your Honor.  I would submit,

25     however, one difference between the two and sort of the format,

1    is that Mr. Meaney drafted that first letter to us without --

2            THE COURT:  Right, because you hadn't gone over there

3    and done what the lawyers from the United States Department of

4    Justice do, which is put your witness through his paces.

5            Guess what, I made an unwarranted assumption.  I could

6    not believe that the United States Department of Justice would

7    be so careless as to submit to me a document -- not under oath

8    but that was being proffered in lieu of a document under

9    oath -- from somebody who was essentially its witness without

10   talking to the witness, prompting the witness, asking questions

11   of the witness, getting the witness's full story.

12           I think you and I would be in agreement that

13   Mr. Meaney's letter of last August would have read rather

14   differently if you had had with him in July the conversation

15   that you obviously had with him in November.  And I actually --

16   based on my prior dealings over the last 19 years with the

17   Department of Justice -- thought that you had.  I thought you

18   had.

19           There are two people sitting in this room who appeared

20   before me as assistant United States attorneys, and it never

21   would have occurred to them when they were in the office here

22   to have submitted a document to me in any form without having

23   heard the story of the individual who authored the document; it

24   just never would have happened.  I don't know, I never worked

25   in the office, I never worked in the Department of Justice, but

1   as a result my experience is informed entirely by what goes on

2   in the building next door and what they do in this building,

3   and I tell you they are very careful about those things.

4           MS. SHAW:  Well, your Honor --

5           THE COURT:  Main Justice I have very few dealings

6   with.

7           MS. SHAW:  Your Honor, I would submit we're not

8   representing that we did not speak with Mr. Meaney prior to

9   that letter.  And again, you know ---

10          THE COURT:  Whoa, I don't think you want to make that

11  representation to me.

12          MS. SHAW:  No, I'm not representing -- we spoke to him

13  and requested the letter, your Honor.  Again, as of July -- and

14  the date is not clear in my head as to when the Allen.

15          THE COURT:  The letter came in August.

16          MS. SHAW:  But certainly I believe the briefs were due

17  on this issue in late August.  We had been advised that the

18  filter team needed to respond at a late date.  They were

19  traveling to London to put documents and interview the witness.

20          THE COURT:  Put that on the trial team, I guess.

21          MS. SHAW:  In any event, your Honor, if there are

22  additional questions concerning.

23          THE COURT:  No, anything you wanted to respond to that

24  Mr. Levine said?  Then he wants to talk again, because

25  Mr. Levine always wants to talk again.

1          MS. SHAW:  Understood, your Honor.  That's all I have.

2          THE COURT:  Your turn, Mr. Levine.

3          MR. LEVINE:  Your Honor, I do note just one

4   interesting little fact, and I agree with my friend from

5   Washington that I believe she is correct that there is no

6   derivative use in the UK.  And, as the court pointed out, I

7   wasn't suggesting so.

8          But that does raise an interesting question in my

9   mind.  As I understand it, the bar is the introduction of the

10  testimony itself, not to its derivative use.  So, why ever

11  would the SFO need a taint team?  There is no need for it if

12  all you have to do is not present it to a court.

13         THE COURT:  You know, I'm not going to second guess

14  Her Majesty's government on why it decided to create a taint

15  team in a circumstance when it is confronted with the need on

16  the one hand to cooperate with American prosecutors and on the

17  other hand to deal with its own business in England.

18         I can understand fully why Her Majesty's government

19  might choose to create something that's not normal procedure

20  for that government in order to deal with the peculiarities of

21  our government which has them all the time.

22         MR. LEVINE:  I quite agree, your Honor, and that's why

23  --

24         THE COURT:  Good.

25         MR. LEVINE:  -- that's why it's surprising to me that

1    in Government Exhibit 33, the affidavit from the SFO itself,

2    there is no mention of a taint team.  The only mention of a

3    taint team is in Mr. Meaney's affidavit.  So, apparently the

4    SFO did not think it important at least to reveal that, which

5    is why I question.  I don't know.

6              THE COURT:  I got to tell you, I'm underwhelmed by

7    that argument, Mr. Levine.

8              MR. LEVINE:  Fair enough.  Your Honor, I'm just trying

9    to get the facts.  Also, your Honor, for your edification, I

10   believe that the mandate issued on November 9, and on February

11   7 the 90 days will elapse.

12             THE COURT:  Thank you.

13             MR. LEVINE:  Well, your Honor, I didn't hear a word

14   about indirect taint about Curtler or King.  So, I suppose we

15   can move on from there; the government doesn't intend to

16   contest the fact that they have not established that there is

17   an indirect taint, because it's not in the affidavits.

18             MS. SHAW:  The government doesn't concede that at all.

19   The affidavits on their face indicate there has been no

20   exposure.  And I don't believe anything that counsel has

21   brought up changes that.

22             Again, it's a preponderance standard, and there is

23   no -- he has pointed to nothing other than the fact that

24   they're cooperators, which is always an argument one can make

25   when somebody admits to a criminal offense.  But I think that

1   just from a logical argument perspective --

2           THE COURT:  Well, it's Mr. Levine's position that the

3   affidavits if accepted as true rule out the possibility of

4   direct taint.  It is his further position that they do not rule

5   out the possibility of indirect taint as, for example, by

6   conversations with people who were exposed.  That's his

7   position.  The government's position is?

8           MS. SHAW:  That there is no one that he has been in

9   contact with with respect to the government or the government

10  trial team or former ones who would have passed that on; that

11  Mr. Prange -- who will be here -- and I won't put words in his

12  mouth -- was, as the FCA was, was told not to put compelled

13  testimony of anyone to their witnesses.  And they did so out of

14  this concern that we had about compelled testimony.

15          So, what counsel has is speculation, but, you know,

16  these transcripts are confidential, they are not to be passed

17  around London.  This wasn't something that was --

18          THE COURT:  I think that's the best part of the

19  government's argument, that it violates UK law to make these

20  transcripts available or to discuss them.

21          MS. SHAW:  Correct, your Honor.  So, you know, other

22  than mere rank speculation that that happened, I don't believe

23  that Mr. Levine -- that counsel has a basis for attacking the

24  affidavit that's before this court.  Certainly he will be able

25  to cross-examine Mr. Curtler on the stand at trial and do

HCD7CONH

1    whatever he wants to do with the fact that he is cooperating

2    with the government.

3           But for purposes of Kastigar I do want to point out --

4    and I won't get into the substance of Mr. Black's compelled

5    testimony -- but your Honor has read it, and I think it would

6    be -- it's not the case where it's the kind of thing that

7    would, as Mr. Levine said, force someone to change their tune.

8    If anything, it defies that notion, because your Honor has seen

9    it -- and I will leave it at that -- we have characterized it

10   in our briefs, and your Honor has also seen it, but this is

11   hardly the thing where, you know, because of reading that, even

12   if he was exposed -- which we're saying he was not indirectly

13   or directly -- it's not the kind of thing one would logically

14   change your tune after reading; in fact, one might proceed very

15   differently.

16          So, with that, your Honor, that would be my point with

17   respect to the two cooperators that Mr. Levine just mentioned.

18          MR. LEVINE:  Your Honor, there is not a word in their

19   affidavit complying with the court's order on page 24 that a

20   representation that the person did not discuss the testimony or

21   anything derived therefrom from any person who has been

22   identified as having been exposed to it.

23          There is just no representation there whatsoever.  And

24   they talk to Mr. Curtler.  They did ask him.  And he said, you

25   know what, I read a bunch of stuff, including the FCA notice

1    and other things.  They didn't even ask him.  We have the 302s.

2    They didn't ask him what else have you been exposed to.  And

3    they come to you now and say -- Judge, what Ms. Shaw said,

4    nobody on the trial team talked to him?  That's all terrific

5    statements.  They're not in the trial team's affidavits.

6    They're not in Mr. Curtler's affidavits.  They're not in any

7    submission that's been made to you.  She has just said it.

8         The whole purpose of this hearing is this is their

9    witness, this is their evidence, it's not here.  So what might

10   be here, I don't know.  I can't guess what might be here.  I

11   know that Mr. Curtler can't be consistent even on what he has.

12   And the Department of Justice twice asked him about this and

13   purposefully it seems didn't get the full answer.

14        So, when Ms. Shaw says there is nothing to see here,

15   if she can point to me where in this affidavit she explains

16   what he said in his 302, or explains his change of testimony

17   from last night, then fair enough; but if she can't, then the

18   government should just concede the point and we should move on,

19   because the words on the page are the words on the page.  So,

20   if there is something I'm missing, I'm happy to be corrected.

21        MS. SHAW:  Your Honor, counsel moved from the

22   cooperator back to Meaney, so with respect --

23        THE COURT:  No, he's still talking about -- because

24   he's talking about Curtler and the supplemental declaration and

25   the, oh, oops, I read the transcript of the brokers trial too.

HCD7CONH

1          MS. SHAW:  Yes, your Honor.  Certainly, as I mentioned

2     before, you know, folks remember things over time.  I do

3     have --

4          THE COURT:  Well, let's be fair.  This is worded in a

5     way that says somebody told me that I read the brokers

6     transcript; I have had my recollection refreshed.  Not I woke

7     up yesterday morning and I remembered that I had read it.  But

8     I've had my recollection -- or somebody told me that I

9     requested copies of the transcripts in the brokers trial and I

10    got them; I don't recall reviewing them.

11         Well, I don't think he didn't review them.  I don't

12    think he got them and put them in the closet unread.  I don't

13    believe that.  All right?

14         I don't recall becoming aware of any reference of the

15    compelled testimony of Gavin Black.

16         Now, we didn't specifically address -- our British

17    friend did not in any of their affidavits particular trials, as

18    I recall.  I think what they said was a general statement that

19    his testimony was not referenced or read from at any trial that

20    took place in the UK.  I think that's what somebody said.

21         MS. SHAW:  That is what the original letter had said,

22    and I believe it said "to the best of my knowledge," and then

23    your Honor requested that either the SFO attest --

24         THE COURT:  And somebody is looking at transcripts.

25         MS. SHAW:  Yes, a colleague of ours has done extensive

HCD7CONH

1   computer searches and reviewed -- there are about over 22,000

2   pages of transcripts from the three trials, and spent I think

3   77 hours going through them with a computer, and has found no

4   references whatsoever to the compelled testimony or anything

5   that appears to be derived from it.

6        THE COURT:  Wait.  Once upon a time I actually

7   litigated cases, and that certainly would have been in my

8   affidavit.  That would have been Exhibit 37.  And Exhibit 35,

9   if I had been representing the government, would be the

10  affidavit from that person to tell me that he/she had spent 77

11  hours reviewing every page and all the computer references of

12  the three trials that were held in London, and could not find a

13  single reference to the compelled testimony of Gavin Black.

14  But there is no such evidence in the record, as Mr. Levine

15  points out.

16       MS. SHAW:  There is.  Exhibit 35 is the declaration

17  that attests to all of those specifics.

18       THE COURT:  Which one is that?

19       MS. SHAW:  Laura Connolly?

20       THE COURT:  Oh, I haven't seen it.  I haven't seen it.

21  It's not one of the ones I read yesterday.  Thank you.  We'll

22  get it.

23       So, Mr. Levine, if we were to proceed as you would

24  wish to proceed, what would you propose?

25       MR. LEVINE:  Your Honor, I think there are just one or

1  two more things I would show you today, because I think it

2  would orient the court to some of my arguments, and then I

3  think after that we need to have a conversation with you about

4  the structure of the hearing to come.

5       I think that one of the things that we just heard from

6  the government is, oh, I'm just raising issues that have been

7  previously litigated.  Well, that is in part true.  I'm going

8  to raise an issue that says you have a bunch of affidavits from

9  a bunch of Department of Justice lawyers who I think when they

10  sign a declaration take it seriously, and they're asking you to

11  believe them, and my general believe is in most cases you

12  should believe them.  But this isn't most cases.

13       Representation have been made to you, your Honor, and

14  I would like to pull one of them up.  Just put the government's

15  brief up.  The government told you in very aggressive response

16  to my motion for joint prosecution treatment these folks are

17  not on the same team together, and I'm going to give you some

18  examples.

19       I am making this argument, Judge, no to reargue my

20  joint prosecution motion -- ly ask for that later.  I will make

21  it to attack the credibility of the affidavits before you.  I

22  would like to read this with you:

23       "The defendants also assume, based on the similarity

24  of various settlement paperwork with Deutsche Bank, that the

25  independent agencies that settled with Deutsche Bank must have

1   jointly investigated and then aligned their view of the facts

2   and allegations.  But these similarities have a simple

3   explanation:  The facts are the facts.  DOJ and these agencies

4   did not share paperwork or have input into what resolutions

5   each agency should have (fine amount, violations) and while the

6   various agencies at the request of Deutsche Bank coordinated on

7   the timing of the resolutions to the extent possible, the

8   settlement timing cannot, and this Circuit's precedent, and

9   does not support a finding that this was a joint

10  investigation."

11         So, I'm wrong, they're right.  The fact that every

12  settlement comes out on the same day in every single one of

13  these LIBOR prosecutions, and they thank each other profusely

14  for all their help, that's diplomatic mumbo jumbo, and we're

15  all Americans.

16         Now let's look at the e-mail which was sent.  Let's

17  see what the Department said.  Let's start with the e-mail from

18  Ms. Saulino on the bottom.  She was one of the lead members of

19  this prosecution before she departed to private practice.  And,

20  Judge, I'm offering this because she has put in an affidavit as

21  well as the rest of the prosecution team.

22         THE COURT:  I saw it.

23         MR. LEVINE:  "I understand that you have shared the

24  FCA's notice with Anthony Albanese at DFS.  For reasons you and

25  I have discussed, I don't want to see your notice.  For similar

reasons, however, would you be able to identify directly to

Anthony the paragraph and portions of the P3 and P5 notice that

you sent him that involve information that was learned from

compelled individuals.  If you have any questions about this

request, I can make myself available at any time tomorrow

morning."

OK.  Now let's see the response from Mr. Meaney.

First sentence:  "We consented to DB sharing a redacted version

of our draft warning notice with DFS."

But let's concentrate on the next paragraph:

"I am not sure we can do what you request regarding

our warning notice.  The reality is even though we don't quote

any compelled testimony in the notice, it has influenced almost

every aspect of the P3 and P5 findings so it would be very

difficult to identify a part that weren't influenced by the

compelled testimony.  Even if we could, it would be such a

small part that it would make the notice meaningless."

Now, the warning notice, your Honor, in England, is a

notice that comes with the final notice -- and I will represent

to the court it's my understanding that in this case they are

for these purposes identical or virtually identical.

P3 and P5 refer in the FCA -- they have principles of

the FCA, and 3 and 5 basically all relate to the conduct at

issue here.  There is another part of the settlement which

relates to 11 principles which are obstruction-like principles.

1    I will show you another e-mail that the Brits were coming to

2    America to talk to Americans about those findings.

3              So, you just heard from them again that I'm just

4    making all of this up.  They represented to you no paperwork

5    was shared?  Really?  They sent the DFS -- the agency that they

6    told you has nothing to do with this -- and it was sent by

7    Deutsche's lawyers, which is a whole other level of taint.  But

8    let's go to the next paragraph, because that's going to get

9    into this even more.

10             "I have reviewed the draft statement of facts to go

11   with your order and confirm that it is very consistent with the

12   findings in our notice, except your time period for U.S. dollar

13   goes back to 2003 and our goes back to 2005, and you make

14   reference to Euribor submitters and we do not."

15             I will represent to the court that the statement of

16   facts, I believe, are the statement of facts attached to the

17   Deutsche Bank settlements which was entered two days later when

18   they all came out.

19             Now, they made a specific representation to you, your

20   Honor, no paperwork was shared.  This is the last of the

21   e-mails, but it's not the first in terms of timing.  That

22   representation is false.

23             THE COURT:  I assume this is referring to the Deutsche

24   Bank settlement order?

25             MR. LEVINE:  Yes, two days later.

HCD7CONH

1          THE COURT:  The order that was signed in connection

2    with the Deutsche Bank -- it was the proposed order that ended

3    up being signed.

4          MR. LEVINE:  Yes, in Connecticut, and I can show it to

5    you.

6          And clearly if you compare, you know, they've said as

7    they say in their brief -- there's no surprise -- they said,

8    well, the facts are the facts.

9          Well, two things, Judge.  Let's just think about the

10   wall here.  Ms. Saulino -- and I will show you -- let's pull up

11   the e-mail -- Ms. Saulino wants to find out whether they're all

12   on the same page.  Which is exactly what they said they didn't

13   do.  So, she sends the statement of facts to Meaney and Co. to

14   review it.  But think about what that means.  That means

15   Ms. Saulino is asking the United Kingdom to look at her

16   documents and say we don't have anything that's different than

17   yours.

18         Now, you know there is a great scene in the movie All

19   The President's Men with the Bob Woodward character, I believe,

20   is asking a question of the source who can't give him the

21   information, and he sort of says just don't respond to me if

22   I'm right.  Everyone knows that that's just a little game, that

23   the source is actually responding; he's confirming it, but he's

24   doing it in a way that gets to the point without necessarily

25   saying it.

HCD7CONH

1          So Ms. Saulino got the FCA to confirm their entire

2     investigation and shape what the Department of Justice thought

3     in some ways based on confirming this.

4          Now, it would be one thing if the government had been

5     candid with you and said, hey, Judge, yes, we worked together,

6     yes, we strategized together -- and we will show you some of

7     that -- yes, we had lots and lots of interactions, but we still

8     don't think that you have told that Brady applies and we're not

9     on the same time.

10          But it's quite another when I've had to file multiple

11     briefs saying to you, Judge, these press releases really say

12     these guys worked together.  And they don't tell you about this

13     e-mail.  They don't tell you that they knew -- and they know

14     today, and they knew before they filed all of this stuff --

15     that the FCA absolutely believes that there's compelled

16     testimony in the notice, that the FCA absolutely believes that

17     they can't differentiate what's what.  And if they can't

18     differentiate what's what, and they admit Mr. Meaney under your

19     Post-it that Mr. Black's testimony is identical to some of it,

20     then how can they say it's not in there?  They can't.

21          So I think this e-mail, and this one from

22     Ms. Saulino -- which basically says as we discussed, we're

23     attaching our drafting statement of facts.  What's the subject

24     line?  DP draft statement of facts, April 15.

25          So where does the representation come from that says

HCD7CONH

1     we didn't share any paperwork?  It's a straight-up

2     misstatement.

3           And Mr. Meaney -- and who else is on this team?  Well,

4     Mr. Powers and Ms. Anderson, the other members of the trial

5     team.  All three of these people put in affidavits; they don't

6     know anything about compelled testimony.  They don't mention

7     anything about any conversations they may have had.  This

8     e-mail I got from the government, Judge.  Why am I showing it

9     to you first?

10          So, I respectfully suggest the government should

11    withdraw its comments suggesting that I'm trying to make up

12    something about the nature of the relationship between these

13    parties, and I think that the representation that says they

14    didn't share paperwork is one that maybe that's another

15    supplemental document that has to be filed to make a

16    correction.

17          Now, let's go on.  Now, your Honor, you have also

18    heard that although they are in the same building there is no

19    issues with respect to the taint team and the prosecution team,

20    because obviously they would never talk about this stuff

21    together.  Let pull up this redacted e-mail I got.

22          This is from Mr. Jackson -- and I don't make any claim

23    that he is doing anything purposefully inappropriate

24    whatsoever.  He seems like a total gentleman to me from my

25    experience with him so far.

HCD7CONH

1          This e-mail with Mr. Jackson, Ms. Sipperly and

2     Ms. Anderson, the members of the trial team.  And what Mr.

3     Jackson is reporting is that he just finished reviewing the

4     compelled testimony in the notice, and he is sharing his

5     thoughts on the relationship between those things.

6          And it's interesting, he says, yeah, there is a lot of

7     stuff in here that's very similar to what Mr. Black says, but

8     all he can't say, I don't know for sure that it wasn't derived.

9     Yeah, this stuff's in there, all these topics -- not just

10    something about eating charts -- it's all in there, but I don't

11    know because, after all, I have no access.

12         So, tell me, Judge, my question to the government is

13    which chink in the wall is this?

14         THE COURT:  Mr. Jackson, good morning.

15         MR. JACKSON:  Good morning, your Honor.  Just to

16    address this particular e-mail that Mr. Levine has put in front

17    of your Honor, this was very, very early on when the taint --

18         THE COURT:  July 2017?

19         MR. JACKSON:  Yes, very early on for the purposes of

20    the taint team in this case.  And this was for the purpose of a

21    hearing that I believe was to take place either -- even though

22    the e-mail was sent very very early that morning -- I think the

23    hearing was to take place later that day or perhaps the

24    following day before this court.  And the purpose was somebody

25    on the taint team had to look at the compelled testimony of

1    Mr. Black and compare it to the final notice to see what there

2    might be in the final notice that could perhaps have come from

3    the compelled testimony.

4           So, I did that, and then I communicated those findings

5    to the trial team.  And I certainly attempted to be, you know,

6    circumspect in what I conveyed, without getting into too much

7    detail or particulars because of the issue of taint.

8           Subsequent to this, after talking to individuals at

9    the FCA, we were able to determine through them that there was

10   nothing in the compelled testimony of Mr. Black that made its

11   way into the final notice.

12          The FCA did inform us -- as the e-mail from Mr. Meaney

13   demonstrated, that defense counsel put in front of your

14   Honor -- that compelled testimony was certainly used in the

15   FCA's construction of the final notice, but it was not

16   Mr. Black's compelled testimony.  That testimony they found --

17   you know, your Honor has looked at it, and I won't try to get

18   into any specific characterization, but --

19          THE COURT:  Please don't.

20          MR. JACKSON:  But they were able to confirm for us

21   that they did not use Mr. Black's compelled testimony.

22          So, those e-mails, I can't stand here and make

23   representations about lines from the trial team's brief about

24   paperwork, but, you know, from our perspective these e-mails

25   don't really have anything to do with the Kastigar issue

1    because they don't demonstrate any exposure.  Quite the

2    opposite, Ms. Saulino, as you will note in her e-mail, said in

3    fact please don't tell me anything because I don't know what

4    might be in there, so I don't want to be tainted.

5            And we would leave it that with that, unless your

6    Honor has more questions about this particular e-mail.

7            THE COURT:  No, I was just wondering what you had to

8    say about it.

9            Mr. Levine?

10           MR. LEVINE:  I mean, look, that's all well and good.

11           Can you show the rest of the e-mail.

12           What's all the redactions?  What else happened here?

13   This is the problem, Judge.  You know, Mr. Jackson -- and he

14   has a difficult job here today, and I respect him for doing

15   it -- but he looked at this thing and said, yeah, these things

16   basically match.  And we will show you, Judge, they do.  And

17   what we have from the FCA is some completely conclusory, well,

18   yes, there is a bunch of people's testimony, and we blocked

19   Black from our mind; we can just use the others.

20           Well, wait a second, that's a line-by-line inquiry

21   where they need to show you exactly what they used and how they

22   used it.  And, by the way, Meaney has already told you he can't

23   do that, because in the quiet, when he is talking directly with

24   the Department of Justice, and Ms. Saulino says, please, tell

25   DFS what is the compelled stuff so I can stay away from it, his

HCD7CONH

1    unvarnished reaction is we can't do that; it's all mixed up,

2    which means I'm in it.

3            And that's another little point.  They're sending it

4    to DFS?  Compelled testimony to another agency?  Which we have

5    contended at least has to be looked at for Brady?  And they

6    told us how ridiculous we were?

7            Where is the communications between DFS and Department

8    of Justice after this?  Where is that in any affidavit here?

9    You've got, you know, members of this trial team who know about

10   it.  Where is the information on what DFS got and how was it

11   derived?  Where is the information on what was passed to other

12   people about this?

13           I mean it's one thing if the government came in here,

14   Judge, and said, look, give me all the contacts between grand

15   jury, indictment and then we will deal with trial, tell me what

16   happened, be open about it, the Allen standard is the Allen

17   standard.  But they don't do that.  They come in and say, oh,

18   this is all just ridiculous, it's all nothing.  And I will say

19   something else about that:  Why is this redacted?

20           But it gets sort of worse -- and this is the last

21   thing I want to show you.  The one other thing that we got --

22   the one other thing we got are some notes of discussions.  This

23   is on the end of 14, and what this is a discussion about, your

24   Honor, it's a call -- the exhibit number is Defense 90 --

25   Mr. Prange, Mr. Meaney, Mr. Stevens -- I don't know who Stevens

1   is; he's an FCA guy -- Mr. King, Mr. Hasan.  The court will

2   recall no doubt that Mr. Prange, King and Hasan were in

3   Mr. Black's testimony.  The government represented it showed in

4   that brief there was no strategic work between these agencies.

5   We didn't do that.  They sort of did their thing; we did ours.

6   It's not true.  But I just want to show you this, because it

7   shows you how closely they were coordinating.

8           This is an e-mail frankly criticizing a very fine

9   lawyer -- and a former Southern District assistant United

10  States attorney -- because they didn't like the way that he

11  conducted an interview which the government and the FCA both

12  put him up to.  And here is a particular quote.  In light of

13  the fact that they never coordinated with each other there is

14  an FCA statement:  "Are you allowed speak with him?"  Talking

15  about Finzi.  "The interview was so bad and they said it was

16  Paul Weiss's fault.  The document was a call in August which

17  was a key document in the entirety of Brown/Labrum where Brown

18  says moved it down a tick and Labrum talks about his own

19  submission.  So that call combines two strands of Brown putting

20  in stuff from Maine and Labrum putting in stuff for himself."

21          So I thought they didn't coordinate with strategy.

22          THE COURT:  Well, I would say -- well, let us put to

23  one side what they think about the job that Mr. Finzi -- who by

24  the way was not at the firm when I was at the firm, as

25  everybody knows.

1          MR. LEVINE:  I know that.

2          THE COURT:  But I think it would be the next paragraph

3     that would perhaps --

4          MR. LEVINE:  Your Honor, this is one example of

5     something I want to show you on the next page.  I can do this

6     for a long time and show you a bunch of these, but let me show

7     you what happens here.

8          Because Ms. Saulino then says -- and this is an

9     issue -- this raises other issues about the nature of this

10    internal investigation, since the government wants to put it in

11    against my client.  But look at the top of the page.  "I got

12    the lawyer's word" -- and I'm substituting "lawyer" for his

13    name -- "that he will approach the interview as if he were a

14    prosecutor, but I agree this is imperfect and I'm completely

15    open to another solution."

16         The FCA -- let's see what the FCA says, the people who

17    are not cooperating, as you have been told by all those

18    prosecution team members --  "We appreciate your Machiavellian

19    approach with asking Paul Weiss to conduct the interview.  We

20    would like to go in on certain dates."

21         THE COURT:  I can tell you, Mr. Levine, you have

22    wandered so far away from Kastigar and so far back into your

23    once and future motion on the joint prosecution issue, that I

24    just -- I'm not.

25         MR. LEVINE:  May I just make a proffer to the court?

1          THE COURT:  What you're saying is I should disbelieve

2     the Justice Department people because you can establish to my

3     satisfaction that they were in fact conducting what would be a

4     joint prosecution for Brady purposes.

5          MR. LEVINE:  I'm actually -- while I think that's

6     true, I have a slightly different variation on that.

7          What I'm saying to you, Judge, is this hearing, we are

8     here to determine the nature of the relationship between the

9     FCA and the Department of Justice and other entities.  And you

10    have been told that that relationship was one in which there

11    were limits, and you're told there is one in which there was a

12    wall that prevented taint.

13          And I am suggesting to you that I have now shown you

14    and can continue to show you that that is not the relationship

15    that existed, that when we have affidavits from all of those

16    Justice Department people that make no mention of the dozens if

17    not hundreds of calls, e-mails and meetings they had, to allow

18    this court to assess whether in any of those calls, in any of

19    those meetings, and in any of those other circumstances, things

20    were indirectly communicated because they're talking about the

21    case -- and I will show you e-mails where they're talking about

22    Mr. Black's case -- it raises the question as to whether the

23    government has met its burden.

24          I am not rearguing that motion, but the only way I can

25    show you, Judge, that these affidavits do not necessarily have

1    a basis in fact is to show you that the background assumption

2    that the court has -- which is these people were not

3    interacting on a daily basis -- is not true.

4           THE COURT:  What makes you think that that's my

5    background assumption?  That's not my background assumption.

6           MR. LEVINE:  Well, I took it --

7           THE COURT:  I mean I have to tell you joint

8    prosecution and interacting on a daily, weekly and monthly

9    basis are not the same thing.  So do me a favor, Mr. Levine,

10    and don't make assumptions about what my background assumptions

11    are.

12           MR. LEVINE:  Fair enough.

13           THE COURT:  My background assumption is that there was

14    in fact cooperation between the British and the American

15    officials on the LIBOR investigation.  That's my assumption,

16    which does not create a joint prosecution and does not

17    necessarily mean that everything in the Brits' files is Brady

18    material.

19           MR. LEVINE:  I think what it does show though is that

20    when you are told that certain things didn't happen that did

21    happen, it calls into question whether you can accept an

22    affidavit on the same related subject.  That's all I'm saying.

23           I'm not presuming to tell the court what to think

24    about that motion.  I'm not rearguing the motion.  But when

25    somebody tells you we didn't share paperwork with the Brits, we

1    didn't strategize with them, and then they're telling you and

2    we didn't get any compelled testimony, if the two propositions

3    are false, then it tends to cast doubt on the next proposition;

4    or at least raises the issue, as you said in your opinion,

5    Mr. Prange has to come because I need to know what his contacts

6    were with the Department of Justice from the time of the

7    compelled testimony at least to the grand jury.

8           And I am now showing you that Mr. Meaney and Mr. King

9    and all of these other folks were having very frequent contacts

10   and the same thing applies.  Because what you've said is that

11   Mr. Prange has to come because he sat with their first

12   cooperator -- and their first cooperator didn't have a one

13   day/two day testimony -- and he changed his story a bit from

14   what he said internally, the investigation.

15          So, the question is how that got shaped.  And it's

16   their burden -- not mine -- to show you that it couldn't have

17   happened.  And they have told you in these affidavits a whole

18   bunch of nothing.  They said we didn't see the thing.  There is

19   nothing in these affidavits that discloses to you these

20   communications.  They don't say, as the court has just said,

21   look, we had frequent conversations with the FCA; we talked

22   about them all the time.  Ms. Saulino and Ms. Anderson are

23   saying I went to England a whole bunch of times.  They didn't

24   tell you, for example, that there was a special meeting

25   arranged where a dozen or so DOJ folks from the fraud section,

HCD7CONH

1    the SFO and a whole bunch of people from the FCA -- I don't

2    know who they are -- had a two day meeting to talk about

3    coordination.

4              I can't tell you what happened there.  Maybe nothing

5    happened there.  But the question is not that.  The question is

6    they have to prove to you that nothing happened there, because

7    Mr. Prange's standard applies.

8              And what I'm attempting to demonstrate to you, Judge,

9    is that the notion, the only Kastigar issue here, the door that

10   has to be closed, is the Mr. Prange door -- which I believe the

11   court fairly inferred from the briefs that were filed before

12   you about the nature of the relationship, so you didn't think

13   there were any other doors to worry about -- is just not true.

14             So, I'm not rearguing the motion, but I'm entitled to

15   say to you they have to close every door to get to trial in

16   this case.  They have to show you with their heavy burden that

17   it didn't happen.  And if you didn't know in your opinion in

18   the Brady section -- and I mentioned this to you when we were

19   in court the other day -- you say I have no information to say

20   that the Department of Justice ever went to London to talk to

21   anybody.

22             THE COURT:  True, the first time I learned about it is

23   when you mentioned it in court.

24             MR. LEVINE:  Exactly right.  Now, Mr. Black's proffer

25   occurred in London.  These folks -- and we have e-mails.  If

HCD7CONH

1    you want to see e-mails about what hotels they're staying it,

2    and who they're going to meet with, and who they're going to

3    have drinks with from the FCA, I'll put them on.

4         You know, we heard before how the Department of

5    Justice couldn't go over to London.  The Department of Justice

6    on this case has been over in London, and most of the proffers

7    occurred over in London, they were there on a daily basis.

8    They had meetings all the time.

9         The number of contacts -- frankly, we started to

10   count -- because we got a lot of these documents very

11   recently -- we can't even come up with a count.  And that's

12   only FCA.  What about SFO?  They also talk about how much they

13   talked to some of the trial team members.

14        The question here is not what the result is in some

15   other part of the case.  The question is how are you going to

16   determine without them telling you that there are all these

17   contacts that nothing happened?

18        And we believe that something did happen, because we

19   can read the FCA notice, and can I read Mr. Black's testimony.

20   And there is no way that what he said didn't get in there.  And

21   Curtler, he submits he read it.  So, he's tainted, this

22   indictment is tainted, and he can't testify at trial.  And

23   Mr. King we believe was subject to Mr. Prange's investigation,

24   and we will show you here other witnesses that they talked

25   about how Prange was going to talk to him, Ms. Saulino giving

HCD7CONH

1   advice to Mr. Prange about what kind of questions to ask.

2           That shows there is no wall, and it shows that unless

3   they prove that every single interaction is clean, Mr. Black

4   should be able to go home.

5           So, I respect the fact that you have heard from me

6   more than enough on everything but especially on the joint

7   prosecution team but, come on, in fairness why haven't you

8   heard about this from them?

9           And these affidavits, look at all of them.  The only

10  ones that said anything about the interaction with the FCA is

11  Ms. Anderson and Ms. Saulino say, yeah, when we talked to the

12  FCA we told them not to tell us stuff.  OK.  What about these

13  meetings?  What about these calls?

14          Now, a lot of these calls they blacked everything out,

15  so I don't know what happened.

16          So, my basic point to you, Judge, is when we take

17  every one of these affidavits right now, and none of these

18  people told you what their interactions were with these other

19  regulators -- oh, and by the way, there is another one, which

20  we will put up in which there is a worry, because Bafin, the

21  German agency, they were getting compelled testimony from the

22  FCA too.  And the government was worried that Paul Weiss was

23  getting it.  And so they wanted to ask the FCA for permission

24  to let them talk to Paul Weiss, because they were worried that

25  the lawyers in Germany and in England were getting stuff back

1    and there was going to be taint.  I don't think you heard any

2    affidavits about that.  You don't have any affidavits

3    addressing the issue about what is the communication between

4    all of these lawyers.  Although we do know from Mr. Meaney from

5    this morning that he had some communicates with Slaughters and

6    May and at least for some period of time he actually believed

7    they had compelled testimony from Mr. Black.  It turns out

8    maybe they didn't.  But where is that explained?

9            So here is this e-mail which is Defense 63.

10           "Steven, as part of our efforts to ensure that no

11   information from compelled interviews is passed through others

12   to us, we are wondering whether you would allow us to discuss

13   with Paul Weiss the fact that you have provided some compelled

14   interview transcripts to Bafin.  We defer to you entirely on

15   this.  One reason we are asking that is so that we can impress

16   upon them that should they receive such a request from Bafin,

17   or reports that might contain information derived from those

18   transcripts, we will want to make sure those materials are

19   produced to a taint team rather than to our investigative team,

20   and, further, that Paul Weiss attorneys don't report to us on

21   our weekly calls about such things.  Best Jennifer."

22           What is this about?  What did Bafin get?  I don't

23   know.  And the government, again, where is the wall?  So Paul

24   Weiss, which side are they on the wall?  How about Slaughter?

25   How about Bafin?

1          And, by the way, in all of these conversations, we

2     haven't talked about the CFTC yet.  CFTC is in on all these

3     conversations as well.  And I will direct your attention that

4     Mr. Braun who gave you an affidavit -- but he filed a different

5     affidavit in Rabo -- and in Rabo what he told Judge Rakoff was,

6     hey, I've been telling those CFTC guys to stop going to

7     compelled testimony.

8          So, we have got the CFTC who is on both sides of the

9     wall, Judge, at least in the early period.  I don't know how

10    the CFTC behaved here, because even though -- I raised this in

11    oral argument.  I raised this in my briefs.

12         THE COURT:  You raised it the first day I ever saw

13    you.

14         MR. LEVINE:  And nonetheless do you have an affidavit

15    from the CFTC?  And in fact the CFTC started this whole LIBOR

16    investigation by contacting the FCA.  That's how it started in

17    2009 or '10.  So what have you been told about the

18    relationship?

19         THE COURT:  Well, Mr. Black hadn't given any compelled

20    testimony in 2009 or '10.

21         MR. LEVINE:  Quite right.  But the point is the

22    interactions with the CFTC and FCA and DOA jointly went on for

23    a while.

24         Here is Mr. Braun's affidavit, which is Defense 38,

25    and let's see what he says.  Number 7:  "I communicated

1    regularly with attorneys at the CFTC's Division of Enforcement

2    during the LIBOR investigation.  On various occasions I advised

3    the CFTC representative of the potential legal ramifications of

4    their participation in or exposure to testimony obtained by

5    compelled interviews."  Then he talks about this.  And he is

6    advised -- if you go down a little bit -- "I was advised that

7    the CFTC attorney attended compelled interviews conducted in

8    London and Singapore during the summer of 2012, and those

9    interviews related to conduct that occurred at financial

10   institutions other than Rabo and interdealer brokerage firms."

11           THE COURT:  Fine.  Mr. Black didn't give any compelled

12   testimony in Singapore as far as I'm aware.

13           MR. LEVINE:  I understand, your Honor.  My question

14   though is:  With all of this, what did the CFTC do?  Did they

15   continue to talk to the FCA about compelled testimony?

16           And with all of this great work they're doing in 2012,

17   how does Mr. Prange end up in a proffer with Mr. King after

18   taking Mr. Black's testimony?

19           So, I don't know the answers to these questions, but I

20   know that you haven't been given even the questions.  You have

21   been told the CFTC has nothing to do with this because the

22   government just rested without putting anything in for them.

23           And I am happy to show you more e-mails in which the

24   CFTC, DOJ and the FCA are all strategizing about this case, not

25   for the purposes of showing you anything other than it's a door

1    that remains open.

2              You also in Mr. Meaney's affidavit, you will notice,

3    and his letter, he didn't mention anything about giving this to

4    DFS.  If you remember, DFS doesn't appear in Mr. Meaney's

5    letter, nor does it appear in his affidavit.  He didn't tell

6    you, oh, by the way, Judge, I threw my notice with compelled

7    testimony over to DFS in his letter or in his affidavit.

8              But it seems like the Department of Justice knew about

9    that.  Can they explained why that's not a relevant factor for

10   this court to consider, whether or not another American

11   agency -- in fact, a New York regulator -- got compelled

12   testimony, and it's not in Mr. Meaney's letter, in his

13   affidavit, his 302 report that we just got?

14             What about Bafin?  They knew about that as well.  No

15   explanation of anything in any of this.

16             THE COURT:  OK.

17             MR. LEVINE:  Thank you.

18             THE COURT:  Do you have anything else that you want to

19   say in response to any of that?  Then we're going to move on.

20             MS. SHAW:  No, your Honor.

21             THE COURT:  "No, your Honor" is a very good thing to

22   say.  Normally after "no, your Honor" sitting down is an

23   excellent idea.

24             OK.  So, now, Mr. Levine, you've done everything

25   except address the question that I asked you to address 20

minutes ago, which was:  How are we, in your view, how are we

to proceed?  We have a gentleman coming to us from London; he

is going to be coming to us in the middle of a murder trial

that I will be conducting, so it's not like I can bring

everything to a screeching halt.  But I'm accommodating him, so

that is when I'm planning to take his testimony.

You have made the perfectly valid point that to the

extent you want to put on a case -- of which you have given me

some tantalizing tidbits, almost none of which relate directly

to Mr. Black, but you tell me you have all kinds of e-mails

that actually do relate to your client which you haven't shown

me yet -- you want to do that after you hear from Mr. Prange.

Right?  That's what you said.  So, I need to think through what

we're going to do.

MR. LEVINE:  That's correct, your Honor.  You know, we

have a variety of materials, some with Mr. Black.  We also have

other information we would ask you to draw an inference on.

I think there is a couple of things I would like.  I'm

very concerned, and I have talked to the taint team about this

last night in an e-mail.  I believe there is -- the government

has said -- and they have been working hard at this.  Some of

these folks at the front table have worked very hard to get us

materials, and I appreciate it, but it's very clear that

although they say they're going to abide by their Jencks and

Brady and Giglio obligations and 26.2 obligations, there is

1   more material out there.

2           If Mr. Meaney was talked to or discussed in August

3   before he put in his letter, if these folks gave statements, if

4   there is additional Brady on these people, we are entitled to

5   it, respectfully, and I think they should produce it and should

6   produce it immediately.  We have been talking about this for

7   months.  I ask all Brady, Giglio and Jencks to be produced.

8           We did ask if there are other material on the

9   affiants, if there are other statements here that they've made.

10  And I will tell you, Judge, they have redacted wholesale

11  materials, which here, "Meeting with Curtler's attorneys,"

12  blacked out.  First of all, that's going to be material which

13  I'm entitled to anyway as 3500.  Some of it has been turned

14  over already from the trial team.

15          But there are other reports of meetings, for example,

16  between Mr. Meaney, Mr. Powers, Ms. Saulino, that are all just

17  blacked out, and they all relate to testimony that's relevant

18  here.

19          Unless they are going to claim a privilege with the

20  FCA -- and if they are, that's fine, they can do a log -- I

21  want all of the statements, because people on every one of

22  these documents are their affiants.  I am entitled to

23  statements that reflect what they've said.  And I don't know

24  who did the redaction job here; it's a horrible one.  It's a

25  tough job anyway, but I have so many documents that are totally

blacked out.

Here is one from March 25 which has the government --
including members of the trial team -- the CFTC -- including
the person that has been identified by the former chairman of
the CFTC as the most important person to the CFTC's case --
plus Mr. Prange, Mr. Clark, Mr. King and Mr. Meaney.

Can you pull this up.  It's 192.

THE COURT:  I can see.

MR. LEVINE:  And it's blacked out.  There was one
little text that relates to Mr. Black.

Now, I have been told by the government that all this
other information somehow is not relevant to the determination
of the Kastigar matter.  I respectfully think anything that
these affiants have said, anything that's 3500, Brady material,
is relevant.  And I think I have shown today that there is some
cause to be concerned.  So, I would ask for immediate
production of unredacted materials, and I would call for that
immediately.

I also think to the extent that there are
representations or statements that might cast doubt on any of
the other affiants -- and I have suggested some places to look
here -- that should be produced as well.

The government has every right in a Kastigar hearing
to try to rely on affidavits, but if they do, then I have the
same rights.

HCD7CONH

1              THE COURT:  You do.

2              MR. LEVINE:  So the one concern I have, Judge, is that

3     with the timing of all of this, I think there is a lot more

4     work for the government to do if they want to produce that.  I

5     am very concerned about the trial date here.

6              THE COURT:  Oh, I am too.  Oh, I am too.

7              MR. LEVINE:  So, I would ask the court that if in

8     fact -- you have a murder trial?

9              THE COURT:  In January?  Yes, I do.

10             MR. LEVINE:  So I'm saying I don't think that

11    Mr. Prange's testimony -- his direct might be ten minutes, but

12    we intend to challenge --

13             THE COURT:  Yes, I know, I did not anticipate that

14    your cross would be 15.

15             MR. LEVINE:  He might prove me wrong, and maybe we can

16    all get out of here early, but I think it's going to be

17    extensive.

18             I also think now, Judge, in light of this affidavit --

19    this 302 from Meaney -- and in light of the fact that the

20    government really can't proffer any evidence, I think there is

21    a real question for you as to who we can accept affidavits from

22    here.  There is a question.

23             And if there is other material out there that might

24    tend to cast doubt on this case -- I have some other material,

25    Judge, which I don't think you want to hear today -- that does

1   not relate to Mr. Black -- to Mr. Black's testimony in the FCA.

2   It does, however, relate to other portions of representations

3   that have been made to this court that are central to this

4   court's disposition of this matter and --

5          THE COURT:  Of the Kastigar matter.

6          MR. LEVINE:  Of the case itself.  And it would tend to

7   suggest that statements that have been made very recently to

8   you are similarly inaccurate.

9          THE COURT:  OK, I would like to focus my attention --

10  I have a triage brain, you know, and it comes in, it goes out.

11  I would like to focus my attention on the issue that's before

12  me, which is the Kastigar issue concerning your client's

13  compelled testimony.

14         Let me say a couple of things.  First of all, yes,

15  indeed the government has the right if it wishes to do so to

16  proceed by affidavit, but that does not alter the fact that the

17  defense, as far as I'm concerned anyway, is entitled to 3500,

18  Brady, Giglio material for every one of those affiants, and

19  that the government may find that the defense wishes to call

20  some of those people on its case, or maybe not, because, as

21  Mr. Levine keeps saying over and over again it is, after all,

22  your burden.  But it's certainly entitled to that information,

23  just as it would be in any other pretrial hearing in a criminal

24  case.

25         Second, it's clear that this matter is going to

1    require us to kick back the trial.  You are scheduled to be

2    here tomorrow, right?  You're saying no but your team is saying

3    yes.  Mr. Breen says yes.

4         I need the trial team here.  I need the trial team

5    here.  I need to have a conference with the trial team -- and

6    we can get them in by telephone.  If we have to get them in by

7    telephone because they're in Washington, I don't care -- about

8    a scheduling matter.  I can't have that conversation today

9    because I don't have the right people here, including but not

10   limited to Mr. O'Neil, who could not be here this morning.

11        MR. LEVINE:  We are happy to arrange the call, Judge.

12        THE COURT:  We are on the calendar for 9:30 or 10

13   o'clock.  9:30?  We can't be on the calendar for 9:30 tomorrow.

14   We can be on the calendar for maybe 10:30 tomorrow morning.

15        After listening to what I have listened to, I will say

16   this:  I understand why he does this, and he is doing a great

17   job for his client, I think that Mr. Levine overcomplicates the

18   discrete issue that needs to be established under Kastigar.  I

19   think the government probably has oversimplified as well by

20   focusing on direct taint and not really apparently giving any

21   serious consideration to the possibility of indirect taint.

22        Mr. Meaney's affidavit will be unsealed except for

23   paragraph 9.  But the portion of Mr. Meaney's affidavit that

24   remains sealed needs to be addressed.  We may be in a position

25   to address it tomorrow, I don't know, at least in part, but it

1    raises some issues in my mind, especially in light of one of

2    the e-mails -- perhaps it was Defendant's 90 -- that Mr. Levine

3    showed me today, which is the e-mail from Mr. Meaney discussing

4    the final notice.

5         As is always the case at the end of one of these

6    conferences, I need to step back from it for about an hour and

7    then get a copy of the transcript and revisit the whole thing

8    and try to figure out what just went on, so I'm going to do

9    that.  I will see you tomorrow.

10        MS. SHAW:  Your Honor, the government just has one

11   point we wanted to raise with respect to the matter of Jencks

12   and 26.2.

13        While we agree with the court that certainly our Brady

14   and Giglio obligations apply in this pretrial motions hearing,

15   it's the government's position -- and we're happy to submit

16   case law and briefing on this -- that the Jencks Act does not

17   apply in this setting nor does 26.2.

18        We have gone through the terms of the Jencks Act as

19   well as 26.2, and there is no applicable provision that Jencks

20   applies in this setting.

21        Certainly, as I said, Brady and Giglio apply.  So to

22   the extent we have Brady and Giglio, we will continue to

23   provide that as required.  But Jencks, in our view -- and I

24   believe under the case law -- and we have a cite that I could

25   provide afterwards which indicates that affiants do not give

1  rise to an obligation to turn over Jencks in a pretrial

2  setting.

3          THE COURT:  All right.

4          MR. LEVINE:  May I address that very briefly?

5          Your Honor, the government has represented to me

6  previously they were going to abide by their Jencks

7  obligations, and in fact have never suggested --

8          THE COURT:  This part of the government or the trial

9  team?

10          MR. LEVINE:  These folks.  And they have been sending

11  me statements on it.  So, I think that's inconsistent with what

12  their letters have said to me.  But let's forget that for a

13  second.

14          26.2 provides that Jencks does apply for suppression

15  hearings.  Part of the relief I'm seeking here, if not

16  dismissal, is suppression of all tainted statements including

17  that of Mr. Curtler's and Mr. King's.  This is therefore in the

18  nature of a hearing that is covered by 26.2 and therefore

19  Jencks, and that is consistent with the government's previous

20  position.

21          I understand that now that they've seen that their

22  witnesses have been impeached Jencks is an inconvenient rule

23  for them, and so is 26.2.  But given that it's a suppression

24  hearing in part, I respectfully submit the government's

25  position is not well founded.  In any event, the overwhelming

HCD7CONH

1    fairness of these proceedings requires it.

2              If in fact they won't be provided, and they will not

3    give me Jencks, then I move under 612 and under general

4    principles that every affidavit in this matter be struck and

5    this matter be held by interrogation, because the court can

6    have no confidence based on the record developed today that we

7    have addressed this most serious constitutional issue.  Thank

8    you so much for indulging me, your Honor.

9              THE COURT:  See you tomorrow morning.

10             (Adjourned)