UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: | |
| DATE FILED: 3/29/18 | |

———————————————————————x

UNITED STATES OF AMERICA,

    -against-                         16 CR 370 (CM)

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

            Defendants.

———————————————————————x

## THOUGHTS ON THE PROOF NECESSARY FOR GOVERNMENT TO ESTABLISH WIRE FRAUD AS CHARGED IN THIS CASE

McMahon, C.J.:

      What follows is not a ruling on any motion. It is a series of observations. I call them "observations" because there is no pending motion that requires a ruling on the matters discussed herein. However, both sides agree that such motions are coming. And as we have beaten this horse to death at repeated conferences over the past year, I asked the parties to set forth their respective positions on what evidence is necessary to prove that the charged conduct is fraudulent. This they have done.

      The briefs I have received read very much like a motion to dismiss the indictment (from the defendants) and an opposition to such a motion. The essence of the defense's presentation is that the Government cannot possibly prove its case. Obviously, at this moment, I cannot grant a motion to dismiss the indictment on that ground – I have to give the Government a chance to offer its proof. The arguments made by the defendants are more appropriately considered on a motion at the close of the Government's case – and, prior to that, in connection with motions *in limine* to preclude certain testimony.

But the Government, to its credit, has not given the defendants' presentation the back of its hand. It has addressed their arguments substantively. They are not unfamiliar arguments, as it turns out; all these issues were raised, argued, ruled on in the district court, and extensively briefed to the Court of Appeals in the earlier LIBOR-rigging case involving Rabobank, *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017). And while the Second Circuit did not reach those issues – instead dismissing the indictment for a *Kastigar* violation – it called them "substantial." *Id.* at 79. The Court even discussed one of those "substantial" issues—a variation of the issue with which this Court is currently grappling—in a provocative footnote:

> One of the issues that Defendants raise in this appeal relates to the District Court's denial of their request to depose John Ewan, the LIBOR Manager at the BBA during the relevant time period. A U.K. resident and citizen, Ewan declined to appear at Defendants' trial in the United States, but he testified in LIBOR–related trials in the U.K. that ended in acquittals for certain individuals and convictions for others. Defendants suggest that Ewan's testimony would have been material because it would have directly rebutted the Government's theory of fraud.

*Id.* at 72, n.19.

Because there is no formal motion pending before me, I could simply file all these papers away until the trial. That seems to me foolish. Having given me (at my request) the benefit of their considered thinking, the parties are entitled to know my considered reaction to their thinking, making them aware of additional questions that have been raised in my mind by their presentations. Because these are complicated matters, that reaction necessarily comes in the form of a writing. Defendants have requested oral argument, but I believe we would just be spinning our wheels until I get something down on paper to which the parties can react at the appropriate time. Besides, I do not understand the concept of "oral argument" when no motion is pending.

I emphasize, however, that what follows (1) is not a ruling, and so (2) is not the "law of the case" (and should never be cited to me as such in future briefs). These serious issues can and

no doubt will be reconsidered over the coming months; and my reactions to the parties' recent

briefs are intended to allow them to refine their arguments, and to find additional relevant

precedents (if any exist) for use in connection with their inevitable *in limine* motions.[1]

## The Indictment

The Government has charged the defendants with use of the wires in connection with a

scheme to defraud.

In order to prove such a scheme, the Government must establish, beyond a reasonable

doubt, all of the following:

First, the defendant knowingly [participated in] [devised] [intended to devise] a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts.

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to [do something][2];

Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, an interstate [or foreign] wire communication to carry out or attempt to carry out an essential part of the scheme.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.........

To convict defendant[s] of wire fraud based on omission[s] of material fact[s], you must find that defendant[s] had a duty to disclose the omitted fact[s] arising out of

---

[1]   As part of my research, I have read not only the briefs filed by the parties at Dockets ##159, 182, 183, and 184, in this case, but also the Government's brief and portions of the Defendants' briefs to the Second Circuit in *United States v Allen.* Even before hearing the evidence, I can recognize that there are significant factual differences between this case and *Allen* Nonetheless, familiarity with these briefs has helped me refine my thinking, and the parties should be aware of the fact that I have read them.

[2]   The actual wording of the model instruction is "they had a natural tendency to influence, or were capable of influencing, a person to part with money or property," but as will be seen, in this case, the alleged false statements were not made to the victims of the fraud and were made well after those victims could have been influenced to do anything.

a relationship of trust. That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise.

Manual of Model Criminal Jury Instructions, 8.124 WIRE FRAUD (18 U.S.C. § 1343).

The instant indictment alleges that the defendants were part of a scheme, carried out between 2004 and 2011, to cause Deutsche Bank (or "DB"), their employer—one of the sixteen "Submitter" banks whose estimated borrowing costs were used by the British Bankers' Association (or "BBA"), a private entity, to set LIBORs in U.S. Dollars—to submit "false and fraudulent USD LIBOR submissions" to BBA. The Indictment charges that the LIBOR submissions were "false and fraudulent" because they were not "unbiased and honest," in that they took into account considerations other than the true cost for Deutsche Bank to borrow from other banks at some future date certain—most notably, the trading positions of the defendants and their co-conspirators. Assuming that the Deutsche Bank LIBOR submission was factored into any particular LIBOR,[3] this had the potential to "benefit their trading positions" at the expense of counterparties to those trades.

Significantly, the "false and fraudulent submissions" at issue here were never communicated to DB's trading counterparties. However, to the extent that they were (or might have been) used to calculate the day's LIBOR (which depended on whether they were in the mid-range of the sixteen submissions for any tenor), they allegedly caused those counterparties "to be susceptible to substantial risk of loss and to suffer actual loss." (Superseding Indictment ("SI" or "Indictment") ¶ 26).

---

[3]    There are sixteen LIBOR submissions for every tenor; the four highest and four lowest are dropped and the eight submissions in the middle are averaged to set any particular LIBOR. There is, therefore, no guarantee that the allegedly false and fraudulent statements that are the subject of this indictment actually factored into the setting of any particular LIBOR.

In short, the Government alleges that misstatements were made to the British Bankers' Association, with the intent that those misstatements would influence the BBA in connection with the setting of LIBOR rates, thereby (potentially) causing parties to whom the misstatements were not made (DB's counter-parties in various trades) to lose money or property, by coming out on the short end of derivatives trades.

The Government can unquestionably prove a scheme to defraud within the ambit of 18 U.S.C. § 1343, even if the party who is the intended victim of the scheme – the party whose property interests are threatened – is not the party to whom the false and fraudulent representations were made. That is to say, there need not be "convergence" between the party "whom [the] fraudster seeks to deceive" and the party who would wrongfully lose money or property as a result of that deceit. *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016). Therefore, the fact that defendants' false and fraudulent representations were allegedly made to the BBA, while the intended victims of the scheme were Deutsche Bank's counter-parties on trades pegged to LIBOR, does not render the indictment defective. We are simply dealing with a so-called "non-convergent" scheme to defraud.

### The Issue That Divides the Parties

The quotation from *Greenberg* in the preceding paragraph states fairly explicitly (or so it seems to me) that a non-convergent scheme to defraud violates the law because the fraudster actually deceives, or at least tries to deceive, the person to whom he makes the false statement— that is the "fraud"—thereby causing the deceived party to take an action that leads to adverse consequences for the intended victim who is unaware of the deceitful statement. Nonetheless, the Government asserts that it can establish the existence of a scheme to defraud if it proves that defendants intended to "cheat a counterparty through deceptive means, *regardless of whether*

5

*they also intended to deceive the BBA,*" the recipient of the false and fraudulent information.[4]
The Government urges that it is enough that defendants intended to cheat their trading
counterparties, and that that would be the case even if no one was deceived by their statements.
The Government further alleges that it need not prove that the misstatements were material to
some decision made by the BBA; rather, it is sufficient to prove that the trading counter-parties
would have wanted to know that such a scheme was afoot. The Government has represented to
the court that it does not intend to call any witness from the BBA to testify on its case in chief.

The defense has argued for months that this strategic decision dooms the Government's
case. While acknowledging that the Government need not prove that false statements were made
to the purported victims (everyone agrees that they were not), it insists that the false statements
must have been intended to deceive the recipient of those statements (the BBA), so that the BBA
would take some action (set LIBORs in a manner favorable to DB's traders) that would deprive
the victims (DB's trading counterparties) of their money or property (because DB would be the
winning party on trades impacted by its false and fraudulent statements to the BBA).[5]
Defendants' argument is that the false statements were not intended to deceive the BBA, and
could not possibly have deceived the BBA, because the BBA was well aware that submitters
were shading their submissions within a range of possible borrowing rates, yet did not explicitly
bar that practice until long after the actions that are the subject of this indictment were complete.
Put otherwise, the defense asserts that, while there may have been some questionable behavior

---

[4]    The Government also asserts that "complicity" by the BBA in any fraud perpetrated by the defendants would not
be a defense. *United States v  Rutigliano*, 790 F. 3d 389, 393 (2d Cir  2015). However, the BBA is not identified
as an unindicted co-conspirator in this case, and I did not understand that the Government intended to prove
beyond a reasonable doubt that the BBA was "complicit" in the fraud. If I am incorrect in my surmise, the
Government should so apprise me – because that will create its own set of concerns.

[5]    The fact that other banks were doing the same thing is no defense, of course, but one wonders whether the multiple
"shaded" LIBOR submissions, each one favorable to a different bank – all of which were trading with the others
– would not just cancel each other out.

6

here, there was no violation of the federal wire fraud statute unless the BBA, the recipient of the false statements, was the "party whom [the] fraudster [sought] to deceive." *Greenberg*, 835 F.3d at 306. And so the defense insists that the Government cannot prove the necessary elements of falsity and materiality without calling a witness from the BBA.

The parties also disagree about what is necessary to prove that the allegedly fraudulent statements were in fact false.

In two decades on this bench, the court has had only one other criminal case in which the sufficiency of the Government's proposed case was challenged so vociferously prior to trial. Having listened to these challenges for months, I asked the parties for preliminary briefing on an issue that may not actually become relevant until the close of the Government's case. I did so, at least in part, because I have some qualms about the Government's understanding of the reach of the wire fraud statute. In a recent decision, Judge David Frank Hamilton of the Seventh Circuit observed that, "from strands of case law…one can piece together a mail or wire fraud case…." *United States v. Weimert*, 819 F.3d 351, 357 (7th Cir. 2016). It has long seemed to me that the Government was trying to do precisely that, and thereby to bring facts that do not fit comfortably within the wire fraud statute within the ambit of that statute.

Of course, the Government has every right to try to advance a novel theory of wire fraud by relying on a snippet from this case and a statement from that one. But it is simply a fact that not all sharp business practices that make use of the wires violate the federal wire fraud statute. Sometimes, a sharp business practice is just a sharp business practice – unethical, dishonest, but not criminal – or, at least, not criminal under the statute invoked in the indictment. Defendants may well have intended to "cheat" (to use the Government's word) the counter-parties, but "cheat" is not a synonym for "defraud;" and at this trial the Government will not be allowed to

7

conflate those two words. One can "cheat" someone without perpetrating a fraud. Fraud is a term of art at law, and as the above-quoted jury instruction makes clear, it involves deceit – deceit that, in the context of this indictment, took the form of making of false statements or representations to the BBA.

That being so, the Government's assertion that it does not need to prove that defendants made an effort to deceive the BBA, and that it does not need to call a witness from the BBA in order to prove its case, is indeed troubling. In fact, the Government's argument raises more questions than it answers.[6]

### 1. Proof of Falsity

The issue of materiality predominates in the parties' briefs, but I want first to turn to the issue of falsity, because falsity is, after all, the first necessary element of wire fraud.

In order to convict the defendants of conspiracy to commit wire fraud, the Government must prove that the statements made by Deutsche Bank's representatives to the BBA, for the purpose of affecting the level at which various LIBORs were to be set by the BBA, were false. Here, the allegedly false statements were DB's answers on particular days to the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting interbank offers in a reasonable market size just prior to 11 am?"

The indictment asserts that DB made misrepresentation by not always giving "honest and unbiased" responses to that question. According to the indictment, an "honest and unbiased"

---

[6] The discussion of this issue by the Government in *Allen*, to my great regret, adds nothing to what I read in the briefs in this case. If anything, the Government's arguments have become more robust over time – which is, I suppose, to be expected.

answer to the question is one that does not take into account extraneous factors in the self-interest of DB – including specifically the bank's positions in trades that are pegged to LIBOR.[7]

The Government can prove falsity by establishing, beyond a reasonable doubt, one of two things: either DB made an affirmative misrepresentation, which is to say, an untrue statement of fact; or that it misleadingly omitted information, such that its submission, while literally true (*i.e.*, DB could in fact have borrowed funds at that particular rate at 11 am on that day), was in fact misleading.

We start from a proposition that the Second Circuit recognized in *Allen*: "… as estimates, LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a 'range' of reasonable LIBOR submissions." 864 F3d. at 75. I have never understood the Government's theory of this case to require it to prove that the particular rate quoted by the submitter fell outside the "range of rates" at which DB would have been able to borrow – or, put otherwise, that DB would have found it impossible to borrow funds at the submitted rate. Indeed, I have always imagined that DB's LIBOR submissions were as likely to be literally true as not.[8]

That being so, the most natural way to read the indictment is that the Government is planning to prove beyond a reasonable doubt that DB omitted/concealed material information that rendered what might otherwise be a literally true answer misleading. It is well-settled that

---

[7]  In its brief in *Allen*, the Government argued that LIBOR submitters were required to submit, not just "honest and unbiased" borrowing rates, but also their "best" borrowing rate to the BBA. The word "best" has not been used in this case, and without testimony from the BBA it does not appear to me that it can be used. *See* the next paragraph in text and n 8.

[8]  In *Allen,* the defendants argued on appeal that the rates submitted by Rabobank could not have been false because they fell within a range of reasonable rates at which Rabobank could have borrowed funds. The Government responded that no record evidence supported this theory. Sadly for us, the Second Circuit never reached the issue, but in view of the argument, its observation that there were at any given time "a 'range' of reasonable LIBOR submissions" cannot be dismissed as just some insignificant piece of dictum.

the wire fraud statute reaches a statement that misleadingly omits (*i.e.*, conceals) material information, as well as one that affirmatively asserts something that is both material and untrue. *Neder v. United States*, 527 U.S. 1, 22 (1999). The easiest way to conceive of the Government's allegation is that DB's misrepresentation lay in an omission: its failure to apprise the BBA that it was shading certain of its LIBOR submissions in order to take into account the positions of its traders (*i.e.*, defendants), in the hope of maximizing the potential realization on those trades.[9]

But while this seems to the court the most natural reading of the indictment, it is also possible that the Government may be trying to prove falsity by affirmative misrepresentation—its theory being that the "honest and unbiased" language that appears in the indictment, but which is found neither in the BBA's question nor in any rules, regulations or guidance about the setting of LIBOR, was fairly implicit in the question asked by the BBA of its submitters. This, I assume, would render a "shaded" submission misleadingly false, because, even if a particular submission fell within the range of rates at which DB could borrow funds, it was inflated or deflated from an "honest and unbiased" submission by virtue of the shading.[10]  That seems to me a strained reading of "affirmative misrepresentation," but the Government is the master of its indictment and its theory of the case.

However, in either event, the Government would need to establish that the BBA harbored an expectation that LIBOR submissions – even those that were literally true (because they fell within the range of rates at which DB could have borrowed funds of a particular tenor at 11 am)

---

[9]   One of the interesting aspects of this case is that DB had no guarantee that the alleged misrepresentations would be of any benefit to its traders, because DB had no way of knowing whether its submission would be one of the eight submissions used to set any particular day's LIBOR at any particular tenor. So DB's alleged "doctoring" submissions might well have been for naught. But of course that is no defense to the crime charged.

[10]   The Government's apparent abandonment of the "best rate" theory that it advanced in *Allen* lends credence to this reading of the indictment

10

– were not to be shaded by purely self-interested considerations.  The Government admits as much. In colloquy with the court last November 30, in which lead counsel for the Government candidly observed that the Government would need to "establish an expectation that there was a LIBOR definition and . . . that certain submissions would have been made during that process. . . . . .;" she also identified the BBA as the party that needed to harbor this expectation. (Tr. at 37.)[11]

The Government apparently believes that it can prove what the BBA expected by asking cooperating witnesses (former colleagues of the defendants) whether they understood the unstated restriction to be implicit in the BBA's question. The courts harbors serious doubt on that score. To the extent that the submitters formulated their understanding about the BBA's expectations from the BBA, their testimony on the subject, offered for the truth of the matter asserted (*i.e.*, that this was the BBA's expectation), would be barred by the hearsay rule.[12] And the cooperating witnesses' personal, subjective beliefs about what the BBA expected of them prove nothing about the BBA's "expectations" (*i.e.*, state of mind) – and, indeed, are irrelevant to the BBA's state of mind. Indeed, to the extent the co-conspirators' state of mind might be relevant, their testimony could only be admitted subject to connection – the very connection the Government insists that it does not have to make.

---

[11]   The Government's concession on this point might appear to foreclose any argument that the BBA was "complicit" in the fraud, for if it were "complicit," how could it harbor the expectation that the Government has admitted it must prove? However, after thinking about it, I have concluded that the BBA could have acted contrary to its own expectation. How the Government might be able to prove that raises more questions that I can at present answer.

[12]   I perceive no basis for invoking the co-conspirator hearsay exception, both because the BBA has not been identified as a "co-conspirator," and because, even if it were, any out-of-court statements by the BBA about what parties were expected to do when responding as LIBOR submitters would not have been made in furtherance of the conspiracy.

Similarly, the Court does not presently see how the BBA's expectations could be proved through expert testimony. Experts can explain how rational markets are supposed to work, but they could not make the necessary link between those observations and the actual state of mind of the BBA, which alone set the rules for LIBOR submissions. Those specific rules and what they mean are not comprehended within any "efficient market" theory about which an expert could testify; they are purely and simply the creation of the BBA.[13]

I assume these matters will be addressed in *in limine* motions seeking to bar particular testimony. I raise my concerns now so that they can be adequately addressed later.

## 2. *Proof of Materiality*

Assuming the Government can prove beyond a reasonable doubt, with admissible evidence, that the relevant LIBOR submissions were false and fraudulent, it must then prove that those statements were material.

Every statement of the law of materiality with which I am familiar says that the Government must prove materiality from the perspective of the person to whom it was made. *See Neder v. United States*, 527 U.S. 1 (1999); *United States v. Gaudin*, 515 U.S. 506, 509 (1995). As the Supreme Court observed in *Gaudin*, determining whether a statement is "material" requires the trier of fact to answer three questions: what statement was made; what decision was the [recipient of the statement] trying to make; and *whether the statement was material to the decision. Gaudin*, 515 U.S. at 512. Only last year, the Second Circuit indicated that one "looks to the effect on the likely or actual behavior *of the recipient of the alleged misrepresentation*," when assessing materiality. *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (citing *Universal Health Services, Inc v. United States*, 136 S.Ct. 1989, 2002 (2016)) (emphasis added).

---

[13] *See* discussion, *infra.*, at pp.18-19.

12

In line with this classic formulation of materiality, then the Government would need to prove what statement was made to the BBA (we know what those statements are), what decision of the BBA the statement was trying to influence (answer: the setting of LIBOR on a particular day at a particular tenor); and whether the false statements made by the co-conspirators on behalf of their employer, DB, were material to the BBA's decisions on setting particular LIBORs.

Under the *Neder* scheme of proof, it appears irrelevant that the third parties who entered into trades pegged to LIBOR with DB would have wanted to know that DB was not always "honest and unbiased" when responding to the BBA's daily question in the manner alleged by the Government before entering into those trade. Put otherwise, it seems that the Government's proposed evidence of materiality (which it insists can come entirely from the counter-parties, not the BBA) is inadmissible, because the allegedly fraudulent statements were incapable of influencing a relevant decision made by those trading counterparties. Only the BBA's decision (the decision on how to set LIBOR) could have been influenced by the allegedly false and fraudulent submissions – not the victims' behavior. Indeed, as I understand matters, the allegedly fraudulent LIBOR submissions that are the subject of the indictment were made to the BBA long after the trades to which they might arguably be material were entered into – that is, they were made in the hope of ensuring the success of trades already on the books. So the statements could not have been made for the purpose of inducing the soon-to-be-taken counter-parties to enter into trades with DB on particular terms. Statements made after the trades had been arranged could not possibly have been material to the counter-parties' decision to enter into those trades.[14]

_____

[14] In *Allen,* the Government argued that parties would have tried not to consummate trades to which they were already committed if they had known about the scheme. I am not familiar with all the terms of standard derivatives, but it is at least possible that undoing the trades was not a decision that was open to them – they would have been remitted to the courts for a remedy.

In short, the Government plans to prove materiality by showing that the counterparties to trades would have wanted to know that DB and other LIBOR submitters were scheming to get the BBA to inflate or deflate LIBOR in ways that would be favorable to their trading positions.

I have no doubt that anyone in the marketplace would have wanted to know what was afoot— not just trading counter-parties, but the thousands of people who every day enter into commercial contracts with interest rates pegged to LIBOR. But that begs the question, which is whether a defendant can be convicted of violating the *federal wire fraud statute* by the making of false statements (as here alleged) if the Government does not prove that those false statements were "material" to the person to whom they were made. In view of the language from all the cases quoted above, simply asserting that market participants would have wanted to know about the alleged scheme – which is all the Government has done to date – is not enough of an answer.

Of course, it is far from irrelevant that the wire fraud cases from which the classic language about materiality is derived did not involve non-convergent frauds like the one charged here.

In *United States v. Neder*, the case that established that materiality was an element of federal wire fraud, the misrepresentation was directed to the alleged victim of the fraud – the Internal Revenue Service. Neder's false statements to the IRS were material to the agency's determination of Neder's income tax liability. 527 U.S. at 16.

In *Universal Health*, the misrepresentation by omission under the False Claims Act was made to the victim of the fraud – Massachusetts Medicaid Program – who was induced thereby to pay Medicaid claims to providers who were not licensed to provide services. 136 S.Ct. at 2004.

14

In *United States v. Weaver* (which contains numerous out-of-context statements that are favorable to the defense's position[15]), the misrepresentations were made by sales agents to the purchasers of vending machines who were the victims of the scheme. 860 F.3d at 90.

In short, all the language about materiality to the recipient of the false statements is found in cases that are unlike this one, in that the schemes were convergent and the false statements were made to the intended victims of the fraud.

This being so, I have been particularly interested to locate cases where the scheme to defraud was non-convergent, as is the scheme in this case, in order to see whether, in any such case, materiality was proved from the perspective of the third party victim – someone to whom the false statement was not made, and who took no action in reliance *on the false statement.* I have yet to find such a case. In the cases I have read, while the misstatement was intended to do damage to someone other than the party to whom it was made, in every instance it was the recipient of the false statement to whom the false statement was material, because in every instance it was the recipient who was influenced thereby to take some action.

For example, in *United States v. Seidling*, 737 F.3d 1155 (7th Cir. 2013), the Seventh Circuit endorsed the concept of the non-convergent scheme to defraud, holding that the false statements did not need to be made directly to the victim in order to further a scheme to defraud. However, in that case, the Government did not prove that the actionable false statements were material to any decision made by the third party victims. Instead, it proved that the false

---

[15]    "'[A] lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal.' *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013). A 'false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed.' *Id.* (internal quotation marks omitted). Recently, the Supreme Court explained that, '[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.' *Universal Health Servs , Inc v. United States*, ——U.S. ——, 136 S.Ct. 1989, 2002, 195 L.Ed.2d 348 (2016) (internal quotation marks and alteration omitted) (discussing materiality under the False Claims Act and the common law)." *Weaver*, 860 F.3d at 94.

statements—made to a small claims court—were material to the court's decision to enter default judgments and subsequent garnishment orders against people who did not know that they had been falsely sued. *Seidling* is thus a classic instance of the false statement's being material, not to the third party, but to the recipient of the statement, who was induced to take an action that ended up depriving the third party victim of money or property.

In *United States v. Weimert, supra.,*[16] defendant Weimert made separate and independent statements to both sides of a business transaction. He told Party A that Party B would not do the deal unless the defendant himself was given a stake in the transaction. And he told Party B that Party A insisted on defendant's having a personal stake in the transaction. Neither statement was true, but obviously both Party A and Party B thought that what it had been told was true, because the deal was structured so that Weimert got a 5% personal stake in the transaction.

Despite Weimert's despicable conduct, which included self-dealing in addition to lying to everyone, his wire fraud conviction was overturned. The majority focused its analysis solely on whether Weimert's statements were material to the purported victim to whom those statements were made—not to whether one party would have wanted to know about statements that were made to the party on the other side of the deal. The court concluded that the misstatements that were made to Party A (the Board of Investment Directions, Inc. (or "IDI")) were not material to any decision made by the Board of IDI; and that the misstatements made to Party B (the Burkes and Kalka) were not material to any decision made by the Burkes and Kalka. There is no

---

[16] *Weimert* is cited by the defense, but not for its holding. It is cited because the United States Attorney for the Northern District of Illinois admitted to the court that materiality in a non-convergent scheme had to be judged from the perspective of the recipient of the false statement, rather than the third party victim -- which is precisely the position of defendants here *See* Brief-of Plaintiff-Appellee, *United States v Weimert*, No. 15-2454, 2015 WL 7686893, at *31 (7th Cir. Nov. 23, 2015), which says, "Looking at the materiality of a defendant's third party misrepresentations from the viewpoint of anyone other than the third party is improper."

indication in the opinion that the majority ever thought about whether misstatements made to the
IDI Board might have been material to the Burkes and Kalka had the latter known about them, or
vice versa – possibly because, as noted above, the Government agreed that the statements had to
be material to the party to whom they were made.

The decision in *Weimert* was not unanimous. Significantly, the dissenter did think about
the relevance to one side of the deal of statements made to the other side: "[E]ven if one assumes
that Weimert's misrepresentations to the Burkes and Kalka did not, standing alone, rise to the
level of criminal wire fraud [viewing the Burkes and Kalka as the victims], they do constitute
such when combined with his statements to the IDI board . . . [because] Weimert's
misrepresentations to the Burkes and Kalka were integral to the success of his scheme to defraud
IDI." *Weimert*, 819 F.3d at 372. For the dissenter, Weimert's misrepresentations to Burke and
Kalka were material to IDI – even though they were not material to Burkes and Kalka, and even
though the IDI Board did not know about those statements -- but only because the court
considered them in context with material misrepresentations that were made directly to the IDI
Board, and only because all of the false statements, whether made to the Board or to the Burkes
and Kalka, were "integral" to the success of the scheme to defraud the IDI Board. There is no
suggestion in the dissent that Weimert's statements to Burke and Kalka would have been
material to the charge of defrauding the IDI Board in the absence of material misstatements
made directly to the IDI Board; quite the contrary.

The dissent in *Weimert* is the only opinion with which I am familiar that even remotely
suggests that the materiality of the false statement to a non-convergent victim can play a role in
determining the element of materiality in a criminal wire fraud prosecution. And I find it
significant that, in *Weimert*, the false statements to the third parties were not enough in and of

themselves to prove fraud on the victim – even to the dissenter. Nor can I ignore the fact that, in
Weimert, essentially identical misrepresentations were made to both parties in connection with a
single deal – facts very much different from those at Bar.

It thus seems to this Court that the testimony the Government proposes to introduce in
this case in order to establish materiality proves nothing of the sort, and is, in fact, irrelevant. I
challenge the Government to find me a case—any case—involving a non-convergent scheme to
defraud in which materiality was assessed without regard to a decision made by the party who
received the misrepresentation, and to do so by the time the defense makes *in limine* motions
seeking to bar this testimony. Again, I understand that the intended victims would have wanted
to know that something fishy was going on in connection with the setting of LIBORs. They
would have wanted to know that DB was "cheating." The question, however, is whether anyone
was defrauded, or whether an effort was made to defraud anyone. The two are not the same.

While puzzling through all this, two other things have occurred to me that the parties
should be prepared to address.

First, there is a school of thought at common law which suggests that the materiality to
Party A of a misstatement made by Party B to Party C might be relevant to proof of the
element—but only if Party C was simply a conduit used by Party B to get the false information
to Party A. *Pasternack v. Laboratory Corporation*, 27 N.Y. 3d 817 (2016) (citing cases from the
19th Century, *Eaton Cole & Burnham Co. v. Avery,* 83 N.Y. 31, 35 (1880); *Bruff v. Mali*, 36 N.Y.
200, 206 (1867); *Rice v. Manley*, 66 N.Y. 82 (1876)).

The argument—which is analogous to the fraud on the market theory of securities
liability—goes like this: when entering into trades with DB pegged to LIBOR, the counter-
parties (*i.e.*, the market) assumed that LIBOR would be set without taking into account the self-

18

centered interests of any of the parties involved in the LIBOR-setting process. Put otherwise, the counterparties relied on a disinterested market process for establishing LIBORs when they decided to participate in a market in which trades were pegged to LIBOR. Had these market participants known that the LIBOR-setting process was being rigged by the submitters for their own benefit, they would not have entered into any trades that were pegged to LIBOR—or, at least, they would not have traded with any party that was part of the LIBOR-setting process, lest they get scammed. The BBA, as the ultimate setter of LIBOR, was the recipient of the false information; but it was really no more than a conduit for getting out into the market the information that the submitters were giving to the BBA. Therefore, the representations made to the BBA were, in a sense, being made to the entire market, and so were material to every player in that market.

Unfortunately for the Government, I am not aware of any criminal *wire fraud* case (as opposed to a securities fraud case) that employs "fraud on the market" analysis to establish materiality. The fact that the Government does not make the argument I have outlined above suggests to me that it may not be aware of any such case, either. Furthermore, my imaginary theory suffers from the additional defect that the information conveyed to the market by the BBA—that is, the various LIBORs—is not the same information that was falsely and fraudulently conveyed to it. While a false submission by DB may have infected a particular LIBOR, no LIBOR conveys to the market precisely the information that DB conveyed to the BBA. It is hard, therefore, for the "conduit" analogy to work.

That said, neither am I aware of any case that rejects application of this theory—so liberally employed in civil actions under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder—to a wire fraud, especially a wire fraud allegedly committed in the securities

19

markets. And while I have not read the expert testimony in *Allen* (which I assume the Government proposes to submit here), I imagine that it relies on something like the "fraud on the market" analysis I posit. If the Government (or for that matter the defense) has any case law or other insight into this issue, I would appreciate hearing about it when the *in limine* motions are briefed.

Second, it may be that the Government's fall-back position is a sort of *res ipsa loquitur*— of course the statements were material to a decision made by the BBA, because they were solicited for the purpose of setting LIBORs and were actually used by the BBA in setting LIBORs. Put otherwise, the circumstances of the making of the statement prove their materiality to the recipient, without the need for additional evidence. Neither party has addressed that possibility, but if no one else raises the issue at the close of the Government's case, rest assured that the Court will.

## Conclusion

The defense is right about one thing: "fraud in the air" is not criminally actionable as wire fraud. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 (2d Cir. 2016). The behavior alleged in the indictment, should it be proved true, is nothing less than reprehensible. But this court does not sit to punish reprehensible behavior; it sits to punish behavior that violates some criminal law passed by the United States Congress.

The defense's position is that the behavior charged, even if true, is not wire fraud. The defense has pointed to several potential flaws in the proof the Government proposes to offer at a trial that is now imminent. The issues it raises are novel (and, regrettably, were not addressed by a higher court in *Allen*). They are anything but frivolous.

20

From where I sit, the Government is dancing around those issues, bootstrapping a novel set of facts onto a law that does not comfortably reach those facts – and doing so by relying on sentences, taken out of context, from cases whose facts are not remotely similar to those at bar.

Of course, it is the Government's job to apply general laws to specific facts, and to try to fit new facts within the language of those statutes, to the outermost limit of logic and common sense. If that were not so, the endless varieties of fraud that human beings invent would go unredressed.

But first, last and always, the misconduct charged must constitute "fraud" as that term has been understood under federal law. I am open to being convinced that the charged conduct falls within the wire fraud statute; but the Government will have to articulate its position far more clearly to overcome my skepticism—skepticism rooted in the defendants' Constitutional right to be presumed innocent until proven guilty.

The proof of the pudding, of course, will come at the trial.

Dated:    March 29, 2018

_____
                                                Chief Judge

BY ECF TO ALL COUNSEL

21