# EXHIBIT A

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

FINANCIAL LIST (ChD)

FL-2017-000002

BETWEEN:

THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AMCORE BANK, NA AND FOR THE OTHER FINANCIAL INSTITUTIONS IDENTIFIED IN SCHEDULE 2 TO THE PARTICULARS OF CLAIM

(incorporated under the laws of the United States of America)

Claimant

- and -

(1)   BARCLAYS BANK PLC

(2)   BANK OF SCOTLAND PLC

(sued in its own right, and also in its capacity as a representative and member of the British Bankers' Association)

(3)   BBA TRENT LIMITED

(4)   BBA ENTERPRISES LIMITED

(5)   COOPERATIEVE RABOBANK UA (FORMERLY KNOWN AS COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK BA)

(6)   DEUTSCHE BANK AG

(sued in its own right, and also in its capacity as a representative and member of the British Bankers' Association)

(7)   LLOYDS BANKING GROUP PLC

(sued in its own right, and also in its capacity as a representative and member of the British Bankers' Association)

(8)   LLOYDS BANK PLC

(9)   THE ROYAL BANK OF SCOTLAND PLC

(10)  THE ROYAL BANK OF SCOTLAND GROUP PLC

(sued in its own right, and also in its capacity as a representative and member of the British Bankers' Association)

(11)  UBS AG

(sued in its own right, and also in its capacity as a representative and member of the British Bankers' Association)

Defendants

---

### DEFENCE OF THE THIRD AND FOURTH DEFENDANTS

---

66. As to paragraph 74(1):

   a. It is admitted that the report of relationship visits undertaken by Mr Ewan and Mr Merriman in 2005 stated that there was a consensus among the banks visited that USD LIBOR was set three or four basis points above true cash rates. The term "highballing" was not used. While Mr Ewan also reported that HBOS had informed him during this meeting that *"Some companies will quote rates to suit their current position. It has always been the way"*, this followed on from HBOS stating that the *"BBA LIBOR fixing process works well"* and concluding that in their view *"BBA LIBOR is just fine as it is"*.

   b. In relation to the feedback from Barclays, although they stated that the BBA should not attempt to influence banks putting in inaccurate submissions, this was in the context of stating that *"If someone is bidding artificially high or low on a regular basis, this is market abuse, and therefore not a matter for the BBA who have no regulatory authority. It is a matter for the tripartite authority."* Therefore Barclays were correctly noting that the BBA had no regulatory authority or role and stating that market abuse should be addressed by the regulator.

   c. At the meeting between the BBA and the Bank of England, Mr Ewan informed the Bank of England that the responses from the LIBOR review were that *"the product was in good health, and clearly understood in the market"*, but *"there was a market consensus that the GBP-USD LIBOR was some 3-4 bp over the actual market rate"* and *"This was essentially a construct of the market, as it is in the interests of banks to have a higher LIBOR."* In circumstances in which the average one month USD LIBOR rate was around 3.6%, a difference of 3-4 basis points was trivial, and the Bank of England did not raise any concerns about this differential. It is denied, if it be alleged, that there was any suggestion that collusive manipulation of LIBOR was taking place.

   d. Save as aforesaid, paragraph 74(1) is denied.

67. As to paragraph 74(2): It is admitted that Mr Ewan sent an email to the FXMMC on 16 August 2007 in the said terms. It is denied that this shows any evidence of collusion. Early August 2007 was the first point at which concerns were raised with the BBA about persistent understatement of USD LIBOR submissions. In this email, Mr Ewan was arranging an urgent ad hoc meeting of the FXMMC which took place on 17 August

as a result of coordinated decisions. Since each Panel Bank was aware of the rates which other Panel Banks had submitted the previous day (and over time) given that all submissions were published, there would be no need for any Panel Bank to coordinate its submissions with other Panel Banks in order to be confident that its submissions would not be materially higher than other Panel Banks'.

111. Paragraph 53 is noted. See paragraphs 9 and 59 above.

112. As to paragraph 54, see paragraphs 60 and 63 above.

113. Save as set out below, paragraph 56 is denied.

114. As to paragraph 57 (**Profit/portfolio incentive**): See paragraph 10 above. The Claimant's case on a common financial and profit based incentive to suppress LIBOR is devoid of reality and an attempt to support a competition law claim for which there is no evidence. If Panel Banks had stood to obtain consistent financial benefits from lower LIBOR rates, lowballing would not have been limited to the period of the financial crisis, and no regulator has found (and the Claimant does not contend) that lowballing took place outside the financial crisis.

115. As to paragraphs 57(1) and 57(2): See paragraph 10(e) above. As to the ability of the Bank Defendants to manipulate LIBOR, the trimming and averaging approach meant that no individual Panel Bank had the ability to manipulate LIBOR by a material amount.

116. Paragraph 57(3) is agreed in the limited context of swap trading. However, a bank's trading portfolio is likely to have included a range of products which used LIBOR and not just floating rate interest rate swaps. Furthermore, since rates would generally be paid on interest rate swap products based on the applicable LIBOR rate on a specific day, in practice, even in the limited context of its interest rate swap trading, the net position of each individual Panel Bank would be likely to vary on a day to day basis.

117. As to paragraph 57(4): While in theory Panel Banks might benefit from knowing in advance exactly where LIBOR rates would be set, this would have equally been the case prior to the financial crisis (and the Claimant does not contend that there was collusive lowballing prior to August 2007). This would, furthermore, have required all or a majority of the Panel Banks to agree a single collectively agreed LIBOR fixing despite the fact that some Panel Banks would benefit from a higher LIBOR rate rather than a lower rate and would have required a highly complicated pre-exchange of