# EXHIBIT B

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          14 CR. 272 (JSR)

ANTHONY ALLEN and ANTHONY
CONTI,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 13, 2015
                                        9:45 a.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BRIAN R. YOUNG
CAROL SIPPERLY
MICHAEL T. KOENIG
     Assistant United States Attorneys

WILLKIE & GALLAGHER LLP
     Attorneys for Defendant Anthony Allen
BY:  MICHAEL S. SCHACHTER
     CASEY DONNELLY

TOR EKELAND, P.C.
     Attorneys for Defendant Anthony Conti
BY:  TOR EKELAND
     AARON WILLIAMSON
```

FINAL
Case 1:16-cr-00370-CM Document 230-2 Filed 04/23/18 Page 3 of 18
Case 1:14-cr-00272-JSR Document 156 Filed 11/17/15 Page 31 of 49
31

1      MR. SCHACHTER:  Sure.  Presumably, they can get that

2  through their cooperating witnesses who are much more like the

3  defendants, and they'll testify about their understanding, I

4  suppose, of the importance of LIBOR and perhaps the government

5  will have evidence that will show exactly what our clients'

6  understanding was of LIBOR.  That may be probative.

7      To have an expert witness testify about that is really

8  too far afield and is inappropriate.  They can do it through

9  actual fact witnesses that will testify about their

10 interactions with the defendants.

11     The second point that I wish to make is with respect

12 to effect on a financial institution.  That is not even close.

13 The government has alleged -- effect on the financial

14 institution is alleged in the indictment.

15     The way they're going to prove it is presumably

16 because there is a financial institution on the other side of a

17 particular swap contract, and they're going to show an act of

18 where there was a false and fraudulent LIBOR submission made on

19 a particular day and that affected a particular financial

20 institution.

21     They cannot satisfy this element, and the jury should

22 not be invited to speculate that, well, you know, there are

23 150 trillion swaps out there.  So we can all guess that there

24 might be a financial institution that may be part of another

25 and may be affected.  That is inviting the jury to speculate

1  and is irrelevant.

2  If the government cannot show an effect on a financial
3  institution through their direct allegations, which is a
4  financial institution on the other side of a swap, then they
5  are not going to satisfy those elements, and they should not be
6  allowed to try to satisfy those elements through the jury's
7  speculation about the 150 swaps that may have theoretically
8  been impacted.

9  THE COURT: I'm going to allow certain of this and not
10 others. I'll tell you specifically why and which. First the
11 which. I will not allow the last sentence, and I'm not going
12 to allow references to mortgages and credit cards and stuff
13 like that. I think student loans were in the indictment.

14 That seems to me to be not only remote from the
15 charges in this case but also calculated to invoke sympathy for
16 the government's position and lack of sympathy for the
17 defendant. Therefore, under Rule 403, whatever modest relevant
18 it may have is substantially outweighed by the prejudice.

19 I will, however, allow the rest of the matter, I
20 think, both as a matter of general background but also on the
21 issue of intent and perhaps materiality.

22 The other sentences there are relevant. This is
23 without prejudice to defense counsel's argument which I think
24 is probably a pretty good one, though I'm not making a final
25 ruling, that none of this will be adequate to satisfy the

1    statute of limitations issue that the government thinks it goes
2    to.
3           If it goes to that, you better have a lot more, and it
4    better be something that you can get into evidence under the
5    indictment because I don't see that the indictment really
6    speaks to financial institutions worldwide were defrauded.
7    That is a much-too-liberal reading of the indictment and not to
8    be countenanced in a criminal case.
9           I will allow the other sentences and for the reasons
10   given.
11          Now we're up to the last paragraph, which is about the
12   potential for manipulation.
13          Are you an expert in manipulation?
14          THE WITNESS:  I've written extensively on it.
15          THE COURT:  How did you determine the -- I've been a
16   judge for 20 years, and I've never seen a financial case where
17   there wasn't a potential for manipulation.  You just had to
18   know enough about how whatever business or situation it was,
19   and then you could figure out a way to manipulate it to your
20   benefit.  Used car salesmen are experts at manipulation.
21          What's special about this?
22          THE WITNESS:  So, yes, there are many situations where
23   people can manipulate situations to their advantage.  In my
24   teaching, I find that my students often don't recognize these
25   situations.  They find it very interesting when I highlight it

```
                                                                 228
     FAJQALL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4            v.                            14 CR. 272 (JSR)
                                           Trial
5    ANTHONY ALLEN and ANTHONY
     CONTI,
6
                    Defendants.
7
     ------------------------------x
8
                                           New York, N.Y.
9                                          October 19, 2015
                                           9:10 a.m.
10

11   Before:

12                      HON. JED S. RAKOFF,

13                                         District Judge
                                           and a Jury
14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BRIAN R. YOUNG
17   CAROL SIPPERLY
     MICHAEL T. KOENIG
18        Assistant United States Attorneys

19   WILLKIE & GALLAGHER LLP
          Attorneys for Defendant Anthony Allen
20   BY:  MICHAEL S. SCHACHTER
          CASEY DONNELLY
21
     TOR EKELAND, P.C.
22        Attorneys for Defendant Anthony Conti
     BY:  TOR EKELAND
23        AARON WILLIAMSON

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                      332
     FAJQALL3                    Robson - direct
```

1   A.  He was our representative at the BBA.

2              THE COURT:  The objection is overruled.  The document

3   is received.

4              (Government's Exhibit 101U received in evidence)

5   Q.  Do you see the second entry the two rates that were flagged

6   by our system?

7   A.  Yes.

8   Q.  For purely statistical reason?

9   A.  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

333
FAJMALL4                Robson - direct

1  Q. Again, if I could just ask you a few more questions your
2  understanding of the BBA's monitoring and what you would do in
3  connection to that.
4  A. So I believe they had a system where if a rate submitted by
5  some of the banks were significantly higher or lower than the
6  rest of the banks that they would contact that relevant bank
7  and say -- and query their rate and say why is it too high and
8  why is it too low.
9  Q. You developed a strategy in connection to that. So now
10 what was the strategy with respect to limits and then what did
11 you do in connection to the trader positions?
12          MR. EKELAND:  Objection.
13          THE COURT:  I'm sorry.  Ground.
14          MR. EKELAND:  Compound question, your Honor.
15          THE COURT:  Sustained.
16 Q. First explain, again, what you did in connection to the
17 limits you understood were imposed by the BBA.
18 A. So what I would do is, I would ask the broker where he felt
19 the LIBORs would be. They would then give us -- for example,
20 three months they would give us a number of submissions or
21 possible rates where the three months could be depending on
22 credit rates and stuff like that. So there would be kind of a
23 range of two or three numbers where LIBOR could possibly be.
24 Q. Before I ask about trader positions, let's say no trader
25 request was made. What would you do with that information?

1    A.   I would go straight down the middle as much as I could.
2    So, for example, if the broker came on and said, three months I
3    think I'm hearing might be 80, might be 85, might be 90, but
4    probably 75, I would go down the middle.
5    Q.   Now, let's say you, in fact, had a trader request where a
6    trader wanted you to submit a LIBOR to favor their position.
7    What would you do?
8    A.   So given those circumstances, if one of the traders had
9    contacted me and said three months, if I needed a higher three
10   months, I would have moved it higher at his request.  I would
11   have moved it towards the 90 level or set 90.
12   Q.   Was that permissible?
13   A.   No, it wasn't.
14          MR. SCHACHTER:  Objection.  Withdrawn.
15          THE COURT:  Then I won't have the pleasure of
16   sustaining the objection.
17   Q.   Now, you had mentioned Mr. Yagami and Mr. Thompson.  Were
18   their positions at ever odds at each other?
19   A.   Yes.  On some occasions they would have been, yeah.
20   Q.   What happened under those circumstances?
21   A.   I would normally leave it to those guys to resolve the
22   situation between themselves and just let me know what they
23   wanted.
24   Q.   What about you?  Were other trader positions ever in
25   conflict with your own interest rate swap positions?

```
                                                                       739
     FANMALL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4             v.                              14 CR. 272 (JSR)

5    ANTHONY ALLEN and ANTHONY
     CONTI,
6
                  Defendants.
7
     ------------------------------x
8
                                              New York, N.Y.
9                                             October 23, 2015
                                              9:25 a.m.
10

11   Before:

12                      HON. JED S. RAKOFF,

13                                            District Judge

14
                           APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BRIAN R. YOUNG
     CAROL SIPPERLY
18   MICHAEL T. KOENIG
          Assistant United States Attorneys
19
     WILLKIE & GALLAGHER LLP
20        Attorneys for Defendant Anthony Allen
     BY:  MICHAEL S. SCHACHTER
21        CASEY DONNELLY

22   TOR EKELAND, P.C.
          Attorneys for Defendant Anthony Conti
23   BY:  TOR EKELAND
          AARON WILLIAMSON
24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

740
FANMALL1                        Yagami - cross

1              (Trial resumed; jury not present)
2              THE COURT:  Good morning.  Please bring in the jury.
3              MR. SCHACHTER:  Your Honor, you had asked us to confer
4    on exhibits last night.  We did.  We reached an agreement.  We
5    will offer at the commencement, with the Court's permission and
6    with the's government consent, a subset of exhibits that we
7    wanted to offer.
8              MS. SIPPERLY:  And questioning --
9              (Jury present)
10             THE COURT:  Good morning, ladies and gentlemen.  I
11   neglected to mention to you that my law clerk seated right here
12   is from Canada and, thus, has this strange notion that the
13   Toronto Blue Jays will not only make it to the World Series,
14   but even prevail.  I feel we should extend to her our advanced
15   sympathy and condolences.
16             Let's continue with the trial.
17    TAKAYUKI YAGAMI, resumed.
18   CROSS-EXAMINATION (cont'd)
19   BY MR. SCHACHTER:
20   Q.  Good morning, Mr. Yagami.
21   A.  Good morning.
22             MR. SCHACHTER:  Your Honor, I believe with the consent
23   of the government, we will at this time offer Defense Exhibits
24   263 to 285.
25             MS. SIPPERLY:  Based on state of mind.

1            THE COURT:  Yes.  For the limited purposes agreed to
2   by counsel, it is received.
3            (Defendant's Exhibits 263-285 received in evidence)
4   Q.  Mr. Yagami, Mr. Robson told you that it was in his view
5   okay to move his LIBOR setting by one or two basis points
6   because LIBOR moves in a range.  Isn't that correct?
7   A.  Yes.  He mentioned that when I was in London in the year
8   2000.
9   Q.  And based on your discussions with Mr. Robson, it was your
10  view that the practice of adjusting submissions by a few basis
11  points based on a trader's interest was a gray area, isn't that
12  correct?
13  A.  At the time I understood in the way he just described.
14  Q.  And that's because Mr. Robson told you that as long as you
15  kept the submission in a reasonable range you could do it,
16  isn't that correct?
17  A.  At the time I understood in this way.
18  Q.  And you agreed that there was a range of correct LIBOR
19  rates that he could submit, is that true?
20  A.  In the range you can trade and adjust the levels based on
21  interest preferences of certain fixing certain positions.  It's
22  agreeable.  It's okay to do.  That's what I understood at the
23  time.
24  Q.  And you also would agree that there was no one single true
25  and correct LIBOR rate for any given day for any given bank,

742
FANMALL1                    Yagami - cross

1  isn't that correct?
2  A.  It's hard to say, but if you are the submitter and doing
3  the cash trade, you have a responsibility to decide a level of
4  the submission of LIBOR.  You should have the rate come up in
5  your mind and that should be the rate to be submitted for the
6  LIBOR.  In that sense what you mention may be correct.  In
7  other sense one submitter decide that level, then that may
8  be -- can be -- the rate has to be submitted.
9  Q.  I want to make sure that I understand what you mean when
10 you say in one sense that is correct.  It is correct that in
11 your view there was no certain and correct level of LIBOR level
12 on a given day for a given bank.  That was your view, correct?
13 A.  In answer to your question, especially 2000 when I just
14 joined Rabobank, my understanding was what you just mentioned.
15 Q.  Thank you.
16          MR. SCHACHTER:  Can we put up on the screen, please,
17 Government Exhibit 601A.  This has been received in evidence.
18 I'm sorry, your Honor.  May we have a moment.
19 Q.  I'm showing you what has been received in evidence as
20 Government Exhibit 601A.  Do you recognize that to be a
21 communication between you and Mr. Robson?
22 A.  Yes, I do.
23 Q.  March 19 of 2008?
24 A.  Yes.
25 Q.  And I'd like to look at your communication at the very

```
                                                                849
   FANQALL4                    Dornbos - direct
1   and also what other witnesses they are going to have so that we
2   can plot out our schedule for the coming week.
3            In addition, start thinking about how long each party
4   wants for summation because we will want to address that fairly
5   soon as well to factor that into the schedule.
6            Anything anyone needs to raise with the Court?
7            Very good.  Thanks a lot.
8            (Luncheon recess)
9        (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

850
FANMALL5                    Dornbos - direct

1              AFTERNOON SESSION
2                   2:15 p.m.
3         THE COURT:  Defense counsel wanted to raise something
4    with the Court.
5         MR. SCHACHTER:  Yes, your Honor.  The government
6    informed us through the testimony of this witness they intend
7    to introduce records of Mr. Allen's, and I believe Mr. Conti's
8    as well, just gross annual compensation.  I don't know what
9    fact of consequence their gross compensation could possibly be
10   relevant to.
11        THE COURT:  Let's find out.
12        MR. YOUNG:  It goes to their intent, your Honor.
13        THE COURT:  Why?
14        MR. YOUNG:  The defendants' intent.  Because what the
15   testimony has shown is that the bonus pool at Rabobank was
16   dependent, at least in part, on the performance of the overall
17   bank.  And so the defendants had an incentive to have the books
18   do well, even books to which they were not attached, because
19   they want to have --
20        THE COURT:  That's already been testified to.  What is
21   the actual figures?  You would have to know what it would have
22   been with or without their alleged misconduct in order to make
23   any additional argument on it.  You already have the argument
24   that their compensation was at least indirectly affected by
25   their alleged misconduct.

851
FANMALL5                Dornbos - direct

1           MR. YOUNG:  We think that the amount of the
2    compensation provides a window into how great the incentive
3    was.
4           THE COURT:  You would only know that if you have a
5    point of comparison.  But for the alleged misconduct they would
6    have made -- I'll take an extreme situation -- but for it they
7    would have made $10 million, and instead they made $10,050,000.
8    Unless you have that comparison you would say, oh, my gosh,
9    they made $10,050,000 that year.  That must have been the
10   fruits of their illegality where it wouldn't have any tendency
11   to prove that at all.
12          And, conversely, but for the alleged illegal conduct
13   they would have made $10,000, but instead they made $50,000,
14   then the incentive would have been arguably very great, but the
15   jury would have no way of knowing that unless they knew what
16   they would have received but for the alleged illegal conduct.
17   I don't see what these gross figures add.
18          MR. YOUNG:  We think that the but for differential
19   isn't the only important point.
20          Another important point that the jury can take away
21   from this is that traders who don't do well at trading tend not
22   to stay as traders.  They may lose their jobs.  They may get
23   fired for performance issues.  So if somebody is making a lot
24   of money as a trader, even if we can't identify exactly how
25   much the manipulation influenced that bonus, they could say,

852
FANMALL5                    Dornbos - direct

1    I'm making a lot of money here and I want to stay at this job
2    making a lot of money.
3             THE COURT:  I want to stay at this job making a lot of
4    money because I'm doing it legitimately because they are very
5    good traders.  The jury has no way of distinguishing anything
6    about intent from these figures.  So the objection is
7    sustained.
8             Let's bring in the jury.  Let's get the witness back
9    on the stand.
10            (Jury present)
11            THE COURT:  Where is the witness?
12            MR. YOUNG:  He is leaving the restroom, your Honor.
13   My apologies.
14            THE COURT:  Counsel.
15            MR. YOUNG:  Thank you, your Honor.
16   Q.  Mr. Dornbos, turning our attention to Exhibit 102C, do you
17   have it in front of you?
18   A.  I do.
19   Q.  Let's walk through the methodology here and what we see on
20   the exhibit.  For each of these slides, what is indicated on
21   the upper right-hand corner of the exhibit?
22   A.  That would be the date that's being highlighted here.
23   Q.  And is there a communication listed below that?
24   A.  There is.
25   Q.  What is signified under the communication box?

                                                                    853
    FANMALL5              Dornbos - direct

1    A.   That's the exhibit from the associated communication.
2    Q.   Exhibit number, what's under that?
3    A.   You mean the three charts at the bottom?
4    Q.   I'm sorry.  It says Exhibit 101AM?
5    A.   Yes.
6    Q.   Is that where you got the information that is summarized in
7    the upper right-hand corner?
8    A.   Yes.  That's the communication where that information is
9    from.
10   Q.   Now, if we go to the middle of the exhibit towards the
11   bottom, are there three tables there?
12   A.   Um-hum.
13   Q.   What data are we seeing in these three tables?
14   A.   Those are the submissions of the 16 panel banks for the
15   data referenced, as well as the day before and after.
16   Q.   Where did you get the data for the submissions of the 16
17   panel banks?
18   A.   From Thompson Reuters.
19   Q.   Is Rabobank the bank that's highlighted?
20   A.   Yes, Rabobank is highlighted.
21   Q.   In this particular exhibit or this particular chart we see
22   a couple of days where there is a tie.  For example, 3.970.
23   You see that part?
24   A.   Um-hum.
25   Q.   How did you indicate the order when two banks submitted the