# EXHIBIT D



Page 1

# BRITISH BANKERS' ASSOCIATION

Pinners Hall
105-108 Old Broad Street
London EC2N 1EX

Tel: +44 (0) 20 7216 8800
Fax: +44 (0) 20 7216 8811

To: Ian Mullen, Sally Scutt, Michael McKee, Wholesale Team

From: Philip Buttifant

**MEETING ON WHOLESALE ISSUES AT THE BANK OF ENGLAND ON 18-08-2005**

Ian Mullen, Michael McKee, Philip Buttifant, Ross Barrett and John Ewan called on Paul Tucker (Executive Director, Markets), David Rule (Head of Sterling Markets) and Paul Fisher (Head of Foreign Exchange). We covered the following topics:

- Cross-market Business Continuity Management Group;
- Hedge funds and credit derivatives;
- The Bank's gathering of market intelligence;
- Money markets reform; and
- LIBOR review

**Cross-market Business Continuity Management Group**

PT circulated copies of the Group's terms of reference and membership. Meetings are co-chaired by PT and Hector Sants of the FSA. Two preparatory meetings had been held in April and June. The general view of the Group was that Euroclear and Swift should be asked to become members; there was some debate within Euroclear about joining, and it was decided that they should join in their own right rather than be represented by Crest.

In addition, there was a view that whilst it would be unwise for the Group to be too large, as this would limit its efficiency in a crisis, there were some eventualities where other bodies should be asked to attend. Therefore, a new category of "contingent member" was set up, including BNP, the LME and the IPE. Also, a communication structure and protocols are being established with other bodies that deal with BCP, such as ICMA, so as to avoid wasteful duplication and to enhance a co-ordinated response to a crisis amongst all aspects of the financial markets.

The Group first met on 7 July, in response to the bombs in London. This meeting was very orderly. One concern raised was that there was little information on the FSA's financial stability website. DR noted that it was difficult to put information on the website unless it could definitely be verified, and there were a large numbers of rumours circulating on the day.

PF said that OMO had been stopped early on 7 July, but prior to closing, the Bank had bought securities to inject a degree of liquidity into the markets, to ensure that market participants had sufficient liquidity to close their books early.

::ODMA\PCDOCS\BBA01\231275\1 17 March 2015

www.bba.org.uk
Registered in London England. Reg. No:3162894 Registered Office: Pinners Hall 105 - 108 Old Broad Street London EC2N 1EX
BBA Enterprises is the trading company of the British Bankers' Association

SFO UNIQUE REFERENCE "LBR07B000554-4889-23"

17
114070472

JE gave an update on LIBOR's business continuity on 7 July. He had contacted Reuters and the contributor banks, and all were able to participate except UBS, which had been evacuated. This meant that the LIBOR fix could take place without difficulty. JE had previously talked to the banks about issues such as this, and about developing protocols for use in cases of serious disruption to the market.

PT asked what the effect on LIBOR would be if Reuters went down. JE replied that this would not be a problem, as Reuters is ubiquitous and another hub could be used. LIBOR would certainly still go out, although it might go out late.

DR noted that plans were in place to set up an Operations Group, being a sub-group of the Money Markets Liaison Group, to look at BCP for money market operations and sterling payments. Crest and CHAPS have been invited to join. It was intended that Richard Pattenson would chair this group. PF observed that a similar group had been set up after 9/11 to deal with back office BCP. This had subsequently worked well with its US counterpart.

PF queried the role of the EBF in BCP. IM and MM replied that it was not particularly involved, given that as it was an "association of associations" it was not particularly close to the ground. IM suggested that the EBF could play a useful role in disseminating information, and that this would be investigated. Consideration would also be given to inviting the ECB and BIS, the two main pan-European bodies involved in financial services BCP, to an EBF meeting in order to discuss the best way forward.

**Hedge funds and credit derivatives**

MM noted that the BBA was closely following developments in both hedge funds and credit derivatives. With regard to the former, the BBA is analysing the DP with the assistance of a Working Group of senior representatives of our member banks, in order to develop a response. At a high level, our initial view is that the FSA's general proposals appear sensible, in that they state their wish to gain more information about the workings of hedge funds, whilst recognising the need not to over-regulate them and hence deter them from operating in the UK. However, given jurisdictional and other issues, there are questions as to how the FSA's strategy can be realistically executed in practice.

PT expressed his apprehensiveness over the FSA's approach. He believes there may be the risk that investors believe that the FSA has more "regulatory grip" over hedge funds than is in fact the case, especially as it seems unlikely that all hedge funds will comply with a non-mandatory request for provision of information.

In addition, the Bank on principle does not believe that hedge funds should be regulated if there is no consumer protection angle, or systemic risk concerns. What they believe is preferable is information gathering of the sort carried out by the Bank at the moment. PT's view is that the level of regulation of hedge funds should be a decision of HMT rather than of the FSA, as essentially this is not an area within the intrinsic scope of the work of the FSA. Another issue lies around demarcation: the FSA has the authority to authorise hedge fund managers but not hedge funds themselves. This limits the regulation that the FSA is legally able to carry out.

In relation to hedge funds, DR pointed out the big growth in business volumes, and noted that back offices were struggling to keep up with this. He confirmed that although the DTCC still has large backlogs, these are improving.

SFO UNIQUE REFERENCE "LBR07B000554-4889-23"

11407472

A significant problem if a trade fails is assignment – does the trade still stand? MM pointed out that this uncertainty leads to a variety of risks, including legal and litigation risk, together with counterparty exposure.

PF noted that dealers in credit derivatives appeared to be "getting their act together" more recently, with greater use of automation and more industry initiatives. There still remain some "laggards", however, both amongst funds and dealers.

Regarding the strong growth of the market in credit derivatives, RB noted that this growth was driven by complex products rather than the plain vanilla. A significant reason for this was arguably that firms' profits were driven more by the high-margin "exotica". MM observed that the FSA was setting up a working group for later this year of market participants to discuss the regulatory and accounting treatment of exotic credit derivatives.

MM noted that the BBA's biennial credit derivatives survey was to be carried out in 2006, to be published in September of that year. He asked if the Bank would consider a secondment of one of their statistical staff to help the BBA with the survey, as happened in 2004. DR was supportive of the request, and will look into it.

**The Bank's gathering of market intelligence**

PT outlined that the FSA's Market stability function had shrunk by some 30 people – this had no significance in relation to the scope or purpose of the function, but simply to the FSA's approach to staffing, namely to do work with fewer, but more experienced, staff.

The development of market intelligence has been building up for some time. The FSA has been building up a network of contacts in the UK and abroad to gather financial stability information. The FSA has also made internal organisational changes: the world has been split into some 15-20 different markets, each with its own champion and a team to cover developments. Essentially, market intelligence used to be there to support the Bank's operations, whereas now, given the more formulaic nature of the Bank's operations, they are there now more to support the gathering and analysis of market intelligence.

PT noted that he would be interested to discuss the Bank's "shopping list" of statistical information when the BBA next carries out its Banking Statistics Survey.

**Money markets reform**

PT noted that there had been a good take-up of the new reserve account facilities, with some 50 reserve banks now, and some 30 new OMO participants. The Bank is happy with this take-up to date, and hopes for more interest going forward. They are still positive about the new arrangements coming into force in March-June of 2006, and will probably be able to narrow this range around November.

The Bank is about to embark on a technical consultation with OMO counterparties on the use of long-term repos. This would make it easier for the Bank than lending on a weekly basis. The intention is to build up a portfolio of long-term bonds, and loan money either six-monthly or annually.

Regarding the overnight range, DR commented that since the trading range was narrowed, the rate was stabilising somewhat, although there was scope for it to stabilise further.

SFO UNIQUE REFERENCE "LBR07B000554-4889-23"

PT expressed his thanks to IM for disseminating Bank information through CEO's Committee and at the recent BBA conference.

**LIBOR review**

JE outlined the progress of the LIBOR review. He had visited all the contributing banks and canvassed their opinions on the current methodology and processes. The responses were to the effect that the product was in good health, and clearly understood in the market. The contributing banks had been revised recently, and JE had received no comments or queries on this, so it could clearly be regarded as unproblematical to the market.

The BBA is also planning to introduce a Swedish Krona LIBOR fix in the future. The product has been tested, and contributors have been identified. No announcement has yet been made to the market.

JE also noted that there was a market consensus that the GBP-USD LIBOR was some 3-4 bp over the actual market rate. This was essentially a construct of the market, as it is in the interests of banks to have a higher LIBOR.



DR asked if the BBA had considered broadening its LIBOR consultative panel to non-bank participants, such as hedge funds or large corporations. MM said that this would be considered in the future – the next LIBOR review would take place in 2006.

PT queried whether EURIBOR more closely matches EONIA than BBA Sterling LIBOR matches SONIA. JE replied that it did, owing to the differences in calculation methodology between EURIBOR and BBA Sterling LIBOR.

JE and DR agreed to meet subsequently to discuss and work together on LIBOR contingency planning.

**Any other business**



IM raised the issue of EU-US regulatory dialogues. This had originally been raised by the FOA, who believed that there was unnecessary complexity in the differences between the regulatory environments that constrained cross-border activity. The BBA and FOA have jointly produced a report – with the legal input of Clifford Chance – that covered areas of complexity in relation to equity (both cash and derivatives) that needed to be addressed. The BBA and FOA had also brought in various US trade associations, and were keen to involve their European counterparts, as this initiative should not be seen as a pure UK-US project.

MM noted that several trips had been made to the US, and The BBA and FOA had held meetings with various political and regulatory bodies. Progress with the SEC was particularly encouraging.

The survey itself was in near final form, and would be published in September. MM asked the Bank for their views on the survey and the best way forward on its publication, to which PT agreed.


SFO UNIQUE REFERENCE "LBR07B000554-4889-23"



**Actions arising**

- Investigate the potential role of the EBF in disseminating information in the event of a crisis, and consider inviting the ECB and BIS to an EBF meeting to discuss the best way forward.
- Liaise with DR re a BoE statistician to be seconded to the BBA to assist with the credit derivatives survey.
- Liaise with PT about statistics in which the BoE may be interested in relation to the next Banking Statistics Survey.
- Consider widening the consultation panel for 2006's LIBOR review.
- JE and DR to meet to discuss and work together on LIBOR contingency planning.
- Work with the Bank on EU-US regulatory dialogues.

SFO UNIQUE REFERENCE "LBR07B000554-4889-23"