**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW CONNOLLY and<br>GAVIN CAMPBELL BLACK,<br><br>                    *Defendants*. | No. 1:16-cr-00370 (CM)<br><br>ECF Case<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANT GAVIN CAMPBELL BLACK'S INDIVIDUAL MOTIONS *IN LIMINE*

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 3

ARGUMENT ......................................................................................................... 8

I.  THE GOVERNMENT SHOULD BE PRECLUDED FROM USING MR. BLACK'S INVOLUNTARY STATEMENTS TO DEUTSCHE BANK'S COUNSEL .................... 8

    A.  Mr. Black's Statements to Paul Weiss Were Involuntary ....................................... 9

    B.  The Conduct of Deutsche Bank and Its Counsel in Compelling Mr. Black to Submit to the Interviews Is Fairly Attributable to the Government ...................... 9

    C.  Alternatively, the Court Should Hold an Evidentiary Hearing ............................. 15

II. MR. BLACK SHOULD BE PERMITTED TO INTRODUCE EVIDENCE DEMONSTRATING THAT HE WAIVED HIS EXTRADITION RIGHTS ................. 15

CONCLUSION ..................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ................................................................. 9

*D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.,*
  279 F.3d 155 (2d Cir. 2002) .................................................... 14

*Flagg v. Yonkers Sav. & Loan Ass'n,*
  396 F.3d 178 (2d Cir. 2005) .................................................... 9

*Garrity v. New Jersey,*
  385 U.S. 493 (1967) ................................................................. 8

*Gilman v. Marsh & McLennan Cos.,*
  826 F.3d 69 (2d Cir. 2016) ...................................................... 14

*Skinner v. Ry. Labor Executives' Ass'n,*
  489 U.S. 602 (1989) ................................................................. 13

*United States v. Biaggi,*
  909 F.2d 662 (2d Cir. 1990) .................................................... 16

*United States v. Certified Envtl. Servs., Inc.,*
  753 F.3d 72 (2d Cir. 2012) ...................................................... 15

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) .................................................... 15

*United States v. Pena,*
  961 F.2d 333 (2d Cir. 1992) .................................................... 15

*United States v. Rajaratnam,*
  No. 13-cr-211, Dkt. No. 94 (S.D.N.Y. May 30, 2014) .......... 16

*United States v. Solomon,*
  509 F.2d 863 (1975) ................................................................. 14

*United States v. Stein,*
  440 F. Supp. 2d 315 (S.D.N.Y. 2006) .................................... 10, 11

*United States v. Stein*,
   541 F.3d 130 (2d Cir. 2008) ............................................................................ *passim*

*United States v. White*,
   692 F.3d 235 (2d Cir. 2012) ..................................................................................... 15

**RULES**

Federal Rule of Evidence 401 ...................................................................................... 15

**OTHER AUTHORITIES**

Abbe David Lowell and Christopher D. Man, *Federalizing Corporate Internal Investigations
   and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L.J. Ann Rev. Crim.
   Proc. III (2011) ....................................................................................................... 13

Lisa Kern Griffin, *Compelled Cooperation and the New Corporate Criminal Procedure*,
   82 N.Y.U. L. Rev. 311 (2007) ..................................................................................... 3

Memorandum from Larry D. Thompson, Deputy Attorney General, to Heads of Department
   Components, United States Attorneys, Principles of Federal Prosecution of Business
   Organizations (Jan. 20, 2003) ............................................................................ 10, 11

Memorandum from Mark Filip, Deputy Attorney General, to the Heads of Department
   Components, United States Attorneys, Principles of Federal Prosecution of Business
   Organizations (Aug. 28, 2008) ......................................................................... 3, 4, 12

Defendant Gavin Campbell Black respectfully submits this memorandum of law in support of his individual motions *in limine* to:  (1) preclude the Government from offering evidence concerning compelled statements that he made to Deutsche Bank's counsel; and (2) permit him to introduce evidence demonstrating that he waived extradition.[1]

## PRELIMINARY STATEMENT

The Government should be precluded from introducing evidence concerning compelled statements that Mr. Black made to Deutsche Bank's counsel.  Deutsche Bank's counsel interviewed Mr. Black on multiple occasions under threat of termination.  Deutsche Bank's written compliance policies mandated that company employees cooperate with internal investigations conducted by the Legal Department, and Mr. Black believed that his employment with Deutsche Bank would have been terminated had he not agreed to participate in these interviews.  Statements obtained under threat of termination are involuntary under the Fifth Amendment.  Here, the Government is responsible for Deutsche Bank's conduct in compelling Mr. Black's statements based on its corporate cooperation policies and its statements made during dozens of communications with Deutsche Bank's counsel in which it injected itself into counsel's investigatory process.

The Government has federalized corporate internal investigations through its corporate cooperation policies.  Pursuant to these policies, a corporation under investigation is not eligible for cooperation credit—which may be the only means to avoid indictment—unless it discloses all relevant facts pertaining to the Government's allegations of misconduct.  These policies have created an expectation that company counsel conducting an internal investigation will work at the behest of the Government and put together a case for the Government to use in its

---

[1] These motions *in limine* pertain only to Mr. Black and not to co-defendant Matthew Connolly. Messrs. Black and Connolly jointly filed a memorandum of law in support of the motions *in limine* that pertain to issues relevant to both defendants.

prosecution of the corporation's employees. This work typically includes company counsel using its leverage over company employees to compel them to submit for interviews in a privileged setting and then turning over the statements made during these involuntary interviews to the Government.

This is exactly what happened in this case. Upon being alerted to the Government's investigation into Deutsche Bank's LIBOR-related practices, Deutsche Bank commenced an internal investigation led by outside counsel who pledged cooperation to the Government and agreed to coordinate its internal investigation with the Government. Over a period of at least several years, Deutsche Bank's counsel was in frequent contact with the Government concerning the status of its internal investigation and received regular direction from the Government, including in connection with interviews of Deutsche Bank employees. To satisfy its disclosure obligations under the Government's corporate cooperation policies, Deutsche Bank's counsel interviewed numerous company employees, including Mr. Black, and disclosed the statements made during many of these interviews to the Government. As a result of Deutsche Bank's cooperation, the Government resolved potential charges against Deutsche Bank through a Deferred Prosecution Agreement ("DPA") that credited Deutsche Bank with "disclosing much of the misconduct" underlying the charges in this case.

Under such circumstances, the Government is responsible for Deutsche Bank's conduct in compelling Mr. Black's interview statements, and these statements are therefore inadmissible against Mr. Black at his criminal trial. Accordingly, the Court should suppress any evidence pertaining to compelled statements that Mr. Black made to Deutsche Bank's counsel.

In addition, Mr. Black should be permitted to admit evidence that he waived his rights under the extradition treaty between the United States and the United Kingdom and voluntarily

surrendered to United States authorities. Mr. Black's decision not to challenge extradition demonstrates his consciousness of innocence, and such evidence is relevant and probative.

## FACTUAL BACKGROUND

### A.     The Government's Corporate Cooperation Policies

The Government's Corporate Fraud Task Force has issued public guidelines concerning the prosecution of corporate defendants called "Principles of Federal Prosecution of Business Organizations," which are binding on all federal prosecutors. The version of these guidelines in effect during the investigation of this case was issued on August 28, 2008 by then-Deputy Attorney General Mark Filip (the "Filip Memorandum"). (*See* Declaration of Seth L. Levine in Support of Mr. Black's Individual Motions *in Limine* ("Levine Decl.") Ex. A.) The Filip Memorandum, as well as the versions of the guidelines that preceded it, required corporations under investigation to agree, in effect, to serve as deputy investigators for the Government in order to obtain cooperation credit and avoid indictment. *See* Lisa Kern Griffin, *Compelled Cooperation and the New Corporate Criminal Procedure*, 82 N.Y.U. L. Rev. 311, 367 (2007) ("The threat of [ruinous indictment] brings significant pressure to bear on corporations, and that threat 'provides a significant nexus between a private entity's employment decision at the government's behest and the government itself.'") (cited in *United States v. Stein*, 541 F.3d 130, 151 (2d Cir. 2008)).

The Filip Memorandum conditions a corporation's eligibility for cooperation credit on its willingness to timely and voluntarily disclose all relevant facts concerning the alleged misconduct under investigation. (*See* Levine Decl. Ex. A §§ 9-28.700, 9-28.720(a) (stating that a cooperation's failure to provide relevant facts "means that the corporation will not be entitled to mitigating credit for cooperation"). While the Filip Memorandum prohibits prosecutors from requesting waivers of non-factual attorney-client communications or work product (*id.*

§ 9-28.710), it makes clear that a corporation must disclose relevant factual information regardless of whether such information was learned through a privileged communication (*id.* § 9-28.720).  The Filip Memorandum states:

> [T]he government's key measure of cooperation must remain the same as it does for an individual: has the party timely disclosed the relevant facts about the putative misconduct?  That is the operative question in assigning cooperation credit for the disclosure of information—*not* whether the corporation discloses attorney-client or work product materials.  Accordingly, a corporation should receive the same credit for disclosing facts contained in materials that are not protected by the attorney-client privilege or attorney work product as it would for disclosing identical facts contained in materials that are so protected.

(*Id.* § 9-28.720(a) (emphasis in original).)

The Filip Memorandum contemplates that corporations will not be able to meet the cooperation eligibility standard without interviewing employees with knowledge of the issues and then disclosing statements made during those interviews to the Government.  (*Id.*)  As the Filip Memorandum recognizes, corporations typically learn at least some of the relevant facts through interviews conducted by counsel during an internal investigation.  (*Id.* § 9-28.720 n.3.)  It further makes clear that "[t]o earn [cooperation] credit," the corporation must provide, and prosecutors may request, "relevant factual information acquired through those interviews."  (*Id.*)

**B.      The Government Obtained Eligibility for Cooperation Credit Under the Filip Memorandum by Disclosing Privileged Statements Made by Mr. Black and Other Employees**

Upon being alerted that the Government and other regulatory authorities were conducting an investigation into Deutsche Bank's LIBOR submission practices, Deutsche Bank "commenced an internal investigation."  (Levine Decl. Ex. B ¶ 4(a).)  Deutsche Bank's internal investigation was conducted by its outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss").   Pursuant to standard practice under the Filip Memorandum, the tremendous pressure placed on Deutsche Bank to avoid indictment led Deutsche Bank to

cooperate and act on behalf of the prosecutors in conducting its internal investigation. The DPA credited Deutsche Bank with "disclosing much of the misconduct described in the [DPA's] Information and Statement of Facts," which are premised on the same theory as the Indictment in this case. (*Id.* ¶ 4(a), SOF ¶¶ 16-35.)

As is typical in corporate cooperation cases, Paul Weiss learned many of the "relevant facts" that it later disclosed to the Government to gain eligibility for cooperation credit through privileged interviews with Deutsche Bank employees, including Mr. Black. Based on FBI Form 302s produced by the Government, as well as other Government representations, Mr. Black believes that the Government intends to introduce statements that he purportedly made to Paul Weiss during interviews on one or both of the following dates: August 25, 2011 and June 19, 2012 (the "Interviews").[2] At the time of the Interviews, Mr. Black was still employed at Deutsche Bank and was not represented by counsel. (Declaration of Gavin Campbell Black ("Black Decl.") ¶ 2.) Paul Weiss later waived privilege and disclosed Mr. Black's statements during the Interviews to the Government.

The Government and Paul Weiss were in frequent contact during the course of Paul Weiss's internal investigation. (*See, e.g.*, Levine Decl. Ex. B ¶ 4(a) ("Deutsche Bank communicated with and updated the Department with increasing frequency as the investigation progressed.").) As reflected in handwritten notes taken by the Government on July 11, 2011— prior to the Interviews—Deutsche Bank advised the Government of its intent to cooperate with the Government's investigation. (Levine Decl. Ex. C at DOJ-A-0010359 ("co. intends to coop[erate] fully").) The Government also identified "USD" as one of its priorities and

---

[2] Paul Weiss also interviewed Mr. Black on other occasions as part of the internal investigation. While Mr. Black does not believe that the Government intends to offer evidence concerning these other interviews, the arguments contained herein also apply to statements at Mr. Black's other interviews with Paul Weiss.

instructed Paul Weiss to "[l]et us know about the process of internal investig[ation]" and to "give us heads up about actions." (*Id.* at DOJ-A-0010360.)

Consistent with the Government's direction, the Government and Paul Weiss had periodic calls and meetings during which they discussed the status of the internal investigation. (*See, e.g.*, Levine Decl. Ex. B ¶ 4(a) ("Deutsche Bank communicated with and updated the Department with increasing frequency as the investigation progressed.".) While Mr. Black does not believe that he has a complete record of the Government's conversations with Paul Weiss, the materials that he has received reflect that Paul Weiss's interviews of Deutsche Bank's employees were a frequent topic of discussion. During these communications, the Government also provided guidance and direction to Paul Weiss concerning the internal investigation, including Paul Weiss's interviews of Deutsche Bank employees. For example, the Government advised the Financial Conduct Authority ("FCA") that it spoke with Paul Weiss in advance of one of its internal interviews, and that the Paul Weiss attorney leading the interview gave the Government his "word that he will approach this interview as if he were a prosecutor," to which the FCA responded that it appreciated the Government's "Machiavellian approach with asking Paul Weiss to conduct the interview." (Levine Decl. Ex. D at DOJ-DB-KAST-0003527.) In a follow-up call, the FCA advised the Government that it also spoke to this Paul Weiss attorney and directed him to provide an interview plan and a list of documents that would be used prior to the interview. (Levine Decl. Ex. E.) In response, the Government advised the FCA that it believed that the Paul Weiss attorney would be able to meet the conditions and that it "really appreciate[d] [the FCA] working with us on this." (*Id.*) In addition, Paul Weiss requested the Government's and the FCA's permission prior to scheduling follow-up interviews of three employees, including Mr. Black (*see* Levine Decl. Ex. F at DOJ-DB-KAST-0003459), and the

Government told Paul Weiss that it "did not have an issue with those follow up interviews."  (*See* Levine Decl. Ex. G at DOJ-DB-KAST-0003472.)

### C.     The Refusal to Meet with Paul Weiss Was a Terminable Offense at Deutsche Bank

As with most corporations, Deutsche Bank's written compliance policies required all company employees to cooperate with internal investigations conducted at the behest of the Legal Department or face termination.  Specifically, Deutsche Bank adopted Global Compliance Core Principles that "set forth . . . ***minimum requirements*** for dealing with compliance-related issues."  (Levine Decl. Ex. H at DOJ-SFO-DB-00002678 (emphasis added).)  One such requirement imposed a mandatory cooperation requirement on company employees.  The Core Principles provided that employees "***must*** fully cooperate with Compliance and other appropriate Deutsche Bank departments (*e.g.*, Legal, Internal Audit, etc.) handling internal and external investigations and other reviews involving Deutsche Bank, its customers and other related company activities."  (*Id.* at DOJ-SFO-DB-00002682 (emphasis added).)  Consistent with the Core Principles, Mr. Black did not believe that he had any choice but to agree to meet with the Paul Weiss lawyers and answer their questions.  (Black Decl. ¶ 3.)  He also believed that, had he refused to do so, it would have resulted in his termination from Deutsche Bank.  (*Id.*)

### D.     Mr. Black

At all relevant times, Mr. Black was a citizen of and resided in the United Kingdom.  The Government could not have secured his presence in the United States without complying with the procedures required by the extradition treaty between the United States and the United Kingdom.

Mr. Black, however, waived any rights that he had in connection with this treaty, including the right to challenge extradition, and agreed to voluntarily surrender to the United

States authorities to answer the charges set forth in the Superseding Indictment ("Indictment"). [Dkt. No. 27.]  Mr. Black promptly agreed to surrender despite receiving assurances from United Kingdom authorities that he would not be subject to criminal prosecution in his home country based on the conduct alleged in the Indictment.  [*Id.* at 1.]  He also waived his right to hearings in the United Kingdom to challenge his extradition, despite knowing that he could not be compelled to surrender to United States authorities until ordered by a United Kingdom court. [*Id.* at 1-2.]

## ARGUMENT

**I.     THE GOVERNMENT SHOULD BE PRECLUDED FROM USING MR. BLACK'S INVOLUNTARY STATEMENTS TO DEUTSCHE BANK'S COUNSEL**

The Government should be precluded from introducing evidence concerning Mr. Black's statements to Deutsche Bank's counsel at the Interviews because they were coerced by conduct that is fairly attributable to the Government.  Based on the Filip Memorandum and the Government's input into Paul Weiss's internal investigation, the Government intervened in and guided Paul Weiss's decisionmaking and thus bears constitutional responsibility for Paul Weiss's conduct in compelling Mr. Black to make involuntary statements during the Interviews.

In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that statements obtained from police officers under threat of termination of employment are involuntary and therefore inadmissible against them in a criminal trial.  The Court found that it is "the antithesis of free choice" to present an individual with the "option to lose their means of livelihood or to pay the penalty of self-incrimination."  *Id.* at 497.

While *Garrity* involved the conduct of a governmental employer, the *Garrity* rule also applies to private employers where its actions are "fairly attributable to the government."  *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008) ("*Stein II*").  Private conduct meets this

standard when "there is a sufficiently close nexus between the [government] and the challenged action." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Stein II*, 541 F.3d at 146.  Situations in which the close nexus requirement is met include:

> [W]hen the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with *significant encouragement*, either overt or covert, or when the private actor operates as a *willful participant in joint activity* with the State or its agents . . . or is *entwined with governmental policies*.

*Stein II*, 541 F.3d at 147 (emphasis in original) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005)).

###### A.   MR. BLACK'S STATEMENTS TO PAUL WEISS WERE INVOLUNTARY

Mr. Black's statements to Paul Weiss at the Interviews were involuntary because he made them under threat of termination of employment.  As counsel for Deutsche Bank, Paul Weiss conducted the Interviews of Mr. Black while he was still a Deutsche Bank employee.  Under Deutsche Bank policy, employees were required to cooperate with investigations initiated by Deutsche Bank's Legal Department or face termination of employment.  (Levine Decl. Ex. H at DOJ-SFO-DB-00002680, DOJ-SFO-DB-00002682.)  Consistent with this policy, Mr. Black did not believe that he had any choice but to agree to meet with the Paul Weiss lawyers and answer their questions.  (Black Decl. ¶ 3.)  He also believed that, had he refused to do so, it would have resulted in his termination from Deutsche Bank.  (*Id.*)  Accordingly, his statements to Paul Weiss were involuntary.

###### B.   THE CONDUCT OF DEUTSCHE BANK AND ITS COUNSEL IN COMPELLING MR. BLACK TO SUBMIT TO THE INTERVIEWS IS FAIRLY ATTRIBUTABLE TO THE GOVERNMENT

Based on the Filip Memorandum and the Government's coordination with Deutsche Bank concerning its cooperation, Deutsche Bank's conduct in compelling Mr. Black to make statements to its counsel during two interviews is fairly attributable to the Government.  In fact,

both this Court and the Second Circuit have previously held that the pressure stemming from the Government's corporate cooperation policies was sufficient to render the Government responsible for the conduct of a private employer.

> **1.    The Government Is Responsible for the Acts of a Private Entity Where Its Policies and Actions Encourage the Private Entity to Take a Specific Course of Conduct**

In *United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ("*Stein I*"), this Court held that the Government was responsible for the pressure that a private employer placed on its employees to agree to submit to proffers with the Government based on facts similar to those present in this case.  In that case, the Government investigated KPMG for its role in allegedly abusive tax shelters.  *Id.* at 318.  To obtain cooperation credit, KPMG yielded to Government encouragement to "press . . . employees to cooperate" with the Government, including by agreeing to proffer.  *Id.* at 318.  The Government's "encouragement" came in two forms:  (1) a version of the Principles of Federal Prosecution of Business Organizations that preceded the Filip Memorandum ("Thompson Memorandum") and (2) statements that the prosecutors made to KPMG's counsel.  *Id.* at 319-21.

The Thompson Memorandum provided, in substance, that "the failure of a business organization facing possible indictment to induce its personnel to submit to interviews by the government and to disclose whatever they know may be a factor weighing in favor of indictment of the entity."  *Id.* at 320.  Specifically, the Thompson Memorandum stated:

> In gauging the extent of the corporation's cooperation [for purposes of determining whether it should be indicted], the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, *to make witnesses available,* to disclose the complete results of its internal investigation, and to waive attorney-client and work-product privileges.

*Id.* at 319 (emphasis and alteration in original) (quoting the Thompson Memorandum).  During meetings, the Government made clear to KPMG counsel that it would consider the Thompson Memorandum in deciding whether to indict, pressured KPMG to cut off legal fees to non-cooperative employees and reported to KPMG the identities of employees who refused to make statements to the Government.  *Id.* at 336-37.

Based on the Government's encouragement, the Court concluded that "the government [wa]s responsible for the pressure that KPMG put on its employees" and suppressed a number of the proffers.  *Id.* at 319.  As the Court explained:

> In this case, the pressure that was exerted on the Moving Defendants was a product of intentional government action.  The government brandished a big stick—it threatened to indict KPMG.  And it held out a very large carrot.  It offered KPMG the hope of avoiding the fate of Arthur Andersen [which went out-of-business following indictment] if KPMG could deliver to the USAO employees who would talk, notwithstanding their constitutional right to remain silent, and strip those employees of economic means of defending themselves.  In two instances, that pressure resulted in statements that otherwise would not have been made . . . . The coerced statements and their fruits must be suppressed.

*Id.* at 337-38.

While the Government appealed the district court's suppression of the proffer statements, this appeal was mooted when the Second Circuit affirmed this Court's subsequent dismissal of the indictment against nearly all of the defendants on the ground that the Government's encouragement caused KPMG to cutoff legal fees to these defendants in violation of their Sixth Amendment right to counsel.  *See Stein II*, 541 F.3d at 135-36 & n.2.  As with the suppression of the proffer statements, the Second Circuit found that KPMG's conduct in cutting off fees to the defendants was fairly attributable to the Government based on the Thompson Memorandum and the Government's statements to KPMG counsel.  *Id.* at 143-44.  According to the court:

> [T]he government forced KPMG to adopt its constricted Fees Policy.  The Thompson Memorandum itself—which prosecutors stated would be considered in deciding whether to indict KPMG—emphasizes that cooperation will be assessed

> in part based upon whether, in advancing counsel fees, "the corporation appears to
> be protecting its culpable employees and agents." Since defense counsel's
> objective in a criminal investigation will virtually always be to protect the client,
> KPMG's risk was that fees for defense counsel would be advanced to someone
> the government considered culpable. So the only safe course was to allow the
> government to become (in effect) paymaster.

*Id.* at 148; *see also id.* at 150 ("KPMG was not in a position to consider coolly the risk of

indictment, weigh the potential significance of the other enumerated factors in the Thompson

Memorandum, and decide for itself how to proceed.").

### 2. The Government Is Responsible for Deutsche Bank's Compelled Interviews of Mr. Black

For reasons similar to those relied on in the *Stein* cases, the Government is responsible

for Deutsche Bank's compelled Interviews of Mr. Black. Based on the Filip Memorandum and

the Government's repeated conversations with Paul Weiss, the Government significantly

encouraged and became entwined with Paul Weiss's decisionmaking in connection with its

interviews of Deutsche Bank employees, including Mr. Black.

The Filip Memorandum induced Paul Weiss's interviews of Mr. Black and other

Deutsche Bank employees because Deutsche Bank would not have been able to meet the

eligibility threshold for cooperation credit without these interviews. Under the Filip

Memorandum, a corporation is not eligible for cooperation credit absent disclosure of the

"relevant facts" pertaining to the Government's allegations of misconduct. (Levine Decl. Ex. A

§ 9-28.720.) The Filip Memorandum also documents the Government's expectation that

cooperating companies will conduct employee interviews, as is "typically" done during internal

investigations, and disclose facts learned from these interviews, except in the unlikely event that

identical information is obtained entirely from other sources. (*Id.* § 9-28.720 n.3.)

Moreover, the Government's encouragement of the Interviews is evident from the fact

that the Government did not interview Mr. Black until after the Interviews occurred and it

received interview summaries from Paul Weiss concerning Mr. Black and other Deutsche Bank

employees.  As several prominent practitioners have noted:

> [T]he government often will defer its interviews of the witnesses until after the
> corporate internal investigators can conduct their own interviews.  Given the
> employees' fear of termination by their employer, the government knows that the
> corporation can be more effective in persuading its employees to speak than it
> could be, and the government knows all to [sic] well that it can then use its
> leverage over the company to compel the company to tell it what the employees
> say, even if that requires the waiver of the attorney-client privileged or work
> product doctrine.

Abbe David Lowell and Christopher D. Man, *Federalizing Corporate Internal Investigations*

*and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L.J. Ann Rev. Crim. Proc. III at

6 n.75 (2011).  Thus, pursuant to the Filip Memorandum, the Government "'did more than adopt

a passive position toward the underlying private conduct,'" *i.e.*, Deutsche Bank's interviews of

its employees; rather, "'it made plain not only its strong preference for [the private conduct], but

also its desire to share the fruits of such intrusions.'"  *Stein II*, 541 F.3d at 147 (alteration in

original) (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989)).

The conclusion that the Deutsche Bank compelled Interviews of Mr. Black should be

imputed to the Government is bolstered by the Government's interactions with Deutsche Bank

during the internal investigation.  The Government took an active role in Paul Weiss's internal

investigation from its inception.  Prior to the Interviews, Paul Weiss informed the Government of

Deutsche Bank's intention to cooperate, and the Government in turn directed Paul Weiss to

apprise it of the actions it planned to take in the internal investigations.  (Levine Decl. Ex. C

at DOJ-A-0010359-60.)  Based on this direction, Paul Weiss's interviews were a frequent topic

of discussion between the Government and Paul Weiss.  This included Paul Weiss asking for and

receiving the Government's permission prior to scheduling follow-up interviews with Mr. Black

and other Deutsche Bank employees in 2014.  (Levine Decl. Exs. F at DOJ-DB-KAST-0003459,

G at DOJ-DB-KAST-0003472.)  In addition, Paul Weiss not only reported what occurred during its interviews, but the Government also gave Paul Weiss direction concerning how to conduct its interviews.  This direction included the Government, on at least one occasion, insisting that one of the Paul Weiss attorneys give the Government his "word that he will approach this interview as if he were a prosecutor."  (Levine Decl. Ex. D at DOJ-DB-KAST-0003527.)

Based on the Filip Memorandum and the Government's statements to Paul Weiss, this case falls squarely within the holdings in the *Stein* cases.  It similarly is distinguishable from other Second Circuit decisions that did not impute a private entity's compulsion of employee interviews to the Government.  *See Gilman v. Marsh & McLennan Cos.*, 826 F.3d 69, 76-77 (2d Cir. 2016); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 163 (2d Cir. 2002); *United States v. Solomon*, 509 F.2d 863, 868-71 (1975).  In those cases, the Government did not bear responsibility for the company's actions because, unlike here, there was no evidence that the prosecution authority "'forced' [the entity] to demand interviews, 'intervened' in [its] decisionmaking, 'steered' [it] to request interviews, or 'supervised' the interview requests." *Gilman*, 826 F.3d at 76; *see also Stein II*, 541 F.3d at 150 (distinguishing *D.L. Cromwell* and *Solomon* based on the fact that the request for interviews was not generated by governmental persuasion or collusion).  Conversely, the Government, through its policies and statements, significantly encouraged Paul Weiss to interview Mr. Black and other Deutsche Bank employees and involved itself in Paul Weiss's activities in such a manner that the entire internal investigation became entwined with the Government's corporate cooperation policies.

Accordingly, Deutsche Bank's compulsion of Mr. Black's Interviews is fairly attributable to the Government, and the Court should suppress Mr. Black's statements to Paul Weiss at the Interviews at trial.

C.    ALTERNATIVELY, THE COURT SHOULD HOLD AN EVIDENTIARY HEARING

Should the Court find that the record is not sufficiently developed to conclude that Deutsche Bank's conduct is fairly attributable to the Government, Mr. Black respectfully requests that the Court hold an evidentiary hearing to further develop the factual record.  *See, e.g.*, *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (stating that an evidentiary hearing "ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact [exist]") (internal quotation marks omitted).

## II.    MR. BLACK SHOULD BE PERMITTED TO INTRODUCE EVIDENCE DEMONSTRATING THAT HE WAIVED HIS EXTRADITION RIGHTS

Mr. Black should also be permitted to admit evidence that he waived his rights under the extradition treaty between the United States and the United Kingdom and voluntarily surrendered to United States authorities.  Mr. Black's decision not to challenge extradition demonstrates his consciousness of innocence and is relevant under Federal Rule of Evidence 401.

"[T]he definition of relevance under Fed. R. Evid. 401 is very broad," *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2012), and "Rule 401 prescribes a 'very low standard'" for admissibility, *United States v. Litvak*, 808 F.3d 160, 180 (2d Cir. 2015) (quoting *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012)).  The decision of a criminal defendant to waive extradition and voluntarily appear in a foreign criminal court is relevant to the defendant's state of mind that he was innocent and had done nothing wrong.  While such a decision by Mr. Black in this case may not be dispositive, that is not the standard.  The Second Circuit has advised:  "Let the accused's whole conduct come in; and whether it tells for consciousness of guilt or for consciousness of innocence, let us take it for what it is worth . . . . Let us not deprive an innocent person, false accused, of the inference which common sense

15

draws from a consciousness of innocence and its natural manifestations." *United States v. Biaggi*, 909 F.2d 662, 691 (2d Cir. 1990) (quoting 2 *Wigmore on Evidence* § 293, at 232 (J. Chadbourn rev. ed. 1979)).   The jury is entitled to draw an inference that Mr. Black's waiver demonstrates his consciousness of innocence, and "[t]hat the jury might not draw the inference urged by the defendant does not strip the evidence of probative force." *Biaggi*, 909 F.2d at 690-91; *see also United States v. Rajaratnam*, No. 13-cr-211, Dkt. No. 94, at 59-65 (S.D.N.Y. May 30, 2014) (finding the defendant's decision to return to the United States from Brazil to face securities fraud charges "relevant and admissible" as "consciousness of innocence evidence"). Such evidence was also found admissible in *United States v. Allen*, where the fact that the defendant "waived extradition and voluntarily appeared to answer the charges" was deemed "probative of consciousness of innocence."  (Levine Decl. Ex. I at 1159:3-1161:13.)

Mr. Black's decision to voluntarily appear in this Court to defend himself against the instant charges—rather than significantly delay these proceedings or potentially secure formal protection from his home country against extradition—suggests a consciousness of innocence and an eagerness to clear his name.  Such evidence therefore meets the low threshold set by the Federal Rules of Evidence and should be ruled admissible.

## CONCLUSION

For the foregoing reasons, the Court should preclude the Government from offering evidence concerning compelled statements that Mr. Black made to Deutsche Bank's counsel, permit Mr. Black to introduce evidence demonstrating that he waived extradition and grant any and all further relief as may be just and proper.

Dated: New York, New York
      April 23, 2018

Respectfully Submitted:

By: S/ Seth L. Levine
    Seth L. Levine
    Scott B. Klugman
    Miriam L. Alinikoff

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425
slevine@levinelee.com
sklugman@levinelee.com
malinikoff@levinelee.com

*Attorneys for Defendant Gavin Campbell Black*

17