UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
            v.                          )
                                        )        16-cr-370 (CM)
MATTHEW CONNOLLY AND                    )
GAVIN BLACK,                            )
                                        )
            Defendants.                 )
_____)

**UNITED STATES' REPLY TO DEFENDANTS' COMBINED MOTIONS *IN LIMINE***

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.   EVIDENCE THAT DEUTSCHE BANK COULD HAVE ACTUALLY BORROWED
     AT THE SUBMITTED INTEREST RATES IS NOT A COMPLETE DEFENSE
     THAT ABSOLVES THEM OF THEIR SCHEME TO DEFRAUD................................. 1

II.  IT IS BLACK LETTER LAW THAT "CHEATING" IS ONE OF MANY WAYS TO
     ACCOMPLISH A SCHEME TO DEFRAUD. ................................................................. 4

III. THAT PANEL BANKS WERE REQUIRED TO MAKE "UNBIASED AND
     HONEST" SUBMISSIONS IS INHEREINT IN THE DEFINITION OF LIBOR. ........... 5

IV.  THE GOVERNMENT SHOULD BE PERMITTED TO ARGUE THAT LIBOR
     SUBMISSIONS CARRIED WITH THEM IMPLIED REPRESENTATIONS ............... 6

V.   THE BBA'S (ALLEGED) KNOWLEDGE THAT PANEL BANKS WERE
     ATTEMPTING TO MANIPULATE LIBOR IS NOT A DEFENSE AND THE
     GOVERNMENT SHOULD NOT BE PRECLUDED FROM OFFERING EVIDENCE
     THAT CONTRADICTS DEFENSE'S EVIDENCE ON THE ISSUE ............................ 8

VI.  DEUTSCHE BANK COUNTERPARTIES THAT HAD A FINANCIAL INTEREST
     IN LIBOR SHOULD BE PERMITTED TO TESTIFY AS TO THE MATERIALITY
     OF THE RIGGED LIBOR SUBMISSIONS THAT THE DEFENDANTS CAUSED
     DEUTSCHE BANK TO SUBMIT. ................................................................................ 10

VII. FEDERAL RULE OF EVIDENCE 701 PERMITS FORMER DEUTSCHE BANK
     TRADERS WHO ARE COOPERATING WITH THE GOVERNMENT'S
     INVESTIGATION TO TESTIFY THAT THEY VIEWED DEUTSCHE BANK'S
     LIBOR SUBMISSIONS TO BE INCONSISTENT WITH THE BBA'S
     DEFINITION. ............................................................................................................... 133

VIII.THE GOVERNMENT'S EXPERT SHOULD BE PERMITTED TO TESTIFY ........... 15

     A.  Dr. Youle should be permitted to testify about the definition of LIBOR ................... 17

     B.  Dr. Youle should be permitted to explain the impact of any manipulation ............... 20

     C.  Dr. Youle should be permitted to testify as to the obvious motivation of derivatives
         traders to manipulate LIBOR .................................................................................... 23

     D.  Dr. Youle should be permitted to testify that an accurate benchmark interest rate is
         useful to market participants if it is accurate ............................................................ 23

     E.  Dr. Youle should be permitted to testify to the ubiquity of LIBOR in the marketplace
         and to harm beyond immediate counterparties .......................................................... 24

i

Intent ......................................................................................................... 24

Materiality................................................................................................. 266

No Unfair Prejudice .................................................................................. 26

IX. THE DEFENDANTS SHOULD ONLY BE PERMITTED TO INTRODUCE
EVIDENCE RELATING TO THE BBA'S AWARENESS OF PANEL BANKS'
CONSIDERATION OF TRADING POSITIONS WHERE THEY CAN SHOW
THAT THE DEFENDANTS OR CO-CONSPIRATORS WERE AWARE OF IT,
SUCH THAT IT GOES TO THEIR STATE OF MIND AND IS OTHERWISE
ADMISSIBLE................................................................................................ 27

X.  THE GOVERNMENT DOES NOT OPPOSE THE ADMISSION OF EVIDENCE OF
THE BBA LIBOR RULE AND GUIDANCE CHANGES AFTER THE
INDICTMENT PERIOD AS LONG AS IT IS OTHERWISE ADMISSIBLE AND
GOES TO THE DEFENDANTS' OR COOPERATORS' STATE OF MIND .............. 28

XI. THE GOVERNMENT DOES NOT OPPOSE THE ADMISSION OF EVIDENCE OF
PUBLIC NEWS REPORTS DISCUSSING CONERNS ABOUT THE LIBOR RATE
AS LONG AS IT IS OTHERWISE ADMISSIBLE AND GOES TO THE
DEFENDANTS' OR COOPERATORS' STATE OF MIND ......................................... 28

XII. THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE EVIDENCE
CONCERNING THE DEFENDANTS' COMPENSATION........................................... 29

XIII.THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE TRADES
AND THE ASSOCIATED DATA AND DOCUMENTS FOR THOSE TRADES
THAT WERE IDENTIFIED IN ITS NOVEMBER 30TH LETTER TO THE COURT. 32

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*United States v. Allen,*

160 F. Supp. 3d 698 (S.D.N.Y. Feb. 16, 2016) ....................................................... 7, 8

*Charles Schwab Corp. v. Bank of Am. Corp.,*

883 F.3d 68 (2d Cir. 2018) (Lynch, J.) ................................................................. 11

*Hammerschmidt v. United States,*

265 U.S. 182 (1924) (Taft, C.J.) ......................................................................... 4

*In re Gordon,*

68 F.3d 577 (2d Cir. 1995) ................................................................................. 4

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*

No. 11-mdl-2262, 2015 U.S. Dist. LEXIS 147561 (Oct. 20, 2015) ........................................ 16

*In re Rezulin Prods. Liab. Litig.,*

309 F. Supp. 2d 531 (S.D.N.Y. Mar. 15, 2004) ....................................................... 18

*Nora Beverages, Inc. v. Perrier Grp. of Am. Inc.,*

164 F.3d 736 (2d Cir. 1998) .......................................................................... 15, 20

*Shaw v. United States,*

S. Ct. 462 (2016) ............................................................................................. 4

*Stinn v. United States,*

856 F. Supp. 2d 531 (E.D.N.Y. Apr, 18, 2012) ........................................................ 4

*United States v. Alfisi,*

308 F.3d 144 (2d Cir. 2002) ............................................................................... 3

*United States v. Anzalone,*

626 F.2d 239 (2d Cir. 1980) ............................................................................. 25

*United States v. Brandon*,

    17 F.3d 409 (1st Cir. 1994) ........................................................................... 25

*United States v. Bryser*,

    838 F. Supp. 124 (S.D.N.Y. Nov. 16, 1993) ..................................................... 4

*United States v. Castillo*,

    924 F.2d 1227 (2d Cir. 1991) ......................................................................... 16

*United States v.*

    *Chacko*, 169 F.3d 140, (2d Cir. 1999) ........................................................... 24

*United States v. Cruz-Diaz*,

    550 F.3d 169 (1st Cir. 2008) ......................................................................... 14

*United States v. Dominguez*,

    280 Fed. Appx. 81 (2d Cir. 2008) ................................................................. 14

*United States v. Dula,*

    39 F.3d 591 (5th Cir. 1994) ............................................................................. 3

*United States v. Ferguson*,

    No. 06-cr-137, 2007 U.S. Dist. LEXIS 87842 (D. Conn. Nov. 30, 2007) ........................ 30, 31

United States v. Finnerty,

    533 F.3d 143 (2d Cir. 2008) ....................................................................... 7, 8

*United States v. Garner*,

    663 F.2d 834 (9th Cir. 1981) ........................................................................... 5

*United States v. Ghavami*,

    23 F. Supp. 3d 148 (S.D.N.Y. May 15, 2014) ............................................... 13

*United States v. Grimm*,

    738 F.3d 498 (2d Cir. 2013) ........................................................................... 4

*United States v. Hayes*,

118 F. Supp. 3d 620 (S.D.N.Y. Aug. 3, 2015) ........................................................................ 7

United States v. Jasper,

No. 00-cr-825, 2003 WL 223212 (S.D.N.Y. Jan. 31, 2003) ................................................... 28

United States v. Lindsey,

850 F.3d 1009 (9th Cir. 2017) ............................................................................................ 12

United States v. Litvak,

808 F.3d 160 (2d Cir. 2015) ............................................................................................... 18

United States v. Manton,

107 F.2d 834 (2d Cir. 1939) ................................................................................................. 3

United States v. Mirilishvili,

No. 14-cr-810, 2016 U.S. Dist. LEXIS 21268 (S.D.N.Y. Feb. 18, 2016) (McMahon, C.J.) .... 15

United States v. Ortiz,

No. 95-1666, 1997 U.S. App. LEXIS 9841 (2d Cir. 1997) ......................................... 17, 21, 22

United States v. Peters,

543 Fed. App'x 5 (2d Cir. 2013) ...................................................................................... 30, 31

United States v. Quattrone,

441 F.3d 153 (2d Cir. 2006) .................................................................................... 29, 30, 31, 32

United States v. Ragosta,

970 F.2d 1085 (2d Cir. 1992) ............................................................................................... 4

United States v. Rajaratnam,

13-cr-211 (NRB) ................................................................................................................ 30

United States v. Reicin,

497 F.2d, 563 (7th Cir. 1974) .............................................................................................. 2

United States v. Rubin/Chambers Dunhill Insurance Services, et al.,

828 F. Supp. 2d 698 (S.D.N.Y. 2011) ................................................................................. 14

*United States v. Ryan*,

    448 F. Supp. 810 (S.D.N.Y. Apr. 17, 1978) ............................................................ 28

*United States v. Scop*,

    846 F.2d 135 (2d Cir. 1988)................................................................................ 22, 23

*United States v. Stahl*,

    616 F.2d 30 (2d Cir. 1980)................................................................................. 31, 32

*United States v. Stavroulakis*,

    952 F.2d 686 (2d Cir. 1992)...................................................................................... 25

*United States v. Thomas*,

    377 F.3d 232 (2d Cir. 2004)...................................................................................... 11

*United States v. Vest*,

    116 F.3d 1179 (7th Cir. 1997) ..................................................................................... 2

*United States v. Weaver*,

    860 F.3d 90 (2d Cir. 2017)........................................................................................ 12

*United States v. Weiss*,

    930 F.2d 185 (2d Cir. 1991)...................................................................................... 32

*United States v. Wynn*,

    684 F.3d 473 (4th Cir. 2012) ...................................................................................... 5

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,

    136 S. Ct. 1989, 2002 (2016)............................................................................. 11, 12

**Statutes**

18 U.S.C. § 1343........................................................................................... 5, 23, 31

**Other Authorities**

Manual of Model Criminal Jury Instructions, 8.124 WIRE FRAUD (18 U.S.C. § 1343) ............. 5

Ninth Circuit Pattern Jury Instruction 3:16 (2010 ed.) .................................................. 5

**Rules**

Federal Rule of Evidence 401 ................................................................................................ 29

Federal Rule of Evidence 403 ................................................................................................ 29

Federal Rule of Evidence 701 ................................................................................................ 13

Federal Rule of Evidence 702 ............................................................................................ 15, 16

Federal Rule of Evidence 801(d)(2)(E) .................................................................................. 14

<u>PRELIMINARY STATEMENT</u>

The government writes in opposition to the defendants' combined motions *in limine* comprising 13 separate motions.  For the reasons set forth below, the Court should rule in the government's favor on each motion.

**I.**     **EVIDENCE THAT DEUTSCHE BANK COULD HAVE ACTUALLY BORROWED AT THE SUBMITTED INTEREST RATES IS NOT A COMPLETE DEFENSE THAT ABSOLVES THE DEFENDANTS OF THEIR SCHEME TO DEFRAUD**

The defendants' argument that falsity requires proof that "Deutsche Bank could not borrow funds at [the] submitted rates" misapprehends both the plain language of the definition of LIBOR and the elements of the wire fraud statute.  (Joint Mot. in Lim. at 5, ECF No. 227.)[1] Even if Deutsche Bank could have borrowed money at the rates submitted, that does not mean that the submissions complied with the definition of LIBOR because the definition requires panel banks to submit an interest rate at which they would actually *accept* an offer, not a rate that another bank would take.  The BBA's question was: "at what rate could you borrow funds, *were you to do so* by asking for *and then accepting* inter-bank offers in a reasonable market size just prior to 11 am?" (Emphasis added.)  Hence, a submission that is at a level that a counterparty would accept, but at which Deutsche Bank would never deal, does not fall within the definition. For example, if the defendants had caused Deutsche Bank to make a LIBOR submission of 200% interest, they would have submitted a number at which Deutsche Bank could have borrowed funds—any banker on the planet would have leaped at the opportunity to lend to Deutsche Bank

---

[1]     Moreover, the defendants completely ignore the fact that they were also charged with attempt, pursuant to 18 U.S.C. § 2.

on those terms.  But a 200% LIBOR submission would fall outside the definition because Deutsche Bank would never have *accepted* a loan at that rate of interest.

From a legal standpoint, whether or not the submissions in question fall within a subjective "range" is no defense to fraud so long as the defendants intended to further a scheme to defraud.  That proposition is evident from a line of cases holding that when a physician intends to bill Medicare for services he thought were unnecessary, evidence that the tests were, in fact, medically necessary is irrelevant.  In *United States v. Vest*, for example, the Seventh Circuit upheld the mail fraud conviction of a doctor who ordered what he viewed as unnecessary tests and affirmed the district court's decision to prohibit the defendant from offering the patients' pre-visit and post-visit medical records (to which the defendant did not have access at the time of diagnosis) in support of the argument that the tests were (as it turned out) medically indicated.  116 F.3d 1179, 1183 (7th Cir. 1997).  In ruling that the issue presented was whether the doctor *intended* to order unnecessary tests, not whether the tests were, in fact, medically necessary, the Seventh Circuit held "[i]f in hindsight it turns out that, considering the patients' pre-visit and post-visit records, the tests [the defendant] ordered *were* medically necessary, that is merely a fortuitous coincidence.  It does not rebut the inference that [the defendant] had a fraudulent intent when he ordered the tests with the data he had."  *Id*. at 1184; *see also United States v. Reicin*, 497 F.2d, 563, 571 (7th Cir. 1974) ("the defendant's intent to defraud does not turn on whether some of the clients 'actually' needed such treatment").

Moreover, even if, by fluke or design, the defendants' rigged LIBOR submissions wound up being close to the interest rate at which Deutsche Bank was actually borrowing, the fact remains that the defendants made the implied false statement that their submissions were calculated according to the rules.  The Fifth Circuit's ruling in *United States v. Dula*, in which

the panel affirmed the conviction of a government contractor who used substandard parts to make a vehicle that ultimately met performance specifications makes clear that the final output cannot overcome a dishonest process. 39 F.3d 591, 592-93 (5th Cir. 1994) ("whether or not the products actually conformed to these specifications is a matter of happenstance and is essentially irrelevant").

Likewise, in affirming the conspiracy and fraud conviction of a former Second Circuit judge who accepted payments in exchange for promises of favorable rulings, the Second Circuit in *United States v. Manton* affirmed the trial court's refusal to charge the jury that they might consider the question of whether the defendant's rulings were correct.  107 F.2d 834, 845-46 (2d Cir. 1939).  In doing so, the panel held, "[a]nd for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided.  But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it."  *Id.* at 846; *cf. United States v. Alfisi*, 308 F.3d 144, 150-52 (2d Cir. 2002) (applying *Manton*'s ruling to a bribery case).

Taken together, the cited cases establish that a defendant completes a scheme to defraud through an intentionally fraudulent process even when the ultimate output is defensible or even reasonable.  The government does not object to the introduction of evidence to show that the submissions were in a reasonable range for purposes of casting doubt onto the government's proof of the relevant elements of conspiracy, bank fraud, and wire fraud.  However, the defendants should be precluded from arguing this would somehow be a complete legal defense. That is, the defense should be precluded from arguing that even if the defendants committed a

scheme to defraud their counterparties, they are still not guilty if Deutsche Bank's submissions were ultimately within a range that the bank could actually borrow.

## II.   IT IS BLACK LETTER LAW THAT "CHEATING" IS ONE OF MANY WAYS TO ACCOMPLISH A SCHEME TO DEFRAUD

The Court should deny the defendants' motion to restrain the government from using the word "cheat" because it is black letter law that defendants who act with the purpose to "cheat" a victim act with a specific intent to defraud.  Indeed, the case law is replete with examples describing a scheme to defraud as "cheating."  *See, e.g.*, *Shaw v. United States*, S. Ct. 462, 466 (2016) ("Thus, [the defendant's] scheme to **cheat** [his victim] was also a scheme to deprive the bank of certain bank property rights."); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (holding that "[t]o conspire to defraud the United States means primarily to **cheat** the Government out of property or money *United States v. Grimm*, 738 F.3d 498, 499 (2d Cir. 2013) (characterizing a fraudulent scheme as "**cheat[ing]** either the municipalities or the Treasury (or both)"); *In re Gordon*, 68 F.3d 577, 581 (2d Cir. 1995) (citing *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.) ("A man is none the less **cheated** out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.")); *United States v. Ragosta*, 970 F.2d 1085, 1091 (2d Cir. 1992) ("There was ample evidence from which the jury reasonably could have inferred that [the defendant] was intentionally **cheating** the Bank . . . ."); *Stinn v. United States*, 856 F. Supp. 2d 531, 540-41 (E.D.N.Y. Apr, 18, 2012) (citing an Eighth Circuit case: "the charge defined 'scheme or artifice to defraud' to '*include* any plan or course of action intended to deceive or **cheat** another out of property'") (initial emphasis in original); *United States v. Bryser*, 838 F. Supp. 124, 125 (S.D.N.Y. Nov. 16, 1993) ("Deceptive nondisclosures such as enticing a victim into taking steps . . . based on ignorance of a defendant's scheme to **cheat** or steal are covered by 18 U.S.C. §§ 1341 and 1343.") (emphases added).

And while the Second Circuit does not have pattern jury instructions, Ninth Circuit Pattern Jury Instruction 3.16 (2010 ed.) charges that "[a]n intent to defraud is an intent to deceive or *cheat*."  (Emphasis added); *see also* Manual of Model Criminal Jury Instructions, 8.124 WIRE FRAUD (18 U.S.C. § 1343) ("the defendant acted with the intent to defraud, that is, the intent to deceive or cheat"); *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (upholding jury charge that "the intent to defraud is the specific intent to deceive or *cheat* someone, usually for personal financial gain or to cause financial loss to someone else") (emphasis added).  Indeed, in *United States v. Garner*, the Ninth Circuit affirmed the wire fraud conviction of a defendant who perpetrated a scheme to "cheat" at blackjack.  663 F.2d 834, 836 (9th Cir. 1981).

Because the law recognizes that "cheating" is one of many ways to accomplish a scheme to defraud, the Court should not restrict the government or its witnesses from using the word "cheat" to describe the conduct at issue.  Allowing such testimony will not prejudice the defendants because the Court will instruct the jury on all of the elements of wire fraud, which will leave no room for juror confusion.

## III.   THAT PANEL BANKS WERE REQUIRED TO MAKE "UNBIASED AND HONEST" SUBMISSIONS IS INHEREINT IN THE DEFINITION OF LIBOR

For the reasons set forth in the government's combined motions *in limine*, the requirement that LIBOR submissions be "unbiased and honest" is inherent in the definition of LIBOR and the circumstances under which the defendants caused LIBOR submissions to be made.  (Mot. in Lim. at 17 & 29, ECF No. 217.)  The defendants are charged with wire fraud.  At its core, wire fraud criminalizes lying, making misrepresentations, and half-truths in order to cheat or deceive someone into losing money or property.  The government is not infusing some rule or requirement that the defendants be honest or refrain from lying.  To say that the defendants and their co-conspirators were required to submit an unbiased and honest LIBOR

submission is the same as saying they were to submit LIBORs without lying, cheating, deceiving, etc.

Moreover, the context in which the BBA created and administered LIBOR shows that permitting traders to skew their submissions to suit their derivative positions to make money at the expense of others would have defeated the purpose of the entire enterprise.  At most, the issue of whether the definition of LIBOR required panel banks to behave honestly is a question of interpretation that should be resolved by the jury.[2]

## IV.   THE GOVERNMENT SHOULD BE PERMITTED TO ARGUE THAT LIBOR SUBMISSIONS CARRIED WITH THEM IMPLIED REPRESENTATIONS

The defendants' motion to prohibit the government from arguing that LIBOR submissions carried with them implied representations wrongfully assumes that the only implied representation that the defendants made through their LIBOR submissions was that their numbers were "unbiased and honest."  (Joint Mot. in Lim. at 9, ECF No. 227.)  As set forth above, the "unbiased and honest" nature of the LIBOR submissions is inherent in the definition of LIBOR and it is the government's position that every LIBOR submission carried with it the implied representation that number was honest and unbiased.  But honesty and impartiality is not the *only* representation that was implied in all LIBOR submissions.

In addition to honesty and impartiality, LIBOR submissions also carried with them the assertion that the number submitted was responsive to the BBA's question, which asked panel banks to estimate borrowing costs.  As Judge Rakoff explained in *Allen*, "[i]t's not the number per se that is the representation.  It is the freight that number carries.  And it is an implied

---

[2]     To the extent the defendants read the definition of LIBOR as permitting "biased and dishonest" submissions, they should be permitted to make that argument to the factfinder based only on otherwise admissible evidence.

representation that this number was arrived at according to the prescribed considerations." (*See* Ex. A at 1383:8-11.) *See also United States v. Allen*, 160 F. Supp. 3d 698, 701-02 (S.D.N.Y. Feb. 16, 2016) (rigged LIBOR submissions constitute express and implied false statements). Even setting aside whether the definition of LIBOR requires "unbiased and honest" submissions, a LIBOR submission that represents the number that the defendants wanted in order to make more money is something wholly different than an estimation of the bank's borrowing costs.

The defendants' due process argument fails as well because it focuses on the clarity of the definition of LIBOR, not the clarity of the statutes with which they are charged. As this Court previously held in its opinion denying the defendants' motion to dismiss the indictment, the question is whether the statute is clear, not whether the definition of LIBOR is clear. (*See* Decision and Order on Defs.' Pretrial Mots. at 11 ("[I]t is the wire fraud and bank fraud statutes—not anything promulgated by the BBA—that is germane to the instant analysis."), ECF No. 145.) The Court's holding on this point is consistent with the analysis that Judge Crotty employed in denying a fugitive defendant's motion to dismiss a complaint alleging that he manipulated the LIBOR rate on the ground that the defendant, a Swiss citizen, had insufficient notice that his conduct was criminal. *See United States v. Hayes*, 118 F. Supp. 3d 620, 629 (S.D.N.Y. Aug. 3, 2015) ("[The defendant] would have known that these hypothetical opinions would benefit UBS at the financial expense of other banks. Based on these allegations, the Court is satisfied that [the defendant] had sufficient notice under the Fifth Amendment that the alleged conduct was criminal.").[3]

---

[3]    Evidence that the defendants' scheme, if successful, would harm counterparties makes LIBOR manipulation distinguishable from the "interpositioning" scheme at issue in United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008). Whereas Finnerty obtained stocks at the client's bid price—the client wanted a stock for $X and Finnerty provided it for $X—the

## V.  THE BBA'S (ALLEGED) KNOWLEDGE THAT PANEL BANKS WERE ATTEMPTING TO MANIPULATE LIBOR IS NOT A DEFENSE AND THE GOVERNMENT SHOULD NOT BE PRECLUDED FROM OFFERING EVIDENCE THAT CONTRADICTS DEFENSE'S EVIDENCE ON THE ISSUE

The defendants' fifth motion *in limine* seeks to exclude "any evidence suggesting that the BBA was not aware that LIBOR submitters considered their banks' trading positions in making their LIBOR submissions."[4]  The motion should be denied regardless of which way the Court rules on the ultimate BBA issue.  If the Court rules consistent with the government's position, the government (and defense) can absolutely introduce evidence showing that the defendants and their coconspirators intended to lie to the BBA by introducing evidence of their concealment of their LIBOR manipulation from the BBA.  On the other hand, if the Court rules that the government must prove whether the BBA was actually deceived, the evidence the defense seeks to exclude is entirely relevant.

---

government proffers that the evidence will show that the defendants' scheme would cause a loss to Deutsche Bank's counterparties if they were successful in manipulating the LIBOR fix.  Id. at 151 ("the government has attributed to Finnerty nothing that deceived the public or affected the price of any stock . . . .").  Moreover, there is nothing in the Finnerty decision to suggest that the district court excluded specific theories of liability, as the defendants attempt to do here.

[4]     The defendants also seek to exclude "any evidence that is inconsistent with the Second Circuit's finding in *Allen* that there existed a range of reasonable LIBOR submissions for each Panel Bank."  (Joint Mot. in Lim. at 13, ECF No. 227.)  Much of the government's response in part I, *supra*, covers the "range" argument.

Suffice it to say, however, the government does not entirely dispute that LIBOR submissions required submitters to exercise some degree of judgment.  The situation is little different than that of a judge of various Olympic sports—whether it be gymnastics, diving, figure skating, etc.—where there may be a reasonable range of scores that could be awarded to an athlete.  But that does not mean a judge is permitted to pick from within that range based on improper considerations, such as the athlete's nationality.  In any event, the government does intend to assert that panel banks were required to submit a *number*, not a *range*, and that on numerous occasions the defendants caused Deutsche Bank submitters to make LIBOR submissions that did not reflect their honest view of where the bank was—or could be—trading cash.

As a threshold matter, in the current posture of the case the government does not intend to present evidence of whether or not the BBA actually "knew" or should have discovered that panel banks were biasing their LIBOR submissions.  The government's position, as stated in its motions *in limine*, continues to be that the government can prove the elements of wire fraud without evidence of BBA's actual knowledge (or lack thereof).  Instead, the government intends to prove that the defendants and coconspirators hid their actions (*i.e.*, that Deutsche Bank's "LIBOR submitters considered their banks' trading positions in making their LIBOR submissions") from the BBA to show their intent to lie in order to execute their scheme to defraud.  That evidence is highly relevant to the defendants and their coconspirators intent.

Moreover, if the Court were to determine that evidence of BBA knowledge is required, the defendants' motion should be denied as an inappropriate attempt to decide an issue before the evidence has been heard in all its detail.  The defendants argue on one hand that an issue is critical for the government to prove and simultaneously argue on the other that the government should be precluded from submitting evidence to prove up that issue.  The defendants base their argument on their own remarkably confident interpretation of narrow pieces of evidence.  For example, they cite the testimony of former BBA executive John Ewan, who was a Crown witness in several LIBOR-related prosecutions in the United Kingdom, as establishing that the BBA was aware that panel banks were altering their LIBOR submissions to improve the profitability of their swap trades.[5]  As a matter of common prosecutorial sense, if that is really what Mr. Ewan said then he is a curious choice as a recurring witness for the Crown.  The reality

---

[5]     Notably, the defendants' brief cites to documents purporting to summarize something that Mr. Ewan said, but it does not reference the testimony that Mr. Ewan provided when called as a Crown witness in successive LIBOR-related criminal trials.

is that Mr. Ewan did not say that, nor did his supervisor Sally Scutt.  (*See* Mem. of Law, Exs. A-C, ECF No. 207.)  The government, as is made clear in both previous and current briefings, has a different position and has facts to support that position.  The defendants' motion is an attempt to take an issue away from the jury by precluding the government from offering evidence that is contrary to the defense on an issue that the defense is arguing is crucial (*i.e.*, whether or not the BBA was actually deceived).

Therefore, the motion should be denied.

## VI.   DEUTSCHE BANK COUNTERPARTIES THAT HAD A FINANCIAL INTEREST IN LIBOR SHOULD BE PERMITTED TO TESTIFY AS TO THE MATERIALITY OF THE RIGGED LIBOR SUBMISSIONS THAT THE DEFENDANTS CAUSED DEUTSCHE BANK TO SUBMIT.

The government argued in Part 1 of its motion *in limine* that testimony from Deutsche Bank's counterparties should be admitted and it rests largely on that submission in responding to the defendants' motion to exclude counterparty testimony.  There are, however, several specific arguments that the government addresses herein.

The defendants' argument relies on the faulty factual premise that "the counterparties were not the recipients of the false statements alleged in the indictment."  (Joint Mot. in Lim. at 17, ECF No. 227.)  Paragraph three of the superseding indictment alleges that "Thomson Reuters as a general matter, pursuant to service agreements with various clients, transmitted the rates to servers and traders of LIBOR-based financial products around the world, including to those located in New York, New York and elsewhere."  (Superseding Indictment ("SI") ¶ 3, ECF No. 22.)  "[T]he rates" that were transmitted to the marketplace included the "estimated borrowing rates" that panel banks submitted (SI ¶ 2) as well as the "averaged rates" calculated by Thomson

Reuters (¶ 3).  Counterparty testimony as to the rates they received—or could have received, if they so chose—is thus plainly relevant to the issues of falsity and materiality.[6]

That the counterparties received the LIBOR "fixes" on the days in question renders the defendants' heavy reliance on *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016), to be misplaced.  Because the objective of the scheme was to make more money (or minimize losses) by manipulating the number upon which the counterparties relied in deciding what to pay (or collect) under the swaps, the counterparties were in a very real sense recipients of the alleged misrepresentations.

Although the evidence will show that Deutsche Bank's counterparties received the LIBOR fixes, it should be noted that *Escobar* did not restrict proof of materiality to individuals who received the false statements directly.  The courts have long recognized that the materiality standard has an objective aspect that approaches the false statement from the perspective of "a person of ordinary prudence" and the government submits that *Escobar* did not convert materiality to a purely subjective standard that limits the inquiry solely to testimony from the individual who directly received the false statement.  *See United States v. Thomas*, 377 F.3d 232, 242-43 (2d Cir. 2004) (materiality is an objective standard); *see also United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quoting *United States v. Facchini*, 832 F.2d 1159, 1162

---

[6]     Counterparty testimony is also relevant to the false and fraudulent statements made upon entering swaps with Deutsche Bank, i.e., statements that appeared on swap confirmations that the trades would be settled on LIBOR when, in reality, it was the defendants' and their co-conspirators' intention to manipulate LIBOR.  That theory of material fraudulent misrepresentation in the context of LIBOR manipulation was recently endorsed by the Second Circuit in Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 94 (2d Cir. 2018) (Lynch, J.) (holding that a civil complaint was adequately pled where the plaintiff alleged the defendants' "failure to disclose their manipulation of LIBOR when selling Schwab floating-rate instruments tied to it" as the basis for a securities fraud suit).

(9th Cir. 1987) ("'Capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end'"). *Escobar* was a civil case in which the Supreme Court analyzed the "implied false certification theory" of liability, which asserts that certain requirements of a government contract are "automatically material" whenever "they are labeled conditions of payments." 136 S. Ct. at 2001. Rather than limiting the materiality inquiry solely to the perspective of the person who received the false statement directly, the Court merely ruled that "materiality cannot rest on a single fact or occurrence as always determinative" and that evidence that the government agency had a practice of ignoring the purported "conditions of payment" is probative. *Id*.

For purposes of the counterparty testimony that the government would offer in this case, what is important about the *Escobar* decision is that it did *not* abandon the traditional understanding of materiality as having an objective component. We know that because the decision references the "reasonable person" standard several times. So while the reaction of the person to whom the false statement was addressed is relevant to materiality, appellate cases interpreting *Escobar* continue to apply an objective approach which analyzes whether the statement in question had the capability of influencing a "reasonable person." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("a lie can support a fraud conviction only if is material, that is, it would affect a reasonable person's evaluation of a proposal") (internal quotation omitted); *United States v. Lindsey*, 850 F.3d 1009, 1015-16 (9th Cir. 2017) (because materiality is an objective standard, whether or not a lender was negligent in approving a fraudulent loan is not a defense to wire fraud). That a counterparty witness would consider a LIBOR submission to be material tends to show that a "reasonable person" would draw the same conclusion.

VII.   **FEDERAL RULE OF EVIDENCE 701 PERMITS FORMER DEUTSCHE BANK TRADERS WHO ARE COOPERATING WITH THE GOVERNMENT'S INVESTIGATION TO TESTIFY THAT THEY VIEWED DEUTSCHE BANK'S LIBOR SUBMISSIONS TO BE INCONSISTENT WITH THE BBA'S DEFINITION.**

As the government asserted in its motion *in limine* at pages 28-30, testimony from former Deutsche Bank employees that they viewed the scheme to defraud as violating the definition of LIBOR is proper lay opinion testimony under Federal Rule of Evidence 701.  Contrary to the defendants' arguments, this testimony is "helpful" under Rule 701(b) for two reasons.  First, the fact that the Deutsche Bank's USD LIBOR submitters themselves viewed their LIBOR submissions as being inconsistent with the rules is highly probative of the existence of a scheme to defraud.  Testimony that an insider witnesses viewed the conduct as wrongful is a traditional method of establishing the existence of a scheme in white collar cases.  *See, e.g., United States v. Ghavami*, 23 F. Supp. 3d 148, 171-72 (S.D.N.Y. May 15, 2014) (permitting cooperator in a financial fraud case to testify, pursuant to Rule 701, that he viewed a certification as "false").  Second, the fact that derivative traders whose livelihood depended on predicting LIBOR accurately viewed Deutsche Bank's practices as being inconsistent with the definition of LIBOR is powerful evidence that Deutsche Bank's submissions were, in fact, inconsistent with the definition of LIBOR.

The defendants' assertion that this testimony "would not be 'helpful,' as is required under Rule 701(b), because it would merely tell the jury what inferences to draw from the evidence," misapprehends the nature of the testimony that the government would offer.  (Joint Mot. in Lim. at 21, ECF No. 227.)  While the government anticipates that it will elicit testimony that is derived, at least in part, on the cooperators' experiences working on trading desks, this does not place this evidence outside the scope of Rule 701 because the government has not asked the witnesses to undertake experiments or investigations of the sort that an expert would normally

perform.  "The Second Circuit has held that as long as opinions do 'not depend on the sort of specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations,' some degree of specific, industry-related knowledge will not disqualify lay opinion testimony."  *United States v. Rubin/Chambers Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 704 (S.D.N.Y. Dec. 7, 2011) (quoting *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2007).

The government intends to ask cooperating witnesses about their observations of the BBA's operations and then argue that the course of conduct they observed constitutes circumstantial evidence that the BBA did not approve of altering LIBOR submissions to suit a panel bank's financial interests.  In doing so, the government anticipates that the witnesses will recount statements that they heard BBA officials make, but these utterances are admissible for non-hearsay purposes.  For example, the government will offer under Federal Rule of Evidence 801(d)(2)(E) evidence that, during a telephone conversation with a representative of the BBA, a co-conspirator made false statements about the manner in which Deutsche Bank calculated its LIBOR submissions while a cooperator, Michael Curtler, listened in.  While such testimony would necessarily require Mr. Curtler to recount what the BBA representative said during the conversation, the out-of-court statements by the BBA are offered to establish the non-hearsay purposes of describing the context in which the co-conspirator made his false statements and establishing the effect that these statements had on the BBA listener.  *See United States v. Cruz-Diaz*, 550 F.3d 169, 176 (1st Cir. 2008) ("Out-of-court statements offered not to prove the truth of the matter asserted but merely to show context – such as a statement offered for the limited purpose of showing what effect the statement had on the listener – are not hearsay"); *see also United States v. Dominguez*, 280 Fed. Appx. 81, 84 (2d Cir. 2008).

Likewise, Mr. Curtler will testify that he participated in meetings of a BBA committee and that, when he could not attend, Mr. Black attended in his absence.  The government anticipates that Mr. Curtler will be able to describe the mission and purpose of the committee and the sorts of topics that were generally discussed.  This testimony would be offered for the non-hearsay purpose of demonstrating the effect that these meetings had on Mr. Black's understanding of the definition of LIBOR.  Indeed, the very fact that the BBA convened a committee, and that Mr. Curtler tasked Mr. Black to attend in his absence, constitutes substantial circumstantial evidence that the BBA would not have approved of a scheme to rig the rate.

## VIII.   THE GOVERNMENT'S EXPERT SHOULD BE PERMITTED TO TESTIFY

Dr. Thomas Youle is qualified, and should be allowed, to testify about everything set forth in the government's expert disclosure that was sent to the defense on November 29, 2017. (Notice of Expert Test., ECF No. 151.)  Moreover, the defendants' objections, which are based on an erroneous characterization of Dr. Youle's proposed testimony and a flawed interpretation of the relevant case law, should be rejected in their entirety.

As the Court knows, the admissibility of expert testimony is governed by Federal Rule of Evidence 702, which was drafted with a "liberal thrust" and creates a "presumption of admissibility."  *United States v. Mirilishvili*, No. 14-cr-810, 2016 U.S. Dist. LEXIS 21268, at *9 (S.D.N.Y. Feb. 18, 2016) (McMahon, C.J.) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993), and *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  As such, the bar for admissibility is low: "[t]he court should admit specialized expert testimony if the witness is [1] 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony [2] 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Nora Beverages, Inc. v. Perrier Grp. of Am. Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (quoting Fed. R. Evid. 702).

As to the first inquiry, even a cursory review of Dr. Youle's curriculum vitae (Ex. B) reveals that he is unquestionably qualified to testify as an expert in this case.  Dr. Youle received a Ph.D. in Economics from the University of Minnesota based on his research in the area of LIBOR manipulation, culminating in an award-winning dissertation entitled "Essays on Libor Manipulation."[7]  It practically goes without saying, but Dr. Youle's successful defense of his LIBOR-based dissertation in front of a panel of Ph.D. economists *ipso facto* demonstrates the reliability of his methodology.  And beyond his dissertation, Dr. Youle has co-authored papers on LIBOR with respected academics in the field.  Dr. Youle has also been called upon for his LIBOR expertise by established media outlets, including *The Wall Street Journal*, *Financial Times*, *The Washington Post*, and CNBC.  Furthermore, Dr. Youle has worked at the Federal Reserve of New York and is currently an assistant professor of economics at Dartmouth University.  There is no serious debate over his qualifications.

Regarding the second inquiry, because the subject matter in this case has a rather steep learning curve and is plainly "beyond the ken of the average juror," *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991), Dr. Youle's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702.[8]  Indeed, Dr. Youle's proposed testimony—as outlined in the government's notice[9]—covers several areas crucial to the jury's understanding of the case.  For example, Dr. Youle will explain interest rates generally and the

---

[7]     Dr. Youle's 2014 dissertation is attached to this brief as Exhibit C.  In 2015, his dissertation won Honorable Mention for the University of Minnesota's Best Dissertation Award. (Ex. B.)

[8]     *Cf. In re LIBOR-Based Financial Instruments Antitrust Litig.*, No. 11-mdl-2262, 2015 U.S. Dist. LEXIS 147561, at *334 (Oct. 20, 2015) ("As an instrument of high finance, an interest rate swap is hardly a product that individuals purchase for 'personal, family or household use.'").

[9]     Notice of Expert Test. (Nov. 29, 2017), ECF No. 151.

notion of a "benchmark" interest rate, then build upon that base to explain the definition and

calculation of LIBOR.  Dr. Youle will also describe derivative financial instruments, such as

forward-rate agreements, swaps, and the like, that are tied to U.S. Dollar LIBOR.  Finally,

Dr. Youle will mathematically demonstrate how manipulation can affect a given day's LIBOR

fixing and, in turn, the settlement of a derivative instrument.[10]  In that way, Dr. Youle will

provide the jury with a framework around which the facts—from documents and witness

testimony—can be understood.  *United States v. Ortiz*, No. 95-1666, 1997 U.S. App. LEXIS

9841, at *16-*17 (2d Cir. 1997).  Importantly, Dr. Youle will *not* opine about the defendants' or

the BBA's actions or states of mind, the specifics of the alleged scheme itself, or anything else

that will infringe upon the province of the Court or the jury.

The defendants raise five meritless objections to the scope of Dr. Youle's proposed

testimony.  Each is taken up sequentially below.

### A. Dr. Youle should be permitted to testify about the definition of LIBOR

The defendants first object to testimony that "[a] panel bank's daily U.S. Dollar LIBOR

submissions . . . were supposed to be unbiased and honest estimates of the bank's borrowing

costs, and not altered to reflect trading positions that stood to gain or lose based on the U.S.

Dollar LIBOR."  (Joint Mot. in Lim. at 24, ECF No. 227.)  More specifically, the defendants

claim that Dr. Youle would improperly testify as to "the BBA's understanding of its own rules,"

that his testimony is not based on "reasonable methodology," and that he would mislead the jury

by testifying to a "made-up LIBOR standard."  *Id.*

---

[10]     The examples given here of Dr. Youle's proposed testimony are not intended to be
limiting.  The expert disclosure, while not covering every detail, provides a more fulsome
description of his testimony.  In advance of trial, the government will provide the defendants
with its expert exhibit—which is a slide presentation—to allow the defendants to raise any
objections specific to the exhibit.

The defendants' arguments are based on a fundamental mischaracterization of Dr. Youle's testimony.  Nothing in the expert disclosure indicates that Dr. Youle will testify as to what the BBA did or did not understand.  Instead, similar to the expert in *United States v. Litvak*, 808 F.3d 160, 181-83 (2d Cir. 2015), Dr. Youle will explain to the jury, based on his expertise, the meaning of the definition itself to the market generally; in essence, that the definition asked banks to report their estimated cash borrowing rates.  He will further explain why trading positions are irrelevant to estimated cash borrowing rates.  Such explanations are entirely appropriate for expert testimony as they do nothing more than provide the jury with a framework to better understand the evidence.  In other words, Dr. Youle will provide LIBOR's rules of the road insofar as they are revealed by the text of the definition and understood by the marketplace generally, but it will be up to the jury—aided by vigorous cross-examination—to determine how much weight to give the rules as he explains them.

The case the defendants cite in support of their argument is inapt.  In *In re Rezulin Prods. Liab. Litig.*, the plaintiffs' proposed experts would have opined on "the intent, motive or states of mind of corporations, regulatory agencies and others" that amounted to speculation "as to the 'real motive' behind certain business transactions."  309 F. Supp. 2d 531, 546 (S.D.N.Y. Mar. 15, 2004).  The court excluded such testimony as usurping the role of the jury.  *Id.* at 547.  Here, by contrast, Dr. Youle does not purport to know, nor will he testify as to, anything the BBA may have been thinking about the definition of LIBOR.  He will simply explain what the words in the definition meant to the marketplace.

The defendants' argument that Dr. Youle's interpretation of the LIBOR definition is not based on "reliable methodology" is a misguided attempt to force a round peg into a square

hole.[11]  It must be remembered that the portion of the testimony at issue here is Dr. Youle's

understanding of the definition of LIBOR; he will not be testifying on, for example, an

experiment he conducted or his reconstruction of any events—where a "reliable methodology"

would seem fitting.  But the notion of "reliable methodology" in the context of testimony about a

definition is altogether misplaced.  In any event, as stated above, his defense of his LIBOR

dissertation—which includes a description of LIBOR as being a cash borrowing and is premised

on the impropriety of skewing LIBOR submissions to favor trading positions (Ex. C at 1-2)—

speaks volumes about the reliability of his methodology.  Indeed, it is difficult to imagine a more

qualified expert in the field.

Likewise, the defendants' claim that Dr. Youle should not be able to testify that LIBOR

submissions were supposed to be unbiased and honest—characterized as the government's

"invented standard"—because it will confuse the jury should be rejected out of hand.  Far from

being an "invented standard," the requirement that submissions be unbiased and honest, although

not explicitly stated in the definition, is rooted in statements by the BBA that the marketplace

relied upon.  To cite just a few examples, the very BBA filing attached to the defendants'

opposition to the government's Rule 15 motion states: "the BBA required Panel Members to

make submissions based on the rates at which they *honestly* believed they could borrow."  (Decl.

of Seth L. Levine, Ex. A ¶ 52(a) (emphasis added), ECF No. 218.)  The same document contains

a 2008 quote from the BBA's John Ewan: "Contributors understand the importance of accurate

*unbiased* quoting."  *Id.* ¶ 104 (emphasis added).  Likewise, in 2009 the BBA touted studies

---

[11]     Dr. Youle is an academic and as such his expertise is based on his education and training.
The defendants' assertion that he is an "experience-based expert"—and therefore that the
government must make a higher showing with respect to "intellectual rigor"—has no basis in
fact.  (*See* Joint Mot. in Lim. at 23-24, ECF No. 227.)

purporting to show that submissions were accurate and "unbiased."  (Ex. D.)  Suffice it to say, an "unbiased and honest" requirement is not something created out of whole cloth for purposes of litigation.

Nor is Dr. Youle's "unbiased and honest" testimony likely to lead to jury confusion.  To the contrary, such testimony—which resonates with common-sense notions of fair play and honest dealing[12]—is a very straightforward way of explaining how the LIBOR submission process was supposed to work under the definition.  Indeed, the whole purpose of expert testimony is to assist the jury by making inaccessible subject matter accessible.  *Nora Beverages*, 164 F.3d at 746.  Therefore, Dr. Youle should be permitted to testify—and to be cross-examined—on the LIBOR definition's implied requirement, and the marketplace's expectation, that submissions were to be "unbiased and honest."[13]

### B.    Dr. Youle should be permitted to explain the impact of any manipulation

As explained above, Dr. Youle will mathematically demonstrate how manipulation can affect a given day's LIBOR fixing and, in turn, the settlement of a derivative instrument.  More specifically, he will use a hypothetical set of submissions to demonstrate how LIBOR is calculated, then he will change (*i.e.*, manipulate) one of the submissions to show the effect on the LIBOR calculation.  Using the original and manipulated LIBORs, Dr. Youle will demonstrate

---

[12]    Indeed, had there been no "unbiased and honest" requirement implicit in the LIBOR definition, then the definition necessarily would have allowed for biased or dishonest submissions.  It is difficult to envision a reality in which the LIBOR benchmark could become "the world's most important number" if market participants—who stake tremendous amounts of money on LIBOR movements—understood that submissions could be biased or dishonest.

[13]    Almost as an afterthought and with no supporting law, the defendants unpersuasively argue that "Dr. Youle should not be able to testify regarding what a LIBOR submitter 'could' consider when making a LIBOR submission during the alleged conspiracy period, as only the BBA can speak to that issue."  (Joint Mot. in Lim. at 26, ECF No. 227.)  But Dr. Youle's written work plainly demonstrates that he is qualified to opine on valid considerations when estimating borrowing rates.

the effect of manipulation on the payment stream of a hypothetical derivative contract. Dr. Youle will not, however, opine as to whether the defendants or their co-conspirators engaged in LIBOR manipulation, and he will certainly not opine as to whether such conduct constitutes fraud or any element of the charges in the indictment.

Demonstrating the effect of a hypothetical manipulation is entirely appropriate as it provides the jury with a framework around which the factual evidence can be understood by the jury. In *Ortiz*, the government used an expert in a similar way. There, the defendant was convicted of, among other things, "structuring financial transactions to avoid currency reporting requirements (in violation of 31 U.S.C. § 5324)." 1997 U.S. App. LEXIS 9841, at *2. The government called an IRS agent as an expert to testify on a number of topics, including "the meaning of financial structuring, as well as the methods by which it is accomplished." *Id.* at *14. However, the expert's testimony "did not itself refer to any government witnesses or to [the defendant]; [the expert] was never presented with fact patterns mimicking [the defendant's] conduct, and was not asked to render an opinion as to whether any specific illegal conduct had occurred in the case." *Id.* at *17.

The expert thus provided "a *framework* by which numerous, repetitive, trivial, and ostensibly routine financial transactions, described by many witnesses, could be understood—by lay jurors—to be part of a sophisticated (illegal) financial scheme." *Id.* at *16-*17 (emphasis added). Notably, the court observed, "[t]o the extent that the government's witnesses testified to facts and events that were similar to circumstances previously described by [the expert], it was merely because [the defendant's] actions (and those of his confederates) so closely fit traditional patterns of illegal money laundering and structuring operations, and deviated so little from methods commonly used to evade the relevant statutory requirements." *Id.* at *17.

Dr. Youle would also provide an *Ortiz*-like framework, allowing the jury to understand how the defendants' numerous manipulation requests and the bank's trading positions were part of a sophisticated financial scheme.  But, like the expert in *Ortiz*, Dr. Youle will not refer to any other witness testimony (indeed, he will be the government's very first witness) or to the defendants; he will not be presented with fact patterns that mimic the defendants' conduct; and he will not opine as to any legal conclusions.  To the extent his hypothetical manipulation example ends up being similar to manipulation attempts later described by government witnesses, it is the byproduct of there being few ways to carry out the alleged scheme (as evidenced by the numerous settlements between the government and panel banks in which the *modus operandi* is more-or-less the same).

The case relied upon by the defendants, *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), *rev'd on other grounds*, 856 F.2d 5 (2d Cir. 1998), is not to the contrary.  In *Scop*, a stock "manipulation" case, an SEC expert—having spent "over one thousand hours during four years of working the . . . case," having "interviewed approximately seventy witnesses," and having "assisted in the preparation of the indictment"—opined that the stock in question "was manipulated" and "repeatedly described the defendants as 'active participants' and 'material participants' in the manipulation."  *Id.* at 138.  The expert further testified that "his positive assessment of the testimony of the government's witnesses . . . was a basis for his opinions."  *Id.* The expert in *Scop* was the prosecution's final witness.  *Id.*

The Second Circuit's disapproval of the expert testimony in *Scop* does not apply here. First of all, the charges in *Scop* included a violation of 15 U.S.C. § 78j(b), which outlawed "the use of 'any *manipulative* or deceptive device or contrivance in contravention' of rules promulgated by the Securities and Exchange Commission in connection with the purchase and

sale of securities." *Scop*, 846 F.2d at 136 n.1 (emphasis added). Thus, whereas the *Scop* expert's opinion that stock prices were "manipulated" tracked the statutory language, no such statutory language is at issue here. Dr. Youle will merely testify that derivative trading positions have no relevance to a bank's perceived borrowing rates, and that a LIBOR submission manipulated to account for a derivative trading position is inconsistent with the LIBOR definition. He will not opine as to whether manipulation constitutes "fraud" within the meaning of 18 U.S.C. § 1343 or otherwise. Additionally, unlike the expert in *Scop*, Dr. Youle had no participation in the government's investigation and, importantly, as the *first* witness will not provide an assessment of any other witness's credibility. Put simply, there is no credible comparison between Dr. Youle and the expert in *Scop*.

C.     **Dr. Youle should be permitted to testify as to the obvious motivation of derivatives traders to manipulate LIBOR**

Dr. Youle should be permitted to testify that a trader—not any particular trader—stood to gain from, and therefore could be motivated to request, a manipulation of the LIBOR submission. That is the obvious conclusion from Dr. Youle's proposed testimony regarding a hypothetical manipulation's effect on the payment stream of a hypothetical derivative contract. But to be clear, Dr. Youle will not testify as to the *defendants*' motivations.

D.     **Dr. Youle should be permitted to testify that an accurate benchmark interest rate is useful to market participants if it is accurate**

The defendants' argument that Dr. Youle should not be permitted to testify concerning the state[s] of mind of the counterparties rests on a fundamental mischaracterization of his proposed testimony. Of course Dr. Youle cannot claim to know what was in the mind of a specific counterparty. Nevertheless, he is perfectly capable of explaining to the jury why a benchmark interest rate is useful to market participants if it is accurate, and why it is not useful if it is inaccurate. Indeed, materiality is an objective standard and, as a result, does not require

proof of the subjective views of market participants.  Thus, Dr. Youle's testimony is adequate to demonstrate the importance of accuracy.

>   **E.    Dr. Youle should be permitted to testify to the ubiquity of LIBOR in the marketplace and to harm beyond immediate counterparties**

Evidence that LIBOR was used in countless financial instruments worldwide and evidence of harm beyond immediate counterparties is important to proving the government's case and, in particular, the elements of intent and materiality.  And the relevance of such evidence is not outweighed by any prejudicial effect.

*Intent*

"When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud."  *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir. 1999) (citing *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970).  Thus, the defendants cannot credibly claim that they lacked intent to defraud where, as here, the harmful effects of their scheme to market participants in general were obvious and far-reaching.  Nor can the defendants escape a finding of fraudulent intent simply because an immediate counterparty hedged its exposure to LIBOR and effectively passed the harm of manipulation to someone else.

Dr. Youle will testify that during the conspiracy (and still today) LIBOR was ubiquitous.  Trillions of dollars of swaps contracts, and countless credit cards, home mortgages and student loans—to name just a few financial instruments—were sensitive to changes in LIBOR.  When LIBOR was manipulated in a particular direction, holders of such instruments were impacted.  To be sure, many market participants would have benefitted unwittingly from the defendants' successful manipulation efforts, but for every benefit there is an inevitable harm.  It follows quite naturally that when the defendants manipulated LIBOR in their favor, the resultant harm was not

confined to discrete lines of counterparties; rather, the harm cascaded in parallel to anyone whose exposure to LIBOR was opposite that of the defendants. Accordingly, injury to market participants generally was a necessary result of a successful execution of defendants' scheme and, therefore, Dr. Youle's testimony along those lines is relevant to intent.

In addition, Dr. Youle will testify that injury beyond immediate counterparties was inescapable and, as such, is relevant to intent. At the most basic level, if the defendants' scheme achieved their goal of manipulating the LIBOR rate in their favor, then immediate counterparties with the opposite exposure would have been harmed. The defendants do not dispute the relevance of such evidence. However, the swaps market is a zero-sum game and, as a result, even if the defendants' counterparties were perfectly hedged with no net exposure to LIBOR, *someone*—perhaps the counterparties' counterparties, or counterparties farther down the line— who had a net exposure to LIBOR opposite the defendants (assuming their scheme succeeded) was inevitably harmed.[14]

---

[14]    It is of no moment that immediate counterparties are readily identifiable, whereas counterparties down the line generally are not. The wire fraud statute does not require victims to be identified or identifiable. *Cf. United States v. Brandon*, 17 F.3d 409, 426 (1st Cir. 1994) (in the context of the closely analogous bank fraud statute, citing *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992), to support the Court's holding that it is "unnecessary for the government to prove that a defendant knows which particular bank will be victimized by his fraud as long as it is established that a defendant knows that *a* financial institution will be defrauded"). Nor does proof of intent require identification of victims. *Cf. Brandon*, 17 F.3d at 426 (rejecting bank fraud defendants' attempt "to sanitize their fraud by interposing an intermediary or an additional victim between their fraud and the federally insured bank"); *United States v. Anzalone*, 626 F.2d 239, 244 (2d Cir. 1980) (holding, in the context of passing counterfeit currency, that "only a general intent that some innocent third party in the chain of distribution be defrauded is required").

*Materiality*

Evidence that manipulation harms the integrity of LIBOR is relevant to proof of materiality.  Dr. Youle will testify that LIBOR's wide reach and trusted integrity shows that it had a natural tendency to influence market participants, including would-be counterparties, and thus demonstrates the inherent materiality of efforts to undermine that integrity through manipulation.  If market participants cannot trust the benchmark, they will not use it for interest rate swaps or otherwise.   While such harm may be less quantifiable, it is no less real or inevitable.  As such, the harmful effect of LIBOR manipulation on the benchmark's integrity is central to the government's proof of materiality and Dr. Youle's testimony in that respect should be permitted.

*No Unfair Prejudice*

Any prejudice arising from the above-described aspects of Dr. Youle's testimony, introduced to prove key elements of the offense charged, is *not* unfair.  The government will not try to make the defendants into scapegoats for the effects of the global financial crisis, and it is perfectly appropriate for the government to explain the gravity of the defendants' fraudulent scheme to prove its case.  Since the very beginning, the government's position has been that the defendants' conduct touched a vast array and volume of financial products and affected a wide range of market participants, from large banks to everyday consumers.  The jury is entitled to that information in evaluating the defendants' fraudulent intent and materiality.  Moreover, depriving the jury of the full picture would be particularly unjust because the defendants, knowing that LIBOR was one of the world's most important benchmark interest rates, nevertheless entered into a fraudulent scheme to manipulate those rates.  The prejudice about which the defendants now complain, therefore, is far from unfair; it is of their own making.

Even if the evidence gives rise to unfair prejudice, the magnitude of any unfairness is minimal and plainly outweighed by the probative value of the evidence. As explained above, evidence of harm beyond immediate counterparties directly supports the government's proof of fraudulent intent and materiality. To exclude evidence probative of those two key elements, the prejudicial effect of that evidence must be highly unfair. But given the defendants' knowing choice to enter into a scheme that, by its very nature, reached innumerable market participants and undermined the integrity of a crucial benchmark, any unfairness cannot outweigh—much less "substantially outweigh" as required by Rule 403—the probative value of the evidence.

IX.   **THE DEFENDANTS SHOULD ONLY BE PERMITTED TO INTRODUCE EVIDENCE RELATING TO THE BBA'S AWARENESS OF PANEL BANKS' CONSIDERATION OF TRADING POSITIONS WHERE THEY CAN SHOW THAT THE DEFENDANTS OR CO-CONSPIRATORS WERE AWARE OF IT, SUCH THAT IT GOES TO THEIR STATE OF MIND AND IS OTHERWISE ADMISSIBLE**

The government maintains the position—discussed at length above—that whether or not the BBA was deceived is irrelevant, and it is instead the defendants' state of mind (*i.e.*, intent to defraud) that is relevant. Thus, potential evidence showing that the BBA was aware of panel banks' LIBOR manipulation is only relevant if it can be traced to the defendants'—or their co-conspirators'—states of mind. That is, such evidence is only relevant if it is evidence that the defendants or their co-conspirators were aware of during the alleged conspiracy.

However, if the Court rules against the government's position and finds that whether or not the BBA was actually itself deceived must be proven in this case, the government would not necessarily oppose the evidence cited in the defendants' motion. That is, of course, if the evidence offered by the defense is otherwise admissible under foundation, authentication, hearsay, and other evidence rules, and it was provided to the government in reciprocal discovery. As noted in previous filings, the government is not in possession of some of the BBA materials

cited by the defendants.  (Resp. in Opp'n at 7-8, ECF No. 130.)  To the extent the defendants do

not provide these materials to the government by June 1, 2018—or whatever reciprocal

discovery deadline the Court imposes—the materials should not be admitted.  *See* Fed. R. Crim.

P. 16(b)(1)(requiring the defense to produce documents it "intends to use [] in [their] case-in-

chief at trial"); *United States v. Ryan*, 448 F. Supp. 810 (S.D.N.Y. Apr. 17, 1978); *United States*

*v. Jasper*, No. 00-cr-825, 2003 WL 223212, at *4 (S.D.N.Y. Jan. 31, 2003) (holding that the

"alternative of not requiring defendant's counsel to turn over material until he decided whether

or not defendant would take the stand, to be unacceptable, since the government would almost

certainly be prejudiced by the insufficient time it would have to prepare its rebuttal.").

## X.   THE GOVERNMENT DOES NOT OPPOSE THE ADMISSION OF EVIDENCE OF THE BBA LIBOR RULE AND GUIDANCE CHANGES AFTER THE INDICTMENT PERIOD AS LONG AS IT IS OTHERWISE ADMISSIBLE AND GOES TO THE DEFENDANTS' OR COOPERATORS' STATE OF MIND

The government does not oppose the evidence cited in the defendants' motion, but only

to the extent it is used to prove the defendants' or their co-conspirators' states of mind (*i.e.*,

whether or not the defendants themselves believed they were causing their co-conspirators to

submit false, dishonest, misleading, and/or fraudulent LIBOR submissions).  That is, of course, if

the evidence offered by the defense is otherwise admissible under foundation, authentication,

hearsay, and other evidence rules, and it was provided to the government in reciprocal discovery.

## XI.   THE GOVERNMENT DOES NOT OPPOSE THE ADMISSION OF EVIDENCE OF PUBLIC NEWS REPORTS DISCUSSING CONERNS ABOUT THE LIBOR RATE AS LONG AS IT IS OTHERWISE ADMISSIBLE AND GOES TO THE DEFENDANTS' OR COOPERATORS' STATE OF MIND

The government does not oppose the evidence cited in the defendants' motion, but only

to the extent it is used to prove the defendants or their co-conspirators' states of mind.  That is,

the government does not oppose the admission of public news reports discussing concerns about

the LIBOR rate as long as the defendants can show that they or their co-conspirators were aware

of, or discussed, the public reports during the alleged scheme.   Admitting other public papers criticizing LIBOR, reporting on LIBOR investigations, or the like that were not known to the defendants or their co-conspirators during the scheme would be inadmissible hearsay that does not fit within the exception for the impact on the listener, and would also be irrelevant.

## XII.   THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE EVIDENCE CONCERNING THE DEFENDANTS' COMPENSATION

The government should be permitted to introduce evidence concerning the defendants' compensation because such evidence is highly relevant, Federal Rule of Evidence 401, and its probative value is not substantially outweighed by a danger of unfair prejudice, Federal Rule of Evidence 403.  The government plans to prove that (1) the vast majority of the defendants' compensation from Deutsche Bank was in the form of performance-based bonuses, and (2) the defendants were highly compensated.[15]  The government will not make the impermissible argument that the defendants should be convicted because they made a lot of money.  Moreover, to the extent there is a danger of unfair prejudice, the Court is empowered to mitigate any such danger by limiting the government's use of compensation evidence and instructing the jury on appropriate and inappropriate inferences to be drawn from compensation evidence.  *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) ("While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth.").

---

[15]    In the relevant years, both defendants received bonuses that amounted to 86% of their total compensation.  If the Court allows evidence of total compensation in terms of dollars and cents (or pounds and pennies), the government will provide those numbers, under seal if the Court so desires.

Compensation evidence is admissible for several purposes.  In *Quattrone*, for example, the Second Circuit held that the district court did not err by admitting evidence of the defendant's compensation for the purpose of demonstrating that the defendant had a motive to obstruct a securities fraud investigation into his employer.  *Id.*  In that case, the Second Circuit specifically pointed out that any danger of unfair prejudice was mitigated by the government because "its references to [the defendant's] compensation during its opening statement and summation specified that evidence of his compensation was to be used for the limited purpose of establishing a motive to obstruct and could not be used to convict [the defendant] simply because of his wealth."  *Id.*

Similarly, in *United States v. Peters*, the Second Circuit affirmed the admission of "some evidence of the defendant's wealth [that] was relevant to the question of motive."  543 Fed. App'x 5, 10 (2d Cir. 2013).  The *Peters* court also explained that "[e]vidence of the defendant's wealth and business savvy was also relevant to refuting the defense's characterization of him as an honest businessman who was duped by a simple accounting scheme."  *Id.*  And as in *Quattrone*, any danger of unfair prejudice was mitigated because "the district court appropriately limited the prosecution's references to the defendant's lifestyle."  *Id.*  Other examples include *United States v. Levy*, where the government used such evidence to prove motive, means, and intent, No. 11-cr-62, 2013 U.S. Dist. LEXIS 31968, at *6-*7 (S.D.N.Y. Mar. 5, 2013); *United States v. Ferguson*, where the court held that "[e]vidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud," No. 06-cr-137, 2007 U.S. Dist. LEXIS 87842, at *5-*7 (D. Conn. Nov. 30, 2007); and *United States v. Rajaratnam*, 13-cr-211 (NRB), where the defendant's compensation during

the period of the conspiracy was admissible to prove motive to commit securities fraud crimes (Ex. E).

Here, the government's evidence is relevant in at least three ways. First, just as in *Quattrone*, *Levy*, *Ferguson*, and *Rajaratnam*, evidence that the vast majority of the defendants' compensation came in the form of performance-based bonuses—coupled with cooperator testimony that LIBOR manipulation enhanced profitability and therefore performance[16]—tends to prove the defendants' motive for engaging in the fraudulent scheme. Second, the same bonus evidence tends to prove that the object of the scheme was to "obtain[] money or property," as required by the wire fraud statute, 18 U.S.C. § 1343. And third, as in *Peters*, the fact that the defendants were highly compensated in absolute terms is inconsistent with their anticipated defense along the lines that they somehow misunderstood the definition of LIBOR to allow for biased and dishonest submissions calculated to account for trading positions—in other words, it is implausible to believe that the defendants would have been compensated at such high levels if they did not understand the LIBOR-based products they were trading.

The defendants' reliance on *United States v. Stahl* is unavailing. The prejudice in that case was exacerbated by the prosecutor's overt appeals to the jury's perceived class bias and repeated references to the defendant as a "multi-millionaire businessman" and the like. 616 F.2d 30, 32 (2d Cir. 1980). Cases interpreting *Stahl*, including *Quattrone*, have recognized that such prejudice can be negated through limiting instructions making clear that the evidence is relevant

---

[16]    The defendants incorrectly suggest that compensation evidence is irrelevant "[w]ithout disentangling what Defendants earned through the conduct charged in the Indictment versus what they earned through the rest of their job activities." (Joint Mot. in Lim. at 40, ECF No. 227.) The focus is on the their states of mind, so as long as they *thought* LIBOR manipulation made a difference the evidence is relevant and there is no need to calculate exact amounts.

to specific issues and by prohibiting the government from making inflammatory arguments.

*Quattrone*, 441 F.3d at 187; *see also United States v. Weiss*, 930 F.2d 185, 197 (2d Cir. 1991)

("*Stahl*, however, involved conduct far more egregious than that involved here . . . the prosecutor

in *Stahl* made repeated statements during the trial that were not supported by the evidence").

Because the government will not use compensation evidence in that way, the probative value of

the compensation evidence far outweighs any danger of unfair prejudice.

### XIII.   THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE TRADES AND THE ASSOCIATED DATA AND DOCUMENTS FOR THOSE TRADES THAT WERE IDENTIFIED IN ITS NOVEMBER 30TH LETTER TO THE COURT

The government has more than complied with the Court's order.  The Court ordered that

the government identify "a finite universe of trades, from which it will . . . choose a still smaller

number of trades" and "provide keys to abbreviations and symbols and whatever other

information may be needed so that defendants can identify, from the massive underlying data

sets, who the counterparties to the relevant trades were and what the terms of the trades were."

(Mem. Decision & Order Granting in Part Defs.' Mot. for a Bill of Particulars ("July 10 Order")

at 12-13, ECF No. 89.)  Indeed, the Court stated that "[e]ven the March 2 spread sheet has one

thousand rows of data—which seems a manageable number, until one realizes that the data is

incomplete and needs to be correlated with underlying data that is not easy to locate."  (*Id.* at 10.)

Yet the government, in continued good faith, reduced the number of trades from a thousand to

215, and for those 215 trades identified the relevant fixing dates and corresponding trade

documents (*i.e.*, trade confirmations).  Additionally, the government has remedied the issue of

correlating the underlying trade information with the data by providing the defense with a list of

trade confirmations such that they have a clear counterparty name as well as Deutsche Bank's

Global No. that specifically corresponds with the SystemID for each line of trade data that is associated with that trade confirmation.

Despite that, the defendants take the unsupported position that the Court had also required the government to "identify (i) the specific direction of the alleged manipulation; (ii) the tenor subject to the alleged manipulation; and (iii) the alleged corresponding request." (Joint Mot. in Lim. at 41, ECF No. 227.) However, as the defendants well understand, the Court specifically rejected the defendants request for that information. (July 10 Order at 13-14 (before denying defendants many other requests for particulars, noting that the defendants sought "precisely which LIBOR rates (by date and tenor) the alleged conspirators manipulated or attempted to manipulate").) That the defendants now seek to preclude the government's evidence because it did not provide what was squarely rejected by the Court in its order on the defendants' bill of particulars motion is baffling. Indeed, the defendants clearly understood this Court's original order to be denying them these particulars because they did not raise the request in their August 29, 2017 submission. (*See* Letter Mot., ECF No. 126.) In this letter detailing the government's many alleged shortcomings that—according to the defense—made it "clear that the [g]overnment has no intention of complying with the Court's orders," the defendants made *no mention* of their new "requirement" that the government provide the direction, tenor, and communication of each alleged manipulation. (*Id.* at 2.) Nor do they mention that the Court responded to their letter by saying: "The [C]ourt is satisfied that the government is in compliance with its July 10 order." (Memo Endorsement, ECF No. 134.), despite having requested this information from the beginning in their motion for a bill of particulars.

In fact, the government has continued to go well beyond the Court's order, not only by significantly narrowing its list of trades and identifying the relevant dates but also by continually

laying out a roadmap for the defendants of how the government intends to use this information at trial (as well as detailing the other key parts of the government's case-in-chief).  (*See, e.g.*, Letter Resp. in Opp'n, ECF No. 152.)  The government will first introduce communications and instances where the defendants and their co-conspirators stood to gain or lose money based on a LIBOR fixing.  The government will then use testimony and submission data to show whether the defendants' co-conspirators manipulated their USD LIBOR submission.  Then, the government will prove that there was a trade at issue on that fixing date by showing a trade document (known as a confirmation) as well as the associated line of trade data and documents for that trade (*i.e.*, the materials relevant to the specific trades listed by the government for the defendants).  The defendants have had the evidence showing exactly what they now seek for almost two years now and are very capable of searching for chats and emails which would show the tenor, direction, and manipulation request for the 43 fixing dates that the government identified in its November 30th letter.  (*Id.*)

To the extent the Court finds that the defendants are entitled to this information pre-trial, preclusion of the evidence at trial is not the appropriate remedy.  Instead of filing a motion to seek this relief during the over five months since the government filed its November 30 letter, the defendants have waited until now to argue that the evidence should be precluded.  While, as the defendants state in their motion, the defendants did request this additional information from the government, the defendants did so via a letter sent on March 29, 2018, to which the government responded within less than a week with the government's position that it has no obligation to provide the additional information that the defendants now demand.

## **CONCLUSION**

For the reasons stated above, the Court should rule in favor of the government on all of the defendants' motions *in limine*.


Date: May 7, 2018

Respectfully submitted,


SANDRA MOSER                           JEFFREY D. MARTINO
Acting Chief, Fraud Section            Chief, New York Office
Criminal Division                      Antitrust Division
United States Department of Justice    United States Department of Justice


_____/s/_____                _____/s/_____
CAROL L. SIPPERLY                       MICHAEL T. KOENIG
Assistant Chief                         Trial Attorney
ALISON L. ANDERSON                      Antitrust Division
MARK CIPOLLETTI                         United States Department of Justice
Trial Attorneys                         (202) 616-2165
Criminal Division, Fraud Section
United States Department of Justice