UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/18

------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

MATTHEW CONNOLLY AND
GAVIN CAMPBELL BLACK

       Defendants.

S1 16 Cr. 370 (CM)

------------------------------------------------------------x

## DECISION ON DEFENDANTS' MOTIONS IN LIMINE, BLACK'S MOTIONS IN LIMINE, AND CONNOLLY'S MOTION IN LIMINE

McMahon, C.J.:

The court, for its decision on Defendants' motions *in limine*:

### A. **Defendants' Joint *In Limine* Motions**

*Defendants' First Joint Motion in Limine*

Defendants move to preclude the Government from arguing that Deutsche Bank AG's (hereinafter "Deutsche Bank") LIBOR submissions were false. The motion is DENIED.

The Government intends to argue that the Deutsche Bank USD LIBOR submissions at issue in this case – the ones that were allegedly influenced by the requests of Deutsche Bank traders, whose trading positions would profit if a LIBOR of a particular tenor moved in one direction or another on a particular day – were false precisely *because* they did not conform to the BBA's definition: which is to say, they were not the rate at which Deutsche Bank could "borrow funds, were [it] to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"

1

The court has already addressed this issue in its opinion ruling on the Government's motion *in limine*. (*See* Decision and Order on Gov't Mots. in Lim. ("Gov't Mots. in Lim. Decision") at 18–21, Dkt. No. 262.) While the court has long been sympathetic to the defense argument that the BBA does not use the words "honest" or "unbiased" – words that the Government uses over and over again in the Indictment – in its question to the Contributor Panel banks, the BBA's question admits of a rather straightforward interpretation, under which a reasonable trier of fact could conclude beyond a reasonable doubt that the Deutsche Bank submissions were false. The question asked by the BBA is couched in easily understood language – plain English – and it does not include any verbiage that would expressly or even arguably permit the practice attacked by the Government.

*Defendants' Second Joint Motion in Limine*

Defendants next move to preclude the Government from using the word "cheat" instead of "fraud." The motion is DENIED if it is intended to preclude the government from ever using the word "cheat." However, as the court has already made clear, the Government will not be allowed to conflate the terms "cheat" and "fraud." (Dkt. No. 203, at 7-8.) The court is perfectly capable of telling the jury that "cheating" does not violate the federal wire fraud statute, and that fraud is a term of art, with specific elements that the Government must prove beyond a reasonable doubt. The Government will be held to its burden of proof. The jurors will be instructed appropriately.

*Defendants' Third Joint Motion in Limine*

The defense motion to preclude the Government from using the words "honest and unbiased" is DENIED. The phrase "not honest and unbiased" is a way of characterizing something as a misrepresentation under the Government's theory of the case. Therefore, assuming admissible

2

evidence of misrepresentation supports its contention, the Government is free to characterize the BBA's question as requiring honest and unbiased submissions. The defense is equally free to point out that the BBA's question, read literally, uses no such words, and to argue that the BBA imposed no such requirement.

*Defendants' Fourth Joint Motion in Limine*

The defense's motion to preclude the Government from proceeding on an "implied misrepresentation" theory is really a motion to preclude the Government from referencing any standard that is not explicitly set forth in the BBA's definition. (Defs.' Joint Mots. in Lim. ("Defs. Br.") at 8, Dkt. No. 227.) I understand the movants to argue that the Government should be barred from arguing that a shaded LIBOR submission is false and fraudulent under the BBA's definition of LIBOR. Or, perhaps, it is an affirmative motion to prevent the Government from proceeding on its new convergent fraud theory.

For reasons articulated earlier in this opinion and in the opinion deciding the Government's motions *in limine*, (*see* Gov't Mots. in Lim. Decision at 6–13, 18–21), that motion is DENIED.

The defense cannot plausibly argue that it lacked notice that the Government might argue implied misrepresentation. The Government has repeatedly reminded the court that, under the wire fraud statute, implied misrepresentations (misrepresentations by omission), as well as half-truths, can be as false and fraudulent as express representations. The defendants certainly cannot claim that they lacked notice of the law.

The defense argues that the Due Process Clause prohibits the government from pursuing an implied misrepresentation theory because Contributor Panel banks did not have fair warning that they were prohibited from considering the bank's trading position when determining LIBOR submissions. (Defs. Br. at 10–12.) It is defendants' position that the BBA would have had to make

3

explicit, through the text of the question or in the form of a rule or guidance, that the practice of "shading" submissions to serve the Contributor Panel bank's own personal interests was prohibited. (Defs. Br. at 10–12.) For the reasons already articulated, I am unpersuaded by the defendants' arguments. The Government is free to argue that the prohibition was apparent from the text of the BBA's question; making that argument does not violate the Due Process Clause. *See also United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (rejecting defendants' argument that a statute "failed the 'fair notice' prong because it [did] not make clear whether the Republican county chairs were under a cognizable fiduciary duty to their party not to accept" bribes).

In any event, "fair notice" requires a court to determine whether a "statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Halloran*, 821 F.3d at 338. The BBA's rules and guidance are not statutes. The statutes at issue here are the mail and wire fraud statutes.

I do agree with the defense that, in order to prove falsity, the Government must negate *any reasonable interpretation* of the BBA's question that would render the alleged misrepresentation – the Deutsche Bank USD LIBOR submissions – not false and not misleading. But the key word here is "reasonable." I expect the Government to argue that it would be unreasonable to interpret the BBA's question as allowing a submitting bank to modify an estimate of its actual cash borrowing cost by taking into account extraneous factors that have nothing to do with the cost of borrowing cash – even though the BBA did not use language that expressly prohibited such a practice. There is no due process problem with making this argument, because the question asked by the BBA can reasonably be interpreted to require the banks to do precisely what the Government

4

argues: respond with a LIBOR submission that estimates the cost to the bank of borrowing cash at the rate the bank would accept, and nothing more.

*Defendants' Fifth Joint Motion in Limine*

Defendants move to bar the Government from putting on false or misleading evidence. Defendants specifically ask the court to bar the Government from presenting two categories of evidence: (1) any evidence suggesting that the BBA was not aware that LIBOR submitters considered their banks' trading position in making their LIBOR submissions; and (2) any evidence that is inconsistent with the Second Circuit's statement in *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017), that there existed a range of reasonable LIBOR submissions for each Contributor Panel bank.

The Government is cautioned not to present testimony that it knows to be false. For example, if the Government has evidence in its possession showing that the BBA was aware that Contributor Panel banks were shading their LIBOR submissions, the Government had best not argue that the BBA was unaware of this practice. That said, I rather imagine that some evidence that the defense thinks is false is not viewed by the Government as false.

Defendants specifically ask the court to bar the Government from arguing that there is an "honest" LIBOR and that all other LIBORs are "dishonest." Their authority for this proposition is a statement made in dictum by the Second Circuit in *Allen,* to the effect that "LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a 'range' of reasonable LIBOR submissions." 864 F.3d at 75. That is a statement of fact, not a conclusion of law. (It is also, as this court has noted previously, dictum; the statement is entirely unnecessary to the Court of Appeals' decision in *Allen*).

The record in this case remains to be developed. With all respect to the Second Circuit, its statements of fact about the evidence in another case – even a closely related case, as *Allen* unquestionably is – are not "findings" in this case. Findings of fact can only be made by a jury; there is no "collateral estoppel" that carries over from a dictum in *Allen* into this case.

Moreover, the Government does not disagree that LIBOR submissions required submitters to exercise some degree of judgment. The Government intends to argue that, while there may have been a reasonable range of possible submissions, submitters picked from within that range based on considerations that did not reflect their honest view of the cost Deutsche Bank would have actually incurred had it accepted an offer to borrow funds in a reasonable interbank marketplace. There is no constitutional bar to its making that argument.

Defendants' motion is DENIED.


*Defendants' Sixth Joint Motion in Limine*

Defendants' sixth motion *in limine* addresses the use of counterparty testimony to prove materiality. This issue was dealt with in the decision on the Government's motion *in limine*. (*See* Gov't Mots. in Lim. Decision at 13–18.)

This court will follow the Supreme Court's pronouncement in *Neder v. United States*, 527 U.S. 1 (1999) – as reinforced most recently in *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) – which holds that the test for materiality in a wire fraud case is whether the alleged false statements has "a natural tendency to influence, or [is] capable of influencing, the decision *of the decisionmaking body to which it was addressed*." (internal quotation marks and citations omitted) (emphasis added). The court rejects any suggestion that this standard has been modified in any way, or that this standard does not apply in a non-convergent fraud case – assuming, of course, that this case still involves a non-convergent fraud scheme.

Therefore, if the Government's theory is that a false USD LIBOR submission was material to some decision that had to be made by the BBA, then as far as this court is concerned, the only witness competent to provide testimony on that question is some representative of the BBA. The market's assessment of what must/could/ought to have been material to the BBA is irrelevant and amounts to nothing more than speculation. Therefore, no one will be permitted to testify to the "BBA's expectations" other than a representative of the BBA.[1]

If, by contrast, we are dealing with a convergent fraud scheme – as appears now to be the case – then of course materiality will be determined with reference to the counterparties, because they were the decision-makers whose decisions were capable of being influenced by the false statements that were made to them. The counterparties are competent to testify as to the materiality of any specific statement that was addressed to them of which they were aware – or any omission to make a statement (of which they were by definition not aware) – as long as it influenced or could have influenced a decision of theirs.

*Defendants' Seventh Joint Motion in Limine*

The defendants' seventh motion *in limine* seeks to preclude cooperators from offering the same type of evidence to which the sixth motion *in limine* was addressed. That subject, too, was dealt with in the Decision on the Government's motions *in limine*. (*See* Gov't Mots. in Lim. Decision at 13–18.)

Defendants are reminded that counterparties and cooperators may well be able to give some of the testimony that the defense seeks to bar because it is relevant and admissible on the issue of

---

[1] For a fuller discussion of this ruling – and the caveat that testimony from cooperators about BBA actions that circumstantially evidence materiality will be admitted – *see* Gov't Mots. in Lim. Decision at 13–18.

falsity – whatever constraints may be imposed on them as regards materiality. (*See* Gov't Mots. in Lim. Decision at 18–21.)

*Defendants' Eighth Joint Motion in Limine*

The defense makes several motions addressing specifically the proposed testimony of Dr. Youle, the Government's expert, much of which it seeks to exclude.

The Government's expert will be examined and *voir dired* before any expert testimony will be received and the court will either accept him as an expert or reject him based on the information presented at that time. However, as a preliminary matter, his credentials appear to be more than sufficient.

The court has already ruled, in connection with the Government's motions *in limine*, that Dr. Youle would appear to be able to give testimony about market expectations, bank practices, and the like, which relate principally to the issue of falsity, rather than materiality. Of course, if the defense makes it clear during *voir dire* that Dr. Youle knows nothing of such matters, he will not be permitted to testify about them.

The Government is strongly cautioned that it should be fully familiar with Second Circuit law on the issue of what an expert can and cannot say in a fraud case – most particularly, those cases holding that an expert cannot be allowed to testify to legal conclusions or to characterize conduct as "manipulative" or "fraudulent." *See, e.g., United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), *modified on other grounds*, 856 F.2d 5 (2d Cir. 1998). This court does not permit experts to encroach on the court's province to explain terms of legal significance to the jury.

Motive is indeed not the province of experts, so experts will not be permitted to testify about motive. But the Government's expert can testify about market-related matters. The two statements from the Government's expert notice that are quoted on page 28 of the Defendants'

Brief in support of their joint *in limine* motion fall comfortably within that category – or would do so if the words "inappropriately manipulate" were removed therefrom.[2] That this testimony may also touch on motive does not render it inadmissible for the purpose for which it is offered; if a limiting instruction is needed, one will be given. The same is true of the statement quoted at the bottom of the same page, which the defense unhelpfully (and inaccurately) characterizes as "state of mind" evidence.[3]

The defense objects to testimony about the potential for injury to market participants other than the Deutsche Bank counterparties from the scheme alleged in the indictment. But the testimony the defendants seek to bar is relevant. That trillions of dollars of trades in the financial marketplace are pegged to LIBORs is a highly relevant fact that can be explained to the jury, as part of proving the Government's argument that LIBOR is "ubiquitous" in the financial marketplace. I disagree with the defense contention that the probative value of this information is outweighed by some sort of prejudice arising from the importance of LIBOR as measured in pure dollar terms. Testimony about the importance of LIBOR to participants in the financial markets, as well as information about the number of contracts and volume of funds that are traded in reliance on that single word – it "ubiquity" – strikes this court as powerful evidence that sophisticate market participants would have entertained – indeed, would have required – a common understanding of

---

[2] The two statements are:

[I]f a panel bank's "traders"—bank employees who created, managed, and generally benefitted from the bank's derivative trading positions—could influence the submitter's U.S Dollar LIBOR submission from an unbiased and honest estimate of the bank's borrowing costs to favor their derivative trading positions, then those traders were in a position to inappropriately manipulate the U.S Dollar LIBOR fix to their benefit at the expense of counterparties.

[D]uring the time period described in the indictment, a potential for U.S. Dollar LIBOR manipulation—and counterparty harm—existed where a panel bank for U.S. Dollar LIBOR also traded derivatives tied to U.S. Dollar LIBOR.

(Defs. Br. at 28.)

[3] "[A] benchmark interest rate is useful to financial market participants only if it accurately characterizes borrowing costs." (Defs. Br. at 28.)

what LIBOR is and how it is calculated. Dr. Youle is plainly competent to testify about the importance of an accurate benchmark rate to the market generally.

The Government apparently intends to ask Dr. Youle about the impact on the market generally of LIBOR manipulation. As I understand it, the Government intends to call Dr. Youle early in its case -- to give the jurors a bit of a tutorial before they begin to hear evidence about what went on at Deutsche Bank. Dr. Youle will not testify about Deutsche Bank's submissions specifically, but will explain to the jurors, using examples he has made up for this purpose, what would happen to a derivatives trade if a LIBOR were higher or lower than it would have been had the Contributor Panel banks submitted rates that were calculated as the Government contends they should have been.

Assuming he steers clear of loaded legal conclusions or intrusion on the jury's role, he is competent to give such testimony. I imagine that it will be useful for the jurors to have an understanding of the impact that a seemingly tiny variance in a LIBOR can have on derivatives' trading. I assume that the Government is fully aware that Dr. Youle cannot sit on the witness stand and parrot the language of the wire fraud statute that defendants are accused of violating. Defendants' reliance on *United States v. Scop*, 846 F. 2d 135 (2d Cir. 1988), is inapposite.

Will Dr. Youle's testimony be "prejudicial" to the defendants? Undoubtedly. But not unfairly so.

*Defendants' Ninth Joint Motion in Limine*

Defendants next move *in limine* to be permitted to introduce evidence that the alleged purported shading of submissions by Contributor Panel banks was in fact not material to the BBA's calculation of LIBOR.

The defense is of course free to present evidence that Deutsche Bank's shaded USD LIBOR submissions were not material to the BBA. The Government concedes relevance in its response to the defendants' motion.

That said, the rules of evidence apply as much to the defense as they do to the Government – so no hearsay, nothing that is not authenticated or without a proper foundation laid. The real issue is not whether evidence of lack of materiality can come in – of course, it can – it is, rather, what particular items of evidence can come in.

The defendants indicate that they want to introduce notes of BBA meetings that document conversations with Contributor Panel banks (which themselves contain hearsay), BBA internal memoranda and correspondence, BBA internal meeting minutes, BBA correspondence and emails, audio calls between the BBA and banks (including but not limited to Deutsche Bank) or other materials documenting the same; and testimony of witnesses who spoke to the BBA.

The defense lumps all this evidence together, calls it "BBA evidence" and asks the court to consider it as one single category of evidence. I decline to do so. It will be considered exhibit by exhibit.

One of these exhibits can be ruled on now. Levine Decl., Exhibit B is a copy of a portion of the transcript of proceedings in *United States v. Allen*, No. 14-cr-272 (S.D.N.Y.). (Dkt. No. 230-2.) It will not be admitted. It is hearsay.

By contrast, the court cannot rule on the admissibility of certain other proposed exhibits. Levine Decl., Exhibit A, for example, is an excerpt from an answer that BBA subsidiaries filed in in response to a complaint filed in a U.K. court by the FDIC. (Dkt. No. 230-1.) The first page bears a stamp from the U.K. High Court of Justice. If and when defendants decide to offer this exhibit – properly authenticated, with an appropriate foundation laid – we can discuss its admissibility.

Levine Decl., Exhibit C, is a document entitled "Notes of the meetings with BBA LIBOR contributor banks, ahead of the 2005 panel review." (Dkt. No. 230-3.) The court's copy bears a stamp from the Serious Frauds Office, which, I believe, means that it was turned over to that body during the UK investigation into LIBOR manipulation. It appears to summarize separate meetings the BBA held with Contributor Panel banks, and many of the comments appears to have been made by the Contributor Panel bank attendees at the meeting. The document contains a huge amount of double hearsay. I have absolutely no idea who prepared this document, when or for what purpose. Again, I will rule on its admissibility when and if defendants offer this exhibit and properly authenticate it and lay foundation. But on its face it appears to suffer from several impediments to admissibility.

Similarly, Levine Decl., Exhibit D will not be admitted without proper authentication and a proffer of why this document is relevant to an issue to be tried and is not hearsay. (Dkt. No. 230-4.) Moreover, if the Government abandons altogether its non-convergent fraud theory at trial I cannot tell that this would be admissible for any purpose.

Levine Decl., Exhibit E is no different than Levine Exhibit C. (Dkt. No. 230-5.) It consists largely of double hearsay; it is not evident who prepared it, when, or why.

Levine Decl., Exhibit F, an email from a BBA employee (John Ewan) to a number of recipients, is hearsay. (Dkt. No. 230-6.) It could not come in as exception to the hearsay rule unless properly authenticated and established as falling within an exception to the rule. Significantly, I do not see defendants, or anyone from Deutsche Bank, listed as an addressee on this email.

Levine Decl., Exhibit G is Government Exhibit 2 from the trial of *United States v. Allen*, No. 14 cr-272 (S.D.N.Y.). (Dkt. No. 230-7.) It appears to be a transcript of a conversation between defendant Allen of Rabobank and Mr. Ewan of the BBA. Neither Allen nor the BBA is a party to

this case, so the document does not come in for the reason it was admitted in *Allen* (*i.e.*, as an admission by the defendant). I will consider its admissibility with authentication and an appropriate proffer; but the fact that it was received into evidence in the *Allen* trial is absolutely irrelevant to the analysis.

Levine Decl., Exhibit H is an Interim Code of Conduct for the LIBOR Contributing Banks, dated April 2013, or perhaps July 5, 2013. (Dkt. No. 230-8.) The Government does not object to the introduction of this document provided it is offered as state of mind evidence – which means the defendants (or, perhaps, only Defendant Black, given its date) would have to testify about his awareness of the document.

Contrary to a suggestion made by the defendants, the court has not previously ruled that this hearsay evidence can come in. Many months ago, the court tentatively observed that a complaint filed by the FDIC in an English court against the BBA could come in as a Government admission – an instinct to which I adhere if the Government tries to prove a non-convergent scheme. (*See* Gov't Mots. in Lim. Decision at 24.) But I have never said that the BBA's point of view could be proven using otherwise inadmissible evidence.

*Defendants' Tenth Joint Motion in Limine*

The defense motion to permit it to introduce evidence about changes that the BBA made to the LIBOR submissions process after the manipulation charges surfaced is RESERVED, pending a showing that the information is otherwise admissible. As noted above, the Government does not object to the introduction of this evidence, provided it can be linked to the defendants' state of mind.

*Defendants' Eleventh Joint Motion in Limine*

Defendants seek leave to introduce various public news reports discussing doubts about the USD LIBOR rate's reliability. Ruling on this motion, too, is RESERVED.

Defendants intend to introduce these articles not for the truth of any matters asserted therein, but to demonstrate that the public – and the BBA in particular – was on notice that LIBOR submissions incorporated information other than Contributor Panel banks' borrowing costs. The Government does not object to the introduction of these articles, but only to the extent they are offered to prove the defendants' or their co-conspirators' states of mind. That, of course, is not the purpose for which the defense seeks to introduce them.

We will cross this bridge at the trial. However, it appears to me that the publication of these articles would not constitute notice to anyone – including the BBA – if they were not in fact read.

*Defendants' Twelfth Joint Motion in Limine*

Evidence concerning the defendants' compensation is plainly relevant to motive in this case and will not be excluded. If that evidences tars defendants as wealthy, so be it.

*Defendants' Thirteenth Joint Motion in Limine*

Defendants move to bar the Government from introducing evidence that was not turned over during discovery.

This motion cannot possibly be decided now, as it is vague, general, and non-specific. The court expects the Government to have complied with its discovery obligations (as extended by the court), and its obligations under the Jencks Act, *Giglio* and *Brady*. If during the trial the defendants can point to some specific item of evidence that was not turned over in violation of (1) a prior court

order, or (2) one of these well-established disclosure obligations, we will discuss the matter. I will not decide questions like this "in the air."

That said, I want to go on record as saying that I am satisfied that the Government has done its level best to turn over all material that was ordered produced by the court. The defense has had far more discovery in this case than Rule 16 of the Federal Rules of Criminal Procedure ordinarily requires. The complexity of the case demanded additional discovery, but at this point I am reasonably certain that the Government will not be relying heavily – if it relies at all – on a mountain of trading data, the analysis of which has so delayed this trial.

I order the Government to turn over all Jencks Act and *Giglio* material to the defense no later than May 24, 2018. I expect the Government to adhere to that schedule, unless the trial is adjourned. If it is, I will set a new date.

## B. The Separate *In Limine* Motions of Gavin Campbell Black

Black has filed a separate *in limine* motion asking the court to: (1) preclude the Government from offering evidence concerning "compelled" statements that he made to Deutsche Bank counsel; and (2) permit him to introduce evidence demonstrating that he waived extradition.

*Black's First Motion in Limine*

Black's *in limine* motion and the Government's response thereto suggest that it is the Government's intention to offer at trial statements that Black made to Deutsche Bank during the bank's internal investigation of its LIBOR practices, as admissions by a party opponent, pursuant to Rule 401(d)(1) of the Federal Rules of Evidence. Black asks that the court preclude

the Government from eliciting any evidence about those statements on the ground that his statements to the Bank were actually compelled by the Government, such that admitting them against him at his criminal trial would violate his Fifth Amendment right against self-incrimination and the rule established in *Kastigar v. United States*, 406 U.S. 441 (1972).

It is Black's position that Deutsche Bank's counsel was in frequent contact with the Government concerning the status of Deutsche Bank's internal investigation into LIBOR practices at Deutsche Bank, and that Bank counsel received regular direction from the Government in connection with interviews of Deutsche employees. Black says that, to satisfy its disclosure obligations to the Government, Deutsche Bank's counsel interviewed numerous company employees under the threat of dismissal – including Black – and then disclosed their statements to the Government. Black contends that Deutsche Bank was essentially acting as an agent of the Government when it obtained a statement from Black, thereby rendering Black's statements inadmissible against him at his criminal trial.

In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that statements obtained from police officers under threat of termination of employment were involuntary and therefore inadmissible against them in a criminal trial. While *Garrity* involved the conduct of a government employer, the *Garrity* rule also applies to a private employer when its actions are "fairly attributable to the government." *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008) ("*Stein II*"). Private conduct meets this standard when "there is a sufficiently close nexus between the [government] and the challenged action." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Stein II*, 541 F.3d at 146.

In *United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ("*Stein I*"), upon which Black relies heavily, the district court held that the Government was responsible for the pressure

that a private employer placed on its employees to agree to submit to proffers with the Government based on facts similar to those present in this case. In that case, the Government was investigating KPMG for its role in allegedly abusive tax shelters. *Id.* at 318. To obtain cooperation credit, KPMG yielded to Government encouragement to "press . . . employees to cooperate" with the Government, including by agreeing to proffer. *Id.* at 318. The Government's "encouragement" came in two forms: (1) a version of the Principles of Federal Prosecution of Business Organizations then in effect ("Thompson Memorandum") then in effect; and (2) statements that the prosecutors made to KPMG's counsel. *Id.* at 319–21.

The Thompson Memorandum provided, in substance, that "the failure of a business organization facing possible indictment to induce its personnel to submit to interviews by the government and to disclose whatever they know may be a factor weighing in favor of indictment of the entity." *Id.* at 320. Specifically, the Thompson Memorandum stated:

> In gauging the extent of the corporation's cooperation [for purposes of determining whether it should be indicted], the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, *to make witnesses available,* to disclose the complete results of its internal investigation, and to waive attorney-client and work-product privileges.

*Id.* at 319 (emphasis and alteration in original). During meetings, the Government made clear to KPMG counsel that it would consider the Thompson Memorandum in deciding whether to indict the firm, pressured KPMG to cut off legal fees to uncooperative employees, and reported to KPMG the identities of employees who refused to make statements to the Government. *Id.* at 336–37.

Based on the Government's encouragement, the court concluded that "the government [wa]s responsible for the pressure that KPMG put on its employees" and suppressed a number of the proffers as a result. *Id.* at 319. As the court explained:

> In this case, the pressure that was exerted on the Moving Defendants was a product of intentional government action. The government brandished a big stick—it threatened to indict KPMG. And it held out a very large carrot. It offered KPMG the hope of avoiding the fate of Arthur Andersen [which went out of business following indictment] if KPMG could deliver to the USAO employees who would talk, notwithstanding their constitutional right to remain silent, and strip those employees of economic means of defending themselves. In two instances, that pressure resulted in statements that otherwise would not have been made . . . . The coerced statements and their fruits must be suppressed.

*Id.* at 337–38.

The Government appealed the district court's suppression of the proffer statements, but the appeal became moot when the Second Circuit affirmed the district court's dismissal of the indictment against nearly all defendants on the ground that the Government caused KPMG to cutoff legal fees to these defendants in violation of their Sixth Amendment right to counsel. *See Stein II*, 541 F.3d at 135–36 & n.2. As with the suppression of the proffer statements, the Second Circuit found that KPMG's conduct in cutting off fees to the defendants was fairly attributable to the Government, based on the Thompson Memorandum and the Government's statements to KPMG counsel. *Id.* at 143–44. According to the court:

> [T]he government forced KPMG to adopt its constricted Fees Policy. The Thompson Memorandum itself—which prosecutors stated would be considered in deciding whether to indict KPMG—emphasizes that cooperation will be assessed in part based upon whether, in advancing counsel fees, "the corporation appears to be protecting its culpable employees and agents." Since defense counsel's objective in a criminal investigation will virtually always be to protect the client, KPMG's risk was that fees for defense counsel would be advanced to someone the government considered culpable. So the only safe course was to allow the government to become (in effect) paymaster.
>
> *Id.* at 148; *see also id.* at 150 ("KPMG was not in a position to consider coolly the risk of indictment, weigh the potential significance of the other enumerated factors in the Thompson Memorandum, and decide for itself how to proceed.").

In the present case, the concerns that were central to *Stein* do not appear to be implicated.

The Thompson Memorandum, on which Judge Kaplan's and the Second Circuit's reasoning

rested heavily, was rescinded prior to the investigation in this case. As the defendant admits, the Filip Memorandum, which replaced it, forbade prosecutors to: (a) pressure companies to cut off payment of legal fees for indicted employees or employees who did not wish to cooperate with the government; (b) ask companies to waive attorney-client or work product protections; or (c) require companies to force its employees to submit to interviews with the government. (Levine Decl., Ex. A.) Black points to nothing that happened in the present case to indicate that the Filip Memorandum was not followed.

Indeed, Black does not actually allege in his motion that the government directed Deutsche Bank to conduct an internal investigation. Nor does he allege that his interviews occurred at government offices, or that the government participated in the interviews. Black acknowledges that he was given an *Upjohn* warning;[4] was told that the interviewer represented the bank and not the defendant; and was advised that the bank could ultimately decide to share the results of the interview with law enforcement or regulators. And Black does not assert that anyone told him he would be fired (even if he believed he would), or that he would face other draconian consequences, if he refused to sit for an interview.

The circumstances presently known to the court about Black's interview by Deutsche Bank's counsel during the Bank's internal investigation are far more akin to the facts presented

---

[4] The notice an attorney (in-house or outside counsel) provides a company employee to inform her that the attorney represents only the company and not the employee individually. An attorney cautions company employees with an *Upjohn* warning when the company is involved in litigation or conducting an internal investigation. Providing an employee with an *Upjohn* warning should make it clear that:

- The attorney-client privilege over communications between the attorney and the employee belongs solely to, and is controlled by, the company.
- The company may choose to waive the privilege and disclose what the employee informs the attorney to a government agency or any other third party.

The term originated with *Upjohn Company v. United States*, 449 U.S. 383 (1981), in which the US Supreme Court held that the attorney-client privilege is preserved between the company and its attorney when its attorney communicates with the company's employees, despite the rule that communications with third parties constitute a waiver of the attorney-client privilege.

in the Second Circuit cases *Gilman v. Marsh & McLennan Cos.*, 826 F.3d 69 (2d Cir. 2016), *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155 (2d Cir. 2002), and *United States v. Solomon,* 509 F.2d 863 (2d Cir. 1975) – cases, not surprisingly, given greater treatment in the Government's brief.

In *Gilman*, Marsh & McLennan was under investigation by the New York Attorney General's Office (the "AG"). It retained a law firm to conduct an internal investigation. 826 F.3d at 71. In connection with that investigation, company counsel asked two employees to submit to interviews with the law firm, and warned that failure to sit for the interviews would result in their termination. *Id.* at 72. After refusing to be interviewed, the employees were fired. *Id.* Both employees subsequently sued the company, alleging, among other things, that the "interview demands constituted state action that infringed their right against self-incrimination." *Id.* at 76.

Calling the employees' argument "the legal equivalent of the Hail Mary pass in football," *id.* (quotation marks and citation omitted), the court noted that *Stein* was not controlling because, among other reasons, the AG did not force the company to "adopt a policy it otherwise would not have adopted," *id.* Instead, the court found that the company had good institutional reasons for requiring its employees to sit for interviews or else lose their jobs. *Id.* The Second Circuit refused to adopt a categorical rule that "acts taken by a private company in response to government action, and that have as one goal obtaining better treatment from the government, amount to state action." *Id.* at 77. Instead, it held that "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation, even when employees suspected of crime end up jettisoned. A rule that deems all such companies to be government actors would be incompatible with corporate

governance and modern regulation." *Id.*

In *D.L. Cromwell Invs., Inc.*, the government and the National Association of Securities Dealers ("NASD") both investigated stockbrokers for the same conduct. NASD, a private actor, demanded to interview the stockbrokers, who sued to enjoin the interviews because they amounted to compulsion due to pressure exerted on NASD by the government prosecutors. *Id.* at 155–56. The district court found, and the Second Circuit agreed, that NASD – which had a "regulatory duty to investigate questionable securities transactions" – had demanded the interviews, not because of "governmental persuasion or collusion," but rather in fulfillment of investigative duties "independent of governmental influence." *Id.* at 163.

Likewise, in *United States v. Solomon*, the defendant was an investment banker and member of the New York Stock Exchange ("NYSE") who was being investigated by both NYSE and the government for understating his company's operating losses. 509 F.2d 863, 864 (2d Cir. 1975). NYSE, as part of its investigation, demanded to interview the defendant on possible pain of suspension or expulsion. *Id.* at 865. The defendant's statements to NYSE were then used to secure an indictment and a conviction, which he claimed violated *Garrity* and the Fifth Amendment. *Id.* at 866. The Second Circuit rejected that argument because that NYSE's investigation was "in pursuance of its own interests and obligations," *id.* at 869, and because there was "no certainty what penalty NYSE would prescribe if [the defendant] refused to speak," *id.* at 872.

Taken together, *Gilman*, *D.L. Cromwell*, and *Solomon* demonstrate that there is no *Garrity* problem, and so no Fifth Amendment issue, if (1) the private actor interviewed the defendant in pursuit of its own duties or interests, and (2) any penalty imposed by the private actor for refusing to sit for the interview was meted out, whether by policy or discretionary act,

without government pressure. The Government takes the position that Black has failed to make a *prima facia* case for his allegation that his statements to Deutsche Bank counsel was compelled by the Government.

I agree that there is no basis on the current record to attribute Deutsche Bank's actions to the Department of Justice.

But that does not mean the court can simply grant the motion today. In the cases cited by the parties where the specter of a *Garrity/Kastigar* violation was raised, the issue was resolved after some form of hearing or after pretrial discovery.[5] Accordingly, the better part of valor is to accept the Government's suggestion that the court hold a hearing before formally ruling on the motion.

The Government offers to tender an anticipated trial witness, Walter Ricciardi from Paul Weiss Rifkind Wharton & Garrison (outside counsel to Deutsche Bank for purposes of its internal investigation), for cross-examination on this issue. As Mr. Ricciardi is to be the Government's very first witness, the court could decide the Fifth Amendment issue well before

---

[5] Judge Kaplan held hearings over three days before deciding the motions in *United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) (*Stein II*): "the Court assumes familiarity with *Stein I*, relies on the evidence adduced in the evidentiary hearing and the findings made on that motion, and elaborates on the prior findings only to the extent that additional findings are necessary. The Court has had the benefit also of a further evidentiary hearing on the present motion." *Id.* at 319. The docket, No. 05-cr-0888, reflects that the hearings took place on July 13, 19, and 20 2006, with the transcript being entered on the docket but not actually filed in Dkt. No. 654, 673, and 674, respectively.

Judge Kaplan similarly held an evidentiary hearing before deciding *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 132 F. Supp. 2d 248 (S.D.N.Y. 2001), *aff'd by* 279 F.3d 155 (2d Cir. 2002): "The Court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction at the conclusion of which it consolidated the trial on the merits with the hearing pursuant to Rule 65(a)(2) and with the consent of the parties." The docket, No. 01-cv-0728, reflects that there was a hearing on February 9, 2001.

The court did not hold hearings to decide *Gilman v. Marsh & McLennan Cos., Inc.*, 85 F. Supp. 3d 757 (S.D.N.Y. 2015), *aff'd by* 826 F.3d 69 (2d Cir. 2016). However, there, the court was deciding a motion for summary judgment, and so the parties would have had an opportunity to depose witnesses and engage in other forms of discovery.

And in *United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975), the Second Circuit's opinion on appeal states that: "The judge denied the motion both before and again after an evidentiary hearing." *Id.* at 866.

the Government offered Black's statements into evidence.

I have no problem with the Government's suggestion – but as I believe all parties are aware, I was at Paul Weiss for two decades prior to going on the bench. While I left the firm twenty-three years ago, I continue to recuse myself from cases in which Paul Weiss represents a party, in deference to the fact that an (ever decreasing) number of my former partners are still active at the firm. Mr. Ricciardi was not associated with the firm during my two decades there. I have been introduced to him at various functions; I have no other contact with him. Nonetheless, if any party believes that it would be preferable to have another judge rule on the credibility of a witness from Paul Weiss, that party should notify the court immediately, and arrangements will be made. I assure the parties that no offense will be taken.

However, if another judge is to preside, the hearing cannot abide the trial; it will have to be done prior to trial.

I see no need for any other witness to testify. *See, e.g., United States v. Krug*, 198 F. Supp. 3d 235, 246 (W.D.N.Y. July 27, 2016) ("The Defendant is not entitled to a *Kastigar* hearing merely because he has, at some point in the past, provided *Garrity* statements."). Of course, Black himself will be afforded an opportunity to testify at any such hearing should he wish to do so.

*Black's Second Motion in Limine*

Black asks that he be allowed to introduce evidence and argue to the jury that his decision to waive extradition is probative of his "consciousness of innocence." The Government opposes the motion on relevance grounds, but says that if the court permits Black to argue "consciousness of innocence" based on his decision to waive extradition, it should be permitted to argue, and to admit supporting evidence, that the defendant's decision had nothing

23

to do with "consciousness of innocence" but rather was motivated by other factors, such as, for example, the need to conserve money and avoid jail in the face of a protracted and likely futile extradition battle.

In cases where a court has allowed a defendants to offer evidence and argue to the jury that his willingness to appear in court and answer the charges against him demonstrates the defendant's "consciousness of innocence," the defendant had a viable option not to attend the trial. In *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), the defendant had rejected an offer of immunity in exchange for providing the government with information. *Id.* at 690. In finding that the district court erred by excluding evidence of the rejected offer, the Second Circuit stated, that "When a defendant rejects an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify, his action is probative of a state of mind devoid of guilty knowledge." *Id.* The court further noted that, "A jury is entitled to believe that most people would jump at the chance to obtain an assurance of immunity from prosecution and to infer from rejection of the offer that the accused lacks knowledge of wrongdoing." *Id.*

While *Biaggi* involved the rejection of an offer of immunity – essentially a get-out- of-jail-free card—the present case centers on the defendant's decision to forego an extradition fight that would have been both expensive and a failure. *Cf. id.* at 691 (distinguishing between the refusal of immunity and the "[r]ejection of an offer to plead guilty to reduced charges," and explaining that "the inference [of an innocent state of mind] is not nearly so strong as rejection of an opportunity to preclude all exposure to a conviction and its consequences"); *id.* ("A plea rejection might simply mean that the defendant prefers to take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea.").

In *United States v. Rajaratnam*, 13-cr-211, Judge Buchwald found admissible evidence that the defendant had voluntarily returned to the United States from Brazil to stand trial. Judge Buchwald emphasized, however, that the offense with which the defendant had been charged was "not an extraditable offense" under Brazilian law. Going even further, the defendant argued that Brazil was "like the Swiss bank" when it comes to extradition, asserting that Brazil "is where fugitives go." Given the strong likelihood that the defendant could not (or would not) have been extradited had he remained in Brazil, Judge Buchwald found that "this is basically in the heartland of *Biaggi*." (Ex. B.)

The circumstances here are wholly unlike those in *Rajaratnam*. The offenses with which Black is charged are covered by the extradition treaty between the United Kingdom and the United States. Black would almost certainly have been extradited had he contested extradition. Unlike a defendant who rejects an "opportunity to preclude all exposure to a conviction and its consequences," *Biaggi*, 909 F.2d at 961 – which provides a reasonably strong basis for an inference of innocence – Black's extradition decision gives rise to competing inferences that are at least as strong, if not far stronger, than the inference of "consciousness of innocence."

Thus, if the court were to allow Black to argue "consciousness of innocence" based on his decision to waive extradition, the court would necessarily have to permit the Government to present evidence and argue that the defendant's decision had nothing to do with "consciousness of innocence," but rather was motivated by other non-exculpatory factors, such as, avoiding the cost of a futile extradition fight, and the possibility of being detained either in the United Kingdom or the United States pending trial. While a jury could rely on common sense in drawing inferences from a defendant's rejection of an immunity offer, as was the case in *Biaggi*, jurors have little common experience to rely upon in considering the reasons why a defendant

might choose to waive extradition. A full consideration of those reasons would require, among other things, an understanding of the extradition process and its cost. Thus, any minimal probative value of the evidence here would be vastly outweighed by the potential for confusion. *See* Fed. R. Evid. 403.

Black will be precluded from presenting his proposed "consciousness of innocence" evidence at trial.

### C. The Separate *In Limine* Motion of Matthew Connolly

Connolly moves separately *in limine* for permission to introduce evidence of his withdrawal from the conspiracy – specifically, evidence that he left his job at Deutsche Bank in 2008. The motion is GRANTED. The Government recognizes that it has no basis to argue that this evidence is inadmissible. Any arguments Connolly might make on the basis of the evidence will be dealt with when they are made.

This constitutes the decision and order of the court. The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 227, 228, 232, and 255 from the court's list of open criminal motions.

Dated: May 15, 2018

_____
Chief Judge

BY ECF TO ALL COUNSEL