```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/27/18

------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                                     16 cr 370 (CM)

MATTHEW CONNOLLY AND
GAVIN CAMPBELL BLACK,

                  Defendants.

------------------------------------------------------------x

## RULING ON ISSUES RAISED ON SEPTEMBER 26, 2018

McMahon, CJ.:

    The trial day of September 26 was spent hearing argument relating to the Government's production of a new exhibit, produced overnight, following the court's refusal to admit certain exhibits (GX 1-404, 405, 406 and 407) – exhibits that the Government attempted to introduce as Deutsche Bank business records, but which were in fact data compilations prepared for the purpose of litigation by an outside consultant who was not available to authenticate its work or to explain how the documents were prepared.

    At the conclusion of the day, when we had spent literally hours discussing the concept of book-to-trader mapping and the validity of data provided to the Government during the course of the LIBOR investigation by Deutsche Bank, the Government made the following statement in open court:

> Ms. ANDERSON: So the point is though is it's net notional is what we've been saying is unreliable. . . . And we sent a letter . . . to them with our notes from a meeting where we got a download of the issues, the book-to-trader mapping. But it's really net notional that we think is unreliable, which is the next step.

The court found this statement troubling, to say the least, in view of the following statements made during the Government's opening statement:

> . . . on a given day the defendants and their team would have many of these different trades on they would fix or that they was the day that the LIBOR publishes rate would matter for that trade's payments. And you'll hear that they had trades in different directions and in varying amounts, but what's important is that every day they knew when you totaled all those trades up whether they would be paying the LIBOR rate or they would be receiving the LIBOR rate. So if they were paying the LIBOR rate they would want it to be low. And if they were receiving the LIBOR rate, they would want it to be higher…so

1

> if the defendants and their teams bet right and LIBOR moved in the predicted way they thought it would go, they would make money. And if they bet wrong, they would lose money. And that mattered to the defendants because, as you're going to see, and you're going to get to compare their base pay to their bonuses....
>
> * * * * * * * * * * * * * * * * * * * * * ***** * * * * * * * * * * * * * * * * *
>
> They would see all the different trades that they had going on and what that was looking like for that day, and they would realize to themselves they have big money riding on that day's LIBOR position . . . and they would get the LIBOR submitter to move the LIBOR submissions higher or lower, not based on any honest estimate of what that LIBOR submitter thought DB would have to pay to borrow money, but in whatever direction benefited the defendants and their team on their trades.....
>
> * * * ** * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
>
> When you boil it down to the basics, all you need to understand is that these trades were tied to this LIBOR interest rate, that the traders, the defendants and their team stood to make money whether that LIBOR rate went up or that LIBOR rate went down . . . and that every extra dollar that they received, somebody else was losing that dollar. And that's it. (Trial Tr. 48-50)

In short, during its opening, the Government articulated a theory of the case. It assigned a motive for the alleged conspiracy to commit wire and bank fraud as the desire, by the co-conspirators, including specifically the defendants, to benefit their net trading book position on a given day.

If the Deutsche Bank trading data – which, according to the Government's Grand Jury presentation, was "an important source of information to our investigation" (Grand Jury Tr. 37: 18-19) -- were invalid or unreliable, or were believed to be so by the Government, that fact could be used to undermine the Government's evidence (to be introduced through cooperators) that defendants' and their co-conspirators' trading books stood to benefit from their alleged requests to set LIBOR in a particular direction on a particular day. Put otherwise, it could be used to undercut the Government's theory about why defendants had a motive to commit the crime. The invalidity of the data thus qualified as material that needed to be disclosed to the defense pursuant to *Brady v. Maryland*.[1] The court directed the Government to provide it with all communications that would demonstrate that the Government had provided the defense with this information about the Deutsche Bank data, and had done so in a timely manner– which is to say, in time for the defense to make use of that fact at trial.

The court received a submission from the Government this morning. Attached to the cover letter are a total of ten communications with defense counsel, beginning in November of 2016 (22 months prior to trial) and going through August 9, 2018 (six weeks prior to trial). After reviewing those communications, the court is satisfied that the Government disclosed the problems with the Deutsche Bank trading data to the defense in ample time for the defense to explore those deficiencies and to use them against the Government at trial.

---

[1] Material can qualify as "exonerative" under *Brady* is more far-reaching than the Government appears to believe.

2

Yesterday's lengthy colloquy focused on the defense contention that (1) the Government failed to disclose that the book-to-trader mapping (a project undertaken by Deutsche Bank during the LIBOR investigation in an effort to overcome the deficiencies in its underlying trade data) was itself potentially problematic until literally the eve of trial, at which point the Government unexpectedly objected to defense expert testimony that relied on the book-to-trader mapping on the ground that it was unreliable; and (2) the Government's sudden position was at odds with a representation made earlier in the case (in a letter dated May 14, 2017) that (i) book-to-trader mapping would be required to establish a link between particular trades and any individual trader's book, and that (ii) were the Government to introduce trading data at trial it would, therefore, be introducing the Deutsche Bank book-to-mapping data. The defense claims to have based its close analysis of the book to trader mapping on representation (2) – particularly representation (2)(ii) – and claims to have been surprised by what is argued was the Government's sudden *volte face* on this subject.

After reviewing the Government's submission of this morning, I conclude that the Government told the defense that there were potential flaws in the book-to-trader mapping project as early as November 2016 (Docket #322, Ex. A), and provided additional information on this subject on other occasions (*id.*, Ex. H, I and J). The last communication, which came on August 9, 2018, included analysis relating to dates where net notional positioning did not support the Government's allegation of motive. While the court was unaware of the Government's view that book-to-trader mapping was unreliable until it moved *in limine* to exclude the defendants' expert testimony, it is indisputable that the defense knew that the Government had problems with the book-to-trader mapping far earlier– indeed, going back to its initial data disclosure in late 2016. Perhaps defense counsel did not understand that the Government viewed those problems to be so great as to render any analysis based on the book-to-trader mapping inadmissible, but that is not required by *Brady*. The Government made the defense aware that there were "issues" with book-to-trader mapping, and it did so in plenty of time for the defense to explore those data deficiencies and make a decision about whether to rely on that data in the presentation of its defense.

There is, therefore, no *Brady* violation.

The defendants' argument ultimately rests on what this court believes to be a faulty premise – namely, that the book-to-trader mapping must be reliable (or at least sufficiently reliable to undergird the Government's case), because the Government committed, in the so-called Joint Submission of May 14, 2017 (Docket #86), that it would rely on the book-to-trader mapping if it decided to introduce trade data in support of its case.[2] But the defense reading of the letter does not comport with the court's reading.

The letter says that the Government agrees with the defense that there are "issues" with Deutsche Bank's data, including which trader booked a specific trade. (Docket # #86 at 5). The letter says that further analysis is needed to associate some trade data with a particular trader, and that this analysis "is often referred to as 'book to trader mapping.'" *Id.* The letter says that "there are issues of assumptions and potential disagreements regarding the methodology used for

---

[2] No one disagrees that the Government repeatedly asserted that trade data "was not the crux of its case" and never committed to introduce any such data.

3

this analysis." *Id.* Finally, the letter says, "To the extent evidence of this nature is offered at trial, the Defendants will have an opportunity to point out that the specific trader was not captured in Deutsche Bank's raw data as well as the opportunity to challenge the assumptions and methodology used for any analysis based off that data." *Id.*

The letter does *not* say, and cannot be read to say, that if the Government decided to introduce trading data, it would do so by relying on the book-to-mapping analysis performed by Deutsche Bank.

The Government does go on to say, in the next paragraph of the Joint Submission, that it "has no indication that Deutsche Bank's raw data is unreliable." (Id.) This could, I suppose, be deemed a disingenuous statement in view of yesterday's voir dire of Mr. Edwards-Weston – although I think it more appropriately described as yet another instance, in a long series of instances, in which the Government was (to put it kindly) careless with its phraseology. However, in light of the entirety of Section B of the letter (which is, after all, headed "The Accuracy of Deutsche Bank's Trade Data"), I cannot say that the Government failed to disclose that there were "issues" with the data -- including specifically what has at trial emerged as the principal "issue" with the data, which is that the system does not capture the name of the trader who booked any specific trade, and that certain assumptions were made in creating the book-to-trader mapping with which people could disagree.

The Government is perfectly free to prove its case by offering only the overt acts and testimony of co-conspirators as evidence, and asking the jury to infer, from the words used and the testimony of co-conspirators, that the requests that were being made "were designed to benefit" the trading positions of the defendants [and their co-conspirators] or of the bank." (Indictment, paragraph 27(d)).[3] The defendants are free to argue that, if the Government fails to prove that any defendant's net notional trading position could have benefitted by a LIBOR submission request made by him or by someone working for him, the Government's evidence is insufficient to permit a rational jury to convict. They can make that argument in the context of a Rule 29 motion or in their closing argument to the jury on the sufficiency of the Government's proof.

The defendants, while having no burden of proof, are equally free to introduce on their case(s) (should either or both of them put one on), any evidence that would tend to cast doubt on the Government's motive theory – including, but not limited to, expert testimony that analyzes the book-to-trader mapping in order to demonstrate that the defendants' net notional positions on any given day relevant to the case would not have benefitting from their LIBOR submission requests. I have not yet received the defendants' revised expert report, so I cannot make final *Daubert* rulings; but I can assure the parties that I will not be precluding expert testimony on the ground that the Government views the Deutsche Bank book-to-trader mapping project to be unreliable. The Government is free to cross on that basis. The Government is also free to introduce rebuttal evidence to undercut the defense case by pointing to the deficiencies in the

---

[3] To the extent the Government is relying on the Bank's overall trading position, there would obviously have to be some evidence that they were aware of the Bank's overall trading position.

4

book-to-trade mapping. I am morally certain that the defense knows this, and that it will try to find a way to get before the jury the publicly filed documents showing (or at least suggesting) that the Government gave Deutsche Bank credit for creating the book-to-mapping data as part of the bank's plea deal. The Government should not be surprised if I decide (though I emphasize that I have not yet decided) that the jury should be aware of that fact.

I remind the defendants that the Government does not need to prove motive in order to prove wire fraud– though it does need to prove intent, and motive, or lack thereof, is certainly relevant to the issue of intent. I remind the Government that, having indicted and opened with motive prominently highlighted, defense efforts to undercut that theory of motive are acceptable.

As far as I am concerned this subject is closed.

Dated: September 27, 2018

_____
Chief Judge