UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

        -against-

MATTHEW CONNOLLY AND
GAVIN CAMPBEL BLACK,

        Defendants.

------------------------------------------------------------x

16 Cr 370 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/1/18

## DECISION ON THE GOVERNMENT'S DAUBERT MOTION IN LIMINE

McMahon, CJ:

    The Government has filed a motion *in limine* in the nature of a *Daubert* motion, seeking to suppress certain aspects of the proposed testimony of two experts who have been disclosed by the defense. I cannot rule on some aspects of this issue until after the Government's case has come in; I cannot rule on other aspects without receiving a much more detailed proffer of the experts' proposed testimony from the defense. However, there are a few matters on which I am able to speak definitively at this time:

*Testimony of Dr. Jonathon Arnold:*[1]

    The defense tenders Dr. Johnathon Arnold as an expert. The expert notice served by the defense indicates that Dr. Arnold will testify that:

*An analysis of the data produced by the Government, including Deutsche Bank's RMS and Kondor transactional data and its interbank lending data, is inconsistent with the Government's theory of alleged manipulation for at least the following reasons:*

    (i)    *The Government failed to provide discovery, including data that substantiates the alleged theory of manipulation*

    (ii)    *The totality of the trading positions held by Deutsche Bank Traders and/or counterparties throughout the Relevant Time Period does not establish the alleged conspiracy*

---

[1] The proper way to make a *Daubert* motion is witness by witness – not issue by issue. The Government's failure to do so has greatly complicated the court's ability to turn this motion around quickly.

> *(iii) The data provided by the Government does not establish that Deutsche Bank counterparties were positioned to be harmed by various of the Operative Submissions[2]*

(Emphasis added).

The Government objects to reason (i) on the ground that its provision of discovery or failure to do so is irrelevant; to reason (ii) on the ground that it is improper for an expert to testify about whether evidence establishes the crime charged; and to reason (iii) because actual harm to the counterparties is irrelevant to the issues in the case and would give rise to confusion and unfair prejudice.

The defense argues that there should be no barrier to Dr. Arnold's undergirding his ultimate conclusion that the data he analyzed is inconsistent with the Government's theory of manipulation with reason (i), because Dr. Arnold is not actually going to testify about the adequacy of the Government's discovery. Rather, he will opine that there is an absence of data that substantiates the alleged theory of manipulation.

Were that so, the notice should have so stated, instead of saying that he would testify about what discovery the Government did or did not provide. The notice says what it says, and what it says is that the Government failed to provide discovery. Dr. Arnold cannot testify about the Government's failure to provide discovery. Nor is the Government's failure to provide discovery a valid basis to undergird an opinion that the data he analyzed (whatever that data may be) is inconsistent with the Government's theory of manipulation.

The defense will have to reframe its notice so that the notice (not the defense brief) accurately reflects that matters about what Dr. Arnold intends to testify. In order to clear up any confusion, the court will require a written proffer, in the nature of what would be provided in an expert report in a civil case, on this subject.

While it is ordinarily true that expert disclosure in a criminal case does not need to be as detailed as the expert report required under Fed. R. Civ. P. 26(a)(2)(B), this is an unusual case. In order for the Government to be able to cross examine Dr. Arnold about the basis for his ultimate conclusion – or for the court to make a *Daubert* ruling on the admissibility of expert testimony – both the Government and the court need to know far more than the defense has disclosed to date about exactly what data Dr. Arnold analyzed and exactly what method he used to analyze it. The defense has until Monday, September 24, at 5 PM, to provide the Government and the court with a clear and complete explanation of what Dr. Arnold did in order to reach a conclusion that is consistent with reason (i).

At this moment, I have no idea what data Dr. Arnold relied on or what analysis he performed on that data. However, if (as the Government apparently fears) it turns out that Dr. Arnold's analysis is based on analysis provided by Deutsche Bank to the Government during the investigation that led to DB's consent settlement with the Government – analysis provided under cover of the letter that is Exhibit 1 to its Reply Brief -- then the Government is not going

---

[2] The court quotes only those subsections that are deemed objectionable by the Government

to obtain an order suppressing expert testimony by protesting to me that the document on which Dr. Arnold relied is unreliable or inaccurate. How would I know that? I certainly cannot take the Government's word for it. I know of no reason why Dr. Arnold should not be permitted to rely on DB's own analysis of its own data in reaching his conclusion that the data is inconsistent with the Government's theory of manipulation. If the Government thinks that DB's analysis is unreliable or inaccurate, it should cross examine him, and then put on a rebuttal case that tears the DB analysis to shreds – which would enable it to argue to the jury that Dr. Arnold's analysis rests on a faulty premise.

But there can be no question that the Government is correct about one thing: defendants need to lay Dr. Arnold's cards on the table. They must disclose in detail the data on which he relied and the methods that he used to analyze that data so as to reach his conclusion that the data is inconsistent with the Government's theory of manipulation.

Turning to reason (ii): the defendants again protest that their notice – which says quite plainly that Dr. Arnold's opinion rests on his conclusion that the Government has not managed to establish the existence of a conspiracy – does not say what it says. Instead, the defense insists that Dr. Arnold will testify that DB's trading activity is inconsistent with the Government's allegation of coordinated action.

Obviously, Dr. Arnold will not be permitted to testify that trading positions do not "establish the conspiracy." Since that is what appears in the operative document (which is the expert disclosure notice), if the defendants intend that to have Dr. Arnold testify to something else, they will have to serve an amended notice. And once again, in order to clear up the confusion in my mind about what is going on, they will have to proffer quite clearly what data Dr. Arnold is relying on and what procedures he performed on that data in order to reach what defendants now say is the conclusion about which he will testify, which is that there was no coordinated action (I assume among the various traders at DB who are alleged to be co-conspirators). I cannot rule on whether Dr. Arnold's stated reason for reaching his ultimate conclusion (that the Government's data is inconsistent with the Government's allegations) comports with *Daubert* until I understand what he did. I certainly do not understand it now. Again, the proffer must be made in writing.

When I finally determine the relevance of Dr. Arnold's conclusions, I will be guided by (among other things) my reading of the indictment – and I am afraid that I read ¶ 26 of the Superceding Indictment differently than defendants do. I do not understand the phrase "their trading positions" as used in that paragraph to refer to the totality of DB's trading positions across all traders, but rather to the defendants' individual trading positions and those of the other individuals who allegedly participated in the conspiracy to manipulate LIBOR (the cooperators, for example). My understanding is consistent with what I once understood the Government to believe: that individual DB traders were trying to get DB's LIBOR submitters to shade their submissions to maximize their winnings on their own trades (not the Bank's overall book), in the hope of obtaining larger year-end bonuses for themselves. I do not believe, as defendants argue, that there is any necessary inconsistency between the contents of the indictment and the Government's position that DB's total trading position is irrelevant. But I do not at present completely understand what Dr. Arnold proposes to testify on this subject.

It is of course possible that the evidence of coordinated action among DB employees that will prove most persuasive to the jury will come, not from analysis of trading positions, but from the email communications between and among DB employees (emails such as those quoted in the indictment), as well as the testimony of cooperators. Dr. Arnold's testimony about what trading data shows about coordinated activity does nothing to counter whatever probative value there may be in the words used by the traders themselves during internal communications. Put otherwise, what the data shows about DB's overall trading position may prove of little value in rebutting the more mundane evidence of a conspiracy among DB employees to manipulate LIBOR for their benefit. But that goes to the weight of Dr. Arnold's proposed testimony, not to its admissibility.

Finally, turning to challenged reason (iii) for Dr. Arnold's ultimate conclusion: since I do not know what the Operative Submissions are (the judge is always the last to know), it is hard for me to rule on whether the Government's challenge to this aspect of Dr. Arnold's reasoning is correct. Therefore, the defendants need to provide me with a written proffer explaining what the Operative Submissions are, as well as what data establishes that counterparties are not in a position to be harmed and how that data enables Dr. Arnold to reach such a conclusion.

That said, I am not sure I understand the relevance of this aspect of Dr. Arnold's reasoning, and I require some elaboration from defendants on that score. The defense concedes that the conspirators need not have succeeded in their nefarious scheme in order to be found guilty on Count One, and the jury will be instructed that lack of success is not a defense to the charged crime. Defendants insist that the lack of harm to the counterparties is relevant to the question of defendants' lack of fraudulent intent, but I confess that I don't see it. Obviously, if the defendants *knew* that their counterparties were not in a position to be harmed by a particular LIBOR submission, it would undermine the Government's argument that they had the requisite intent to defraud when they suggested shading submissions (assuming, of course, that they were making such suggestions). However, absent some testimony indicating that the defendants knew, at the time they made their suggestions to the DB submitter, that the counterparties were not in a position to be harmed, it is difficult to see what Dr. Arnold's evidence has to do with the issue of *defendants'* intent. Net benefit to DB would of course be proof of intent, as would net benefit to the book of a particular trader-conspirator. But it does not follow that net loss to the counterparties is evidence of lack of intent. If Defendants and others agreed to make false submissions in the hope of benefitting at the expense of their counterparties -- of winning on trades –they can be found guilty of conspiracy to defraud, even though they did not know for sure that their intended victims would actually lose money on any given deal. The only way I know of at present to make this aspect of Dr. Arnold's testimony admissible is for defendants to lay a foundation by testifying that they were aware of whether and how their counterparties were hedge on various trades. I cannot make any final ruling on the admissibility of this testimony until after I know whether defendants intend to lay such a foundation – and that is not a decision defendants have to make today, or at any time until the Government rests.

However, just to be clear, I reject the defense contention that "fraudulent intent is inextricably intertwined with counterparties being harmed on particular transactions." (D Br. At 13). That is a complete *non sequitur*.

I feel differently about Dr. Arnold's proposed testimony that "Mr. Black's trading books were not positioned to have benefited from various of the Operative Submissions." (ECF #288 at 4). That testimony will be admitted; there is no need for any further proffer or hearing.

Whether Black was in a position to benefit from submissions on days when he communicated with DB's LIBOR submitters would indeed bear on his intent to defraud when making those communications – assuming, of course, that the ultimate submission was in line with the suggestion he (may have) made to the submitter. If Black's suggestion to the submitter was ignored, it would not necessarily absolve him of conspiracy; but it would certainly bear on his guilt on the substantive wire fraud charges. I can think of no reason at present why Dr. Arnold could not testify about his analysis of Black's trading positions on days when he is alleged to have participated in the charged conspiracy, and to have committed wire fraud. This trader-specific data is precisely what *would* have some value for the defense, because it counters the inference the Government would have the jury drwaw. And since the Government has all of Black's trading position data, and knows the Relevant Dates, I cannot imagine that it will not be able to cross examine Dr. Arnold on this topic without further disclosure.

*Testimony of Matthew A. Evans*

The defense has also filed an expert notice for a second witness, Matthew Evans, who is planning to testify that, based on "a comprehensive review of all the positions between particular counterparties and Deutsche Bank on the Relevant Dates....counterparties *may* have net benefitted from the LIBOR setting" on dates specified in the Superseding Indictment. (ECF 287 at 3; emphasis added) Again, defendants insist that this testimony is relevant on the issue of Mr. Connolly's intent. Again, the Government objects.

For the reasons stated above in connection with Dr. Arnold's proposed testimony about counterparties' not being in a position to be harmed, I fail to see why this proves anything about defendants' intent – at least in the absence of defendants' own testimony (which they are under no obligation to offer) that they knew that their counterparties would not be harmed. Mr. Evans post hoc analysis of trading data does not establish what the defendants knew or did not know on the Relevant Dates, so I fail to see how it speaks to their intent *vis a vis* their counterparties on those dates. I await further enlightenment.

Moreover, Mr. Evans' testimony on this subject is subject to a Rule 403 objection, in that the probative value of his purely hypothetical conclusion (that the counterparties "may" have net benefitted from the LIBOR setting on relevant dates) does not outweigh the unfair prejudice that arises from the suggestion of "no harm, no foul" to which this testimony inevitably gives rise. I appreciate that a limiting instruction could ameliorate that harm, but since there is virtually no probative value in testimony about what "may" have happened (as opposed to what actually did happen), the balance falls heavily in favor of disallowing the testimony. It will not be admitted.

*Testimony of Both Experts on Economic Reasonableness of Submissions*

Finally, as I understand it, both Dr. Arnold and Mr. Evans intend to testify that the rates submitted by DB's LIBOR submitters to the BBA on relevant dates were "economically reasonable." This testimony is offered, as I understand it, to address the issues of falsity.

The Government challenge the admissibility of this testimony and seeks to suppress it.

Insofar as the testimony is addressed to the issue of falsity, it does not appear to be admissible.

This court has discussed falsity many times before during the overlong pendency of this case. Where falsity is concerned, we start from first principles. DB's LIBOR submitter was asked to answer a question. The question was this: "At what rate could you borrow funds, were you to do so by asking for and then accepting interbank offers in a reasonable market size just prior to 11 am?" The Government contends that the submitter responded falsely to this question by shading submissions in response to requests from DB traders whose book of business would benefit from a higher or lower LIBOR at a particular tenor.

This court has previously suggested that DB's answer to the BBA's question could not possibly be false if the rate quoted by the submitter was in fact a rate at which DB could have borrowed funds at a particular tenor, taking into account both what rate interbank lenders were willing to offer and *and what offer DB would have accepted.* The BBA did not ask its LIBOR submitters to submit an "economically reasonable" borrowing rate – no doubt there were many such. Rather, it asked them to opine as follows: "At what rate or rates do you think people would offer this morning to lend you money (in this case, USD) for a particular period of time (tenor), and assuming you got multiple offers, which one would you have accepted?" The question assumes that DB and the other banks are functioning in a reasonable market; I would have no issue with admitting expert testimony to explain to a lay jury how reasonable markets work (and I assume that an expert would testify, inter alia, that DB would accept the lowest offer it got, since to do otherwise – to pay a higher rate of interest than it had to -- would, at least in my understanding of the banking world, be unreasonable).

But testimony that particular rates, or ranges of rates, were economically reasonable on a particular day would be responsive to the BBA's question only if "economically reasonable" means "the rate someone would have offered *and DB would have accepted* to borrow funds at a particular tenor on a particular day." I cannot tell from the expert submissions tendered by the defense whether that is what the phrase "economically reasonable" means to players in the market. If the BBA's question does not ask submitters for an economically reasonable submission within a range of rates – and, read literally, it does not – then it seems to me that the experts' testimony is "non-responsive" – it does not address the issue of whether the answer to the BBA's question was false.

I admit that I could be missing something. Here again, I derive little benefit or understanding from disclosure at the level of generality provided by the defense. Defendants are free to proffer, with the detail usually reserved for an expert report in a civil case, exactly what

their witnesses mean when they say that the rates submitted by DB's submitters on particular days were "economically reasonable" within the parameters of the market. I can then make a proper *Daubert* ruling about whether the proposed evidence does or does not address the issue of misrepresentation/falsity – i.e., whether it would help the jury draw a conclusion that DB's response to the BBA's question was either true or not true.

All enhanced defense proffers required by this opinion are due next Monday, September 24, at 5 PM. They must be made in writing.

I do not understand the Government to have made any other motion at this time, including any specific motion addressed to the expert disclosure provided by the defense's third expert, Mr. Rooke. It has only to have indicated that it may at some point in the future make such a motion. I also do not understand the meaning of the phrase, "Allowing [ ] testimony [about the economic reasonableness of submissions] *unfettered* could easily mislead the jury." What, exactly, is "unfettered" testimony?

However, the time for making *Daubert* motions has long since passed. I am not inclined to entertain any others. That does not mean that particular questions addressed to an expert would not be objectionable on relevance grounds.

Dated: September 18, 2018

_____
Chief Judge

BY HAND TO ALL COUNSEL