

U.S. Department of Justice

Criminal Division

---

*Fraud Section*

*Christina J. Brown*
*(202) 598-8839*
*christina.brown@usdoj.gov*
*450 5th Street NW*
*Washington, D.C. 20530*

**VIA ECF**  October 8, 2018

Honorable Colleen McMahon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re: <u>United States v. Connolly and Black, 16-CR-370 (CM)</u>

Dear Chief Judge McMahon:

    With its case in chief nearly concluded, the government writes regarding the jury instructions to be given on the materiality element of wire fraud, as well as potential claims of constructive amendment that bear directly on the materiality instructions and the shape of the parties' impending closing arguments.

    Given the Court's ruling on the government's motions *in limine*—recognizing that the government may argue, as parties do all the time, in the alternative[1]—and the evidence at trial, the government intends to present to the jury the following ways the defendants made material misrepresentations, each of which is based on the same underlying conduct set forth in the indictment: (1) Defendants made material misrepresentations to the BBA when they caused the transmission of skewed LIBOR submissions; (2) Defendants made material misrepresentations directly to Deutsche Bank's counterparties when entering into swaps and other derivative transactions; and (3) Defendants made material misrepresentations to counterparties, directly and through the BBA/Thomson Reuters acting as a conduit, when they skewed the LIBOR submissions that were then used to calculate LIBOR and to settle swaps and other derivative

---

[1] As the Court explained:
> The Government's new convergent fraud theory is not inconsistent with its original non-convergent fraud theory; it is certainly not irreconcilable with the non-convergent fraud theory. Both types of fraud could have been committed simultaneously. Indeed, it is possible that the Government wishes to offer evidence in support of both theories at trial; it has made *in limine* motions that are consistent with arguing both theories to the jury, in the hope that at least one of them will appeal to the trier of fact. Parties argue in the alternative all the time without triggering judicial estoppel.

(ECF No. 262 at 12.)

contracts. Each of these merely highlights the various ways the defendants' misrepresentations were material, but at all times it was the counterparties who were defrauded and at risk of harm.

Because each way the defendants made material misrepresentations is consistent with the "core of criminality" and essential elements of the indictment, there is no constructive amendment of the indictment and, accordingly, the government seeks jury instructions on materiality tailored to all three alternatives. However, in the event the Court finds the government's second way (misrepresentations made to the counterparties upon entering swap transactions) would be a constructive amendment, the government would seek to proceed on jury instructions that do not incorporate that alternative.

I.   The Defendants Made Material Misrepresentations to Both the BBA and Deutsche Bank's Counterparties Directly and Through Thomson Reuters as a Conduit

The indictment alleges facts showing the defendants engaged in a fraudulent scheme for purposes of the wire fraud statute that encompassed material misrepresentations made in at least three ways. Based on the evidence offered during its case in chief, the government intends to proceed on each of these misrepresentations, specifically:

1) Defrauding Counterparties by Deceiving the BBA into Setting LIBORs Favorable to the Defendants and Against the Counterparties: The defendants made false and fraudulent LIBOR submissions to the BBA (via its agent, Thomson Reuters) for inclusion in the calculation of LIBOR, representing that the rates submitted were an honest estimate of Deutsche Bank's borrowing costs when in fact the submissions reflected rates designed to benefit their trading positions. (Superseding Indictment ("Ind.") ¶ 26.) These submissions were material to the BBA, as the BBA/Thomson Reuters relied on the submissions and used them to set the published LIBORs transmitted to traders around the world, including Deutsche Bank's counterparties. (Ind. ¶¶ 2-3, 26.) This caused Deutsche Bank counterparties whose trading positions were opposite those of Deutsche Bank to be susceptible to loss. (Ind. ¶ 26.) Because the parties whose property interests were threatened (the counterparties) are distinct from the party to whom the misrepresentation was made (the BBA via Thomson Reuters), this may be referred to as a "non-convergent" scheme. *See United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).

The Court recognized this as a viable alternative during the second week of trial:

> If the Government is still arguing a non-convergent fraud theory – if it is arguing that the plan was to defraud the BBA into setting LIBOR favorably to the defendants' trading positions, with the idea that the DB traders would benefit at the expense of their counterparties, who are the victims, but not the recipients of the false statements – then the Government simply proves its case by offering evidence that (1) the submissions to the BBA were both not true and capable of influencing the day's LIBOR setting; (2) the higher or lower setting that was requested would impact whether particular trades by DB traders were or were not successful; and (3) the concept was that the conspirators at DB would see their books benefit at the expense of their trading counterparties.

(Response to Recent Submissions by the Parties, ECF No. 321 at 2.)

While the government does not agree that the law requires materiality be proven as to the actual recipient of the misrepresentations (*see, e.g.*, United States' Combined Motions in Limine, ECF No. 217 at 15), the government is prepared to meet that burden in this case, as the evidence presented at trial establishes Deutsche Bank's LIBOR submissions were material to the BBA.[2] That is, the BBA (through Thomson Reuters) relied upon and used these submissions to set the published LIBORs, as is evident from the LIBOR calculation itself.  The government will highlight further supporting evidence showing materiality as to the BBA in connection with any Rule 29 proceeding.  The government thus does not object to a jury instruction that the jury must find the misrepresentations were material to the BBA/Thomson Reuters.  In the event the Court plans to instruct the jury simply that a misrepresentation must have been material to the party to whom it was made (*see* Prelim. Tr. 12:6-7), the government's position is that it is free to argue the defendants' misrepresentations were material to both the BBA and counterparties.

2)   <u>Defrauding Counterparties when Entering Transactions by Representing the Transactions Would Be Based on Objective LIBORs While Knowing They Would (and Did) Skew Their LIBOR Submissions to Benefit Their Own Trading Positions</u>:  The defendants also deceived Deutsche Bank's counterparties, including false representations when entering into swap agreements.  The defendants and their co-conspirators made and caused to be made false and misleading representations to their counterparties that Deutsche Bank would pay or receive "LIBOR," when in reality they intended to deceive their counterparties and provide something else—a manipulated LIBOR when it suited their own financial interest to the counterparties' detriment. (Ind. ¶¶ 4-5, 26, 27(f); *see also* Prelim. Tr. at 1413:10-21 (testimony of George Maroun, a swap trader at Federal Home Loan Bank (FHLB) of Boston, that when entering swap trades with Deutsche Bank that were tied to LIBOR, he thought he was agreeing to "a fair market trade that was representative of a deep and liquid market"); Prelim Tr. at 2196:14-17 (testimony of Cindy Konich, CEO and President of FHLB of Indianapolis, that when they were entering into swaps with Deutsche Bank, they expected LIBOR would be "very transparent, very honest, and fair of what their expectations were in the market").)  Here the fraudulent representations were made to and relied upon by the same parties whose property interests were threatened, Deutsche Bank's counterparties.

3)   <u>Defrauding Counterparties by Making False Representations (as Manipulated LIBORs) that Were Transmitted Both Directly and Through Thomson Reuters as a Conduit and that Served as the Basis for Their Settlement Payments</u>:  The defendants also made false representations to Deutsche Bank's counterparties during the life of swap agreements.  The defendants and their co-conspirators caused manipulated LIBORs to be transmitted to the counterparties, who in turn settled their derivatives based on that rigged rate. (Ind. ¶¶ 4-5, 26, 27(f).)  These manipulated LIBORs were transmitted to the counterparties through Thomson Reuters, which acted as a conduit to the counterparties, as well as directly from Deutsche Bank. (*See, e.g.*, Prelim. Tr. at 2194:24-2195:17, 2203:21-2204:1 (testimony of Ms. Konich that FHLB of Indianapolis received the LIBORs on which their contractual payments were calculated directly from Deutsche Bank as well as from the BBA's agent).)  Here too the fraudulent

---

[2] Indeed, it has been the defendants' position that the government must prove the defendants' misrepresentations were material to the BBA.  (Defs.' Joint Combined Motions *in Limine*, ECF No. 227 at 17 ("the Government must prove beyond a reasonable doubt at trial that the alleged false statements were capable of influencing the BBA's decision on how to set LIBOR").)

representations were made to and relied upon by the same parties whose property interests were threatened, Deutsche Bank's counterparties—though certain of these representations reached the counterparties through the conduit of Thomson Reuters.

All three of these ways the defendants made material misrepresentations fall within the core criminality of the indictment, as discussed further below, and are supported by the evidence at trial. The government thus intends to proceed on all three as alternative bases on which the jury may find the defendants guilty of the wire fraud and conspiracy charges.

II. All Three Ways the Defendants Made Material Misrepresentations Fall Within the Alleged "Core of Criminality;" There Is Thus No Constructive Amendment of the Indictment

The government need not allege a specific legal theory in an indictment; rather, it is sufficient if the indictment "encompasses" the specific legal theory or evidence used at trial. *See United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012). Thus, a change in legal theory would not be a constructive amendment so long as it contains the "core of criminality" alleged in the indictment. *Id.*; *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (citing *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphasis in original)).

The Second Circuit has interpreted the "core of criminality" concept broadly, finding that the "'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *D'Amelio*, 683 F.3d at 418; *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) ("[s]o long as the indictment identifies the 'essence of [the] crime' against which the defendant must defend himself, discrepancies in 'the particulars of how a defendant effected the crime' do not constructively amend the indictment") (quoting *D'Amelio*, 683 F.3d at 418).

In *Salmonese*, for example, the core of criminality was a fraud scheme operating within a particular timeframe, whose ultimate purpose was the conspirators' realization of profits from unlawful sales of stock warrants. 352 F.3d at 621. While the indictment identified certain sales of stripped warrants, this did not preclude the government from proving other, unalleged sales of stripped warrants or sales of stolen warrants at trial. *Id.* In *Banki*, the core of criminality was the operation of an unlicensed money-transmitting business; though the indictment identified the defendant's cousin as the source of the wire transfers while evidence at trial pointed to his father, there was "no uncertainty" the defendant was convicted of "conduct" that was the subject of the indictment. 685 F.3d at 118-19.

Similarly, the core of criminality alleged in *United States v. Seabrook* was a scheme to steer city funds intended to further a city initiative toward non-profits the defendant controlled. 613 Fed. Appx. 20, *23-24 (2d Cir. 2015). That the indictment charged a scheme to defraud a non-profit while the government alleged at trial that the defendant defrauded the city itself did not constitute a constructive amendment, as "essential elements of the scheme described in the indictment were the same as those proved at trial." *Id.* That is, the core of criminality was the

fraudulent scheme itself. The details of how that scheme was carried out, including the particular parties who were defrauded, were subject to proof at trial.

Here too, the core of criminality is a fraudulent scheme—to manipulate LIBORs to benefit defendants' trading positions at the expense of the counterparties whose trading positions were opposite those of Deutsche Bank. The indictment alleges the essential elements of the scheme, describing how the defendants caused skewed LIBOR transmissions to be submitted to the BBA/Thomson Reuters for inclusion in published LIBORs, how counterparties entered into derivatives contracts with Deutsche Bank on the belief they would be based on honest LIBORs, and how counterparties were susceptible to substantial risk of loss when payments under these contracts were instead based on the skewed LIBORs. (*See* Ind. ¶¶ 2-5, 26, 27(f).) This is more than sufficient to "encompass" each of the three ways the defendants made material misrepresentations as discussed above.

Moreover, the government has articulated the ways the defendants made material misrepresentations throughout the case, as the defendants and the Court have recognized. For example:

- At the January 18, 2017 status conference, defense counsel characterized the government's theory of the case as one of fraud on Deutsche Bank's counterparty banks: "The theory of this case is that our clients somehow defrauded Goldman Sachs and J.P. Morgan and Bear Stearns. . . ." (ECF No. 49 at 10:21-22.)

- At the March 2, 2017 status conference, defense counsel again characterized the government's theory of the case as fraud on Deutsche Bank's counterparties: "As the Court is aware, the theory of the prosecution is that somehow we defrauded counterparties." (ECF No. 62 at 7:2-4.)

- On March 10, 2017, Defendant Black filed a memorandum in support of his motion for a bill of particulars, which characterized the government's legal theory as one of fraud on the counterparties via fraudulent submissions made to the BBA: "The Superseding Indictment alleges that Mr. Black and Defendant Matthew Connolly (collectively, "Defendants"), while working for Deutsche Bank, defrauded Deutsche Bank's trade counterparties by making false and fraudulent submissions of the London Interbank Offered Rate ("LIBOR") to the British Bankers' Association ("BBA") over a seven-year period." (ECF No. 67 at 4.)

- On March 13, 2017, Defendant Connolly filed a memorandum in support of his motion for a bill of particulars, which acknowledged: "The Superseding Indictment alleges that four such counterparties were defrauded, identifying them as Banks A-D." (ECF No. 69 at 2.)

- In the Court's April 20, 2017 order regarding the defendants' motions for a bill of particulars, the Court recognized that the superseding indictment "identifies: who the Defendants intended to mislead (trade counterparties and the British Bankers' Association). . . ." (ECF No. 76 at 2.)

Having explicitly acknowledged these ways the government alleges the defendants made material misrepresentations—including misrepresentations made to both the BBA and counterparties—it would be disingenuous for the defendants to now claim these alternatives are somehow a surprise.  The defendants have been given more than sufficient "notice of the core of criminality to be proven at trial."  *D'Amelio*, 683 F.3d at 417.  The Court should thus find that there has been no constructive amendment and allow the government to argue all three ways the defendants made material misrepresentations to the jury.

In the event the Court finds the government's second alternative, of misrepresentations made to the counterparties upon entering swap transactions, would constitute a constructive amendment, the government respectfully submits that the most efficient way to cure this defect is by delivering a jury charge that does not allow this alternative to be submitted to the jury, rather than litigating the matter after a jury verdict (should it become necessary to do so).  The Court could accomplish this through a jury instruction that describes the indictment's allegations in terms that would not result in a constructive amendment.  In doing so, the Court could essentially cure the issue of a potential constructive amendment by ensuring that a legally infirm theory of prosecution never gets submitted to the jury and, therefore, will never become the basis for a guilty verdict.

III.   <u>The Court Should Instruct the Jury on Materiality In Accordance with the Ways the Government Alleges the Defendants Made Material Misrepresentations</u>

The government's proposed jury instructions on materiality are particularly germane to the ways the defendants made material misrepresentations as articulated above.  Accordingly, the government renews its request that the Court instruct the jury as follows:

1)  "The government does not have to show that a false or fraudulent statement or representation was made directly to a victim so long as it proves beyond a reasonable doubt that the fraudulent statement or representation was made in furtherance of a scheme to defraud, with the intent to defraud as I have described above."  (United States' Proposed Jury Instructions, ECF No. 299 at 27.)

Such an instruction is key to the allegation that the defendants defrauded counterparties by deceiving the BBA into setting skewed LIBORs.  It does not matter for purposes of the wire fraud statute that the parties to whom the fraudulent statements were made (the BBA/Thomson Reuters) are distinct from the victims, the parties whose property interests were threatened (Deutsche Bank's counterparties), and the jury should be so instructed.  (*See id.* at n. 8.)

2)  "A material fact is one that you would expect to be of concern to a reasonable and prudent person in relying upon the representation or the statement in making a decision.  In assessing materiality, you can look to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.  A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information."  (*Id.* at 27.)

This set of instructions is critical to the ways the defendants' misrepresentations were material to the counterparties, both at the time of entering swap contracts and when the contracts

were settled based on then-current LIBORs.  They incorporate language the Court used in final jury instructions in *United States v. Binday*, 12-cr-152-CM (S.D.N.Y. 2013), ECF No. 282 at 1578:11-13 ("A material fact is one that you would expect to be of concern to a reasonable and prudent person in relying upon the representation or the statement in making a decision."), as well as language referenced by the Court in ruling on the government's motions *in limine* in this case (*see* ECF No. 299 at 27 n.6 & 7).

      3)   "The government is not required to establish that anyone actually relied on any false or fraudulent statement or representation.  Rather, the misrepresentation merely had to be capable of influencing the victims.  Whether it actually influenced the victims is of no moment.  However, the government must prove beyond a reasonable doubt that the defendant intended that the misrepresentation influence the victims."  (United States' Proposed Jury Instructions, ECF No. 299 at 27-28).

This instruction likewise goes to both ways the defendants' misrepresentations were material to the counterparties, at the time of entering swap contracts and when the contracts were settled.  The government's proposed language tracks the Court's charges in *Binday* (ECF No. 282 at 1578:19-1579:2), and it is applicable here as well.

*****

The ways in which the Court will permit the government to proceed to prove the defendants made material misrepresentations, and the jury instructions to be given in accordance with this, are matters best determined in advance of closing arguments.  The government respectfully seeks the Court's guidance as set forth above.

Sincerely,

/s/
CAROL L. SIPPERLY
Senior Litigation Counsel
ALISON L. ANDERSON
Trial Attorney
Criminal Division—Fraud Section
United States Department of Justice

MICHAEL T. KOENIG
CHRISTINA J. BROWN
Trial Attorneys
Antitrust Division
United States Department of Justice