

1(212) 318-6344
kennethbreen@paulhastings.com

October 12, 2018

Honorable Colleen McMahon
Chief United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *United States v. Connolly, et al.*, No. 16-CR-00370

Dear Chief Judge McMahon:

      We respectfully submit this opposition to the government's submission, dated October 11, 2018, relating to the proposed jury charge on conscious avoidance. The factual predicate required for a conscious avoidance instruction has not been met as to either defendant. As to Mr. Connolly specifically, we respectfully submit that prior to the Court's decision on this issue, Ms. Sipperly mischaracterized Mr. Parietti's testimony in support of the government's request for a conscious avoidance instruction. We respectfully request that Your Honor reconsider this ruling.

      First, it is well settled in this Circuit that conscious avoidance may <u>not</u> be used to support a finding as to knowing participation or membership in a conspiracy. As this Circuit explained recently in *United States v. Lewis*, 545 Fed.Appx. 9 (2d Cir. 2013) (citing *United States v. Ferrarini*, 219 F.3d 145, 154–55 (2d Cir.2000) (emphasis added)): "There are two aspects of knowledge in a conspiracy: 1) knowing participation or membership in the scheme charged[,] and 2) some knowledge of the unlawful aims and objectives of the scheme. . . . Conscious avoidance may <u>not</u> be used to support a finding as to the former . . . it may be used to support a finding with respect to the latter."

      Thus, if any conscious avoidance were to be given – which it should not for the reasons set forth below – jurors should not be instructed that conscious avoidance can satisfy the intent element for knowing and voluntary membership in the charged conspiracy. The Second Circuit has held that it is error to instruct the jury in such a way as to allow it to conclude that "one could innocently join an undertaking without knowing of its illegal character, and that conscious avoidance of... indications of wrongful behavior was sufficient to make that person a member of a criminal conspiracy." *United States v. Lewis*, 545 F. App'x at 11 (2d Cir. 2013) (summary order); *United States v. Ferrarini*, 219 F.3d 145, 154-55 (2d Cir. 219 F.3d 145, 154-55 (2d Cir.2000).

      Furthermore, a conscious avoidance instruction may only be given where "the appropriate factual predicate for the charge exists." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003). Specifically, "there must be 'evidence ... that [allows] a rational juror [to] reach [the] conclusion beyond a reasonable doubt . . . that [the defendant] was aware of a high probability [of the criminal objective] and consciously avoided confirming the fact.'" *Ferrarini*, 219 F.3d at 154 (citation omitted); *see Lewis*, 545 Fed.Appx. at 11.

      The requisite factual predicates for a conscious avoidance instruction are nowhere in the record as to the Defendants. Both Defendants have asserted through counsel that they did not know or have reason to know that communications with Deutsche Bank's USD LIBOR submitters was wrong or illegal or even had a high probability of being illegal. There also is no evidence that they consciously or

TO: Honorable Colleen McMahon
October 12, 2018
Page 2

deliberately avoided learning whether their communications with submitters or consideration of derivatives positions was prohibited by the BBA.

With respect to Mr. Connolly, the factual predicate cited by Ms. Sipperly at yesterday's charge conference was Mr. Parietti's testimony.  However, in doing so, she misstated that testimony and conflated the cooperator's testimony about his own internal state of mind with actual conversations.  The testimony related to conversations with Andrew Smoler at an unspecified point in time, which were represented to have taken place on the trading desk, by default in proximity to Mr. Connolly.  The alleged conversation, however, was only about the fact that other banks (and possibly Deutsche Bank) were considering derivatives positions in their LIBOR submissions.  There has not been any testimony that the conversation Mr. Parietti testified to was about this practice not being "permitted by the LIBOR definition," which is what Ms. Sipperly specifically represented to the Court yesterday.  (Tr. 2577:4-12).  There has similarly been no such testimony from any witness in this trial.

Rather, as set forth below Mr. Parietti's testimony was about his own interpretation of the conversation with Andrew Smoler, not anything that was said out loud in proximity to Mr. Connolly or otherwise.  The testimony from Mr. Parietti was actually quite different (Prelim. Tr. 1045-46):

Q: With respect to Andrew Smoler, did you have conversations with Mr. Smoler?
A: Yes.
Q: Were other people present during those conversations?
A: Yes.
Q: Who also was present?
A: Also present was Dave Park and Matt Connolly.
Q: And what time period did you have conversations about LIBOR and the London desk when you had these conversations with Smoler – Andrew Smoler and Matthew Connolly?
[ . . . ]
A: What was said was that people didn't trust the submission process for LIBOR; people thought – Andrew Smoler thought that banks were considering their positions when they submitted their LIBORs; and that he suspected that our bank was doing the same thing.
Q:  And what did you say?
A:  I didn't say much about it.  I generally agreed when it was said that it was bullshit.
Q: When it was, I'm sorry?
A: It was bullshit.
Q: And what did you understand that to mean when that to mean when that was said?
A: I understood that to mean that they shouldn't be submitting LIBOR based on their positions, and that it was a dishonest thing to do.
Q: And was Matthew Connolly, did he speak during these conversations?
A: No, not really.
Q: Did he gesture?
A: He would sort of shrug or shake his head.

The testimony Ms. Sipperly referred to was specifically about Mr. Parietti's own state of mind in interpreting this conversation.  Mr. Parietti did not, and of course, cannot testify, to what Mr. Connolly understood.  He did not testify that any words were said about compliance with the LIBOR definition.  Mr. Parietti's internal thoughts have been conflated with the actual discussion he testified about remembering.  Mr. Connolly cannot be said to have "consciously avoided" something that was never said out loud.

Mr. Parietti also testified that he never had any conversation about Mr. Connolly about the LIBOR submissions as inaccurate, wrong, or inconsistent with the LIBOR definition.  In fact, Mr. Parietti never

TO: Honorable Colleen McMahon
October 12, 2018
Page 3

actually used the word "wrong" in connection with the LIBOR submissions until after his cooperation with the government.

  Further, the jury has no idea when these alleged conversations that Mr. Parietti testified to took place.  Therefore, there is absolutely no basis for suggesting that these conversations happened before Mr. Connolly's alleged "instruction" discussion with Mr. Parietti.  It is completely untethered to time and does not suggest an "awareness of a high probability" of the illegal objects of the charged conspiracy.  Whatever Mr. Parietti's self-servingly claims now was running through inside his mind during these conversations with Mr. Smoler on unspecified dates cannot be attributed to Mr. Connolly, who could not have read Mr. Parietti's mind.

  There is nothing on this record that suggests that Mr. Connolly formed in his own mind "a high probability of illegal activity" and no evidence that he turned a "blind eye" or took deliberate steps to consciously avoid learning anything.  Mr. Parietti himself testified that, after copying Matt Connolly on his first request to Mr. King on or about March 20, 2006, he stopped copying Mr. Connolly on his own.  He further testified that Mr. Connolly never instructed him to lie to anyone or delete any messages.  (Prelim. Tr. 1209.)  There simply are not facts that suggest that Mr. Connolly believed there even was a high probability of anything illegal or improper about his conduct or that of his colleagues.

  Similarly, with Mr. Black, there is nothing in the government's letter that remotely suggests Mr. Black had received information that even would have suggested that there was a high probability that there was something unlawful or improper with sharing trading positions or communications with submitters was improper or illegal, let alone evidence that he consciously avoided confirming such a fact.  None of the government's citations satisfy the requisite factual predicates.  These citations are entirely consistent with Mr. Black's consistent position that he did what his supervisors told him to do – send communications to USD LIBOR submitters and share trading positions.

  We thank the Court for its consideration.


Respectfully submitted,

*/s/ Kenneth M. Breen*

Kenneth M. Breen
for PAUL HASTINGS LLP

cc: Counsel for all Parties (via ECF)