**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

        *Defendants*.

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT GAVIN CAMPBELL BLACK'S MOTION
## <u>FOR A JUDGMENT OF ACQUITTAL OR NEW TRIAL</u>

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 3

I.    RULE 29 REQUIRES ENTRY OF A JUDGMENT OF ACQUITTAL............................ 3

      A.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
            OF FALSITY .................................................................................... 4

            1.    The Government Failed to Establish that Deutsche Bank's LIBOR
                  Submissions to the BBA Were False ........................................... 5

            2.    The Government Failed to Establish that the BBA's Published
                  LIBORs Were False.................................................................. 18

            3.    The Government Failed to Prove Falsity Under Either Theory
                  Because Neither the BBA's Instructions nor the Trade Confirmations
                  Unambiguously Prohibited Consideration of a Panel Bank's
                  Derivatives Trading Positions................................................... 22

      B.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
            OF MATERIALITY .......................................................................... 26

            1.    The Evidence Was Insufficient to Establish that Any Alleged False
                  Statement Was Material to the BBA.......................................... 26

            2.    The Evidence Was Insufficient to Establish that Any Alleged False
                  Statement Was Material to a Reasonable Derivatives Trader ........ 33

      C.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
            OF FRAUDULENT INTENT ................................................................ 39

            1.    The Government Did Not Prove that Mr. Black Did Not Act in Good
                  Faith ..................................................................................... 39

            2.    The Evidence Was Insufficient to Establish that Mr. Black Acted with
                  Fraudulent Intent under *Countrywide* ....................................... 55

            3.    The Government Cannot Meet Its Burden to Prove Fraudulent Intent
                  Because It Failed to Introduce Evidence of Mr. Black's Net Trading
                  Positions ............................................................................... 57

      D.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
            OF AN EFFECT ON A FINANCIAL INSTITUTION ...................................... 60

      E.    JUDGMENT OF ACQUITTAL ON THE LONE REMAINING
            SUBSTANTIVE COUNT AGAINST MR. BLACK IS APPROPRIATE.......... 63

II.       MR. BLACK SHOULD HAVE HIS CONVICTION REVERSED OR RECEIVE A NEW TRIAL BECAUSE THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT ...................................................................................... 67

       A.     THE EVIDENCE AND JURY CHARGE UNCONSTITUTIONALLY BROADENED THE POSSIBLE BASES OF CONVICTION FROM THAT ALLEGED IN THE INDICTMENT .................................................................. 68

       B.     THE INDICTMENT WAS CONSTRUCTIVELY AMENDED BECAUSE IT FAILED TO NOTIFY MR. BLACK OF THE "CORE OF CRIMINALITY" THAT THE GOVERNMENT ATTEMPTED TO PROVE AT TRIAL.............. 71

       C.     THE GOVERNMENT'S EVIDENCE AND ARGUMENT AT TRIAL OPERATED AS A PREJUDICIAL VARIANCE TO THE INDICTMENT....... 74

III.     IN THE ALTERNATIVE, THE INTEREST OF JUSTICE REQUIRES DISMISSAL OR, AT A MINIMUM, A NEW TRIAL UNDER RULE 33........................................... 77

CONCLUSION............................................................................................................ 79

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Feder Kaszovitz LLP v. Rosen*,
 2018 WL 3708662 (S.D.N.Y. Aug. 3, 2018). ........................................................ 20

*Jackson v. Virginia*,
 443 U.S. 307 (1979) .................................................................................................. 3

*Kungys v. United States,*
 485 U.S. 759 (1988) ................................................................................................ 26

*Neder v. United States*,
 527 U.S. 1 (1999) ............................................................................................... 26, 37

*Stirone v. United States*,
 361 U.S. 212 (1960) ................................................................................................ 68

*United States v. Allen*,
 864 F.3d 63 (2d Cir. 2017) ................................................................................... 9, 24

*United States v. Amrep Corp.*,
 560 F.2d 539 (2d Cir. 1977) ..................................................................................... 8

*United States v. Autuori*,
 212 F.3d 105 (2d Cir. 2000) ..................................................................................... 4

*United States v. Bouyea*,
 152 F.3d 192 (2d Cir. 1998) ................................................................................... 63

*United States v. Bryant*,
 556 F. Supp. 2d 378 (D.N.J. 2008) ........................................................................ 23

*United States v. Cassese*,
 428 F.3d 92 (2d Cir. 2005) ....................................................................................... 3

*United States v. Clemente*,
 22 F.3d 477 (2d Cir. 1994) ..................................................................................... 67

*United States v. Coplan*,
 703 F.3d 46 (2d Cir. 2012) ..................................................................................... 62

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ................................................................. 33

*United States v. Countrywide Fin. Corp.,*
    961 F. Supp. 2d 598 (S.D.N.Y. 2013) ................................................ 63

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
    822 F.3d 650 (2d Cir. 2016) ......................................................... *passim*

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ................................................................ 39

*United States v. D'Amelio,*
    636 F. Supp. 2d 234 (S.D.N.Y. 2009) ................................................ 77

*United States v. D'Amelio,*
    683 F.3d 412 (2d Cir. 2012) ................................................................ 71

*United States v. Davis,*
    2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ........................ 68, 74, 77

*United States v. Dupre,*
    462 F.3d 131 (2d Cir. 2006) ................................................................ 39

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) ......................................................... 77, 78

*United States v. Finnerty,*
    474 F. Supp. 2d 530 (S.D.N.Y. 2007) ................................................ 15

*United States v. Finnerty,*
    533 F.3d 143 (2d Cir. 2008) ......................................................... *passim*

*United States v. Gaudin,*
    515 U.S. 506 (1995) .............................................................................. 26

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002) .................................................................... 3

*United States v. Greenberg,*
    835 F.3d 295 (2d Cir. 2016) ................................................................ 74

*United States v. Heinz,*
    790 F.3d 365 (2d Cir. 2015) ......................................................... 60, 63

*United States v. Jones*,
    393 F.3d 107 (2d Cir. 2004)..................................................... 3

*United States v. Kapelioujnyj*,
    547 F.3d 149 (2d Cir. 2008)..................................................... 3

*United States v. Lanier*,
    520 U.S. 259 (1997)............................................................. 22

*United States v. LeRoy*,
    687 F.2d 610 (2d Cir. 1982)................................................... 78

*United States v. Litvak*,
    808 F.3d 106 (2d Cir. 2015)....................................... 31, 32, 37

*United States v. Litvak*,
    889 F.3d 56 (2d Cir. 2018)............................................... 33, 34

*United States v. Lorenzo*,
    534 F.3d 153 (2d Cir. 2008)..................................................... 3

*United States v. Martinez*,
    54 F.3d 1040 (2d Cir. 1995)..................................................... 3

*United States v. Miller*,
    471 U.S. 130 (1985)............................................................. 67

*United States v. Milstein*,
    401 F.3d 53 (2d Cir. 2005)..................................................... 67

*United States v. Mollica*,
    849 F.2d 723 (2d Cir. 1988)................................................... 68

*United States v. Parkes*,
    497 F.3d 220 (2d Cir. 2007)................................................... 78

*United States v. Pauling*,
    256 F. Supp. 3d 329 (S.D.N.Y. 2017)............................... 77, 78

*United States v. Pierce*,
    785 F.3d 832 (2d Cir. 2015)................................................... 75

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000)............................................... 23, 74

*United States v. Resendiz-Ponce,*
    549 U.S. 102 (2007) ................................................................ 74

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) ............................... 31, 67, 71, 74

*United States v. Roshko,*
    969 F.2d 1 (2d Cir. 1992) ............................................ 67, 68, 71

*United States v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003) .................................................. 75

*United States v. Skelly,*
    442 F.3d 94 (2d Cir. 2006) .............................................. 13, 14

*United States v. Triumph Capital Grp., Inc.,*
    544 F.3d 149 (2d Cir. 2008) .................................................... 3

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) .................................................... 3

*United States v. Valle,*
    301 F.R.D. 53 (S.D.N.Y. 2014) ............................................ 77

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) .............................................. 26, 33

*United States v. Whiteside,*
    285 F.3d 1345 (11th Cir. 2002) ........................................... 23

*United States v. Zingaro,*
    858 F.2d 94 (2d Cir. 1988) .................................................... 68

*Universal Health Servs., Inc. v. United States,*
    136 S. Ct. 1989 (2016) ................................................. *passim*

*Williams v. United States,*
    458 U.S. 279 (1982) ............................................................. 14

**S**TATUTES

18 U.S.C. § 3293 ................................................................................................ 60

**R**ULES

Federal Rule of Criminal Procedure 29 .................................................. *passim*

Federal Rule of Criminal Procedure 33 ................................................ 77, 78

## PRELIMINARY STATEMENT

Defendant Gavin Campbell Black hereby respectfully renews his motion for judgment of acquittal under Federal Rule of Criminal Procedure ("Rule") 29 because the Government failed to introduce sufficient evidence to establish numerous elements of each of the two remaining charges against him. The Court should also dismiss the Superseding Indictment (the "Indictment") or, alternatively, vacate his convictions and order a new trial because the Government constructively amended the Indictment and committed a prejudicial variance through its evidence and argument at trial. To the extent either count of conviction survives dismissal pursuant to this motion and the other post-trial motions filed contemporaneously herewith, the Court should exercise its discretion under Rule 33 and grant Mr. Black a new trial in the interest of justice. While Mr. Black submits this motion to address facts and issues specific to him, he respectfully joins the arguments set forth in Defendant Matthew Connolly's motion for judgment of acquittal.

The Government's failure of proof and ever-shifting theories of wrongdoing stem from the fact that Mr. Black is an innocent man who committed no crime. The evidence at trial demonstrated as follows: the British Bankers' Association ("BBA")—an unregulated bank trade association—owned LIBOR and made the rules governing a Panel Bank's submission of LIBOR. Under the instructions issued by the BBA to Panel Banks (the "BBA Instructions"), a Panel Bank was to submit an estimate of its hypothetical borrowing costs for loans in reasonable market size; there was no corresponding requirement to disclose the methodology used in the calculations of such costs. Both the BBA and the market understood that a Panel Bank often was able to borrow in a range of rates. The BBA Instructions gave a Panel Bank discretion to choose any rate within that reasonable range as its LIBOR submission.

Against this backdrop, the Government brought fraud-based claims against Mr. Black. The Government charged him with knowingly and willfully violating the BBA's Instructions based on his requests that Deutsche Bank's LIBOR submitters—the ultimate deciders of the bank's daily LIBOR submissions—consider his trading positions when determining the rates to submit to the BBA. Although the BBA's Instructions were indisputably silent as to consideration of trading positions, the Government substituted a standard of wrongdoing that it created after the fact for the actual BBA Instructions in order to prosecute Mr. Black.

While the Government's case was replete with an unprecedented number of "surprises, fiascoes, [and] retractions" [Trial Transcript ("Tr.") 1891:23], its defining characteristic was a paucity of evidence. This failure of proof extended to multiple elements of the charges in this case. Among other things, there was no evidence that any of the submitted rates were false, meaning they did not reflect a reasonable and accurate estimate of Deutsche Bank's borrowing costs. There was similarly no evidence that Mr. Black made a false statement to anyone or requested that Deutsche Bank's submitters submit a false LIBOR rate. Nor was there any evidence that either the BBA or the market found any alleged misstatement material, as there was no testimony or other evidence that the BBA or the market expected that Panel Banks would not consider their trading positions in making their submissions. There was also insufficient evidence for a reasonable juror to conclude that Mr. Black acted with the requisite fraudulent intent as opposed to in good faith, as his job and his supervisors dictated. Beyond this lack of proof, the Government also constructively amended and prejudicially varied the Indictment because it proceeded on a theory of criminality at trial that was different from that alleged in the Indictment. And the Government further violated Mr. Black's constitutional rights by continuing to shift its theory of prosecution in the weeks leading up to—and even during—the trial.

For these and the other reasons discussed herein, the Court should vacate Mr. Black's convictions and dismiss the Indictment or, alternatively, grant him a new trial.

## <u>ARGUMENT</u>

### I.    RULE 29 REQUIRES ENTRY OF A JUDGMENT OF ACQUITTAL

Federal Rule of Criminal Procedure 29 requires entry of a judgment of acquittal if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "Applying this standard does not, however, mean that a reviewing court must affirm all jury verdicts." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  While a defendant challenging the sufficiency of the evidence supporting a conviction faces "a heavy burden," it is "not an impossible one." *United States v. Kapelioujnyj*, 547 F.3d 149, 152-53 (2d Cir. 2008) (internal quotation marks omitted).  Although the Court should defer to the jury's assessments of witness credibility, conflicting testimony, and the jury's choice of competing inferences that can be drawn from the evidence, "specious inferences" should not be credited. *Id.* at 153 (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)); *accord United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004).

The Second Circuit has emphasized that where a fact to be proved is also an element of the offense, "'it is not enough that the inferences in the government's favor are permissible.'" *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).  "[A]t the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir. 2002)).  Under this standard, Rule 29 requires

entry of a judgment of acquittal on all counts against Mr. Black because the Government failed to produce sufficient evidence as to multiple elements on each of the two counts of conviction.

A.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF FALSITY

No rational juror could have found that the Government presented sufficient evidence to establish beyond a reasonable doubt the falsity element of the charged offenses.  [*See* ECF No. 203 ("Thoughts") at 8 ("[F]alsity is, after all, the first necessary element of wire fraud.").] Where, as here, the Government proceeds on only an affirmative misrepresentation theory,[1] the Government must prove that the scheme involved "false or misleading statements made with fraudulent intent."  *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 (2d Cir. 2016) ("*Countrywide*"); *see United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose.").  To meet this burden, the Government must establish that the scheme involved either outright lies or half-truths, *i.e.*, partially true statements that omitted information necessary to correct a false impression. *Countrywide*, 822 F.3d at 663; *Autuori*, 212 F.3d at 118; *see* Thoughts at 9 ("The Government can prove falsity by establishing, beyond a reasonable doubt, one of two things:  either DB made an affirmative misrepresentation, which is to say, an untrue statement of fact; or that it misleadingly omitted information, such that its submission, while literally true (*i.e.*, DB could in fact have borrowed funds at that particular rate at 11 am on that day), was, in fact misleading.").

Despite the allegations in the Indictment, the Government requested that the Court charge the jury on three theories of falsity:  (1) a non-convergent theory of falsity involving the

---

[1]      The Government acknowledged during the charge conference that the evidence did not support a conviction on an omission theory.  [Tr. 2569:9-11 ("This is not an omission case.  You know, we would not ask for an omission instruction, and we don't need the duty instruction. This is not an omission case.").]

transmission of allegedly false LIBOR submissions to the BBA; (2) a convergent theory of

falsity in which Defendants allegedly made affirmative misrepresentations to their counterparties

at the time of contracting; and (3) a convergent theory of falsity in which Defendants caused

allegedly false LIBORs to be sent to the counterparties, which were then used to settle swaps and

other derivatives contracts. [ECF No. 334 at 1-2.] The Court dismissed the second of these

theories at the close of the Government's case because there was insufficient evidence of any

false statements made at the time of contract. [Tr. 2509:20-2510:18.] The Court also limited the

Government's third theory to false statements allegedly made to the three counterparties whose

representatives testified at trial (the "Relevant Counterparties"). [*See* Tr. 2562:7-13.]

The Court should likewise enter a judgment of acquittal on the Government's remaining

two theories of falsity. As demonstrated below, the Government failed to prove that any of the

Deutsche Bank submissions to the BBA or the published LIBORs used to settle Deutsche Bank's

trades with the Relevant Counterparties were false or fraudulent.

### 1. The Government Failed to Establish that Deutsche Bank's LIBOR Submissions to the BBA Were False

No rational juror could find that the Government proved that any of Deutsche Bank's

LIBOR submissions to the BBA constituted actual false statements, implied false statements, or

misleading half-truths. The undisputed evidence at trial established that LIBOR was a product

that was owned and operated by the BBA—an unregulated bank trade association that had

absolute discretion to set the LIBOR submission rules. [GX 1-803 ("BBA LIBOR is the BBA

fixing of the London Inter-Bank Offered Rate."); DX 1171A ("LIBOR is owned by the

BBA . . . ."); *see* Tr. 1925:13-25, 1956:25-1957:8 (Curtler) (testifying that the BBA is "a trade

group for bankers" that is "the exclusive determiner[] of what LIBOR is").] There was similarly

no dispute that the BBA published very limited "Instructions to BBA LIBOR Contributor

Banks" that governed the LIBOR submission process throughout the relevant period. [GX 1-803; Tr. 1462:14-17 (Maroun) (testifying that he was "aware that the BBA had only very, very limited guidance that it gave to panel banks on precisely how they had to do their jobs").]

The BBA Instructions provided that: "An individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100." [GX 1-803.] The BBA Instructions called for the submission of hypothetical estimated rates reflecting the bank's "perception" of its cost of borrowing in the interbank market. [DX 1171A ¶ 12.2.]

Given the BBA's Instructions, the Government was required to "prove that the defendants made (or, since neither defendant was a submitter, 'caused to be made') a 'false or fraudulent' statement concerning estimated borrowing costs to the BBA" to meet its burden in this case. [Dkt. No. 145 ("Oct. 19 Decision") at 6-7.] The Government failed to do so.

> a) *The Evidence Was Insufficient to Establish that Deutsche Bank's LIBOR Submissions Were Actually False*

The Government did not prove falsity in this case because it did not present evidence sufficient to establish that Deutsche Bank was unable to borrow at the submitted rates. The Government presented no cash data or other evidence of Deutsche Bank's actual borrowing costs. In addition, the Government did not present sufficient evidence to establish that Deutsche Bank's LIBOR submissions were outside the reasonable range permitted by the BBA.

> i. The Government presented no evidence of Deutsche Bank's actual or perceived borrowing costs

The Government did not present evidence sufficient to establish that Deutsche Bank LIBOR submissions did not reflect reasonable or accurate estimates of the bank's perceived costs of borrowing. The Government presented no cash or derivatives trading data, or other evidence of market factors to establish the rates at which Deutsche Bank did or could borrow.

Thus, there was no quantitative evidence from which a rational jury could determine Deutsche Bank's costs of borrowing, let alone determine that the submitted rates were not accurate.

In addition, despite calling Deutsche Bank's LIBOR submitters (Mr. King and Mr. Curtler) as cooperating witnesses, the Government did not question them or offer any evidence of their perceptions as to Deutsche Bank's borrowing rates for any of the dates and tenors at issue. To the contrary, both Mr. King and Mr. Curtler testified that they did not have independent memories of the submissions shown to them in this case, including their perceptions of Deutsche Bank's borrowing rates or the market factors relevant to an evaluation of Deutsche Bank's submissions on those dates. [*See, e.g.*, Tr. 593:23-594:13, 639:14-640:21 (King) (testifying that he did not have an independent memory of the requests shown to him or factors relevant to Deutsche Bank's estimated borrowing costs on those dates, including the rates suggested by his pricer or the brokers); 2128:23-2129:16 (Curtler) (testifying that he did not have an independent memory of where cash was trading or where Deutsche Bank could borrow for any of the days about which he testified).]

Not only did Mr. King and Mr. Curtler fail to testify about Deutsche Bank's actual cost of borrowing on any of the alleged dates, but the Government also sought to introduce its evidence without providing any of the requisite context. As Mr. Curtler testified, "it's generally accepted that the financial crisis . . . started around the first week or so of August of 2007" [Tr. 1809:18-21 (Curtler)] and was punctuated by the Lehman Brothers bankruptcy in September 2008, which was a "very, very big market event . . . [t]hat had a huge effect on LIBOR" [Tr. 1901:5-9 (Curtler)]. These events occurred in the middle of the conspiracy alleged by the Government but

were completely absent from its presentation of the evidence,[2] as was any reference to the contemporaneous market factors that a reasonable derivatives trader and/or LIBOR submitter would consider when forming a view of where the rate should be on a given day. As Mr. Curtler admitted at trial, he "shouldn't be suggesting looking at some LIBOR chart from ten years ago what it means if you don't know what the market factors were," but that is exactly what the Government repeatedly asked him and his fellow cooperators to do. [Tr. 2002:17-20 (Curtler).] Without evidence as to these market factors and other important pieces of context, there is no way for a reasonable juror to find beyond a reasonable doubt that Deutsche Bank's LIBOR submissions were false.

The Government cannot avoid its obligation to prove that Deutsche Bank could not borrow at the submitted rates by characterizing Deutsche Bank's LIBOR submissions as opinions. An opinion not honestly held cannot form the basis for a criminal fraud prosecution unless it is expressed. *See, e.g.*, *United States v. Amrep Corp.*, 560 F.2d 539, 544 (2d Cir. 1977) ("The ***expression*** of an opinion not honestly entertained is a factual misrepresentation.") (emphasis added); *see also Countrywide*, 822 F.3d at 663 ("Of course, freestanding 'bad faith' or intent to defraud without accompanying conduct is not actionable under the federal fraud statutes . . . ."). By virtue of the BBA's Instructions, the only opinion expressed by a LIBOR submission is that Deutsche Bank "could" borrow at the submitted rates in "reasonable market size." [*See, e.g.*, GX 1-803.] As the Government introduced no evidence that Deutsche Bank's LIBOR submissions did not reflect accurate estimates of the bank's perceived borrowing costs or

---

[2] Even before trial, the Government elicited statements from its cooperating witnesses by showing them communications devoid of the context necessary to understand them. [*See, e.g.*, Tr. 1964:21-25 (Curtler) (testifying that during the investigation he was "just shown an email with a particular date without all the context").]

that Mr. Black (or any co-conspirator for that matter) believed that to be the case, no rational juror could have concluded that Deutsche Bank's LIBOR submissions were actually false.

<ol type="i" start="2">
<li>

**The Government presented no evidence that any Deutsche Bank submission was outside a reasonable range**

</li>
</ol>

While the BBA Instructions required the submission of a single rate for each tenor, the evidence established that Instructions gave Panel Banks "leeway" to select the submitted rate from within a "range" of reasonable rates. *See United States v. Allen*, 864 F.3d 63, 75 (2d Cir. 2017) (crediting the Government's admission that, "as 'estimates,' LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a 'range' of reasonable LIBOR submissions"); *see also* Tr. 2173:8-11 (Curtler) (testifying that a 2008 industry publication [DX 1135] said that banks had "leeway" in setting LIBOR submissions). The existence of the reasonable range was based, in part, on the BBA's deliberate decision not to define "reasonable market size" during the relevant period. [GX 1-803; DX 1171A ¶ 12.3 (stating that the BBA's decision not to define "reasonable market size" was "intentional"); *see* Tr. 667:9-13 (King).] In fact, the BBA stated that what is a "reasonable market size" varied from day to day and from bank to bank. [DX 1171A ¶ 12.3.]

The undisputed evidence established that the BBA's deliberate decision not to define "reasonable market size" gave submitters the "flexibility" or "leeway" to submit from within a range of rates because the cost of borrowing cash typically increased as the borrowing size increased. [*See, e.g.*, Tr. 667:9-668:2 (King); Tr. 2173:8-11 (Curtler); DX 1135 (industry publication stating that LIBOR Panel Banks have "some leeway" in making their daily submissions).] For example, Mr. King testified that:

Q. The BBA's LIBOR definition uses the phrase "reasonable market size"?

A. Yes.

Q.  And that term is not defined in the definition, right?

A.  That's right.

Q.  And the reasonable market size term gave you flexibility as to where you could actually submit your LIBOR, right?

A.  Yes.

Q.  And, for example, if you could borrow cash at 500 million at the same tenor at one price, and you borrow cash, let's say, a yard, which is a billion, at another price, the BBA's definition doesn't say which of those two prices you're supposed to use?

A.  Correct.

Q.  And those two prices aren't necessarily the same, right?

A.  That's right.

Q.  Often it costs you more to borrow more cash than less cash, right?

A.  Yes.

[Tr. 667:9-668:2 (King); *see also* Tr. 669:6-672:3 (King) (acknowledging that, at the time he worked at Deutsche Bank, he believed that the BBA Instructions permitted him to submit his estimate at where he could borrow cash or "thereabouts" and acknowledged that that flexibility allowed him to submit within a two-basis point range in response to a specific example)[3].]

The testimony concerning the "flexibility" and "leeway" inherent in the term "reasonable market size" was reinforced in the Chicago Mercantile Exchange's ("CME") letter to the BBA, sent in response to the BBA's June 10, 2008 paper that provided "[c]larifications to the definition of BBA LIBOR."  [DX 9044A at 6; *see* DX 1171A § 12.]  In its letter, the CME stated that:  "A Contributor Panelist ***who can borrow*** 'in reasonable market size' ***at any one of a wide range of***

---

[3]      For this reason, Mr. Black respectfully submits that the Court's view prior to trial that there may be one correct rate because a reasonable bank would always accept the offer at the lowest price was mistaken.  [ECF No. 262 at 19-20.]  In the example provided to Mr. King, there was a range of correct rates because, hypothetically speaking, Deutsche Bank would have accepted an offer at one rate to borrow $500 million and an offer at a higher rate to borrow $1 billion, as well as offers between those rates to borrow cash between $500 million and $1 billion.

*offered rates commits no falsehood if she bases her response to the daily Libor survey upon*

*the lowest of these (or the highest, or any other arbitrary selection from among them)*."

[DX 9044A at 7 (emphasis added).]  Even though the BBA specifically sought these comments

from the CME and other market participants [*see* DX 1171A ¶ 12.4] and acknowledged the

CME's comments [*see* GX 1-176A at 14], the BBA deliberately decided not to "tighten" the

flexibility permitted by the "reasonable market size" concept.   In its Consultation Feedback

Statement, dated August 5, 2008, the BBA stated:

> An overwhelming number of respondents do not support a tightening of the
> definition of 'reasonable market size'.  As it varies from currency to currency and
> from situation to situation, what is meant by the definition will always require an
> element of judgement.  A hardening of the definition therefore has the potential
> for an adverse effect.  Consequently, the FX and MM Committee has decided to
> retain the concept in its current form.

[GX 1-176A ¶ 1.10.]

The Government failed to introduce any evidence that any of the submissions were

outside the reasonable range of rates permitted by the BBA's Instructions.  In fact, to the extent

there was any evidence of Deutsche Bank's cost of borrowing, the evidence established that

Deutsche Bank always submitted within a reasonable range of rates regardless of whether there

was a communication from a derivatives trader.   Specifically, Mr. King admitted that the

submissions that he changed based on a request from a derivatives trader were made within a

"reasonable range."  [Tr. 748:18-749:1 (King); *see also* Tr. 583:4-19 (King) (testifying that he

always tried putting in a rate that he felt was "reasonable").]  And the evidence showed that there

were times when Mr. King was unable to change the rate because he did not have the "leeway"

permitted under the BBA rules.  [*See* GX 4-002 (email from Mr. Parietti to Mr. Black in which

Mr. Parietti states that Mr. King ignored Mr. Parietti's request to submit a higher rate); *see also*

GX 1-004; Tr. 518:16-519:10 (King) (acknowledging that while he could likely change the submitted rate based on a request, he might not be able to make an adjustment).]

Moreover, the communications show Deutsche Bank's submissions were, in fact, within the reasonable range. For example, on February 24, 2006, Mr. King received a request from Mr. Curtler and Mr. Bittar for a low one-month LIBOR submission. [GX 1-033.] In the same email chain, a broker quoted Mr. King a one-month cash price of 4.565% to 4.57% and a one-month LIBOR prediction of 4.605%. [GX 1-033; Tr. 590:20-595:11 (King).] Mr. King made Deutsche Bank's LIBOR submission at 4.595%, near the top of the range established in the broker's email, despite Mr. Curtler's and Mr. Bittar's requests for a low rate. [Tr. 596:18-597:7 (King).]

Accordingly, the Government did not present sufficient evidence from which a rational juror could conclude that any of Deutsche Bank's LIBOR submissions were outside the reasonable range permitted under the BBA rules. The absence of such evidence provides a second basis on which to conclude that the Government failed to prove that Deutsche Bank's LIBOR submissions were false.

        *b)*    *The Evidence Was Insufficient to Establish that Deutsche Bank's Submissions Contained Any Implied Misrepresentations or Half-Truths*

The Government also did not present sufficient evidence to establish falsity on an implied misrepresentation or half-truth theory. To prevail on an implied misrepresentation or half-truth theory, the Government must prove that the statement at issue both contained a tacit representation and omitted information necessary to correct a false impression. *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000-01 (2016) (holding that "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the

goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths"); *Countrywide*, 822 F.3d at 663 (acknowledging that an affirmative misstatement theory of fraud requires proof of "a statement that was either 'an outright lie' or partially true but 'omitt[ed] information necessary to correct [a] false impression'") (alterations in original) (citation omitted). Conversely, the act of "simply fail[ing] to disclose information that [a defendant] is under no obligation to reveal" does not amount to fraud under a half-truth theory. *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006). Based on the evidence at trial, the Government failed to prove that Deutsche Bank's LIBOR submissions tacitly represented that they were arrived at without regard to its derivatives traders' positions or that the BBA had a false impression to this effect.

There was no evidence presented that the BBA required Panel Banks to make any disclosure concerning the methodology used to arrive at their LIBOR submissions. Pursuant to the BBA Instructions, LIBOR submissions were composed only of "[r]ates . . . contributed in decimal to at least two decimal places but no more than five." [GX 1-803.] The Government presented no evidence that Mr. Black, the alleged co-conspirators, or Deutsche Bank made any representations concerning the estimates in their submissions, including how Mr. King and Mr. Curtler arrived at these estimates.

Nor did the BBA Instructions prescribe that Panel Banks use any particular methodology or protocol in arriving at their estimates or prohibit them from considering trading positions when selecting a rate to submit from within a reasonable range. [*See, e.g.*, GX 1-803; DX 1171A.] The absence of any such evidence distinguishes this case from *Universal Health*. Unlike LIBOR submissions, the numbers submitted in the claim forms in *Universal Health* had

an implicit meaning because they corresponded to code numbers that represented that specific medical services were provided. The Court stated:

> [B]y submitting claims for payment using payment codes that corresponded to specific counseling services, [the petitioner] represented that it had provided individual therapy, family therapy, preventive medication counseling, and other types of treatment. Moreover . . . staff members allegedly made further representations in submitting Medicaid reimbursement claims by using National Provider Identification numbers corresponding to specific job titles. And these representations were clearly misleading in context.

*Universal Health*, 136 S. Ct. at 2000.

Here, by contrast, there was no evidence presented that the numbers in the LIBOR submissions conveyed any tacit information. Rather, the numbers in the submissions themselves were meaningless without reference to the BBA's LIBOR Instructions, which again, required only the submission of a single number that represented a bank's perceived cost of borrowing. *See Williams v. United States*, 458 U.S. 279, 284-85 (1982) (finding that the depositing of checks not supported by sufficient funds "did not involve the making of a 'false statement'" because "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'"). As such, the evidence, at most, established that Mr. Black and his alleged co-conspirators "simply fail[ed] to disclose information that [they were] under no obligation to reveal," *Skelly*, 442 F.3d at 97, which is insufficient to support an implied misrepresentation or half-truth theory.

In addition, there was no evidence that any non-disclosure was deceptive because there was no evidence presented as to the BBA's expectations. "Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). The Government cannot meet this burden by simply labeling conduct obviously or "self-evidently deceptive." *Id.* at 150. Rather, there must be some

evidence that the alleged deceived party "conveyed a misleading impression." *Id.* at 149. As this Court stated in granting a Rule 29 motion in the *Finnerty* case:

> [T]he Government was required to prove that customers [(*i.e.*, the alleged deceived party)] expected one thing and got something different. ***Without evidence of what the customers expected, no rational juror could conclude that the [conduct at issue] had a tendency to deceive or the power to mislead***. A juror would only be able to reach that conclusion by speculating—impermissibly—as to what customers expected.

*United States v. Finnerty*, 474 F. Supp. 2d 530, 539-40 (S.D.N.Y. 2007) (emphasis added), *aff'd*, 533 F.3d at 145.

There was no evidence from which the jury in this case could conclude that the BBA was under any misimpression because the Government failed to call a BBA witness. As the Court stated in ruling on Defendants' pretrial motions, "[s]omeone is going to have to testify about the expectations of the BBA, or the case will be on precarious footing at the close of the Government's evidence." [Oct. 19 Decision at 7.] In fact, as the Court recognized, the Government previously acknowledged at a status conference that it could not prevail at trial on a half-truth theory absent evidence that the BBA did not expect that Panel Banks adjusted their LIBOR submissions based on trading positions. [Thoughts at 10-11 ("[T]he Government would need to establish that the BBA harbored an expectation that LIBOR submissions – even those that were literally true (because they fell within the range of rate at which DB could have borrowed funds of a particular tenor at 11 am) – were not to be shaded by purely self-interested considerations. ***The Government admits as much***.") (emphasis added).]

The Government, however, failed to call any witness to testify as to the BBA's expectations, let alone provide testimony that the BBA expected that Panel Banks would not use their trading positions in arriving at their LIBOR estimates. While the Government's three cooperators, the Relevant Counterparties, and Dr. Youle testified as to their own understandings

of the BBA's Instructions, none of them provided any evidence concerning the BBA's expectations or understanding of those Instructions. Specifically, none of them testified that they had any conversation with BBA representatives in which the BBA explained its expectations or endorsed the witnesses' understanding of the BBA Instructions, and the witnesses' testimony suggests that they were in no position to have any insight into the BBA's expectations or understanding of the LIBOR Instructions. [*See, e.g.*, Tr. 159:25-160:8 (Youle); 1574:11-13 (Hunter); 2055:9-11 (Curtler); 2207:24-2208:1 (Konich).] Indeed, the Court ruled that the counterparties, cooperators, and Dr. Youle were not competent to testify as to the BBA's expectations. [*See* ECF No. 262 at 14-17; *see also* Thoughts at 11 ("[T]he cooperating witnesses' personal, subjective beliefs about what the BBA expected of them prove nothing about the BBA's 'expectations' (*i.e.*, state of mind) – and, indeed, are irrelevant to the BBA's state of mind."); Tr. 2167:21-23 (the Court holding that "the objection is very much sustained" in response to a question from the Government that began, "Do you think that John Ewan [the director of BBA LIBOR] would have wanted to know . . .").]

To the extent there was any evidence in the record concerning the BBA's expectations, such evidence refuted the Government's theory that the BBA expected rigid compliance with its Instructions concerning the submission of borrowing costs. For example, the evidence showed that the BBA contacted Deutsche Bank on several occasions and instructed it to submit rates above its costs of borrowing. Specifically, after a call from Thomson Reuters on January 14, 2008, Mr. King raised Deutsche Bank's one-, two-, and three-month LIBOR submissions, even though Mr. King told the Thomson Reuters representative on the call that he was "happy" with his original submissions and that the original submissions contained the rates "where we're receiving cash." [DX 1104; DX 1104T.] During the call, the Thomson Reuters representative

16

indicated that the basis for his call was that Deutsche Bank submitted at rates lower than the other Panel Banks; the Thomson Reuters representative had no regard for the fact that Deutsche Bank was actually able to borrow cash at the rates contained in its original submissions. [DX 1104; DX 1104T.] Moreover, even though Mr. King did not have an independent memory of the costs of borrowing on the date of the call, he sent an email on that same date that confirmed his statement on the call that, as to his three-month submission, Deutsche Bank was able to borrow at the submitted rate. [Tr. 669:6-672:3 (King); *see* GX 1-103 (stating, "Cash has been very well offered this morning with a good name in the mkt giving 3.95 in the 3s," which matches the rate contained in Deutsche Bank's original three-month submission).]

Similarly, Mr. Curtler testified that, on one occasion, the BBA criticized Deutsche Bank for significantly dropping its submission from the day before even though the drop was based on Deutsche Bank's actual cost of borrowing. [Tr. 2082:4-2088:25 (Curtler).] Mr. Curtler testified that the reason for the large drop in Deutsche Bank's submission was that it received an offer for cash on the day in question at the rate it submitted. [Tr. 2086:4-14 (Curtler).] John Ewan, the BBA's LIBOR manager, nevertheless commented at a meeting of the BBA's Foreign Exchange & Money Markets Committee that Deutsche Bank should have staggered its drop or, at the very least, first sought BBA guidance as to whether to stagger its drop or drop its rate all at once. [Tr. 2086:15-2088:11 (Curtler).]

Accordingly, the Government did not present sufficient evidence of falsity on an implied representation or a half-truth theory in connection with Deutsche Bank's LIBOR submissions to the BBA because no rational juror could conclude either that these submissions contained any implied misrepresentations or that the BBA was deceived in its expectations concerning Deutsche Bank's submitted rates.

### 2. The Government Failed to Establish that the BBA's Published LIBORs Were False

No rational juror could have found that there was sufficient evidence to establish falsity under the Government's remaining convergent fraud theory, which is that the BBA's published LIBORs—as opposed to Deutsche Bank's submissions—were false. The Government failed to prove that the LIBORs published by the BBA and used to settle the Relevant Counterparties' trades were actually false because, among other things, there was no evidence that any of the trades with the Relevant Counterparties did not settle in accordance with the terms of the parties' contract. The Government also did not prove that these statements constituted implied misrepresentations or half-truths because there was no evidence that the Relevant Counterparties' understandings of LIBOR were based on any statement or conduct of Mr. Black or his alleged co-conspirators.

#### a) There Was No Evidence that the BBA's Published LIBORs Were Actually False

There was no evidence that the BBA's published LIBORs were actually false. The evidence was undisputed that the BBA—not Deutsche Bank—was responsible for setting LIBOR. As the BBA stated in its published guidance: "The BBA will fix BBA LIBOR and its decision shall be final." [GX 1-803.] In making this decision, the BBA had absolute discretion to use the Panel Banks' submissions or to suggest that they be changed for any reason as part of its scrutiny and monitoring of the process. [*See, e.g.*, DX 1171A § 13.3 (describing the BBA's LIBOR scrutiny mechanism); GX 1-803 at 2 (indicating the BBA's publication agent would correct "manifest errors"); *see also* DX 1104.] The Government did not allege that the BBA was a co-conspirator, and no evidence was presented that the BBA falsified the published LIBOR as part of the scheme. [*See* ECF No. 262 at 8 ("Indeed, a good argument can be made that Thomson Reuters' transmissions were true, since they consisted of the actual LIBORs that were

in fact set by the BBA on that particular day—no other LIBORs were set on those four days—and the actual Contributor Panel bank submissions on which the LIBOR settings were based.").]

The evidence was undisputed that Deutsche Bank's trades with the Relevant Counterparties settled based on the BBA's published LIBORs and not on Deutsche Bank's LIBOR submissions. [*See, e.g.*, Tr. 1438:12-15 (Maroun) (testifying that the trades were settled on the BBA's published LIBOR and not Deutsche Bank's LIBOR submission); 2194:7-2195:17 (Konich) (testifying that her bank confirmed that trades were settled properly by looking LIBOR up on the electronic page belonging to Telerate (the BBA's publication agent prior to Thomson Reuters)).] The trade confirmations called for the trades to be settled based on "USD-LIBOR-BBA," a term that was defined in the ISDA Definitions that were incorporated by reference into the trade confirmations. [GX 1-513 at 2; GX 1-514 at 2; GX 1-544 at 2; GX 1-545 at 2.] The ISDA Definitions defined "USD-LIBOR-BBA" as merely the rate published in a certain location on a certain date by the BBA's publication agent—either Telerate or Thomson Reuters. [*See* DX 1588 at 40 § 7.1(w)(xvii).] The trade confirmation contracts said nothing about the permissible methodology or protocol to arrive at the published rate and, in fact, did not even refer to or incorporate by reference the BBA's Instructions. [*See, e.g.*, GX 1-514.] Nor did the contracts include any promises, representations, or warranties concerning Deutsche Bank's LIBOR submissions. [*See, e.g.*, *id.*] Because there was no evidence that Deutsche Bank's trades with the Relevant Counterparties did not settle at the contracted rate, the evidence was insufficient to establish actual falsity of the BBA's published rates in this case.

> b) *The Evidence Was Insufficient to Establish that the BBA's Published LIBORs Contained Any Implied Misrepresentations or Half-Truths*

The evidence was insufficient to support a conviction on the theory that the BBA's published LIBORs contained implied misrepresentations or half-truths because there was no

evidence that Mr. Black or his co-conspirators conveyed any information to the counterparties that gave them a false impression. *See Finnerty*, 533 F.3d at 149 (affirming the grant of judgment of acquittal on a securities fraud charge because there was no evidence that the defendant "conveyed an impression that was misleading"). In fact, there was no evidence that anyone from Deutsche Bank made any statements to the Relevant Counterparties at the time the BBA published LIBOR.

The BBA's publication of LIBOR did not contain any tacit representations because it was an unambiguous, legally operative term. [ECF No. 262 at 16 ("The word 'LIBOR' is a term of a contract, and so it, like every term of the contract, is legally operative . . . ."); *see* Tr. 1447:9-13, 1452:4-9 (Maroun) (testifying that the ISDA Master Agreement between FHLB Boston and Deutsche Bank and the trade confirmation established the legal obligations between the parties).] Where, as here, the term "USD-LIBOR-BBA," as defined in the ISDA Definitions, was "clear and unambiguous," the parties' unspoken understandings are not relevant to contract interpretation and may not be used to contradict or vary the agreement's plain meaning. *See, e.g.*, *Feder Kaszovitz LLP v. Rosen*, 2018 WL 3708662, at *7 (S.D.N.Y. Aug. 3, 2018). Thus, as per the terms of the parties' agreement, the term "USD-LIBOR-BBA" means nothing more than the LIBOR published by the BBA's publication agent (either Telerate or Thomson Reuters).

The Government's implied misrepresentation/half-truth theory also fails because there was no evidence that anyone from Deutsche Bank made any representations concerning the meaning of the term "USD-BBA-LIBOR," the BBA's Instructions, or the LIBOR calculation. While the witnesses for the Relevant Counterparties testified as to their superficial understandings of LIBOR [Tr. 1411:8-12 (Maroun); 1568:8-15, 1573:13-24 (Hunter); 2196:1-22 (Konich)], none of them testified that any of these understandings were based on any statements

or conduct from anyone at Deutsche Bank.  To the contrary, they each testified that they did not have any knowledge of any contact between their institutions and Deutsche Bank's London office, let alone Mr. Black.  [Tr. 1444:25-1445:2 (Maroun); 1592:11-15 (Hunter); 2207:12-16 (Konich).]    Nor did the Relevant Counterparties provide any testimony concerning communications with any other member of the conspiracy.  Absent such evidence, no rational juror could find the BBA's published LIBORs amounted to implied misrepresentations or half-truths.  *See Finnerty*, 533 F.3d at 150 (finding the evidence insufficient to support a securities fraud conviction based on an alleged rule violation where there was no evidence that the alleged victims' understandings of the rules "was based on a statement or conduct by [the defendant]").

Moreover, the representations and warranties in the trade confirmations further refute any argument that the Relevant Counterparties' understandings of LIBOR were based on statements or conduct by Deutsche Bank.  As part of the standard terms of ISDA agreements, the trade confirmations contained "Non-reliance" and "Assessment and Understanding" representations in which each party represented that it was not relying on any communication of the other party in entering the trade and was capable of understanding the terms of the trade on its own.  [*See* GX 1-513 § 8; GX 1-514 § 8; GX 1-544 § 6.]  These standard terms also provided that neither party was acting as a fiduciary in connection with the trade [*see id.*], and none of the Relevant Counterparty witnesses testified that Deutsche Bank induced or solicited them to enter into the trades at issue [*see* Tr. 2510:10-18 (the Court commented that in light of "all of the evidence . . . this notion that the government can go to the jury and argue that a misrepresentation was made to induce the contract is ludicrous")].

The Government cannot avoid its burden of linking the Relevant Counterparties' understandings to statements or conduct of one of the co-conspirators by characterizing its after-

the-fact interpretation of the BBA Instructions as "common sense" or "self-evident." [ECF No. 262 at 18.] As the Second Circuit has held, such characterizations are "conclusory" and do not obviate the Government's need to prove deceptive conduct. *Finnerty*, 533 F.3d at 150. Moreover, the evidence refuted any suggestion that the market had a "common understanding" of BBA LIBOR that corresponded to the Government's interpretation. [*See* ECF No. 262 at 19.] As referenced above, the CME—the largest exchange for LIBOR-based futures in the world— made clear that it understood that there was a range of reasonable LIBOR submissions and that the BBA's Instructions placed no limits on a Panel Bank's ability to select any number from within that range, even if the selection was based on "arbitrary" reasons. [DX 9044A at 7.]

Accordingly, the evidence was insufficient to establish that the BBA LIBORs used to settle the Relevant Counterparties' trades constituted implied misrepresentations or half-truths.

3.     **The Government Failed to Prove Falsity Under Either Theory Because Neither the BBA's Instructions nor the Trade Confirmations Unambiguously Prohibited Consideration of a Panel Bank's Derivatives Trading Positions**

As the Court stated prior to trial, "in order to prove falsity, the Government must negate *any reasonable interpretation* of the BBA's question that would render the alleged misrepresentation—the Deutsche Bank USD LIBOR submissions—not false and misleading." [ECF No. 263 at 4 (emphasis in original).] The Government's burden to make this showing stems from the fair warning requirement of the Due Process Clause which, *inter alia*, bars criminal prosecution in situations in which a person of ordinary intelligence does not have fair notice of what is prohibited. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 266 (1997). Where, as here, the Government brings a criminal prosecution based on the alleged violation of a rule or duty not contained in a specific criminal statute—in this case, the BBA Instructions—the fair warning requirement extends beyond the statutory text and requires that the underlying rule

or duty be sufficiently clear so as to provide fair warning that the conduct at issue was prohibited. *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.") (citation omitted); Tr. 2574:7-18 (Charge Conference) (agreeing with Defendants that, because the Government here brought a criminal fraud prosecution based on the alleged violation of the BBA's Instructions, those Instructions "effectively . . . g[ot] incorporated into the wire fraud statute"). As a result, the Government was required to prove that the BBA Instructions "unambiguously prohibit[ed] [the defendants'] conduct" and to "negat[e] any reasonable interpretation" of these Instructions that would make Deutsche Bank's submissions consistent with a reasonable exercise of its submitters' discretion. *United States v. Bryant*, 556 F. Supp. 2d 378, 444 (D.N.J. 2008); *see also United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretative question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.").

The Government failed to meet this burden because the BBA Instructions, by their plain terms, did not prohibit the alleged fraudulent practice. As noted above, the BBA Instructions required the submission of the rates at which a Panel Bank "could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100." [GX 1-803; DX 1171A §§ 3.3, 12.2; GX 1-176A § 1.15.] The BBA, however, provided very limited guidance as to how Panel Banks should calculate the rates to be included in their submissions. [GX 1-803; DX 1171A; GX 1-176A.] The BBA's Instructions do not contain the "unbiased and honest" standard contained in the Indictment [SI ¶ 8], and they are silent as to the

consideration of derivatives trading positions in the submission of rates. In addition, at no point during the relevant period did the BBA Instructions prohibit LIBOR submitters from trading derivatives, set forth a list of either permitted or prohibited factors, or require Panel Banks to adopt an information wall between submitters and derivatives traders. [GX 1-803; DX 1171A; GX 1-176A.] Thus, the alleged fraudulent conduct was not unambiguously prohibited by the BBA's LIBOR Instructions.

The Government cannot get around the absence of an express prohibition by arguing that "it would be unreasonable to interpret the BBA's question as allowing a submitting bank to modify an estimate of its actual cash borrowing cost by taking into account extraneous factors that have nothing to do with the cost of borrowing cash." [ECF No. 263 at 4.] The fallacy of this argument is that it does not account for the imprecision in the LIBOR submission process and is based on the mistaken premise that there is always a single correct estimate of cash borrowing costs under the BBA's Instructions. *See Allen*, 864 F.3d at 75 (acknowledging the Government's admission that the LIBOR submission process was "necessarily imprecise" even in the best of market conditions). As shown above, the evidence established that there typically was a range of estimates of cash borrowing costs in "reasonable market size" because the price of cash generally increased as borrowing size increased. (*See supra* § I.A.1.) In fact, the unambiguous language of the BBA Instructions inherently leads to a range of estimates because the word "offers" is plural. [*See* GX 1-803.] By contemplating a process in which a Panel Bank hypothetically accepts multiple "offers" in "reasonable market size"—an undefined term that the BBA left to the "judgement" of the submitter [GX 1-176A ¶ 1.10]—the definition itself naturally produces a range of permissible estimates from which a Panel Bank must choose in making its submission. Given the absence of any guidance concerning how to choose among the

permissible rates, the BBA's LIBOR Instructions themselves did not unambiguously prohibit the use of "extraneous factors that have nothing to do with the cost of borrowing cash" in making this determination.  [ECF No. 263 at 4.]

Nor did the Government establish that it would be unreasonable to interpret the BBA Instructions to permit Mr. Black's conduct.  The Government did not call a BBA witness or present any evidence pertaining to the BBA's interpretation of its own rules.  To the contrary, the only evidence in the record established that the BBA's understanding of its rules permitted Panel Banks to choose among rates in the permissible range for any reason, including "arbitrary" ones, as the BBA did not disagree with or correct the CME letter, nor did it opt to "tighten" the term "reasonable market size."  [DX 9044A at 7; *see* GX 1-176A.]

Deutsche Bank's contracts with the Relevant Counterparties likewise did not prohibit Deutsche Bank from considering its derivatives trading positions in making its LIBOR submissions.  In fact, the trade confirmations make no mention of Deutsche Bank's LIBOR submissions; nor did Deutsche Bank make any representations, warranties or promises concerning its role as a Panel Bank.  (*See supra* § I.A.2.)  The trade confirmations also do not mention the BBA's Instructions.  (*Id.*)  Rather, the confirmations defined "USD-LIBOR-BBA" as the rate published by the BBA's publication agent without any reference as to how the BBA or its publication agent calculated the rate.  (*Id.*)

Accordingly, the Government failed to prove falsity under either of its remaining theories because no rational juror could have concluded that the BBA's LIBOR Instructions or the trade confirmations unambiguously prohibited Deutsche Bank from considering its derivatives trading positions when making its LIBOR submissions.

**B.    THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF MATERIALITY**

No rational juror could have found that the Government presented sufficient evidence to establish beyond a reasonable doubt the materiality element of the charged offenses.  *See Neder v. United States*, 527 U.S. 1, 20, 25 (1999) (holding that materiality is a requisite element of a "scheme or artifice to defraud" under the federal fraud statutes).  The materiality of an alleged false statement must be assessed from the perspective of the person to whom the statement was made.  [ECF No. 262 at 9 (citing *Universal Health*, 136 S. Ct. at 2002).]  The Court set forth the materiality standard in ruling on the parties' motions *in limine*:

> As the Supreme Court explained in *United States v. Gaudin,* 515 U.S. 506, 509 (1995), determining materiality breaks down into three questions: (1) "what statement was made;" (2) "what decision was the [recipient of the statement] trying to make;" and (3) "whether the statement was material to the decision."  A statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Id.* (quoting *Kungys v. United States,* 485 U.S. 759, 770 (1988).  In assessing materiality, the trier of fact "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *United States v. Weaver,* 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Universal Health Servs., Inc. v. United States,* 136 S. Ct. 1989, 2002 (2016)).  Therefore, to establish materiality to the BBA, the Government would have to prove that defendants and their co-conspirators' submissions had a natural tendency to influence, or were capable of influencing, the BBA's decision in setting particular LIBORs.

[ECF No. 262 at 14 (alterations in original).]   The evidence was insufficient to establish materiality either to the BBA on a non-convergent fraud theory or to a reasonable derivatives trader on a convergent fraud theory.

**1.    The Evidence Was Insufficient to Establish that Any Alleged False Statement Was Material to the BBA**

The Government failed to prove that any alleged false statement was material to the BBA because there was no evidence from which a rational juror could conclude that Deutsche Bank's consideration of its trading positions in making a LIBOR submission was capable of influencing

the BBA's setting of LIBOR. As the Government was repeatedly advised, "[t]he court had expressed considerable skepticism about the Government's ability to prove that Deutsche Bank's statements were material to the BBA — the party whose 'expectations' the Government has long represented it would have to demonstrate (*see* Nov. 30, 2017 Hr'g Tr. at 37) — without calling a witness from the BBA." [ECF No. 262 at 9.] Despite the Court's guidance, the Government opted not to call a witness from the BBA. Nor did it present any other evidence sufficient to demonstrate that the BBA expected that Panel Banks would not consider their trading positions in making their LIBOR submissions. In fact, as reflected in the CME letter, the BBA was made aware that the market understood that Panel Banks were permitted to choose among rates in the permissible range for any reason, including "arbitrary" ones. [DX 9044A at 7; *see* GX 1-176A.]

Moreover, the evidence established that the BBA adopted the trimmed mean methodology specifically because it prevented any one LIBOR submission from "materially" affecting the LIBOR rate. [DX 1171A ¶ 10.1.] In its June 10, 2008 paper—which did not change the hypothetical question posed to Panel Banks and provided only "[c]larification[s] to the definition of BBA LIBOR" [DX 9044A at 6]—the BBA wrote that:

> 3.3     The data compilation is undertaken by Reuters, on behalf of the BBA. For each currency and maturity, contributor banks submit to Reuters the rate at which a contributing bank believes it could borrow funds should it wish to do so, by asking for and then accepting inter bank offers in reasonable market size just prior to the fix time, which is 11am London time. Submitted rates are trimmed to screen out high or low rates and then the average calculated. ***The trimming process removes outlying data as well as preventing any individual bank from attempting to influence the rates***. . . .

> 10.1     Currently [LIBORs] are created by ranking the contributors, discarding the top and bottom quartiles and then averaging the 2 central quartiles. ***It is therefore difficult to influence the rates as any submitted rate that is far enough away from the average to move the fixing <u>materially</u> will be discarded***.

[DX 1171A ¶¶ 3.3, 10.1 (emphasis added).] As Mr. Curtler testified, these statements reflected that the BBA considered its trimmed mean methodology as eliminating the potential for any issue with the ultimate LIBOR fix based on the submission of a single Panel Bank:

> Q. And what the BBA said to its members, said to anybody that wants to be involved with LIBOR, said to the world, is the trimming process removes outlying data, as well as preventing any individual bank from attempting to influence rates. That's what the BBA said, right?
>
> A. Yes, they did.
>
> Q. And it was the BBA's view, based on what they thought was important, that this rule took care of issues about individual bank submissions. That's what they said, right?
>
> A. In this paper, yes, they did.
>
> Q. They said that. And the BBA, since they've been running LIBOR since, what, the '80s?
>
> A. Yes.
>
> Q. They understand how the math of LIBOR works, right?
>
> A. Yes, they do.
>
> Q. And they made a decision that for them, the trimming process is what is important with respect to any issue about an individual submission, right? That's what they said.
>
> A. I think this is the draft --
>
> THE COURT: It's a yes or a no --
>
> THE WITNESS: Yes.

[Tr. 2054:8-2055:4 (Curtler).]

In that same 2008 paper, the BBA also made clear that it did not consider a one basis point change to a LIBOR fix—let alone a change to only one of the sixteen individual LIBOR submissions, such as the one from Deutsche Bank—to be material. Specifically, the BBA considered changing its methodology for the LIBOR calculation from a trimmed mean to a

28

median in response to public criticism of LIBOR after the publication of the *Wall Street Journal* article in April 2008. [*See* DX 1171A ¶ 10.1.] After performing an analysis, the BBA rejected making such a change because it determined that "the effect of moving to a median is less than 1 basis point in major currencies and less than 2 in smaller currencies." [*Id.*; *see also* Tr. 2058:2-2059:8 (Curtler) (acknowledging that the decision not to switch to the median is reflective of the lack of importance to the BBA of a one basis point change to the LIBOR setting).] The BBA reaffirmed its decision to reject a switch to the median after receiving public comment on the issue, stating:

> The majority of respondents saw little benefit in switching to a median method. They commented that there is no real difference in the final figure whichever method is used, and changing the method of calculation would not materially add to the information available either to the market or to the FX & MM Committee. One respondent who could see a benefit considered the median method to be a more robust method of calculation, and could decrease further the effect of an outlier on the rate outcome. The FX & MM Committee have therefore decided to maintain the current trimmed mean method of calculation for producing the fix.

[GX 1-176A ¶ 3.26.]

The Government did not present evidence sufficient to prove materiality in light of the BBA's own statements. The Government did not allege that Deutsche Bank colluded with other Panel Banks in the submission of rates, and the Government presented no evidence to quantify the impact that Deutsche Bank's adjustment of its submissions had on the ultimate LIBOR rate. In fact, even in Dr. Youle's examples based on fictitious data, an adjustment of a Panel Bank's LIBOR submission of up to one basis point affected the ultimate LIBOR fix by only fractions of a basis point because of the dilutive effect of the trimmed mean methodology. [GX 1-452 at 31-32, 35-36.] Notably, Mr. King testified that he always submitted a rate that he believed to be reasonable [Tr. 583:4-19 (King)], and Mr. Curtler testified that the typical adjustment that he and

Mr. King made to Deutsche Bank's submission (not the published rate) was half a basis point [Tr. 1616:5-10 (Curtler)].

As the Court previously held, the Government cannot use the expectations of its cooperators or the counterparties to serve as a substitute for calling a BBA witness. The Court stated that "should the Government decide to prove its original non-convergent fraud theory, then it must prove that Deutsche Bank's statement were material *to the BBA*. And that evidence cannot come from its cooperators or from the counterparties." [ECF No. 262 at 14 (emphasis in original).] Dr. Youle's testimony was also insufficient to prove that the alleged false statements were material to the BBA. [*Id.* at 17 (stating prior to trial that "[e]ven the Government's proposed expert testimony on materiality *to the BBA* appears to suffer from a related flaw. . . . [The expert] testimony at best proves that LIBOR is material to the people who operate in financial markets. It does not prove that Deutsche Bank's LIBOR submissions were material to the BBA.") (emphasis in original).] The Government has thus not introduced evidence sufficient to establish materiality to the BBA on a non-convergent fraud theory.

The Government cannot avoid its burden to present evidence of materiality by relying on what the Court has referred to as a *res ipsa loquitur* materiality argument. [*See* ECF No. 262 at 17 n.6.] The Supreme Court rejected a similar argument in *Universal Health* when addressing the materiality standard in the context of a False Claim Act claim alleging that the defendant implicitly falsely represented that it complied with all statutory, regulatory, and contractual requirements in seeking payment for services to Medicaid patients. *See* 136 S. Ct. at 1999-2004. Acknowledging that "the common law could not have conceived of fraud without proof of materiality," *id.* at 2002 (internal quotation marks omitted), the Court rejected the Government's

argument that any rule violation is automatically material so long as the Government would be entitled to refuse payment if it was aware of the violation, *id.* at 2004. The Court stated:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the government regularly pays a particular type of claim in full despite actual knowledge that the requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04; *see also United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007) (stating that the simple fact that the decisionmaker required certain information to be provided "does not make any misstatement of that information *per se* material").

The Second Circuit also rejected a *res-ipsa* type materiality argument in *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ("*Litvak I*"). In that case, the Second Circuit found that the evidence was insufficient to establish the materiality element on charges that the defendant made false statements to and defrauded the Treasury Department. *See id.* at 170-74. While the evidence established that the defendant's misstatements may have negatively impacted the value of the Treasury Department's investments that he managed, the court emphasized that the relevant standard was whether the misstatements were "capable of influencing a *decision* of the Treasury." *Id.* at 172 (emphasis in original). The Second Circuit found that the evidence did not meet that standard because there was no evidence that the Treasury Department participated in any investment decisions and, as a result, any inference that the defendant's misstatements were capable of influencing a decision of the Treasury was speculative at best. *Id.*

The decisions in *Universal Health* and *Litvak I* further support the conclusion that the evidence was not sufficient to establish materiality to the BBA here. The was no evidence that the BBA considered a LIBOR submission that was influenced by the submitting bank's trading positions to be improper, or that such a submission would have had any effect on any decision that the BBA had to make in the setting of LIBOR. To the contrary, the BBA's decision not to include such a prohibition in its rules—even after publication of the *Wall Street Journal* article in April 2008—suggests that the factors that a Panel Bank used in arriving at its LIBOR submission were not material or important to the BBA. [*See* Oct. 19 Decision at 7 ("The question submitters were asked to answer in their LIBOR submissions . . . says nothing about 'unbiased and honest' estimates of borrowing costs; neither does the BBA's LIBOR definition during the period encompassed by the conspiracy").]

The BBA's disclosures regarding the process it used in monitoring the Panel Banks' LIBOR submissions provide further support for this conclusion. In connection with this process, the BBA itself advised the market that its concerns were that Panel Banks submitted rates that were "realistic" in that they did not "fluctuate" or "alter rapidly without any obvious external cause," or were not "consistent with their market activity in the relevant period." [DX 1171A ¶ 13.3.] As with the BBA's other rules, the BBA guidance concerning its monitoring of LIBOR submissions made no mention of a Panel Bank's use of trading position as a relevant consideration, and there was no evidence presented that any of the Deutsche Bank submissions at issue did not meet the BBA's "realistic" rate standard. Accordingly, the Government failed to prove that any alleged false statement in this case was material to the BBA.

### 2.  The Evidence Was Insufficient to Establish that Any Alleged False Statement Was Material to a Reasonable Derivatives Trader

The evidence was insufficient to establish that a Panel Bank's consideration of its trading positions in making its LIBOR submissions would have been material information to a reasonable derivatives trader.  The Relevant Counterparty witnesses acknowledged that they were ill-informed about the BBA Instructions, and their testimony did not prove objective materiality, especially given the evidence that the market understood that the BBA's Instructions gave Panel Banks flexibility in making their submissions.  The Government also failed to prove that any alleged false statement in the publication of LIBOR was capable of influencing the only decisions that the Relevant Counterparties were required to make—the net payment required to be exchanged under the trade confirmations.  Finally, the Government did not prove that any of the Relevant Counterparties were positioned to lose money based on a published LIBOR calculated using a Deutsche Bank submission that was influenced by a trading position.

#### a)  The Government Did Not Prove Objective Materiality

As the parties agreed during the charge conference [*see* Tr. 2571:25-2572:9], materiality must be judged using an objective standard.  *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (stating that a "'lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal'") (quoting *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013)).  As an objective standard, the materiality threshold varies with the nature of traders involved in the particular market.  *United States v. Litvak*, 889 F.3d 56, 64-65 (2d Cir. 2018) ("*Litvak II*") ("The reasonable investor in a market in which many individual investors trade will be deemed to be somewhat less schooled and sophisticated than a reasonable investor in a market, like the one now before us, in which only institutions trade with the help of

complex computer programs and professional traders."). "Materiality cannot be proven by the mistaken beliefs of the worst informed trader in the market." *Id.* at 65.

The Government relied on the subjective views of the Relevant Counterparty witnesses to prove materiality under its convergent fraud theory. The Government's ability to meet its burden using such an approach is limited, as the Second Circuit made clear in *Litvak II:*

> This approach is permissible in a case like this, but only so long as the testimony about the significance of the content of a defendant's misstatements and each trader's "own point of view" is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue. In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market.

*Id.* There is no evidence of such a nexus in this case because there was no evidence that the Relevant Counterparty witnesses fully informed themselves regarding the BBA's LIBOR Instructions; indeed, the evidence showed they were often misinformed about the BBA's rules.

The testimony of these witnesses established that their understanding of LIBOR was superficial at best. For example, Mr. Maroun testified that he did not know at the time of the trade that Deutsche Bank was on the LIBOR panel, acknowledging that he "wouldn't have contemplated it." [Tr. 1412:24-1413:2 (Maroun).] In addition, he did not know that there was no prohibition on derivatives traders serving as Panel Bank LIBOR submitters, and did not know whether he was aware that the BBA's Instructions were silent as to whether a Panel Bank could consider trading positions in LIBOR submissions. [Tr. 1462:4-6, 1463:13-20 (Maroun).]

While Ms. Konich testified that she had a basic understanding of the trimmed mean calculation, she testified that her expectation as to how LIBOR was set was that it would be "very transparent, very honest, and fair of what [large institutions'] expectations were in the market." [Tr. 2196:1-22 (Konich).] Ms. Konich, however, provided no explanation for what she considered to be "transparent," "honest" or "fair" in the context of a LIBOR submission. In fact,

when asked on direct whether it would have mattered to her had she learned Deutsche Bank submitted LIBOR to benefit its trades against her bank, she gave a conditional answer using the same unexplained terms.  [Tr. 2196:23-2197:9 (Konich) (testifying "*[i]f* we thought that the rate wasn't being set in an honest, fair and transparent way, that would have had an impact on us, yes") (emphasis added).]  There also was no evidence that Ms. Konich knew that Deutsche Bank was a Panel Bank as she was never asked that question.

Ms. Hunter's testimony also established that she had no real understanding as to how LIBOR worked.  When asked about her understanding of the LIBOR setting process at the time of the trade at issue, she testified that she "*assumed* it was an actively traded index with different tenors on the index."  [Tr. 1568:8-15 (Hunter) (emphasis added).]  But she subsequently acknowledged, "I don't know how it's actually set," and she did not learn that Deutsche Bank was a Panel Bank until recently.  [Tr. 1573:13-24 (Hunter).]  She also admitted that she had "no idea" as to whether a bank's LIBOR submissions that were made in accordance with the BBA's Instructions were accurate.  [Tr. 1574:11-13 (Hunter).]

While the three Relevant Counterparty witnesses' failure to familiarize themselves with the applicable BBA Instructions, standing alone, renders their testimony insufficient to establish objective materiality, the unreasonableness of their conduct is exacerbated by the representations and warranties in the relevant ISDA contracts.   Under these provisions, each Relevant Counterparty pledged that it was "capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of [the trade.]"  [GX 1-513 at 3 § 8(ii); GX 1-514 at 3 § 8(ii); GX 1-544 at 3 § 6(ii); GX 1-545 at 5 § 9(ii).]  Mr. Maroun testified that this representation required his bank to become fully apprised of the LIBOR process:

Q. And one of the key terms of this transaction is that you've decided to select the BBA's product called LIBOR, right?

A. Yes.

Q. So you'd agree with me, sir, that if you fulfilled your promise, Federal Home Loan Bank of Boston would have done its research and would have known every aspect of what the BBA has said about how LIBOR works, right?

A. To the extent it can be; the definitions can be vague.

[Tr. 1461:5-12 (Maroun); *see also* Tr. 1463:21-1464:6 (Maroun).]

Moreover, the CME's letter to the BBA demonstrates that a reasonable market participant would have been aware that the BBA's Instructions gave Panel Banks the flexibility to consider their trading positions in making their LIBOR submissions. [DX 9044A at 7.] The CME was not just an ordinary market participant; it ran the world's largest LIBOR-based derivatives exchange. [*See, e.g.*, Tr. 736:6-10 (King); 2060:3-14 (Curtler).] Mr. Curtler testified as follows:

Q. Chicago Mercantile Exchange is the biggest futures exchange in the world though, isn't it?

A. Yes.

Q. And the Chicago Mercantile Exchange is often referred to as the CME, right?

A. It is, yes.

Q. And they obviously, since the futures are traded on their exchange, they understand something about LIBOR, right?

A. Yes.

Q. And they are not a bank, they are not a market participant; they are actually a market, they are an exchange, right?

A. Yes, they are.

[Tr. 2060:3-14 (Curtler).] As such, the CME's view further undermines any argument that the evidence established the requisite nexus between the Relevant Counterparties' ill-informed, subjective views and the mainstream understanding of the BBA's Instructions.

Accordingly, the Government failed to present sufficient evidence to establish objective materiality on its convergent fraud theory.

> b) *The Government Did Not Prove that Any False Statement in Connection with the Publication of LIBOR Was Capable of Influencing the Net Payments Due under the Trade Confirmations*

The Government also failed to prove materiality under a convergent fraud theory because the evidence was insufficient to establish that the alleged deception was capable of influencing a "decision" that the Relevant Counterparties had to make. *See Neder*, 527 U.S. at 16; *Litvak I*, 808 F.3d at 172. The evidence established that the only decision that the Relevant Counterparties were required to make at the time of the alleged false statement—the publication of LIBOR—was the proper net payment amount to be exchanged under the terms of the trade confirmation. The evidence established that this involved a purely ministerial act of confirming that the relevant published LIBOR was used in calculating the net payment.

Specifically, all of the economic terms of the trades at issue were defined in written trade confirmations that were made part of the parties' ISDA agreement. [*See* Tr. 1413:23-1414:5 (Maroun); 2189:24-2190:11 (Konich); GX 1-513; GX 1-514; GX 1-544; GX 1-545.] The trade confirmations made no reference to Deutsche Bank's LIBOR submission or the BBA's LIBOR submission rules. [*See* GX 1-513; GX 1-514; GX 1-544; GX 1-545.] As the Court already found, "[t]here is indeed no such evidence . . . that people cared about the submissions" of individual panel banks like Deutsche Bank. [Tr. 2520:7-9.] The only number of any potential interest to a counterparty was the LIBOR fix on a given date, and this was because the trade confirmations simply required an exchange of a fixed amount for an amount calculated using the rate published by the BBA's publication agent—either Telerate or Thomson Reuters. [*See* GX 1-513; GX 1-514; GX 1-544; GX 1-545; DX 1588 at 40 § 7.1(w)(xvii).] As Ms. Konich

testified, the counterparties' decision at the time of LIBOR publication merely involved confirming that the correct rate was used in calculating the net payment to be exchanged:

> Q.  So -- and when you say you would have made a determination based upon the LIBOR set on April 12, 2006, mechanically how would that work?  Would there be access to a published LIBOR rate?
>
> A.  There would.  We would have looked it up on Telerate, and then what we would have also done is compared it back to Deutsche Bank, and we would have confirmed that we were in agreement with the amount and then later made the payment.
>
> THE COURT:  Can you explain that last part?  You would have looked at Telerate, and then you would have done what?
>
> THE WITNESS:  What we would have done is -- Deutsche Bank would have -- they would have indicated what they thought the rate was.  We simultaneously also would have looked at that same rate, made sure we were in agreement, and then confirmed the payments back and forth to each other.
>
> THE COURT: They would have said LIBOR is this--
>
> THE WITNESS: We would have confirmed it.  There's a Telerate page and a Bloomberg we would have looked and have been able to confirm it, so we do have a validating source.

[Tr. 2194:24-2195:17 (Konich).]  Accordingly, the Government failed to prove materiality under a convergent fraud theory because there was no evidence that any alleged false statement was capable of influencing a decision that the Relevant Counterparties had to make.

> c)  *The Government Did Not Prove that the Relevant Counterparties Were Positioned to Lose Money on the Trade Dates at Issue*

The Government also failed to prove materiality because it failed to introduce evidence of the net trading positions of the Relevant Counterparties.  All three Relevant Counterparty witnesses testified that the trades at issue were entered into as a hedge against another investment or asset.  [Tr. 1430:2-17 (Maroun); 1576:1-7 (Hunter); 2199:3-16 (Konich).]  As such, the Relevant Counterparties each had LIBOR-based positions going in both directions [*see, e.g.*, Tr. 1429:19-22 (Maroun) ("We certainly had transactions going in both directions . . . .")], but no

evidence was presented as to their other positions on the relevant reset dates or the impact of a LIBOR move on their overall position. As Mr. Maroun acknowledged, because he did not analyze his bank's net trading position, a higher LIBOR setting may have resulted in a net gain in his bank's overall position even though it was paying LIBOR on its trade with Deutsche Bank. [Tr. 1430:8-21 (Maroun) (admitting that "[a]ny which way could have been possible").] The Government thus failed to establish that the Relevant Counterparties were positioned to lose money based on a published LIBOR that included a Deutsche Bank's LIBOR submission influenced by a trading position.

## C. THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF FRAUDULENT INTENT

### 1. The Government Did Not Prove that Mr. Black Did Not Act in Good Faith

The evidence at trial was insufficient to establish Mr. Black's fraudulent intent because the Government failed to prove that Mr. Black knew that the alleged conduct was unlawful or to disprove that he acted in good faith. *See United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006) ("[G]ood faith constitutes a complete defense to charges of wire fraud."). As discussed in more detail below, the record contained substantial evidence that Mr. Black acted in good faith at all times. The Government did not counter this evidence or present any evidence that proved Mr. Black lacked good faith in making requests to Deutsche Bank's LIBOR submitters. As a result, the Government's assertions that Mr. Black knew that he was committing a crime were based on only speculation and surmise. *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (stating that while the Government is entitled to have "permissible inferences" drawn in its favor in opposing a motion for a judgment for acquittal, "a conviction based on speculation and surmise alone cannot stand.").

a)    *The Record Contained Substantial Evidence that Mr. Black Acted in Good Faith*

The evidence established that in making requests of the submitters, Mr. Black was doing his job as he was trained by Deutsche Bank. Specifically, the direction and training that Mr. Black received from his employer, including Deutsche Bank's senior management, was that it was proper and in accordance with the BBA's Instructions to share his trading positions with Deutsche Bank's LIBOR submitters for consideration in making the LIBOR submissions.

i.    Deutsche Bank's senior management encouraged the communications that the Government claims are criminal

Deutsche Bank's most-senior management encouraged the bank's derivatives traders and LIBOR submitters to engage in the very conduct that the Government claims to be criminal in this case. In 2005, Deutsche Bank's most-senior executives in the capital markets department, including Anshu Jain (who later became Deutsche Bank's CEO) and Alan Cloete, restructured the cash and derivatives groups within the department to promote communication between the two groups. [Tr. 1284:22-1288:19 (Parietti); 1865:1-16, 1867:15-1869:22 (Curtler).] The restructuring included reorganizing the desks such that the USD cash traders and derivatives traders in London sat side by side. [Tr. 1284:22-1285:6 (Parietti); 1871:17-22 (Curtler).] It also included setting up a weekly risk call, often chaired by David Nicholls (Mr. Black's boss's boss), involving Deutsche Bank's cash and derivatives traders in multiple offices worldwide. [Tr. 526:17-528:13, 742:3-743:14 (King); 1194:8-1196:12 (Parietti); 1682:2-8 (Curtler).] During these calls, derivatives traders were encouraged to discuss trading positions and strategies, and the LIBOR submitters were encouraged to discuss LIBOR. [Tr. 528:3-7, 742:3-9 (King); 1196:2-12 (Parietti).] The evidence that the Government presented at trial therefore demonstrated that Mr. Black was simply doing his job.

All three cooperators testified that they understood that the purpose of the restructuring was to promote the sharing of information between cash and derivatives traders, including the sharing of trading positions. Mr. Curtler testified:

> Q. Now, when the trades [*sic*] were brought together, that was part of what you've called a team-focused culture right? You wanted people to be talking, right? And that includes sharing trading positions, right?
>
> A. Yes.
>
> Q. In fact, you've explained that Mr. Nichols [*sic*], implementing Mr. Cloete and Mr. Jain's plan, wanted everyone to talk about everything, including LIBOR and trading positions, right?
>
> A. Yes.
>
> Q. Those are the instructions that came on from down high, right?
>
> A. Yes.
>
> Q. And that's what you did, right?
>
> A. Yes.
>
> Q. And the natural and probable result of those instructions was for the folks sitting next to each other to share the kinds of information that we've been talking about in this trial, right?
>
> A. Yes.

[Tr. 1870:20-1871:13 (Curtler).] Mr. Parietti echoed these sentiments in his testimony, acknowledging that he understood that "it was [his] job to share positions with the cash traders in London." [Tr. 1288:2-14 (Parietti).] Mr. King similarly testified that he understood the reason for the reorganization was to enable derivatives traders to share positions and trading strategies and to enable Deutsche Bank's submitters to share information about LIBOR. [Tr. 744:11-745:3 (King).] Therefore, while the Government attempted to cast Mr. Black's sharing of his positions as nefarious, criminal activity, the evidence demonstrates that Mr. Black was in fact performing his job as he was encouraged by his superiors.

The fact that Deutsche Bank assigned responsibility for the LIBOR submission function to employees who traded derivatives further evidences Mr. Black's good faith. It defies logic for anyone in Mr. Black's position to believe that it was wrong, let alone against the law, to share derivative trading positions when Deutsche Bank did not separate the submission and derivatives trading functions.

Mr. Curtler was clear in his testimony that he wore two hats at Deutsche Bank—one trading derivatives and one running the cash desk—and there was absolutely no segregation of duties between those two functions. [*See* Tr. 1849:14-1851:5, 1910:8-11 (Curtler).] This dual role was not kept secret or otherwise concealed at Deutsche Bank; it was authorized by senior management. [*See* Tr. 1849:14-1851:5, 1910:8-11 (Curtler).] As Mr. Curtler admitted, he was in fact "one of the biggest derivatives traders at Deutsche Bank" while fulfilling his role as "the official supervisor of the LIBOR submission process." [Tr. 1849:14-20 (Curtler).] Mr. King also maintained a derivatives trading book. [Tr. 557:9-13, 558:9-22 (King); 1850:2-4 (Curtler).] In fact, Mr. King was "encouraged to trade even more derivatives" by his superiors at Deutsche Bank, including Mr. Curtler, "over and over and over again." [Tr. 558:9-15 (King).]

Moreover, the evidence at trial demonstrated that this organizational structure was not unique to Deutsche Bank and was well-known in the marketplace. Goldman Sachs circulated an article in May 2008 that pointed out as an aside that "LIBOR fixings are submitted by a derivative trader that does not even sit on a cash desk." [GX 6-001; *see* Tr. 1997:8-18 (Curtler).] As Mr. Curtler testified, he told the Government it was "common knowledge" that panel banks considered trading positions when submitting LIBOR. [Tr. 1986:10-15 (Curtler).] Even the BBA acknowledged that LIBOR submitters at Panel Banks were also trading derivatives, and it

continued to permit the practice. In June 2008, the BBA clarified that LIBORs "must be submitted by members of staff at a bank with primary responsibility for management of a bank's cash, rather than a bank's derivative book." [DX 1171A ¶ 12.2.] The BBA plainly understood that Panel Banks had been using LIBOR submitters whose primary responsibility was derivatives trading, and rather than barring such a practice, it continued to allow LIBOR submitters to trade derivatives so long as their "primary responsibility" was on the cash desk. In fact, the BBA did not adopt a rule prohibiting LIBOR submitters from having parallel responsibility for trading derivatives until 2013—several years after the end of the alleged conspiracy. [*See* DX 151 § 4.5; Tr. 184:19-185:15 (Youle).] The BBA therefore sanctioned the setup at Deutsche Bank in which Mr. Curtler and Mr. King, two individuals tasked with trading derivatives, continued to submit LIBOR, as their "primary responsibility" was cash. [*See, e.g.*, Tr. 2069:4-2070:9 (Curtler).]

It is undisputed that Mr. Black worked closely with Mr. Curtler and Mr. King, sitting back to back with them and communicating every day. [Tr. 285:17-287:11 (King); 1611:18-1612:9, 1863:2-7 (Curtler).] Mr. Black was aware that Mr. Curtler and Mr. King, Deutsche Bank's LIBOR submitters, also traded derivatives; as evidence at trial demonstrated, this arrangement was common knowledge at Deutsche Bank and throughout the industry. This structure in and of itself evidences Mr. Black's good faith belief that there was nothing wrong with sharing his positions with the submitters because Mr. Curtler and Mr. King, in performing their LIBOR submission duties, would unquestionably know the impact that a higher or lower fixing would have on their own derivatives trading positions.

iii.      Mr. Black was trained to make requests to Deutsche Bank's LIBOR submitters as part of his job duties

The evidence that Mr. Black was trained to share his trading positions with Deutsche Bank's LIBOR submitters also showed that he acted in good faith. Mr. King testified that as a

part of his own training, he was instructed to "ask the derivative traders what they need." [Tr. 512:9-12 (King).] Following that training, he proactively reached out to derivatives traders and solicited their LIBOR requests, as did Mr. Curtler. [Tr. 512:18-22, 519:19-520:2 (King); *see also* GX 1-004; GX 1-015; DX 1018.] As Mr. King acknowledged, he "didn't need to be proactive any more once [the derivatives traders] knew the process from [him]." [Tr. 514:25-515:3 (King).]

The *de facto* training and guidance that Mr. Black and the derivatives traders received from Deutsche Bank's LIBOR submitters was Mr. Black's only LIBOR-related training. Mr. Curtler testified that he "received training in lots of different topics," but that there was no LIBOR-specific training or course on LIBOR. [Tr. 1873:5-1874:17-21 (Curtler).] Mr. King also testified that he did not have any formal LIBOR training [Tr. 500:19-501:1 (King)] and was not aware of any training related to LIBOR that the derivatives traders, like Mr. Black, received [Tr. 513:14-18 (King)]. This was confirmed by Mr. Parietti, a derivatives trader himself, who testified, "We did not receive any formal compliance training on LIBOR." [Tr. 1189:19 (Parietti).] In fact, the Court asked Mr. Parietti directly:

> [T]here were no classes or other instruction given to you other than what you learned yourself as a result of doing your job? You didn't get any other kind of training? But you are an old Army guy. The Army trains you to do every job. They send you to some kind of class. They give you instructions. They are famous for it and they do a great job. The question was did Deutsche Bank have something like that to acquaint you with LIBOR?

[Tr. 1190:1-8.] And Mr. Parietti responded, "No, your Honor." [Tr. 1190:9 (Parietti).]

In sum, the evidence demonstrated that, to the extent Mr. Black received any training relating to the LIBOR submission process, he was instructed by those responsible for Deutsche Bank's LIBOR submission function to make requests to them. A reasonable juror therefore

could not have concluded that Mr. Black acted with the requisite fraudulent intent. To the contrary, the only reasonable conclusion is that Mr. Black was just doing his job.

iv.     <u>Requests were made on recorded emails and phone calls</u>

Mr. Black's good faith was further demonstrated by evidence that neither he nor anyone else tried to hide anything in making requests in connection with the LIBOR submission process. In fact, the evidence showed that requests were made over various media known to be recorded, such as company emails and telephone lines.

Mr. King testified that "the communications with derivatives traders concerning their opinions and their trade positions occurred in the open," including "on recorded phone lines" and "on Deutsche Bank's company email system." [Tr. 555:18-556:4 (King).] Mr. King further acknowledged that even though he "knew at the time that all these conversations . . . were recorded," he never instructed his coworkers not to make LIBOR requests over recorded lines. [Tr. 556:8-557:3 (King).] Mr. King testified:

> Q. In these recorded communications, if people thought and requested that a certain tenor should be high, they said that that tenor should be high openly, right?
>
> A. Yes.
>
> Q. And if they thought it should be low or requested low, they said that openly too?
>
> A. Yes.
>
> Q. No code words.
>
> A. No.
>
> Q. No if I stand up and tug on my ear three times, then that means lower?
>
> A. No.
>
> Q. And you never said to anyone, Don't write an email if you have an opinion or request about LIBOR. You never said that?
>
> A. No.

45

Q.  Or, for heaven's sake, don't call me on a recorded line.  You never said that either?

A. No.

[Tr. 556:11-557:3 (King).]   Mr. Parietti similarly testified that he was aware that Deutsche Bank's compliance department "had the ability to review [his] phone calls and review [his] emails."  [Tr. 1289:19-22 (Parietti).]

The fact that the conduct at issue was done out in the open, via means of communication that were known to be recorded, suggests that Mr. Black did not think what he was doing was wrong and provides further evidence of his good faith.

v.    Deutsche Bank's LIBOR submitters repeatedly communicated to Mr. Black that their submissions were accurate and made in accordance with the BBA instructions

Mr. Curtler and Mr. King repeatedly stated that they believed that Deutsche Bank was setting LIBOR properly.  They made these statements to various individuals, both within the bank and without, including Mr. Black.  The fact that Mr. Curtler and Mr. King both told various people, including Mr. Black, that they believed Deutsche Bank was setting LIBOR accurately during the time period when Mr. Black was sharing his trading positions suggests that Mr. Black could not have believed that his conduct was wrong in any way.

The evidence included a series of emails that Mr. Curtler and Mr. King sent to Mr. Black and others in which they stated that their LIBOR submissions reflected their good faith estimates of borrowing and made in accordance with BBA rules.  These included the following:

- An email dated October 30, 2007 from Mr. King to several dozen recipients, including Mr. Black, in which Mr. King wrote about several LIBORs that day: "Personally i think it's too high but if that's where people are willing to / having to buy cash then that's where the libor has to be."  [GX 1-090; *see* Tr. 553:25-554:2 (King).]

- An email chain dated April 16, 2018, involving Mr. Curtler, Mr. King, Mr. Black and others, in which Mr. Curtler wrote:  "We can only speak for DB but we can assure you that cash has been trading to our name, both via the market and direct at sub LIBOR

46

fixing levels and our fixing reflects this," *i.e.*, Mr. Curtler was "saying that [Deutsche Bank's LIBOR submissions are] accurate; that the cash has been fixing at sub LIBOR levels, and our fixing goes in at those sub LIBOR levels." [GX 1-127; *see* Tr. 662:13-663:1 (King); 1948:11-1949:15 (Curtler).]

- An email chain between Mr. Curtler and Mr. King dated April 17, 2008, in which Mr. Curtler wrote: "Our 1 to 3 month libor has always reflected either where we raise cash or believe we raise cash," and Mr. King responded: "our libors have always reflected where we think we can raise cash or where we have been raising cash. as for today, i have absolutely no idea. i need to find some offers for our name." [DX 645; *see* Tr. 552:1-553:5.]

- An email chain dated December 17, 2008 involving Mr. Curtler, Mr. King and Mr. Black, in which Mr. King stated that his ability to push Deutsche Bank's one-month submission lower "[d]epend[ed] where the cash is coming," by which Mr. King meant that "[he could] only push [the submission] lower if cash was coming lower." [DX 1222; *see* Tr. 549:4-551:25 (King).]

- An email dated May 14, 2009 from Mr. Curtler to dozens of Deutsche Bank employees, including Mr. Black, stating: "Plenty of air time from DB 3mth Libor FIX yday in USD. It was knocked out of the panel on the low side but can I point out that we try and be as true as possible with the LIBOR fixings sent to BBA by DB in all ccy [currencies], rather than a fixing that 'fits' in." [DX 1240; *see* Tr.537:7-539:11 (King).]

- An email dated May 20, 2009 from Mr. Curtler to Mr. King stating: "BBA has been in today so will go through all of that today. It is my opinion we are the Bank that is 100% correct and others have followed but I do need to speak to you." [DX 1242; *see* Tr. 536:5-537:6 (King).]

- An email dated May 27, 2010 from Mr. Curtler to approximately twenty recipients including Mr. Black, in which he wrote: "With individual bank contributions to LIBOR please continue to ensure that DB LIBOR contributions remain a true reflection of the market and are based upon the BBA guidelines." [DX 1261; *see* Tr. 533:1-534:11 (King).]

Notably, the defense introduced so many emails in which Deutsche Bank's LIBOR submitters told Mr. Black and others that they were doing things correctly that the Government remarked, "[a]t some point it will be cumulative." [Tr. 537:16-18.] But these "cumulative" emails, together with the other evidence showing that Mr. Black was trained and encouraged by Deutsche Bank to make LIBOR requests of and share his trading positions with Deutsche Bank's

LIBOR submitters (who themselves traded derivatives), provided substantial evidence that Mr. Black was acting in good faith at all times.

b) <i>The Government Failed to Present Evidence to Show that Mr. Black Lacked Good Faith</i>

The Government failed to rebut the evidence of Mr. Black's good faith with any evidence showing that he knowingly and willfully did anything wrong. There was no evidence that Mr. Black made a false statement to anyone, directed others to make a false statement, or was told that the BBA Instructions *sub silentio* prohibited him from making LIBOR requests in accordance with the training and encouragement he received from Deutsche Bank.

i. <u>The Government did not offer any evidence that Mr. Black made a false statement to anyone</u>

First, there was no evidence that Mr. Black made any false statements to any counterparty. The evidence established that Deutsche Bank and the Relevant Counterparties used form ISDA confirmations with standard and defined terms to execute the derivatives trades at issue. [*See, e.g.*, Tr. 1320:10-1321:16 (Parietti); 1445:6-1447:13 (Maroun).] The Relevant Counterparty witnesses did not know Mr. Black, did not trade with Deutsche Bank's London office, and did not even interact with the derivatives traders in New York. [*See* Tr. 1413:8-9 (Maroun); 1592:11-15 (Hunter); 2207:12-19 (Konich).] The Government did not call representatives from any counterparty with whom Mr. Black traded. In fact, the Government's cooperators testified that derivatives traders typically had no interactions with their counterparties. [*See* Tr. 1322:13-20 (Parietti); 1857:1-4, 1859:16-1860:4 (Curtler).] As a result, the record contained no evidence that Mr. Black made any representation to any counterparty, let alone any misrepresentations concerning LIBOR or Deutsche Bank's submission process.

Second, there was no evidence that Mr. Black made any false statements to the BBA. The evidence showed that Mr. Black's contact with the BBA was limited to attending a few

committee meetings when Mr. Curtler was not available. [Tr. 2072:25-2073:10 (Curtler).] The record contained no evidence that Mr. Black discussed Deutsche Bank's LIBOR submission process with the BBA, or that, at the BBA meetings Mr. Black attended, anyone discussed whether Panel Banks were permitted to consider their trading positions in making their LIBOR submissions. [*See* Tr. 2072:25-2075:19 (Curtler) (discussing certain BBA meetings that Mr. Black attended at Mr. Curtler's request).]

Moreover, the evidence established that Mr. Black was not responsible for making Deutsche Bank's LIBOR submissions or selecting the rate that was ultimately submitted to the BBA. Deutsche Bank's cash desk had that responsibility: Mr. King served as the primary USD LIBOR submitter, and Mr. Curtler supervised him and the USD LIBOR submission process. [Tr. 502:24-503:9, 510:6-21 (King); 1791:22-23 (Curtler).] The evidence showed that Mr. King and Mr. Curtler (or occasionally a backup submitter from the cash desk) had the final say as to the rates that Deutsche Bank ultimately submitted, regardless of whether they received a request from Mr. Black or another derivatives trader. [Tr. 510:6-21, 640:7-9 (King); 1797:1-13, 1798:13-18 (Curtler).] In fact, the evidence established that there were times when Mr. King and Mr. Curtler disregarded requests from derivatives traders in making their submissions. [Tr. 586:5-15 (King); 1797:8-10 (Curtler).]

Accordingly, the Government failed to demonstrate that Mr. Black did not act in good faith because there was no evidence that he ever made a false statement to anyone.

ii.     There was no evidence that Mr. Black's requests did not conform to his good faith view of the market

The Government also failed to prove that Mr. Black lacked good faith because the evidence was insufficient to establish that any of his requests for "high" or "low" submissions did not correspond to his legitimate, good faith market view.

The evidence established that a derivatives trader's positions typically reflected that trader's view of the market. As Mr. Parietti testified:

Q. What I'm saying is that when you are managing your book, your market view tells you a lot about how you should be trading?

A. Yes.

Q. And your trades -- if a professional trader looks at your trades, they are going to understand that because you're taking certain positions and certain risks in your trades. That also reflects something about what you think about the market, right?

A. Yes.

[Tr. 1297:16-25 (Parietti).] In addition, Mr. Parietti testified that "hav[ing] a position doesn't mean that your market view is somehow disqualified or dishonest." [Tr. 1299:24-1300:1 (Parietti).] Similarly, Mr. Curtler testified that "the fact that somebody has a trading position doesn't mean that what they're saying about the market isn't true." [Tr. 1921:25-1922:3 (Curtler).]

In fact, Mr. Parietti testified, with "no hesitation," that Mr. Black was "a student of the market" who "had thoughtful views" [Tr. 1295:4-11 (Parietti)], a sentiment with which Mr. Curtler agreed [Tr. 1854:24-1855:5 (Curtler) (noting that Mr. Black was "a very, very thoughtful trader" who "had a very sophisticated view of the market")]. Traders "sought Mr. Black out, because [they] thought the man really was a thoughtful trader." [*See* Tr. 1855:16-19 (Curtler).] Not only was Mr. Black widely known, according to the evidence, as being a "student of the market," but his colleagues believed that the market views he shared were "candid and honest." [*See* Tr. 1300:19-21 (Parietti).] This is further evidence that Mr. Black's LIBOR-related communications consistently reflected his good faith views of the market.

Based on this evidence, the Government was required to come forward with affirmative evidence from which the jury could infer that Mr. Black's requests did not conform to his good

faith view of the market. Not only did the Government fail to do so, but the record contained substantial evidence that Mr. Black's directional LIBOR requests aligned with external market events and factors, which bolsters the conclusion that he was acting in good faith.

For example, with regard Mr. Black's September 16, 2008 request to "KEEP THE 'LED' WIDE" [*see* GX 1-188], which refers to the difference between one- and three-month LIBORs, Mr. Curtler admitted that Mr. Black's view was "objective" and that it reflected "an absolute good faith market belief," [Tr. 2040:24-2044:9 (Curtler)]. In fact, Mr. Curtler acknowledged that he shared in Mr. Black's belief, reflected in the request, that "spreads [*i.e.*, the difference between the one-month and three-month LIBOR] should be widening" due to the extreme stress in the financial markets following the collapse of Lehman Brothers the previous day. [Tr. 2044:6-9 (Curtler).] He further acknowledged that this "crucial set of facts was completely absent" from the Government's presentation of this exhibit. [Tr. 2043:7-10 (Curtler).]

There were multiple other instances in which the evidence demonstrated that the direction of Mr. Black's requests was consistent with an external market event or factor. For example, several of Mr. Black's requests for a "high" LIBOR submission occurred on year-end turn dates. [*See, e.g.*, Tr. 689:14-691:8 (King) (testifying that Mr. Black's request in GX 1-183 occurred on the four-month turn date).] On a year-end turn date, LIBOR tends to increase because banks are generally more reluctant to lend at year-end. [*See* Tr. 555:9-16. (King).] As Mr. King testified, Mr. Black had a "legitimate interest" in making sure that Deutsche Bank's LIBOR submitters did not forget to include a turn premium in their LIBOR submissions. [Tr. 691:17-24 (King).] In other instances, Mr. Black's requests were directionally consistent with the submissions of the other Panel Banks. [*E.g.*, Tr. 639:9-642:12 (King) (testifying that Mr. Black's request in GX 1-006 for a low six-month submission on April 1, 2005 was consistent with the submissions of

other Panel Banks because 14 out 16 Panel Banks lowered their submissions on that day from the day before); GX 1-455 at 1 (reflecting that Mr. Black's request for a "high" six-month submission at a certain rate was consistent with the submissions of the other Panel Banks, 13 of which increased their submission by more, and submitted a higher rate, than Deutsche Bank).]

While there were multiple instances in which evidence showed that Mr. Black's requests were made in good faith, the Government did not, for a single communication, present market data or other evidence to demonstrate the opposite, as was required to meet its burden in this case. [Tr. 2896:18-19 (Jury Charge) ("[T]he burden is on the government to prove lack of good faith, and to do so beyond a reasonable doubt.").] Because the Government did not show that Mr. Black's requests for "high" or "low" submissions did not correspond to his legitimate, good faith market views, the evidence was insufficient to prove fraudulent intent.

iii.     There was no evidence that Mr. Black ever requested that Deutsche Bank's LIBOR submitters submit a rate at which they could not hypothetically borrow cash

The Government also failed to demonstrate that Mr. Black ever requested that Deutsche Bank submit a false rate, that is, a rate that did not reflect a reasonable estimate of Deutsche Bank's hypothetical cash borrowing costs. The communications do not evidence that Mr. Black requested that Deutsche Bank submit a false or unreasonable borrowing estimate. As Mr. King conceded when looking at various of Mr. Black's requests, they did not ask that he submit a rate outside the range where Deutsche Bank could borrow cash. [*See, e.g.*, Tr. 638:25-639:8, 640:3-6 (King).] Mr. Curtler provided similar testimony, noting that he did not "have any reason to believe that [Deutsche Bank] couldn't borrow cash" at the submitted rate on any of the days in question. [Tr. 2127:13-15 (Curtler).] Not only did the Government fail to prove that Mr. Black requested the submission of a rate other than one at which Deutsche Bank could borrow cash, but the actual cash submitters confirmed that they did not recall any such request being made.

Moreover, the Government presented no other evidence to establish that Mr. Black did not believe that Deutsche Bank could not borrow at the submitted rates. While the evidence showed that Mr. Black had his own pricing tool that was more sophisticated than that used by Mr. Curtler and Mr. King [Tr. 574:12-576:5 (King); 1974:25-1975:4 (Curtler)], the Government presented no evidence that Mr. Black's requests were inconsistent with the data on which he was relying in his pricing tool. [*See* Tr. 578:9-14, 627:23-628:4 (King).] Absent such evidence, the Government failed to rebut the evidence of Mr. Black's good faith and meet its burden to establish that Mr. Black acted with fraudulent intent.

c)       *The BBA Instructions Did Not Prohibit the Conduct at Issue*

The record also is void of any evidence that Mr. Black believed that the BBA Instructions prohibited derivatives traders from sharing their views with submitters even when such views benefitted their trading positions. "[W]here, as here, a scheme to defraud is premised on an instruction—in this case from the BBA to the submitting bank—the government has the burden to negate any reasonable interpretation of the instruction that would make Deutsche Bank's submission responsive." [Tr. 2895:15-19 (Jury Charge).] The Government failed to do so.

It is indisputable that the BBA Instructions do not on their face prohibit such conduct. There was no rule prohibiting communications between derivatives traders and submitters; there was no rule prohibiting submitters from themselves trading derivatives; and there was no rule prohibiting submitters from considering trading positions in making LIBOR submissions. [GX 1-803; DX 1171A.] Because the evidence did not establish that the BBA unambiguously prohibited Mr. Black's conduct, the Government failed to prove, beyond a reasonable doubt, that Mr. Black lacked good faith.

     *d)*     *There Was No Evidence that Mr. Black Was Ever Told that*
                *Deutsche Bank's Submissions Violated the BBA's Instructions*

The Government failed to introduce evidence that Mr. Black was ever told that the BBA's Instructions prohibited the sharing of trading positions, which was necessary to rebut the evidence that Deutsche Bank's submitters repeatedly told him and others that their LIBOR submissions properly reflected an estimate of cash borrowing costs and were made in accordance with BBA rules. To the contrary, the Government's cooperators testified that they never told Mr. Black—or anyone else—that they believed what they were doing was wrong.

Mr. King provided the following testimony in connection with any email in which he solicited a New York-based trader to tell him "if you need something in particular in the libors i.e. you have an interest in a high or a low fix let me know and there's a high chance i'll be able to go in a different level" [*see* GX 1-004]:

> Q. And in doing that, you didn't say to him, "hey, I'm asking you to do something wrong with me."
>
> A. No.
>
> Q. And you didn't say that you were doing anything wrong to the other derivatives traders who you gave that same type of encouragement too [*sic*], right?
>
> A. That's right.

[Tr. 529:7-13 (King).] Mr. Curtler similarly acknowledged that he repeatedly told his co-workers that he was doing nothing wrong. [Tr. 1912:11-17 (Curtler).]

* * * *

In sum, the Government presented no evidence from which a rational juror could conclude beyond a reasonable doubt that Mr. Black did not act in good faith, especially given the evidence in the record concerning the direction and guidance that he received that the sharing of

trading positions was permissible under the BBA's Instructions. The Government therefore has not met its burden to prove the requisite fraudulent intent.

### 2. The Evidence Was Insufficient to Establish that Mr. Black Acted with Fraudulent Intent under *Countrywide*

Pursuant to the Second Circuit's decision in *Countrywide*, the evidence of fraudulent intent was insufficient because the Government's proof did not establish Mr. Black's fraudulent intent at the time he entered into any of the trades. As referenced above, one of the theories that the Government proceeded on at trial was that "Defendants made material misrepresentations directly to Deutsche Bank's counterparties when entering into swaps and other derivative transactions." [ECF No. 334 at 1.] The Court dismissed this theory at the close of the Government's case, stating:

> [T]here is not a scintilla of evidence in the record that either Mr. Connolly or Mr. Black, who, in the end, are the people I care about, knew on the day he entered into any particular trade or, in the case of Mr. Connolly, on the day somebody he supervised entered into a particular trade, that anyone from Deutsche Bank three months, six months, nine months, a year down the line, was going to be in a position to ask the submitter to manipulate the LIBOR on a reset date on that particular trade. They weren't going to know it. They couldn't know it. They couldn't foresee it. They weren't fortune tellers. It was impossible. And the evidence is entirely to the contrary, because all of the evidence demonstrates that the trader would only know on the reset date how he might want LIBOR to sit, not on the day that he entered into the trade. And it would be based on his overall position on that day and not on any individual trade. So this notion that the government can go to the jury and argue that a misrepresentation was made to induce the contract is ludicrous. And it won't be permitted.

[Tr. 2509:20-2510:18.] Based on *Countrywide*, it follows from this holding that the Government's evidence was insufficient to prove that Mr. Black acted with fraudulent intent under its remaining two theories as well—*i.e.*, (i) a non-convergent theory of fraud based on allegedly false LIBOR submissions to the BBA and (ii) a convergent theory of fraud predicated on the dissemination of false LIBORs to the Relevant Counterparties.

In *Countrywide*, the Second Circuit described the "central issue" in the case through the following hypothetical:

> Imagine that two parties—*A* and *B*—execute a contract, in which *A* agrees to provide widgets periodically to *B* during the five-year term of the agreement. *A* represents that each delivery of widgets, "as of" the date of delivery, complies with a set of standards identified as "widget specifications" in the contract. At the time of contracting, *A* intends to fulfill the bargain and provide conforming widgets. Later, after several successful and conforming deliveries to *B*, *A's* production process experiences difficulties, and the quality of *A's* widgets falls below the specified standards. Despite knowing the widgets are subpar, *A* decides to ship these nonconforming widgets to *B* without saying anything about their quality. When these widgets begin to break down, *B* complains, alleging that *A* has not only breached its agreement but also has committed a fraud. *B's* fraud theory is that *A* knowingly and intentionally provided substandard widgets in violation of the contractual promise—a promise *A* made at the time of contract execution about the quality of widgets at the time of future delivery. Is *A's* willful but silent noncompliance a fraud—a knowingly false statement, made with intent to defraud—or is it simply an intentional breach of contract?

822 F.3d at 650. The court held that the situation presented in the hypothetical did not violate the federal fraud statutes based on the common law principle that a representation is fraudulent only if made with the contemporaneous intent to defraud. *See id.* at 658-62. The court deemed this principle to be incorporated into the federal mail and wire fraud statutes, explaining that "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud. . . . [T]he proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it." *Id.* at 662.

Like the shipment of non-conforming widgets, the submission and publication of an allegedly non-conforming LIBOR—which the Government referred to pretrial as "manipulated LIBOR"—cannot support a finding of fraudulent intent under the federal fraud statutes. To meet its burden in this case, the Government instead was required to prove that Mr. Black did not

56

intend to comply with his contractual obligations ***at the time he entered into the trade confirmation***.  As the Court previously held, the Government failed to do so, which should result in the entry of a judgment of acquittal pursuant to *Countrywide*.

Moreover, the evidence was insufficient to establish that this case fell within the limited category of cases in which no proof of fraudulent intent at the time of contract is required.  *See id.* at 661 n.12.  As the *Countrywide* Court stated, those cases "involve deceptive conduct that was employed in a contractual relationship to hide breaches of contract or nonperformance."  *Id.* The Government did not present any evidence that Mr. Black made any representations to the counterparties or the BBA concerning Deutsche Bank's LIBOR submissions or the BBA's published LIBOR, let alone took affirmative steps to hide the fact that he was making requests to Deutsche Bank's LIBOR submitters.  Thus, at most, Mr. Black's conduct amounts to silent noncompliance with the terms of the trade confirmation.  As such, the evidence is insufficient to sustain a finding beyond a reasonable doubt that Mr. Black acted with fraudulent intent.

> **3.    The Government Cannot Meet Its Burden to Prove Fraudulent Intent Because It Failed to Introduce Evidence of Mr. Black's Net Trading Positions**

No rational juror could conclude that Mr. Black acted with fraudulent intent because the Government did not prove that Mr. Black's requests to Deutsche Bank's LIBOR submitters were made to benefit his trading positions.[4]  The Indictment alleged one theory of fraudulent intent: that Mr. Black knowingly and willfully caused and agreed to cause Deutsche Bank to make LIBOR submissions that "reflected rates that were designed to benefit [his] trading positions." [SI ¶ 26.]  The Government, however, presented no trade data or other evidence to show what

---

[4]      In fact, as discussed in Defendant's motion to dismiss on due process grounds filed simultaneously with this motion, the Government's own analysis showed that some of Mr. Black's requests were made opposite to his trading positions despite false representations that the Government made to the jury to the contrary.

Mr. Black's trading positions were on the days he made requests. As such, the Government failed to present sufficient evidence to establish that Mr. Black's requests were made for the only fraudulent purpose identified in the Superseding Indictment.

The evidence established that Deutsche Bank assigned its derivatives traders one or more trading books and that the impact of LIBOR on a trader's book(s) must be assessed by looking at the trader's net trading position. [*See, e.g.*, Tr. 623:17-625:10 (King) (testifying that you have to look at the "net position" to determine which way a trader's trade book is positioned); Tr. 1015:15-1016:7 (Parietti) (testifying that the determination as to whether a higher or lower LIBOR would help his trade book was "based on what the system says your total position is, considering all the deals that you have on in the book that you're trading for the bank"); 1854:2-16 (Curtler) (testifying that the way to look at the trading book is based on "net position").] To prove that Mr. Black's requests were "designed to benefit" his trading books, the Government was required to introduce evidence sufficient to establish that all of Mr. Black's requests were in the same direction as his net trading positions, *i.e.*, he was net receiving LIBOR on days when he requested a "high" submission and he was net paying "LIBOR" on days when he requested a "low" submission. The Government failed to do so.

The Government presented no trading data or other evidence to establish Mr. Black's net trading positions on the days of the requests. Despite the fact its cooperator (Deutsche Bank) maintained LIBOR-based derivatives trading data in its computer systems [*see* Tr. 803:2-11; 804:21-24 (Weston-Edwards)], the Government did not introduce any derivatives trading data at trial. In fact, the Government induced a Deutsche Bank custodian of records to sign two perjurious certifications that misrepresented certain trading data as business records of Deutsche Bank when the Government knew that not to be the case. [Tr. 804:25-815:16 (Weston-

Edwards).]   The Government therefore was unable to introduce the derivatives trading data through the Deutsche Bank custodian whom it induced to sign the false certifications and made no effort to introduce it or any other trading data through another witness.   Based on its failure to introduce any derivatives trading data, there was no evidence from which a rational juror could conclude that Mr. Black's made requests for the fraudulent purpose alleged in the Indictment.

The Government cannot get around its failure to introduce any derivatives trading data by relying on witness testimony because the witnesses testified that they lacked knowledge as to Mr. Black's net trading positions on the days of the requests.   Both Mr. King and Mr. Curtler specifically admitted that they did not know what Mr. Black's trading positions were on the days he made requests.   [Tr. 625:18-626:1 (King); 2095:8-2096:7 (Curtler).]   For example, Mr. King testified as follows:

Q.  On direct the prosecutors did not show you any trade data?

A.  No.

Q.  You didn't have access to Mr. Black's trading books, did you?

A.  I didn't.

Q.   So you don't know his net trading position on any of the days that the prosecutors discussed with you on direct; correct?

A.  That's correct.

[Tr. 625:18-626:1 (King); *see also* 1395:13-16 (Parietti) (acknowledging that he does not know the impact of trades on books other than his own).]   The witnesses for the Relevant Counterparties—who had never heard of Mr. Black and did not have any knowledge that they ever traded with him—likewise provided no evidence concerning Mr. Black's net trading positions.   [*See* Tr. 1413:8-9 (Maroun); 1592:11-15 (Hunter); 2207:12-19 (Konich).]

The Government cannot avoid its burden of introducing derivatives trading data by relying on the request chats and emails themselves because, as Mr. Curtler acknowledged, it is purely speculative to determine a derivatives trader's net trading position based on a request for a "high" or "low" LIBOR. [Tr. 1854:14-16 (Curtler).] Specifically, Mr. Curtler admitted that "you can't really tell from emails exactly what's in [a derivatives trader's] book." [*Id.*]

Moreover, with one exception, none of the requests provided any information concerning Mr. Black's net trading position. In the one exception, Mr. Black wrote to Mr. Curtler, "[l]ow 1mth today pls shag, paying on 18 bio," [GX 6-001], which Mr. Curtler interpreted to mean that Mr. Black's "reset 18 billion in 1-month where he needed a low 1-month rate." [Tr. 1721:12-14 (Curtler).] The evidence at trial showed that there were market factors that supported Mr. Black's request on this one day, and there was no countervailing evidence that this request did not conform to Mr. Black's good faith market view. [*See, e.g.*, Tr. 1991:23-1992:19, 1996:17-1997:3, 2179:14-17 (Curtler).] Leaving that aside, no rational juror could extrapolate from this one request that Mr. Black's net trading positions were in the same direction as his other requests or conclude that the Government proved beyond a reasonable doubt that the requests were "designed to benefit [Mr. Black's] trading positions" as alleged in the Indictment. Accordingly, the evidence was insufficient to establish that Mr. Black acted with fraudulent intent because the Government failed to introduce any derivatives trading data.

### D. THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE OF AN EFFECT ON A FINANCIAL INSTITUTION

The Government also failed to prove that the charged offenses affected a financial institution. Such proof is necessary to extend the statute of limitations for the charged crimes from five to ten years. *See United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (noting that 18 U.S.C. § 3293(2) extends the statute of limitations for wire fraud from five to ten years when

the fraud has a "sufficiently direct" effect on a financial institution).  In this case, absent such an extension, the two counts against Mr. Black that the jury considered are time-barred.  Although the Indictment charged a conspiracy in Count One that continued "through at least in or about 2011" [SI ¶ 25], the Government's case at trial alleged a conspiracy that ended in 2010, [*see, e.g.*, Tr. 45:1-3 (Government Opening) ("But first you're going to learn about how from 2004 through 2010, the defendants cheated others by rigging the LIBOR rate.")].  And Count Eleven, the remaining substantive wire fraud count against Mr. Black, is dated May 15, 2008.  [*See* SI ¶ 51.]  The Indictment was filed in May 2016—six years after the end of the conspiracy alleged by the Government at trial and eight years after Mr. Black's alleged substantive wire fraud—so both counts would be time-barred absent an extension of the statute of limitations.  [*See* Tr. 2898:25-2899:20; 2907:8-10 (Jury Charge) (instructing the jury that it must find an effect on a financial institution on both the substantive wire fraud counts and the conspiracy count).]  For the following reasons, the Government failed to prove that the alleged conduct affected a financial institution, requiring dismissal of the remaining counts against Mr. Black.

*First*, the Government failed to demonstrate that any of the banks identified in the Indictment were affected by the alleged conduct.  Although they are not mentioned by name, the banks that were allegedly affected by Defendants' conduct—meaning that they suffered, or were susceptible to substantial risk of, actual loss—were Bank of America, Federal Home Loan Bank of Pittsburgh, Bear Stearns, and Goldman Sachs.  [*See* SI ¶¶ 21-24, 26.]  While the Government demonstrated that each of these banks were FDIC-insured, it did not elicit testimony or introduce documentary evidence that these banks were affected by the conspiracy.  Indeed, not a single representative from any one of these four banks was called as a witness in this case.  In the

absence of such evidence, the Government has failed to carry its burden to prove that any one of the banks identified in its own Indictment were affected by Defendants' alleged conduct.

*Second*, the Government failed to demonstrate an effect—meaning a loss or substantial risk of loss—on any of the Relevant Counterparties. As a threshold matter, none of these witnesses had any interactions with Mr. Black, and none of the trades identified had the London office of Deutsche Bank as a counterparty. Moreover, each of these witnesses testified that their respective banks were hedged, meaning that the bank had structured its investments so that they were not susceptible to the requisite loss or risk of loss. [*See, e.g.*, Tr. 1430:2-17 (Maroun); 1576:1-7 (Hunter); 2199:3-16 (Konich).] Also absent from the Government's case and these witnesses' testimony was any evidence concerning the net positions of these banks on the days when the Government identified a trade. [*See, e.g.*, Tr. 1430:18-21 (Maroun) (admitting that he did not know which positions offset the trade presented).] Looking at the trades in isolation provides no insight as to whether these particular counterparty banks were exposed to any risk of loss on those dates. Therefore, on each day identified by the Government, it is just as reasonable for a juror to conclude that the testifying bank was not susceptible to any loss as it would be to conclude that there was an effect on a financial institution. In such a circumstance, the Government has not met its burden, and judgment of acquittal is appropriate. *See United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (reversing a conviction where the evidence as to an element of the charged crime was "in equipoise" and noting that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain reasonable doubt").

*Third*, the Government presented no evidence under a "self-affecting" theory that Mr. Black's alleged conduct exposed Deutsche Bank to loss or increased risk of loss.[5]  [*See* SI ¶ 26 (advancing a self-affecting theory based on Deutsche Bank's internal investigation and the penalties paid to the Government).]  As the Court noted throughout trial, the Indictment is not evidence, and while there was testimony about an investigation at Deutsche Bank, there was neither testimony nor any other evidence about its cost.  Nor was there any testimony or evidence showing a nexus between Mr. Black's alleged conduct and the investigation itself.  *See United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (requiring a "sufficiently direct" nexus between the alleged conduct and the effect on the financial institution).  The mere fact of an investigation at Deutsche Bank, without more, does not satisfy the Government's burden to prove, beyond a reasonable doubt, the requisite effect on a financial institution.

In sum, the Government failed to offer sufficient evidence that Mr. Black's alleged conduct affected a financial institution, and this failure should result in a judgment of acquittal.

### E.  JUDGMENT OF ACQUITTAL ON THE LONE REMAINING SUBSTANTIVE COUNT AGAINST MR. BLACK IS APPROPRIATE

For the reasons discussed above, Rule 29 requires a judgment of acquittal for Mr. Black on all counts.  There are specific reasons, however, why such a judgment is appropriate as to Count Eleven, the lone substantive count against Mr. Black that was considered by the jury.[6]

---

[5]  Mr. Black maintains that the self-affecting theory may not be applicable at all in this case.  While courts have applied this theory when the bank itself is a defendant or when a defendant-employee acts outside the scope of his authority, it has not been applied when a defendant-employee acts pursuant to a companywide policy set by his superiors.  *See Heinz*, 790 F.3d at 367; *United States v. Countrywide Fin. Corp.*, 961 F. Supp. 2d 598, 605 (S.D.N.Y. 2013).  That said, the lack of evidence offered by the Government in support of this theory at trial is an independent and sufficient reason for a judgment of acquittal on this point.

[6]  Mr. Black was indicted for three substantive counts of wire fraud:  Counts Four, Six, and Eleven.  Count Six alleged wire fraud based on a wire transfer payment [*see* SI ¶ 51], and based on its inability to introduce the requisite evidence to substantiate the allegations, the Government

*First*, the Government offered insufficient evidence to prove that the alleged misstatement was indeed false. The alleged misstatement(s) in Count Eleven are the rate submitted by Deutsche Bank and the resulting LIBOR fix on May 15, 2008. [*See* SI ¶ 51.] The Government failed to demonstrate that Deutsche Bank's submission or the LIBOR on that date were false.

The Government introduced an email in which Mr. Black requested a low one-month submission on May 15, 2008. [*See* GX 6-001.] On that same date, Mr. Curtler sent a "cash run" to several brokers that included the rate at which Deutsche Bank would be willing to pay for one-month cash. [DX 673; Tr. 1999:14-2001:9 (Curtler).] Mr. Curtler's cash run revealed that his one-month bid was three basis points **below** Deutsche Bank's one-month submission on that date. [DX 673; GX 1-455 at 35; Tr. 2001:4-16 (Curtler).] In other words, despite Mr. Black's request for a low LIBOR, the cash run email supported a lower LIBOR submission than the one actually made by Deutsche Bank. When confronted with this email, Mr. Curtler admitted that he did not recall where cash was trading on that day or whether he was able to borrow cash at his submitted bid rate. [Tr. 2001:17-2002:11.] Mr. Curtler further admitted that he had no basis on which to state that Deutsche Bank's one-month LIBOR submission on that date was false:

> Q. So when you set the LIBOR that day at 2.48, and the prosecutors just show you that, you can't say here today that 2.48 isn't consistent with the market factors that were occurring on that day, can you? You don't know.
>
> A. I don't know.

---

agreed to dismiss the Count at the close of its case. [Tr. 2399:12-2404:11, 2451:1-3.] With regard to Count Four, following Rule 29 argument, the Court asked the Government, "Where is the evidence of the crime that was committed in connection with the wire that was sent that day, that Mr. Black had some involvement? Where is the thing that says he made a request to the submitter on that day some hours earlier?" [Tr. 2521:20-24.] Upon hearing the Government's insufficient proffer, Count Four was dismissed as well. [Tr. 2521:25-2523:8.]

Q. So do you agree with me, sir, that you shouldn't be suggesting looking at some LIBOR chart from ten years ago what it means if you don't know what the market factors were, right?

A. No.  Correct.

[Tr. 2002:12-20 (Curtler).]  Given this testimony from the Government's cooperator, and the lack of additional evidence offered by the Government, there is insufficient evidence that Mr. Black caused to be made a false statement, which is the first element of federal wire fraud.

*Second*, there is insufficient evidence for a reasonable juror to find that Mr. Black acted with the requisite fraudulent intent on May 15, 2008.  In connection with the key email on that date [*see* GX 6-001], Mr. Curtler admitted that he "[didn't] know what was going on at the time," but that Mr. Black's request for a "low" LIBOR was in line with Goldman Sachs' contemporaneous "view [that] the market for LIBORs are going to come down."  [Tr. 1996:17-20 (Curtler).]  Mr. Curtler testified that Goldman Sachs and Mr. Black were "saying the same thing."  [Tr. 1996:25-1997:3 (Curtler).]  Indeed, when Deutsche Bank bid for cash on that day, it proposed a rate three basis points *lower* than where the Bank ultimately submitted its LIBOR, indicating that a "low" LIBOR, as Mr. Black requested, was consistent with market conditions. [*See* Tr. 1999:14-2002:20 (Curtler) (discussing DX 0673).]  This is further corroborated by the evidence that on May 15, 2008, of the fifteen Panel Banks other than Deutsche Bank, nine of them also lowered their one-month LIBOR submissions—two of them by even more than Deutsche Bank and the other seven by the same amount—and none increased its submission. [GX 1-455 at 35.]  This evidence, which went unrebutted by the Government, suggests that Mr. Black's request was done in good faith rather than with the intent to defraud some unknown, unnamed counterparty.

*Third*, the Government has not demonstrated that the Deutsche Bank submission or the LIBOR fix on that day was material.  For the reasons discussed above (*see supra* § I.B.1), there

was insufficient evidence to prove that Deutsche Bank's submission—the only statement that Mr. Black could have possibly caused to be made to the BBA—was material to the BBA. And with regard to the Government's convergent fraud theory, the Government failed to prove that Deutsche Bank's LIBOR submission or the ultimate LIBOR fix was material to the Relevant Counterparties on May 15, 2008, the only date relevant to Count Eleven. In addition to the general reasons why the Government's proof on counterparty materiality falls short (*see supra* § I.B.2), there was no absolutely evidence that the Relevant Counterparties entered into or settled trades with Deutsche Bank on May 15, 2008. [*See* GX 1-513, GX 1-514, GX 1-544, GX 1-545.] Moreover, there was no evidence that the Relevant Counterparties ever interacted with Mr. Black or Deutsche Bank's London office more broadly. [*See* Tr. 1413:8-9 (Maroun); 1592:11-15 (Hunter); 2207:12-19 (Konich).] Because materiality of a representation is judged from the perspective of the person to whom it was made and the Relevant Counterparties were not the recipient of any alleged misstatement on May 15, 2008, Count Eleven must be dismissed.

*Fourth*, as the Court has recognized, the Government's failure to introduce any data concerning Mr. Black's net trading positions is particularly problematic for meeting its burden of proof as to the substantive count. Upon learning from the Government's view that it was not required to prove Mr. Black's net notional position, the Court cautioned, "I understand that that is your position. I told you, with respect to the conspiracy count, that's one count out of 11. There are ten substantive wire fraud counts." [Tr. 897:10-12.] Later, the Court commented, "I am so astonished, because it never occurred to me in two and-a-half years that you weren't prepared to show that on a day when Mr. Black made a request -- and I've seen the emails and I've made an assumption. The assumption that I made was that the government was fully prepared to demonstrate that when he said, Hey, Edino, 1-month high, 1-month fix, that you

could look at his book on that day and see why." [Tr. 980:14-21.] At the close of its case, the Government had failed to introduce any evidence to demonstrate what was in Mr. Black's book on the date of the alleged wire fraud. Accordingly, the Government has not met its burden.

## II. MR. BLACK SHOULD HAVE HIS CONVICTION REVERSED OR RECEIVE A NEW TRIAL BECAUSE THE GOVERNMENT CONSTRUCTIVELY AMENDED THE INDICTMENT

The Government constructively amended the Indictment because it proceeded on a theory of criminality at trial that was different from that alleged in the Indictment. An indictment is constructively amended "[w]hen the trial evidence or the jury charge operates to 'broaden [] the possible bases for conviction from that which appeared in the indictment.'" *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (second alteration in original) (quoting *United States v. Miller,* 471 U.S. 130, 138 (1985)). This standard is met where the indictment fails to give a defendant notice of the "core of criminality," or the government's proof at trial "'modif[ies] essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" *Rigas*, 490 F.3d at 228 (quoting *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994)). A constructive amendment is a *per se* violation of the Grand Jury Clause of the Fifth Amendment. *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992).

Increased scrutiny is required to ensure that the Government adheres to these standards in fraud prosecutions. The Second Circuit stated:

> In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury. In order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.

*United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (citations and internal quotation marks omitted); *see Roshko*, 969 F.2d at 4-5 ("[B]ecause the fraud statutes target a broad range of conduct, it is even more critical that reviewing courts be vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions.") (citation and internal quotation marks omitted). The Government did not meet these standards in this case.

### A. THE EVIDENCE AND JURY CHARGE UNCONSTITUTIONALLY BROADENED THE POSSIBLE BASES OF CONVICTION FROM THAT ALLEGED IN THE INDICTMENT

A constructive amendment occurs where the legal theory falls outside the specific charging terms of the indictment or where a generally framed indictment does not encompass the specific legal theory or evidence used at trial. *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988); *United States v. Davis*, 2017 WL 3328240, at *33, *33 n.36 (S.D.N.Y. Aug. 3, 2017); *see also Stirone v. United States*, 361 U.S. 212, 218 (1960) ("It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another.").

Here, the Indictment brought charges based on one legal theory: a non-convergent scheme involving alleged false and fraudulent statements made to the BBA for the purpose of influencing the BBA in its setting of LIBOR. The Government, however, proceeded at trial on a second theory not encompassed in the charging terms of the Indictment: a convergent fraud scheme involving allegedly false LIBORs transmitted directly to Deutsche Bank's counterparties after the rates had been set by the BBA. [*See, e.g.*, Tr. 867:15-21 ("Our case is that the counterparties were defrauded. . . . They wouldn't have entered into a contract in the first place, and they certainly would have done whatever they could do if it made sense at the reset, if they thought that the rate would be manipulated against them. . . . [T]hat's what our case is here.").]

Not only did the Government advance both theories before the jury, but the jury was also instructed on both the non-convergent and convergent fraud theories. [*See* Tr. 2887:3-2888:10.] As such, the Indictment was constructively amended because the evidence and jury charge improperly broadened the possible bases for conviction.

The Indictment contained specific language defining the scheme to defraud. In multiple paragraphs, the Indictment described the scheme as follows:

> [T]he defendants engaged in a scheme to manipulate and attempt to manipulate benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, by the dissemination, and submission, of ***false and fraudulent statements intended to influence and manipulate the benchmark interest rates*** to which the profitability of their interest rate derivative trades . . . were tied.

[SI ¶ 25(B) (emphasis added).] The Indictment further specified that the alleged "false and fraudulent statements intended to influence and manipulate the benchmark interest rates" were Deutsche Bank's LIBOR submissions made to the BBA. [*See id.* ¶¶ 25-26.] The Indictment alleged that the object of the charged scheme was:

> to obtain money and property ***by making false and fraudulent USD LIBOR submissions to the BBA*** for inclusion in the calculation of USD LIBOR representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the submissions reflected rates that were designed to benefit their [i.e., Defendants' and coconspirators'] trading positions.

[*Id.* ¶ 26 (emphasis added).]

Despite the plain terms of the Indictment describing a single theory, the jury charge and the evidence permitted conviction on another theory involving statements made directly to the counterparties. The Court charged the jury on "an alternative theory" regarding the Relevant Counterparties. [Tr. 2887:24-2888:10 (Jury Charge).] Under this alternative theory, the Government contended that "the defendants caused false or fraudulent representations, those being LIBORs whose settings were impacted by the alleged misrepresentation that defendants

69

caused the Deutsche Bank submitters to make to the BBA, to be relayed directly to those banks by Thomson-Reuters, and that those three counterparties, the ones who testified, settled certain trades on the basis of LIBORs that had been manipulated by virtue of the alleged misrepresentations." [*Id.*] The Government also introduced evidence relevant only to this alternative theory, which included testimony from the Relevant Counterparties concerning their understanding of LIBOR and expectations in connection therewith. [*See, e.g.*, Tr. 1411:8-1412:5, 1421:24-1423:2 (Maroun); 1568:8-1569:6 (Hunter); 2196:1-2197:19 (Konich); *see also* ECF No. 262 at 13-16 (holding that the testimony of the counterparty witnesses was not relevant to prove that Deutsche Bank's statements were material to the BBA).] As demonstrated from the Indictment's description of the alleged scheme as quoted above, this "alternative theory" was not encompassed in the charges in the Indictment, and the Court recognized as much. [*See* Tr. 863:2-7 ("I know what was indicted because it is what you tried in *Allen* and what you tried in *Allen* was not the BBA as a conduit to the counterparty. It was a misrepresentation to the BBA . . . ."), 977:1-3 (distinguishing between the theory the Government was proceeding on at trial and "the indictment theory").]

Moreover, while the Indictment "describes in great detail the 'manners and means' by which defendants allegedly attempted to manipulate LIBOR using the wires," it makes no reference to making any false statements, either directly or indirectly, to the counterparties on the other side of the trading positions referenced in the alleged scheme's pleaded purpose. [*See* ECF No. 262 at 4.] Nor does it allege that any false and fraudulent statements were made after the BBA set the LIBOR underlying their trades. The list of overt acts similarly fails to reference any false statements that were alleged to have been made to the counterparties. As the Court stated:

> All of [the overt acts] relate to alleged efforts by Deutsche Bank employees to influence the LIBOR submissions that were made to Thomson Reuters, acting as

agent for the BBA, for the purpose of setting particular LIBORs on particular days. None of the identified overt acts involves the transmission of Deutsche Bank's LIBOR submissions – the only statements identified in the indictment as false and fraudulent – directly to the bank's trading counterparties, either by Deutsche Bank or by Thomson Reuters.

[*Id.* at 5.]

At bottom, the Indictment alleges only one legal theory: a non-convergent scheme based on false and fraudulent statements in the LIBOR submissions made to the BBA. As the Court plainly told the Government during its case-in-chief, "the way you indicted [the case] is that [Defendants] made a misrepresentation to the BBA." [Tr. 862:20-22.] As such, the Government was required to obtain a conviction on that theory, but the evidence and jury charge impermissibly broadened the possible bases for conviction from that contained in the Indictment. Thus, Mr. Black's constitutional rights were violated, and reversal of his conviction is required.

### B.     THE INDICTMENT WAS CONSTRUCTIVELY AMENDED BECAUSE IT FAILED TO NOTIFY MR. BLACK OF THE "CORE OF CRIMINALITY" THAT THE GOVERNMENT ATTEMPTED TO PROVE AT TRIAL

The Indictment also was constructively amended because it failed to give Mr. Black notice of the "core of criminality" on which it relied at trial. *See Rigas*, 490 F.3d at 228. The "'core of criminality' of an offense involves the essence of a crime, in general terms." *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012). It includes the specific legal theory identified in the indictment, as well as the object of the alleged offense. *See Rigas*, 490 F.3d at 228; *Roshko*, 969 F.2d at 5.

In ruling on the parties' motions *in limine*, the Court described the core of criminality alleged in the Indictment as follows:

"In sum: the detailed factual allegations underlying the indictment charges the defendants with participating in a scheme to defraud that was perpetrated (1) by making materially false and fraudulent representations about Deutsche Bank's cash borrowing costs; (2) to the BBA; (3) for the purpose of influencing its setting

of USD LIBORs (*i.e.*, that is the decision to which the false statements are material).

[ECF No. 262 at 5-6.]   As such, the Indictment failed to provide notice that the "core of criminality" involved a convergent theory of fraud involving false statements allegedly made directly to the counterparties.

The Court's prior opinions in this case make clear that the Indictment did not put Mr. Black on notice of the Government's convergent fraud theory.   For example, in ruling on Defendants' motion for a bill of particulars, the Court stated:

> The false statements specified in the Indictment ***were not made to the victims of the fraud***; rather, ***they were made to the BBA***, which unwittingly utilized those false statements to set various LIBOR benchmark rates in ways that allegedly favored DB's position in various derivatives trades, thereby causing losses to various third parties.

[ECF No. 89 at 4 (emphasis added).]   Similarly, in ruling on pretrial motions, the Court stated:

> The ***"false and fraudulent submissions" were never communicated to those counterparties***, but to the extent that they were (or might have been) used to calculate the day's LIBOR (which depended on whether they were in the mid-range of the 16 submissions for any tenor), they allegedly caused those counterparties "to be susceptible to substantial risk of loss and to suffer actual loss."

[Oct. 19 Decision at 2 (emphasis added) (quoting SI ¶ 26).]

The Court also noted the Indictment's failure to allege a convergent theory of fraud after the Government notified the Court and Mr. Black of its intent to change its theory of prosecution for the first time in a brief filed on April 16, 2018.   [*See* ECF No. 217 at 11.]   In response to the Government's expressed intention to try the case on a theory that Defendants made two different types of false statements to the counterparties rather than the BBA, the Court stated:

> Neither of these arguments is apparent from the face of the indictment. . . .

> This case has been litigated actively and vigorously since it was indicted some twenty-four months.   At no point during this time did the Government ever apprise the court that its case was predicated on the types of statements described

above. Rather, its theory has consistently been that the false and fraudulent statements made by defendants and their co-conspirators were the doctored LIBOR submissions that were made to the BBA (via Thomson Reuters) during the LIBOR-setting process. . . .

And now, a scant six weeks before trial, the Government switches horses. Whether or not the defendants feel sandbagged – and I would be surprised if they did not – the court feels sandbagged.

[ECF No. 262 at 8-9.]

The Government's shifting positions and inconsistent statements left Mr. Black in the impossible position of not knowing the theory or theories on which the Government intended to proceed until near the end of the trial. [*See* Tr. 10:25-11:7.] A little more than a month after the Government belatedly articulated its new convergent fraud theories, it represented that it was abandoning the non-convergent fraud theory alleged in the Indictment and would proceed at trial only on the two convergent fraud theories. [*See* ECF No. 272.] Specifically, during a May 22, 2018 status conference, the Court ordered the Government to disclose the theories that it would pursue at trial on or before May 29, 2018. [May 22, 2018 Tr. 4:24-6:1.] The Government ostensibly complied with the Court's order by making the following disclosure in a letter dated May 29, 2018:

[W]e intend to prove that the defendants made two types of false statements to Deutsche Bank's counterparties: (1) false statements when entering into swap transactions; and (2) biased and dishonest LIBOR submissions that went through the BBA and Thomson Reuters, acting as conduits.

[ECF No. 272 at 1.] Notably, the Court entered a judgment of acquittal on the first of these two theories at the close of the Government's case [*see* Tr. 2517:19-22], and the Government did not request that the Court charge the jury on the second of these theories, instead arguing a theory of manipulated LIBORs rather than Deutsche Bank LIBOR submissions [*see* ECF No. 334 at 3-4], presumably because there was not a shred of evidence that the Relevant Counterparties ever looked at Deutsche Bank's LIBOR submissions at all.

Nevertheless, the Government contradicted its representations to the Court and Mr. Black by submitting in early September proposed requests to charge that resuscitated the non-convergent theory of fraud. [*See* ECF No. 299 at 27 n.8 (citing *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016)).] This left Mr. Black in the untenable position of having to try this case without any idea as to which theory or theories the Government ultimately intended to pursue. The Government was still undecided as to its theory of prosecution several weeks into the trial, stating: "And so I do think the government, you know, has been seriously considering coming back to the Court saying it should go on both theories, and if you'd give us a little while longer, we'll come back." [Tr. 2028:5-8.] The Court in fact noted that "the government's intransigent refusal to try its indictment" posed a "real problem." [*Id.* at 2027:7-10.]

Mr. Black agrees. The Government's gamesmanship further eroded the basic constitutional protections guaranteed to Mr. Black under the Fifth Amendment's Grand Jury Clause. These include the right to be charged in an indictment that "'fairly informs a defendant of the charge against which he must defend,'" *Rigas*, 490 F.3d at 228 (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)), and the right to be protected from the Government "'fill[ing] in elements of its case with facts other than those considered by the grand jury,'" *Davis*, 2017 WL 3328240, at *27 (quoting *Pirro*, 212 F.3d at 92). Accordingly, the Indictment was constructively amended because it failed to notify Mr. Black that the core of criminality with which he was charged encompassed a convergent fraud scheme premised on alleged false statements to counterparties that were disseminated after the BBA had set the relevant LIBORs.

## C. THE GOVERNMENT'S EVIDENCE AND ARGUMENT AT TRIAL OPERATED AS A PREJUDICIAL VARIANCE TO THE INDICTMENT

In addition to constructively amending the Indictment, the Government's evidence and argument at trial proved materially different facts from those alleged in the Indictment, a

variance that substantially prejudiced Mr. Black. The Government's insistence on not committing to a theory of prosecution—and then undermining any commitments it ultimately made regarding which theory it would pursue—fundamentally prejudiced Mr. Black and warrants reversal of his conviction or, at the very least, a new trial.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (internal quotation marks omitted). While a constructive amendment of the indictment is a *per se* violation of the Grand Jury Clause, a variance must be prejudicial to violate a defendant's constitutional rights. *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015). A variance is prejudicial when the pleading and the proof do not substantially correspond, when the variance could have misled the defendant at trial, or when the variance could deprive the accused of his right to be protected against another prosecution for the same offense. *Salmonese*, 352 F.3d at 621-22.

As discussed above, the Government's decision to charge a non-convergent fraud, maintain such a theory for approximately two years, and then change to a convergent fraud theory recast the core of criminality charged in the Indictment and fundamentally altered the case Mr. Black was forced to defend. The Court recognized that such a change in position, at the very least, operated as a prejudicial variance and attempted to "eliminate the possibility that any variance would prove prejudicial to defendants" by adjourning trial for approximately three months, which theoretically "would give the defendants additional time to prepare to meet the Government's anticipated case." [ECF No. 262 at 13.]

Had the Government pursued the convergent fraud theory articulated to Defendants and the Court in its *in limine* briefing, such an adjournment could have potentially cured the

prejudice. But the Government could not stick to its theory. Instead, the Government's case took the following trajectory: *First*, on May 29, 2018, the Government represented that it was pursuing only a convergent fraud theory, not a non-convergent fraud theory, with the alleged false statements being representations to counterparties at the start of the contract and transmissions of manipulated Deutsche Bank LIBOR submissions to the counterparties through the BBA as a conduit. [*See* ECF No. 272 at 1.] *Second*, on September 7, 2018, the Government filed requests to charge that included the previously abandoned non-convergent fraud theory. [*See* ECF No. 299 at 29.] *Third*, on October 3, 2018, during its case-in-chief, the Government told the Court it was "seriously considering coming back to the Court saying it should go on both theories," implicitly acknowledging that it had been proceeding on only the convergent fraud theory but attempting to leave the door open to another change in position. [Tr. 2028:5-8.] *Fourth*, the Government submitted a letter on October 8, 2018, following the close of its case, requesting jury instructions on (i) a non-convergent fraud that resembled the one in the Indictment; (ii) a convergent fraud based on alleged misrepresentations to the counterparties at the start of the contracts at issue (as per the May 29, 2018 letter); and (iii) a convergent fraud theory—not set forth in its May 29, 2018 letter—based on allegedly false LIBORs, rather than allegedly false Deutsche Bank LIBOR submissions, being transmitted to counterparties via the BBA. [*See* ECF No. 334].

The Government's refusal to commit to a theory of prosecution undermined the Court's effort to guard against a prejudicial variance by giving Mr. Black additional time to prepare for trial. Even during trial, Mr. Black could not be sure what case the Government was trying. As the Court put it, the Government acted as a "shape-shifter," repeatedly undercutting and recasting its own representations to Defendants and the Court. [Tr. 362:6-18.] This slipperiness

extended to the entire presentation of evidence, with the Court concluding: "the shape shifting that this case has undergone is astonishing." [*Id.* at 820:15-16.] Where, as here, the Government pursues an "ever-shifting theory on a crucial element of the case," it creates "precisely the kind of dynamic the constructive amendment and prejudicial variance doctrines are designed to prevent," and vacatur is appropriate. *See Davis*, 2017 WL 3328240, at *29, *35. Accordingly, Mr. Black's conviction should be reversed or vacated because the Government's ever-shifting theory of prosecution prejudicially varied the Indictment.

## III. IN THE ALTERNATIVE, THE INTEREST OF JUSTICE REQUIRES DISMISSAL OR, AT A MINIMUM, A NEW TRIAL UNDER RULE 33

To the extent the Court does not dismiss the charges against Mr. Black under Rule 29, it should exercise its discretion to dismiss the Indictment or, at a minimum, grant Mr. Black a new trial in the interest of justice. Rule 33 provides the Court with "broad discretion" to set aside a jury verdict and order a new trial to "avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quotations omitted). "The Court's broad discretion empowers it to grant relief based not only on the sufficiency *vel non* of the evidence at trial but on any other circumstances that might render the trial 'essentially unfair,' including trial errors." *United States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009) (CM). In addition, "[c]ourts may not only grant a Rule 33 motion where the evidence is legally insufficient, but also where a jury's verdict is contrary to the weight of the evidence." *United States v. Valle*, 301 F.R.D. 53, 103 (S.D.N.Y. 2014) (citation omitted).

In considering a Rule 33 motion, the Court's discretion is broader than under Rule 29: the Court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Pauling*, 256 F. Supp.

3d 329, 339 (S.D.N.Y. 2017) (quoting *Ferguson,* 246 F.3d at 134. "Unlike Rule 29 . . . under which the Court view[s] the evidence in the light most favorable to the prosecution, Rule 33 permits the Court to weigh the evidence objectively." *Id.* at 340. Of course, in analyzing the evidence at trial, the Court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir. 1982). Nonetheless, the Court should grant relief under Rule 33 if, as here, there is "a real concern that an innocent person may have been convicted." *United States v. Parkes,* 497 F.3d 220, 232 (2d Cir. 2007) (quoting *Ferguson,* 246 F.3d at 134).

For the reasons stated in Mr. Black's Rule 29 motion, the trial evidence should leave the Court with serious concern that Mr. Black is innocent of the crimes with which he was charged and that there has been a miscarriage of justice in this case. The evidence at trial showed that Mr. Black did nothing more than his job as he was trained, encouraged, and directed by Deutsche Bank. There was no evidence that Mr. Black made or otherwise knew of any false statements. Nor was there evidence that the BBA interpreted its LIBOR Instructions as imposing *sub silentio* an obligation on Panel Banks not to consider their trading positions when deciding on a rate to submit from within a range of reasonable borrowing estimates. As a result, to the extent the Court does not enter a judgment of acquittal on both remaining counts against Mr. Black, it should exercise its discretion to dismiss the Indictment or grant a new trial under Rule 33.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Black's motion for a judgment of

acquittal or new trial and grant such further and other relief as may be just and proper.

Dated: New York, New York
December 10, 2018

Respectfully Submitted:

By: /s/ Seth L. Levine
Seth L. Levine
Scott B. Klugman
Miriam L. Alinikoff
Dylan A. Stern

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
slevine@levinelee.com
sklugman@levinelee.com
malinikoff@levinelee.com
dstern@levinelee.com

*Attorneys for Defendant Gavin Campbell Black*