UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )
                                        )        16-cr-370 (CM)
MATTHEW CONNOLLY AND                     )
GAVIN BLACK,                            )
                                        )
        Defendants.                     )
_____)


**UNITED STATES' RESPONSE TO DEFENDANT
GAVIN BLACK'S MOTION FOR KASTIGAR RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    I.      The CFTC's request that Deutsche Bank conduct an internal investigation by outside counsel was consistent with its role as a prudential regulator in the banking industry ................................................................................................................ 3

    II.    Other LIBOR investigations were already underway before the CFTC sent its April 19, 2010 Letter to Deutsche Bank. ....................................................................... 5

    III.   Deutsche Bank's internal investigation began before the CFTC's April 19, 2010 Letter. ............................................................................................................................... 5

    IV.   Paul Weiss's internal investigation had many aims and their client was always Deutsche Bank. ............................................................................................................. 6

    V.    Both the DOJ and CFTC investigated outside of Deutsche Bank's cooperation. ........ 7

    VI.   Gavin Black's interviews with Paul Weiss were not coerced ...................................... 9

    VII.  Gavin Black's interview with the DOJ and CFTC accompanied by his defense counsel was not coerced ............................................................................................... 12

    VIII.  Gavin Black's subsequent interview with Paul Weiss along with his defense counsel was not coerced ............................................................................................... 12

    IX.   Gavin Black does not allege, and the record is clear, that he was never threatened with the loss of his attorneys' fees if he did not cooperate. ....................................... 13

ARGUMENT ..................................................................................................................... 13

    I.      THE DEFENDANT WAS NOT "COERCED" TO GIVE A STATEMENT IN VIOLATION OF HIS FIFTH AMENDMENT RIGHTS BECAUSE HE WAS NEVER THREATENED WITH ANY ADVERSE EMPLOYMENT ACTION IF HE INVOKED HIS RIGHT TO REMAIN SILENT. ............................................... 13

        A.    The Defendant's failure to allege that anyone threatened him with termination is fatal to his *Garrity* claim ............................................................ 15

        B.    *Garrity* requires the adverse consequence to be automatic and certain – that the Defendant "may" have lost his job if he invoked his Fifth Amendment right as a result of Deutsche Bank's general policy is insufficient as a matter of law. ........................................................................................................... 18

        C.    The Defendant's *Garrity* claim also fails because no government actor pressured anyone to give the Defendant the impression that he would be fired if he did not talk ................................................................................................ 24

        D.    Under the totality of the circumstances, the Defendant's interviews with Paul Weiss were not coercive or intimidating, and his affidavit fails to carry

his burden of establishing that he agreed to an interview because he feared termination, as opposed to other reasons. .......................................................... 31

II.     A REQUIREMENT THAT THE GOVERNMENT PROVE THAT ALL GOVERNMENT AGENCIES DID NOT "OUTSOURCE THEIR INVESTIGATIVE DUTIES" TO PAUL WEISS, A PRIVATE ACTOR, CONTRAVENES SECOND CIRCUIT LAW. ............................................................ 35

III.    EVEN IF A GOVERNMENT ACTOR COERCED A STATEMENT FROM THE DEFENDANT IN VIOLATION OF *GARRITY*, THE ERROR IS HARMLESS BECAUSE THE GOVERNMENT DID NOT OFFER HIS STATEMENTS AT TRIAL. ................................................................................. 40

        A.     Because *Garrity* violations are a species of coerced confessions, trial courts in this district and others apply the remedy of suppression, not a *Kastigar* inquiry. ............................................................................................................... 40

        B.     Applying a suppression analysis, any *Garrity* violation was harmless because the Government never offered the Defendant's statements to Paul Weiss at trial. ..................................................................................................... 46

        C.     The Defendant has waived the argument that he is entitled to any remedy except barring the admission of his statements to Paul Weiss at trial. ................. 50

        D.     If the Defendant's view of the law was adopted, the low bar that he sets for assessing coercion would have ruinous consequences for corporate governance and the investigation of corporate crimes. ........................................ 52

IV.     IF THE COURT DOES FIND THAT THERE WAS A *GARRITY* VIOLATION AND THAT *KASTIGAR* APPLIES, THE GOVERNMENT SUCCEEDS IN A *KASTIGAR* FINDING ON THE PAPERS BECAUSE THE DEFENDANT'S STATEMENTS WERE FALSE DENIALS. .............................................................. 54

V.      FURTHER FACT FINDING OR HEARING ON THE QUESTION OF WHETHER THE DOJ OR CFTC "OUTSOURCED THEIR INVESTIGATIONS" IS NOT NECESSARY TO DENY THE DEFENDANT'S MOTION AND WOULD SET A PRECEDENT FOR SPRAWLING AND UNWARRANTED LITIGATION ON AN ISSUE THAT IS IRRELEVANT UNDER SECOND CIRCUIT LAW. ........................................................................ 57

VI.     THE DEFENDANT IS ALSO NOT ENTITLED TO FURTHER *KASTIGAR* RELIEF IN REGARDS TO HIS FCA TESTIMONY. ............................................. 60

CONCLUSION ..................................................................................................................... 62

# TABLE OF AUTHORITIES

**Cases**

*Blum v. Yaretsky*, 457 U.S. 991 (1982)................................................................ 14, 25

*D.L. Cromwell Investments, Inc. v. NASD*, 279 F.3d 155 (2d Cir. 2002)............................... 25, 36

*Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198 (2d Cir. 1999) ........ passim

*Gilman v. Marsh & McLennan Companies, Inc.*, 826 F.3d 69 (2d Cir. 2016) ..................... passim

*Harris v. New York*, 401 U.S. 222 (1971)................................................................ 47

*Harrison v. United States*, 392 U.S. 219 (1968) ........................................................ 43

*Kastigar v. United States*, 406 U.S. 441 (1972)................................................ 43, 44, 45

*Oregon v. Elstad*, 470 U.S. 298 (1985)................................................................ 47

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ...................................................... 32

*United States ex rel Sanney v Montanye*, 500 F.2d 411 (2d Cir. 1974)........................... 15, 19, 26

*United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015) ............................... 46, 47

*United States v. Allen*, 864 F.3d 63 (2d Cir. 2017)................................. 26, 45, 56, 60

*United States v. Balsys*, 524 U.S. 666 (1998) ......................................................... 44

*United States v. Blumberg*, No. 2:14-cr-00458-JLL (D.N.J. June 7, 2016)................................. 58

*United States v. Bowers*, 739 F.2d 1050 (6th Cir. 1984) ............................................... 16

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012) ................................................ 30

*United States v. Camacho*, 739 F. Supp. 1504 (S.D. Fl. 1990) ............................................ 26, 42

*United States v. Cosgrove*, No. 8:09-cr-00077 (C.D. Cal. May 22, 2012) ................ 17, 23, 27, 37

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988)............................................ 62

*United States v. Ferguson*, 2007 WL 4240782 (D. Conn. 2007)........................................ passim

*United States v. Garrity*, 385 U.S. 493 (1967)....................................................... passim

*United States v. Ghailani*, 743 F. Supp. 2d 242 (S.D.N.Y. 2010) ............................ 42, 43, 46, 47

*United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991) ................................................ 45

*United States v. Hubbell*, 530 U.S. 27 (2000) ........................................................ 24, 43

*United States v. Indorato*, 628 F.2d 711 (1st Cir. 1980) ............................................. 16

*United States v. Johnson*, 131 F.3d 132, 1997 WL 792443 (2d Cir. 1997) ..................... 1, 16, 17

*United States v. Kaba*, 999 F.2d 47 (2d Cir. 1993) .................................................... 32

*United States v. Kandik*, 633 F.2d 1334 (9th Cir. 1980) ............................................. 48

*United States v. Krug*, 198 F.Supp.3d 235 (W.D.N.Y. 2016) ....................................... 42

*United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976) ............................................. 3, 55

*United States v. Miller*, 382 F. Supp. 2d 350 (S.D.N.Y. 2005) .................................... 41

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) .............................................. 44

*United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) ........................................... 44, 62

*United States v. Patane*, 542 U.S. 630 (2004) ......................................................... 42

*United States v. Rivieccio*, 919 F.2d 812 (2d Cir. 1990) ............................................ 56

*United States v. Roberts*, 660 F.3d 149 (2d Cir 2011) .............................. 17, 20, 22, 41

*United States v. Schmidgall*, 25 F.3d 1523 (11th Cir. 1994) ....................................... 56

*United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011) ........................................ 56, 62

*United States v. Solomon*, 509 F.2d 863 (2d Cir. 1975) ........................................ passim

*United States v. Stein*, 233 F.3d 6 (1st Cir. 2000) .................................................... 21

*United States v. Stein*, 440 F. Supp. 2d 315 (S.D.N.Y. 2006) ................................ passim

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ..................................... 25, 27, 39

*United States v. Stevens*, 601 F.2d 1075 (9th Cir. 1979) ............................................ 38

*United States v. Tramunti*, 500 F.2d 1334 (2d Cir. 1974) .......................................... 55

*United States v. Trevino*, 215 Fed. Appx. 319 (5th Cir. 2007) ...................................................... 41

*United States v. Turner*, 936 F.2d 221 (6th Cir. 1991) ................................................................. 45

*United States v. Velasco*, 953 F.2d 1467 (7th Cir. 1992).............................................................. 57

*United States v. Vilar*, 530 F. Supp. 2d 616 (S.D.N.Y. 2008) ...................................................... 47

*United States v. Walther*, 652 F.2d 788 (9th Cir. 1981) ................................................................ 31

*UpJohn Company v. United States*, 449 U.S. 383 (1981)............................................................... 11

*Utah v. Strieff*, 136 S. Ct. 2056 (2016) ......................................................................................... 47

*Wong Sun v. United States*, 371 U.S. 471 (1963) .......................................................................... 46

**Statutes**

18 U.S.C. § 6002 ........................................................................................................................ 41, 43

18 U.S.C. § 6003 ............................................................................................................................. 45

**Rules**

Rule 12(b) ........................................................................................................................................ 50

## INTRODUCTION

The Defendant's motion for *Kastigar* relief for an alleged *Garrity* violation fails as a matter of law.  The undisputed facts and Second Circuit law present insurmountable hurdles for the Defendant at every turn.  Thus, the Court should deny the Defendant's motion for at least four independent reasons.

First, the Defendant fails to establish that he was coerced as required by *Garrity* which requires that the Defendant show that he was explicitly threatened with termination if he chose not to speak.  Here, the Defendant alleges only that he "believe[d] that, had [he] refused [to meet with Paul Weiss], it would have resulted in [his] termination from Deutsche Bank."  *See* Exhibit 16, Gavin Black Affidavit at 1.  The Defendant does not allege that he was threatened by Mr. Ricciardi of Paul Weiss or anyone else that he would be fired, or face any adverse consequence, if he did not speak to Paul Weiss.  Second Circuit law makes clear that his subjective belief is not enough to show coercion sufficient to establish a *Garrity* claim.  *See United States v. Johnson*, 131 F.3d 132, 1997 WL 792443 at *2 (2d Cir. 1997) (unpublished) (The defendant's "alleged belief that he was required to provide information to law enforcement officials, or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a Garrity inadmissibility because he was *never explicitly threatened* with termination of his employment.") (emphasis added).

Defendant's reliance on Deutsche Bank's 2007 policy is similarly unavailing because there was no certain or automatic consequence within that policy that left the Defendant with the stark choice of speak or be fired.  *See United States v. Solomon*, 509 F.2d 863, 872 (2d Cir. 1975) (In *Garrity*, "the penalty for a claim of the right to remain silent was mandatory dismissal from office, loss of accrued pension benefits, and permanent disability from state or municipal employment.  Here, there was *no certainty* what penalty NYSE would prescribe if Solomon

refused to speak."). The Defendant also fails to show—or even allege—as he must, that a government or state actor had anything to do with any supposed threat. More specifically, the Defendant does not allege, because he cannot, that the CFTC or DOJ had any hand in Deutsche Bank's policy that was adopted in 2007, long before the CFTC and DOJ investigations began.

Second, the question of whether the CFTC or DOJ "outsourced their investigations" to Paul Weiss is not the relevant legal analysis in this case. Second Circuit precedent makes clear that evaluating state action under a *Garrity* analysis should not be focused on the general relationship between the government and a private party but, instead, on the specific action challenged—that is, the interviews of Gavin Black. *See Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 206-07 (2d Cir. 1999) ("Constitutional standards are involved only when it can be said that the State is responsible for the *specific conduct of which the plaintiff complains*") (emphasis added). Here, the interviews of Gavin Black were not state action because Paul Weiss did not interview Gavin Black "but for" the CFTC's request. *See Gilman v. Marsh & McLennan Companies, Inc.*, 826 F.3d 69, 77 (2d Cir. 2016) (In *Stein*, "it was therefore found that *government compulsion was the 'but for' reason for the new Fees Policy*.") (emphasis added).

Third, even if the Defendant's statements were coerced under *Garrity*, his statements have already been suppressed as they were not admitted at trial, making his motion moot. *See United States v. Stein*, 440 F. Supp. 2d 315, 338 (S.D.N.Y. 2006) (after finding the statements violated *Garrity*, the district court suppressed them, holding that "[t]he coerced statements and their fruits must be suppressed").

Fourth, even if the Court finds both a *Garrity* violation and that a *Kastigar* remedy applies, the Defendant's motion still fails because his statements were false denials that are not

protected by *Kastigar* analysis.  *See United States v. Kurzer*, 534 F.2d 511, 518 (2d Cir. 1976) ("[I]mmunity, like the privilege itself, covers the incriminatory truth, not the exculpatory falsehood.").

Finally, because the Defendant's allegations do not clear even one of these hurdles, his motion should be denied without any further factual inquiry or hearing.  Further fact finding on the issue of whether the DOJ or CFTC "outsourced their investigations" would lead to sprawling and unwarranted litigation on an issue that is irrelevant under Second Circuit law.  Instead, the relevant facts of any involvement of the CFTC and DOJ in Paul Weiss' interviews of Gavin Black have been provided in the many motion papers and prior *Garrity* hearing, such that the Defendant's motion should be denied on the current record.

In his motion, the Defendant also asks this Court to, in essence, reconsider its prior ruling denying the Defendant's motion to dismiss the indictment on *Kastigar* grounds as it related to his FCA testimony.  Notwithstanding this request, the Defendant advances no new arguments nor points to any new facts that would warrant the Court revisiting its carefully-considered May 16, 2018 *Kastigar* ruling.  The Defendant's motion for *Kastigar* relief related to his FCA testimony should also be denied.

## **FACTUAL BACKGROUND**

I.    **The CFTC's request that Deutsche Bank conduct an internal investigation by outside counsel was consistent with its role as a prudential regulator in the banking industry.**

The CFTC provides industry oversight, engages in rulemaking, and enforces its rules—within administrative and civil frameworks—by bringing enforcement actions against individuals and companies registered with the CFTC as authorized by the Commodity Exchange Act.  Deutsche Bank is registered with the CFTC.  *See* https://www.db.com/company/en/dodd-frank-resource-centre.htm.  "In the aftermath of the 2008 financial crisis, which was caused, in

3

part, by the unregulated swaps market, President Obama and Congress enhanced the CFTC's regulatory authority with passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act)," which authorizes the CFTC to oversee the more than $400 trillion swaps market. *See* https://www.cftc.gov/About/MissionResponsibilities/index.htm. The CFTC does not have the authority to bring criminal charges and, instead, if the CFTC believes a crime has been committed, the CFTC may refer the matter to the DOJ.

At the time of the LIBOR investigations, Deutsche Bank was registered with the CFTC and thus subject to the CFTC's oversight of its swaps dealings. The CFTC began investigating the allegations of LIBOR manipulation at least by October 2008, starting with Barclays and UBS. *See* Exhibit 1, BBA Meeting Notes. As the investigations continued, the CFTC turned to Deutsche Bank, and on April 19, 2010, the CFTC sent a letter to Deutsche Bank's General Counsel for the Americas requesting, among other things, that Deutsche Bank cooperate with its LIBOR investigation and hire outside counsel to get to the bottom of what had occurred at Deutsche Bank. *See* Exhibit 2, CFTC April 19, 2010 Letter. Deutsche Bank, who had already hired Paul Weiss to represent Deutsche Bank for the LIBOR investigation, had Paul Weiss respond to the CFTC's request. *See* Trial Transcript (Tr.) 1484:20 – 1485:1 (Mr. Ricciardi testified that the internal investigation "was initiated because the CFTC wrote a letter… and said will you have your outside counsel conduct an internal investigation regarding LIBOR issues, and they said yes, and they asked us to do it. We had already been retained, but they then asked us to do the internal investigation with Slaughters in the U.K."); 1490:5-19 (Mr. Ricciardi testified "the initial question I got from the government related to doing the internal investigation. As I said, we were already representing Deutsche Bank in connection with LIBOR before CFTC asked for it. The first call did come from Joe Polizzotto to represent them in

connection with an SEC investigation. The first investigation was with the SEC. That was early 2010.").

At no time was Paul Weiss hired by the CFTC, paid by the CFTC, or owed its duty of loyalty to anyone other than Deutsche Bank. *See* Tr. 1494:2 (Mr. Ricciardi testified "[o]ur duty of loyalty was to our client Deutsche Bank."). And it was Deutsche Bank that paid for Paul Weiss's services. *See* Tr. 1518.

## II.     Other LIBOR investigations were already underway before the CFTC sent its April 19, 2010 Letter to Deutsche Bank.

Both the CFTC and the DOJ's LIBOR investigations began at other banks and did not start with Deutsche Bank. At least as early as October 29, 2008, minutes from a BBA meeting of the FX and Money Markets Advisory Panel state that the CFTC "has made requests of certain banks (registered outside as well as inside the US) to disclose all relevant information on their LIBOR rate settings." Exhibit 1, BBA Meeting Notes at 1; *see also* Exhibit 3, Barclays FINRA Summary at 2 (the summary that Barclays Bank provided to FINRA stating that in October 2008, the CFTC "sent a data request to BCI's office in New York, indicating that the CFTC was investigating London Inter-Bank Offered Rate submissions by Barclays Bank PLC."). Included in these requests for information were "the personnel responsible for fixings and all trades relevant to LIBOR." Exhibit 1, BBA Meeting Notes at 1. Also, Special Agent (SA) McGillicuddy testified at trial that the Deutsche Bank investigation was "a spin-off of another LIBOR investigation involving a different bank." Tr. 2236:22-23.

## III.    Deutsche Bank's internal investigation began before the CFTC's April 19, 2010 Letter.

Mr. Ricciardi testified that his firm was hired by Deutsche Bank in response to the SEC's investigation. Indeed, Deutsche Bank's counsel began reaching out to Michael Curtler to get up to speed about LIBOR before the CFTC sent its April 19, 2010 letter. This is evidenced by

5

internal emails at Deutsche Bank on March 12, 2010, in which Deutsche Bank's counsel

contacted Mr. Curtler to "pick his brain" regarding LIBOR in connection with the ongoing SEC

inquiry.  Exhibit 4, March 12, 2010 Email at 6.  On March 24, 2010, there were further email

discussions between Mr. Curtler and Mr. Ricciardi as well as Deutsche Bank counsel regarding

LIBOR.  *See id.* at 1-3.   The next day, Mr. Curtler emailed an employee who worked in

Deutsche Bank's compliance department to discuss the SEC inquiry, informing him that Mr.

Curtler has been told "notice will be served to himself, James King, David Sharratt, and Dave

Nicholls regarding LIBOR."  Exhibit 5, March 25, 2010 Email.

**IV.    Paul Weiss's internal investigation had many aims and their client was always Deutsche Bank.**

As Mr. Ricciardi testified, Paul Weiss's duty of loyalty was always to Deutsche Bank.

Tr. 1494:2.  Mr. Ricciardi also testified that the internal investigation had many aims and was not

focused only on responding to the CFTC's April letter request.  As Mr. Ricciardi confirmed on

cross, Paul Weiss was not solely responding to one investigation; their role was to "coordinate

the defense of multiple agencies, multiple fronts, multiple countries all at the same time."  Trans

1498:10-16.  Mr. Ricciardi also underscored how Deutsche Bank's duty to the public motivated

interviews of bank employees, saying "they're a public company, and I believe that as a

responsible public company, they wanted to know if there was any wrongdoing going on, and, if

so, take appropriate remedial steps."  Tr. 1485:7-12.  This is further evidenced by emails and call

notes.  *See* Exhibit 6, Status Tracker at 1 (a status tracker for a May 26, 2011 call between Paul

Weiss, Slaughters, and the Deutsche Bank detailing a multiplicity of regulatory LIBOR

investigations by the FSA, the CFTC, the SEC, and the Canadian Competition Bureau, as well as

a half dozen civil cases related to USD LIBOR); *see also* Exhibit 7, June 7, 2010 Email at 2 (an

email in which Deutsche Bank counsel contacted James King and David Nicholls to "loop them

6

in on the SEC and CFTC investigations" and set up a call with Paul Weiss to discuss status of the investigations' and next steps).

V.     **Both the DOJ and CFTC investigated outside of Deutsche Bank's cooperation.**

Materials already provided in discovery as well as evidence in the current record make clear that that CFTC, DOJ, and other federal government agencies investigated this case and did not simply rely on Deutsche Bank's cooperation via Paul Weiss.  To start, federal government agencies subpoenaed Deutsche Bank, requiring Deutsche Bank to provide evidence regardless of whether it conducted an internal investigation or not.  The SEC subpoenaed Deutsche Bank in August 2010, *see* Exhibit 8, SEC Subpoena; the DOJ subpoenaed Deutsche Bank on June 27, 2011, *see* Exhibit 9, DOJ Subpoena.

The CFTC and DOJ also sought information from other sources including, but not limited to: Thomson Reuters; Federal Home Loan Banks of Pittsburgh, Boston, Indianapolis, San Francisco, and Atlanta; KeyBank; the UK Financial Services Authority; the UK Serious Fraud Office; and a CFTC whistleblower.  The CFTC separately requested material and information from the BBA in September 2008.  *See* Exhibit 1, BBA Meeting Notes at 3.

And it was clear to all parties that the DOJ and CFTC were not going to simply rely on Paul Weiss interviews even before Gavin Black was interviewed by Paul Weiss because the DOJ had already begun conducting its own interviews in the other LIBOR investigations.  *See* Exhibit 11, Interviews Before November 22, 2010.  The DOJ conducted an additional approximately 22 interviews before Gavin Black's second interview with Paul Weiss.  *See* Exhibit 12, Additional Interviews Before August 25, 2011.  It is also clear that Paul Weiss and the DOJ's interest in interviews did not completely overlap.  By the conclusion of the Deutsche Bank investigation, Paul Weiss had interviewed over 70 Deutsche Bank employees, *see* Exhibit 13, Paul Weiss Interview List at 3-9, approximately 10 of which were interviewed by the Government, *see*

Exhibit 14, Interviews that Overlap Between DOJ and Paul Weiss.  And the DOJ interviewed

approximately 33 witnesses that Paul Weiss did not interview.  *See* Exhibit 15, DOJ Interviews.

Some of these interviews were done with the CFTC.  These facts alone make clear that the DOJ

and CFTC did not simply sit back and take the information that Paul Weiss provided without

doing its own extensive investigation.

In addition to interviews, testimony at trial by SA McGillicuddy established that the

Government conducted a rigorous investigation through document review, subpoenas to non-

Deutsche Bank entities, and witness interviews.  The DOJ did not limit its understanding to

materials identified by Deutsche Bank counsel.  SA McGillicuddy testified that FBI document

review was conducted initially by an FBI corporate fraud response team and later by contractors

hired for that purpose.  Tr. 2237:3-9.  In preparation for interviews, the DOJ sought out relevant

documents using targeted review that included searching the custodial field for the interview

subject and searching e-mails sent by or sent to the individual in conjunction with LIBOR-related

search terms.  Tr. 2241:2-22.  SA McGillicuddy also testified that the case team went beyond

Paul Weiss to obtain documents, explaining "we sometimes subpoenaed and sometimes got

information voluntarily from a lot of Deutsche Bank's counterparties.  We also subpoenaed

Thomson Reuters for LIBOR submission data."  Tr. 2238:2-4.

Indeed, the Deferred Prosecution Agreement between the DOJ and Deutsche Bank shows

that Deutsche Bank was not taking orders from the DOJ:

> Although Deutsche Bank's cooperation was often helpful, Deutsche Bank's
> cooperation also fell short in some important respects. First, Deutsche Bank was
> slow to cooperate fully with the Department's investigation. For example,
> Deutsche Bank did not timely produce certain information, including key
> information related to Deutsche Bank's Euro traders. As another example, in a
> telephone conversation, two executive level managers discussed knowing that the
> Department asked for relevant information and that the information had been
> withheld from the Department and other U.S. authorities while acknowledging

they probably would have to give the information to the European Union. Second, Deutsche Bank was not, by comparison to previously settling institutions, proactive in its investigation and disclosure. For example, Deutsche Bank's conduct included interbank coordination between it and other institutions, but it was the other institutions, not Deutsche Bank, that provided that information to the Department. Third, Deutsche Bank's investigation was hampered by numerous unintentional but significant mistakes in the preservation, collection, and production of documents, audio, and data. For example, Deutsche Bank destroyed thousands of hours of potentially responsive audio recordings due to the negligent execution of certain discovery holds. As another example, Deutsche Bank discovered an important communications platform more than two years after receiving the Department's initial request for information, which platform contained some of the most explicit documents. Fourth, Deutsche Bank caused the Department to be misinformed that the bank was not permitted to provide to the Department a report by Deutsche Bank's primary domestic regulator, BaFin, that discussed shortcomings in Deutsche Bank's internal investigation of IBOR related misconduct. Despite these shortcomings, Deutsche Bank's cooperation improved markedly over time.

Exhibit 27, Deutsche Bank and DOJ DPA at 4-6.

### VI.   Gavin Black's interviews with Paul Weiss were not coerced.

Gavin Black was not coerced into sitting for his November 22, 2010, August 25, 2011, or June 19, 2012 interviews with Paul Weiss.  Even according to Gavin Black, he was not told he would be fired or threatened with any economic consequence by Paul Weiss or Deutsche Bank.  *See* Exhibit 16, Gavin Black Affidavit.  In fact, he does not even allege that he asked about potential consequences if he did not want to speak with Paul Weiss.  *See id*.  Mr. Ricciardi confirms that at no point was Gavin Black threatened that if he did not speak with Paul Weiss, he would be fired.  *See* Tr. 1488: 14-25 (Mr. Ricciardi testimony: "Q. Now, leading up to these interviews, were there any Deutsche Bank employees that had been terminated for not sitting for an interview? A. No. Q. Were Deutsche Bank employees given any specific guidance on whether they would be terminated or not if they chose to sit for the interview? A. Not to my knowledge. Q. During these interviews, did Mr. Black ask you any questions about whether he would be terminated if he didn't sit for the interview? A. No.").  Mr. Ricciardi also confirmed that the DOJ

9

did not ask Paul Weiss to fire Gavin Black. *See* Tr. 1542: 6-12 (Mr. Ricciardi testimony: Q. Did the DOJ ask you to fire Gavin Black? A. No.).

There is no evidence, and the Defendant has not even alleged, that the DOJ or CFTC took any position on whether Gavin Black would be fired or face any other adverse consequence if he did not sit for the interviews with Paul Weiss. Instead, the only fact that the Defendant points to—in his briefing—for his basis of economic coercion is a 2007 Deutsche Bank policy that states that an employee "must fully cooperate with Compliance and other appropriate Deutsche Bank departments (e.g., Legal, Group Audit, etc.) handling internal and external examinations, investigations and other reviews involving Deutsche Bank, its customers and other related company activities." Exhibit 17, Deutsche Bank 2007 Core Principles at 7.[1] Before Deutsche Bank's Core Principles policy lays out approximately 35 directives to its employees—one of which is the above directive that they cooperate with Compliance and Deutsche Bank departments—the policy states as a general matter that:

> Employees who violate Deutsche Bank's policies *may* be subject to disciplinary action up to and including termination of employment. In addition, violations or suspected violations of laws, rules or regulations may result in referral to the appropriate regulatory authorities. In certain instances, violations may result in criminal and/or civil penalties, including imprisonment.

*Id*. at 5 (emphasis added).

---

[1] The Defendant misstates the policy in his motion to say that an employee "must fully cooperate with Compliance and other appropriate Deutsche Bank departments (e.g., Legal, Internal Audit, etc.) *handling internal and external investigations* and other reviews," *see* ECF No. 232 at 11 (emphasis added), when the policy actually states "must fully cooperate with Compliance and other appropriate Deutsche Bank departments (e.g., Legal, Group Audit, etc.) handling *internal and external examinations,* investigations and other reviews." Examinations include the more routine audit examinations described in the policy while the Defendant's version of "external investigations" leads the reader to believe the policy specifically addressed external investigations like Paul Weiss's.

Notably, Gavin Black does not even allege in his affidavit that he had read this policy at the time or even knew of its existence or general guidance.  *See* Exhibit 16, Gavin Black Affidavit.  Instead, the record is clear—and Gavin Black does not dispute—that no one raised the policy at the interview.  In fact, at the beginning of each interview, Gavin Black was given an *UpJohn* warning, pursuant to *UpJohn Co. v. United States*, 449 U.S. 383 (1981).  Tr. 1487:8-16 (Mr. Ricciardi testified that his colleague "gave [Gavin Black] a standard *Upjohn* warning where he explained to him that we were counsel to Deutsche Bank, we were not his lawyer, and that the privilege belonged to Deutsche Bank. Deutsche Bank could choose to waive the privilege. He would have no say in whether or not the privilege would be waived; that there were investigations pending, and if Deutsche Bank chose to, they could share the information with the governments doing the investigations.").

And in this interview, Gavin Black did not admit any conduct but, instead, made false denials.  *See* Exhibit 18, September 8, 2016 Ricciardi 302 at 2 ("Black adamantly stated he was not aware of any attempts to influence DB's LIBOR rates. He was also adamant that he understood that influencing a LIBOR setter to help trading positions would be wrong."; "Black was adamant that he never spoke with King or Curtler on what they intended to submit. They might have known he had a position open but he never asked them to help him with submissions." "Black stated neither King nor Curtler ever solicited his needs or desires related to the setting of a LIBOR rate. His discussions with King and Curtler were strictly related to transactions they were seeing in the market that constituted market color." "Black was adamant that he never said anything to either Curtler or King that even suggested where he would want them to set LIBOR rates.").

11

VII.   **Gavin Black's interview with the DOJ and CFTC accompanied by his defense counsel was not coerced.**

Most telling about the DOJ and CFTC's possible outsourcing of their investigations, and specifically as it relates to the challenged action of his "coerced interview" at issue in this motion, is that after receiving Paul Weiss' description of Gavin Black's interview statements (*i.e.*, a download), the DOJ and CFTC still sought to interview Gavin Black directly.  That is, the DOJ and CFTC were not content to simply take the download of Gavin Black's interview with Paul Weiss but, instead, worked with Gavin Black's counsel at the time to set up a separate interview and traveled to London for it.  *See* Exhibit 20, Gavin Black 302.  This interview included representatives from both the CFTC and DOJ, and did not include Paul Weiss.  *See id*. at 1.

In this interview, Gavin Black largely relayed the same exculpatory denials to the DOJ and CFTC as he had to Paul Weiss.  *See id*. at 5 ("Black would occasionally volunteer a view of where a particular rate might be; generally his view of this would be informed by price changes in the products Black was trading. Black's view on where LIBOR should be would be based on Black's interpretation of markets."); *id*. ("Derivative trading positions were not something that was included as a factor in submitting LIBOR; this extends to MMD positions and cash positions. Black assumed LIBOR submissions were based on a fair and accurate representation, which does not include the bank's trading positions. Black did not ever request that the bank accommodate his trading positions in their submission of LIBOR.").

VIII.   **Gavin Black's subsequent interview with Paul Weiss along with his defense counsel was not coerced.**

After sitting for an interview with the DOJ, Gavin Black, yet again, sat for an interview with Paul Weiss on December 4, 2014.  He makes no allegation that he was directly threatened that he would be fired at this interview either.  Gavin Black, at this time, had both a U.K. and a

U.S. lawyer, and yet, once again, voluntarily sat for an interview with Paul Weiss. Indeed, he had his personal U.S. defense counsel present for this interview with Paul Weiss and, yet, he did not allege that he asserted his Fifth Amendment right not to speak or allege that he even asked questions about potential economic consequences.

IX.     **Gavin Black does not allege, and the record is clear, that he was never threatened with the loss of his attorneys' fees if he did not cooperate.**

The Defendant also does not allege at any point—in his briefing or in his affidavit—that Paul Weiss, Deutsche Bank, the DOJ, the CFTC, or anyone else ever threatened to, or took, any action to stop Deutsche Bank from paying his attorneys fees if he did not speak with Paul Weiss. And it is clear that refusing to cooperate with the DOJ or CFTC's investigations never jeopardized the Defendant's receipt of attorneys' fees as the Defendant chose not to cooperate and Deutsche Bank continued to pay the Defendant's attorneys' fees at least through this trial.

## ARGUMENT

I.     **THE DEFENDANT WAS NOT "COERCED" TO GIVE A STATEMENT IN VIOLATION OF HIS FIFTH AMENDMENT RIGHTS BECAUSE HE WAS NEVER THREATENED WITH ANY ADVERSE EMPLOYMENT ACTION IF HE INVOKED HIS RIGHT TO REMAIN SILENT.**

A *Garrity* violation cannot be found where a defendant is not threatened with the specific, direct choice of speak or face the automatic punishment of being fired. The Court's analysis of the Defendant's Fifth Amendment claim should start and stop with Mr. Ricciardi's undisputed testimony that no one ever threatened the Defendant with termination if he invoked his right to remain silent. Here, the undisputed facts and even the Defendant's allegations fall short, as Gavin Black's own affidavit does not include any statement at all akin to anyone having threatened him with any adverse economic consequence if he did not speak with Paul Weiss. His reliance on Deutsche Bank's 2007 policy as providing that threat is equally misplaced as it does not present a threat of automatic termination if he refused to speak.

13

Further, such a threat must have been made because a government or state actor pressured Paul Weiss or Deutsche Bank to do so. The thrust of *Garrity* is that a government actor cannot use coercive means to force an individual to speak—in violation of his Fifth Amendment right—and that, when it comes to private parties, a government actor cannot end-run this prohibition by getting a private party to take coercive actions to force incriminating statements. That is, to violate *Garrity* through private party action, not only did that private party have to engage in conduct that was coercive, but a government actor must have been the one driving that coercive conduct, pressuring the private party to force the defendant to speak by threatening adverse economic consequences.

Thus, Second Circuit precedent makes clear that a *Garrity* claim cannot succeed unless the defendant receives: 1) an explicit threat 2) of an automatic adverse employment consequence 3) that was issued at the behest of a government actor. The Defendant has failed to establish even one of these elements. It is undisputed that nobody—not anyone from the DOJ, CFTC, Paul Weiss, nor Deutsche Bank—threatened Gavin Black with termination. Further, Deutsche Bank's 2007 policy did not *automatically require* termination for non-compliance with a bank inquiry. The Government does not dispute[2], for the purposes of this motion, that the CFTC effectively suggested Deutsche Bank to interview Gavin Black. But the Government does not intrude on a defendant's Fifth Amendment rights by requesting a company to interview an

---

[2] While the CFTC did not ask Paul Weiss to specifically interview Gavin Black, the CFTC did ask that they interview relevant derivatives traders, and it was Deutsche Bank that identified Gavin Black, by Michael Curtler as one of the relevant derivatives traders. *See* Exhibit 24, CFTC July 14, 2010 Letter; Exhibit 25, November 15, 2010 Curtler Email. However, for purposes of this motion the Government does not dispute that the CFTC requested that Paul Weiss interview Gavin Black. While the Government believes that distinction matters under *Blum v. Yaretsky*, 457 U.S. 991 (1982) and its progeny, *see* ECF No. 333, it now does not dispute the distinction for purposes of this motion.

14

employee unless it is behind the company giving the employee a choice between automatic

termination and waiving his right to remain silent (*i.e.*, the coercion).  That is, the Defendant

cannot satisfy the Fifth Amendment's state action requirement by showing that the CFTC asked

that he be interviewed – rather, the Defendant must show, at a minimum, that a government actor

was driving any threat that refusal to give a statement would be met with termination.  This did

not happen, and is not even alleged to have happened in this case.

### A.  The Defendant's failure to allege that anyone threatened him with termination is fatal to his *Garrity* claim.

The Defendant's subjective belief, even if reasonable, that he would be fired if he did not

speak with Paul Weiss is not enough to establish coercion.  Instead, he had to be affirmatively

told[3] that if he did not speak, he would be terminated.  In *United States v. Garrity*, the Supreme

Court held that the defendants' confessions were coerced because they faced the stark choice of

either incrimination or automatic and mandatory termination, as set forth in N.J. Rev. Stat. §

2A:81-17.1 (Supp. 1965).  385 U.S. 493 (1967).  *Garrity*'s holding turned on the fact that the

officers were expressly threatened with certain termination if they did not talk.  The Court's

opinion makes this clear by framing the question presented as "whether a State, contrary to the

requirement of the Fourteenth Amendment, can use the *threat* of discharge to secure

incriminatory evidence against an employee," and by emphasizing, in the second paragraph of

---

[3]This can be in the form of a spoken threat, written threat, or policy but it must have a direct and automatic consequence, as discussed in greater detail below in Section I.B.  Deutsche Bank's policy is not a sufficient to show such a threat.  *Cf. United States ex rel Sanney v Montanye*, 500 F.2d 411, 413 (2d Cir. 1974) (where a policy served as the basis of the threat, the court found the state had involved itself in the private actors use of that policy and the policy itself would have automatic consequences relating to defendant's employment); *Solomon*, 509 F.2d at 871 (interpreting *Montanye*).

the opinion, that the defendant was specifically warned that "if he refused to answer he *would* be subject to removal from office." *Id.* at 494, 499 (emphasis added).

The appellate courts, including the Second Circuit, have interpreted *Garrity* as requiring proof that a government agent expressly threatened the defendant with certain adverse consequences if he did not talk.  In *United States v. Indorato*, the First Circuit rejected a police officer's contention that his incriminating statement to a superior was coerced because departmental regulations required the dismissal of any officer who refused to obey a lawful order.  628 F.2d 711, 715 (1st Cir. 1980).  In doing so, the panel held:

> In all of the cases flowing from *Garrity*, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure.  In this case, there was no explicit "or else" choice and no statutorily mandated firing is involved.  We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity*'s cloak of protection.

*Id*. at 716.  In *United States v. Johnson*, an unpublished opinion that is directly on point, the Second Circuit applied *Indorato* and made clear that proof of an explicit threat is required: "[t]he district court was correct that Johnson's alleged belief that he was required to provide information to law enforcement officials, or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility because he was *never explicitly threatened* with termination of his employment." *United States v. Johnson*, 131 F.3d 132, 1997 WL 792443 at *2 (2d Cir. 1997) (unpublished) (emphasis added); *see also United States v. Bowers*, 739 F.2d 1050, 1056 (6th Cir. 1984) ("Unlike the defendants in *Garrity*, Bowers was not told by agent Layman that he would be disciplined if he refused to answer questions.  In fact, Layman testified that *discipline would not necessarily have followed* had Bowers refused to cooperate.") (emphasis added); *United States v. Stein*, 440 F. Supp. 2d 315,

331 (S.D.N.Y. 2006) (suppressing statements where KPMG threatened to cut off a defendant's legal fees and "*explicitly threatened* to fire him if he did not waive his constitutional rights and proffer.") (emphasis added).

Absent a specific threat, the Defendant's subjective belief that he would be fired if he did not speak is not enough to prove coercion under *Garrity*. *See Johnson*, 131 F.3d 132, 1997 WL 792443 at *2 ("his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility"); *see also United States v. Solomon*, 509 F.2d 863, 865 (2d Cir. 1975)[4] (holding that there was no coercion where *Solomon*—like Gavin Black in this case— alleged that he spoke with the NYSE under threat of economic harm because he "was aware of" the NYSE's policy that they were "empowered to suspend [him] if [he] refused to cooperate and answer all questions."); *United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) (requiring that defendant show "a significant *threat* of economic harm") (emphasis added); *United States v. Ferguson*, 2007 WL 4240782 *5 (D. Conn. Nov. 30, 2007); *United States v. Cosgrove*, No. 8:09-cr-00077, 8 (C.D. Cal. May 22, 2012) (attached as Exhibit 10) ("The Court concludes that even if there were both a subjective and reasonably objective belief of job loss, that would still be insufficient to establish the requisite coercion.").

While Gavin Black's affidavit attests that he was worried about potential negative consequences if he did not meet with Deutsche Bank's lawyers, he does not allege that he was threatened in any way with termination if he did not talk. And Mr. Ricciardi's testimony

---

[4] While Solomon had asserted 'Mr. Pape and his cohorts in the off-the-record discussions which preceded their formal interrogation, also reminded me of the sanction of suspension which would be imposed if I did not testify' the Court found that "[t]he warning given by Mr. Pape at the beginning of the on-the-record interrogation mentioned suspension or expulsion only in the context of a misstatement upon a material point" not if he did not speak. *Solomon*, 509 F.2d at 865.

confirmed that he did not issue such an express, nor any implicit, threat and was not aware of anyone at Deutsche Bank doing so either.  *See* Tr. 1488:14-25.  Gavin Black does not allege in his affidavit, and there is no evidence to suggest, that Mr. Ricciardi even referenced the Deutsche Bank policies requiring cooperation.  The absence of any threat whatsoever, standing alone, resolves the *Garrity* issue in the Government's favor.

> **B. *Garrity* requires the adverse consequence to be automatic and certain – that the Defendant "may" have lost his job if he invoked his Fifth Amendment right as a result of Deutsche Bank's general policy is insufficient as a matter of law.**

The Defendant's reliance on Deutsche Bank's policy to meet the Second Circuit's standard of showing a sufficient threat also fails as a matter of law.  The argument fails because termination was not a *certain* consequence of invocation of his right to remain silent under Deutsche Bank's policy.  The Defendant's argument that he faced termination relies solely on Deutsche Bank's 2007 Core Principles, which indicate that employees "may" be subject to disciplinary action for non-compliance.  Before Deutsche Bank's Core Principles policy lays out approximately 35 directives to its employees—one of which is the above directive that they cooperate with Compliance and Deutsche Bank departments—the policy states as a general matter that "[e]mployees who violate Deutsche Bank's policies *may* be subject to disciplinary action *up to* and including termination of employment."  Exhibit 17, Deutsche Bank 2007 Core Principles at 5 (emphasis added).  Thus, the potential repercussions are not even specific to the directive that an employee cooperate with Deutsche Bank Compliance and Legal.  Indeed, Mr. Ricciardi testified that employees must cooperate with internal investigations "or they could be subject to disciplinary action."  Tr. 1542: 23-24.  As the following authorities make clear, "may," "up to," and "could be" and unspecified "disciplinary actions" are not good enough to establish coercion for *Garrity* purposes.

18

The choice faced by the defendants in *Garrity* was certain: either talk or lose your job. The Court made clear that the New Jersey Statute at issue made the sanction automatic. 385 U.S. at 494 n.1. Second Circuit decisions applying *Garrity* require the defendant to show certain—not possible or even likely—termination in response to silence. In *United States ex rel Sanney v Montanye*, the Second Circuit held that the interview (polygraph) was directly connected to the defendant's "qualifying for the position" such that his refusal to sit for the polygraph would result in losing the job, consistent with the requirement that the defendant face an explicit threat of economic harm. 500 F.2d 411, 413 (2d Cir. 1974). The *Montanye* court ultimately held that while termination would have been an automatic consequence for the defendant's invocation of his Fifth Amendment right, there was no *Garrity* violation because the loss of a transient employment opportunity was not the sort of economic sanction envisioned by *Garrity*. *Id.*

In *United States v. Solomon*, the Second Circuit held that a securities broker's statements to the New York Stock Exchange (NYSE) were not coerced because it was not certain that the NYSE would revoke his license if he remained silent. 509 F.2d 863, 872 (2d Cir. 1975). The NYSE policy provided that members who refused information or testimony "may be suspended or expelled." [5] The Second Circuit distinguished *Garrity*, where "the penalty for a claim of the right to remain silent was mandatory dismissal from office, loss of accrued pension benefits, and permanent disability from state or municipal employment. Here, there was *no certainty* what

---

[5] The policy in *Solomon* stated "Whenever it is adjudged in a proceeding under this Article that a member, allied member or approved person has been required by the Board or any committee, officer or employee of the Exchange authorized thereby . . . to furnish information to or to appear and testify before or to cause any such employee to appear and testify before the Board or any such committee, officer, or employee and has refused or failed to comply with such requirement, such member or allied member may be suspended or expelled and such approved person may have his approval withdrawn." *Solomon*, 509 F.2d at 865. This policy is similar to that in Deutsche Bank as the adverse consequence in both "may" occur.

penalty NYSE would prescribe if Solomon refused to speak." *Id*. (emphasis added); *see also*

*Roberts*, 660 F.3d at 156-7 (citing Solomon for the proposition that there can be no coercion

"where the record demonstrates 'no certainty what penalty' [the] employer might prescribe").

Like the NYSE policy in *Solomon*, the Deutsche Bank policy here used the discretionary "may,"

rather than a mandatory "shall" as well as saying "up to" termination, this defeats the

Defendant's argument.  So too does Mr. Ricciardi's testimony that whether or not Gavin Black

would have been fired if he remained silent was up to Deutsche Bank—not Paul Weiss—and that

Deutsche Bank "could" have elected to terminate Gavin Black's employment.  Tr. 1542:23-24.

　　　　Further, Mr. Ricciardi's testimony that a hypothetical bank employee may have had no

"effective" choice but to cooperate with their employer[6] or risk losing employment does not get

the Defendant over the hurdle of the flaw in relying on Deutsche Bank's uncertain policy.  In

responding to a hypothetical of "an employee" at "Bank A," not speaking specifically about

Gavin Black or even Deutsche Bank, Mr. Ricciardi's testified that if such an employee is "not

cooperating, it's more likely that the licensing authority will take away your license . . . and it's

going to be hard to be employed in a job you need a license for" such that "[t]he choice is to

cooperate or find new employment basically."  *Id*. at 1526-27.  When Mr. Ricciardi testified that

a hypothetical bank employee had "[t]he choice is to cooperate or find new employment,

basically," he did not assert that Deutsche Bank would have fired Gavin Black in response to an

invocation of silence, let alone that he threatened him with that result.  *Id*. at 1527: 14-15.  Taken

in context, Mr. Ricciardi was, at best, making the common sense general point that there are

---

[6] Mr. Ricciardi clarified on re-direct that the cooperation he was discussing at this point was an employee's cooperation with their employer, not the Government.  *See* Tr. 1542.

attenuated potential consequences to not cooperating, which is not enough to satisfy *Garrity*.  *Id.* at 1527:4-7.

Mr. Ricciardi's highly speculative statements regarding the potential civil consequences faced by a hypothetical bank employee are too indefinite to meet *Garrity*'s certainty requirement. Whereas *Solomon* held that adverse employment action must be a "certainty," the *most* that can be inferred from Mr. Ricciardi's statements is that it is "more likely" that a regulator would revoke a license and that the lack of a license would make it "hard" for a bank employee to be employed.  The multiple levels of supposition embedded in Mr. Ricciardi's testimony on this point are not good enough to satisfy *Garrity*.

At any rate, even if we assume for the sake of argument that termination would have been a practical consequence of Gavin Black's invocation either because of Deutsche Bank's policy or the potential licensure issues Mr. Ricciardi discussed, these circumstances are insufficient to support a *Garrity* claim.  This is because *Garrity* requires the defendant to prove that invocation would have resulted in termination "automatically and without more."  *United States v. Stein*, 233 F.3d 6, 16 (1st Cir. 2000) ("[W]hile refusal to waive the Fifth Amendment might increase the risk that [an attorney] would be disbarred, disbarment would not result automatically and without more.  Hence, she was not threatened with a penalty within the meaning of *Garrity* for invoking her Fifth Amendment privilege.").

In *United States v. Roberts*, the Second Circuit relied on *Stein* to affirm the conviction of an airline baggage handler who was caught unloading drugs from an airplane and who gave a statement to an Immigration and Customs Enforcement agent after being advised that if he chose to remain silent and not cooperate, she would report his arrest to Customs and Border Protection, which could suspend the defendant's access to restricted areas within the airport.  660 F.3d 149,

156 (2d Cir. 2011).  The defendant moved to suppress his statements as coerced under *Garrity* because a loss of airport access would ultimately lead to his termination from the airline.  In affirming the conviction, the Second Circuit held that the defendant must show that the employer would have terminated employment because of the invocation of the right to remain silent—that loss of employment would have been the practical result of silence is insufficient: "where . . . invocation of the Fifth Amendment does not, by itself, result in forfeiture of the job or license in question, the fact that claiming the Fifth may, as a practical matter, result in damage to one's chances of retaining the privilege at stake does not necessarily establish a constitutional violation."  *Id*. at 157 (quoting *Stein*, 233 F.3d at 15).  Thus, advising Roberts of the ICE and CBP procedures "without reference to adverse consequences for Roberts, did not so plainly threaten Robert's employment as to deprive him of the free choice in deciding whether to speak with government authorities."  *Id.* at 156.  "Whether Robert's interests in his liberty and employment were best served by maintaining his innocence or negotiating a plea agreement, by remaining silent or cooperating, undoubtedly presented him with hard choices," but "the Fifth Amendment 'does not protect against hard choices.'"  *Id.* at 157 (quoting *Solomon*, 509 F.2d at 872).  It only "protects against coercion that deprives a defendant of the opportunity to make such choices himself."  *Id.*

Just as Roberts asserted that the loss of airport privileges would have cost him his job at the airport, here, the Defendant asserts that a loss of licensure would have cost him his job at Deutsche Bank.  But both consequences are too attenuated to make out a *Garrity* claim.  Even accepting that invocation would have set in motion a chain of events that resulted in the loss of Gavin Black's license and, in turn, his job, these facts certainly do not establish that invocation resulted in termination "without more."  Knowing he and his co-workers manipulated LIBOR,

the Defendant knew he faced hard choices when Paul Weiss sought to interview him about LIBOR.  But that did not deprive him of the opportunity to make the choice himself—he chose to speak and falsely deny all wrongdoing.  That does not amount to a Fifth Amendment violation.

Moreover, even when a defendant is warned before the interview about an employer's policy that *may* result in his termination if he does not cooperate—a fact not even *alleged* here— that is not enough to rise to the level of economic threat that renders a statement coerced under *Garrity*.  For example, in *United States v. Ferguson*, the court held that an interview did not amount to coercion because the defendant "was never faced with such a clear-cut choice between asserting his rights or suffering economic hardship," despite the fact that the employer advised the employees before his interview that, his employer, Gen Re "would consider disciplining employees who failed to cooperate," and "would reexamine its obligations, under its by-laws, to pay non-cooperating employees' legal fees."  2007 WL 4240782 at *5 (D. Conn. Nov. 30, 2007). The court explained that the letter he "received from Gen Re informed him that non-cooperation '*may*' result in a reassessment by [Gen Re] of the factors governing whether it is obligated to indemnify [him] for [his] reasonable legal expenses."  *Id.* (emphasis added; alterations in original).  Moreover, "[c]onditioning the payment of legal fees on Gen Re's obligations as established in its by-laws is far different from using open threats of non-payment to coerce employees to cooperate with investigators."  *Id.*; *see also Cosgrove*, No. 8:09-cr-00077 at 6 (no coercion where company advised "As someone involved in the Severe Service business, the Company expects you to cooperate fully in this process.  Arrangements have been made for you to meet with the investigators.  When you do so, please answer all their questions and furnish all information they request."); *cf. Solomon*, 509 F.2d at 865 (noting defendant alleged NYSE

interviewers "reminded [him] of the sanction of suspension which would be imposed if [he] did not testify").

Here, the 2007 Bank policy—that Gavin Black does not even allege to have read in his affidavit—is far too attenuated to support his *Garrity* claim.  Thus, with the Defendant's failure to allege a specific threat, his attempt to rely on Deutsche Bank's policy to support his allegation of coercion equal unavailing as it does not come close to having the level of certainty of adverse economic consequence required to establish a *Garrity* violation.

### C. The Defendant's *Garrity* claim also fails because no government actor pressured anyone to give the Defendant the impression that he would be fired if he did not talk.

Even assuming that someone at Paul Weiss or Deutsche Bank made a threat of automatic termination—despite the fact that there is no fact on the record to support this and is not even *alleged* by Gavin Black—that threat would *still* be insufficient because there is no allegation or evidence that any government actor asked any party to take adverse employment action against Gavin Black if he declined to speak.  A direction from the CFTC[7] that Paul Weiss interview the

---

[7] In answering the question of whether a statement should be suppressed based on a private party's action argued to be at the behest of civil regulators, courts have made the assumption that a civil agency's actions could bar the introduction of a statement in criminal proceedings under a *Garrity* analysis.  However, the Government has not found a case where the Second Circuit or Supreme Court have specifically addressed the issue of whether—in the *Garrity* context—the actions of a civil agency should be imputed to criminal authorities in a criminal trial.  Similar to Fourth Amendment law, the Court should not impute the actions of a civil regulator to the criminal authority unless they were acting jointly (as opposed to in parallel) or the civil agency was acting at the behest of the criminal authority.  *See e.g.*, *Stein*, 440 F. Supp. 2d at 331 (distinguishing statements made in an "IRS promoter audit" and an "SEC independence investigation" with criminal proceedings as the "former occurred in circumstances in which only KPMG's interests were immediately at stake, not [the defendant's] personal liberty. . . .  Once the criminal referral was made and the USAO sent [the defendant] a subject letter, the personal stakes for him changed dramatically."); *United States v. Hubbell*, 530 U.S. 27, 35 n.17 (2000) ("The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws.") (citations omitted)).

relevant derivatives traders that ultimately included Gavin Black is insufficient to establish state action for the purposes of a *Garrity* claim.  Instead, the Defendant's claim fails because he does not even allege that a government actor directed, pressured, or even implied to Paul Weiss that they should communicate to the Defendant that *he would be fired if he refused to speak.*  Nor does he allege that a government actor had any role in the adoption of Deutsche Banks' 2007 policy—a policy that itself still does not meet the requisite showing of coercion—let alone that a government actor did so in connection with coercing the Defendant.

The requisite nexus between a state actor and a private actor is established "only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original).  The Second Circuit explained this requirement further, in *Desiderio v. National Ass'n of Securities Dealers, Inc.*, that "private entities may be held to constitutional standards if their actions are 'fairly attributable' to the state" and articulated the applicable standard: "constitutional standards are involved *only when it can be said that the State is responsible for the specific conduct* of when the plaintiff complains."  191 F.3d 198, 206-7 (2d Cir. 1999) (emphasis in original).  Thus, a "State normally can be held responsible for a private decision *only when it has exercised coercive power or has provided such significant encouragement*, either overt or covert, that the choice must in law be deemed to be that of the State" but "*[m]ere approval is not sufficient* to justify holding the State responsible for those initiatives."  *Id.* (citing *Blum*, 457 U.S. at 1004-5); *see also D.L. Cromwell Investments, Inc. v. NASD*, 279 F.3d 155, 161 (2d Cir. 2002) (applying standard set out in *Desiderio*); *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) ("The 'close nexus' test is not satisfied when the state '[m]ere[ly] approv[es] of or acquiesce[s] in the initiatives' of the private entity.") (alterations in original).  "A subjective belief that *Garrity*

applies will not be considered objectively reasonable if the state has *played no role in creating the impression that the refusal to give a statement will be met with termination* of employment." *United States v. Camacho*, 739 F. Supp. 1504, 1505 (S.D. Fl. 1990) (citing *Solomon*, 509 F.2d at 871-72).

Here, the conduct for which the Defendant complains, is not and cannot be, simply that Paul Weiss interviewed Gavin Black (which is clearly not a *Garrity* violation) but the complaint is that Gavin Black—as he argues—was coerced into speaking with Paul Weiss or face losing his job. *See* Exhibit 16, Gavin Black Affidavit.  It is this supposed economic threat, the Defendant argues, that made the statement coerced under *Garrity*.   Thus, the obvious relevant question in this case is whether a government actor had any involvement in the Defendant's claimed threat that left Gavin Black with the supposed stark choice to speak with Paul Weiss or lose his job. *See United States v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974) ("The controlling factor is . . . the fact that the state has involved itself *in the use of substantial economic threat to coerce* a person into furnishing an incriminating statement.") (emphasis added); *see also Solomon*, 509 F.2d at 870-71 ("*Garrity*'s interpretation of the privilege applies only when the interrogator has the power to compel testimony against which the privilege would be a shield and *the state has sought to shatter the shield* by the threat that raising it will involve consequences as devastating as in that case.") (emphasis added); *United States v. Allen*, 864 F.3d 63, 85 (2d Cir. 2017) ("[I]t certainly would not be unreasonable to conclude that the *link between a coercive act* and *some sort of state action* is stronger when foreign government officials act than when private action is solely responsible *for a coercive act*.") (emphasis added); *Ferguson*, 2007 WL 4240782 *1 (to establish a *Garrity* violation, the defendant "must show that *any pressure he felt* from [his company] to participate in the interviews *is 'fairly attributable' to the government*." (emphasis

added) (citing *D.L. Cromwell*, 279 F.3d at 161; *Desiderio*, 191 F.3d at 206); *Cosgrove*, No. 8:09-cr-00077 at 7 ("Nothing here establishes that the Government '*deliberately precipitated' the supposed coercion* employed by [the company being investigated] in causing the interviews to go forward.") (emphasis added).

The requirement that a government actor had a role in the alleged economic coercion in a *Garrity* analysis becomes even clearer when looking at the *Stein* case.  The *Stein* court reinforces this requirement that a government actor be involved in the coercive conduct in order for there to be a *Garrity* violation, stating that the defendants were "entitled to suppression only if the actions of KPMG *in coercing* the statements in question are fairly *attributable to the government*. In other words, state action will be found where the government commands or significantly encourages a private entity to take *the specific action alleged to violate the Fifth Amendment*, as well as where the government is 'entwined' in the management or control of specific conduct at issue."  *United States v. Stein*, 440 F. Supp. 2d 315, 331 (S.D.N.Y. 2006) (emphasis added). "[T]he controlling factor is the fact that *the state had involved itself in the use of a substantial economic threat* to coerce a person into furnishing an incriminating statement."  *Id*. at 334 (emphasis added) (quoting *Montanye*, 500 F.2d at 415); *see also United States v. Stein*, 541 F.3d 130, 148 (2d Cir. 2008)[8] ("State action is established here as a matter of law because the *government forced KPMG to adopt its constricted Fees Policy*".) (emphasis added).  In suppressing the defendants' statements after finding a *Garrity* violation occurred, the *Stein* court found that "KPMG's 'common practice' had been to pay legal fees for employees in connection

---

[8] While the Second Circuit did not address the *Garrity* issue in *Stein* and only whether or not the defendants' Sixth Amendment right had been violated, the Second Circuit did discuss whether the conduct for which the defendants complain—that KPMG would cut off their legal fees if they did not cooperate with the government—was state action.  *Stein*, 541 F.3d at 148.

with legal matters arising out of their doing their jobs" and that "KPMG changed its practice regarding legal fees" because "the government threatened to consider such payments as a factor weighing in favor of indicting the firm."  *Stein*, 440 F. Supp. 2d at 318.

The sequencing and tangled involvement between the government and KPMG in the economic threat alleged in *Stein* is also significant.  The *Stein* court noted that one defendant refused to speak with the prosecutors, the government then informed KPMG, and KPMG responded by threatening to cut off that defendant's legal fees and "explicitly threatened to fire him if he did not waive his constitutional rights and proffer."  *Id.* at 331.  Based on these facts, the *Stein* court held "KPMG's decision to cut off all payments of legal fees and expenses to anyone who was indicted and to limit and to condition such payments prior to indictment up on cooperation with the government was the direct consequence of the pressure applied by the Thompson Memorandum and the USAO. . . . The USAO knew that KPMG would apply additional pressure, beyond the threatened cut-off of legal fees, to 'uncooperative' employees. Indeed, it reported them to KPMG in circumstances in which there was *no conceivable reason for doing so except to facilitate the firing threats* that ensued."  *Id.* at 335 (emphasis added).

The Second Circuit recently reiterated the importance of the government's connection to the coercive conduct at issue in *Stein*, holding that "KPMG had no institutional interest in stripping its employees of their chosen defense counsel and KPMG was forced to abandon a longstanding policy that it had decided to continue; it was therefore found that *government compulsion was the 'but for' reason for the new Fees Policy*."  *Gilman v. Marsh & McLennan Companies*, *Inc.*, 826 F.3d 69, 77 (2d Cir. 2016) (emphasis added).

The situation here is in stark contrast with *Stein* because no government actor had any involvement with the supposed threat.  The Defendant's argument falls short because it is

undisputed that no government actor ever asked Mr. Ricciardi (or anyone else) to threaten Gavin Black with adverse employment action. Mr. Ricciardi testified that the DOJ never asked him to fire Gavin Black, that the topic of employment consequences never came up during the interview, and that Gavin Black was still employed at Deutsche Bank at the time Mr. Ricciardi was done working on the investigation. *See* Tr. 1488, 1542. Nor is there any suggestion that the DOJ or CFTC urged Deutsche Bank to adopt its 2007 Core Principles—the purported instrument of coercion—much less did so to coerce the Defendant into incriminating himself. This policy was promulgated long before any LIBOR investigations began at Deutsche Bank. Even assuming the CFTC asked Deutsche Bank to interview Gavin Black, the "specific conduct" of which the Defendant complains is not the interview itself – it is the alleged pressure to talk "or else." Because nobody from the CFTC or DOJ ever asked Mr. Ricciardi to pressure Gavin Black, the Defendant fails to identify sufficient state action to support a *Garrity* claim. The *allegations* themselves are void of *any* fact showing that the DOJ, CFTC, or any government actor asserted pressure on Paul Weiss or Deutsche Bank to pressure Gavin Black to sit for the Paul Weiss interview.

The sole support provided in the Defendant's brief to allege government action is the fact that the Filip Memorandum was in place at the time of Gavin Black's interviews with Paul Weiss. This falls completely short. As this Court already found, the Filip Memorandum is simply too attenuated and does not include the same specific directions as the Thompson Memorandum to create coercive government action where it does not exist. *See* ECF No. 263 at 19 ("As the defendant admits, the Filip Memorandum, which replaced [the Thompson Memorandum], forbade prosecutors to: (a) pressure companies to cut off payment of legal fees for indicted employees or employees who did not wish to cooperate with the government; (b) ask

companies to waive attorney-client or work product protections; or (c) require companies to force its employees to submit to interviews with the government. (Levine Decl., Ex. A.) Black points to nothing that happened in the present case to indicate that the Filip Memorandum was not followed"). Even where the Thompson Memorandum was the governing memorandum at the time of a defendant's claim, that fact is not enough to support a finding of government coercion. *See United States v. Brooks*, 681 F.3d 678, 690 (5th Cir. 2012) (affirming a district court's finding that there was no *Garrity* violation even where the Thompson Memorandum was the relevant memo; "Whereas in *Stein*, where the government specifically threatened to take into account KPMG's payment of legal fees, referring to the Thompson Memorandum, the correspondence here does not refer to that memorandum and it includes no threat to indict El Paso if it continued to pay fees."). Thus, the Filip Memorandum which precludes the DOJ from pressuring companies to force employees to meet with the DOJ or to pressure companies to take adverse economic actions against employees, certainly cannot be enough to support a finding that the DOJ coerced Paul Weiss to threaten anyone.

Furthermore, because there is nothing inappropriate about a regulator asking a bank to interview an employee, the CFTC's actions cannot, as a matter of law, run afoul of *Garrity*. In *Stein*, the court recognized that the policy aim of *Garrity* was to prohibit the government from executing an end-run around the rules: "The Court recognizes that the criminal process often requires defendants and prospective defendants to make hard choices among unpalatable alternatives and that there often is nothing wrong with this. What distinguishes this case is that the government here coerced KPMG to apply pressure to [the defendants] *in order to secure waivers of constitutional rights that the government itself could not obtain*. That goes beyond the bounds of appropriate government action." 440 F. Supp. 2d at 332-33 (emphasis added); *see*

30

*also United States v. Walther*, 652 F.2d 788, 793 (9th Cir. 1981) (The test is whether the government actor has "knowingly acquiesce[d] in and encourage[d] directly or indirectly a private citizen to engage in activity which *it is prohibited*") (emphasis added).

Here, far from using Deutsche Bank as a proxy to do something the Government could not do directly, the CFTC, at most, asked Deutsche Bank to interview Gavin Black, a task which it could—*and did*—do itself.  Borrowing *Stein*'s language, a regulator acts well within the bounds of "appropriate government action" when it asks a regulated party to investigate potential misconduct.  *Cf. Solomon*, 509 F.2d at 869 ("this is but one of many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes").

> **D.  Under the totality of the circumstances, the Defendant's interviews with Paul Weiss were not coercive or intimidating, and his affidavit fails to carry his burden of establishing that he agreed to an interview because he feared termination, as opposed to other reasons.**

Putting aside the facts that no one threatened Gavin Black, that he did not face a certain or automatic consequence under Deutsche Bank's policy, and that a government actor was not behind the supposed coercion, the Defendant fails to show that under a totality of the circumstances analysis his interview with Paul Weiss was coercive.

If the Court were to find that the DOJ or CFTC was responsible for an economic threat that was sufficient enough to show a *Garrity* violation—which is not the case—the Court would still be required to conduct a "totality of the circumstances" analysis to determine—when taking into account all of the circumstances—whether the DOJ or CFTC was responsible for an interview that was coerced.  *See Ferguson*, 2007 WL 4240782 at *1 (analyzing in the alternative and assuming "even if [the company] [was] a state actor, [the defendant's] proffer session statements [were] admissible because they were voluntary" under a totality of the circumstances

31

analysis; "Courts assessing whether a defendant's inculpatory statements were voluntary must look at the totality of the circumstances under which the statements were made.") (citing *Nelson v. Walker*, 121 F.3d 828, 833 (2d. Cir.1997)).  "In evaluating the voluntariness of confessions, [the Second Circuit] look[s] at the totality of the circumstances in which they were given to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined."  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (internal quotation marks omitted).  "Factors a district court should weigh in this analysis include 'the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials.'"  *Ferguson*, 2007 WL 4240782 at *6 (quoting *Nelson*, 121 F.3d at 833); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973) (listing factors affecting voluntariness of self-incriminating statements and noting that the analysis does not "turn[ ] on the presence or absence of a single controlling criterion . . . [but rather] reflect[s] a careful scrutiny of all the surrounding circumstances").

With the benefit of hindsight and the electronic communications and testimony submitted at trial, it is now well established that Gavin Black participated in a criminal scheme to rig LIBOR.  But at the time of the interviews, Mr. Ricciardi and his team sat on one end of the table.  They did not have that full perspective of the USD LIBOR manipulation scheme at Deutsche Bank when Mr. Ricciardi first met Gavin Black in August 2011.  Mr. Ricciardi did not walk into the interview ready to grill Gavin Black with threats of "talk, or else . . ."  Rather, during the early stages of the internal investigation, Mr. Ricciardi and his team were still learning about LIBOR, and they were trying to figure out how the benchmark worked: "the process was initially we had no idea what we were doing, so we started talking to people about how did LIBOR work,

how does the submission process work, who's involved with that, and we started talking to people involved with the process. And then we learned that there's also trading related to it, and we started interviewing traders." Tr. 1485.

At the other end of the table sat Gavin Black, the well-educated, greatly experienced, and highly compensated career swaps trader at an elite bank who knew more about LIBOR, and the derivatives to which it was linked, than almost anyone else on the planet. Gavin Black certainly knew the most about his involvement in his scheme to manipulate LIBOR than anyone else in that room.

Mr. Ricciardi was not accompanied by any law enforcement agents or prosecutors. He never issued any threat and instead began the meeting with *UpJohn* warnings. The very nature of an *UpJohn* warning is to provide the interviewee with the knowledge of reasons they may not want to talk (*i.e.*, that the interviewer's interest is Deutsche Bank's and not that of the interviewee, and that what the interviewee shares can be shared with government investigators). Offering such a warning is completely inconsistent with coercion and leaves the interviewee with knowledge to make an informed decision to speak or not. Gavin Black's own affidavit does not mention anything about the circumstances of that interview that made him feel pressured or coerced outside of his subjective belief that he risked termination if he did not speak. *See* Exhibit 16, Gavin Black Affidavit. Whatever pressure Gavin Black felt at that interview was not even great enough to get him to tell the truth about his conduct to Mr. Ricciardi and his team.

Under the circumstances, it is more likely that Gavin Black took the meeting with Mr. Ricciardi out of an effort to exculpate himself, than he did out of duress. The district court in *Stein* recognized that the defendant carries the burden of showing that he or she talked as a result of coercive conduct, and held that one defendant failed to exclude the possibility that he gave a

statement for self-serving reasons that were unrelated to coercion.  440 F. Supp. 2d at 328-29.

Given the myriad of reasons why a person may elect to give a statement during an investigation,

the *Stein* court held that there was insufficient evidence to link the investigator's threat to the

defendant's decision to speak:

> Some [make a statement] in efforts to negotiate pleas.  And some do so in the
> hope of persuading the government not to indict at all.  Thus, the fact that most of
> these defendants made proffers after KPMG conditioned the continued payment
> of their legal fees on their cooperating with the government in and of itself sheds
> little light on whether their statements were coerced.  In other words, the fact that
> these defendants proffered *after* KPMG conditioned payment of their legal fees
> on cooperation does not mean that they proffered, even in part, *because* KPMG so
> conditioned payment. . . .  In light of the fact that proffers often are made
> voluntarily to serve the interests of those [who] make them, that is not enough
> absent some reliable proof that the proffers in question were coerced rather than
> voluntary acts.  There is no factual issue warranting an evidentiary hearing, and
> the motion is denied in respect of these statements.

Id. at 329-330 (emphasis in the original).

Notably, KPMG's lawyers *expressly threatened* to terminate the payment of legal fees to

those employees who declined to cooperate.  *Id*. at 321.  In contrast, the FBI 302 memorializing

Mr. Ricciardi's recounting of his interview with Gavin Black establishes that Gavin Black

viewed the meeting as a chance to exculpate himself: "Black adamantly stated he was not aware

of any attempts to influence DB's LIBOR rates. He was also adamant that he understood that

influencing a LIBOR setter to help trading positions would be wrong. He discussed market color

with King and Curtler but… he never asked them to help him with submissions."  *See* Exhibit

18, September 8, 2016 Ricciardi 302 at 2.

While Gavin Black attests to a subjective belief that he would have been terminated had he refused to meet with Paul Weiss, his affidavit[9] does not even say that the reason he talked was to avoid adverse employment consequences.  Most telling about Gavin Black's motives and interest in not invoking his Fifth Amendment right and instead speaking, is that after he received an individual attorney (both a U.K. and U.S. based attorney) who counseled and advised him[10], Gavin Black voluntarily interviewed with the DOJ and CFTC and continued to sit for interviews with Paul Weiss.  *See* Exhibit 20, Gavin Black 302; Exhibit 21, December 23, 2014 Call Notes at 1.  Further evidencing the voluntariness of his early Paul Weiss interviews, Gavin Black had U.S. counsel present with him when he sat for an additional interview on December 4, 2014 with Paul Weiss.  Given the relatively amicable circumstances of the parties' first meetings and Gavin Black's continued interest in speaking with both Paul Weiss and government authorities after receiving counsel, Gavin Black's allegations are insufficient to carry his burden of showing that under the totality of the circumstances analysis, even if there was a threat to his employment and there was a government actor behind it, his statements were involuntary.

## II.   A REQUIREMENT THAT THE GOVERNMENT PROVE THAT ALL GOVERNMENT AGENCIES DID NOT "OUTSOURCE THEIR INVESTIGATIVE DUTIES" TO PAUL WEISS, A PRIVATE ACTOR, CONTRAVENES SECOND CIRCUIT LAW.

As discussed above, the Defendant's inability to allege facts establishing that he was sufficiently "coerced" for the purposes of *Garrity* or that a government actor was behind the

---

[9] While the Government could challenge the weight the Court should give Gavin Black's affidavit as it is the statement of a convicted felon that has not been subject to cross-examination, its credibility does not matter because even assuming his allegations are true, the motion fails.

[10] The Government obviously does not know what that advice was but is simply pointing out that Gavin Black made the decision to continue to waive his Fifth Amendment right after receiving legal advice and counsel.

supposed coercion dooms his argument, regardless of the relationship between Paul Weiss and the CFTC or DOJ. Thus, the extent to which the CFTC or DOJ relied on Paul Weiss does not matter. We could assume for the sake of argument that the DOJ did nothing at all to investigate the case but read Mr. Ricciardi's interview reports and it would not make a difference. However, assuming the relationship between Paul Weiss and the DOJ or CFTC is significant, it is only significant as to the *interview of Gavin Black*. And the fact that the DOJ and CFTC directly interviewed Gavin Black themselves proves that the DOJ and CFTC did not "outsource their investigations" when it came to that interview.

At the outset, Second Circuit precedent forecloses any basis for the question of whether the DOJ or CFTC "outsourced" their investigations writ large to Paul Weiss. Instead, under Second Circuit law, a private actor remains a private actor and cannot become a state actor such that the entirety of its actions can be attributed to the state. Whether an entity is a private actor or a state actor in the general sense, turns only on who controls the entity. *See*, *e.g.*, *D.L. Cromwell*, 279 F.3d at 162 (When deciding the NASD was not a government actor, the court focused on the facts that "[i]t is a private corporation that receives no federal or state funding . . . nor does the government appoint its members or serve on any NASD board or committee."); *see also Desiderio*, 191 F.3d at 206-7 (holding that NASD actions are not state action even though "[i]ts authority is exercised under the close supervision of the SEC, which must approve all the NASD's rules and regulations" and that "[i]n order to work in the securities industry, the SEC requires a securities broker to be registered with at least one self-regulatory organization," like the NASD); *Solomon*, 509 F.2d at 867-71 (holding that the New York Stock Exchange is not a state actor where "the SEC was given the power and the duty to make sure that the responsibility was diligently and effectively used").

36

The Second Circuit has identified no situation where an overall relationship of cooperation between a private actor and a state actor can have the effect of turning the private actor into the state in all aspects of an investigation.  *See Desiderio*, 191 F.3d at 206-7 ("[T]he fact that a business entity is subject to "extensive and detailed" state regulation does not convert that organization's actions into those of the state.") (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)).  To the contrary, the Second Circuit has been clear that "a company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation and for cooperating with a governmental investigation, even when employees suspected of crime end up jettisoned.  A rule that deems all such companies to be government actors would be incompatible with corporate governance and modern regulation."  *Gilman v. Marsh & McLennan Companies, Inc.*, 826 F.3d 69, 77 (2d Cir. 2016) (citing *Solomon*, 509 F.2d at 870); *see also Cosgrove*, No. 8:09-cr-00077 at 6 ("Cooperation with the government does not convert the party cooperating into a state actor."); *Ferguson*, 2007 WL 4240782 at *5.  Indeed, the Second Circuit has recognized that many regulated companies engage in self-policing at the behest of governmental regulatory bodies, and that does not make these self-policing entities state actors in their entirety.  *See Solomon*, 509 F.2d at 869 (NYSE is "but one of many instances where government relies on self-policing by private organizations to effectuate the purposes underlying federal regulating statutes.").

And courts rightly reject the idea that any private actor can be deemed a state actor for an entire investigation where the private actor is answerable to private authority.  *See Gilman*, 826 F.3d at 77 ("[T]he holding of *D.L. Cromwell* is that there was no state action because NASD had independent regulatory interests and motives for making its inquiries and for cooperating with a parallel investigation being conducted by the government.  That is, NASD would have requested

interviews regardless of governmental pressure. We arrived at this conclusion notwithstanding informal and formal sharing of documents and information between the government and the NASD and the fact that the NASD interview demands followed shortly after the stockbrokers contested grand jury subpoenas.") (internal quotations and citations omitted); *see also United States v. Stevens*, 601 F.2d 1075, 1078 (9th Cir. 1979) (noting in its analysis of whether private investigators were state actors, that the private investigators "are answerable to no one save their own employers").

Here, Paul Weiss was a private actor who owed its duty of loyalty to Deutsche Bank. *See* Tr. 1494:2 (Mr. Ricciardi testified that "[o]ur duty of loyalty was to our client Deutsche Bank."). Whether Paul Weiss provided information that it received from employee interviews was up to Deutsche Bank. Paul Weiss also was paid by Deutsche Bank and not the CFTC or DOJ. *See* Tr. 1518. Thus, Paul Weiss as an organization cannot be deemed a government actor for the entirety of the internal investigation regardless of what actions the CTC or DOJ did or did not take.

Instead, and as discussed above, the evaluation is on an action-by-action basis. It is not the CFTC's or DOJ's relationship with Paul Weiss in general that can serve as a potential basis for the Defendant's *Garrity* claim – it was, if anything, the CFTC or DOJ's relationship with Paul Weiss in connection with its interviews of Gavin Black. *See Desiderio*, 191 F.3d at 206-07 ("Constitutional standards are involved only when it can be said that the State is responsible for the *specific conduct of which the plaintiff complains*") (emphasis added). The only interview that the Defendant has legal standing to complain about is his own.

Further, in looking at the specific action of Gavin Black's interview, the action of conducting the interview itself does not simply make it state action even if the CFTC had requested it. That is because when deciding if a private party's action is state action, the Second

Circuit applies a "but-for" analysis. *See United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008) ("For the foregoing reasons, we cannot disturb Judge Kaplan's factual findings, including his finding that, *but for* the Thompson Memorandum and the prosecutors' conduct, KPMG would have advanced legal fees without condition or cap.") (emphasis added). Indeed, in *Gilman*, the Second Circuit articulated the "but-for" analysis that it also applied in *D.L. Cromwell* when deciding if the NASD's interviews were state action. The *Gilman* court reiterated that there was no state action in *D.L. Cromwell* where interviews were "not a measure [the internal investigation] would have forgone 'but for' the AG's influence." *Gilman*, 826 F.3d at 77. That is, the Second Circuit held that because the NASD had its own reasons for conducting the interviews and would have conducted them regardless of the AG's actions, conducting the interviews was not state action.

The same is true here. As Mr. Ricciardi testified, Deutsche Bank ran its internal investigation for many reasons, including determining what misconduct had occurred in order to fulfill its obligations as a publicly traded corporation. *See* Tr. 1485:9-13 (Mr. Ricciardi testified that "as a responsible public company, they wanted to know if there was any wrongdoing going on, and, if so, take appropriate remedial steps and also cooperate fully with the government's investigations."). It is inconceivable that Paul Weiss would not have interviewed Gavin Black but for the CFTC's request that Paul Weiss interview the relevant traders.

In any event, to the extent that "outsourcing" matters, the question is whether the DOJ or CFTC "outsourced" the interview of Gavin Black. Put in those terms, one undisputed fact resolves the Defendant's claim in the Government's favor: the DOJ and CFTC interviewed Gavin Black. It is axiomatic that one does not "outsource" a task *which she herself performed*.

### III.   EVEN IF A GOVERNMENT ACTOR COERCED A STATEMENT FROM THE DEFENDANT IN VIOLATION OF *GARRITY*, THE ERROR IS HARMLESS BECAUSE THE GOVERNMENT DID NOT OFFER HIS STATEMENTS AT TRIAL.

When the Defendant first raised his *Garrity* argument, he did not seek a *Kastigar* hearing or *Kastigar* relief but rather sought the correct form of relief for a *Garrity* violation: suppression of his statement.  *See* ECF No. 395 at 13.  After the Government did not introduce any of his supposedly coerced statements at trial—the very relief he had sought—the Defendant changed his tune.  Now he argues that he is entitled to a *Kastigar* hearing requiring the Government to show that the evidence the Government offered at trial was wholly independent from the statements that he made to Deutsche Bank.  For the reasons set forth below, as to the remedy for a *Garrity* violation, the Defendant was right the first time: a statement obtained in violation of *Garrity* requires suppression, not a *Kastigar* analysis.  While the Second Circuit has not itself decided the specific issue of which standard applies in the *Garrity* context, *see Solomon*, 509 F.2d at 866 ("we do not reach the question of [*Garrity*] remedy"), a review of the case law makes clear that a *Garrity* violation is more akin to other forms of coerced confessions for which suppression is the remedy, as opposed to bargained-for statutory immunity which carries the burden of *Kastigar*.  Thus, even assuming that Gavin Black's statements were obtained in violation of *Garrity*, the error is harmless because the Government never offered them at trial.

### A.  Because *Garrity* violations are a species of coerced confessions, trial courts in this district and others apply the remedy of suppression, not a *Kastigar* inquiry.

Unlike in *Kastigar*, where a defendant was judicially compelled to make a statement under a grant of immunity, a Fifth Amendment violation in *Garrity* resulted from coercion, which the Court described as the absence of "free choice to speak out or remain silent."  *Garrity*, 385 U.S. at 497.  In describing this harm, the Court explicitly likened a confession obtained in

violation of *Garrity* to an interrogation conducted without *Miranda* warnings, and thus held that

the Constitution prohibits the "use in subsequent criminal proceedings of statements obtained

under threat of removal from office." *Id*. at 497, 500.  And that is how this Court should treat

any *Garrity* violation suffered by Gavin Black: as a custodial interrogation conducted without

*Miranda* warranting the suppression of the statements, at best.

The fact that courts analyzing *Garrity* claims look to the "totality of the circumstances"

also confirms that *Kastigar* is not the remedy for a *Garrity* violation.  *See Roberts*, 660 F.3d at

156 (whether a statement was coerced in violation of *Garrity* depends on "the totality of the

circumstances); *United States v. Trevino*, 215 Fed. Appx. 319, 321-22 (5th Cir. 2007) ("to

determine whether Trevino's *Garrity* rights were violated, we must look at the surrounding

circumstances, specifically focusing on whether the questioning was coercive"); *United States v.

Ferguson*, 2007 WL 4240782 at *6 (D. Conn. Nov. 30, 2007) (applying a "totality of the

circumstances" test in analyzing a *Garrity* claim).  Notably, that the "totality of the

circumstances" test applied in *Garrity* cases resembles the approach that courts take to assess

whether a defendant made a voluntary waiver of his *Miranda* rights where the warnings were not

issued further strengthens the inference that the same remedy applies for both *Garrity* and

*Miranda* violations.  *See United States v. Miller*, 382 F. Supp. 2d 350, 370-71 (S.D.N.Y. 2005)

(validity of *Miranda* waiver depends on the totality of the circumstances).  In contrast, there is no

totality of the circumstances test for testimony immunized under 18 U.S.C. § 6002, with its

absolute guarantee of no use or derivative use.

*Garrity*'s "totality of the circumstances" test is incompatible with a *Kastigar* remedy

because, under *Kastigar*, compulsion is determined with reference to the legal process in place,

not the characteristics of the environment in which a defendant gave the compelled testimony.

41

What triggers *Kastigar* is a legal order compelling testimony—facts such as the questioner's tone, the setup of the room, and whether the witness was free to take breaks do not matter. Likewise, if the remedy were *Kastigar*, there would be no reason for federal investigators to provide the "*Garrity* warnings" that are routinely read to suspects. This is because no level of warning could cure the government's "use" of testimony compelled through legal process.

The remedy for an unwarned statement taken during custodial interrogation in violation of *Miranda*, which should thus be applied in the *Garrity* context, is exclusion of the statement itself. *United States v. Patane*, 542 U.S. 630, 637 (2004) (explaining *Miranda* remedy as exclusion). Accordingly, district courts finding *Garrity* violations routinely suppress the statements, not conduct *Kastigar* hearings. *See United States v. Stein*, 440 F. Supp. 2d 315, 338 (S.D.N.Y. 2006) (after finding the statements violated *Garrity*, the district court suppressed them, holding that "[t]he coerced statements and their fruits must be suppressed"); *United States v. Ferguson*, 2007 WL 4240782 *1 (D. Conn. Nov. 30, 2007) (denying the defendant's motion to exclude his statements at trial for alleged *Garrity* violation); *United States v. Camacho*, 739 F. Supp. 1504, 1520 (S.D. Fl. 1990) (suppressing statements obtained in violation of *Garrity*); *but see United States v. Krug*, 198 F. Supp. 3d 235, 246-47 (W.D.N.Y. 2016) (applying *Kastigar* to a *Garrity* violation without questioning or analysis as to whether that was the applicable standard).

Indeed, in a carefully reasoned opinion, a district court in this district has held that *Kastigar* analysis does not apply to coerced confessions and, instead, suppressed the statements and applied "the fruit of the poisonous tree" doctrine to determine if any other evidence should be suppressed that resulted from the coerced confession. *United States v. Ghailani*, 743 F. Supp. 2d 242, 251-53 (S.D.N.Y. 2010). The court explained that although "the Supreme Court has not fully defined the exact scope of the exclusionary rule as applied to evidence derived from

coerced confessions," the Court"[n]onetheless, [] has applied poisonous fruit doctrine and

reasoning developed in Fourth Amendment cases in the unlawfully obtained confession context,

and it has indicated broadly that this generally is appropriate." *Id*.  For example, in *Harrison v.*

*United States*, the Supreme Court employed a poisonous fruit analysis to determine whether a

defendant's subsequent incriminating statement, indirectly obtained from earlier involuntary

confession, was admissible against him.  392 U.S. 219 (1968) (citations omitted).  Accordingly,

"[l]ower courts and commentators consistently have assumed that the poisonous fruit doctrine,

with its qualifications, applies to coerced confessions."  *Ghailani*, 743 F. Supp. 2d at 251-53.

"Moreover, there is good reason for treating evidence derived from a coerced confession

differently from evidence gained as a result of testimony compelled by a grant of immunity" that

is"[d]ifferent policy concerns drive applications of exclusionary rules in each context."  *Id.*

      On the other hand, the Supreme Court's approach in *Kastigar* was fashioned to deal with

the narrow circumstances of judicially compelled testimony and was not intended to be a

framework with which to analyze all coerced statements.  In *Kastigar*, the Supreme Court's

focus was to determine if the remedy provided by the immunity statute was sufficient to ensure

that immunized compelled testimony was not used against a defendant in a later criminal

proceeding in violation of the Fifth Amendment.  *Kastigar v. United States*, 406 U.S. 441 (1972).

The *Kastigar* "independent source" standard was grounded and derived directly from the

language of statutory immunity found in 18 U.S.C. § 6002.  *See United States v. Hubbell*, 530

U.S. 27, 38-46 (2000).  Because *Kastigar*'s ruling is the result of the Court's judgment of how

best to weigh the "important [compulsion] powers of the States as well as the Federal

Government" against the Fifth Amendment rights of individual defendants, its "independent

source" test is a check on the immunity powers of the Federal Government and the States rather

than a framework for analyzing the use of any statement coerced by any actor under any

circumstance.  *See Kastigar*, 406 U.S. at 460 (emphasis added) (*quoting Murphy v. Waterfront

Comm'n*, 378 U.S. 52, 93-94 (1964) (abrogated by *United States v. Balsys*, 524 U.S. 666 (1998)).

   The decisions interpreting *Kastigar* make clear that *Kastigar*'s "independent source"

requirement is the byproduct of a bargain in which a state actor obtains testimony in exchange

for, and with full knowledge of, the obstacles to prosecution that are necessary to protect the

witness's Fifth Amendment rights.  The Supreme Court in *United States v. Balsys*, for example,

described compulsion and immunization as a transaction: "under the Self-Incrimination Clause,

the government has an option to exchange the stated privilege for an immunity to prosecutorial

use of any compelled inculpatory testimony."  524 U.S. 666, 682 (1989).  And in both *North*

cases, the D.C. Circuit emphasized that Congress was aware that compelling the defendant to

testify would impede the Independent Counsel's prosecution and nonetheless made an informed

decision that compulsion was in the national interest.  In the first of the two cases, the D.C.

Circuit observed that "the Fifth Amendment requires that the government establish priorities

before making the immunization decision.  The government must occasionally decide which it

values more: immunization (perhaps to discharge institutional duties, such as congressional fact-

finding and information-dissemination) or prosecution." *United States v. North*, 910 F.2d 843,

862 (D.C. Cir. 1990).  The D.C. Circuit expanded on this point in the second case: "Surely

Congress [confers immunity] only when its perception of the national interest justifies this

extraordinary step. . . .  The decision as to whether the national interest justifies that institutional

cost in the enforcement of the criminal laws is, of course, a political one to be made by

Congress."  *United States v. North*, 920 F.2d 940, 945 (D.C. Cir. 1990).

In *Kastigar* itself, the Supreme Court specifically emphasized that it was not proclaiming a new standard for all coerced confessions but instead, specifically distinguished testimony that was compelled by statutory immunity and "a Fifth Amendment coerced-confession claim." *Kastigar*, 406 U.S. at 461. The Second Circuit has also acknowledge that *Kastigar* did not articulate the minimum protections necessary to safeguard the self-incrimination rights of individuals compelled or coerced to give statements in all circumstances. *See United States v. Helmsley*, 941 F.2d 71, 81 (2d Cir. 1991) ("*Kastigar* considered only the facial validity of the federal use immunity statute and did not address the intricacies of what constitutes impermissible use of immunized testimony"); *see also United States v. Turner*, 936 F.2d 221, 224 (6th Cir. 1991) (defendant was not entitled to a *Kastigar* hearing because he received only "pocket" immunity from an AUSA, and not statutory immunity under 18 U.S.C. § 6003, which an AUSA is not authorized to confer).

Most recently, in *United States v. Allen*, a case where a foreign sovereign, not a private actor—a fact that the Second Circuit found meaningful—compelled an individual to testify against himself, the Second Circuit noted that in that situation—one much more akin to formal, statutory immunity than a *Garrity* violation—it is not clear even in that case, that the *Kastigar* remedy would apply. *Allen*, 864 F.3d at 91 n.121 ("[U]nder our Fifth Amendment jurisprudence, it is not clear whether all involuntary statements or all compelled statements should be subjected to the strong medicine prescribed in *Kastigar*, or whether some other doctrine should govern certain circumstances."). Instead, the Second Circuit applied *Kastigar* because the Government "made no argument on behalf of applying something other than *Kastigar*." *Id*.

45

**B.  Applying a suppression analysis, any *Garrity* violation was harmless because the Government never offered the Defendant's statements to Paul Weiss at trial.**

A suppression and "fruits" analysis does not carry the heavy burden of the *Kastigar* standard.  While *Kastigar* requires the Government to affirmatively prove an independent source for its evidence presented at trial, a suppression and fruits analysis requires the Defendant to identify what evidence was directly obtained as a result of the suppressed statement.  Applying a suppression and fruits analysis, the Defendant's statement was not introduced at trial and thus effectively suppressed, so the only question is whether any "fruits" from that statement were otherwise admitted at trial.  It is clear from Gavin Black's statements that there were no evidentiary "fruits," as his statements contained false denials.

"[T]he fruit of the poisonous tree doctrine requires the exclusion of the fruits of illegally obtained evidence unless, 'granting establishment of the primary illegality, the evidence has been come at instead by means sufficiently distinguishable to be purged of the primary taint.'"  *United States v. Ahmed*, 94 F. Supp. 3d 394, 437 (E.D.N.Y. 2015) (quoting *Ghailani*, 743 F. Supp. 2d at 250 and *Wong Sun v. United States*, 371 U.S. 471, 187 (1963)); *see also Ghailani*, 743 F. Supp. 2d at 252-53 (Although the Supreme Court has not had occasion to extend the 'fruit of the poisonous tree doctrine" to coerced confessions, "[l]ower courts and commentators consistently have assumed that the poisonous fruit doctrine, with its qualifications, applies to coerced confessions.").  This doctrine "allows the receipt in evidence, despite law enforcement misconduct, of that evidence that the government inevitably would have discovered legally in any case as well as evidence that is only tenuously connected to illegal government action." *Ghailani*, 743 F. Supp. 2d at 250.

"Even in such extreme cases . . . in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the

46

coercive effect of the confession could, with time, be dissipated." *Oregon v. Elstad*, 470 U.S. 298, 311-12 (1985); *see also Harris v. New York*, 401 U.S. 222, 225 (1971) (holding that the presumption of coercion where a defendant did not receive *Miranda* warnings before his confession did not bar the use of his statement for cross-examination).  That is, under a "fruits" analysis, evidence can become attenuated enough from the coerced statement that it is not tainted and admissible.

The Supreme Court has recently defined the "attenuation doctrine": "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)); *see also Ghailani*, 743 F. Supp. 2d at 250 (applying fruits analysis and the attenuation doctrine to a coerced confession).  And the Court has specifically rejected the "lingering compulsion" argument that "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in doing so, has sealed his own fate," holding instead that although the defendant's first statement needed to be suppressed due to a *Miranda* violation, his second statement made after appropriate *Miranda* warnings was admissible.  *Elstad*, 470 U.S. at 317.

In identifying fruits of the poisonous tree, "[d]efendants must do more than merely speculate that all of the Government's evidence may be tainted and demand that the Government prove the genealogy of each and every piece of evidence it intends to use against them."  *Ahmed*, 94 F. Supp. 3d 394 at 437; *see also United States v. Vilar*, 530 F. Supp. 2d 616, 637-41 (S.D.N.Y. 2008) (denying unparticularized motion for a taint hearing and directing defendants to

specifically review government disclosures to determine whether any evidence raised issue of
taint prior to renewing motion to suppress tainted evidence); *United States v. Kandik*, 633 F.2d
1334, 1335-36 (9th Cir. 1980) (explaining that "a defendant has the initial burden of establishing
a factual nexus between the illegality and the challenged evidence," and affirming the district
court's refusal to conduct a taint hearing where the defendant did not establish such a factual
nexus although "the illegally seized evidence [was] known to all parties, and any connection
between it and the challenged testimony would be readily traceable.").

       The Defendant does not point to any specific (or even general set) of evidence admitted
at trial that is traceable to any statements he made to Paul Weiss.  This is because that is
impossible to do where the statements at issue consist entirely of false denials.  When confronted
with emails and chats showing his requests to the LIBOR submitters during his interviews with
Paul Weiss, Gavin Black responded by denying that they were requests that the LIBOR
submitters move their LIBOR submission to help benefit his trades.  *See* Exhibit 18, September
8, 2016 Ricciardi 302 at 2 ("Black adamantly stated he was not aware of any attempts to
influence DB's LIBOR rates. He was also adamant that he understood that influencing a LIBOR
setter to help trading positions would be wrong."; "Black was adamant that he never spoke with
King or Curtler on what they intended to submit. They might have known he had a position open
but he never asked them to help him with submissions." "Black stated neither King nor Curtler
ever solicited his needs or desires related to the setting of a LIBOR rate. His discussions with
King and Curtler were strictly related to transactions they were seeing in the market that
constituted market color." "Black was adamant that he never said anything to either Curtler or
King that even suggested where he would want them to set LIBOR rates."); *id*. at 3
("[Ricciardi's] impression of Black was that he clearly and unambiguously denied any untoward

involvement in influencing LIBOR rates."); *see also* Exhibit 19, Notes of Gavin Black Downloads from Paul Weiss at 1 ("Did not seek to influence DB submission nor did submitters solicit Black"); *id.* at 2 ("It would be wrong to affect LIBOR; wrong to consider even doing so" and "[n]ot aware of DB traders trying to affect DB submission"); *id.* at 3 ("Gavin was encouraged to tell setters his positions and did tell them his positions. It was up to the setters to determine whether to give derivative positions weight. . . Gavin assumed good faith on part of the setters when they submitted their LIBORs.").

The DOJ's evidence at trial was witness testimony and documents, neither of which were a product of Gavin Black's false denials to Paul Weiss.  Because Gavin Black's statements to Paul Weiss were not presented at trial nor to the Grand Jury at all, the only remaining possible use or derivative use that the DOJ could have made of the statements was during its investigation.  *See* Exhibit 5 and 6 to the United States' Response to Defendants' Motion to Vacate Convictions and Dismiss the Indictment on the Basis of Prosecutorial Misconduct, Grand Jury Transcripts.  But it is clear from reading Gavin Black's statements themselves, that the DOJ had no way of using them to benefit its investigation because Gavin Black's statements only included false denials.  *See* Exhibit 22, Ricciardi 302s; Exhibit 19, Notes of Gavin Black Downloads from Paul Weiss.  Gavin Black did not point to any relevant evidence, identify any witnesses not known to the Government, or provide any documents.  There is simply no way the DOJ could have used his false denials that his communications with James King and Michael Curtler were "market color" rather than requests to move their LIBOR submissions to benefit his trades.

Further, Gavin Black sat for an interview with the CFTC and DOJ approximately eight months after the DOJ received the information from his interview with Paul Weiss.  *See* Exhibit

49

19, Notes of Gavin Black Downloads from Paul Weiss; Exhibit 20, Gavin Black 302.  The

Defendant was represented by an attorney and voluntarily sat for this interview with the

Government and made the same false denials that he did in his interview with Paul Weiss.  And

in his statement to both the CFTC and DOJ, Gavin Black took the same position that his

communications were "market color" and that he was not asking the LIBOR submitters to

change their LIBORs to benefit his trades.  Thus, applying the reasoning *Elstad* that a second

uncoerced statement is not the "fruit" of a first coerced statement, Gavin Black's statements to

the CFTC and DOJ cannot be said to be fruit of Gavin Black's initial statements to Paul Weiss

such that the any possible taint from his original statements had dissipated by this point, almost

five years before trial.

There is also zero basis to argue that the Government could not use Gavin Black's

statement to the CFTC and DOJ to further investigate.  *See* Exhibit 23; Gavin Black Proffer

Agreement ("The government may make derivative use of any statements made or other

information provided by Client during the meeting. Therefore, the government may pursue any

investigative leads obtained directly or indirectly from such statements and information and may

use the evidence or information subsequently obtained therefrom against Client in any manner

and in any proceeding.).  Thus, any evidence that the Defendant argues to be "tainted" would be

too attenuated from his early statements to Paul Weiss because he choose, after advice of

counsel, to sit with the CFTC and DOJ and repeat the same story.

### C.  The Defendant has waived the argument that he is entitled to any remedy except barring the admission of his statements to Paul Weiss at trial.

The Defendant now requests "*Kastigar* relief" for an alleged *Garrity* violation, ECF No.

395 at 13, but the Defendant has waived *Kastigar* relief.  That is, the Defendant waived the

argument that the indictment should be dismissed on *Kastigar* grounds for an alleged *Garrity*

violation by not raising it at his dispositive motions deadline.  *See* Rule 12(b)(3)(A)(v) ("an error

in the grand-jury proceeding" must be raised pre-trial), 12(b)(3)(B) (same for a defect in the

indictment).  Indeed, the Defendant raised this issue in a motion *in limine* seeking to keep the

statement from being admitted at trial.  ECF No. 62 at 12.  The Defendant has now received that

relief, as his statement was not admitted at trial, and his motion is therefore moot as well.

Defense counsel clearly understood how to assert a *Kastigar* remedy for an alleged Fifth

Amendment violation, *see* ECF No. 106, yet he chose not to raise the Defendant's statements to

Paul Weiss in that way or at the appropriate time, despite having received Mr. Ricciardi's 302

describing the CFTC's letter, as well as the CFTC's April 19, 2010 letter, by November 2016,

more than six months before he filed his *Kastigar* motion related to Gavin Black's FCA

testimony.  Instead, as evidenced by the hearing, he chose to surprise [11] the Government and the

Court with his arguments (*i.e.*, that the CFTC's Letter Request turned Gavin Black's interview

into state action)—which he has every right to do—but he should be stuck with the consequences

that also follow from a strategy of mid-trial surprise when it comes to his late-requested *Kastigar*

relief.  Understanding that the Court can grant, in its discretion, an exception for "good cause,"

the Government will not further belabor the point, but notes its position for the record.

---

[11] Despite counsel's feigned surprise at the hearing that the CFTC requested an internal
investigation by external counsel, this fact had been disclosed in an early Ricciardi 302 that was
provided to the defense on November 8, 2016, *see* Exhibit 18 at 1, as well as the CFTC's April
2010 letter, produced to the Defendant on September 23, 2016, that counsel had in his hand and
offered up at the hearing, *see* Tr. 1531:18-25, that was provided to counsel on September 23,
2016.  *See* Tr. 2308:3-10 ("A:  I believe it was initiated because the CFTC wrote a letter."  THE
COURT:  Right.  That was the direct.  That was when I almost fell off my chair.  MR. LEVINE:
Forget about me.  The United States, sitting in the front row, again, we're having another one of
these conversations, I'm not casting any aspersions on this witness at this time at all.  I'm simply
reacting to the fact that I sat in the courtroom and listened to this.").  The Defendant also did not
raise, even tangentially, the actions of the CFTC in his Motion *in Limine*.  *See* ECF No. 232.

D.  **If the Defendant's view of the law was adopted, the low bar that he sets for assessing coercion would have ruinous consequences for corporate governance and the investigation of corporate crimes.**

In essence, the Defendant proposes that a defendant who was never threatened with adverse action is nonetheless "compelled" to give a statement when he has a subjective fear that a corporate policy may result in adverse employment consequences if he does not talk. Accepting the proposition that coercion can arise from a corporate policy even in the absence of any threat by a government actor not only flies in the face of controlling precedent, but would also functionally confer upon private corporations the power to grant use immunity to witnesses. The Second Circuit in *Solomon* warned that the sort of argument advanced by the Defendant "would mean that a large number of private bodies have been unwittingly endowed with a power to grant exactly such immunity," an outcome which "would clearly be intolerable."  509 F.2d at 870.

As the Second Circuit recognized, the immunization process is supervised by the Attorney General, whose duty is to the public and who may be held democratically accountable for immunity decisions that scuttle a criminal prosecution.  *See id.*  Corporations like Deutsche Bank, however, owe a duty to their shareholders, not the public.  As such, an interpretation of the Fifth Amendment that effectively outsources immunity decisions to corporations would allow corporate officers to frustrate criminal enforcement by making tactical use of the company's compliance policies.  Additionally, private actors—even those acting in good faith—generally have little experience in the criminal justice system and cannot be counted on to assess the effects that a grant of immunity would have on a prosecution the way a professional prosecutor can.

Likewise, a ruling that Deutsche Bank's compliance policy was effectively an instrument of coercion would put responsible companies in the impossible position of choosing between

52

effective internal controls and cooperation with criminal authorities.  As *Solomon* recognized, companies and trade associations are in the best position to police their employees and members and it is good public policy that they do so: "there would be a complete breakdown in the regulation of many areas of business if employers did not carry most of the load in keeping their employees in line and have the sanction of discharge for refusal to answer what is essential to that end."  *Id.*

The allegations of LIBOR manipulation leveled at Deutsche Bank were serious, and Deutsche Bank had an obligation to its shareholders to discover whether or not its employees were involved in misconduct.[12]  And there is nothing wrong with that.  "A company is not prohibited from cooperating, and typically has supremely reasonable, independent interests for conducting an internal investigation and for cooperating with a governmental investigation, even when employees suspected of crime end up jettisoned.  A rule that deems all such companies to be government actors would be incompatible with corporate governance and modern regulation." *Gilman v. Marsh & McLennan Companies, Inc.*, 826 F.3d 69, 77 (2d Cir. 2016).  Business associations have simultaneous interests in discovering misconduct within their ranks and seeing that wrongdoers are punished.  The standard proposed by the Defendant would pose a Hobson's choice of picking one or the other.

Finally, if this standard were the law, it would apply even further and inhibit civil regulators from issuing subpoenas.  That is, any statement that an employee of any reputable

---

[12] Paul Weiss was hired before the CFTC sent its April 2010 letter, *see* Factual Background Section III, and Deutsche Bank's duty to the public motivated interviews of bank employees, saying "they're a public company, and I believe that as a responsible public company, they wanted to know if there was any wrongdoing going on, and, if so, take appropriate remedial steps."  Tr. 1485:7-12.

company gives to a regulator while testifying under subpoena would be inadmissible in a subsequent criminal case.  Worse yet, if *Kastigar* applied, the Government would face the daunting task of proving that nothing in its case derived from such a statement.

Mr. Ricciardi testified that virtually all public companies, like Deutsche Bank, require employees to cooperate with regulatory and criminal investigations.  *See* Tr. 1520.  Hence, any employee of a company with a corporate compliance policy that requires cooperation (which is virtually all sizeable companies) could suppress statements made to regulators merely by submitting a declaration attesting that, although never threatened, he or she feared that silence would have resulted in an adverse employment action.  Indeed, one is hard pressed to identify a publicly traded company that would continue the employment of an officer who asserted the Fifth Amendment right during an SEC deposition.  Notably, because administrative subpoenas are clearly state action, this policy concern is not limited to situations in which a regulator asks an employer conduct an interview, but would instead apply whenever a regulatory body seeks testimony (which is a much clearer case of state action).   To apply the Defendant's view of the law would have an incredible chilling effect on all civil-criminal parallel investigations.

IV.   **IF THE COURT DOES FIND THAT THERE WAS A *GARRITY* VIOLATION AND THAT *KASTIGAR* APPLIES, THE GOVERNMENT SUCCEEDS IN A *KASTIGAR* FINDING ON THE PAPERS BECAUSE THE DEFENDANT'S STATEMENTS WERE FALSE DENIALS.**

If the Court determines that Gavin Black's statements to Paul Weiss were obtained in violation of *Garrity* and should be treated more like immunized testimony than a coerced statement, then the rule that immunity only covers incriminating truth and not exculpatory falsehoods should equally apply.  To be clear, if the Court agrees with the Government that Gavin Black's statements to Paul Weiss should be treated under the legal framework of coerced statements (assuming a *Garrity* violation), then whether or not his statements were incriminatory

or not, they should be suppressed.  As discussed above, the testimony was suppressed and thus, the legal analysis would end there and the Defendant's motion denied.

On the other hand, should the Court disagree and find a *Garrity* violation and that *Kastigar* is the remedy on the basis that *Garrity* violations should be treated like immunized testimony, then it matters whether Gavin Black's statements to Paul Weiss were "exculpatory denials" or "the incriminating truth."  The reason is "immunity, like the privilege itself, covers the incriminatory truth, not the exculpatory falsehood."  *United States v. Kurzer*, 534 F.2d 511, 518 (2d Cir. 1976) (citing *United States v. Tramunti*, 500 F.2d 1334, 1345 (2d Cir. 1974)).  Courts treat immunity differently for this reason because there is a bargain struck—in that the government provides immunity in exchange for "incriminatory truth"—and if the defendant does not hold up his end of the bargain and provide "incriminatory truth," then he does not get the benefit of immunity.  As explained by the Second Circuit in *Tramunti*:

> The theory of immunity statutes is that in return for his surrender of his fifth amendment right to remain silent lest he incriminate himself, the witness is promised that he will not be prosecuted based on the inculpatory evidence he gives in exchange. However, the bargain struck is conditional upon the witness who is under oath telling the truth. If he gives false testimony, it is not compelled at all. In that case, the testimony given not only violates his oath, but is not the incriminatory truth which the Constitution was intended to protect. Thus, the agreement is breached and the testimony falls outside the constitutional privilege. Moreover, by perjuring himself the witness commits a new crime beyond the scope of the immunity which was intended to protect him against his past indiscretions. This is not only a rational explanation of the accommodation between the competing interests and rights of the parties, but it is supported by authority.

500 F.2d at 1342-45 ("[T]he statute speaks of 'compelled testimony,' and the cases establish that this is the incriminating truth not otherwise available which is at the heart of the immunity

intended to be established by the congressional enactments.").[13]  Thus, because Gavin Black's statements to Paul Weiss were false denials, as detailed above, and not the incriminating truth (as determined conclusively by a jury verdict), the Defendant fails under a *Kastigar* analysis.

Lastly, even if the Defendant does not lose his *Kastigar* analysis due to the fact that it only protects incriminating truth, his false denials cannot be said to have produced any evidence at trial.  It does not matter, for *Kastigar* analysis, whether his statements were used to form questions asked at trial, in making charging decisions, to assess a witness's demeanor at trial, or otherwise impacted a prosecutor's thought process.  *See United States v. Rivieccio*, 919 F.2d 812, 815 (2d Cir. 1990) ("[T]o the extent the Government's thought process or questioning of witnesses may have been influenced by Appellant's immunized testimony, we hold that any such use was merely tangential and was therefore not a prohibited use.") (questioned on other grounds by *United States v. Allen*, 864 F.3d at 99 (holding that the use of immunized testimony for evidence presented to the grand jury could result in dismissal of the indictment); *see also United States v. Slough*, 641 F.3d 544, 553 (D.C. Cir. 2011) (ruling that the district court erred in dismissing an indictment on the ground that the prosecutor relied on immunized testimony in making charging decisions and relied upon *Rivieccio* in support of the proposition that *Kastigar* does not bar a prosecutor from relying on a defendant's immunized testimony in deciding whether or not to indict him); *United States v. Schmidgall*, 25 F.3d 1523, 1529 (11th Cir. 1994) ("[T]his Circuit has adopted the 'evidentiary' interpretation of *Kastigar*:  that the focus of a challenge on self-incrimination grounds should be on the direct and indirect evidentiary uses of

---

[13] The treatment of "compelled testimony" as this type of bargain that is breached where the defendant provides false exculpatory statements further supports the Government's position in Section III above that a *Garrity* violation is much more akin to a coerced confession than compelled testimony.

immunized testimony, rather than on non-evidentiary matters such as the exercise of prosecutorial discretion"); *United States v. Velasco*, 953 F.2d 1467, 1474 (7th Cir. 1992) ("the mere tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not an impermissible 'use' of that information").

V.      **FURTHER FACT FINDING OR HEARING ON THE QUESTION OF WHETHER THE DOJ OR CFTC "OUTSOURCED THEIR INVESTIGATIONS" IS NOT NECESSARY TO DENY THE DEFENDANT'S MOTION AND WOULD SET A PRECEDENT FOR SPRAWLING AND UNWARRANTED LITIGATION ON AN ISSUE THAT IS IRRELEVANT UNDER SECOND CIRCUIT LAW.**

While the Court noted in its December 19, 2018 order, ECF No. 406, that it anticipated that the Government would supply additional facts relevant to the issue of what the CFTC and DOJ did to investigate this case aside from receiving materials from Paul Weiss, the Government will not seek to supplement the record on this issue as, in this case and as discussed above, the issue of whether the DOJ or CFTC "outsourced their investigations" is not relevant or necessary to deny the Defendant's motion.  When raising this issue with the parties during trial, the Court referenced the *Blumberg* case when discussing its view about having a potential hearing or further fact-finding on the issue of whether the CFTC or DOJ "outsourced their investigations" to Paul Weiss.  *See* Tr. 2367:11-16 ("But I have said, and I mean it, that notwithstanding my truth-finding function, that three weeks into trial is not the time when we can take a break and have a three-day hearing, which is apparently what Mr. Levine had in the other case.  So you are going to get a ruling based on whatever record I have got.").  To be clear, the issue in *Blumberg*—the case in which Mr. Levine had an evidentiary hearing referenced herein—was not a *Garrity* question.

The issue in *Blumberg*, and focus of that hearing, was to determine "whether the Government should be ordered to search ConvergEx's files for *Brady* material."  Exhibit 26,

57

*United States v. Blumberg*, No. 2:14-cr-00458-JLL at 1 (D.N.J. June 7, 2016) (district court

ordering a hearing).  Here, the Defendant did not even raise or allege that Deutsche Bank was a

member of the prosecution team in its Motion to Compel or Amended Motion to Compel—

despite having alleged that many other entities were—such that the Government would be

responsible for searching Deutsche Bank's files for *Brady* material.  *See* ECF No. 53 and 117.

       In *Blumberg*, litigating the issue of whether or not the DOJ "outsourced its investigation"

consumed the Court and the parties' efforts for more than two years.[14]  For the Court to have a

---

[14] In *Blumberg*, the district court granted the defendant's request for an evidentiary hearing on
June 7, 2016 and set the hearing for three months later.  *See* ECF. No. 113.  Almost two years of
motion practice, hearings, and other collateral litigation ensued before the hearing finally took
place over three days in March and May of 2018.  After the court issued its initial order, the
defendant served extensive discovery requests on the government, as well as ConvergEx and its
law firms.  Both resulted in extensive motion practice: the defendant moved to compel discovery
responses from the government, and ConvergEx and the law firms sought to quash the subpoenas
on the ground of privilege.  *See* ECF. No. 119, 121, 130, 132.  By the end of August 2016, after
the court had ordered the government to produce documents relevant to the hearing *see* ECF. No.
126, the defendant added a request for production of government notes and internal
communications between prosecutors, and raised new arguments for obtaining documents from
ConvergEx and its law firms.  *See* ECF. No. 135, 141.  The originally-scheduled September 2016
hearing became a status conference instead.  *See* ECF. No. 142.  Following "extensive
argument," the court ordered the government to produce a privilege log of internal notes and to
produce internal DOJ communications for in camera review.  *See* ECF. No. 144.  More litigation
followed over ConvergEx and the law firms' assertion of privilege and the scope of the
government's notes production. *See* ECF. No. 145, 146, 147, 148, 149, 152.  The court then
issued another order requiring ConvergEx to produce a privilege log and to produce its own
internal communications for in camera review.  *See* ECF. No. 151.  While these disputes
remained pending, the defendant and ConvergEx spent months negotiating over the scope of the
subpoena to ConvergEx.  *See, e.g.*, ECF. No. 187.  In April 2017, the magistrate judge denied the
defendant's request for internal communications between DOJ prosecutors and between
ConvergEx attorneys, determining, after sampling several hundred of the "thousands of internal
communications," that the materials were protected by the work product privilege.  *See* ECF. No.
194.  With the hearing rescheduled for September 2017, the defendant then moved ex parte for
the issuance of more third-party subpoenas, *see* ECF. No. 197, and filed another motion
contesting ConvergEx's production of notes pursuant to the original subpoenas.  *See* ECF. No.
198.  As to the new subpoenas, there was further litigation before the subpoenas were quashed.
*See* ECF. No. 199, 200, 202, 205, 218, 225, 227, 229.  There also was extensive litigation over

*Blumberg*-styled inquiry, when any results of that inquiry would not be relevant to the question of whether Gavin Black's Fifth Amendment rights were violated, would lead to unwarranted and sprawling litigation.  Allowing additional facts, a third day of *Garrity* hearing, and potential additional discovery on an issue that is not legally relevant in this case is prejudicial to the Government and would be an unnecessary waste of the Court's time and resources.  As explained above, the only facts that are relevant to the issue of Defendant's allegation of a *Garrity* violation is what facts surrounded Gavin Black's interview with Paul Weiss and the CFTC or DOJ's involvement with that interview.  These facts—related to the CFTC or DOJ's relationship in regards to Gavin Black's interviews—have already been developed through the parties' motions, responses, and two days of hearing.

The Defendant has had ample time to supplement the record to provide every piece of fact and legal argument to be made on this issue.  The Defendant filed the original motion invoking *Garrity* to exclude his statement on April 23, 2018, had two days of hearing on October 2 and 5, 2018, and has now had an additional two months since trial to file his current motion and accompanying exhibits.  As fully articulated above, assuming the Defendants' allegations to be true, the Defendant fails to make a cognizable *Garrity* claim.  Facts related to whether the CFTC or DOJ outsourced their investigations are not at all dispositive under Second Circuit precedent or the facts of this case especially when the Government did not introduce the challenged statements at trial.  Thus, further fact-finding and hearing is unwarranted in this case.

---

the defendant's demand for additional documents from ConvergEx centering on ConvergEx's assertions of privilege, with more submission of in camera materials to the magistrate judge and another hearing.  *See* ECF. No. 203, 204, 207, 209, 210, 212, 213.  After the hearing, the defendant and ConvergEx filed another round of briefs, *see* ECF. No. 226, 228, before the defendant's request for additional materials was denied.  *See* ECF. No. 234.  Finally, the hearing took place March 13-14 and May 14-15, 2018.

VI.   **THE DEFENDANT IS ALSO NOT ENTITLED TO FURTHER *KASTIGAR* RELIEF IN REGARDS TO HIS FCA TESTIMONY.**

The Defendant asks this Court to, in essence, reconsider its prior ruling denying his motion to dismiss the indictment on *Kastigar* grounds, either by dismissing the indictment now or by granting him a second *Kastigar* hearing.  But the Defendant advances no new arguments nor points to any new facts that would give this Court grounds to revisit its carefully-considered May 16, 2018 *Kastigar* ruling.  The Defendant similarly fails to identify *any* specific trial testimony or other evidence that would warrant a second hearing, instead positing that the mere fact that the Defendant was compelled to testify by a foreign sovereign—absent any plausible showing of taint—means that the government must (once again) prove a negative, a position which this Court has already rightly rejected.  *See* May 16, 2018 Order, ECF No. 274 at 18 ("[N]othing in *Kastigar* suggests that the mere invocation of that word by a defendant compels the Government to try to prove a negative.").[15]

The Defendant nevertheless contends that the Court should reopen the *Kastigar* hearing for two reasons.  First, he claims that "the Government offered no evidence to demonstrate that any of the individuals at [Deutsche Bank and its outside counsel, Paul Weiss and Slaughter and May] did not have access to Mr. Black's compelled testimony or any evidence derived therefrom."  ECF No. 395 at 19.  Second, he claims that because the Government's trial evidence included evidence "first produced by Deutsche Bank" to the CFTC and the SFO, and because all three of these entities "interacted with the FCA," the Government "must affirmatively prove that

---

[15] The Government preserves for the record its position that *Kastigar* is inapplicable to testimony compelled by a foreign sovereign, notwithstanding the Second Circuit's decision in *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017), as well as its position that the Fifth Amendment does not require the application of *Kastigar*—as opposed to an alternative legal standard—to a defendant's compelled statements in these circumstances, a matter which the *Allen* case expressly left open, *id.* at 90 n.121.

none of this evidence was gathered or identified as significant based on Mr. Black's FCA testimony or anything derived from it." ECF No. 395 at 19. The Government thus should have, the Defendant contends, submitted affidavits on behalf of all of the trial witnesses (or presented their live testimony) regarding these "interactions" at the pretrial *Kastigar* hearing. ECF No. 395 at 18-19. The Defendant's entire argument is premised on one speculative contention: because Deutsche Bank and its counsel "interacted" with the FCA, they may have tainted the Government's trial evidence or trial witnesses.

But contrary to Defendant's assertion, the record on which the Court ruled in its *Kastigar* Order does sufficiently address the issue of taint through Deutsche Bank or its counsel. As the declarations of Patrick Meaney on behalf of the FCA and Louise van der Straeten on behalf of the SFO make clear, the FCA and the SFO provided Gavin Black's compelled testimony only to a circumscribed list of recipients and no one else. *See* ECF 170 Ex. 1-2. Moreover, these affidavits make clear that U.K. law restricts further dissemination of the Defendant's compelled testimony, *see id.*, a point to which Michael Prange also testified at the *Kastigar* hearing (4/24/18 Tr. 11:8–17). This Court has previously stated that sworn testimony of this nature would be "powerful evidence" that the Defendant's compelled testimony was not shared with extraneous parties. ECF No. 145 at 23. The sworn testimony of these three witnesses establishes that Deutsche Bank and its counsel did not receive Gavin Black's FCA-compelled testimony or a summary thereof from either the FCA or the SFO, and therefore were not tainted.[16]

---

[16] Although Mr. Meaney had at one point thought it possible that the FCA shared a copy of Gavin Black's compelled testimony transcript with counsel representing Deutsche Bank (as reflected in a 302 interview report the government produced to the defense in advance of the Kastigar hearing), upon investigation, Mr. Meaney determined that that the FCA had not, in fact, disclosed the transcript to counsel for Deutsche Bank and so swore in his declaration.

The Defendant has identified no new facts relevant to the *Kastigar* inquiry of which he has become aware since the Court's *Kastigar* Order, notwithstanding the Court's admonition that "in the absence of a much stronger and more plausible showing of possible taint than Black has been able to mount to date [pre-trial], the court does not anticipate engaging in this exercise again." ECF No. 274 at 18 (redacted filing).  The Defendant ignores this caution from the Court and instead attempts to obfuscate the Government's burden under *Kastigar* with blanket statements such as that "the Government has not negated the possibility that the trial witnesses were tainted." ECF No. 395 at 19.  Such an assertion misstates the Government's burden.  The Government is not required "to 'negate all abstract "possibility" of taint.'"  *United States v. Dynalectric Co.*, 859 F.2d 1559, 1578 (11th Cir. 1988) (quoting *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985)).  The Defendant, who is well aware of the contents of his own compelled testimony, has failed to point to a single example of evidence introduced at trial that was purportedly tainted by his FCA testimony.  There can be little doubt that the Defendant would have been quick to point out any such examples if they existed.  "[A] defendant bears the burden of laying 'a firm "foundation" resting on more than "suspicion"' that proffered evidence was tainted by exposure to immunized testimony."  *United States v. Slough*, 641 F.3d 544, 551 (D.C. Cir. 2011) (quoting *United States v. North*, 920 F.2d 940 n.9 (D.C. Cir. 1990)).  The Defendant has made no attempt to establish any such foundation here.  The Court should deny the Defendant's demand to vacate his conviction or to give him another bite at the *Kastigar* apple based on nothing more than unfounded speculation.

## CONCLUSION

For those reasons, the Defendant's Motion for *Kastigar* Relief should be denied.


Respectfully submitted,

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

_____/s/_____
CAROL L. SIPPERLY
Senior Litigation Counsel
ALISON L. ANDERSON
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

JAMES J. FREDRICKS
Chief, Washington Criminal II Section
Antitrust Division
United States Department of Justice

_____/s/_____
MICHAEL T. KOENIG
CHRISTINA J. BROWN
Trial Attorneys
Antitrust Division
United States Department of Justice