MUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
_____
                                          )
UNITED STATES OF AMERICA                  )
                                          )
        v.                                )
                                          )        No. 16-cr-370
MATTHEW CONNOLLY AND                      )
GAVIN BLACK,                              )
                                          )
        Defendants.                       )
_____)
```

**UNITED STATES' RESPONSE TO DEFENDANTS BLACK AND CONNOLLY'S
MOTIONS FOR A JUDGMENT OF ACQUITTAL OR NEW TRIAL**

# TABLE OF CONTENTS

I.   THE JURY HEARD MORE THAN SUFFICIENT EVIDENCE TO FIND THE
     DEFENDANTS GUILTY ON ALL COUNTS ................................................................... 3

     A.   The Defendants Participated in a Conspiracy and Scheme to Defraud Involving the
          Use of False or Fraudulent Statements ........................................................................ 3

          1.   The Defendants Caused Deutsche Bank to Change Its Predetermined LIBOR
               Submissions to Benefit Their Trading Positions at Their Counterparties'
               Expense ............................................................................................................... 3

          2.   The Evidence Did Not Have to Show Deutsche Bank Could Not Have
               Borrowed Funds at the Submitted Rates to Establish Falsity ........................... 6

          3.   The Evidence Did Not Establish a "Reasonable Range" of LIBOR
               Submissions that Would Allow for Consideration of Trading Positions .......... 9

          4.   The Defendants' False and Fraudulent Statements Need Not Be Expressly
               Prohibited ........................................................................................................ 10

          5.   Evidence that LIBOR Fixes Were Themselves False Was Not Required ...... 12

          6.   The Court Correctly Instructed the Jury that Falsity Can Be Established By
               Evidence of Implied False Statements and Misleading Half-Truths .............. 13

     B.   Deutsche Bank's Skewed LIBOR Submissions Were Material to the BBA and to
          Deutsche Bank's Counterparties ............................................................................... 14

          1.   The Defendants' Fraudulent Scheme Was Capable of Influencing the BBA's
               Actions ............................................................................................................. 16

          2.   The Defendants' Fraudulent Scheme Was Capable of Influencing the Actions
               of Deutsche Bank's Counterparties ................................................................ 19

     C.   The Defendants Acted with Intent to Defraud by Causing Deutsche Bank to Make
          LIBOR Submissions Calculated to Harm Its Counterparties .................................... 23

          1.   The Evidence Showed the Defendants Did Not Act in Good Faith .............. 26

          2.   Countrywide Is Materially Different and Does Not Preclude the Jury's
               Guilty Verdict ................................................................................................. 32

          3.   Data Regarding Net Trading Positions Was Not Required ............................ 33

     D.   The Jury Heard Sufficient Evidence that Counterparties Were Defrauded ............. 35

          1.   The Case Was Not Based On, and the Government Was Not Required to
               Establish, a Duty to Disclose ......................................................................... 35

          2.   The Trial Record Shows that Misrepresentations Were Made to the
               Counterparties Through the BBA/Thomson Reuters as a Conduit................. 36

          3.   The Evidence Established that the Scheme was Capable of Influencing the
               Counterparties' Actions .................................................................................. 37

i

    E.   The Defendants' Scheme to Rig the LIBOR Benchmark Affected Financial Institutions ............................................................................................................... 38

        1.   The Defendants' Scheme Affected Deutsche Bank's Trading Counterparties ................................................................................................................. 39

        2.   The Defendants' Scheme Also Affected Deutsche Bank ............................... 42

    F.   The Jury Heard Sufficient Evidence of Interstate Wire Communications to Support the Substantive Wire Fraud Counts .......................................................................... 44

    G.   The Jury Heard Sufficient Evidence of the Conspiracy and that Mr. Connolly Knowingly Joined It ................................................................................................... 47

II.   THE PROOF AT TRIAL FELL WITHIN THE "CORE OF CRIMINALITY" ALLEGED IN THE INDICTMENT AND THERE WAS THUS NO CONSTRUCTIVE AMENDMENT OR PREJUDICIAL VARIANCE ............................................................. 48

    A.   The Alleged "Core of Criminality" Is the Scheme to Manipulate LIBORs to Benefit the Defendants' Trading Positions at the Expense of Their Counterparties ............ 48

    B.   The Defendants Have Long Been on Notice of the Alleged Misrepresentations to Deutsche Bank's Counterparties ................................................................................. 51

    C.   Whether or Not the Grand Jury Heard Sufficient Evidence of Misrepresentations to Deutsche Bank's Counterparties Is Irrelevant and Harmless in Light of the Jury's Guilty Verdict ............................................................................................................. 55

III.  THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL .................................... 57

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Bruff v. Mali*, 36 N.Y. 200 (N.Y. 1867)...................................................................................... 37

*Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (N.Y. 1880) .................................................... 37

*Lopez v. Riley*, 865 F.2d 30 (2d Cir. 1989)................................................................................... 56

*Neder v. United States*, 527 U.S. 1 (1999)............................................................................. 17, 37

*Pasternack v. Laboratory Corp. of America Holdings*, 27 N.Y.3d 817 (N.Y. 2016).................. 37

*Schmuck v. United States*, 489 U.S. 705 (1989) .......................................................................... 45

*Securities Investor Protection Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702 (N.Y. 2001)....... 37

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016)
.................................................................................................................................................. 32

*United States v. Allen*, 160 F. Supp. 3d 698 (S.D.N.Y. 2016) ...................................................... 8

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .................................................. 7, 8, 13, 35

*United States v. Banki*, 685 F.3d 99 (2d Cir. 2012) ............................................................... 49, 50

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) ........................................................... 3, 23

*United States v. Block*, 16-cr-595 (JPO), 2017 WL 1608905 (S.D.N.Y. Apr. 28, 2017) ............ 12

*United States v. Bogucki*, 316 F. Supp. 3d 1177 (N.D. Cal. 2018)........................................ 41, 42

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................................. 17

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994)............................................................... 33

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012)....................................................... 49, 50

*United States v. D'Anna*, 450 F.2d 1201 (2d Cir. 1971)............................................................... 51

*United States v. Dula*, 39 F.3d 591 (5th Cir. 1994) ...................................................................... 8

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ................................................... 12, 15, 36

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001)............................................................. 57

*United States v. Ghavami*, 10-cr-1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ............................................................................................................................... 40, 44

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ........................................ 12

*United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015) ........................................ 38, 42

*United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991) .................................... 7

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) ...................................... 27

*United States v. Manton*, 107 F.2d 834 (2d Cir. 1939) ...................................... 8

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) ................................ 57

*United States v. Mechanik*, 475 U.S. 66 (1986) ............................................ 56

*United States v. Mollica*, 849 F.2d 723 (2d Cir. 1988) ............................ 49, 51

*United States v. Morgenstern*, 933 F.2d 1108 (2d Cir. 1991) ........................ 8

*United States v. Prieto*, 812 F.3d 6 (1st Cir. 2016) ...................................... 18

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .................................... 33

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................... 49

*United States v. Riley*, 621 F.3d 312 (3d Cir. 2010) .................................... 33

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ................ 49, 50, 51

*United States v. Seabrook*, 613 Fed. Appx. 20 (2d Cir. 2015) .................... 50

*United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) .................................... 45

*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012) ................................ 31

*United States v. Vest*, 116 F.3d 1179 (7th Cir. 1997) .................................... 8

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) .............................. 22, 37

*United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) ............................ 13

*United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ........................ 40

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016) ........................ 13

## Statutes

12 U.S.C. § 1422 ..................................................................................................... 39

12 U.S.C. § 1841 ..................................................................................................... 43

12 U.S.C. § 3101 ..................................................................................................... 44

18 U.S.C. § 1343 ..................................................................................................... 42

18 U.S.C. § 1344 ..................................................................................................... 39

18 U.S.C. § 1349 ..................................................................................................... 42

18 U.S.C. § 20 ............................................................................................... 39, 43, 44

18 U.S.C. § 3293 .............................................................................................. passim

Mr. Black's and Mr. Connolly's motions for a judgment of acquittal or new trial fail to identify any genuine gaps in the proof at trial. Instead, they resort to misleading characterizations of the government's case, misconstructions of the evidence, and made-up legal requirements. In reality, however, the Court demanded rigorous proof from the government at trial as to each element of the charged crimes. And the jury heard more than enough evidence to find every element of those crimes beyond a reasonable doubt.

All three co-conspirator witnesses testified they participated with the defendants in a scheme to manipulate the LIBOR rate, the world's most important financial benchmark, by causing Deutsche Bank to misrepresent its perceived borrowing rates by skewing its LIBOR submissions to suit its trading positions and thereby depriving its counterparties of money. Their testimony was corroborated by contemporaneous written requests from the defendants to move Deutsche Bank's LIBOR submissions to benefit its trades. And all three co-conspirator witnesses admitted they knew what they were doing was wrong. The jury heard evidence that these submissions were material both to the British Bankers' Association (BBA), which used the submissions to calculate the overall LIBOR rates, and to Deutsche Bank's counterparties, who then made or received payments on their trades with Deutsche Bank based on the LIBOR rates. The jury likewise heard that the defendants and their co-conspirators acted with intent to defraud by disadvantaging these counterparties when their trades were settled based on manipulated LIBOR submissions. The evidence made clear that the scheme affected federally insured financial institutions—as one would expect from a scheme to manipulate a key financial benchmark to which trillions of dollars in financial instruments were tied. And the evidence showed the scheme foreseeably involved interstate or international wires. The evidence was thus

1

more than sufficient to support the jury's verdicts against both Mr. Black and Mr. Connolly, and neither a judgment of acquittal nor new trial is warranted as to either defendant.

The defendants' arguments regarding constructive amendment or prejudicial variance from the indictment are similarly misplaced. The evidence showed that the defendants transmitted material misrepresentations in at least two ways: (1) to the BBA when they caused the transmission of skewed LIBOR submissions, and (2) to Deutsche Bank's counterparties, through the BBA/Thomson Reuters as a conduit, when they skewed the LIBOR submissions that were then used to calculate LIBOR and settle counterparty trades. Contrary to the defendants' claims, each of those is consistent with the "core of criminality" alleged in the indictment—that is, the fraudulent scheme to manipulate LIBORs to benefit the defendants' trading positions at the expense of the counterparties whose positions were opposite those of Deutsche Bank. Whether each theory is labeled "convergent" or "non-convergent" does not matter. The core of criminality for purposes of constructive amendment depends on a defendant's alleged conduct, not the labels attached to the government's legal theories. And the defendants have acknowledged on multiple occasions the alleged misrepresentations to both the BBA and Deutsche Bank's counterparties. Indeed, the Court recognized both allegations in ruling on the defendants' motions for a bill of particulars. The defendants have thus been on notice of these allegations from the very beginning of this case, and there has been no constructive amendment of, or prejudicial variance from, the indictment.

Much like their motions at trial, the defendants' current motions (ECF No. 390 and 392) fail to raise any issue that comes even close to warranting acquittal or a new trial. The defendants' motions should be denied.

## I.     THE JURY HEARD MORE THAN SUFFICIENT EVIDENCE TO FIND THE DEFENDANTS GUILTY ON ALL COUNTS

A defendant challenging the sufficiency of the evidence faces a "heavy burden," as courts are "exceedingly deferential" to a jury's verdict.  *United States v. Binday*, 804 F.3d 558, 572 (2d Cir. 2015) (quoting *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015)).  The sufficiency of the evidence is analyzed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Id.*  A conviction must be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)).  Here, the jury heard more than enough evidence to find every element of the crimes alleged against Mr. Black and Mr. Connolly beyond a reasonable doubt.

### A.   The Defendants Participated in a Conspiracy and Scheme to Defraud Involving the Use of False or Fraudulent Statements

#### 1.   The Defendants Caused Deutsche Bank to Change Its Predetermined LIBOR Submissions to Benefit Their Trading Positions at Their Counterparties' Expense

The question posed by the BBA asked panel banks to report the rate at which they could borrow funds by asking for and accepting interbank offers in a reasonable market size.  *See, e.g.*, GX 1-801 & GX 1-803 (pages from BBA's website regarding submissions by panel banks); Trial Transcript ("Tr.") 274:1-2 (Mr. King explaining this meant "[t]hat the rates that I was supposed to be submitting was to be a reflection of where we could borrow funds in the interbank market").  The jury heard Deutsche Bank had an impartial system—a "pricer"—for calculating what its LIBOR submission should be.  *See, e.g.*, GX 1-402A (screenshot of Deutsche Bank's pricer); Tr. 271:14-273:2 (Mr. King explaining how the pricer's LIBOR column would show the

rates to be submitted on any given day).  And the jury heard the conspirators caused Deutsche Bank to submit a number that was *not* that.  Instead, they caused Deutsche Bank to take its determined LIBOR number and move it in a direction (higher or lower) that would take more money from their counterparties on trades tied to LIBOR.  *See, e.g.*, Tr. 295:5-296:4 (Mr. King testifying he moved the number generated by the pricer higher or lower in an effort to affect the day's overall LIBOR fixing); Tr. 2143:2-8 (Mr. Curtler explaining how they would use the pricer to come up with Deutsche Bank's LIBOR submission and then move it per request by "skewing the rates"); Tr. 1608:10-24 (Mr. Curtler testifying he changed what otherwise would have been his submissions to take account of trading positions).

All three co-conspirator witnesses testified they understood this conduct was "wrong" and would give Deutsche Bank an unfair advantage over its trading counterparties.  As Mr. King put it, "[i]t's intuitively wrong because we are, you know, as I say, taking advantage of the position.  We are benefiting.  There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing."  Tr. 277:22-278:13; *see also* Tr. 1009:13-1010:10 (Mr. Parietti testifying that "I knew it was wrong because, you know, it was pretty obvious that LIBOR is a really important benchmark. . . .  And it was clear that it wasn't fair and objective if, you know, the submitters were biasing it to make their own bank more money."); Tr. 1647:12-13 (Mr. Curtler acknowledging that "it was wrong what we were doing").

The co-conspirators' testimony also established that the defendants participated in the scheme.  Mr. King, for example, described how he received requests from Mr. Black and Mr. Connolly to change Deutsche Bank's LIBOR submissions to suit its trading positions.  *See*, *e.g.*, Tr. 289:4-20 ("On any given day if someone has -- for example, Gavin Black had a fixing and needed me to make a LIBOR rate or submission higher or lower than we would have

ordinarily have done, then that would be communicated either verbally or electronically and then I would change the rates."); Tr. 293:4-12 ("Matthew Connolly on occasion made requests for me to change our LIBOR rates and to benefit the trader's position.").  Mr. Curtler received similar requests to move Deutsche Bank's LIBOR submission from both the defendants.  *See, e.g.*, Tr. 1657:10-18 (describing how he sat next to Mr. Black and received requests from him in person); Tr. 1625:11-1626:9 (describing example of written request from Mr. Connolly for the 3-month LIBOR submission to be as high as possible).  Mr. Parietti also testified that Mr. Connolly, his supervisor, instructed him to communicate his trading positions to Mr. King and Mr. Curtler so they could consider them in making Deutsche Bank's LIBOR submissions. Tr. 1008:13-1009:12 ("I interacted with them to let them know what my LIBOR fixings were for the next fixing so that they could consider it when they made their submission. . . . My boss, Matt Connolly, told me to.").

The testimony was corroborated by numerous trial exhibits showing Mr. Black and Mr. Connolly asking Deutsche Bank's LIBOR submitters to move their submissions higher or lower to take account of the bank's trading positions.  For example, in a Bloomberg chat with Mr. Curtler, Mr. Connolly responded regarding the 1 month LIBOR, "WE WOULD PREFER IT HIGHER. . . WE HAVE ABOUT 15BB 1MO RECEIVES. . . ."  GX 1-027.  Similarly, in an email to Mr. King, Mr. Connolly requested, "If possible, we need in NY 1mo libor as low as possible next few days ….tons of pays coming up overall…thanks!" to which Mr. King responded, "Will do our best Matt. . . . ."  GX 2-001.  *See also* GX 1-003 (Bloomberg chat with Gurjit Dehl, in which Mr. Black asked "can we have a high 6mth libor today pls gezzer?"); GX 1-006 (Bloomberg chat with Mr. King, in which Mr. Black asked "COULD WE PLEASE HAVE A LOW 6MTH FIX TODAY OLD BEAN?"); GX 1-019 (Bloomberg chat with

Mr. Curtler, in which Mr. Black requested "LOW 1 MUNF. . . SAME AS YEST, 8375, U

CAARNT"); GX 1-024 (email to Mr. Curtler and Mr. King from Mr. Connolly, relaying "OTC

requests 3 mo Libor be as high as possible Thursday and Friday if you see the market higher").

2. <u>The Evidence Did Not Have to Show Deutsche Bank Could Not Have<br>Borrowed Funds at the Submitted Rates to Establish Falsity</u>

The defendants' argument that the government must present data showing Deutsche

Bank's actual or perceived borrowing costs and "contemporaneous market factors" to exclude

the possibility that Deutsche Bank could have borrowed funds at the skewed rates Deutsche

Bank submitted is unavailing. *See* Black Mot. I.A.1.a.i at 6-8; Connolly Mot. II.A-B at 11-12.

Evidence that Deutsche Bank *could not* have borrowed funds at a rate submitted to the BBA is

not necessary to establish the falsity of its LIBOR submissions, nor would evidence that

Deutsche Bank *could* have borrowed funds at a submitted rate change the false and fraudulent

nature of the defendants' statements.

As a factual matter, even if Deutsche Bank could have borrowed funds at a submitted

rate, that would not prevent the submission from being false and misleading. As Mr. Curtler and

Dr. Youle testified, if a bank could borrow funds at a particular interest rate, it could also pay

more money to borrow those same funds at higher interest rates. *See, e.g.*, Tr. 2182:18-2183:3

(Mr. Curtler explaining that, if a bank could get a loan at a particular rate of interest, it stands to

reason that the lender would also have accepted a higher rate of interest on that same loan);

Tr. 214:23-25 (Dr. Thomas Youle explaining that, "if you were to go to a broker and ask them,

they would give you the lowest, because why would you pay more if you could pay less").

Similarly, if an auto dealer agreed to sell a buyer a car for $10,000, it stands to reason that he

would also have parted with the car for $12,000. But it would not be accurate to say the price of

the car was $12,000.

6

The BBA's question did not call for panel banks to submit any number at which they could theoretically (though not rationally) borrow funds—rather, it asked banks to report the rate at which they could borrow funds by asking for *and accepting* interbank offers in a reasonable market size.  *See* GX 1-801.  If Deutsche Bank could have borrowed funds at a rate of 5%, for example, it could also have borrowed funds at a rate of 50%.  But it never would have *accepted* a loan at that interest rate.  *See, e.g.*, Tr. 2182:7 (Mr. Curtler explaining "[y]ou would borrow the cheapest money first").  Thus, whether Deutsche Bank *could* have borrowed funds at a submitted rate is not dispositive of the falsity of those submissions.  What matters, and what the evidence showed, is that Deutsche Bank determined what its LIBOR submissions should be, and the defendants caused the bank to change the numbers and submit something else.  The jury could reasonably find those submissions were fraudulent.

More fundamentally, whether or not Deutsche Bank could actually have borrowed at the submitted rates is not a defense to fraud because opinions are not scientifically right or wrong—rather, they are either honestly held or they are not.  The fraudulent nature of the false statements thus depends on the intent behind them, not on whether the substance of the statements was reasonable or could be justified after the fact.  "The expression of an opinion not honestly entertained is a factual misrepresentation."  *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (quoting *United States v. Amrep Corp.*, 560 F.2d 539, 544 (2d Cir. 1977)).  Indeed, in fraud cases, material statements made for the purpose of deceiving another party establish a scheme to defraud even where those statements, by luck or design, are factually defensible.  *See United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991) (upholding mail fraud conviction of a

real estate mogul who intended to defraud the State of New York of tax revenue, notwithstanding that the government failed to prove that the taxes were actually due).[1]

Thus, the question for the jury was whether the defendants made LIBOR submissions that were something other than honestly held estimates of Deutsche Bank's borrowing costs. The jury heard evidence that the defendants asked Deutsche Bank submitters to change the bank's submissions in line with their trading positions, from which jurors could easily infer that the bank's LIBOR submissions were not a true estimate of borrowing costs, but rather numbers manipulated for its financial gain. The evidence thus showed Deutsche Bank's LIBOR submissions were false and fraudulent statements because they did not actually reflect the conspirators' estimates of the bank's borrowing costs.

The jury also heard sufficient evidence to find that Deutsche Bank's LIBOR submissions were fraudulent because each submission carried with it the implicit certification that it was determined according to the BBA's rules, which is not what happened. *See United States v. Allen*, 160 F. Supp. 3d 698, 701-02 (S.D.N.Y. 2016) (rigged LIBOR submissions constitute express and implied false statements), *rev'd on other grounds* 864 F.3d 63 (2d Cir. 2017); *see also United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (recognizing that fraud liability may attach to implicit statements); *see also Autuori*, 212 F.3d at 118 (recognizing that

---

[1] Courts have likewise held in analogous contexts that criminal liability attaches to conduct intended to deceive another party, even when the statements uttered are reasonable, defensible, or even truthful. *See, e.g.*, *United States v. Manton*, 107 F.2d 834, 845-46 (2d Cir. 1939) (in the context of a former judge who accepted bribes, "the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it."); *United States v. Vest*, 116 F.3d 1179, 1183-84 (7th Cir. 1997) ("[I]f in hindsight it turns out that . . . the tests [defendant] ordered *were* medically necessary, that is merely a fortuitous coincidence. It does not rebut the inference that [defendant] had a fraudulent intent when he ordered the tests with the data he had.") (emphasis in original); *United States v. Dula*, 39 F.3d 591, 593 n. 10 (5th Cir. 1994) ("[W]hether or not the products actually conformed to these specifications is a matter of happenstance and is essentially irrelevant").

fraud liability may attach to half-truths, as discussed *infra* I.A.6).  By making LIBOR submissions in response to the BBA's question, the conspirators held Deutsche Bank out as a panel member that participated in the process as directed.  And the conspirators understood their counterparties believed that the LIBOR rates used to settle their trades would be determined objectively.  *See, e.g.*, Tr. 1678:25-1679:11 (Mr. Curtler explaining that if counterparties "found out you were skewing your LIBOR to benefit your positions, they either wouldn't deal with you or report you to the BBA"); Tr. 1168:3-15 (Mr. Parietti wanted his counterparties "to think LIBOR was a fair and objective benchmark and that they could trust it").  These implied statements were false, because the numbers the conspirators caused to be submitted were not calculated according to the prescribed considerations, but were instead numbers that would help Deutsche Bank make money at its counterparties' expense.

### 3.   The Evidence Did Not Establish a "Reasonable Range" of LIBOR Submissions that Would Allow for Consideration of Trading Positions

Contrary to the defendants' assertion, the evidence at trial did not establish a "reasonable range" within which LIBOR submitters were free to select their submissions with reference to their banks' trading positions.  *See* Black Mot. I.A.1.a.ii at 9-12; Connolly Mot. II.B at 13. Indeed, the defendants forcefully made that argument at trial, but the jury rejected it.  Mr. King, Mr. Curtler, and Mr. Parietti all testified, not only was that not their understanding, but they had never heard the concept of a "reasonable range" until after the investigation began, and instead understood making LIBOR submissions to benefit trading positions was contrary to the BBA's question.  *See, e.g.*, Tr. 759:9-21 (Mr. King explaining, when asked if Deutsche Bank's LIBOR submission was a "range of numbers," that it was instead "a number that our pricer came up with or that we -- we came up with to get a single number, which was a number for us that we would submit in any particular tenor"); Tr. 2148:18-23 (Mr. Curtler being asked, "And before this

investigation began into LIBOR and at Deutsche Bank, had you ever in any of your discussions and conversations on the trading desk talked about there being some sort of reasonable range or leeway in which you can move your LIBOR positions to benefit trader positions?" to which he responded, "No, I haven't."); Tr. 1379:3-6 (Mr. Parietti being asked, "Do you have a view whether or not there is flexibility in LIBOR that would allow you to ask a setter to move his submission to benefit your trading position?" to which he responded, "My view is that there is not.").  Dr. Youle similarly testified that there was no such "range" of true borrowing costs. Tr. 215:12-15 ("Q. . . . Do you agree that there was a range of true borrowing costs at banks? A. Based on what I just said, no.").

That the BBA did not define "reasonable market size" does not somehow establish a "reasonable range" of LIBOR submissions.  Nor does a letter from a third party, the Chicago Mercantile Exchange (CME), to the BBA expressing concern regarding the setting of LIBORs change the BBA's definition or establish such a range.  Indeed, the BBA declined to adopt the CME's views in its August 2008 evaluation of procedures for setting LIBOR.  *See* GX 1-176A at ¶ 1.6 ("After evaluating the responses received, the FX & MM Committee has decided that as the market supports the current procedures and processes in relation to the fix that these should remain in place. . .").  And importantly, the evidence showed that Deutsche Bank determined the particular rate—not a range of rates—at which it could ask for and accept interbank offers for each currency and tenor, per the BBA's definition, and the defendants at times changed some of those rates to benefit their trades at the expense of their counterparties.

### 4.   The Defendants' False and Fraudulent Statements Need Not Be Expressly Prohibited

The government was not required to prove the BBA "unambiguously prohibited" the defendants' conduct, or that Deutsche Bank's trade confirmations with its counterparties

prohibited Deutsche Bank from skewing its LIBOR submissions to benefit its trading positions

to their detriment.  *See* Black Mot. I.A.3 at 22-25.  Nor was the government required to put on

evidence of the BBA's specific misimpressions or call any particular witness, including a witness

from the BBA.  *See* Black Mot. I.A.1.b at 13-17.  Indeed, the defendants themselves went to

great lengths to depose former BBA director John Ewan during trial, yet then declined to

introduce his testimony.  *See* Tr. 1703:17-1704:25 (defense counsel admitting that when asked

what the BBA knew regarding cash and derivatives desks not being separated, Mr. Ewan

"claimed he didn't understand at the time," though he "acknowledged receiving that

information").  And as the Court instructed the jury, the evidence had to "negate any *reasonable*

interpretation of the [BBA's] instruction that would make Deutsche Bank's submission

responsive."  Tr. 2895:17-19 (emphasis added).  The testimony of the co-conspirator witnesses

and Dr. Youle regarding their understanding of the BBA's question and the "intuitive"

wrongfulness of moving Deutsche Bank's LIBOR submissions to suit the bank's trading

positions and disadvantage its counterparties did just that.  Similarly, when asked if there was

anything in a counterparty trade confirmation that led him to believe it was "okay for you to

move your LIBOR submissions for traders' positions," Mr. Curtler acknowledged that "[n]o,

there's not."  Tr. 2147:25-2148:3 (referencing DX 9064, trade confirm with FHLB of Atlanta).

That LIBOR was intended and understood to measure borrowing costs, and not rates

skewed to benefit banks' trading positions, is also clear from the language of the BBA's question

itself—as the Court has recognized.  *See* Decision on Defs.' Motions *in Limine*, ECF No. 263 at

4-5 ("the question asked by the BBA can reasonably be interpreted to require the banks to do

precisely what the Government argues: respond with a LIBOR submission that estimates the cost

to the bank of borrowing cash at the rate the bank would accept, and nothing more"). And the evidence showed this is not what the defendants and their co-conspirators actually did.

### 5. Evidence that LIBOR Fixes Were Themselves False Was Not Required

The government also did not have to prove the BBA's *published LIBORs* were actually false, impliedly false, or misleading half-truths. *See* Black Mot. I.A.2.a & b at 18-22. That is, the government was not required to show, as Mr. Black claims, that Deutsche Bank's trades with relevant counterparties did not settle at the contracted rate, *i.e.*, the LIBOR for the particular reset date, *see* Black Mot. at 18-19, or that the defendants or co-conspirators conveyed any false or misleading information to the counterparties directly, *see* Black Mot. at 20-21. Mr. Black's assertion that the government had a "burden of linking the Relevant Counterparties' understandings to statements or conduct of one of the co-conspirators," *see* Black Mot. at 21, is simply made up—there is no such legal requirement or burden. *See United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (party to whom misrepresentation was made need not be the party whose property interests were threatened).

Many well-recognized fraud schemes involve the manipulation of a single input that infects an overall number that is ultimately transmitted to the victim. For example, criminal liability for a scheme to defraud attaches when a bookkeeper, acting with the purpose of propping up his company's stock price, alters a factual input concerning a debit or credit which ultimately influences the net corporate profits reported to the investing public. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 114 (2d Cir. 2006) (defendants reduced line item costs in WorldCom's general ledger, which had the effect of boosting the company's reported earnings); *United States v. Block*, 16-cr-595 (JPO), 2017 WL 1608905 at *2-3 (S.D.N.Y. Apr. 28, 2017) (denying motion to dismiss securities fraud counts where defendant made false entries into a

spreadsheet that totaled numbers ultimately used in a 10-Q because "the Government claims that the *inputs* on their own fraudulently inflated the ultimate output") (emphasis in original).  Here too, Deutsche Bank's skewed LIBOR submissions infected the overall LIBOR fix.  As described above, the evidence showed the defendants caused Deutsche Bank to make false or fraudulent LIBOR submissions to the BBA, which were capable of influencing, and at times actually influenced, the overall LIBOR fix upon which counterparty trades were settled.[2]  Thus, while calculated according to the BBA's prescribed formula, the LIBOR fix was itself not an accurate reflection of the panel banks' perceived borrowing costs.  This is sufficient to prove falsity (as well as materiality) for purposes of a scheme to defraud.

> 6.   The Court Correctly Instructed the Jury that Falsity Can Be Established By Evidence of Implied False Statements and Misleading Half-Truths

Mr. Connolly's motion wrongly conflates the concept of half-truths with omission cases—a distinct legal theory not applicable here.  *See* Connolly Mot. II.C at 15; *see also* Tr. 2569:9-11 (confirming "[t]his is not an omission case").  As the Court properly instructed the jury, a representation is "false for purposes of the wire fraud statute if it is actually false, if it is *impliedly false*, or if it is a *misleading half truth.*"  Tr. 2889:8-11 (emphasis added); *see also Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation. . .");  *Autuori*, 212 F.3d at 118 (". . . it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.");  *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of a misrepresentation is

---

[2] For example, Mr. Curtler described an instance in which he made a higher, 4.295, LIBOR submission at Mr. Connolly's request, GX 1-028 ("we went in 295 for you"), and explained that a movement in Deutsche Bank's submission from 4.290 to 4.295 would have affected the overall LIBOR fix, which "would have come out at 4.29 instead of 4.29063," Tr. 1645:11-18.

also broad, reaching not only false statements of fact but also misleading half-truths and knowingly false promises. . . . It can also include the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim.").

Contrary to Mr. Connolly's assertion, half-truths are not "inapposite to LIBOR submissions." *See* Connolly Mot. at 15. Indeed, the evidence showed that the LIBOR submissions made by, and at the request of, Mr. Connolly and his co-conspirators carried the implicit false statements that the numbers submitted were objectively determined according to the BBA's definition, when they were actually based at least in part on Deutsche Bank's trading positions. The jury could readily conclude that the falsity element was satisfied.

**B. <u>Deutsche Bank's Skewed LIBOR Submissions Were Material to the BBA and to Deutsche Bank's Counterparties</u>**

As the Court recognized during trial, "all the Government needs to show in order to obtain a conviction" with respect to materiality, is "that the charged misrepresentation is objectively capable of influencing a decision by the recipient of that misrepresentation." Court's Response to Recent Submissions by the Parties, ECF No. 321 at 1-2; *see also* Tr. 2889:21-25 (instructing jury that a statement is material "if it was capable of influencing the actions of the person to whom it was made"). As the Court recognized with respect to misrepresentations to the BBA:

> . . . the Government has introduced evidence tending to show that the DB LIBOR submissions were *objectively capable* of influencing the setting on LIBOR by the BBA on any given day, simply because of the way the LIBOR formula works. The BBA (via Thomson Reuters, its agent) was the recipient of the submissions; it was the entity to which the alleged misrepresentations were addressed. Adding those two things together gets the Government to the jury on the issue of materiality. . . ."

14

ECF No. 321 at 1-2 (emphasis in original).  And as the Court recognized with respect to misrepresentations to Deutsche Bank's counterparties:

> . . . the Government simply proves its case by offering evidence that (1) the submissions to the BBA were both not true and capable of influencing the day's LIBOR setting; (2) the higher or lower setting that was requested would impact whether particular trades by DB traders were or were not successful; and (3) the concept was that the conspirators at DB would see their books benefit at the expense of their trading counterparties.

*Id.* at 2.  Accordingly, to show materiality to the BBA or Deutsche Bank's counterparties, the evidence had to show that the defendants caused statements to be made to the BBA or counterparties that were capable of influencing their actions.  The evidence at trial established both, and the government properly argued both to the jury.

There is no dispute that Deutsche Bank made its LIBOR submissions to the BBA.  Witnesses from Deutsche Bank's counterparties also testified they received the overall LIBOR fix both from Deutsche Bank and via Thomson Reuters.  Cindy Konich of Federal Home Loan Bank (FHLB) of Indianapolis testified that, during the process of settling a swap, Deutsche Bank transmitted the LIBOR fix to that FHLB directly.  Tr. 2195:9-11.  In addition to receiving the fix from Deutsche Bank, Ms. Konich's institution viewed the rate on Bloomberg and used the information to settle the swap.  Tr. 2194:24-2195:17.[3]  Both Annette Hunter and George Maroun similarly testified that their FHLBs viewed the LIBOR fix before settling their swaps with

---

[3] That Deutsche Bank sent Ms. Konich the fix, and not necessarily each individual panel bank's submissions does not matter.  The purpose of the scheme was for Deutsche Bank's submissions to alter the overall fix, and the law recognizes that a defendant can defraud another by changing an input that infects the information transmitted to the victim.  *See, e.g., Ebbers*, 458 F.3d at 114 (defendants reduced line item costs in WorldCom's general ledger, which had the effect of boosting the company's reported earnings); *Block*, 2017 WL 1608905 at *3 (denying motion to dismiss securities fraud counts where defendant made false entries into a spreadsheet which totaled numbers that were ultimately used in a 10-Q because "the Government claims that the *inputs* on their own fraudulently inflated the ultimate output") (emphasis in original).

Deutsche Bank.  Tr. 1420:6-12, 1563:19-1564:16.  The evidence thus established that the defendants caused their skewed LIBOR submissions to be communicated to the BBA and the resulting LIBOR fixes communicated to Deutsche Bank's counterparties.  The evidence likewise established that these fraudulent LIBOR submissions were capable of influencing both the BBA's and counterparties' actions, as set forth below.

        1.   <u>The Defendants' Fraudulent Scheme Was Capable of Influencing the BBA's Actions</u>

The evidence established that Deutsche Bank's fraudulent LIBOR submissions were material to the BBA because they were capable of influencing, and in some cases actually influenced, the overall LIBOR fix published by the BBA.  Contrary to the defendants' claims, *see* Black Mot. I.B.1 at 27-29; Connolly Mot. IV.B at 29, the BBA's practice of trimming the panel banks' submissions (*i.e.*, omitting the highest four and lowest four prior to averaging) in an effort to avoid undue influence from outlying submissions does not mean the BBA was incapable of being influenced or even succeeded in avoiding such influence, or that the defendants' conduct does not meet the separate, legal standard for materiality.  Dr. Youle established that, in terms of mathematics, a single contributor's submission can influence the overall fix, even if it is not included in the middle eight submissions.  Tr. 151:16-155:5 (explaining a hypothetical in which bank E raised its submission so it was one of the four highest submissions and thus trimmed; "even though bank E got excluded, the average is still larger than it was going to be before . . . the reason being, bank D is now included, when it wasn't included before.  Bank D has a relatively higher quote.  This overall cumulative effect of the change by bank E is going to make it so the LIBOR used to be 2.89 before, now it's 2.8909, slightly larger, because now bank D is replacing it.");  GX 1-452 at 31-37 (slides illustrating Dr. Youle's hypothetical).  Similarly, Mr. King and Mr. Curtler established there were instances in which Deutsche Bank's

submissions changed the overall fix.  *See, e.g.*, Tr. 473:12-475:19, 1645:11-18.  The evidence thereby established materiality as a matter of mathematics.

Contrary to Mr. Black's argument, the government was not required to present "evidence to quantify the impact that Deutsche Bank's adjustment of its submissions had on the ultimate LIBOR rate."  *See* Black Mot. at 29 (arguing such evidence was needed to prove materiality).  As the relevant cases make clear, the evidence need not show the *amount* of impact or even that there *was* impact; instead, the evidence must show that the statement in question was *capable of* having an influence.  *See Neder v. United States*, 527 U.S. 1, 16 (1999) ("A false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.") (internal quotation omitted); *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013) ("a misrepresentation is material if it is capable of influencing the decisionmaker"); *see also* Tr. 2890:5-8 (charging the jury that "government is not required to prove that the false statement actually influenced some decision made by the person to whom the statement was made in order to meet its burden to prove materiality").

Nor was the government required, as Mr. Black claims, to call a witness from the BBA or present evidence that the BBA considered LIBOR submissions skewed to benefit a panel bank's trading positions to be improper.  *See* Black Mot. at 27.  Rather, it was sufficient to show, as the evidence did, that the skewed LIBOR submissions were capable of influencing the BBA's overall LIBOR fix.  Moreover, the evidence showed more—that those submissions in fact influenced the LIBOR fix.

In addition to the arithmetic proof that skewed LIBOR submissions were capable of influencing the LIBOR fix, the jury taking all reasonable inferences in a light most favorable to the government could readily find that the accuracy of the world's most important benchmark

was important to the BBA.  The jury heard evidence that LIBOR was ubiquitous in the financial

markets.  *See, e.g.*, Tr. 128:1-6 (Dr. Youle describing that "complex contracts that are used by

traders, banks, sophisticated entities," as well as consumer products such as "[m]ortgages,

student loans, auto loans, and credit cards are often all tied to LIBOR explicitly"); Tr. 129:8-20

(Dr. Youle explaining how "it snowballed over time until it became this truly central interest rate

in all of the financial markets where trillions and trillions of dollars of contracts in notion value

depend on it").  Jurors also learned the BBA questioned panel banks when numbers appeared to

be out of line with other banks' submissions.  Tr. 1698:3-22 (Mr. Curtler explaining that

individual panel banks' LIBOR submissions were published along with the overall LIBOR fix,

and the BBA was "very quick to call banks" in response to complaints from market participants

that banks were bidding above their submitted rates).  These facts support a finding that the BBA

intended LIBOR to measure borrowing costs, not rates the defendants wanted to see in order to

make more money.  And as a matter of common sense, the jury was entitled to conclude that the

BBA did not intend to create and publish a benchmark tied to trillions of dollars in financial

instruments that reflected interest rates that major banks believed best advantaged them on a

given day, but rather one that accurately reflected the banks' prevailing borrowing costs.

The co-conspirators' testimony that they concealed the scheme from the BBA further

supports materiality (and fraudulent intent).  *See United States v. Prieto*, 812 F.3d 6, 14 (1st Cir.

2016) (there would be no reason for the defendant to lie about something immaterial).  Mr. King

admitted he did not tell the BBA that he was moving his LIBOR submissions to benefit Deutsche

Bank's trading positions.  Tr. 476:23-477:11, 478:2-11.  Mr. Parietti further explained that "I

didn't tell the BBA because I didn't want them to know that I was cheating and that I might get

in trouble."  Tr. 1167:25-1168:2.  Indeed, Mr. Curtler testified that he believed Deutsche Bank

would have been removed from the panel had the BBA learned the truth, testifying that "we thought that if you were spotted doing what we're doing, you'd get kicked off the panel." Tr. 1647:14-16.

>    2.    The Defendants' Fraudulent Scheme Was Capable of Influencing the Actions of Deutsche Bank's Counterparties

The scheme to defraud was material to Deutsche Bank's counterparties as well.  The evidence established that Deutsche Bank's skewed submissions at times influenced the overall LIBOR, which in turn impacted the amount of money Deutsche Bank's counterparties would pay or receive under their contracts with Deutsche Bank.  *See, e.g.*, Tr. 2190:6-2192:20 (Ms. Konich describing a "typical trade confirmation" for an interest rate swap between FHLB of Indianapolis and Deutsche Bank in which payments made depended on the direction of LIBOR, such that "the higher the LIBOR, that's going to make LIBOR minus 18 a higher rate"); Tr. 1560:5-9 (Ms. Hunter explaining that when FHLB of Atlanta entered into interest rate swaps, "if we are receiving LIBOR and it goes down, we basically receive less.  If we are paying LIBOR and it goes down, we pay less.  But if it goes up, we pay more."); Tr. 1416:20-1417:12 (Mr. Maroun describing a trade between FHLB of Boston and Deutsche Bank and explaining that if the FHLB was paying LIBOR, it would benefit if LIBOR was lower, while Deutsche Bank would benefit if LIBOR was higher); *see also* Tr. 152:17-155:5 (Dr. Youle explaining that an increase in the overall LIBOR fix of even .0006 would be large enough to affect financial contracts, and providing examples of how a small change in the LIBOR fix would change the amount of money owed by a party to a trade).  That is sufficient to show materiality to those counterparties.  *See* Tr. 2890:9-10 (jury instructed that a statement must be "capable of influencing some decision or action"); ECF No 321 at 2 (government proves its case with evidence that "the higher or lower

setting that was requested would impact whether particular trades by DB traders were or were not successful").

Whether or not the calculation of the amounts to be paid on trades may be characterized as "ministerial," *see* Black Mot. I.B.2.b at 37-38, is irrelevant and a made-up legal requirement.[4] The conduct was still capable of influencing the amounts of money counterparties paid Deutsche Bank or received from Deutsche Bank. And contrary to Mr. Black's further argument, the government's ability to prove materiality in no way hinged on the introduction of "evidence of the net trading positions" of certain counterparties. *See* Black Mot. I.B.2.c at 38. Data reflecting a counterparty's overall "net exposure" to LIBOR on any given day is unnecessary to establish that Deutsche Bank's skewed LIBOR submissions were capable of influencing the amounts that counterparty would pay or receive from its trades with Deutsche Bank.

Additionally, the counterparty witnesses testified they would have acted differently had they known of Deutsche Bank's conduct. Ms. Konich testified she would have called the bank's legal counsel and regulators had she known they were influencing LIBOR while a swap contract was ongoing. Tr. 2210:13-22 ("I first would have gone to my legal counsel and asked them to look at the contract that we have, the ISDA contract that was referenced with Deutsche Bank . . . We probably would have also alerted our regulator if we thought there was something going amiss . . ."). Mr. Maroun similarly testified that, had he known what Deutsche Bank was up to, he would have considered not using them as a counterparty. Tr. 1422:13-17 ("We would have explored our options, not to do business with them, do business with other counterparties, try to negotiate getting out of the trade, those types of things"). And had he learned of Deutsche

---

[4] And arguably it was not ministerial; as Ms. Konich testified, it involved comparing the applicable LIBOR published on Telerate and received from Deutsche Bank, confirming the bank's agreement with the amount, and then making the payment. Tr. 2194:24-2195:17.

Bank's conduct after entering into a trade with the bank, he would have looked into unwinding, or terminating, the ongoing trade.  Tr. 1422:21-1423:2 ("[A]t that point, we would explore what's called unwinding the trade or negotiating our way out of it to terminate it.").  The fact that these witnesses were not familiar with all of the details of how LIBOR was set, *see* Black Mot. I.B.2.a at 34-35, does not diminish their testimony.  What matters is that, had they known Deutsche Bank was skewing its LIBOR submissions to benefit its trading positions, they likely would not have continued entering into trades with Deutsche Bank—that is, the defendants' conduct was capable of influencing their decisions.

Nor did the counterparty witnesses have to be derivatives traders themselves to speak to the impact of the defendants' conduct on their institutions.  *See* Connolly Mot. IV.A.1 at 23-25. The evidence established that Ms. Konich and Ms. Hunter were familiar with their institutions' practices of entering into and settling derivatives trades based on LIBOR, including with Deutsche Bank.  *See, e.g.*, Tr. 2187:11-14, 2189:13-23 (Ms. Konich, currently CEO and President of FHLB of Indianapolis, was previously its vice president and treasurer in charge of financial functions, including its derivatives trades such as interest rate swaps); Tr. 1557:23-1558:9 (Ms. Hunter serves as senior vice president and director of accounting operations for FHLB of Atlanta, responsible for their derivative operations including interest rate swaps).  And Mr. Maroun was a derivatives swaps trader himself and executed such trades with Deutsche Bank.  Tr. 1410:6-1411:7 (Mr. Maroun traded swaps for FHLB of Boston and engaged in "[p]robably several hundred" LIBOR-based trades); Tr. 1412:6-23 (explaining the process for engaging in trades with Deutsche Bank).  All three witnesses were thus qualified to testify, as they did, about how the LIBOR fix impacted the amounts their institutions paid on or received

from derivatives trades with Deutsche Bank, and how they likely would not have done business with Deutsche Bank had they known of the scheme.

Their testimony was not misleading, as Mr. Connolly claims, because the counterparties had no "legal right to know" that Deutsche Bank's LIBOR submissions took trader positions into account, another made-up legal requirement. *See* Connolly Mot. IV.A.2 at 25-26. As the jury was instructed, materiality is proven by evidence that false or fraudulent statements were capable of influencing a person's actions. There is no additional requirement that this person have some specified "legal right" to certain information not being shared. Similarly, while the International Swaps and Derivatives Association ("ISDA") contracts between the counterparties and Deutsche Bank provided in their standard terms that the counterparties understood the risks of the trades they entered into, *see* Black Mot. I.B.2.a at 35-36, the counterparties reasonably understood LIBOR was being set in a transparent, objective, and honest way. *See* Tr. 1413:10-19 (Mr. Maroun thought he was agreeing to "what would be a fair market trade that was representative of a deep and liquid market" and did not expect that Deutsche Bank's LIBOR submitters may have been moving their submissions to benefit Deutsche Bank's trading positions); Tr. 2196:14-17 (Ms. Konich expected LIBOR would be set in a manner that was "very transparent, very honest, and fair of what their expectations were in the market"); Tr. 2197:11-14 (Ms. Hunter explaining that LIBOR is "used to set a lot of different rates and indices, particularly like we're talking about here swaps, loans, and etc. and it needs to be something that's working in a fair and honest manner"). And the Second Circuit has held that such contractual disclaimers do not defeat materiality for purposes of federal fraud charges. *See* *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) ("contractual disclaimers of reliance on

prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes").

Testimony that the conspirators hid the conduct from the counterparties also tends to prove materiality.  Tr. 478:2-11 (Mr. King "didn't want them to know because it was -- we were giving ourselves -- we were taking advantage of the position we had as a LIBOR panel bank"); Tr. 1167:23-24 (Mr. Parietti "did not tell my counterparties because I didn't want them to know that I was using an unfair advantage in my trades").  Hearing all of this evidence, the jury could reasonably find that the defendants' scheme was capable of influencing the actions of Deutsche Bank's trading counterparties, and thus, material to those counterparties.

## C.   The Defendants Acted with Intent to Defraud by Causing Deutsche Bank to Make LIBOR Submissions Calculated to Harm Its Counterparties

The defendants and their co-conspirators acted with intent to defraud because they understood Deutsche Bank's counterparties would lose money if their scheme to manipulate the LIBOR rate was successful.  *See* Tr. 2894:3-7 (instructing jury that a "person acts with intent to defraud when he acts willfully and with the specific purpose -- the conscious aim or objective -- of depriving someone else of money or property by means of false pretenses, representations, or promises"); *Binday*, 804 F.3d at 578 ("the deceit must be coupled with a contemplated harm to the victim").

All three co-conspirator witnesses testified they understood making LIBOR submissions calculated to improve Deutsche Bank's trading positions would give the bank an unfair advantage at the expense of its counterparties.  *See, e.g.*, Tr. 277:22-278:13 (Mr. King explaining that they were "taking advantage of the position.  We are benefiting.  There was a counterparty on the other side who doesn't know what we're doing and is being affected negatively by what we're doing."); Tr. 1009:13-1010:10 (Mr. Parietti acknowledging that "it was pretty obvious that

LIBOR is a really important benchmark. . . .  And it was clear that it wasn't fair and objective if, you know, the submitters were biasing it to make their own bank more money."); Tr. 1609:22-24 (Mr. Curtler describing "if we had a position fixing that day and we altered our LIBOR just to take into account that position or that fixing, it would give us an unfair advantage.").

Mr. Black and Mr. Connolly had as much, if not more, knowledge of how Deutsche Bank's trades with counterparties worked and how they would be affected by changes in the LIBOR fix.  Mr. Black worked as a U.S. dollar money market derivatives trader at Deutsche Bank, meaning that his main responsibility was to enter U.S. dollar derivatives trades with counterparties on the bank's behalf.  *See* Tr. 286:16-288:20.  Indeed, Mr. Black's counsel emphasized Mr. Black's knowledge of the derivatives trading market in his opening statement and cross examination of the co-conspirator witnesses, and the witnesses agreed.  Tr. 68:16-19 ("You're going to see in this trial that Mr. Black was a student of the market.  He had a very thoughtful view about how he believed interest rates, LIBOR, and the entire market were moving."); Tr. 1294:23-1295:3 (questioning Mr. Parietti, "Q. And Gavin Black was a very smart trader, right?  A. Yes.  Q. He had a very sophisticated view of the market, right?  A. Yes.  Q. He was -- fair to say he was a student of the market?  A. I think we all were."); Tr. 1855:2-9 (questioning Mr. Curtler, "Q. He was a very, very thoughtful trader, right?  A. Yes.  Q. He's a student of the market, right? . . . He's a man that sits all day and studies all kinds of information, and people come and talk to him to get his views.  Right?  A. Correct.").  And Mr. Connolly, as director of Deutsche Bank's pool trading desk in New York, managed and had responsibility for both cash and derivatives trading desks.  *See* Tr. 292:16-25; 1005:4-1007:1.  A reasonable juror could readily conclude Mr. Black and Mr. Connolly had the same understanding as any rational

24

trader on their desks—*i.e.*, that influencing LIBOR to help Deutsche Bank's trading positions gave the bank an unfair advantage that harmed other market participants.

Mr. Black's and Mr. Connolly's own words, in written communications and audio recordings, confirmed they understood LIBOR was supposed to be an estimate of cash borrowing costs. *See, e.g.*, GX 1-122 (Mr. Black noting that "THE LIBORS (BOTH 1MTH AND ESPECIALLY 3MTH) ARE WAY TOO LOW AND DON'T ACCURATELY REFLECT THE TRUE COST OF UNSECURED USD CASH"); GX 1-132T at 1 (Mr. Black explaining that the U.S. dollar LIBOR uses "exactly the same definition" as LIBOR for other currencies, "it just seems to be that the fixing in dollars is pretty close to the bid side of the cash market than the offer side . . ."); GX 1-159TE at 1 (Mr. Black noting that LIBOR "rates are meant to be reflective of lending and borrowing between good names"); GX 1-293 (Mr. Connolly explaining the relationship between LIBOR and banks' ability to borrow funds:  "Certainly Libors are poised to go lower and spreads have come in a decent amount.  In addition, a few of the banks I spoke to before and during the auction process that were particularly worried received funds in the auction and were much calmer today . . . Very important.").

Mr. Black's and Mr. Connolly's communications likewise confirmed they understood the impact that moving LIBOR could have on trades with counterparties, and that they intended their requests to move Deutsche Bank's LIBOR submissions to benefit the bank's trades to the detriment of its counterparties.  Mr. Black acknowledged the "sort of linkage of that fixing to grillions of derivative contracts all around the world," GX 1-159TE at 2, and at times referenced his own derivatives trading positions in connection with his requests to Deutsche Bank's submitters, *see, e.g.*, GX 1-085 ("it suits me for low 1s and high 3s so will badger them in the morning. . . u need it low too?"); GX 6-001 ("Low 1mth today pls shag, paying on 18 bio").

Mr. Connolly similarly referenced Deutsche Bank's trading positions as the reason motivating his requests to move LIBOR submissions in a certain direction. *See e.g.*, GX 1-024 ("OTC requests 3mo Libor be as high as possible Thursday and Friday if you see the market higher. . . Cronin mcteague in rates had 12 yards today and tomorrow. . ."); GX 1-027 ("WE WOULD PREFER IT HIGHER . . . WE HAVE ABOUT 15BB 1MO RECEIVES"); GX 2-001 ("If possible, we need in NY 1mo libor as low as possible next few days. . . tons of pays coming up overall"); *see also* GX 1-036 (email from Mr. Parietti copying Mr. Connolly: "Regarding Mondays 3mLibor, MMD NY is receiving 3mL on USD 6.5 Bn so hoping for higher 3mL"); Tr. 1051:20-1052:2 (Mr. Parietti relating his conversation with Mr. Connolly after sending the email—"I said to him: Hey, Matt, did you see my email to London? And he said to me: Yeah, do it just like that.") Tr. 289:4-20, 293:4-12 (Mr. King describing requests from Mr. Black and Mr. Connolly to move LIBOR submissions to benefit the bank). A reasonable juror could easily find from this evidence that the defendants acted consciously to benefit Deutsche Bank at the detriment of its counterparties, and thus, acted with intent to defraud.

### 1. The Evidence Showed the Defendants Did Not Act in Good Faith

The jury likewise could reasonably find from the evidence that neither Mr. Black nor Mr. Connolly acted in good faith, *i.e.*, that Mr. Black and Mr. Connolly "honestly believe[d] that the representations he made or caused to be made were true or honestly believe[d] that all material facts ha[d] been disclosed," Tr. 2896:2-9. Both the defendants' good faith arguments misconstrue the evidence presented at trial.

Contrary to the defendants' arguments, neither the fact that Deutsche Bank's cash traders and derivatives traders were seated near each other nor the weekly risk calls among traders from various offices indicated that the defendants' supervisors directed or encouraged them to request

fraudulent LIBOR submissions to benefit their trading positions, let alone mandated a jury finding of good faith.  *See* Black Mot. I.C.1.a.i at 40-41; Connolly Mot. V.B.2 at 39.  At most, it showed that supervisors encouraged employees to communicate; not that they encouraged them to communicate to commit fraud.  That certain employees had roles related to Deutsche Bank's cash trading and LIBOR submissions and to its derivatives trading similarly does not absolve the defendants of liability for their criminal conduct.  *See* Black Mot. I.C.1.a.ii at 42-43; Connolly Mot. V.B.2 at 39.

More importantly, even if supervisors directed or encouraged the fraud, that is not a defense to illegal conduct.  The "I was following orders" excuse is not equivalent to a good faith defense, *i.e.*, an "opinion honestly held that what the defendant was doing was not wrong," Tr. 2896:2-3 (instructing the jury); *cf. United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (finding that, while evidence of the defendant's supervisors approving similar conduct should have been admitted, such evidence was "less probative" of his intent).  Here, the jury heard the evidence and the defendants' arguments and still found both defendants acted with fraudulent intent.  As Mr. Curtler acknowledged, notwithstanding Deutsche Bank supervisors seating cash and derivatives traders near each other, he still understood moving the bank's LIBOR submissions to be wrong.  Tr. 2152:23-25 ("Q. Do you think because your bosses put you together, that you didn't do anything wrong?  A. No.").  Similarly, when asked if the "fact that it was your supervisor telling you to do that" made him think his conduct was permissible, Mr. Parietti replied "No, I did not think that it was permissible, but I did do it."  Tr. 1382:15-22.

The defendants' attempt to shift the blame to Deutsche Bank's training and the prevalence of the fraudulent conduct should likewise be rejected.  That the defendants were not specifically trained *not* to manipulate LIBOR does not negate their fraudulent intent, any more

than the fact that others were doing it also.  *See* Black Mot. I.C.1.a.iii at 43-44; Connolly Mot.

V.B.2 at 39.  The very nature of a conspiracy is that others agreed to engage in the same

unlawful scheme; that such conduct was widespread among Deutsche Bank's traders does not

diminish Mr. Black's or Mr. Connolly's intent to participate in it.  As the Court instructed the

jury in connection with evidence of other banks' conduct, "'everybody is doing it' is not a

defense to the crime of wire fraud or conspiracy to commit wire fraud; just as 'everybody

speeds' is not a defense if your car happens to get picked up on the radar."  Tr. 2913:4-7; *see

also* Decision on Government's Motions *in Limine*, ECF No. 262 at 22 ("the court has already

assured the Government that it will deliver a jury instruction to the effect that 'everybody's

doing it' is NOT a defense to criminal liability").  And as the co-conspirator witnesses who were

also doing it acknowledged, they knew their conduct was wrongful even without any training or

being told that it was wrong.  Mr. King, for example, testified that despite not having formal

training, he knew it was wrong "[i]ntuitively," Tr. 277:25-278:7, and that he did not need

training to figure out that he should not consider trading positions, Tr. 467:16-19.  Mr. Curler

testified similarly.  Tr. 1787:18-1788:2 ("Q. . . . did you ever receive training while at the bank

that said you could not move your LIBOR submissions in order to make more money for

yourself or your team?  A. No. . . .  Q. Did you need training to know that you were not supposed

to do that?  A. No.").

        Similarly, the defendants' and other traders' openness about their behavior at Deutsche

Bank does not demonstrate good faith, particularly when the evidence showed they made efforts

to conceal their scheme from external entities, including the BBA and Deutsche Bank's

counterparties.  *See* Black Mot. I.C.1.a.iv at 45-46; *see also supra* I.B.1&2.  Moreover, the

evidence did not show that the defendants and their co-conspirators were open about their

conduct beyond their own group.  Their self-serving emails and Bloomberg communications sent to broader audiences do not show good faith on the defendants' part, nor do they negate their fraudulent intent.  *See* Black Mot. I.C.1.a.v at 46-47, citing, *e.g.*, GX 1-090 (Bloomberg communication from Mr. King to "a large group of other traders and salespeople," Tr. 468:9-14); DX 1240 (email from Mr. Curtler to "a whole group of Deutsche Bank employees," Tr. 537:7-15); DX 1261 (email from Mr. Curtler to "about 20 people," including derivatives traders and submitters, Tr. 532:25-533:14).

That Mr. Black may not have made false statements directly to counterparties or the BBA does not matter.  *See* Black Mot. I.C.1.b.i at 48-49.  Rather, it was sufficient that the defendants intended to cause Deutsche Bank submitters to make false statements in the form of manipulated LIBOR submissions to the BBA for inclusion in the overall LIBOR rate, which was then transmitted to counterparties.  Tr. 2887:6-12 (instructing the jury that "[t]he false or fraudulent representations that allegedly underlay the scheme consisted of submitting, *or causing someone else to submit*, to the British Bankers' Association on behalf of Deutsche Bank LIBOR submissions that reflected, at least in part, an intent to benefit the trading positions held by the defendants, their subordinates, or their co-conspirators") (emphasis added).

Likewise, that Mr. Black may have been a "student of the market" or "thoughtful trader," *see* Black Mot. I.C.1.b.ii at 50, or that his requests for skewed LIBOR rates at times moved in a direction consistent with the market, *see* Black Mot. at 51, does not show good faith or change his intent to manipulate Deutsche Bank's submissions in his favor.  If anything, it indicates Mr. Black was an experienced trader who knew how to skew LIBOR submissions to his counterparties' disadvantage.  And again, the government was not required to prove the defendants requested the submission of rates at which Deutsche Bank could not theoretically

borrow funds, *see supra* I.A.2.  *See* Black Mot. I.C.1.b.iii at 52-53.  Mr. Black's repetition of this

argument is no more availing with respect to his claim of good faith as it is with respect to

falsity.  As discussed above, the evidence showed that Deutsche Bank determined its LIBOR

number, and the defendants and their co-conspirators caused the bank to change that number and

instead submit a different number that would benefit the bank's trades.

Nor was the government required to establish that the BBA "unambiguously prohibited

Mr. Black's conduct," *see* Black Mot. I.C.1.c at 53, or that the defendants were "told that the

BBA's Instructions prohibited the sharing of trading positions," *see* Black Mot. I.C.1.d at 54;

Connolly Mot. V.B.2 at 38 (complaining the "BBA did not publish express prohibitions on

LIBOR submitters considering trading positions" until 2013).  The BBA's failure to explicitly

prohibit submitters having parallel responsibility for derivatives trading prior to 2013 does not

mean the BBA "sanctioned" the practice before that, *see* Black Mot. at 43, or that it was

acceptable for a panel bank to skew its LIBOR submissions to benefit its trading positions.  As

discussed above, the evidence had only to "negate any reasonable interpretation of the [BBA's]

instruction that would make Deutsche Bank's submission responsive."  Tr. 2895:17-19.

Mr. King, Mr. Parietti, Mr. Curtler, and Dr. Youle all testified that LIBOR submissions were

meant to reflect a panel bank's borrowing costs, and that moving submissions to benefit a bank's

trades was obviously wrong.  By way of analogy, a school teacher might write "no biting" on the

chalkboard in response to one of his students biting others in the class, but that does not mean it

was acceptable for students to bite each other previously, or the biter should not be punished.

*See* Tr. 2653:17-22 (government's summation).

Contrary to Mr. Connolly's assertion, the "entirety of the government's case against

[him]" did not rest simply on three emails.  *See* Connolly Mot. V.A at 31, citing GX 1-025,

GX 1-026, and GX 3-001.  Aside from the fact that there is no minimum amount of evidence

required for a reasonable juror to find guilt, *see, e.g.*, *United States v. Truman*, 688 F.3d 129, 139

(2d Cir. 2012) ("even the testimony of a single accomplice witness is sufficient to sustain a

conviction, provided it is not incredible on its face") (internal quotation omitted), Mr. Connolly

is incorrect in his claim.  Rather, the cited communications and others, combined with the

testimony of his co-conspirators, established that Mr. Connolly made requests for Deutsche

Bank's LIBOR submissions to take account of its trading positions and instructed Mr. Parietti to

do the same.  The evidence further established that his co-conspirators believed such activity to

be wrong—and the jury could reasonably have inferred that Mr. Connolly harbored a similar

understanding.  Nor does Mr. Connolly's call with Mr. Hilty, his successor at Deutsche Bank,

show good faith.  *See* Connolly Mot. at 35.  To the contrary, the jury could reasonably have

interpreted Mr. Connolly's comments, including that "[n]obody has a fucking clue what the

definition is, where it should be . . ." as demonstrating his awareness (like that of his co-

conspirators) that LIBOR submissions were susceptible to wrongful manipulation.  *See* GX 1-

133T at 5.  Mr. Connolly even acknowledged in the same call that "people fuck around with it on

their positions," which shows he knew trading positions should not be a relevant consideration

for LIBOR submissions.  *Id.*

Mr. Connolly's claimed inability to understand the LIBOR submissions process because

he was not himself a derivatives trader or submitter, *see* Connolly Mot. V.B at 36-37, is also

insufficient to override the jury's finding to the contrary.  Co-conspirator witnesses who were

themselves not primarily derivatives traders (Mr. King) or LIBOR submitters (Mr. Parietti)

testified they understood that changing Deutsche Bank's LIBOR submissions to take account of

its trading positions was something other than what was called for by the BBA's definition, and

that this deceit gave the bank an unfair advantage over its counterparties. The jury could reasonably have inferred that any rational trader was capable of this understanding. Combined with the other testimony and documents above, there was more than enough evidence from which the jury could find Mr. Connolly himself was more than capable of this understanding and thus did not act in good faith.

2. *Countrywide* Is Materially Different and Does Not Preclude the Jury's Guilty Verdict

Mr. Black's reliance on the Second Circuit's decision in *Countrywide* is misplaced. *See* Black Mot. I.C.2 at 55-57. *Countrywide* addressed a completely different fraud and set of evidence, and its holding does not render the evidence of the defendants' fraud insufficient. The Court in *Countrywide* analyzed a situation in which the defendants contracted to sell loans of a defined quality but ended up selling loans that fell short of this standard. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 653-55 (2d Cir. 2016) (emphasis added). The panel reversed the conviction because the evidence failed to prove the defendants formed the intent to provide non-conforming loans *at the time of the contract* and because the government did not prove the defendants made false statements after entering into the contract. *Id.* at 663. Thus, the defendants in *Countrywide* did not possess fraudulent intent at the time they made the representations about the quality of the loans.

This case is different because the evidence showed the manipulated submissions were made with the requisite intent. In other words, the defendants' fraudulent intent was accompanied by fraudulent action when they caused Deutsche Bank submitters to make LIBOR submissions that appeared to be in accordance with the BBA's definition and to be a true estimate of the bank's borrowing costs, but were instead something else, and which influenced or were capable of influencing the LIBOR fix communicated to Deutsche Bank's counterparties to

settle trades.  The defendants thus possessed the requisite intent at the time they caused

misrepresentations to be made in furtherance of the fraudulent scheme, and their false or

fraudulent statements were made "with 'intent to defraud' someone."  Tr. 2890:12-14 (jury

instruction on intent to defraud).  Additionally, the evidence showed the scheme was in progress,

and thus, the defendants and their co-conspirators had already formed fraudulent intent, when

they entered into and settled swap trades based on LIBOR.  *See, e.g.*, GX 1-513 (trade

confirmation with FHLB of Indianapolis dated April 7, 2006); GX 1-514 (trade confirmation

with FHLB of Boston dated May 2, 2006); GX 1-545 (trade confirmation with FHLB of Atlanta

dated December 13, 2007).  Unlike the defendants in *Countrywide*, who formed intent only after

all contracting was complete and did not make subsequent false statements, the fact that the

conspirators here were already perpetrating a fraud at the time they entered into and settled

trades shows they acted with intent to defraud at the time those trades were executed.

### 3.  Data Regarding Net Trading Positions Was Not Required

Finally, despite Mr. Black's claims, the government was under no obligation to present

trade data or other evidence "sufficient to establish that all of Mr. Black's requests were in the

same direction as his net trading positions," *see* Black Mot. I.C.3 at 58.  It is well-established that

a scheme need not be successful, and a defendant need not actually benefit to be guilty of fraud.

*See United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) ("to violate the [wire fraud] statute,

the defendant need not have completed or succeeded in his scheme to defraud"); *United States v.

D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("scheme to defraud need not have been successful

or complete"); *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) ("[t]o support a fraud

conviction it is not necessary for the Government to demonstrate that the defendant personally

benefitted from the scheme") (internal quotations omitted).[5]  As the Court instructed the jury here, the government "need only show that a scheme to defraud existed -- it doesn't have to prove that it succeeded -- it is not necessary for the government to prove that any intended victim actually lost money or property as a result of the scheme or that the defendant, whichever one you're considering, personally benefited from the scheme."  Tr. 2891:22-2892:3.  The jury could reasonably have found, from the multitude of evidence described above, that the government met its burden as to both defendants.

Moreover, the evidence showed that the defendants and their co-conspirators did consider their overall, or net, trading positions in their requests to move Deutsche Bank's LIBOR submissions.  And it is the traders' own views of their trading positions at the time and what LIBOR movements would benefit them that matters, not a post-hoc attempt to establish trading positions on any given day nearly a decade ago.  Mr. Black, for example, requested a low 1-month LIBOR submission because he was paying that rate on 18 billion notional.  *See, e.g.*, GX 6-001; Tr. 1721:9-16 (Mr. Curtler explaining that "[h]e's reset 18 billion in 1-month where he needed a low 1-month rate," and that "18 billion is a large position or fixing").  Mr. Connolly similarly referenced a position of about 15 billion in his request for a higher and then lower 1-month LIBOR submission, GX 1-027, as well as "pays coming up overall."  GX 2-001; *see also* Tr. 1664:1-11 (Mr. Curtler understood Mr. Connolly to be saying that "they have a lot of pay sets coming up over the next few days, they need low LIBOR," and thus asking him to move the LIBOR submission to "benefit his positions").  Mr. Parietti similarly took account of his desk's overall positions in making requests to move Deutsche Bank's LIBOR submissions.

---

[5] Nor would "all" requests to move Deutsche Bank's LIBOR submissions need to be successful or benefit Mr. Black, as his motion asserts.  *See* Black Mot. at 58.

Tr. 1011:19-24 ("When I made my requests for the submitters to consider my positions, I would check with the other traders on my desk with the understanding that I was going to include their position in the net that I sent, in the net position that I sent to the submitters for this purpose.").

### D. __The Jury Heard Sufficient Evidence that Counterparties Were Defrauded__

Mr. Connolly separately challenges the government's "conduit" theory, *see* Connolly Mot. III at 15, which focused on the defendants' making material misrepresentations to counterparties through the BBA/Thomson Reuters acting as a conduit, when they skewed the LIBOR submissions that were used to calculate LIBOR and to settle swaps and other derivative contracts. As explained below, Mr. Connolly's challenges misapprehend the government's case and the evidence presented at trial.

        1.   The Case Was Not Based On, and the Government Was Not Required to Establish, a Duty to Disclose

Mr. Connolly relies on cases discussing the duty to disclose in prosecutions based on omissions. *See* Connolly Mot. III.A. at 16 ("*an omission*, after the time of contracting, only violates the wire fraud statute 'in the context of a duty to disclose'") (emphasis added) (quoting *Autuori*, 212 F.3d at 119). But this reliance is misplaced because, as the government made clear, and Mr. Connolly acknowledges, this is not an omissions case. *See* Connolly Mot. at 14 ("this case was not charged as an omission case"). Rather, the case against Mr. Connolly is based on affirmative misrepresentations, including those made to Deutsche Bank's counterparties both directly and through the BBA/Thomson Reuters as a conduit. The Court recognized the viability of that theory and instructed the jury accordingly. *See, e.g.*, Tr. 2887:24-2888:10 (". . . the government argues an alternative theory; namely, that the defendants caused false or fraudulent representations, those being LIBORs whose settings were impacted by the alleged misrepresentation that defendants caused the Deutsche Bank submitters to make to the BBA, to

be relayed directly to those banks by Thomson-Reuters, and that those three counterparties, the ones who testified, settled certain trades on the basis of LIBORs that had been manipulated by virtue of the alleged misrepresentations").

It thus does not matter whether the counterparties were or were not relying on communications from Deutsche Bank, or whether they disclaimed any fiduciary duty by Deutsche Bank in their ISDA agreements. *See* Connolly Mot. at 17. Rather, the evidence established the defendants made and caused to be made misrepresentations that were transmitted to the counterparties and used to settle their trades, and that the counterparties likely would have ceased their business with Deutsche Bank or taken other corrective action had they known of the scheme. *See supra* I.B.2. No showing of a duty of disclosure was necessary to prove the government's case.

    2.   <u>The Trial Record Shows that Misrepresentations Were Made to the Counterparties Through the BBA/Thomson Reuters as a Conduit</u>

The use of a conduit to transmit the defendants' misrepresentations does not somehow erase their fraudulent conduct. As discussed above, the evidence at trial established both falsity and materiality to Deutsche Bank's counterparties. *See supra* I.A & I.B.2. Contrary to Mr. Connolly's assertion, *see* Connolly Mot. III.B, the government was not required to establish that counterparties considered the individual submissions of Deutsche Bank or other panel banks on any particular day. Nor does the fact that the BBA used Deutsche Bank's submissions to calculate the overall LIBOR fix preclude such a conduit theory. As discussed above, many well-recognized fraud schemes similarly involve the manipulation of a single input that infects an overall number that is ultimately transmitted to the victim, *see supra* I.A.5. *See, e.g.*, *Ebbers*, 458 F.3d at 114 (defendants reduced line item costs in WorldCom's general ledger, which had the effect of boosting the company's reported earnings); *Block*, 2017 WL 1608905 at *2-3

(defendant made false entries into a spreadsheet that totaled numbers ultimately used in a 10-Q). Thus, the federal fraud statutes are not rendered void by the use of a conduit.

The cases cited in Mr. Connolly's motion do not prove otherwise. *See* Connolly Mot. at 19. *Pasternack v. Laboratory Corp. of America Holdings*, 27 N.Y.3d 817 (N.Y. 2016), dealt with the reliance element of civil fraud claims under New York law, which is not an element of the federal criminal fraud statutes. *See Weaver*, 860 F.3d at 95 ("common-law requirements of 'justifiable reliance' and 'damage[s]'. . . plainly have no place in the federal fraud statutes") (quoting *Neder*, 527 U.S. at 24-25). *Eaton Cole* and *Bruff*, which date back to the nineteenth century and articulate a different theory of fraud, in which the fraudulent statement itself was conveyed to the victim, likewise dealt with civil common-law fraud claims. Connolly Mot. at 19 (citing *Eaton Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (N.Y. 1880) and *Bruff v. Mali*, 36 N.Y. 200 (N.Y. 1867)). And contrary to cases in which the conduit exercised its own independent judgment over each output ultimately transmitted to the victim, *see* Connolly Mot. at 20-21, citing *Securities Investor Protection Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 705-06 (N.Y. 2001), here the process by which the BBA set each LIBOR fix was pre-established by a mathematical formula and not subject to such discretion. The formula itself made it possible for the defendants to manipulate LIBOR by moving Deutsche Bank's submissions.

        3.   The Evidence Established that the Scheme was Capable of Influencing the Counterparties' Actions

That the counterparties' contracts called for trades to be settled using the applicable LIBOR fix, which technically occurred, does not change the false and material nature of the scheme to defraud the counterparties. *See* Connolly Mot. III.C at 21-22. The evidence established that Deutsche Bank's altered submissions were capable of influencing and, at times, did influence the LIBOR fix. This in turn impacted the amounts that counterparties paid or

received under their contracts with Deutsche Bank.  *See supra* I.B.1&2.  The evidence likewise established that the counterparties expected LIBOR was being set in a transparent and honest manner, and that, had they known of the defendants' scheme, the counterparties likely would have acted differently by ceasing to do business with Deutsche Bank or taking other measures. *See supra* I.B.2.  Nothing more was required to prove a scheme to defraud Deutsche Bank's counterparties.

### E.   The Defendants' Scheme to Rig the LIBOR Benchmark Affected Financial Institutions

The defendants challenge the timeliness of the charges believing a five-year statute of limitations should have applied.  As shown at trial, however, the government proceeded under 18 U.S.C. § 3293(2), which "extends to ten years the statute of limitations for wire fraud offenses (including conspiracy to commit wire fraud) 'if the offense affects a financial institution.'" *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (quoting § 3293(2)).  The "verb 'to affect' expresses a broad and open-ended range of influences."  *Id.* (quoting *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir. 1999)).  Thus, "§ 3293(2) 'broadly applies to any act of wire fraud that affects a financial institution,' provided the effect of the fraud is 'sufficiently direct.'"  *Id.* (quoting *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998)).

The defendants' argument rests on the astounding claim that, despite evidence they rigged the world's most important financial benchmark, to which trillions of dollars in financial instruments were tied, no reasonable juror could have found an effect on a financial institution. *See* Black Mot. I.D at 61-62; Connolly Mot. I.B at 9-10.  Such claims defy common sense. Given the evidence of LIBOR's ubiquity in the financial markets, and the fact that it is linked to trillions of dollars' worth of credit cards, mortgages, and derivatives, *see supra* I.B.1, a rational jury could easily conclude that the scheme naturally had an effect on large institutional banks.  It

is hard to conceive of a rational jury that could reach any other conclusion based on this evidence alone. And yet, the government went further and offered particularized evidence establishing that the defendants' conduct "affected" two categories of financial institutions: (1) five specific institutions that were Deutsche Bank's counterparties, and (2) Deutsche Bank itself. A ten-year statute of limitations thus applies to each count. *See* 18 U.S.C. § 3293(2).[6]

      1.  <u>The Defendants' Scheme Affected Deutsche Bank's Trading Counterparties</u>

The evidence more than supported a conclusion that Deutsche Bank's counterparties were affected by the fraudulent scheme. These counterparties were federally insured institutions or federal home loan banks—each a "financial institution" for purposes of § 3293(2).[7] As the following table demonstrates, the jury heard evidence that Deutsche Bank had swaps with counterparties that "reset" (*i.e.*, had payments calculated) based on LIBOR on particular days. The evidence also showed that the conspirators schemed to manipulate LIBOR on those days.

| Manipulation Exhibit | Date | Tenor | Corresponding Swap Confirmation | FDIC or FHLB Counterparty |
|---|---|---|---|---|
| GX 1-038 | 4/12/2006 | 3M | GX 1-513 | FHLB of Indianapolis (GX 1-911A) |
| GX 1-038 | 4/12/2006 | 3M | GX 1-502 | FDIC-Insured Wachovia (GX 1-913C/ GX 1-913D) |
| GX 1-040 | 5/18/2006 | 3M | GX 1-514 | FHLB Boston |
| GX 1-042 | 9/27/2006 | 3M | GX 1-544 | FHLB of Atlanta (GX 1-912) |
| GX 1-102 | 12/14/2007 | 3M | GX 1-545 | FHLB of Atlanta (GX 1-912) |
| GX 1-188 | 9/16/2008 | 1M/3M | GX 1-529 | FDIC-Insured Bank of America (GX 1-901C/1-901D) |

---

[6] For one object of the conspiracy charged in Count One, the conspiracy to commit bank fraud (18 U.S.C. § 1344), no showing of an effect on a financial institution is required for the ten-year statute of limitations to apply. *See* 18 U.S.C. § 3293(1).

[7] *See* 18 U.S.C. § 20(1) (insured depository institutions); 18 U.S.C. § 20(3) and 12 U.S.C. § 1422 (federal home loan banks).

The defendants argue these institutions tried to "hedge" their risk to LIBOR by entering into countervailing or offsetting trades. *See* Black Mot. I.D at 62; Connolly I.B at 9. But the jury heard testimony from counterparty witnesses that it was rare for their institutions to be perfectly hedged on any given day, meaning that the institutions retained an exposure to LIBOR. *See* Tr. 1559:14-1560:12 (Ms. Hunter testifying "we hedge both sides, but we are not perfectly hedged," and "the way our portfolio has been since I've been working there for 16 years is we've always paid more LIBOR than we had received"); Tr. 1422:11-12 (Mr. Maroun explaining how "it would have affected us negatively had it been skewed upward"); Tr. 1430:11-13 (Mr. Maroun acknowledging "we would not have been one hundred percent hedged on any given day").

Likewise, while the jury did not hear what the institutions' overall "net exposure" to LIBOR was on any given day, *see* Black Mot. I.D at 62, such evidence is unnecessary to establish an effect. As an initial matter, the defendants' assumption that the focus should be on a victim's overall condition is misguided. To the contrary, a victim is no less impacted if factors apart from the crime mitigate the harm caused by the crime or even make the victim whole. That a person has homeowner's insurance does not justify burglary, for example, any more than a bank being federally insured makes it lawful to rob the bank.

Nor must the government prove that any institution suffered an out of pocket loss in order to be affected at all. Instead, "[c]ourts have repeatedly held that in order to allege such an effect, the [g]overnment need not allege actual harm, but only facts that would demonstrate that the bank suffered an *increased risk of loss* due to its conduct." *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 630 (S.D.N.Y. 2013) (emphasis added); *see also United States v. Ghavami*, 10-cr-1217 (KMW), 2012 WL 2878126 at *6 (S.D.N.Y. July 13, 2012) (explaining that limiting the reach of § 3293(2) "to cases in which financial institutions suffered a net loss

would perversely incentivize financial institutions to participate in frauds in which they expect to earn a net benefit, which is behavior that the statute seeks to discourage," while "determining whether a scheme ultimately resulted in a net benefit or a net loss for a financial institution would require a court to perform extremely complex and speculative calculations").  Similarly, a court in the Northern District of California recently rejected the proposition that 18 U.S.C. § 3293(2) requires proof that the defendant's action was inconsistent with a financial institution's "net" position (as opposed to being inconsistent with the institution's interest in the discrete transaction in question): "the statute [18 U.S.C. § 3293(2)], again, speaks only to an 'effect' and not, for instance, a 'net effect.'  More importantly, the government need not show that the bank *actually* lost money, but rather only that the bank was exposed to a *risk* of loss."  *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1189 (N.D. Cal. 2018) (emphasis in original).  Thus, so long as a Deutsche Bank counterparty was exposed to a risk of loss on any particular trade, it has been "affected" regardless of what its "net," or overall, exposure to LIBOR was on that day.

Here, the jury heard evidence that financial institutions were exposed to a risk of loss on the swaps in question because the conspirators schemed to move LIBOR in a direction that would have harmed the counterparties' financial interests on those particular deals.  Indeed, on September 16, 2008, the conspirators schemed to move the rate in a direction that harmed Bank of America.  *See* GX 1-188 and Tr. 1765:8-1766:2 (Mr. Black and Mr. Curtler discussed "keep[ing] the 'LED' wide," meaning keeping 1-month LIBOR low and 3-month LIBOR high); GX 1-455 at 37-38 and Tr. 1766:3-23 (Deutsche Bank's LIBOR submissions were in line with this); GX 1-529 (trade confirm with Bank of America, showing Bank of America receiving 1-month LIBOR and paying 3-month LIBOR).  When a counterparty is required to pay more

money or receive less profit than it was entitled to under a swap by virtue of a fraudulent

scheme, then that counterparty was "affected" by the scheme.

Mr. Connolly further argues that evidence of single trade confirmations presented at trial

cannot establish a risk of loss.  *See* Connolly Mot. I.B at 9.  But this argument ignores both the

law discussed above as well as the instances when the conspirators were successful in moving

LIBOR in a direction that would have disadvantaged the counterparties' financial interests on

particular deals.  It also ignores the fact that 18 U.S.C § 3293(2) requires proof that the

"offense"—not a specific act or wire—affected a financial institution.  And the "offense" at issue

is a conspiracy or scheme to defraud.  18 U.S.C. §§ 1343, 1349.  Thus, the government needed

only to prove the defendants' fraudulent conspiracy or scheme as a whole exposed a financial

institution to loss or a risk of loss.  This is exactly what the scheme was intended to do and, in

fact, resulted in with mathematical precision.  This is more than "sufficiently direct" for purposes

of *Heinz*, 790 F.3d at 367.  Given the importance of LIBOR to financial markets across the

globe, combined with the evidence of the defendants and their co-conspirators scheming to move

LIBOR against their counterparties' financial interests on particular days, a rational jury could

find the scheme naturally had an effect on financial institutions.

### 2.   The Defendants' Scheme Also Affected Deutsche Bank

Alternatively, as to Deutsche Bank itself, the Second Circuit has recognized that an

employee of a financial institution who engages in misconduct that causes that institution to

incur costs in the form of fines and attorney's fees "affects" that institution.  *See Heinz*, 790 F.3d

at 367; *see also Bogucki*, 316 F. Supp. 3d at 1189 (finding that "[l]itigation risk. . . fits

comfortably within the scope of the effects that trigger § 3293(2)").  The jury heard evidence that

Deutsche Bank conducted an extensive internal investigation into the conspirators' conduct and

could reasonably infer that it thus incurred significant attorney's fees and associated expenses in connection with that investigation.  Tr. 283:23-284:13 (Mr. King was interviewed by the law firm Paul Weiss, which Deutsche Bank brought in to conduct the investigation); Tr. 1166:7-17 (Mr. Parietti was interviewed during the investigations at Deutsche Bank in 2012); Tr. 1781:13-1782:22 (Deutsche Bank's investigation began in early 2010, and Mr. Curtler was interviewed multiple times, by Deutsche Bank's internal and external lawyers).

Deutsche Bank is a "financial institution" because it is a "depository institution holding company" under 18 U.S.C. § 20(6).  A "depository institution holding company" is defined by the Federal Deposit Insurance Act as "any company which has control over any bank."  *See* 12 U.S.C. § 1841(a)(1).  12 U.S.C. § 1841(a)(2) defines what it means to have "control," and the testimony of Carol Saracco, managing director at Deutsche Bank, made clear that Deutsche Bank AG has "control" over Deutsche Bank Trust Companies America ("DBTCA"), a wholly-owned subsidiary that has FDIC insurance.  Tr. 2229:19-2230:3.  Further, the FDIC certificate shows that DBTCA was FDIC insured during the time of the scheme.  GX 1-904C.  DBTCA is also the entity that makes the payments for many of the relevant trade confirmations presented at trial. *See* GX 1-512 at 2, GX 1-544 at 3, GX 1-545 at 4, and GX 1-525 at 3 (trade confirms identifying DBTCA as the Deutsche Bank payor by SWIFT Code "BKTRUS33"). Deutsche Bank AG is therefore a "financial institution" for purposes of § 3293(2).[8]

---

[8] Additionally, Deutsche Bank is a "financial institution" as defined by 18 U.S.C. § 20(9) because it is a "branch or agency of a foreign bank," as defined by the Banking Act of 1978. Under 12 U.S.C. § 3101(3), a "branch" means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received."  Ms. Saracco testified that Deutsche Bank AG takes corporate deposits in the United States, in its New York offices.  Tr. 2229:2-3.  Given the defendants' objection, however, the government did not argue to the jury that Deutsche Bank is a financial institution on this basis, nor was the jury so instructed.  *See* Tr. 2598:2-18.

Mr. Black's and Mr. Connolly's claims that there was no nexus between their conduct and Deutsche Bank's investigation defies logic.  *See* Black Mot. I.D at 63; Connolly Mot. I.A at 8.  As all three co-conspirator witnesses testified, they were interviewed as part of an internal investigation looking into the very conduct—manipulation of Deutsche Bank's LIBOR submissions—for which Mr. Black and Mr. Connolly were convicted.  The investigation and underlying conduct exposed Deutsche Bank to "a new or increased risk of loss" for purposes of § 3293(2).  *See Ghavami*, 2012 WL 2878126 at *6 (explaining that "interpreting § 3293(2) to cover conduct that exposes a financial institution to a new or increased risk of loss is also consistent with the statute's legislative purpose, which is 'to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes'") (quoting *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003)).  The evidence thus showed an effect on Deutsche Bank's counterparties and Deutsche Bank itself.  This was more than sufficient to support the jury's verdict.

### F.  <u>The Jury Heard Sufficient Evidence of Interstate Wire Communications to Support the Substantive Wire Fraud Counts</u>

As the Court instructed the jury, the wire fraud charges required proof that "interstate or international wire facilities would be used [in] furtherance of the scheme to defraud" and that "the defendant could reasonably foresee that the communication would be required in execution of the scheme to defraud."  Tr. 2897:19-23, 2898:10-15.  But the information that was wired "need not itself be fraudulent or carry any false or misleading representation."  Tr. 2898:2-3.

That the defendants' scheme foreseeably involved interstate and international wires is not seriously in dispute.  Thomson Reuters's Stephen Turner established that the LIBOR fix was communicated from the U.K. to the United States via international wire transfer.  Tr. 794:4-8, 796:5-10.  That LIBOR was fixed in the U.K. and published in the United States and around the

world was well known to those in the industry.  *See, e.g.*, Tr. 150:22-23 (Dr. Youle describing

how the LIBOR "fixings are published around the world publicly"); Tr. 276:8-12 (Mr. King

explaining that "the calculations made are then published to the public, I guess, or so the rates

are made public and [are] then picked up by whoever needs access to the rates or whatever uses

the rates, and then it's used globally in financial markets, financial transactions, etc.").

Deutsche Bank technology manager Neil Guy's testimony regarding the bank's email

servers also made clear that when the conspirators were communicating between London and

New York regarding their manipulation of LIBOR in their favor, they were sending electronic

wires between London and New York.  Tr. 251:13-257:12.  When Mr. Connolly in New York

emailed Mr. King in London, for example, as a matter of common sense, it was foreseeable that

the communications would travel internationally over the wires.  There was thus ample evidence

from which the jury could find defendants "could reasonably foresee that the communications"

—the published LIBOR fixes and emailed requests to move Deutsche Bank's LIBOR

submissions—"would be required in execution of the scheme to defraud."  Tr. 2898:14-15.

Contrary to the defendants' assertions, *see* Black Mot. I.E at 64-66, Connolly Mot. VI at

41-42, there is no additional requirement to prove the communication underlying each

substantive wire fraud count was *itself* false, made with fraudulent intent, or material to Deutsche

Bank's counterparties.  Rather it is black letter law, as the Court instructed, Tr. 2898:2-3, that for

liability to attach under a federal fraud statute, the mailing or wire need only have been "a step in

the plot."  *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989); *see also United States v.

Tocco*, 135 F.3d 116, 125 (2d Cir. 1998) (wire need not itself contain fraudulent information).

Nor was the government required to introduce data concerning Mr. Black's net trading

positions to show he was poised to benefit from the skewed LIBOR submission on the date of an

alleged wire communication, as he claims, *see* Black Mot. I.E at 66.  Being poised to benefit is

not required to show the wire communication underlying a wire fraud charge.  And, as discussed

above, a defendant may be held responsible for his participation in a scheme to defraud

regardless of the scheme's success or any actual benefit he may (or may not) have received from

it.  *See supra* I.C.3.  In any event, Mr. Black's own communications (and the witness testimony)

demonstrate his LIBOR requests were made for the purposes of benefitting him or the bank.  *See*

*supra* I.A.1 & I.C.

      For each substantive wire fraud count, the government met its burden by showing that an

interstate or international wire was used in furtherance of the fraudulent scheme, as reasonably

foreseeable to Mr. Connolly and Mr. Black.  With respect to Count Two against Mr. Connolly,

the wire communications consisted of August 12 and August 15, 2007 emails between

Mr. Connolly and Mr. King, in which Mr. Connolly requested a low one-month LIBOR

submission to benefit Deutsche Bank's trades.  GX 2-001, GX 2-002.  With respect to Count

Nine against Mr. Connolly, the wire communications consisted of the corresponding publication

of Deutsche Bank's and the other panel banks' submissions and the LIBOR fix on August 13,

2007.  *See* Tr. 251:13-257:12 (Mr. Turner describing how such numbers were communicated

from the U.K. to the United States via international wire transfer).  With respect to Count Eleven

against Mr. Black, the wire communications consisted of a May 15, 2008 email from Mr. Black

to Mr. Curtler requesting a low one-month LIBOR submission to benefit his trading position,

GX 6-001, and the publication of the corresponding LIBOR submission and fix via international

wire.  *See* Tr. 251:13-257:12 (Mr. Turner's testimony).  This evidence is summarized below:

| Count | Defendant | Description | Communication Exhibit | Wire Evidence |
|-------|-----------|-------------|----------------------|---------------|
| 2 | Mr. Connolly | August 15, 2007, CONNOLLY and King discussed via electronic message the manipulation of Deutsche Bank's USD LIBOR Submission | GX 2-001, GX 2-002 | Neil Guy, Tr. 251:13-257:12 |
| 9 | Mr. Connolly | August 13, 2007, the rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates—or LIBORs—were published via international wire | GX 2-001, GX 2-002 | Stephen Turner, Tr. 794:4-8, 796:5-10 |
| 11 | Mr. Black | May 15, 2008, the rates submitted by Deutsche Bank and the other Contributor Panel banks and the averaged rates—or LIBORs—were published via international wire | GX 6-001 | Stephen Turner, Tr. 794:4-8, 796:5-10 |

Combined with the evidence discussed above, which established the defendants' participation in the scheme to defraud, its materiality to the BBA and Deutsche Bank's counterparties, the defendants' intent to defraud, and the resulting effect on financial institutions, this was more than sufficient to support Mr. Black's and Mr. Connolly's conviction on the substantive wire fraud counts.

G. **The Jury Heard Sufficient Evidence of the Conspiracy and that Mr. Connolly Knowingly Joined It**

Mr. Connolly's argument concerning the conspiracy count is premised on his contention that the government failed to prove wire fraud or bank fraud, and thus, could not prove a conspiracy to commit those offenses. *See* Connolly Mot. VII at 42-43. As set forth above, however, the evidence established each element of wire fraud and bank fraud—the fraudulent scheme to manipulate Deutsche Bank's LIBOR submissions, the materiality of the scheme to the BBA and Deutsche Bank's counterparties, Mr. Connolly's fraudulent intent to participate in the scheme, and its effect on financial institutions. The evidence further established that

47

Mr. Connolly joined a conspiracy to commit wire fraud and bank fraud, as evidenced by his requests to others within Deutsche Bank to change its LIBOR submissions in accordance with its trading positions, his instructions to Mr. Parietti to do the same, the similar requests made by other traders he supervised,[9] and each testifying co-conspirator's understanding that this was something other than the estimate called for by the BBA's definition and would give Deutsche Bank an advantage over its counterparties.  The jury heard sufficient evidence from which it could infer Mr. Connolly's fraudulent intent, as well as his intent to enter into and further the charged conspiracy.

## II.     THE PROOF AT TRIAL FELL WITHIN THE "CORE OF CRIMINALITY" ALLEGED IN THE INDICTMENT AND THERE WAS THUS NO CONSTRUCTIVE AMENDMENT OR PREJUDICIAL VARIANCE

### A.     The Alleged "Core of Criminality" Is the Scheme to Manipulate LIBORs to Benefit the Defendants' Trading Positions at the Expense of Their Counterparties

The thrust of the defendants' constructive amendment challenge is that, while the indictment alleged a "non-convergent" fraud scheme, the government sought to prove a "convergent" fraud scheme at trial.  Even if that were true—which, for the reasons discussed below, it is not—this sort of change does not amount to a constructive amendment, which occurs only when the evidence and jury instructions "modify *essential elements* of the offense charged"

---

[9] For example, Andrew Smoler and David Park, who were also traders on Mr. Connolly's desk in New York, made requests to change Deutsche Bank's LIBOR submissions to benefit their trading positions. *See, e.g.*, GX 1-040 (request from Mr. Smoler, "If you can help we can use a high 3m fix tom"); Tr. 388:13-392:10 (Mr. King explaining how he raised Deutsche Bank's LIBOR submission in response to Mr. Smoler's request); GX 1-049 (request from Mr. Park, "LIBOR higher tomorrow?"); Tr. 406:25-408:13 (Mr. King interpreting Mr. Park's comment as "communicating that he is typically or their trading books typically need higher LIBORs); *see also* Tr. 1011:14-1012:12 and 1029:20-1030:3 (Mr. Parietti testifying that he took account of Mr. Smoler's and Mr. Park's positions in his requests to move Deutsche Bank's LIBOR submissions, and that Mr. Connolly supervised him, Mr. Smoler, and Mr. Park).

to a degree that the defendant was convicted of an offense with which he was not charged.
*United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (emphasis added).  So long as the
indictment alleges the "core of criminality" of the offense proved at trial, no constructive
amendment has occurred.  *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007).  And the
"core of criminality" depends on the defendant's conduct, not on the label attached to the
government's legal theories.  *See United States v. Banki*, 685 F.3d 99, 119 (2d Cir. 2012) (no
constructive amendment despite change in legal theory because the proof at trial "related to the
same statements in the same letters as described in the [i]ndictment"); *United States v. D'Amelio*,
683 F.3d 412, 418 (2d Cir. 2012) ("the 'core of criminality' of an offense involves the essence of
the crime, in general terms; the particulars of how a defendant effected the crime falls outside
that purview").

      In *D'Amelio*, for example, the Second Circuit held that the government did not
impermissibly amend the indictment by proving the defendant enticed a minor through internet
*and* telephone communications when the indictment alleged only internet communications as the
facility of interstate commerce.  683 F.3d at 414.  Similarly, in *United States v. Salmonese*, the
core of criminality was a fraud scheme to realize profits from unlawful sales of stock warrants.
352 F.3d 608, 621 (2d Cir. 2003).  While the indictment identified certain sales of stripped
warrants, this did not preclude the government from proving other, unalleged sales of stripped
warrants or sales of stolen warrants at trial.  *Id.*  In *Banki*, the core of criminality was the
operation of an unlicensed money-transmitting business; though the indictment identified the
defendant's cousin as the source of the wire transfers while evidence at trial pointed to his father,
there was "no uncertainty" the defendant was convicted of "conduct" that was the subject of the
indictment.  685 F.3d at 118-19.  And in *United States v. Seabrook*, no constructive amendment

occurred where the indictment charged a scheme to defraud non-profits controlled by the defendant while the government alleged at trial that the defendant defrauded a municipality.  613 Fed. Appx. 20, *23-24 (2d Cir. 2015).  This was because the factual circumstances and means of the crime were the same under either theory.  *Id.* (finding the "essential elements of the scheme described in the indictment were the same as those proved at trial").  The core of criminality was thus the fraudulent scheme itself, while the details of how that scheme was carried out, including the particular parties who were defrauded, were subject to proof at trial.

Here, the core of the indictment is a fraudulent scheme to obtain money by manipulating the LIBOR rate, and that is exactly what the evidence at trial proved.  The Manners and Means portion of the indictment describes a scheme in which the defendants, who traded LIBOR-based financial products, contacted Deutsche Bank's LIBOR submitters to ask for submissions calculated to suit the bank's derivative positions, rather than submissions reflecting an honest assessment of the bank's borrowing costs.  Superseding Indictment, ECF No. 22 ("Indictment") at ¶ 27(a)-(i).  And the Overt Acts section of the indictment identifies the date, currency, and tenor of over twenty LIBOR manipulation requests made in furtherance of the conspiracy.  *Id.* at ¶¶ 28-48.  The conduct alleged in the indictment is precisely what the government proved at trial. Even if it were true that the government essentially switched victims between indictment and trial—which, again, is not what happened—this would not constitute a constructive amendment. As in *D'Amelio*, *Salmonese*, *Banki*, and *Seabrook*, that the government proved the indictment's alleged scheme at trial means the indictment was not constructively amended.

The defendants' inability to identify an element of the offense that changed due to the purported shift in theories is also fatal to their claims.  To establish a constructive amendment, the defense must show the presentation of evidence at trial altered the "essential elements" of the

offense charged.  *Mollica*, 849 F.2d at 729.  The essential elements of wire fraud are 1) a scheme

to defraud, 2) intent to defraud, and 3) use of interstate or international wires.  This is so

regardless of whether the scheme alleged in the indictment is labeled convergent, non-

convergent, or otherwise, and these are the elements that the evidence at trial proved.

### B.   The Defendants Have Long Been on Notice of the Alleged Misrepresentations to Deutsche Bank's Counterparties

The purported shift in the government's legal theory does not even constitute a variance,

which "occurs when the charging terms of the indictment are left unaltered, but the evidence

offered at trial proves *facts* materially different from those alleged in the indictment."

*Salmonese*, 352 F.3d at 621 (emphasis added).  This is because a variance similarly depends on a

difference between *facts* alleged and *facts* proved at trial, not on the legal theory advanced.  As

indicated above, the indictment alleged that the defendants schemed with Deutsche Bank's

LIBOR submitters to submit economically advantageous rates, and that is exactly the proof that

the jury saw.

Even if a variance occurred, reversal is appropriate only where the variance prejudiced

the defendants by infringing on the notice requirements of the indictment.  *See United States v.

D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971); *see also* Decision on Government's Motions *in

Limine*, ECF No. 262 at 13 ("variance between allegation and proof is not fatal unless the

defendant has been thereby deprived of an adequate opportunity to prepare a defense or has been

exposed to a risk of being prosecuted twice for the same offense") (quoting *United States v.

Ratliff-White*, 493 F.3d 812, 822 (7th Cir. 2007)).  Here, the Court effectively cured any

prejudice that could have resulted by continuing the trial for several months so that defense

counsel could assess their defense in light of the government's submissions regarding its legal

theories, and thus to "eliminate the possibility that any variance would prove prejudicial to

defendants." ECF No. 262 at 13.  Having had this additional time, the defendants cannot now claim to have been prejudiced by the evidence presented at trial—which was consistent with the allegations of the indictment charged over two years before trial.

The defendants' attempts to feign surprise at the government's allegation at trial that one of the objects of the scheme was to defraud Deutsche Bank's counterparties by causing misrepresentations to be made to the BBA ring hollow.  The defendants acknowledge, as they must, that the indictment alleges false and fraudulent statements made to the BBA for the purpose of influencing the LIBOR fix.  *See* Black Mot. at 68; Connolly Mot. at 49.  The indictment describes in detail the process by which Thomson Reuters, acting as an agent for the BBA, receives panel banks' submissions and calculates the LIBOR fix.  Indictment at ¶ 2.  The indictment further alleges that Mr. Black, Mr. Connolly, and their co-conspirators engaged in a scheme to obtain money and property "by making false and fraudulent USD LIBOR submissions to the BBA for inclusion in the calculation of USD LIBOR representing that the rates submitted were an unbiased and honest estimate of the bank's borrowing costs when in fact the submissions reflected rates that were designed to benefit their trading positions."  *Id.* ¶ 26.

But contrary to the defendants' assertions, the indictment also alleges false and fraudulent statements made to Deutsche Bank's counterparties.  It describes in similar detail how the LIBOR settings were published—transmitted "to servers and traders of LIBOR-based financial products around the world"—and how these published LIBORs were used as the basis for the pricing of derivatives trades among these counterparties.  *Id.* ¶¶ 3- 4.  It explains how the payments to be made on the derivatives contracts were affected by the LIBORs published on certain dates, such that "[i]f the relevant LIBORs moved in the direction favorable to the traders' position, the financial institution and the trader stood to benefit *at the expense of their*

*counterparties*." *Id.* ¶ 5 (emphasis added). The indictment describes in further detail how the scheme thus caused Deutsche Bank's counterparties that had "entered into trades throughout the relevant time period in which their positions were opposite to those of the defendants and their co-conspirators" to be "susceptible to substantial risk of loss and to suffer actual loss." *Id.* ¶ 26. And the indictment alleges that the "manipulations and attempted manipulations of Deutsche Bank's USD LIBOR submissions and the published USD LIBOR rate were intended to benefit the trading positions of Deutsche Bank traders, including the defendants and their co-conspirators, and others and to the detriment of, among others, parties who entered into derivative contracts with Deutsche Bank, including, but not limited to, Bank A, Bank B, Bank C, and Bank D." *Id.* ¶ 27(f). The indictment thus makes clear that the skewed LIBORs were published to the counterparties, to be used to determine the payments made on the counterparties' trades with Deutsche Bank.

Since filing the indictment in 2016, the government has maintained that the defendants made material misrepresentations to both the BBA and Deutsche Bank's counterparties. In its March 2017 response to the defendants' motions for bills of particulars, for example, the government explained how the indictment identified "who the Defendants intended to mislead (*trade counterparties* and the British Bankers' Association)." ECF No. 71 at 1 (emphasis added). At the November 30, 2017 pretrial conference, the government noted three times that the BBA was a "conduit" for the defendants' scheme to defraud counterparties. Nov. 30, 2017 Tr., ECF No. 322-14, at 34:24, 35:6-8, 38:18-25 ("we're saying the defendants abused and exploited a system that was in place when it came to submitting its rates so it could benefit and [] either *pay less to a counterparty or get more money from the counterparty*. And we're saying that the BBA in that way is the *conduit*. . .") (emphasis added). This was well before the Court

issued its Thoughts on the Proof Necessary for Government to Establish Wire Fraud as Charged in this Case in March 2018, ECF No. 203.  And in its December 7, 2017 brief, the government explained:  "[t]he Government's position is that the defendants *deceived the counterparties* as well," ECF No. 159 at 5 n.2 (emphasis added), and "[i]n short, the United States does not need to call a witness from the BBA because its theory of prosecution is that the defendants *intended to trick their counterparties*, not the BBA," ECF No. 159 at 7 (emphasis added).

In its motions *in limine* filed in April 2018, the government likewise made clear it intended to prove "the defendants and their co-conspirators made and caused to be made false and misleading statements *to its counterparties*, both directly and through a third-party conduit," including that "during the life of the interest swap agreements, the defendants and their co-conspirators further deceived their counterparties by causing manipulated LIBORs to be transmitted to Deutsche Bank' counterparties through Thomson Reuters, which acted as a conduit to the counterparties, and who in turn settled their derivatives based on that rigged rate." ECF No. 217 at 1-2 (emphasis added).  Accordingly, the government elicited evidence from those counterparties at trial.  The defendants have thus been on notice of the alleged scheme and the alleged misrepresentations to both the BBA and Deutsche Bank's counterparties throughout the case, for more than two years.

The defendants' claim that they were not on notice of the "core of criminality," including alleged misrepresentations to Deutsche Bank's counterparties, is particularly disingenuous in light of their own acknowledgments of this allegation.  At the January 18, 2017 status conference, defense counsel characterized the government's theory of the case as one of fraud on Deutsche Bank's counterparty banks:  "The theory of this case is that our clients somehow defrauded Goldman Sachs and J.P. Morgan and Bear Stearns. . . ."  Jan. 18, 2017 Hrg. Tr., ECF

No. 49, at 10:21-22.  Similarly, at the March 2, 2017 status conference, defense counsel again characterized the government's theory of the case as fraud on Deutsche Bank's counterparties: "As the Court is aware, the theory of the prosecution is that somehow we defrauded counterparties."  Mar. 2, 2017 Hrg. Tr., ECF No. 62, at 7:2-4.  Shortly thereafter, on March 10, 2017, Mr. Black filed a memorandum in support of his motion for a bill of particulars, which characterized the government's legal theory as one of fraud on the counterparties via fraudulent submissions made to the BBA:  "The Superseding Indictment alleges that Mr. Black and Defendant Matthew Connolly (collectively, "Defendants"), while working for Deutsche Bank, defrauded Deutsche Bank's trade counterparties by making false and fraudulent submissions of the London Interbank Offered Rate ("LIBOR") to the British Bankers' Association ("BBA") over a seven-year period."  ECF No. 67 at 1.  Mr. Connolly likewise filed a memorandum in support of his motion for a bill of particulars, which acknowledged:  "The Superseding Indictment alleges that four such counterparties were defrauded, identifying them as Banks A-D."  ECF No. 69 at 2.

The Court has acknowledged the government's allegations with respect to Deutsche Bank's counterparties as well.  In its April 20, 2017 order addressing the defendants' motions for a bill of particulars, for example, the Court recognized that the superseding indictment "identifies: who the Defendants intended to mislead (trade counterparties and the British Bankers' Association). . . ."  ECF No. 76 at 2.

### C.  Whether or Not the Grand Jury Heard Sufficient Evidence of Misrepresentations to Deutsche Bank's Counterparties Is Irrelevant and Harmless in Light of the Jury's Guilty Verdict

Mr. Connolly further protests that the testimony presented to the grand jury before it returned the indictment did not reference misrepresentations to counterparties.  Not only does

this argument miss the mark legally, but it is also factually incorrect.  Any insufficiency of the evidence presented to the grand jury on a given point is harmless, because a conviction by the petit jury cures any defect in the grand jury presentation.  *See United States v. Mechanik*, 475 U.S. 66, 70-72 (1986); *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989).

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████       The information presented to the grand jury, as well as the indictment itself, made clear that the defendants were alleged to have participated in a fraudulent scheme through which false or fraudulent statements were made to both the BBA and Deutsche Bank's counterparties in an effort to make money at the counterparties' expense.

## III.   THE DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL

For the same reasons that acquittal is unwarranted under Rule 29, the defendants are not entitled to a new trial.  *See* Black Mot. III; Connolly Mot. VIII.  Motions for new trials are disfavored and should be granted only in "extraordinary circumstances."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)).  The "ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  And to grant a new trial, a district court must have "a real concern that an innocent person may have been convicted."  *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  While a court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, "it nonetheless must exercise the Rule 33 authority 'sparingly.'"  *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

As detailed above, the witness testimony, audio recordings, and documents presented at trial established every element of the crimes against Mr. Black and Mr. Connolly beyond a reasonable doubt.  This evidence showed that the defendants participated in a conspiracy and

scheme to defraud using false or fraudulent statements, that the rigged LIBOR submissions that resulted from this scheme were material to the BBA and Deutsche Bank's counterparties, that the defendants acted with intent to defraud by causing Deutsche Bank to make LIBOR submissions calculated to disadvantage its counterparties, that the scheme foreseeably involved interstate or international wires, and that the scheme affected financial institutions.  And the defendants were on notice from the very outset that they were alleged to have made material misrepresentations both to the BBA when they caused the transmission of rigged LIBOR submissions, and to Deutsche Bank's counterparties directly and through the BBA/Thomson Reuters as a conduit when their rigged LIBOR submissions were then used to calculate LIBOR and settle trades. Moreover, as detailed in the government's response to the defendants' motion to vacate the convictions and dismiss the indictment on the basis of prosecutorial misconduct, which the government incorporates herein by reference, nothing the defendants complain of came even close to depriving them of due process or would warrant relief in the form of vacatur, dismissal, or a new trial.  The defendants' motions for judgments of acquittal or new trial should be denied.

Respectfully submitted.

ROBERT ZINK                          JAMES J. FREDRICKS
Acting Chief, Fraud Section          Chief, Washington Criminal II Section
Criminal Division                    Antitrust Division
United States Department of Justice  United States Department of Justice


_____/s/_____                 _____/s/_____
CAROL L. SIPPERLY                    MICHAEL T. KOENIG
Senior Litigation Counsel            CHRISTINA J. BROWN
ALISON L. ANDERSON                   Trial Attorneys
Trial Attorney                       Antitrust Division
Criminal Division, Fraud Section     United States Department of Justice
United States Department of Justice