UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )
                                        )        No. 16-cr-370
MATTHEW CONNOLLY AND                    )
GAVIN BLACK,                            )
                                        )
            Defendants.                 )
_____)

**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION
TO VACATE CONVICTIONS AND DISMISS
THE INDICTMENT ON THE BASIS OF PROSECUTORIAL MISCONDUCT**

## Table of Contents

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ....................................................................................................................... 4

I.    The Government Did Not Make Pre-Trial Misrepresentations or Violate The Defendants' Constitutional Rights ............................................................. 4

    A.    The Government Did Nothing Improper Before The Grand Jury ......................... 4

        1.    Mr. Black Did Make Requests To Benefit His Trading Positions ............... 5

        2.    "Spillover" Effect on Mr. Connolly Does Not Warrant Dismissal ............. 7

        3.    Testimony Regarding Mr. Parietti's Book Was Not Knowingly False ........ 8

    B.    The Government Did Not Make Misrepresentations In Connection With Trade Data ............................................................................................................ 9

        1.    The Government Disclosed Issues with Book-to-Trader Mapping and Net Notional Analyses ................................................................. 9

        2.    Additional Background Undermines the Defendants' Argument ............. 18

    C.    The Government Did Not Misrepresent Its Communications With Alleged Counterparty Victims Or Fail To Produce Related Brady .................................... 24

    D.    The Government's Opposition To The Defendants' Motion To Compel Did Not Contain A Series Of False Statements In Order To Avoid *Brady* And Discovery Obligations .......................................................................................... 26

    E.    The Government Did Not Mislead The Defendants Or The Court With Regard To BBA Materials ................................................................................................. 30

    F.    The Government Did Not "Actively Hide" Evidence in Connection with the *Kastigar* Hearing .............................................................................................. 37

        1.    The Government Did Not Withhold Prange's July 21 Email .................... 37

        2.    The Government Did Not Conceal that DOJ Received a Draft of the FCA Notice ................................................................................. 40

        3.    The FCA Letter Does Not Reflect Prosecutorial Misconduct .................... 41

        4.    The Anderson Declaration Was Not Misleading ........................................ 42

II.    The Defendants' Argument That The Government Knowingly Used False Testimony Or Made Misrepresentations At Trial Has No Merit ......................... 43

    A.    The Testimony And Government Arguments To The Jury That Mr. Black's Requests Were Designed To Benefit His Trading Positions Were Neither False Nor Misleading ................................................................................................... 43

B.    The Government Did Not Suborn Perjury By Guy Weston-Edwards .................. 47

C.    The Government's Offer Of Screenshots And Data Strips Was Entirely Proper . 54

D.    The Government Did Not Elicit False Testimony From Mr. Parietti .................. 57

E.    The government did not make misrepresentations in connection with the *Garrity* hearing ............................................................................................... 59

F.    The Government Did Not Undermine Mr. Black's Good Faith Defense By Misleading The Jury On Bids And Offers ........................................................... 62

G.    The government did not elicit false evidence relating to the materiality of the alleged scheme ........................................................................................................ 65

H.    The defendants' allegation that the government suggested that the defendants were responsible for the financial crisis borders on the absurd ........................... 68

I.    The Government Did Not Elicit Misleading Testimony At Trial Or Engage In "Fact Bargaining" With Cooperators .................................................................... 70

    1.    Mr. Parietti's Allocution and Testimony .................................................... 70

    2.    Deferred Prosecution Agreement and Mr. Curtler's Testimony ................. 72

**CONCLUSION** ................................................................................................................. 74

## Table of Authorities

**Cases**

*Conway*, 476 Fed. App'x 928 (2d Cir. 2012) .............................................................. 57

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ....................................................... 69

*Frazier v. Cupp*, 394 U.S. 731 (1969) ......................................................................... 9

*Hughes v. Phillips*, 457 F. Supp. 2d 343, 363 (S.D.N.Y. June 12, 2006) (McMahon, J.) ............ 32

*Nike, Inc. v. Wu*, No. 13-cv-8012, 2018 U.S. Dist. LEXIS 198872 (S.D.N.Y. Nov. 19, 2018) ..... 1

*Osorio v. Conway*, 496 F. Supp. 2d 285 (S.D.N.Y. July 17, 2007) ............................................. 69

*St. Germain v. United States*, No. 99-cr-339 (CM), 2004 U.S. Dist. LEXIS 9784 ..................... 32

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................................... 25

*United States v. Annabi*, No. 10-cr-7 (CM), 2012 U.S. Dist. LEXIS 161372 (S.D.N.Y. Nov. 7, 2012) ......................................................................................................... 32

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) .............................................. 32

*United States v. Bank of Nova Scotia*, 487 U.S. 250 (1988) ........................................... 4

*United States v. Banky-Alli*, No. 05-cr-0589, 2005 U.S. App. LEXIS 25427 (2d Cir. 2005) ...... 32

*United States v. Bari*, 750 F.2d 1169 (2d Cir. 1984) ................................................. 4, 8

*United States v. Battles*, 514 Fed. App'x 242 (3d Cir. 2013) ...................................... 49

*United States v. Bortnovsky*, 879 F.2d 30 (2d Cir. 1989) ...................................... 44, 45

*United States v. Bruno*, 83 Fed. App'x 361 (2d Cir. 2003) ......................................... 44

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ......................................... 4

iii

*United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013) .................................................................. 3

*United States v. D'Agostino*, 638 Fed. App'x 51 (2d Cir. 2016)........................................... 49, 51

*United States v. Eisenhart*, 710 Fed. App'x 50 (2d Cir. 2018)...................................................... 72

*United States v. Elias*, 285 F.3d (2d. Cir. 2002) ........................................................................... 70

*United States v. Fields*, 592 F.2d 638 (2d Cir. 1978) ..................................................................... 3

*United States v. Frank*, Nos. 17-2965 & 17-4057, 2019 U.S. App. LEXIS 1736 (2d Cir. 2019)  59

*United States v. Fujii*, 301 F.3d 535 (7th Cir. 2002) ..................................................................... 49

*United States v. Halloran*, 821 F.3d 321, (2d Cir. 2016)......................................................... 25, 26

*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007) ............................................................ 4

*United States v. Mallay*, 712 F.3d 79 (2d Cir. 2013) ..................................................................... 5

*United States v. Mechanik*, 475 U.S. 66 (1986)....................................................................... 4, 10

*United States v. Melendez*, 57 F.3d 238 (2d Cir. 1995) ................................................................. 5

*United States v. Meregildo*, 920 F. Supp. 2d 434 (S.D.N.Y. Jan 31, 2013) ................................ 32

*United States v. Muyet*, 994 F. Supp. 501 (S.D.N.Y. Feb. 20, 1998................................................ 5

*United States v. Nordlicht*, No. 16-cr-640, 2018 U.S. Dist. LEXIS 198762 (E.D.N.Y. Nov. 21, 2018)................................................................................................................................. 1

*United States v. Reyes*, 157 F.3d 949 (2d Cir. 1998) .............................................................. 15, 56

*United States v. Roque*, 628 Fed. App'x 65 (2d Cir. 2016) .......................................................... 26

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992........................................................... 4, 44

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ........................................................ 3

*United States v. Takhalov*, 827 F.3d 1307(11th Cir. 2016) ........................................... 21

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018)..................................................... 3

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................. 8

*United States v. Wilmington Trust Corp.*, No. 15-cr-23, 2017 U.S. Dist. LEXIS 154757 (D.

Del. Sept. 22, 2017)......................................................................................................... 1

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) ............................................. 44

**Statutes**

U.S.S.G. § 1B1.3..................................................................................................... 71

**Rules**

Fed. R. Evid. 1001 ................................................................................................. 49

Rule 803 ........................................................................................................... passim

Rule 901 ...................................................................................................... 47, 53

## INTRODUCTION

The defendants' accusations of prosecutorial misconduct lack merit and, whether taken individually or together, do not come anywhere close to a deprivation of due process. That is particularly true because the defendants have had a more-than fair opportunity to make their case to the jury and the Court. Notably, although the Court provided the defendants with "the benefit of regulating the government's conduct in this case far more than maybe any [defense counsel] ever worked on," Trial Tr. 1692:18-20, the lion's share of the defendants' allegations of misconduct are nothing more than a re-hashing of arguments already resolved during trial that should once again be resolved in the government's favor.

Constant claims of misconduct without factual basis has been the defendants' litigation tactic throughout these proceedings to distract from the strength of the government's case. *See Nike, Inc. v. Wu*, No. 13-cv-8012, 2018 U.S. Dist. LEXIS 198872, at *32 (S.D.N.Y. Nov. 19, 2018) ("As the saying goes, 'if the law and the facts are against you, pound the table'—here, apparently, by dropping a 5-lb. book on it.").[1] The defendants' strategy is to conglomerate

---

[1]     Defense counsel's suggestion that they make these claims only because this case is a proverbial "spotted owl" of misconduct, Trial Tr. 2454:13, is belied by the frequency with which they level similar accusations. For example:

- In August 2017, Mr. Breen and Ms. Guberman accused (in a motion that was denied) Assistant U.S. Attorneys from the District of Delaware of using false testimony to secure an indictment against their clients, *United States v. Wilmington Trust Corp.*, No. 15-cr-23, 2017 U.S. Dist. LEXIS 154757 (D. Del. Sept. 22, 2017).
- In May 2017, Messrs. Levine and Klugman accused the "Government" of illegally leaking grand jury information and "obstruct[ing] the administration of justice," Ex. 1, in a motion that was denied as "disingenuous at best" and "frivolous speculation," *United States v. Nordlicht*, No. 16-cr-640, 2018 U.S. Dist. LEXIS 198762, *15 & *23 (E.D.N.Y. Nov. 21, 2018); *see also* Order (May 8, 2017), Ex. 2 at 2-3 (describing the manner of filing as "inappropriate," "dilatory," and "gamesmanship").
- In March 2018, Messrs. Levine and Klugman accused Criminal Division lawyers of "*Brady* laundering" in order to circumvent the government's discovery obligations, Ex. 3 at 3.

individual developments that normally arise before or during trial and recast them into a single nefarious government scheme.  Nothing complained of by the defendants comes even close to misconduct or a deprivation of due process.

## LEGAL STANDARD

"Dismissal of an indictment is a remedy of last resort."  *United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008).  "To meet the 'very heavy' burden of establishing a due process violation to dismiss an indictment for outrageous governmental misconduct, a defendant must show that the Government's conduct was 'so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction.'"  *United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018).  Stated differently, the "inquiry 'turn[s] on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience.'"  *Id.* (quoting *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991)).  And the defendants concede, as they must, that "[s]uccessful motions to dismiss on [the shock-the-conscience] ground have ordinarily involved coercion or violation of the defendant's person."  *Walters*, 910 F.3d at 27.  *See also United States v. Cromitie*, 727 F.3d 194, 217-19 (2d Cir. 2013).  They are incorrect, however, in suggesting that prosecutorial "misconduct" of the nature alleged in this case could rise to that level.  *See* Defs.' Br. at 3.  As *Walters* itself demonstrates, even prosecutorial conduct that involves non-coercive, non-violent, but "perhaps even criminal" activity does not meet the shock-the-conscience standard, especially where, as here, the defendants were not prejudiced by the alleged "misconduct."  *See* 910 F.3d at 28.

The defendants are also incorrect in their assertion that the non-prejudicial "misconduct" alleged in this prosecution could warrant dismissing the indictment pursuant to the Court's supervisory powers.  Defs.' Br. at 3-4.  In the only Second Circuit case cited by the defendants, *United States v. Fields*, the court suggested in *dicta* that "widespread or continuous" misconduct

2

that is not isolated to a particular case may warrant dismissal as a "deterrent" in the absence of prejudice. 592 F.2d 638, 648 (2d Cir. 1978). But that case was decided before *Bank of Nova Scotia*, where the Supreme Court held that a court may not dismiss an indictment pursuant to its supervisory powers absent a showing of prejudice (or non-harmless error). 487 U.S. 250, 254 (1988). So whatever value the *Fields dicta* may have had held at one time, it is no longer valid.

Post-verdict dismissal of an indictment—which is the current posture of this case—is almost never appropriate. "[D]ismissal of an indictment based on a prosecutor's conduct or misconduct is warranted only where a substantial right of the defendant has been jeopardized." *United States v. Casamento*, 887 F.2d 1141, 1183 (2d Cir. 1989). That is a high standard, but the standard is even higher for post-verdict allegations of misconduct before the grand jury. A conviction "means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." *United States v. Mechanik*, 475 F.2d 66, 70 (1986). *See also United States v. Lombardozzi*, 491 F.3d 61, 80 (2d Cir. 2007). Thus, "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt," *Mechanik*, 475 U.S. at 70, in all but the most extraordinary of circumstances. "[D]ismissal is warranted *only* where the prosecutor's conduct amounts to a knowing or reckless misleading of the grand jury as to an essential fact." *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984) (emphasis added). "In addition, the mere fact that evidence presented to the grand jury was unreliable, misleading, or inaccurate, is not sufficient to require dismissal of an indictment." *Lombardozzi*, 491 F.3d at 79 (2d Cir. 2007) (citing *Bank of Nova Scotia*, 487 U.S. at 260-61).

Similarly, the Court's power to grant a new trial "should be exercised sparingly," and a new trial should be ordered "only with great caution and in the most extraordinary

circumstances." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *Id.* (internal quotation marks omitted). Accordingly, "[w]hen a defendant alleges that prosecutorial misconduct entitles him to a new trial, he faces a substantial burden because the misconduct alleged must be so severe and significant as to result in the denial of a fair trial." *United States v. Muyet*, 994 F. Supp. 501, 520 (S.D.N.Y. Feb. 20, 1998). To warrant a new trial, the Court "must harbor a real concern that an innocent person may have been convicted." *United States v. Mallay*, 712 F.3d 79, 107 (2d Cir. 2013). Thus, the Court should evaluate the degree of any misconduct, the curative measures adopted to avoid prejudice, and, if there is any residual prejudice, the certainty of conviction in the absence of the misconduct. *See United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995).

## <u>ARGUMENT</u>

The government's investigation, conduct before the grand jury, and manner of trying this case were all entirely proper and did not unfairly prejudice the defendants. Taken together or individually, the government's actions do not warrant the extraordinary remedies of vacatur, dismissal, or a new trial. The government now addresses each of the defendants' arguments in the order they were raised.

**I.     The Government Did Not Make Pre-Trial Misrepresentations or Violate The Defendants' Constitutional Rights**

        A.     <u>The Government Did Nothing Improper Before The Grand Jury</u>

████████████████████████████████████████████████

████████████████████████

### 1. *Mr. Black Did Make Requests To Benefit His Trading Positions*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ █

---

2   *See, e.g.*, Trial Tr. 278:5-7 (King: "We were in the position where we were one of 16 banks in the LIBOR panel, and we were taking advantage of that position to benefit or to benefit trades."); *id.* 1011:20-24 (Parietti: "When I made my requests for the submitters to consider my positions, I would check with the other traders on my desk with the understanding that I was going to include their position in the net that I sent, in the net position that I sent to the submitters for this purpose."); *id.* 1608:15-17 (Curtler: "So if we [referring to was the David Nichols group, which included Mr. Black, *id.* 1608:20-1609:8] came up with a U.S. dollar LIBOR submission for that day and my position required the rate to be higher, we'd skew it to the upside, and the opposite if we wanted it low."). The same three co-conspirators testified specifically with respect to Mr. Black's profit motives. *See, e.g.*, Trial Tr. 289:16-20 (King: "Gavin Black had a fixing and needed me to make a LIBOR rate or submission higher or lower than we would have ordinarily have done, then that would be communicated either verbally or electronically and then I would change the rates."); *id.* 1088:4-6 (Parietti: "[T]he high 1-month LIBOR fix was bad for [Mr. Black] also because of his large position in the same 1s/3s basis swap we've been talking about."); *id.* 1721:13-14 (Curtler: "[Mr. Black] reset 18 billion in 1-month where he needed a low 1-month rate.").

[REDACTED]

---

[3]   Deutsche Bank/Paul Weiss created net notional analyses for the government that were produced to the defendants.  The FBI, using similar methods, re-created net notional analyses that were also produced to the defendants.  Although largely similar, to the extent it matters which set of net notional analyses are being discussed in this brief, the particular set is identified (*i.e.*, Deutsche Bank vs. FBI).

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ █ ████████████

████████████████████████████████████████████

    2.      *"Spillover" Effect on Mr. Connolly Does Not Warrant Dismissal*

██████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

█ The government explained at trial that there were also times the net notional analyses supported the government's theory of the case, Trial Tr. 994:99-10, so it is not clear that the net notional analyses would actually be exculpatory as a whole.

████████████████████████████████████████████████████

████████████████████████████

### 3. *Testimony Regarding Mr. Parietti's Book Was Not Knowingly False*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████





B.    <u>The Government Did Not Make Misrepresentations In Connection With Trade Data</u>

The Court already addressed and rejected the defendants' argument here, concluding "it is *indisputable* that the defense knew that the Government had problems with the book-to-trader mapping . . . going back to its initial data disclosure in late 2016."  ECF No. 323 at 3 (emphasis added).  The Court was exactly right then and should once again reject their argument.

1.    *The Government Disclosed Issues with Book-to-Trader Mapping and Net Notional Analyses*

The defendants' arguments that the government misrepresented the Deutsche Bank trade data repeat the same efforts to sow confusion and mislead the Court that consumed so much time

---

[6]      Exhibit 9 was produced to Mr. Black on December 5, 2017, in connection with the *Kastigar* hearing.  *See* Ex. 10 at 1 (Production 4 – Disc 2).

at trial and were ultimately futile because the government has been straightforward about the nature, reliability, and drawbacks of the available data.  And yet, they re-hash the issue and again attempt to take unfair advantage of the Court's understandable lack of familiarity with the two years of inter-party communications leading up to trial.  The defendants also seek to confuse by conflating book-to-trader mapping and net notional analyses as the same thing, when they are not.  And thus, it is useful to take a step back and review the bigger picture of what the data are, how they were analyzed, and how open and clear the government was with the defense throughout the process.

Deutsche Bank's RMS database[7] is a large dataset containing various fields reflecting information about the banks' trades.  When it comes to fields that are required to settle trades (*e.g.*, fixing date, notional amount, tenor, etc.), the database is highly reliable because if both sides do not agree when settling a trade, there will be a problem and the data on one side or the other will need to be corrected.  Therefore, counterparties who have significant amounts of money riding on that data being correct serve as an important check to ensure that the data were entered correctly.  Other fields—fields not required to settle trades—remain reliable accounts of what was entered into the system but, because they do not have that outside check, they are naturally less so than required fields.  The "trader" field falls into the latter category because it is not necessary for settlement.  Nevertheless, that does not mean the trader field is inherently unreliable.  It is just the name that Deutsche Bank staff entered when they took the trade order and put it into the system.  *See* Trial Tr. 947:11-16.

---

[7]     References to data from the RMS (Risk Management System) database in this brief should be understood to refer to data from the Summit database to the extent RMS data are duplicated in Summit.  Trial Tr. 902:6-903:24.

During the course of the LIBOR investigation, the bank attempted to aid the government's analysis of the RMS trade data by trying to reconstruct the net positions of individual traders on specific days during the relevant period (the so-called "net notional" analyses or spreadsheets).  The reconstruction required connecting trades to traders, but faced a significant obstacle: while the trader field was usually populated with the name of the relevant trader, it was unpopulated for approximately 10% of trades.  Trial Tr. 952:14-19.  The "book" field, on the other hand, did not have the same problem, and so the bank undertook a book-to-trader mapping exercise to bridge the gap left by the unpopulated trader fields and thereby to connect trades to traders.

The book-to-trader mapping process was disclosed to the defendants, as indicated previously, at least as early as December 2017.  *See supra* note 6.  As that disclosure revealed, the first step was to look at the trader field.  If it was populated, the bank took steps to confirm the book-to-trader match was correct, but that was essentially the end of the analysis.  If the field was unpopulated, however, the process became less straightforward and required some inferential analysis that involved looking at other fields, analyzing profit-and-loss reports, reviewing HR records, and interviewing traders and managers who still worked at the bank.  *See* Ex. 9 at 2.  In the end, Deutsche Bank produced the mappings with the following caveat: "given the limitations of the source materials used in reconstructing these mappings, there is a material risk that they are incomplete."  Ex. 11 at 2.[8]

That material risk was magnified further when Deutsche Bank sought to use the book-to-trader mapping to reconstruct individual traders' positions in its net notional analyses because

---

[8]     Exhibit 11, with starting Bates number DOJ-A-0012599, was produced to the defendants on April 18, 2018.  *See* Ex. 12 at 1 (Supplement 21).

the bank coupled the book-to-trader mapping process with steps that required additional assumptions regarding shared books that undermined the analyses reliability.  *See* Ex. 26 (produced to the defendants on November 8, 2016, *see infra* note 29).  Moreover, Deutsche Bank could not sufficiently account for futures contracts because, as is revealed by a quick perusal of the data, there was no field to indicate whether a given future had been sold or was still on the books, thus leaving a hole in the net notional analyses.  The effort, though arduous and well-intentioned, ultimately fell short of the type of evidence the government would seek to use in a criminal trial.

Importantly, the defendants were not sandbagged or led astray in connection with those deficits, denied exculpatory evidence in violation of their due process rights, or promised that the government was going to use the book-to-trader mapping or net notional analyses at trial.[9]  After reviewing the government's September 27, 2018, submission, ECF No. 322, which detailed many of the government's disclosures to the defendants long before trial, not only did the Court conclude it is "indisputable" that the problems had been disclosed, ECF No. 323 at 3, but further observed:

> The defendants' argument ultimately rests on what this court believes to be a faulty premise—namely, that the book-to-trader mapping must be reliable (or at least sufficiently reliable to undergird the Government's case), because the Government committed, in the so-called Joint Submission of May 14, 2017 (Docket #86), that it would rely on the book-to-trader mapping if it decided to introduce trade data in support of its case.  But the defense reading of the letter does not comport with the court's reading.
>
> . . .

---

[9]     The compilation of exhibits demonstrating those points attached to the government's September 27 brief (ECF No. 322) are incorporated by reference.

> The letter does not say, *and cannot be read to say*, that if the Government decided to introduce trading data, it would do so by relying on the book-to-mapping analysis performed by Deutsche Bank.

ECF No. 323 at 3-4 (emphasis added) (footnote omitted).

And nothing in the arguably new points the defendants cobbled together in their brief should cause the Court to reconsider. For example, the defendants fault the government's March 2, 2017, letter for providing Deutsche Bank's "net" trading positions vis-à-vis individual counterparties, thus requiring them to figure out the government's method for navigating the data—"a methodology that the Government repeatedly represented was anchored in the BTM analysis." Defs.' Br. at 13. Determining the bank-wide "net" position vis-à-vis individual counterparties has absolutely nothing to do with book-to-trader mapping because bank-wide positions by their very nature lump all books and traders together; there is no need for any mapping. Likewise, the government's method for navigating the trade data—shared with the defendants at an in-person meeting on April 18, 2017—had nothing to do with book-to-trader mapping either; rather, "the purpose of the presentation was to show the defendants how we took the raw data essentially and looked for transaction tied to LIBOR and identified the relevant counterparties . . . on specific dates[.]" Tr. 9:5-8 (May 3, 2017), ECF No. 84.

The defendants' arguments to the contrary are unfounded. They point out that (1) the government's April 18 presentation showed them a few book names in the data, (2) meeting notes produced by the government allegedly "indicate that Deutsche Bank used book-to-trader mapping to associate trades with particular traders, explaining that '[e]very trade is put into a book' and that the '[b]ook is the most granular level' for performing '[t]rader mapping,'" and (3) the government said in a joint letter:

> Deutsche Bank's system did not capture the specific Deutsche Bank trader that booked each individual trade. Instead, the data shows a trading book that is associated with the trade and *further analysis is needed to link trading books to*

13

> *specific Deutsche Bank traders.  This analysis is often referred to as "book-to-trader mapping," a post-hoc analysis based on the raw data.*

Defs.' Br. at 13-14 (emphasis added by defendants).  Finally, the defendants claim the government misled them by saying that, while book-to-trader mapping had issues, the data was accurate and reliable, and further by suggesting the government may introduce the book-to-trader mapping at trial.  *Id.*

Those arguments are flawed in several respects.  First, the government's mere mentioning of the book field in its presentation is a far cry from saying that book-to-trader mapping is required to navigate the data.  Second, the defendants' use of quotes from the meeting notes—to the extent they prove anything at all—is misleading, as everything they quote is under the heading "Trader ID field not populated often."  *See* Levine Decl. Ex. 5 at 7.  But the notes produced on December 5, 2017, *see supra* note 6, indicate there was not much left to do when the trader field was populated, so there would be no need for a full-blown book-to-trader analysis in those cases.  Ex. 9 at 1-2.  Likewise with respect to the above block quote the defendants cite, that only applies when the trader field was not populated.  Finally, the fact that the government said the data are accurate and reliable is a statement about information in the RMS trade database;[10] it says nothing about the accuracy or reliability of the bank's post-hoc analyses.  To the extent the government suggested it *may* introduce book-to-trader mapping at trial, it is of no moment.  The government commits no misconduct by not foreclosing its possible use of certain exhibits at trial.  To quote the Court: "based on developments at the trial, the government can

---

[10]   Mr. Weston-Edwards testified that the trader field is not 100% reliable, Trial Tr. 950:21-25, which is not the same as saying the trader field is unreliable.  While the Court ultimately disagreed about the reliability of the trader field, the government's contrary position was reasonable and does not amount to misconduct. *United States v. Reyes*, 157 F.3d 949, 953 (2d Cir. 1998) ("Residual doubts" on the trustworthiness of business records, including "irregularities, such as missing names," "go to the weight of the evidence, not its admissibility.")

pivot." Trial Tr. 884:9-10. (And, of course, had the government offered the book-to-trader

mapping at trial, the defense would have been free to attack its admissibility or weight based on

the problems disclosed by the government.)

The defendants' argument that the government did not disclose that the trades it

particularized for presentation at trial could not be reliably associated with members of the

conspiracy, Defs.' Br. at 14-16, is unavailing. Before trial, when the government particularized

the trades, it understood there was no obligation to connect trades with the conspirators based on

the Court's ruling on the defendants' bill-of-particulars motions. Specifically, the Court said:

> Defendants argue that the universe of trades being presented in this case should
> include only trades involving the alleged co-conspirators. I disagree; the
> Government can specify whatever specific trades it believes were impacted by the
> scheme. The fact that the trades were carried out by persons other than the co-
> conspirators identified in the indictment is a matter to be brought to the attention
> of the jury for whatever relevance that fact might have.

ECF No. 89 at 13. When the Court ruled at trial that the government would have to connect the

trades with conspirators after all,[11] the government did so successfully and reliably through

Mr. Parietti, a witness with knowledge to testify about which books belonged to which traders,

Trial Tr. 358:4-15; 360:16-21. Thus, there was nothing to disclose.

The defendants' argument that the government did not disclose that there was no way to

determine whether particular trades were consistent with the traders' net trading positions, Defs.'

Br. at 14-16, is equally meritless. The government did disclose the shortcomings of the book-to-

---

[11]      *See, e.g.*, Trial Tr. 354:10-19 (Ms. Sipperly: "But we were also going to offer [evidence
of objective materiality] from a specific counterparty perspective." The Court: "Okay. Then you
have to tie it to these defendants or their co-conspirators. And if you can't do that, if you cannot
do that, then their testimony, if it even comes in, will be stricken." Ms. Sipperly: "Okay." The
Court: "It's not Joe Deutsche Bank generally. I'm sorry."); *id.* 350:19-24 (Mr. Levine: "[The
government] identified specific swaps that [counterparty witnesses] are going to testify about. So
the question is, okay, can you tie those swaps back to something other than just Deutsche Bank
writ large." The Court: "If they can't, believe me, the testimony will be stricken.").

trader mapping, which served as the basis for the net notional analyses.  *See generally* ECF No. 322.  And, in fact, the government explained in its November 28, 2017, letter—almost a year before trial—that it would "*not* . . . prove net exposure on any given day."  ECF No. 152 at 3 (emphasis in original).  The government simply did not conceal the difficulties inherent in proving net positions.

Also unconvincing is the defendants attempt to cite the Court's remark—"Well, I'll tell you, you weren't very clear with me"—as proof that they had been sandbagged.  Defs.' Br. at 18.  For that statement to say anything about whether the government changed its position would require the Court to be privy to the two years of back-and-forth between the government and the defendants.  As the Court's September 27 opinion makes clear, once that back-and-forth was brought to light, the Court recognized that "it is indisputable that the defense knew that the Government had problems with the book-to-trader mapping . . . going back to its initial data disclosure in late 2016."  ECF No. 323 at 3.

The defendants make a similar argument with respect to the Court's statement, "Boy, that's not what you wrote," which was said in response to the government's statement at trial that it had written in the joint letter that the book-to-trader mapping and net notional analyses were not comprehensive.  *See* Defs. Br. at 20.  There, too, the government demonstrated to the Court's satisfaction with its September 27 submission that the problems with the book-to-trader mapping and the net notional analyses were adequately disclosed to the defendants, and also that the government was correct in its characterization of what had been written in the joint letter.  *See* ECF No. 322 at 3-4.

The defendants also complain that their due process rights were violated when the government stated that Deutsche Bank "provided little explanation as to how [the net notional

analyses] were prepared," when in fact, according to the defendants, the government had "extensive communication" with the bank on that subject. Defs.' Br. at 21. In support of their claim, however, the defendants conflate book-to-trader mapping with the net notional analyses. They point to four exhibits, only one of which—a cover letter from Paul Weiss, Levine Decl. Ex. 7—relates to net notional analyses; the others all relate to book-to-trader mapping or data generally, *see* Levine Decl. 1 & 5-6. In any event, the defendants are quibbling over a matter of degree—was the explanation "little" or "extensive"?—without offering any explanation or authority as to why their quibble amounts to a due process violation or how they were prejudiced.

Finally, the defendants make a nonsensical claim that they were deprived of due process because the government never disclosed that book-to-trader mapping did not contain futures data. Defs.' Br. at 21-22. The book-to-trader mapping is, as the name suggests, a mapping from books to traders. Aside from the book names themselves, the book-to-trader mapping does not contain data from *any* type of trade. The defendants' reliance on the March 2 letter or the April 18 presentation in this context is misplaced. Neither had anything to do with book-to-trader mapping. Regardless, the government had disclosed the futures dataset to the defendants, so the defendants had the data showing that the futures data did not include the equivalent of a sold date and thus that any net notional analyses could not have accounted accurately for futures.[12]

---

[12]    It is worth noting that defense counsel seem to have a more-than-passing familiarity with the transcripts from the prosecutions of Anthony Allen and Anthony Conti for LIBOR manipulation, *see, e.g.*, ECF No. 233-9, so the defendants not only had the futures data in this case but also understood the best ways to cross-examine on futures data, which includes the possibility that futures data can be a major obstacle to calculating net positions, *see, e.g.*, Ex. 13 at 1015:1-1019:11.

In short, none of the defendants' arguments about trade data, the book-to-trader mapping, or the net notional analyses—taken separately or together—show that the government made misrepresentations or withheld information, much less that due process was violated.

2.    *Additional Background Undermines the Defendants' Argument*

The government provides the following additional context for the book-to-trader mapping issue to show the repeated false statements by defense counsel that resulted in the loss of a full day in the middle of trial and that bear on the trustworthiness of their current assertions.

Unbeknownst to the Court, at that time, there had been a lengthy back-and-forth between the parties due to the government's refusal to stipulate that the net notional analyses were business records—because they are not. *See supra* § I.B.1. The government's principled refusal to stipulate presented a problem for the defendants as the net notional analyses were the backbone of their expert testimony. To be sure, the problem was not necessarily intractable because their expert could reconstruct the net notional analyses using the book-to-trader mapping and the RMS trade data, or the defendants could have called a witness from Deutsche Bank to lay a proper foundation. However, when the government's *Daubert* reply brief pointed out foundational issues with the net notional analyses themselves (based on risks associated with the book-to-trader mapping as well as the additional assumptions needed), and when the Court ruled that the government would be permitted to "put on a rebuttal case that tears the DB analysis to shreds," ECF No. 328 at 3, the defendants' problem became much more difficult. With the net notional analyses being vulnerable, their expert's reconstruction of the net notional analyses would be useless. Defense counsel put it best: "they are going to blow up the book-to-trader mapping because it blows up the net notional spreadsheet." Trial Tr. 865:16-18.

The government did not have that same problem, however, because it did not seek to introduce traders' net positions via trade data. ECF No. 152 at 3 (explaining that the government

would "*not . . .* prove net exposure on any given day") (emphasis in original).  For the
government, the trade data was primarily an investigative tool used to identify Deutsche Bank's
counterparties who would have been harmed on various manipulation dates.  *See, e.g.*, ECF No.
71 at 9.  Accordingly, the government explained early and often that its use of the trade data
would be limited at trial, and furthermore the government explained it would prove, through
cooperator testimony, that people making manipulation requests did so because of a subjective
belief—not mathematical certainty—that doing so was consistent with their net positions.  *See,
e.g.*, ECF No. 152 at 3 ("[W]hen the Defendants and their co-conspirators asked the submitters to
manipulate the bank's submissions in a particular direction or to a particular level, the request
was motivated by their subjective belief that what they had asked for would benefit them.").
Moreover, the government had no significant need for the book-to-trader mapping even without
the net notional analyses because up to that point, as the Court ruled on May 24, 2017, there was
no need—at least as a legal matter—to tie trades to the defendants or their co-conspirators.  *See*
ECF No. 89 at 13; *supra* p. 15.

Facing the possibility that their expert testimony was on the verge of being undercut,
coupled with the fact that eliminating the book-to-trader mapping and the net notional analyses
would not harm the government's case, the defendants embarked on a campaign, not only to
eliminate counterparty witnesses but also to smear the government prosecutors through
misleading and untrue statements.  It started at the end of the trial day on September 20 with the
defendants' motion to exclude the testimony of the Federal Home Loan Bank (FHLB) witnesses
on the ground that, without the book-to-trader mapping, there was no way to connect the
defendants or their co-conspirators to the FHLB trades.  Trial Tr. 342:23-343:18.  That assertion
was patently untrue.  The government previewed one obvious way: Mr. Parietti could testify that

19

the FHLB trades were in a book run by his NYMMD desk, thus connecting him and his co-conspirators to the trade.  *Id.* 357:13-15.  And the defendants should have known Mr. Parietti could provide such testimony based on two separate 302s.  *See* Ex. 14 at 4 (Mr. Parietti explaining that the "OIS Basis" book belonged to him and "NY Basis" belonged to co-conspirator David Park);[13] Ex. 16 at 2 (Mr. Parietti explaining Deutsche Bank's book names).[14] In any event, as the defendants had known since at least December 5, 2017, *supra* note 6, the first step of the book-to-trader mapping process was to look at the trader field in the data, Ex. 9 at 1-2, and that was a reliable way to make the connection when that field was populated.[15]

But the Court would have had no way to know that, so defense counsel took advantage and revised history to fit their narrative.  Specifically, they falsely claimed that the government had not disclosed the problems with the book-to-trader mapping and net notional analyses, and pretended that the government had tricked the defendants into relying on them.  Feigning shock like *Casablanca*'s Captain Renault, they told the Court:

> The fact that they are taking this position, now that the cooperator spent a year creating for them a piece of nonsense, is so disingenuous.  The fact is *we could hardly believe these papers when we saw them*, that they are actually taking this position.

Trial Tr. 360:8-12 (emphasis added).  But just as Captain Renault knew of the gambling ("Croupier: Your winnings, sir."),[16] the defendants long knew of the problems with the book-to-

---

[13]     Exhibit 14 was produced to the defendants on February 6, 2018.  *See* Ex. 15 (DOJ-A-0011041).

[14]     Exhibit 16 was produced to the defendants on May 18, 2018.  *See* Ex. 17 (DOJ-A-0013092).

[15]     To reiterate, the problems with book-to-trader mapping do not stem from its reliance on the trader field, but rather the fact that the trader field is often times unpopulated.

[16]     *See United States v. Takhalov*, 827 F.3d 1307, 1310 n.2 (11th Cir. 2016).

trader mapping and thus the net notional analyses built upon it.  *See, e.g.*, ECF No. 323 at 3 ("After reviewing the Government's submission of this morning, I conclude that the Government told the defense that there were potential flaws in the book-to-trader mapping project as early as November 2016.").  Their insincere protestations of surprise stand in stark contrast to defense counsel's previous mockery of the book-to-trader mapping, *see* Tr. 47:24-48:1 (May 3, 2017), ECF No. 84 ("They did some exercise for the government to try to guess.  But they actually can't map these back to my client and his client.").

Their campaign reached a zenith on September 26 in response to the government's perfectly reasonable attempt to use the trader field alone to make the connections between trades and traders—something the government had not thought was necessary until the Court's ruling at trial that trades needed to be connected to a defendant or co-conspirator.  Defense counsel wasted an entire trial day with a dizzying array of false accusations and misleading arguments that culminated in the government being sent on an all-night excursion to demonstrate something the defendants already knew to be true: the government had not committed a *Brady* violation or otherwise acted improperly with respect to the book-to-trader mapping or the net notional analyses.  ECF No. 322.

The number of falsehoods and misrepresentations uttered by defense counsel on September 26 is both staggering and telling:

| Facts Defense Counsel Knew But Misrepresented | Support From The Record |
|---|---|
| *Defense counsel knew that the government:*<br>• *had disclosed issues with book-to-trader mapping, and*<br>• *had not committed to using book-to-trader mapping.* | "The Government made the Defense aware that there were 'issues' with book-to-trader mapping, and it did so in plenty of time for the defense to explore those data deficiencies and make a decision about whether to rely on that data in the presentation of its defense. . . .  The letter does *not* say, and cannot be read to say, that if the Government decided to introduce trading data, it would do so by relying on the book-to-[trader] mapping analysis performed by Deutsche Bank."<br><br>Ruling On Issues Raised On September 26, 2018, ECF No. 323 at 3-4 (emphasis in original). |
| *Defense counsel made at least 11 untrue statements about the government's representations regarding book-to-trader mapping.* | (1)  "And the government said to us, if we go to trial, we're using this mapping.  We may not use it, but that's what we're going to use."  Trial Tr. 832:16-18.<br><br>(2)  "I worked all summer. And the only way I can do it is because they gave us a piece of paper, and it says if you want to know which trader is associated with which book, here's a map.  And we used that map.  And the moment they got our expert report, they pulled the rug out, and said, 'Oh, now it's not reliable.'"  Trial Tr. 833:18-23.<br><br>(3)  "They should be held to their position.  The book-to-trader mapping was how you did it."  Trial Tr. 891:9-10.<br><br>(4)  "The issue is when the government tells me that were it to do something at trial, this is the method, the appropriate method, to be used.  Trial Tr. 955:13-15.<br><br>(5)  "And the only way they said you can reliably do that is to book-to-trader mapping."  Trial Tr. 955:19-21.<br><br>(6)  "What I can't do is tell you I'm selling you a house with no termites, and I buy it, and later you say, Oh, you know what?  It's infested, and I knew that beforehand.  So I don't want the termites.  The problem |

| | |
|---|---|
| | here is they have sandbagged me and Mr. Breen, because they have changed."  Trial Tr. 955:25-956:5. |
| | (7)   They should have to use the methodology they said, had they chosen to present it, they would have used."  Trial Tr. 956:21-23. |
| | (8)   "The word of the United States is its bond.  And in my view, they told me, I'm going to do it this way."  Trial Tr. 957:2-4. |
| | (9)   "The government said had we done something, this is how we would have done it.  We accepted that.  And they should stick with it."  Trial Tr. 957:22-24. |
| | (10)   "As they said, [i]t's not perfect, and you could try to poke holes in it, if you want, Mr. Levine.  But that's the best we got."  Trial Tr. 970:7-9. |
| | (11)   "The letter says if we do a trial, we are going to use this."  Trial Tr. 979:6-7. |

| | |
|---|---|
| *Defense counsel knew that:*<br>• *the "trader" field existed in RMS, and*<br>• *Deutsche Bank relied on the "trader" field for book-to-trader mapping* | ➤ Methodology (more granular understanding can be given if requested)<br>■ **Michael Curtler/James King/Gavin Black/Yves Paturel**<br>● RMS (derivative trades booking software):<br>◆ (1) Look to "trader field" for who executed trader. When un-populated and/or to confirm, DB then looked at…<br>◆ (2) "entered by" field<br>➤ For 80% of the time where this field populated, the trader was identified.<br>➤ If a book contained a trader's name under this field ≥ 80%, the bank assigned the book to that trader<br>◆ (3) Analyzed head trader p/l reports<br>➤ Used, when available, to corroborate step 2<br>◆ (4) Looked in Human Records reports to see if able to corroborate<br>◆ (5) Looked in employment contract as well (only Bittar and Maine applicable here) but looked anyways.<br>◆ (6) Where the business manager is available, used to confirm findings.<br><br>Exhibit 9 at 1-2 (highlighting added). |

| | |
|---|---|
| *Defense counsel made at least 3 untrue statements about the "trader" field being manufactured or new or not relied upon by Deutsche Bank* | (1)   "There's a trader column that they've manufactured."  Trial Tr. 841:18.<br><br>(2)   ". . . just look at this trader column which Deutsche decided not to rely on . . ."  Trial Tr. 896:8-9. |

23

|  | (3) | "And I don't want to get, after preparing my case, sideswiped by them saying, Oh, you're using that book-to-trader mapping.  Under our new trader column, it affects it.  I can't deal with that at trial, because I need to know beforehand, because I did my homework.  And that's what's going on here."  Trial Tr. 956:15-20. |

### C.     The Government Did Not Misrepresent Its Communications With Alleged Counterparty Victims Or Fail To Produce Related Brady

The defendants complain that the government withheld two exculpatory communications with Goldman Sachs, Defs.' Br. at 23-26, but the government did not, much less violate defendants' due process rights.

For starters, the defendants have not shown a *Brady* violation.  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  "The government's failure to produce evidence is prejudicial and thereby violates a defendant's rights under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016) (internal quotation marks omitted).  "[A]s long as a defendant possesses *Brady* evidence in time for its effective use, there can be no *Brady* violation."  *Id.* at 341. (internal quotation marks omitted).

The two communications at issue—(1) an FBI conversation with Goldman Sachs' in-house counsel, who said the firm did not want to participate in the LIBOR matter, and (2) a conversation between a Department of Justice attorney and Goldman Sachs' outside counsel, who said the firm did not want to designate a witness who could come back to bite them

24

litigation[17]—are not *Brady* material.  Nothing in either communication—reflecting conversations with non-witness lawyers—gives any indication that Goldman Sachs did not view itself as a victim, which is the only basis the defendants assert for classifying the evidence as *Brady*, or even that Goldman Sachs possessed exculpatory evidence.  The communications thus fail *Brady*'s first requirement because they were not favorable to the defendants.

They also fail *Brady*'s prejudice requirement because there is no reason to think, let alone a reasonable probability, that an earlier disclosure would have affected the outcome.  All Goldman Sachs evidence, as well as the only substantive wire fraud count involving Goldman Sachs, were excluded from the jury's consideration and the count dismissed, Trial Tr. 2395:10-11, 2395:19-21.  Thus, the defendants cannot establish prejudice, even assuming the communications were exculpatory (which they were not).

Moreover, in *Halloran*, the Second Circuit found no *Brady* violation for material disclosed eight days into trial where the defendant was granted a one-week continuance to question witnesses about the evidence but declined to introduce the evidence after the continuance.  *Id.* at 341-42.  Here, the disclosure was approximately eleven days into trial, and five days before the government rested.  The defendants had adequate time to request relief (*e.g.*, a brief continuance or adjournment) from the Court on October 5, *see* Trial Tr. at 2369:11 (Court: "Anything you want to put in, Mr. Breen."), to make use of the information, but they declined to do so.  *Cf. United States v. Roque*, 628 Fed. App'x 65, 66 (2d Cir. 2016) (summary order) ("[N]o *Brady* violation where defendant 'did not request a continuance, even though the District Court offered one[.]'") (quoting *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir.

---

[17]     The communications were summarized in a letter submitted *ex parte* for *in camera* review on October 4, 2018.

2013).  Nor do the defendants offer evidence that they approached Goldman Sachs at any time, in spite of both the fact that they have known about Goldman Sachs in relation to this case for a very long time and their confidence that Goldman Sachs would provide favorable information, *see* Trial Tr. 844:20-23 (Mr. Levine: "And I wonder what happened when Goldman Sachs was called by the government and said, 'Were you victims here?'  My bet is their counsel, probably after dropping the phone in laughter, probably told them no.").

      D.     <u>The Government's Opposition To The Defendants' Motion To Compel Did Not Contain A Series Of False Statements In Order To Avoid *Brady* And Discovery Obligations</u>

The defendants' argument that the government made false statements in its briefing on the scope of the prosecution team in order to avoid *Brady* and other discovery obligations rests on the untrue assumption that the government is trying to hide some unspecified exculpatory material within the halls of its investigative partners.  That is absolutely untrue; the government is not in the business of hiding exculpatory evidence or otherwise violating the defendants' constitutional rights.  To the contrary, the government understands, and takes very seriously, its discovery obligations.  It is also unclear what the defendants think is out there that will exculpate them by showing that they did not write the words they wrote or did not take the actions they took.  It is all an exercise in grasping straws.

The defendants are attempting to turn the government's good-faith effort to summarize an extensive investigation that spanned several years, crossed international borders, and saw substantial turnover in personnel at all levels—administrative, IT, paralegal, line attorney, and management—by seizing on perceived discrepancies and crying "gotcha!"  To the extent anything in the brief did not perfectly encapsulate or described slightly differently somebody's notes from years ago, that is merely the byproduct of the nature of the gigantic task of distilling

the government's relationships with other entities to its essence, and nothing more.  But that does not establish bad faith or prejudice.

Many of the defendants' specific "gotcha" claims have been addressed before and none are meritorious.  Their first claim—that the government falsely stated that it did not share its paperwork or discuss the resolution of its investigation—is misleading and distorts what the government said.  As the government explained in its December 26, 2017, letter to the Court, the point of the statement in question "was intended to rebut the notion that the DOJ and FCA actually collaborated on their respective statements of fact and essentially co-authored work product as part of a unified team."  ECF No. 176 at 1-2.  The Department of Justice did forward a draft statement of facts to FCA a few days before resolution with Deutsche Bank "for the purpose of avoiding surprise and enabling the FCA to assess the potential regulatory implications and collateral consequences," *id.* at 1, but again, as the government explained in its December 26 letter, that was not the type of paperwork sharing reflecting, for example, co-authored work product as part of a unified team.  Nor was the draft FCA notice, which was sent to the government apparently unsolicited.

Likewise with respect to fine amounts, while the government discussed fines—and additional topics—with other regulators, "each resolving agency approached the negotiation table with its own independently determined form of resolution and fine amount."  *Id.* at 2.  And that was all the government intended to convey.  The fact that Deutsche Bank asked for a reduction that the Department of Justice and other domestic regulators discussed, and ultimately agreed to, *id.*, was not contradictory to the government's statement in its brief.

The defendants' second claim is that the government misrepresented the nature of its communications with the other agencies by describing the nature of its interactions as limited to

27

non-substantive communications, but it too fails.[18]  Taking the communications in order, the first

is a Financial Conduct Authority (FCA) email to Deutsche Bank giving the bank statutory notice

of a change of the scope of its investigation subsequently forwarded to the government.  Levine

Decl. Ex. 17.  The FCA letting the Justice Department know where its investigation is headed, or

vice versa, is an integral part of avoiding or reducing potential negative impact on each other's

investigations.  It is not evidence of a joint investigation.  In fact, the FCA was telling the DOJ,

not asking. The second communication is an email among the Department of Justice, the FCA

and the CFTC coordinating audio or document production priorities.  Levine Decl. Ex. 18.  It

falls into the same category because it helped streamline the production process when Deutsche

Bank received competing demands from multiple regulators.  The third communication, relating

to what documents would be used in the King interview, Levine Decl. Ex. 19, was also sent to

streamline the interview and avoid duplication.  Fourth, the defendants point to an email sent on

the eve of settlement from FCA to DOJ proposing several topics to discuss at an upcoming

meeting.  Levine Decl. Ex. 20.  None of the topics appear to touch on "strategy for prosecuting"

the case or "strateg[y] about what the DOJ needed and would request for its case," as suggested

by the defendants.  *See* Defs.' Br. at 33.  In fact, because the meeting was to occur a few weeks

before settlement with Deutsche Bank, it is difficult to understand what valuable strategic or

---

[18]     To the extent the defendants insinuate that the volume of communications between the
government and the FCA is somehow probative of the nature of the two entities' relationship, the
Court has already addressed that issue.  Tr. 73:7-9 (Dec. 13, 2017) ("I mean I have to tell you
joint prosecution and interacting on a daily, weekly and monthly basis are not the same thing.");
73:13-18 ("My background assumption is that there was in fact cooperation between the British
and the American officials on the LIBOR investigation.  That's my assumption, which does not
create a joint prosecution and does not necessarily mean that everything in the Brits' files is
*Brady* material."), ECF No. 187.

discovery plans could have been discussed.  Finally, the defendants' citation to a congratulatory

email, Levine Decl. Ex. 16, proves nothing except the hollowness of their argument.

The defendants next make a claim that the government has, once again, already refuted.

Contrary to their assertions, Defs.' Br. at 34-36, the government did not misrepresent the number

of joint interviews that it conducted with prosecution members.  In short, the defendants argue

that the government's numbers correspond only to the Deutsche Bank investigation but should

instead correspond to all the other LIBOR investigations, which yields a higher number, because

the government's discovery obligations extend to all the other LIBOR investigations as well.

But the defendants admit that the government's representations were "in connection with its

'investigation into manipulation of the LIBOR at Deutsche Bank.'"  Defs.' Br. at 35 (quoting

ECF No. 51 at 5).  Thus, there was no factual error with the government's statements:

- "FCA investigators attended two out of the thirty-four DOJ interviews related to this case."  ECF No. 51 at 9.

- "The DOJ did not receive Deutsche Bank-related documents from, or conduct any joint interviews with, the SEC."  *Id.* at 11.

- "Overall, the CFTC participated in thirteen of the thirty-four interviews related to Deutsche Bank[.]"  *Id.* at 12.

The government stands by those statements and, in addition, maintains that the number of

interviews conducted along with other agencies in relation to Deutsche Bank is the correct metric

for the question of whether there was a joint Deutsche Bank investigation.  The defendants

disagree, obviously, but their disagreement with the government is legal, not factual, and

therefore does not support their overall claim that the government made factual

misrepresentations.

Finally, the defendants' claim that the *Garrity* hearing further revealed the misleading

nature of the government's representations about its interactions with the CFTC, Defs. Br. at 36-

37, is unavailing.  The government has never hidden the fact that its interaction with the CFTC was more extensive than with other agencies.  *See, e.g.*, ECF No. 51 at 11-12.  And the government has never denied attending calls and meetings with CFTC and Deutsche Bank. Indeed, the very document—Deutsche Bank's white paper, DX 862—that supposedly evidences hidden calls and meetings was produced to the defendants on March 23, 2017, *see* Ex. 19 (DOJ-A-0006528); Ex. 20 (DOJ-A-0006528), so it is disingenuous for them to raise it now as though something was recently revealed or that they somehow were able to peek behind the curtain by obtaining that material.  In any event, nothing raised by the defendants here warrants a finding that the government made misrepresentations at all, and definitely none that deprived them of their rights to due process.

Furthermore, it is telling that the defendants, for all their allegations of misrepresentations on this issue, never filed a renewed motion to revisit the scope of the prosecution team in spite of the fact that the Court effectively invited them to do just that in December 2017.[19]  Tr. 71:23 (Dec. 13, 2017) (referring to the defendants' "once and future motion on the joint prosecution issue"), ECF No. 187.  And the reason seems apparent: the defendants knew that none of the alleged "misrepresentations" were inaccurate, and defense's arguments otherwise would not be sufficient to convince the Court to change its ruling on the prosecution team.

E.  The Government Did Not Mislead The Defendants Or The Court With Regard To BBA Materials

The defendants' complaint that the government failed to produce allegedly exculpatory BBA materials in the possession of the Federal Deposit Insurance Corporation (FDIC) that were

---

[19]     The defendants had previously renewed their motion on the scope of the prosecution team in the form of a motion to compel in August of 2017, ECF No. at 17-26, which the Court denied, ECF No. at 25-28.

revealed by that agency's lawsuit in the United Kingdom, Defs.' Br. at 38, is misguided.  The

government[20] does not possess the FDIC files, does not have ready access to them, and has no

obligation to request anything from an independent agency such as FDIC.[21]  As the Second

Circuit has explained:

> [T]he imposition of an unlimited duty on a prosecutor to inquire of other offices
> not working with the prosecutor's office on the case in question would
> inappropriately require us to adopt a monolithic view of government that would
> condemn the prosecution of criminal cases to a state of paralysis.

*United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998).  Simply put, "*Brady* does not require

the Government to obtain documents that might prove helpful to the defense—even if the

defendant has difficulty obtaining those documents."  *St. Germain v. United States*, No. 99-cr-

339 (CM), 2004 U.S. Dist. LEXIS 9784, at *16.[22]

Moreover, the government had no additional duties upon learning of the FDIC's

allegations regarding the BBA because mere knowledge of the availability of documents that

---

[20]     The "government" in this context means "attorneys from the United States Department of
Justice's Criminal Division Fraud Section and Antitrust Division, as well as agents from the
Federal Bureau of Investigation's Washington Field Office."  ECF No. 51 at 4.

[21]     The fact that the Department of Justice represents FDIC from time to time in legal
matters does not mean the government has unfettered access to FDIC files.  Any access to FDIC
documents is limited to documents related to those matters.  The FDIC is represented by a
private firm in the LIBOR litigation, so the DOJ certainly does not have such access here.  *See*
ECF No. 159 at 7-10.  Nor was the FDIC a member of the prosecution team.

[22]     *See also United States v. Banky-Alli*, No. 05-cr-0589, 2005 U.S. App. LEXIS 25427, at
*6 (2d Cir. 2005) (holding that the U.S. Attorney's Office for the Eastern District of New York
did not have a duty to find allegedly exculpatory material in the possession of the Department of
Homeland Security); *United States v. Meregildo*, 920 F. Supp. 2d 434, 445 (S.D.N.Y. Jan 31,
2013) ("*Brady* . . . does not require the government to act as a private investigator and valet for
the defendant, gathering evidence and delivering it to opposing counsel.") (quoting *United States
v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002); *United States v. Annabi*, No. 10-cr-7 (CM), 2012
U.S. Dist. LEXIS 161372, at *53 (S.D.N.Y. Nov. 7, 2012); *Hughes v. Phillips*, 457 F. Supp. 2d
343, 363 (S.D.N.Y. June 12, 2006) (McMahon, J.).

might have exculpatory information is not itself *Brady* material.  *Id.* (explaining that "*Brady*

requires only the disclosure of evidence" and the availability of documents is not evidence).

That is especially true where such knowledge is "hardly a Government secret" because the

defendants could have issued subpoenas for production at trial or requested the Court to

authorize pre-trial discovery.  *Id.* at *15-*16.  The defendants knew of the FDIC's lawsuits both

here and abroad—and were fully aware that the government's position was that it did not have to

get those documents—in plenty of time to obtain whatever exculpatory information in the FDIC

may have possessed, but they did nothing.

      The defendants' argument that the government "feigned" ignorance of the FDIC's

lawsuit in the U.K. at a November 2017 hearing, and then failed to follow through on an alleged

commitment to produce FDIC documents, Defs.' Br. at 38-39, is likewise futile.  First, the

government was generally aware that FDIC had filed multiple civil LIBOR suits.  But in the

moment at the hearing, when the U.K. suit was raised by defense counsel seemingly out of

nowhere, the prosecutors did not immediately recall that specific suit being attached to a defense

filing more than two months prior.  That hardly rises to the level of misconduct or a deprivation

of due process.

      Additionally, the government never committed to search FDIC's files for *Brady*.  The

defendants argue, to the contrary, that the government did so commit when it said at the hearing:

"To the extent that there is something with the FDIC filed [sic], we'll look at it immediately."

Defs.' Br. at 39.  Reading that as a commitment to produce anything stretches the statement

beyond anything it can bear.  The government also did not understand the Court's "admonition"

at the November hearing to constitute, as the defendants suggest, Defs.' Br. at 39 n.8, a finding

that the government had a responsibility to search FDIC's files.  In fact, the government's letter

of December 7, 2017, explained that "[b]ecause the FDIC is not a member of the prosecution team, the government did not have an obligation to seek discovery from the FDIC." ECF No. 159 at 10 n.5. If the defendants thought there was a legitimate basis for including FDIC as part of the prosecution team, they should have taken the Court's invitation at the December 2017 hearing to file a motion on the issue. *See* Tr. 71:23 (Dec. 13, 2017), ECF No. 187. But again, the defendants declined, thus revealing the disingenuousness of their current argument.

The defendants' further claim that the government misrepresented its search for, and production of, BBA materials, Defs.' Br. at 40, is meritless as well. As evidence of the alleged misrepresentation, the defendants point out that the government (1) produced over 1,000 pages of BBA material after representing to the Court in an August 2017 brief that it had done a diligent, good-faith search that turned up nothing additional, *id.*, and (2) failed to produce the Chicago Mercantile Exchange (CME) document that would later become DX 9044A even though, as the defendants argue, Agent McGillicuddy testified at trial that he "had seen this [CME] document as case agent," *id.* at 40 n.9.

First, the "over 1,000 pages of BBA material" comprised, in large part, documents obtained in September 2017 via an MLAT request, after the government's statement in August 2017. Ex. 21. Any other BBA materials in that did not come from the MLAT request were produced—almost a year before trial—in the ordinary course and were not, until then, secreted away by the government, as the defendants suggest. To the extent the defendants complain that they did not receive enough information regarding the BBA, they were able to depose the BBA's John Ewan during trial so there was no prejudice. Any suggestion that they were prejudiced even with the deposition rings hollow as Mr. Ewan's testimony was decidedly inculpatory:

> Q. From your perspective, Mr. Ewan, when were you first sure or thought that it had been established that banks were in fact manipulating LIBOR?

> A.     The first time that I was sure that a bank was manipulating LIBOR was—I think it was late June, 2012, when a number of regulators jointly in the UK and the US fined Barclays for LIBOR manipulation.
>
> Q.     Does that mean, Mr. Ewan, that you yourself were deceived, if in fact banks had been adjusting their LIBOR submissions to make swaps more profitable during the period of time that you were at the BBA?
>
> A.     Yes.

Ex. 22 111:10-24.

Second, with respect to Agent McGillicuddy's testimony, the defendants grossly rewrite the testimony in an attempt to, once again, distort the record. The defendants attempt to demonstrate that the so-called CME letter (DX 9044A) was in the government's possession during the investigation, but failed to produce it. Specifically, they assert:

> While this document was never produced by the Government, on cross-examination, Special Agent McGillicuddy acknowledged becoming aware of the letter in the course of investigating this case: 'Yes, I had seen this [CME] document as case agent.'"

Defs.' Br. at 40 n.9. Thus, according to the defendants with their addition of "[CME]" to the transcript, Agent McGillicuddy admitted on the stand that he had the CME letter *during* the investigation and therefore, their theory goes, the government has been caught red-handed suppressing exculpatory evidence.

That is not what happened at all. The testimony quoted and altered by the defendants to include "[CME]" was actually Agent McGillicuddy explaining that he had reviewed a BBA document, which was marked for trial as GX 1-176A, during the investigation. The BBA document was a LIBOR consultation paper in which the CME was credited for giving input. The agent was *not* discussing the CME letter or agreeing that he had reviewed it during the investigation. In fact, Agent McGillicuddy explicitly denied that he had obtained the CME letter during the investigation, which was a point that the defendants elicited to imply that a good

34

investigator would have obtained the letter,[23] the exact opposite point they are trying to make now.  The full exchange is clear:

Q       If we could look at GX 1-176A please.  It's a document that you were shown but with a different number during direct.  And that's in evidence.  So if we could just show that on the screen.  You're familiar with that document, sir?

A       Yes, I've seen it.

Q       What is it?

A       This appears to be the final LIBOR consultation paper authored by the BBA in August of 2008.

Q       And am I correct that the BBA had sought input from outside parties with regard to fixing LIBOR?

A       Strengthening LIBOR, yes.

Q       So they'd gone out to panel banks; correct?

A       Yes.

Q       And people responded, right?  As far as you know?

A       Yeah, there's a list of respondents on page 14.

Q       Okay.  Can you read the list.  Can we see it.  You don't have to read the whole list.  Is the CME on there?  The Chicago Mercantile Exchange?

A       Yes.

Q       *So you say you were aware of the BBA documents, this is one of the documents that you were aware of as case agent?*

A       *Yes, I had seen this document as case agent.*

---

[23]    *See, e.g.*, Trial Tr. 2539:8-11 (MR. BREEN: "The CME letter, your Honor, was admitted for that special purpose, but now it's been used with Special Agent McGillicuddy to show the investigative steps that weren't taken prior to the indictment[.]"); *id.* 2540:6-18 (MR. LEVINE: "I want to make sure this is clear: We didn't get the CME letter from the government.  Ms. Sipperly was representing the government had this letter."  MS. SIPPERLY: "Sorry, I said the BBA.  I thought he said BBA."  THE COURT: "No, no, no."  MS. SIPPERLY: "I misheard what he said."  THE COURT: "Special Agent McGillicuddy was quite clear, he didn't know.").

Q      As a result, had you tried to get that CME input?

A      No.

Q      You know the CME is the largest futures exchange in the world?

A      I know that they are a very large exchange.

Q      And that their view on such matters would be very sophisticated; correct?

A      I would expect so.

Q      But it wasn't something that you—as part of your case agent duties or part of this investigation, it wasn't something you went out and got?

A      That's correct.

Q      I want to show you DX-9044A which is in evidence.

A      Sorry, is this in the binder?

Q      65.  Are you familiar with this document?

A      Yes.[24]

Q      Is that the CME's response to the BBA's request on strengthening LIBOR?

A      It appears to be part of its response.

Q      So this appeared to be what you would have gotten if you'd gone to CME to see what input they gave the BBA in 2008?

A      If I had gone to the CME?

Q      *Yeah, from the last document.  You said that you had the document and were aware that the CME had provided input; correct?*

A      *Correct.*

Q      *But you say you didn't go to find that input, right?*

A      *That's true.*

Trial Tr. 2436:10-2438:12 (emphases added).

---

[24]      Agent McGillicuddy was "familiar" with the CME letter because it was produced by the defendants to the government shortly before trial and used by the defendants at trial.

The actual, unaltered testimony demonstrates the falsity of the defendants' premise—that the government possessed the CME letter during the investigation.  Therefore, there was no misconduct or denial of due process.  (And, of course, the defendants can hardly establish prejudice from a document they possessed and offered into evidence.)

      F.      The Government Did Not "Actively Hide" Evidence in Connection with the *Kastigar* Hearing

The defendants make a series of incendiary and false accusations against the government's filter team, alleging that the government "actively hid evidence," "concealed" material facts, filed "false and misleading" sworn declarations, tried to "cover up" its misdeeds by advancing "frivolous[]" legal positions, and "violated its *Brady* and discovery obligations" in connection with the pretrial *Kastigar* hearing.  Defs.' Br. at 41–43.  The defendants mischaracterize the record in a fruitless attempt to support their baseless claims.  To be sure, as is often the case in any complex litigation requiring voluminous discovery, the government's productions were made on a rolling basis and were not without error; the government, for example, made a supplemental production on March 5, 2018, of material that had inadvertently been omitted from earlier productions.  But Mr. Black had all the discovery to which he was entitled—indeed, substantially *more* discovery than he was entitled to—well in advance of the April 24, 2018, hearing.  The laundry list of supposed prosecutorial misconduct recounted in defendants' motion has no basis in reality, and the defendants do not even attempt to demonstrate any prejudice resulting from any of their imagined discovery violations.

      *1.*      *The Government Did Not Withhold Prange's July 21 Email*

The defendants first claim that the government "falsely understated the scope of the FCA's involvement in the King Proffer, and then attempted to cover up its false representations."  Defs.' Br. at 41.  They point to the government's brief in opposition to his request for a hearing,

in which the government stated that "the FCA lawyer who sat in during James King's proffer [*i.e.*, Mr. Prange] asked only a small handful of clarifying questions, and did not discuss Black's compelled testimony with King." *Id.* at 41 (quoting ECF No. 131 at 13) (alteration in original). As is clear from the context of the government's brief, this statement was made in connection with the government's argument that Mr. Prange's attendance at the interview of Mr. King did not taint the prosecution team or Mr. King. *See* ECF No. 131 at 13. The defendants claim that to be a "false statement" because it does not reference the questions that Mr. Prange provided to Ms. Saulino via email on July 21, 2014, approximately ten days before Mr. Prange attended the proffer. *See* Levine Decl. Ex. 24. Failure to mention that email—which the filter team was not even aware existed at the time it authored its brief—does not render the brief's statement false.[25]

The defendants again try to read a statement out of context—in this instance, from Jennifer Saulino's declaration—in an attempt to impute nefarious motives to the government and its declarant. Ms. Saulino's declaration stated:

> I have read the portion of the Court's October 19, 2017 Decision and Order on Defendants' Pretrial Motions that refers to the proffer of James King. I led the questioning at that proffer. I recall that Mr. Prange of the FCA attended that proffer, but I do not recall him asking questions of Mr. King.

ECF No. 158 Ex. 22 ¶ 14. It is clear that Ms. Saulino was talking about what took place on the date of Mr. King's proffer, and providing her recollection as to Mr. Prange's participation that day. The defendant merely assert without substance that her statement was therefore

---

[25]     As was previously explained to the Court and defense counsel in a May 8, 2018, letter accompanying Ms. Anderson's supplemental declaration, the statement in the filter team's brief that Mr. Prange "asked only a small handful of clarifying questions" was based on a conversation that a member of the filter team had with Ms. Anderson about her recollection of the King proffer during the brief-writing process. Ms. Anderson's supplemental declaration clarified that her recollection was that Mr. Prange asked *Ms. Saulino* to follow up on a particular line of inquiry during a break in the interview; not that Mr. Prange asked any questions directly of Mr. King. ECF No. 253 (emphasis added).

"misleading" because it did not recount facts reflected in other documents. Such a position misconstrues the purpose of sworn declarations such as Ms. Saulino's, which is to capture facts that are *not* otherwise in the record. As the Court recognized at the December 14, 2017, *Kastigar* hearing, the Court "d[id]n't want [the declarants] to say things that are extraneous." Tr. 23:24-25 (Dec. 14, 2017), ECF No. 179. The fact that Mr. Prange or other representatives of the FCA had other communications with the government is best captured by the written communications themselves, not by summarizing them in a declaration.

The defendants further accuse the government of intentionally withholding the July 21 email, when they are well aware that is not the case. The government filter team had believed that the July 21 email was produced in late 2017, prior to the first *Kastigar* hearing. However, after defense counsel raised concerns in a February 16, 2018, letter about the completeness of the government's prior productions, the filter team investigated the matter and discovered that, due to a technical mistake within the document database that the government used to process and produce discovery, the July 21 email and some other documents were inadvertently excluded from the initial round of *Kastigar* discovery. Immediately upon discovering this issue, the filter team informed defense counsel of the problem and worked diligently to correct the mistake, and made a supplemental production to the defense on March 5, 2018. While the government regrets the technical error that resulted in the production delay, it was an unintentional error that does not remotely rise to the level of prosecutorial misconduct.[26]

---

[26]     Defendant also suggests that the Government opposed the defense request for production of Jencks Act materials in connection with the *Kastigar* hearing in order to conceal the existence of the July 21 email. *See* ECF 398 at 42. That is patently untrue, as the Government believed it *had already produced* the July 21 email at the time of the December 13–14, 2017 hearing. The Government maintains for the record its position that the Jencks Act is inapplicable in these circumstances. The Court's ruling to the contrary, with which the Government fully complied, itself indicates that the Government's opposition was not "frivolous[]," ECF 398 at 42, because

Moreover, the questions in the July 21 email were not material to the inquiry into possible taint stemming from Mr. Prange's involvement during the proffer. As reflected in a 302 report produced to Mr. Black in advance of the *Kastigar* hearing, Mr. Prange's questions did not contain "any information or questions [Ms. Saulino] would not have planned to ask." Levine Decl. Ex. 28 at 4. Moreover, as Mr. Prange himself further explained during the *Kastigar* hearing, the questions were not based on anything learned from Mr. Black's FCA-compelled testimony. As the Court concluded, "the suggested topics are quite general and none of them specifically relates to USD LIBOR or to Black." ECF No. 274 at 10 (citing Tr. 44:25–45:8, 126:13–127:5). The defendants implicitly concede the lack of materiality of the July 21 email, or any other belatedly disclosed documents, when they fail to make any argument that Mr. Black was prejudiced by the late disclosure, which took place some *seven weeks* in advance of Mr. Prange's testimony at the *Kastigar* hearing. Such an inadvertent technical error, which did not prejudice the defense, does nothing to undermine the validity of the indictment on which Mr. Black was convicted.

2. *The Government Did Not Conceal that DOJ Received a Draft of the FCA Notice*

Once again, the defendants ignore important context in order to manufacture a pretense of prosecutorial misconduct. First, the government did not "conceal" the fact that Ms. Saulino had received an excerpt of the draft FCA notice from the CFTC. The March 4, 2015 email from Jonathan Huth of the CFTC to Ms. Saulino attaching the excerpt was produced in discovery.[27]

───────────────

the Court limited the scope of materials that the Government was required to turn over pursuant to the Jencks Act to less than what the defense had sought, *see* ECF 175 at 2.

[27]   The defendants overstate what the FCA actually provided to the CFTC. As the FCA made clear in a letter filed with the Court on May 2, 2018, "[a]lthough full copies of the draft or actual Warning, Decision and Final Notices were not provided by the FCA to the CFTC or DOJ,

Second, Ms. Saulino's receipt of the draft excerpt does not render her declaration "misleading" simply because she did not mention it in her declaration.  As discussed above, the purpose of the government's *Kastigar* declarations was to capture facts known to the declarants that were not otherwise captured in the written record; the receipt of the draft excerpt was, obviously, reflected in the produced email.  In any event, it is the defendants' insinuations about the omission that are misleading: they imply that Ms. Saulino's statement that she "never received any transcripts or summaries of the compelled testimony of Mr. Black" should not be believed because the draft of the FCA notice she received "contained compelled testimony."  Defs.' Br. at 45.  But Mr. Black is well aware (though he does not mention) that any compelled testimony reflected therein came from many sources *besides Defendant*.  Moreover, the Court previously found that the FCA Final Notice was not tainting "based on Prange's credible testimony[] that the FCA had a source other than Black's compelled testimony for the P5 findings in the Final Notice that are arguably relevant to . . . Weeks' grand jury testimony."  ECF 274 at 14 (emphasis deleted); *see generally id.* at 11–16.  In sum, Ms. Saulino's declaration is accurate, and the government did not "conceal" anything.

### 3.    The FCA Letter Does Not Reflect Prosecutorial Misconduct

The defendants assert that the unsworn August 30, 2017, letter from then-FCA representative Patrick Meaney was "replete with false and misleading statements as the Government should have recognized prior to submitting it to the Court."  Defs.' Br. at 47.  The government acknowledges that the August 30 letter was, regrettably, not completely accurate in all respects.  Nevertheless, the government has since corrected the record by filing a carefully-

---

an excerpt of the draft Warning Notice was sent by the FCA to the Commodities Futures Trading Commission on 12 February 2015."  ECF 244, Ex. 1.

vetted, sworn declaration from Mr. Meaney.  The FCA as an institution also provided a supplemental letter to the Court to clarify Mr. Meaney's August 30 letter.  ECF 244, Ex. 1.  As the Court is aware, the government has, throughout the *Kastigar* inquiry process, lacked the ability to compel the FCA in any way and has been limited to the voluntary assistance that the FCA has graciously provided.  Nothing in the circumstances surrounding the August 30 letter recounted by the defendants—all of which were known to the defense and the Court months in advance of Mr. Prange's testimony and the Court's subsequent *Kastigar* ruling—suggests that the government engaged in any prosecutorial misconduct.  The defendants make no claim that the subsequent sworn declaration from Mr. Meaney was inaccurate or misleading, or that the defense was ultimately prejudiced by the initial unsworn letter from the FCA.

### 4.    *The Anderson Declaration Was Not Misleading*

As the Court is aware, the government filed two declarations from Mr. Anderson in connection with the *Kastigar* inquiry.  As the Court has acknowledged, the first was "submitted for the purpose of demonstrating her lack of access to Black's compelled testimony," and therefore "did not mention the matter of Prange's purported questioning."  ECF No. 274 at 8.  The second declaration was merely a supplement to the first, contrary to the defendants' erroneous claim that it was "corrected," Defs. Br. at 48, 49.  Ms. Anderson's first declaration was accurate in all respects; there was nothing to be "corrected."  The purpose of the second declaration was merely to provide additional facts to the Court that were not otherwise captured in the written record.  As with Ms. Saulino's declaration, the omission of facts that were captured elsewhere in the written record does not make the first declaration "misleading."  Once again, the defendants have made no pretense of arguing that Mr. Black was prejudiced by circumstances of which the defense and the Court were aware in advance of the Court's *Kastigar* ruling.

II.     **The Defendants' Argument That The Government Knowingly Used False Testimony Or Made Misrepresentations At Trial Has No Merit**

A.      The Testimony And Government Arguments To The Jury That Mr. Black's Requests Were Designed To Benefit His Trading Positions Were Neither False Nor Misleading

The defendants' argument that the government elicited false testimony and made misleading arguments to establish that Mr. Black's requests were designed to benefit his trading positions—testimony and arguments they say conflicted with the FBI's net notional analyses—attempts to turn a jury question, or at most a sufficiency of the evidence issue, into a misconduct claim.  That attempt and their misconduct argument should be rejected as it is simply a re-hash of their defense at trial, which the jury rejected.

Even so, it is well established that "discrepancies in the evidence do not . . . establish that the government offered perjured testimony, knowingly or not."  *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000).  Thus, a mere conflict between a government witness's trial testimony and other testimony or evidence is not proof that prosecutors elicited "knowingly false" or perjured testimony, but rather a situation simply "present[ing] a credibility question for the jury, at most."  *United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992).  *See, e.g.*, *United States v. Bruno*, 83 Fed. App'x 361, 362 (2d Cir. 2003) (summary order) (explaining that a witness's testimony that "merely differed from either another witness's testimony, his own prior testimony, or his own prior out-of-court statements . . . do not amount to perjury, but present a credibility question for the jury"); *United States v. Bortnovsky*, 879 F.2d 30, 33 (2d Cir. 1989) ("Nor does the fact that [a government witness's] testimony conflicted with that of the defendants' expert at an earlier trial support an inference of perjury.").  Were that not the case, no defendant could ever be convicted except in the extraordinary case where all material evidence at trial is undisputed.

43

The defendants argue that the FBI's net notional analyses—which essentially attempted to replicate the bank's net notional analyses—sometimes contradicts the positions explicitly found in, or readily inferred from, Mr. Black's manipulation requests, which were introduced at trial. *See, e.g.*, GX 6-001 ("Low 1mth today pls shag, paying on 18 bio"). The defendants' and co-conspirators' requests themselves establish that they had, or thought they had, positions that would benefit from manipulation of Deutsche Bank's submission in the direction requested, regardless of what any net notional analyses might show. *See* Trial Tr. 293:11-12, 294:17-23, 298:5-13, 1011:19-24. Therefore, the government did not elicit "knowingly false" testimony from cooperators who explained those communications to the jury.

Moreover, the defendants' argument assumes the FBI's net notional analyses are incontrovertible, but in fact they carry flaws similar to Deutsche Bank's net notional analyses. Had the FBI analyses been in evidence, any instances where they showed Mr. Black's net notional position would not have benefitted from the direction of the request proves at most that there could have been a disputed issue of fact for the jury to resolve. It does not demonstrate that the government witnesses' testimony was false or that the government made misleading arguments. *See, e.g.*, *Bortnovsky*, 879 F.2d at 33.

The defendants' complaints about the "ker-ching" email are equally unavailing. In that email from July 26, 2007, Mr. Curtler wrote "5.35% 3mth LIBOR tom?" to Mr. Black, who responded, "nice,,, i have 4bio 3*1 vs 3mth libor fixing tom. . . . . ker-ching." Ex. 23 (GX 1-056). The defendants seem to argue that when the government elicited testimony from Mr. Curtler that the "ker-ching" response shows that Mr. Black would have benefitted from a low submission, the government was suborning perjury because it knew that the FBI's net

44

notional analyses showed that Mr. Black would have benefitted from a high 3-month submission and that his saying "ker-ching" was therefore sarcastic.  Defs.' Br. at 51-52.

The defendants' argument fails for several reasons.  First, as explained above, the defendants' assumption that the FBI's net notional analyses always reliably reflected Mr. Black's position is dubious.  *See supra* § I.B.1.  Second, the defendants' reading of "ker-ching" as sarcastic merely competes with Mr. Curtler's eminently reasonable reading of "ker-ching" as meaning "5.35 percent three-month LIBOR tomorrow suits [Mr. Black's] position," Trial Tr. 1663:8-9.  Ultimately it was for the jury to decide and the conflicting interpretations do not support a finding of prosecutorial misconduct.  *See, e.g.*, *Bortnovsky*, 879 F.2d at 33.  Third, in response to the government's question "[c]an you tell which direction he's interested just from this email?" Mr Curtler testified that he could not, Trial Tr. 1663:17-19, so the jury was told *by Mr. Curtler himself* that his interpretation might not be correct.  The claim that his testimony supports a finding of prosecutorial misconduct simply has no merit.

Relatedly, the defendants' complaint about the government saying "ker-ching" in opening to "falsely suggest[] that this email was the prime example of Mr. Black making an improper LIBOR request to benefit his trading position," Defs.' Br. at 53, is equally without merit.  First of all, the defendants' interpretation of the government's opening statement is wrong.  The government's exact words at the beginning of the opening were:

> *Ker-ching.  You know what that sound is, right?  The sound of making money. Ker-ching.  In the words of the defendant Gavin Black, he tells you what his and the defendant Matt Connolly's crime was all about, and it was all about making every extra dollar that they could.*  And in their quest to make every extra dollar that they could to push their profits to the max, you're going to learn that they cheated.  They cheated by rigging the LIBOR interest rate, which you're going to learn is a very important interest rate for the global economy.

Trial Tr. 43:20-44:4 (emphasis added).  In the initial sentences (the emphasized portion), the government established the defendants' motive by asserting that "ker-ching" revealed that the

scheme was about making money.  In the following sentences (the portion without emphasis), the government explained that the means of the scheme was to rig LIBOR.  It was nothing more than answering the questions "why?" and "how?"  The government's second use of the phrase in opening was likewise innocuous: "And you'll see them reacting to small movements in LIBOR with ka-ching, because for them, those movements meant big bucks."  Trial Tr. 60:8-9.

Obvious from the face of either quote, the government did not say "ker-ching" should be viewed as a request and therefore did not mischaracterize non-testimonial evidence.  Quite the opposite, Mr. Curtler, the government's witness, testified in response to the government's question "do you read this as a request to move your LIBOR submission?" that he did not.  Trial Tr. 1663:10-12.  On rebuttal, the government stated that "[Mr. Curtler's] testimony about [the "ker ching"] document was that looking at that document, he didn't see that to be a request."  Trial Tr. 2835:17-19.  So, even accepting the defendants' interpretation of what was said in opening, any possible prejudice was cured by the testimony itself, the government's rebuttal statement, and the Court's jury instruction that attorney statements are not evidence.  Trial Tr. 2730:4-5.  Nothing here amounts to a deprivation of the defendants' due process rights or prosecutorial misconduct, let alone a violation warranting a new trial or dismissal.

There is also nothing amounting to prosecutorial misconduct in the remaining instances raised by the defendants.  In fact, the entire premise of page 54 of the defendants' brief is that Mr. Black's positions, as reflected in the FBI net notional analyses, contradict the inference about his positions to be drawn from the request itself.  Defs.' Br. at 54.  Once again, the defendants dubiously assume the analyses are infallible—but that is not so.  But the fact that the defendants did not attempt to admit the analysis suggests that even they do not believe that assumption and recognize that the analysis would not withstand scrutiny.  *See supra* p. 19.

46

The defendants' remaining salvo is that the government falsely represented that the requests themselves evidenced Mr. Black's positions even though some requests did not explicitly state a position, but that too misses the mark.  It is a perfectly reasonable inference that Mr. Black's requests, even when he did not state his position, were not just for fun but were made to benefit himself and his co-conspirators even if he did not say so explicitly.  In addition, the cooperators testified that if a request was made, the assumption—the perfectly reasonable assumption—was that the purpose was to benefit a trading position.  Trial Tr. 1051:8-11; 1679:12-16.  It simply did not matter whether the requester's motivation was explicitly stated each and every time because everyone knew the reason: the traders were trying to make more money.  Trial Tr. 1032-1033:24-2; 1042:2-3; 1043:6-7.

B.      The Government Did Not Suborn Perjury By Guy Weston-Edwards

The government did not suborn perjury by Guy Weston-Edwards, and it is shocking that his testimony ever became a point of contention because, just before trial, defense counsel *stated in writing* that GX 1-404 through 1-407 were, in their opinion, authentic business records within the scope of Rules 803(6) and 901.  *See* Ex. 25.[28]  The defendants argue, nevertheless, that the government induced Mr. Weston-Edwards "to sign two perjurious affidavits in an effort to lay a foundation for the admissibility of certain business records" because GX 1-404 through 1-407 were not kept in the course of a regularly conducted business activity in that exact format, but were instead created by a third party known as Cornerstone.  Defs.' Br. at 56.

---

[28]      Specifically, and as described below, defense counsel said, with respect to "Government Exhibits 1-404, 1-405, 1-406 and 1-407," "Defendants would consider such materials to fall within the scope of the revised Paragraph 3."  Ex. 25.  "Paragraph 3" refers to the third paragraph of the draft stipulation then under consideration, which would have established the body of evidence the parties agreed to as authentic business records under Federal Rules of Evidence 803(6) and 901.  *See* Ex. 24 ¶¶ 2-3.

The defendants' argument is not only meritless but also highly misleading and disingenuous. Throughout this litigation, the defendants have been tireless in their efforts to sow confusion regarding Deutsche Bank's trade data, and their accusation of perjury arose as a direct result of the defendants' deceitful efforts to offer Deutsche Bank's net notional analyses into evidence as stipulated business records. As the defendants knew, the net notional analyses were produced with the caveat from Paul Weiss that they were "*not* a record maintained in the ordinary course of business by Deutsche Bank." Ex. 26 at 2 (emphasis added).[29]

To dispel any confusion, the history of the allegedly perjurious affidavits and the negotiations with defense counsel must be recounted. On July 12, 2018, Deutsche Bank's Guy Weston-Edwards signed a declaration—*never* offered into evidence by the government—in which he swore under penalty of perjury that:

> the *trade data* and related records attached hereto and identified in the chart below [GX 1-404 through 1-407], maintained by Deutsche Bank in the United Kingdom, are original records or true and accurate copies of records that: a) were made at or near the time of the occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of those matters; b) were kept in the course of a regularly conducted business activity; c) were made by the said business activity as a regular practice; and d) if such records are not originals, such records are duplicates of the originals.

Ex. 28 ¶ 3 (GX 3500-GWE-4) (emphasis added). The subject of the declaration, as evident from its face, was "trade data" maintained by Deutsche Bank in the United Kingdom.

The spreadsheets (GX 1-404 through 1-407) were electronic printouts created in anticipation of litigation at the request of the government, to be sure, but that does not put them outside the scope of Rule 803(6). *See, e.g.*, *United States v. D'Agostino*, 638 Fed. App'x 51, 55 (2d Cir. 2016) (summary order) (holding that IRS "account transcripts" of data drawn from a

---

[29]     Exhibit 26 was produced to the defendants on November 8, 2016. *See* Ex. 27 at 2 (Supplement 6). *See also* Trial Tr. 784:4-7.

large database, though created in anticipation of litigation are business records under Rule 803(6)); *United States v. Battles*, 514 Fed. App'x 242, 249 (3d Cir. 2013) ("That the spreadsheet excerpt [from a bank's database] was created for the purpose of litigation does not render it hearsay."); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the *printouts* themselves are not kept in the ordinary course of business.") (emphasis in original); Fed. R. Evid. 1001(d) ("For electronically stored information, 'original' means any printout—or other output readable by sight—if it accurately reflects the information.").

As Mr. Weston-Edwards' testimony at trial later established, the trade data that was the subject of his declaration met all the requirements of Rule 803(6). *See* Trial Tr. 804:18-805:5, 805:14-16, 806:4-10. The fact that his declaration did not explain how that data were extracted to spreadsheets or that Cornerstone did the work does not change the validity of the declaration, any more than Neil Guy's[30] testimony should have touched on any third-party vendors hired to extract, stamp, and collate the bank's electronically stored communications. In any event, the defendants knew long before trial that—as Mr. Weston-Edwards testified, Trial Tr. 805:14-16— Deutsche Bank had employed a third-party firm to help create the trade data spreadsheets requested by the government and produced to the defendants. Ex. 29 at 3-4.[31] They also knew that Cornerstone did not "manipulate . . . or alter any of the RMS data." *Id.* at 3. The defendants thus knew nothing nefarious by the government was afoot, but rather the government was

---

[30]     Neil Guy is a Deutsche Bank document custodian who testified at trial.

[31]     Exhibit 29 was produced to the defendants on February 6, 2018. *See* Ex. 30 (DOJ-A-0011032).

preparing to use and introduce the most quintessential of business records: the trading records of a major international bank.

Meanwhile, counsel for the defendants were scheming to get Deutsche Bank's net notional analyses into evidence as business records, despite the fact that they met none of the Rule 803(6) criteria.  In August 2018, the defendants proposed, under the guise of cooperation with the government, a "global" stipulation with the stated goal of establishing that "the materials produced by Deutsche Bank to the government, which the government in turn produced to Defendants in discovery," met the requirements of Federal Rules of Evidence 803(6) and 901 without the need to name specific exhibits.  Ex. 31.

Thinking—naively, as it turned out—the proposal sounded reasonable, the government sent a draft stipulation to the defendants that covered, among other things, all Deutsche Bank-produced materials.  While the language of Mr. Weston-Edwards' July 12 declaration was legally sufficient for purposes of Rule 803(6), *D'Agostino*, 638 Fed. App'x at 55, the government's approach evolved in the lead-up to trial and became more conservative with belt-and-suspenders language.  Accordingly, to make it clear that the trade data were the actual business records—as opposed to the spreadsheets, which all parties knew were merely containers created to make the trade data accessible—the government suggested the following language:

> Exhibits 1-404 (DBGJ00055132), 1-405 (DBGJ00055133), 1-406 (DBGJ00055134), 1-407 (DBGJ00055135), and 1-456 are not themselves authentic business records, but rather comprise trade data from Deutsche Bank's RMS database that are authentic business records.

Ex. 32 ¶ 5.[32]  What is clear from the above formulation is that the government was trying in good faith to craft language that was precise and accurate, which is the exact opposite of misconduct.

---

[32]     Mr. Weston-Edwards' September 6 declaration—also *never* offered into evidence by the government—also used more conservative language than it had used in the July 12 declaration:

The defendants rejected the government's attempt to be precise and accurate, however, and also rebuffed the government attempt to simplify the discussion by excluding GX 1-404 through 1-407 from the stipulation altogether, Ex. 24 ¶ 4:

> For reasons that Defendants do not understand, the Government wishes to specifically exclude from the stipulation Government Exhibits 1-404, 1-405, 1-406 and 1-407.  While *Defendants would consider such materials to fall within the scope of the revised Paragraph 3*,[33] the Government may have its reasons for specifically exempting these particular Deutsche Bank summaries/compilations from among the entire universe of Deutsche Bank produced materials covered by Paragraph 3.

Ex. 25 (emphasis added).  The defendants' admission that GX 1-404 through 1-407 were business records stands in stark contrast to their counsel's disingenuous statement at trial: "obviously these weren't business records," Trial Tr. 828:19.

The government eventually realized that the defendants wanted their broader stipulation so they could offer the net notional analyses into evidence as business records despite those analyses not qualifying under Rule 803(6).  Defense counsel even admitted in open court that that is exactly what they were trying to do:

> Yeah, we tried to talk about stipulations.  We actually foolishly were going to agree—we wanted the whole thing—we were going to take some of this stuff in,

---

> I further declare that Exhibits [1-404 through 1-407] are true and accurate *compilations of trade data* maintained by Deutsche Bank in the United Kingdom. Exhibit 1-456 is a true and accurate *extract of trade data* maintained by Deutsche Bank in the United Kingdom.  Such trade data are original records or true and accurate copies of records that: a) were made at or near the time of the occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of those matters; b) were kept in the course of a regularly conducted business activity; c) were made by the said business activity as a regular practice; and d) if such records are not originals, such records are duplicates of the originals.

Ex. 33 ¶ 3 (GX 3500-GWE-5) (emphasis added).

33       *See supra* note 28.

51

> *including this net position spreadsheet*, but once they figured out we wanted it,
> they refused.

Trial Tr. 840:4-8 (emphasis added).  But contrary to defense counsel's assertion, the reason the

government would not stipulate was not because the defendants "wanted it," but rather because

the net notional analyses are the antithesis of business records.  They were not prepared at or

near the time of the trading activity by a person with knowledge, nor were they kept in the

regular course of the trading activity or as a regular practice, as explicitly stated by Paul Weiss

when they were produced.  Ex. 26 at 2.  Rather, while they drew on the trade data, the net

notional analyses were prepared after the fact for purposes of a criminal investigation and

prosecution.

Because the parties reached an impasse, the government decided to call Mr. Weston-

Edwards to testify about the data in GX 1-404 through 1-407 (the data extracted from the RMS

trade database), and 1-456 (the data strip exhibit also reflecting data extracted from the RMS

trade database).  His two declarations were still produced to the defense as witness statements

under 18 U.S.C. § 3500, but Mr. Weston-Edwards himself would provide live testimony to

authenticate the records and establish the Rule 803(6) prerequisites.  As expected, Mr. Weston-

Edwards' testimony, which was neither false nor misleading, established that each element of the

business records exception was met:

> Q.    Is data entered into RMS by people with knowledge of the trades
>       themselves?
>
> A.    Typically, yes.
>
> Q.    And is RMS data something that Deutsche Bank keeps in the course of
>       regularly conducted business activity as a regular practice?
>
> A.    Yes, it's maintained.
>
> Q.    Have you reviewed Government Exhibits 1-404, 405, 406 and 407?
>
> A.    Yes, I have.
>
> Q.    What are they?

A.      They are extracts of RMS trade data for—they're split by different
        products.

---

Q.      Where did that data come from?

A.      The data originally sourced from RMS, but I believe it was compiled by
        an external forensic accountancy firm.[34]

---

Q.      Using the technique you used, are you satisfied that the data that populates
        those four spreadsheets represent a true and accurate copy of RMS data?

A.      Yes, I randomly took samples of a few hundred trades in various parts of
        the sheet, and I compared those with the data in RMS and there is no
        discrepancies, which is a reasonable assumption that the data is accurate.

Trial Tr. 804:18-805:5, 805:14-16, 806:4-10.

The government, therefore, offered GX 1-404 and 1-407 into evidence without using the

declarations. *See* Trial Tr. 806:11-13.  Given the defendants' representations leading up to trial

that they "would consider such materials to fall within the scope of [Rules 803(6) and 901]," Ex.

25, the government was surprised when defense counsel did an about-face and in *voir dire*

preyed upon a witness's unfamiliarity with legal matters and confused him into agreeing that his

July 12 declaration was untrue.  Trial Tr. 811:12-14.  Furthermore, having represented to the

government that they believed GX 1-404 through 1-407 were business records, Ex. 25, it was

beyond disingenuous for defense counsel (1) to assert that Mr. Weston-Edwards "admits he has

been suborned; he has been tampered with," Trial Tr. 833:2-3; (2) to ask the witness in front of

the jury whether "the government of the United States told [him] that since [he was] working

with them, don't worry about it, [the government was] involved in creating the false statements

too, so that's a free crime," *id.* 944:6-9; and (3) to suggest that the prosecutors themselves should

---

[34]     The defendants suggest that the government was trying to hide Cornerstone's
involvement, Defs.' Br. at 56, but that is untrue.  This excerpt proves without question that the
government elicited testimony about Cornerstone's role, even if the name "Cornerstone" was not
explicitly stated.

be prosecuted for obstruction, *id.* 2489:23-2490:2.  All of that was plainly designed to besmirch the government's lawyers in front of the Court and the jury.

In light of that history, the claim that there was any prosecutorial misconduct or a deprivation of due process is unsupportable.  Instead, the full background reveals that the defendants' are wrong when they claim that the government tried to lay a foundation for the business record exception using Mr. Weston-Edwards' allegedly perjurious declarations.  Defs.' Br. at 56.  The defendants, not the government, injected his declarations in to the proceedings. The defendants are wrong when they claim that the government committed misconduct by "trying to pass the spreadsheets off as a Deutsche Bank business records."  *Id.* at 57.  The government tried in earnest to describe GX 1-404 through 1-407 as precisely and accurately as possible for the purpose of Rule 803(6), while the defendants deceitfully attempted to obtain a stipulation that incorrectly represented that the net notional analyses were business records when they were not.  Finally, even if Mr. Weston-Edwards had perjured himself—and he did not— there was no prejudice because the trade data spreadsheets were excluded, Trial Tr. 879:15-18, and the jury was made aware of the alleged perjury and could thus weigh that knowledge against other facts in rendering their judgment.  The only prejudice resulting from the incident was to the government, whose exhibits compiling business record data were excluded and whose reputation was sullied before the Court and the jury.

C.     The Government's Offer Of Screenshots And Data Strips Was Entirely Proper

The defendants' next argument—that the government violated their due process rights by unsuccessfully attempting to introduce allegedly unreliable evidence—fails because the attempt was proper and, in any event, could not have prejudiced them.  At issue are (1) screenshots of trade data from RMS, and (2) the government's data strips exhibit, GX 1-460, which was a later version of GX 1-456 updated to include the "trader" field from the RMS trade database.

54

Those exhibits were prepared during trial in response to evidentiary rulings at trial. As explained above, consistent with the Court's ruling in the bill-of-particulars order, ECF No. 89 at 13, the government had not focused on the task of associating trades with the defendants or their co-conspirators and thus prepared a data strip exhibit, GX 1-456—which simply displayed selected fields of RMS data associated with a set of trades—without including a column for the trader field. Ex. 34.

After the Court ruled from the bench on September 20, 2018, that the government would need to connect trades to the names of "people who are allegedly involved in this conspiracy," Trial Tr. 346:15, however, the government wrote the Court on September 21 to lay out exactly how it would do that. *See* ECF No. 316 at 2. The plan, in short, was for Mr. Parietti to testify, for the relevant trades, as to his recollection of which traders owned the trading books associated with those trades, and also for Mr. Weston-Edwards to testify which trader was reflected in both the RMS trade database itself and the spreadsheets of RMS data (GX 1-404 through 1-407) for those trades. *See id.* The government further explained that it would introduce through Mr. Weston-Edwards an updated data strip exhibit that contained the trader field from the RMS trade database. *Id.* at 2 n.1.

But due to the developments on September 25, *see supra* § II.B, the Court excluded the RMS spreadsheets, Trial Tr. 821:20, and, the following day, excluded GX 1-456 (the original data strips without trader names), *id.* 876:24-25. In response to the exclusion of the RMS spreadsheets, the government produced a new data strip exhibit, GX 1-460 that had trader names, as well as screenshots from RMS's graphical user interface, marked as GX 1-410 through 1-434, that had been printed out by Mr. Weston-Edwards from a computer terminal at the bank's 60 Wall Street location that could access Deutsche Bank's trade data directly. *See* Trial Tr. 905:6-

14.  Each screenshot exhibit corresponded to a trade data strip and showed the same data, including the trader field.  Outside the presence of the jury, the Court heard testimony from Mr. Weston-Edwards concerning GX 1-460 and the creation and content of the data screenshots. Trial Tr. 901:6-953:10.  And although the Court found him "very high on [its] list of credible witnesses," Trial Tr. 951:9, because he testified that the trader field was "not a hundred percent reliable," *id.* 933:20, the Court ultimately excluded GX 1-460 and the screenshots as unreliable, *id.* 999:9-12.

The government believed in good faith then—and continues to believe in good faith now—that GX 1-460, Ex. 35, with its inclusion of the trader field and the associated screenshots were sufficiently, though not 100%, reliable and should have been admitted.  *Cf. United States v. Reyes*, 157 F.3d 949, 953 (2d Cir. 1998) ("Residual doubts" on the trustworthiness of business records, including "irregularities, such as missing names," "go to the weight of the evidence, not its admissibility.")  The government's belief was well-founded, for whatever were the concerns the reliability of the book-to-trader mapping and net notional analyses, they do not affect the trade data, including the information in the trader fields, in RMS itself, which was the source for GX 1-460 and the screenshots.

In any event, there can be no prejudice from those disallowed exhibits.  It is axiomatic that the defendants could not have been prejudiced by evidence the jury was not permitted to see. For example, in *Moore v. Conway*, the prosecution attempted to show the jury a photograph that had been previously excluded.  476 Fed. App'x 928, 930-31 (2d Cir. 2012).  It was not clear whether any jurors actually saw the photograph, but even if they did the judge's curative instruction to ignore the photograph rendered the claims of prosecutorial misconduct moot.  *Id.* at 931.  Here, the Court excluded GX 1-460 and the screenshots, and that was the end of the story;

there was no need for a curative instruction, as there was in *Moore*, because there was no possibility that the jury saw the evidence.  Not only is the issue moot but the government attempting to introduce a revised exhibit is not misconduct, as the government has every right to try to adapt to the Court's rulings in the midst of trial.

The defendants also argue in conclusory fashion that they were prejudiced because they "were never given the opportunity to probe what other data was available in the form of screenshots of Deutsche Bank's internal systems."  Defs.' Br. at 60.  Their argument is flawed because the screenshots merely reflect a pre-programmed interface for displaying and arranging the data, and the defendants knew that.  The defendants had the raw data in GX 1-404 through 1-407, which Mr. Weston-Edwards testified was the same as the RMS data, and could have pulled whatever arrangement of data they wanted themselves.  Their failure to do so is not a deprivation of due process by the government.[35]

### D.    The Government Did Not Elicit False Testimony From Mr. Parietti

The defendants' argument that the government knowingly elicited false testimony from Mr. Parietti relating to trading books, trades and traders, Defs.' Br. at 61-63, is yet another meritless accusation against the prosecutors.  The defendants' attack his testimony as part of their strategy to undermine his credibility and to impugn the government by pointing out inconsistencies between his testimony and other evidence.  In particular, they point out (1) an inconsistency between Agent Weeks' testimony before the grand jury and Mr. Parietti's trial

---

[35]     After the Court ruled that the screenshots would not be admitted (Trial Tr. 874:13), defense counsel misrepresented to the Court that *other* screenshot exhibits were the RMS screenshots that had not been admitted.  Objecting to the admission GX 304B-D, defense counsel asserted: "[i]t's a screen shot of data and the Court ruled yesterday," (Trial Tr. 2010:21-25).  The same thing occurred when the government offered GX 1-116 and GX 1-116B, an email and a screen shot of the email's attachment that was marked as an exhibit before trial, Trial Tr. 1367:4-6 ("I don't recall seeing this document, and I think it's more of this data they produced over the weekend or last weekend when we had the whole issue with Mr. Edwards.").)

testimony, Defs.' Br. at 62; (2) an inconsistency between one of the FBI's interview reports for Mr. Parietti and his trial testimony, *id.* at 62-63; and (3) the fact that Mr. Parietti's method of recalling books and traders was different than the bank's book-to-trader mapping process, *id.* at 63. While inconsistencies are fodder for impeachment, the defendants do not establish that the government elicited any false testimony—much less, knowingly—and especially anything warranting a new trial or dismissal.

Here, the alleged inconsistencies are very minor. Indeed, the government already explained that Agent Weeks had a good-faith basis for believing that the trading book in question belonged to Mr. Parietti—his name populated the trader field in RMS—and, in any event, the jury's verdict erased any possible prejudice from an error in the grand jury. *See supra* § I.A. And as to any inconsistencies between Mr. Parietti's statements to the FBI and his trial testimony—such as inconsistencies about which traders owned which books—the defendants had ample opportunity to bring that to the attention of the jury through cross-examination. Finally, the defendants' observation that Mr. Parietti's mental devices for remembering book assignments is not the same as the book-to-trader mapping process is an irrelevant comparison of apples to oranges. Mr. Parietti was a first-hand observer of the events in question and thus relied on his memory; the book-to-trader mapping process was an after-the-fact invention designed to aid non first-hand observers.[36]

The defendants suggest that the timing of Mr. Parietti's mid-trial interviews indicates that his testimony was fabricated, but the timing only reflects the fact that the need for the

---

[36]     Not only are the alleged inconsistencies inconsequential, but also the defendants provide no principled basis on which to determine that any such inconsistency was the result of Mr. Parietti testifying falsely. *Cf. United States v. Frank*, Nos. 17-2965 & 17-4057, 2019 U.S. App. LEXIS 1736, at *8-*9 (2d Cir. 2019) (summary order).

government to connect trades and traders arose during trial.  As discussed above, *supra* § II.C, because of the Court's mid-trial ruling, the government wrote a letter to the Court describing a plan to make the connections through the testimony of Mr. Parietti and Mr. Weston-Edwards. ECF No. 316 at 2.  Under the circumstances, there was nothing suspicious or untoward about the government's course of action or the timing of its interview with Mr. Parietti about specific trades and trader books.  As the Court said, "based on developments at the trial, the government can pivot," Trial Tr. 884:9-10, and that is what the government did.  The defendants then had ample opportunity to cross-examine Mr. Parietti on the subject.  It was not misconduct simply because the defendants did not like the fact that Mr. Parietti did in fact remember which trader had which books, and that the government had a way to connect the trades in spite of adverse evidentiary rulings.

> E.     The government did not make misrepresentations in connection with the *Garrity* hearing

In relation to the *Garrity* issue, the defendants make a series of wrong and misleading claims that the government made false representations to the Court.

Their first claim is that the government's response to Mr. Black's motion *in limine* falsely "represented that 'the government did not direct Deutsche Bank to conduct an internal investigation,'" Defs.' Br. at 64, but they fail to recognize that the "government" being discussed was the prosecution team from the Department of Justice, not including the CFTC.  Mr. Black's motion *in limine* brief never mentions of the CFTC, and yet the defendants' claim that the government made a false statement is based entirely on evidence relating to the CFTC's request that Deutsche Bank hire outside counsel to conduct an investigation.  Defs.' Br. at 64-65.  While devoid of references to the CFTC, Mr. Black's motion *in limine* brief is replete with arguments about Deutsche Bank's fear of indictment—a fear based on potential action by the Justice

Department, not the CFTC.  *See generally* ECF No. 232.  That is not a surprise, of course, because the defendants conjured their CFTC argument only recently.  The defendants offer no evidence that the government—the Department of Justice's prosecution team—directed Deutsche Bank to conduct an internal investigation and, therefore, they have not shown that the statement was false—which it was not.

The defendants next claim the government made false statements in its October 5, 2018, letter that was written overnight during trial.  It addressed a completely new issue, providing additional analysis of the effect on Mr. Black's *Garrity* argument of the CFTC's request for Deutsche Bank to conduct an investigation using an external law firm, Paul Weiss.  *See* Defs.' Br. at 65-67.  They pluck two sentences out of a five-page, single-spaced letter, thus removing all context, and spin them into false statements.  The defendants point, in particular, at two sentences stating that (1) "[t]he actions taken during the course of that internal investigation were not directed by the CFTC," and (2) "[w]hile there became a time when Deutsche Bank's cooperation led to more specific requests from the government, that time was after Mr. Ricciardi left the investigation and after the interviews in question."  *Id.* at 65.

Neither sentence is false or misleading.  The government's statement that the investigative actions were not directed by the CFTC was said in the broader context of demonstrating that the actions taken were in response to many internal and external forces, not just the CFTC's request:

> Mr. Ricciardi made clear that there were many reasons for the Bank's internal investigation and that Deutsche Bank would have conducted the internal investigation regardless of the request of the CFTC.  Indeed, Mr. Ricciardi's testimony makes clear that while the CFTC issued a standard Request for Information (RFI) that included a request for an internal investigation, the internal investigation that Paul Weiss was doing for Deutsche Bank was done for multiple purposes.  The actions taken during the course of that internal investigation were not directed by the CFTC.  Deutsche Bank decided to conduct an internal

> investigation in which it provided information to multiple regulators but also for
> its own purposes as a public company.  There was not one internal investigation
> done solely for reporting information to the CFTC.

ECF No. 333 at 2.  In other words, Paul Weiss was responding on many fronts at the same time

and as such were not simply acting as the CFTC's hired gun.  And read in that context, the

statement has a clear meaning that the defendants ignore.

Likewise, the government's statement that specific requests "from the government" to

Paul Weiss increased after Mr. Ricciardi left the investigation is also taken out of context to

make it appear false or misleading.  As before, the defendants support their claim with evidence

about the CFTC making investigative requests before Mr. Ricciardi left the investigation.

However, the context reveals that the "government" referenced in the letter was the Department

of Justice's prosecution team.  The letter plainly discusses the CFTC's actions in the preceding

paragraphs and then transitions to the "government": "Mr. Ricciardi *also* made clear that the

*government* was not directing Deutsche Bank's internal investigation. 'I wouldn't characterize

the *government* as giving me a starting point.  They pretty much left it up to us.'"[37]  ECF No.

333 at 3 (emphases added).  Immediately following in a footnote is the allegedly offending

sentence: "While there became a time when Deutsche Bank's cooperation led to more specific

requests *from the government*, that time was after Mr. Ricciardi left the investigation and after

the interviews in question."  *Id.* at 3 n.1 (emphasis added).  In that context, once again, the

government's statement was not misleading or false.

---

[37]     The question posed to Mr. Ricciardi that led to the answer quoted above was "[D]id you
think of what the various governmental entities were asking for as merely a starting point, and
you were going to pursue a robust investigation to make sure the *DOJ* knew about every possible
. . . piece of information?"  Trial Tr. 1547:21-25 (emphasis added).

F.      The Government Did Not Undermine Mr. Black's Good Faith Defense By Misleading The Jury On Bids And Offers

The defendants' argument that the government misled the jury in relation to bids and offers was wrong when they made it at trial and it continues to be wrong now.  As the Court emphatically stated at trial:

> I quite understand it.  I don't agree with you, Mr. Klugman.  You are free to make whatever argument you think is appropriate on closing.  But I understood perfectly.  I understood perfectly.  I may be the only person in the world to whom the BBA's definition is quite clear.  It's the rate at which you could borrow.

Trial Tr. 2161:22-2162:3.

To address the issue more fully, some background about the difference between bid and offer rates is important.  Mr. King testified about the difference between a bid and an offer, and that a bid and an offer are two sides of a trade.  Trial Tr. 505:22-506:25.  That is, if he was looking to do a cash trade (*i.e.*, borrow money from another bank at a percentage rate of interest), then he would have his cash bid (where he hoped to borrow money) and the other bank would make an offer (the percentage they were willing to let Deutsche bank borrow money at from them).  In discussing LIBOR, Mr. King explained, "[t]he technicalities around whether it's the borrowing rate, the offered rate, in the definition it talks about the offered rates where banks can offer you money; but at the same time it's a way you can borrow money as well.  So you can borrow money where another bank is offering you money.  So it sort of depends on whether you are looking for offers or whether you put a bid in the market and someone lowers that offer to a bid, etc."  Trial Tr. 505:24-506:6.

Mr. King further explained that Deutsche Bank estimated its LIBOR submission by taking the rate at which it was bidding for cash (*i.e.*, telling others banks that Deutsche Bank was willing to borrow money at that rate) and adding four basis points to it to determine where its

LIBOR submission should be.  Trial Tr. 782:15-17.[38]  The four basis points reflected the fact that

the number Deutsche Bank put out in the market as its bid rate was the rate at which it hoped to

borrow cash, not where it actually could borrow cash.  Like any negotiation, Deutsche Bank put

out its bid for cash on the low side and other banks put out their offers to lend cash to Deutsche

Bank on the high side.  What matters for Deutsche Bank's LIBOR submission—under the

definition—is where Deutsche Bank "could" borrow funds, not the rate they hoped to borrow at,

so the submission would be closer to the higher, offered rate.

Taking the example the defendants cite in their argument, if the bid rate in the cash-run

email (DX 0673) is 2.45 then an additional four basis points yields 2.49.  But Deutsche Bank

submitted 2.48 on the day in question, which is consistent with Mr. King or Mr. Curtler moving

the bank's LIBOR submission lower (by one basis point) to accommodate Mr. Black's request:

"Low 1mth today pls shag, paying on 18 bio," GX 6-001.  Thus, when counsel raised the cash-

run email with Mr. Curtler and asked him, "did your bid rate tend to be lower or higher than your

offered rate?" and he correctly answered "lower."  Trial Tr. 2156:25-2157:2.

That testimony undercut the defendants' narrative—that Mr. Black, in GX 6-001, was

suggesting a low 1-month submission due to market forces revealed by the lower bid rates

contained in cash-run email—and is the apparent impetus behind their accusation that the

government misled the jury into thinking that LIBOR was a measurement of the rate at which

Deutsche Bank was willing to lend money out (which also happens to be called an offered rate,

but not the same offered rate discussed above).  The Court rightly rejected the argument out of

hand:

---

[38]     Mr. King explained that the bank's bid rate for borrowing cash would be same as its
DBQ rate (an internal borrowing rate).  *See* Trial Tr. 784:4-7.

| MR. KLUGMAN: | I'd like to raise the fact that Ms. Anderson falsely suggested to this jury that LIBOR was an offered rate, meaning a loan rate, rather than a borrow rate. And I want to know what the good-faith basis was for making that false suggestion to the jury, given that having investigated this case for multiple years, she should very well know that it is not an offered rate, that it is a bid rate, as has been testified to by all three of her cooperators. |
|---|---|
| MS. ANDERSON: | Your Honor, I think Mr. Klugman doesn't understand the difference, and I'm happy to have Mr. Curtler explain it again. But when it comes to their borrowing rate, they have a bid rate that they put out into the market, and then there is an offered rate in which other banks are offering to them. But it's still about their borrowing. |
| THE COURT: | I quite understand it. I don't agree with you, Mr. Klugman. You are free to make whatever argument you think is appropriate on closing. But I understood perfectly. I understood perfectly. I may be the only person in the world to whom the BBA's definition is quite clear. It's the rate at which you could borrow. |
| MR. KLUGMAN: | Right. And she suggested that it's the rate that they were lending at. |
| THE COURT: | No, no, she did not. I did not understand her to say that at all. Excuse me. I didn't understand her to say that at all. But if you think that that was the testimony that she elicited, please light into it on closing. That's not what I heard. |

Trial Tr. 2161:7-2162:10. The defendants made a similarly misguided argument after the

government's rebuttal summation, which the Court again rightly rejected. *See* Trial Tr. 2863:6-

2864:17.

The defendants essentially make the same argument yet again, complaining about

Mr. Curtler's testimony and claiming that the government's rebuttal added to the jury's alleged

confusion, Defs.' Br. at 70, but the third time is not the charm. The defendants' argument

distorts the record and Mr. Curtler's testimony. Their underlying premise that "Low 1mth today

pls shag, paying on 18 bio," GX 6-001, can be read as anything but a request to benefit

Mr. Black's trading position is belied not only by his own words on the face of the document but also by Mr. Curtler's testimony in connection with the request, Trial Tr. 1721:13-14 ("He's reset 18 billion in 1-month where he needed a low 1-month rate.").  And Mr. Curtler's testimony on redirect cannot be understood to say that LIBOR was supposed to be the rate at which Deutsche Bank would lend money to other banks.  Not once did he mention Deutsche Bank's lending rates.  Moreover, the government's explanation in rebuttal was spot on and consistent with the testimony.  Trial Tr. 2843:1-12.  Indeed, Mr. Black himself obviously understood the concept. *See* Ex. 36 at 1 (GX 1-132T) (Mr. Black explaining that even though the U.S. dollar LIBOR uses "exactly the same definition" as LIBOR for other currencies, the reason the BBA is looking into USD LIBOR is because "it just seems to be that the fixing in dollars is pretty close to the bid side of the cash market than the offer side . . ." when it should not be)

In short, the Court was correct in ruling against the defendants at trial because there was no misconduct or deprivation of due process.

G.       The government did not elicit false evidence relating to the materiality of the alleged scheme

Just like their argument regarding GX 1-460 and the data screenshots, *supra* § II.C, the defendants' argument that the government elicited false materiality testimony from Annette Hunter of FHLB Atlanta cannot succeed because the jury was not exposed to any false evidence, as there was none.  The defendants claim, in particular, that the government "attempted to induce Ms. Hunter to falsely suggest that the conduct at issue in this case was one of the many reasons" that FHLB Atlanta terminated its business with Deutsche Bank for a period of time. Defs.' Br. at 71.  But, although the government's question was grounded in good faith, it was never answered by the witness.  Apparently, then, the "false evidence" was in the form of an unanswered question posed by the government.  Moreover, the information Ms. Hunter did

65

provide to the jury—among all the reasons she stated for FHLB Atlanta stopping doing business with Deutsche Bank, LIBOR manipulation was not among them—was favorable to the defense.

While the government strongly disputes the notion that it intended to mislead the jury, the government does not dispute that it expected Ms. Hunter to testify that FHLB Atlanta stopped doing business with Deutsche Bank, at least in part, due to the LIBOR scandal.  Where the defendants are wrong, however, is in their assertion that the government "knew that the termination had nothing to do with the conduct in this case."  Defs.' Br. at 71.  Based on her interview statement,[39] the government expected Ms. Hunter to answer that allegations of LIBOR contributed to the termination.  Additionally, and more importantly, it is highly unlikely that the jury understood the question, as posed, to suggest the "false evidence" as the defendants seem to claim:

> Q.    Did there come a time when you—Federal Home Loan Bank Atlanta didn't do business with Deutsche Bank?
>
> . . .
>
> A.    So at one point in time, and this was after 2006, 2007, we stopped doing business with Deutsche Bank.  We cut them off as a counterparty.  We also had them at one point as a futures commission merchant to do with our clearing, it has to do with clearing swaps, and we had them as one of our main counterparties then, and we actually unwound those trades with them at that time.
>
> Q.    With respect to what you are testifying here today—if there are other reasons, there are other reasons—but were there any reasons connected to what you're testifying here today?  Were there reasons?
>
> THE COURT:    I'm sorry?  I don't understand your question.
>
> Q.    I'm trying to limit—were there many reasons you didn't continue doing business with Deutsche Bank?

---

[39]    As the government explained to the Court, Ms. Hunter's interview statement—that she said FHLB Atlanta stopped doing business with Deutsche Bank for a time was due in part to allegations of LIBOR manipulation—was not recorded in the contemporaneous interview notes of one FBI agent because it was not believed to be new information.  ECF No. 332.

Trial Tr. 1569:10-1570:7 (emphasis added).

Furthermore, once a clear question was asked, Ms. Hunter's answer cures any "false

evidence" inference the jury may have taken from the immediately preceding inquiry:

| THE COURT: | Why did you discontinue doing business with Deutsche Bank, if you know? |
|---|---|
| THE WITNESS: | It had to do with their credit rating and what was happening in the market, and also it had to do with a litigation settlement of some sort.  They weren't just financial—they weren't financially sound. |

*Id.* 1570:8-13.

The government asked nothing improper and, in any event, there was no prejudice

against the defendants.  The Court offered to strike the testimony, though commented that the

testimony was unhelpful to the government, so the defendants might not have wanted to strike it.

Trial Tr. 2033:21-2034:1.  The defendants never took up the Court on its offer, apparently seeing

the testimony the same way as the Court.[40]

---

[40]     Another example of the defendants misleading the Court: defense counsel misrepresented
Ms. Hunter's testimony by suggesting that FHLB actually benefitted from the manipulation.  In
particular, defense counsel said: "In fact, Ms. Hunter had to testify, I believe: Oh, yeah, I guess
we actually made money on this deal."  Trial Tr. 2472:11-13.

To the contrary, Ms. Hunter explained that on September 27, 2006, FHLB of Atlanta and
Deutsche Bank had multiple swap contracts such that Deutsche Bank paid the FHLB 3-month
LIBOR on a $126 million notional value.  On cross examination, she testified that FHLB paid
Deutsche Bank 3-month LIBOR on a $125 million notional value.  Trial Tr. 1578:3-1584:17.
Given this $1 million difference, FHLB necessarily received a net payment from Deutsche
Bank—the amount of which depended on the 3-month LIBOR for that date.  *Id.* 1594:14-23 (Ms.
Hunter explaining that, "in this particular case what it is we are actually paying on 125 million
where we're receiving 126 million.  So in this particular case, we are gaining more.  We have
more LIBOR than we're paying out on LIBOR. . . .  it was not a complete wash.").

And as Mr. King testified, September 27, 2006 was a date on which he skewed Deutsche
Bank's three-month LIBOR submission to be lower.  *See* Trial Tr. 396:5-398:10 (Mr. King
understood Mr. Parietti to be asking him to submit a lower three-month LIBOR, and Mr. King
submitted a lower three-month LIBOR than he otherwise would have in response).  A *lower*
three-month LIBOR on September 27, 2006 meant Deutsche Bank owed FHLB of Atlanta a
*lower* net payment.  Thus, the FHLB would still have lost (*i.e.*, received less) money—as
Ms. Hunter acknowledged, *see* Trial Tr. 1594:23 ("it was not a complete wash").  Defense

H.    <u>The defendants' allegation that the government suggested that the defendants were responsible for the financial crisis borders on the absurd</u>

The defendants also claim they were prejudiced by the government's alleged "statements designed to suggest that [they] were responsible for the financial crisis."  Defs.' Br. at 73.  To support their contention, they point to three assertions in the government's opening statement: (1) the "LIBOR rate was a critical interest rate for the global financial system;" (2) the "LIBOR rate was so important that it was honest and that it had integrity because so much money throughout the entire global financial system was riding on it;" and (3) "this handful of guys were sending a ripple effect through the financial market."  Defs.' Br. at 73 (emphasis omitted).  According to the defendants, the government "had no good-faith basis for making these grandiose claims in its opening because the Government knew it would not present any evidence (and Defendants are aware of none) that the BBA's setting of LIBOR had anything to do with the financial crisis."  *Id.*  Therefore, they conclude, they were denied a fair trial.  *Id.*

The defendants' argument fails because the statements they complain about do not actually mention the financial crisis.  The statements do not even imply a connection between the defendants and the financial crisis.  Courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Here, there is not even ambiguity: the statements separately or in combination cannot fairly be read as blaming the defendants' LIBOR manipulation for the financial crisis, and they do not contain any such implication.  The only reasonable interpretation is the one intended, the one that is 100% true, and the one fully

---

counsel's statement suggested the FHLB somehow benefitted from Deutsche Bank's manipulated LIBOR submission—the opposite of what actually happened—and is thus inaccurate and misleading.

supported by the evidence adduced at trial: LIBOR is a really important number in global finance.

Even if the government's statements could have been interpreted as suggesting that LIBOR manipulation was responsible for the financial crisis—and they cannot be so interpreted—the Court gave a defense-requested instruction to ensure that the jurors did not consider the issue.  Specifically, the Court instructed them: "I particularly remind you that it would be improper for you to allow any feelings you might have about big banks or Wall Street or the financial markets or the financial crisis or anything relating to those topics to influence you in any way as you consider the evidence."  Trial Tr. 2883:1-5.  That prophylactic measure alone would have cured any conceivable prejudice, had there been any.  *See, e.g.*, *Osorio v. Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. July 17, 2007).  But additionally, in response to defense counsel's repeated references to the financial crisis during summation, *see, e.g.*, Trial Tr. 2758:12-22 & 2761:15-21, the government in rebuttal explicitly said that it was not attempting to cast blame for the financial crisis on LIBOR manipulation:

> You also heard argument that the government is somehow arguing that the defendant's use of the threes-ones position alone is sinister or that we somehow are arguing that they caused the financial crisis.  That is not the argument.  The argument is that you cannot move your LIBOR submissions to benefit that position of having a high threes and a low one month.

Trial Tr. 2840:15-21.

Furthermore, because "[t]he specific remarks at issue do not touch upon or bolster the most potent parts of the government's evidence," *United States v. Elias*, 285 F.3d at 192 (2d. Cir. 2002), there is no question that the defendants would have been convicted without the three statements from the government's opening.

I.      The Government Did Not Elicit Misleading Testimony At Trial Or Engage In "Fact Bargaining" With Cooperators.

The defendants make two final arguments, both falsely accusing the government of engaging in "fact bargaining" cooperators and thus eliciting false testimony from them.  First, they allege that the government struck a side deal with Mr. Parietti that allowed him to keep his $9 million bonus from 2009 by allegedly allowing him to allocute that his participation in the scheme ended in 2008, but then elicited testimony that he and Mr. Black continued to participate in the scheme until 2010.  Defs.' Br. at 74-76.  Second, the defendants allege that the government negotiated with Deutsche Bank to eliminate mention of Anshu Jain (the bank's former Chief Executive Officer) and possibly other senior management from the statement of facts—even though the government believed Mr. Jain and other senior management to be involved in the conduct—that was to be filed with the deferred prosecution agreement (DPA), apparently in exchange for finalizing the settlement, and then elicited misleading testimony from Mr. Cutler that Mr. Jain and other senior management were not involved in the conduct.  *Id.* at 76-78.  Neither allegation is true.

### 1.      *Mr. Parietti's Allocution and Testimony*

The defendants misinterpret the facts and misunderstand the relevant sentencing law.  At his allocution, Mr. Parietti originally said that he was involved in the conspiracy from "early 2006 through *approximately* 2008," but after his lawyers conferred with the government Mr. Parietti offered the following clarification: "Earlier, I had said that the practice I engaged in occurred from early 2006 through approximately 2008.  And I should have said *at least* 2008."  Defs.' Br. at 75.  The defendants claim that the change from "approximately" to "at least" restricted his admission to conduct ending in 2008—which they speculate was to allow him to keep a $9 million bonus he received in 2009 at sentencing.  *Id.*  Nevertheless, the government

elicited testimony at trial that he and Mr. Black engaged in LIBOR manipulation into 2010.  *Id.*
at 76.  Apparently, the defendants have strained to piece together an argument that the
government "fact bargained" with Mr. Parietti: he would keep his $9 million bonus by only
admitting conduct through 2008 at the plea hearing in exchange for testifying at trial that the
conduct went through 2010.

There is no evidence that Mr. Parietti ever struck a side deal with the government—
because he did not.  The term "at least" is broader than the term "approximately," so when
Mr. Parietti changed from "approximately 2008" until "at least 2008," he was expanding, not
contracting, his admission to fit a longer timeline and, assuming for the sake of argument the law
supports it, possibly greater consequences at sentencing.  If anything, the outcome of the
conference between counsel for Mr. Parietti and the government is a clarification that
"approximately 2008" was not necessarily the end point of the conspiracy, but rather that it may
well have continued past 2008, which is of course consistent with Mr. Parietti's trial testimony
and other evidence of the defendants' conspiracy.

In any event, Mr. Parietti's alleged side deal would be meaningless under the law
applicable at sentencing, and experienced defense counsel knows that.  The sentencing
guidelines define the term "offense" for purposes of "relevant conduct" (§ 1B1.3) as "the offense
of conviction *and all relevant conduct*."  U.S. Sentencing Guidelines Manual § 1B1.1 cmt.
n.1(N) (hereinafter "U.S.S.G.").  And "relevant conduct" encompasses actions "that were part of
the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G.
§ 1B1.3(a)(2).  *See also United States v. Eisenhart*, 710 Fed. App'x 50, 52 (2d Cir. 2018)
(summary order).  Therefore, conduct occurring after 2008 is relevant to sentencing.

Either way, Mr. Parietti's post-2008 conduct will be considered at his sentencing, which is currently scheduled for February 8, 2019, and there was nothing misleading or improper about his testimony at trial.

2.      *Deferred Prosecution Agreement and Mr. Curtler's Testimony*

The defendants' final claim that the government "fact bargained" to finalize the DPA and then misled the Court with testimony from Mr. Curtler is itself an exercise in misleading the Court.  They claim that the final DPA removed allegations that Deutsche Bank's senior management, including Mr. Jain, were complicit in LIBOR manipulation and, knowing that, nevertheless elicited testimony from Mr. Curtler that senior management was not complicit.  Not only does the defendants' claim require several conspiratorial assumptions, they also completely mischaracterize Mr. Curtler's testimony.

The defendants' factual claims are untrue and are just another attempt to manufacture baseless controversy.  The defendants first contrast allegations in a draft of the DPA's statement of facts labeled "Attachment A," *see* Levine Decl. Ex. 12 at 3, with the final DPA (*sans* attachments), *see* Levine Decl. Ex. 57, and suggest the latter is the final version of the former.  That is wrong.  The final DPA has an "Attachment A" that is the actual final version of the draft statement of facts.  Ex. 37.[41]  When the correct comparison is made between the two versions, the contrast fades away.  Specifically, the defendants claim that the draft contains allegations regarding Deutsche Bank's senior management, "specifically Anshu Jain," Defs.' Br. at 77, that were omitted from the final, but that is also wrong.  To be sure, there were changes between draft and final.  However, neither version of the statement of facts mentions Mr. Jain, or any other

---

[41]      It is difficult to believe that the defendants did not know exactly what they were doing, for the two documents look nothing alike and, in fact, each document makes reference to the other.

senior manager, in the relevant paragraphs with one exception.  That one exception is David

Nicholls ("Senior Manager-1"), who in both the draft and final is implicated in the scheme.

*Compare* Levine Decl. Ex. 12 ¶¶ 98-105 *with* Ex. 37 ¶¶ 99-101.  Therefore, the "fact bargaining"

alleged by the defendants—without a shred of factual support—did not happen.

> In addition, there was nothing false or misleading about Mr. Curtler's testimony; the only

thing misleading is the defendants' characterization of it.  On redirect, Mr. Curtler testified as

follows:

> Q.  You were asked a lot of questions, do you remember, about whether or not
> there was a Deutsche Bank policy, whether there was a Deutsche Bank
> training or compliance program about LIBOR, and specifically about
> LIBOR submissions?
>
> A.  Yes, I do.
>
> Q.  Did you need a policy in order to know that moving a worldwide
> benchmark rate was wrong?
>
> A.  No, I didn't.
>
> . . .
>
> Q  Mr. Curtler, was there anything about the directives from your bosses, so
> including Anshu Jain, I think we heard Alan Cloete, or David Nicholls,
> that made you think that it would be okay to submit LIBOR submissions
> that you skewed in order to benefit trader's positions?
>
> . . .
>
> A  No, there wasn't.

Trial Tr. 2168:6-2169:7.  The clear import of that line of questioning was to elicit Mr. Curtler's

understanding that regardless of the lack of a policy and regardless of any initiatives or directives

he received from his bosses, he still knew manipulating LIBOR was wrong.  The defendants,

however, selectively quote only the final question and answer to support their assertion that

Mr. Curtler said senior management was not complicit in LIBOR manipulation.  That is not what

he said or what he meant at all, and it is disingenuous for the defendants to suggest that he did,

especially since Mr. Curtler testified that one of his managers—Mr. Nicholls—knew about the

manipulation, Trial Tr. 2158:19-2159:2.

## **CONCLUSION**

The Court should deny the defendants' motion in its entirety.


Respectfully submitted.

ROBERT ZINK                                    JAMES J. FREDRICKS
Acting Chief, Fraud Section                     Chief, Washington Criminal II Section
Criminal Division                               Antitrust Division
United States Department of Justice             United States Department of Justice


_____/s/_____        _____/s/_____
CAROL L. SIPPERLY                               MICHAEL T. KOENIG
Senior Litigation Counsel                       CHRISTINA J. BROWN
ALISON L. ANDERSON                              Trial Attorneys
Trial Attorney                                  Antitrust Division
Criminal Division, Fraud Section                United States Department of Justice
United States Department of Justice