**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

    v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK,

             *Defendants*.

No. 1:16-cr-00370 (CM)

ECF Case

**ORAL ARGUMENT REQUESTED**

**SECOND PARTIAL REPLY MEMORANDUM IN FURTHER SUPPORT OF**
**DEFENDANT GAVIN CAMPBELL BLACK'S MOTION FOR *KASTIGAR* RELIEF**

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425

*Attorneys for Defendant Gavin Campbell Black*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.     THE GOVERNMENT'S *GARRITY* VIOLATION REQUIRES DISMISSAL OF THE
       INDICTMENT IN THIS CASE ........................................................................ 3

       A.     The Government's Argument that It Should Not Be Required to Meet Its
              Burden Under *Kastigar* Is Without Merit ................................................ 3

       B.     The Government Has Not Met Its Heavy Burden Under *Kastigar* ...................... 12

II.    THE COURT SHOULD VACATE MR. BLACK'S CONVICTION AND DISMISS
       THE CASE BASED ON THE GOVERNMENT'S FAILURE TO PROVE LACK
       OF TAINT FROM HIS FCA TESTIMONY OR HOLD A SECOND *KASTIGAR*
       HEARING ON HIS FCA TESTIMONY ................................................................ 14

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*In re Grand Jury*,
    478 F.3d 581 (4th Cir. 2007) ............................................................... 6

*Kastigar v. United States*,
    406 U.S. 441 (1972) ............................................................... 6, 12, 19

*Lefkowitz v. Turley*,
    414 U.S. 70 (1973) ............................................................... 4

*Maness v. Meyers*,
    419 U.S. 449 (1975) ............................................................... 4

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009) ............................................................... 10

*Sher v. Dep't of Veterans Affairs*,
    488 F.3d 489 (1st Cir. 2007) ............................................................... 5

*Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation*,
    426 F.2d 619 (2d Cir. 1970) ............................................................... 4

*United States v. Allen*,
    864 F.3d 63 (2d Cir. 2017) ............................................................... *passim*

*United States v. Blumberg*,
    14-CR-458 (D.N.J.) ............................................................... 10

*United States v. Brimberry*,
    744 F.2d 580 (7th Cir. 1984) ............................................................... 9

*United States v. Camacho*,
    739 F. Supp. 1504 (S.D. Fla. 1990) ............................................................... 7

*United States v. Chavez*,
    538 U.S. 760 (2003) ............................................................... 5, 7, 8

*United States v. Ferguson*,
    No. 06-CR-137, 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ............................................................... 7

*United States v. Ghailani*,
    743 F. Supp. 2d 242 (S.D.N.Y. 2010) ............................................................... 6

*United States v. Jarvis*,
    7 F.3d 404 (4th Cir. 1993) ............................................................... 9

*United States v. Krug*,
  198 F. Supp. 3d 235 (W.D.N.Y. 2016) ............................................... 7

*United States v. Kurzer*,
  534 F.2d 511 (2d Cir. 1976) .................................................... 13, 14

*United States v. Moten*,
  551 F.3d 763 (8th Cir. 2008) ..................................................... 6

*United States v. Nanni*,
  59 F.3d 1425 (2d Cir. 1995) .................................................... 12, 14

*United States v. Nemes*,
  555 F.2d 51 (2d Cir. 1977) ...................................................... 12

*United States v. Patane*,
  542 U.S. 630 (2004) ............................................................. 8

*United States v. Pelletier*,
  898 F.2d 297 (2d Cir. 1990) ..................................................... 9

*United States v. Pendergrass*,
  648 F. App'x 29 (2d Cir. 2016) .................................................. 5

*United States v. Proano*,
  912 F.3d 431 (7th Cir. 2019) .................................................... 5

*United States v. Slough*,
  641 F.3d 544 (D.C. Cir. 2011) ................................................... 7

*United States v. Slough*,
  677 F. Supp. 2d 112 (D.D.C. 2009) .............................................. 7

*United States v. Stein*,
  440 F. Supp. 2d 315 (S.D.N.Y. 2006) ......................................... 7, 10

*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008) ..................................................... 10

*United States v. Tramunti*,
  500 F.2d 1334 (2d Cir. 1974) ................................................... 14

<u>R</u>ULES

Federal Rule of Criminal Procedure 12 ........................................................................... 8

<u>O</u>THER <u>A</u>UTHORITIES

Fed. R. Crim. P. 12(b)(1)-(2) advisory committee's note to 1944 adoption............................. 8, 9

Fed. R. Crim. P. 12(b)(3) advisory committee's note to 2014 amendment................................. 9

*The Thompson Memorandum's Effect on the Right to Counsel in Corporate Investigations*,
  S. Hr'g. 109-835 Before the Comm. on the Judiciary, 109th Cong. (Sept. 12, 2006).............. 11

Defendant Gavin Campbell Black respectfully submits this second partial reply memorandum of law in further support of his motion for *Kastigar* relief pursuant to the Court's February 7, 2019 Order (the "Scheduling Order").[1]

## PRELIMINARY STATEMENT

Upon finding that the Government violated *Garrity*, either with or without an evidentiary hearing, the Court should dismiss the Indictment under *Kastigar* based on the Government's refusal to supplement the record.  (Opp. at 57.)  The *Kastigar* portion of the Opposition raises a series of arguments that are contrary to controlling Supreme Court and Second Circuit authority that the Government fails to address.

The Government ignores controlling authority in arguing that *Kastigar* relief does not apply to *Garrity* violations.  Under settled law, *Garrity* provides a form of immunity that entitles a *Garrity*-covered defendant—*i.e.*, a defendant who made statements under threat of dismissal—to the protections of *Kastigar*, including the requirement that the Government meet the heavy burden of negating the possibility of taint and affirmatively proving that any evidence it used against the defendant in the grand jury and at trial was derived from a legitimate source wholly independent of the compelled testimony.  The Government has failed to carry that burden here, and vacatur of Mr. Black's conviction and dismissal of the Indictment is warranted.

The Government also ignores controlling authority in arguing that Mr. Black waived his *Kastigar* rights under Federal Rule of Criminal Procedure 12(b) by not raising the issue before

---

[1]     The Scheduling Order ordered Mr. Black to respond only to the Government's *Garrity* arguments by February 13, 2019, if possible.  [ECF No. 414.]  Mr. Black's First Partial Reply Memorandum of Law in Further Support of His Motion for *Kastigar* Relief therefore addressed only those Government arguments that are confined strictly to whether a *Garrity* violation occurred.  [*See* ECF No. 415.]  This Memorandum of Law addresses the remainder of the Government's arguments set forth in its Response to Mr. Black's Motion for *Kastigar* Relief. [ECF No. 409 ("Opposition" or "Opp.").]

trial.  However, as the Advisory Committee Notes to this Rule provide, there is no requirement that immunity-type defenses be raised prior to trial, and the Second Circuit and other courts have held that *Kastigar* and other immunity-type defense motions are not waived even if they are not raised before trial.  Mr. Black's motion is therefore timely and properly before this Court at this stage.

The Government's argument that Mr. Black's statements are not protected by *Kastigar* because Mr. Black denied any wrongdoing is without merit.  Under settled law, the Government is not permitted to use factual information provided by a defendant under immunity even where it asserts that the defendant's statement was not truthful.  The argument is also factually untrue.  As the Government concedes, Deutsche Bank and its counsel relied on their initial interviews with Mr. Black to gain an understanding of the LIBOR process, identify evidence, and develop investigative leads.  Because the Government outsourced its investigative responsibilities to Deutsche Bank, the Government was required to negate the possibility that the evidence that Deutsche Bank and its counsel provided to the Government—which the Government thereafter used in the grand jury and at trial—was derived from Mr. Black's compelled statements.  The Government's failure to do so should result in a vacatur of Mr. Black's conviction and a dismissal of the Indictment.

In addition, the Government has not met its burden to negate the taint stemming from Mr. Black's compelled FCA testimony.  The Government makes no effort to defend its misstatements to the Court in connection with the prior *Kastigar* hearing on which the Court relied.  Nor did it supplement the record to demonstrate that its case was not tainted based on its interactions with Deutsche Bank and other members of the Prosecution Team who discussed, or may have discussed, Mr. Black's compelled testimony with the FCA investigators.  Accordingly,

Mr. Black's conviction should be vacated, and the Indictment dismissed because the Government failed to prove lack of taint from his FCA testimony.

## ARGUMENT

### I.   THE GOVERNMENT'S *GARRITY* VIOLATION REQUIRES DISMISSAL OF THE INDICTMENT IN THIS CASE

The Government has not met its heavy burden under *Kastigar* to (1) negate the possibility of taint from Mr. Black's compelled statements to Deutsche Bank and its counsel and (2) demonstrate that the evidence that it used in the grand jury and at trial—much of which was from Deutsche Bank—was derived from sources wholly independent of Mr. Black's statements. *See United States v. Allen*, 864 F.3d 63, 91 (2d Cir. 2017) (setting forth the Government's *Kastigar* burden).  The Government instead has advised the Court that it "will not seek to supplement the record on this issue" (Opp. at 57), and rests entirely on legal arguments that are contrary to controlling authority.  As such, the Government's *Garrity* violation should result in a vacatur of Mr. Black's conviction and dismissal of the Indictment.

#### A.   THE GOVERNMENT'S ARGUMENT THAT IT SHOULD NOT BE REQUIRED TO MEET ITS BURDEN UNDER *KASTIGAR* IS WITHOUT MERIT

The Government raises three arguments as to why it should not be required to meet its heavy burden under *Kastigar* with respect to its *Garrity* violation:  (1) *Kastigar* protections do not apply to a *Garrity* violation (*id.* at 40-45); (2) Mr. Black waived his right to *Kastigar* relief (*id.* at 50-51); and (3) enforcing Mr. Black's constitutional rights will have "ruinous consequences" to the Government's ability to delegate its investigative responsibilities to corporate America (*id.* at 52-54).  Each of these arguments is refuted by binding precedent and settled law that the Government's Opposition ignores.  Therefore, each should be rejected.

1.     ***Kastigar* Protections Apply to *Garrity* Violations**

The Government ignores an entire body of case law in arguing that suppression is the proper remedy for a *Garrity* violation.  (*See id.* at 40-45.)  Controlling authority makes clear that the *Garrity* rule functions as a form of automatic immunity which requires not merely suppression of the compelled statements—but dismissal of the action—if the Government cannot meet the heavy burden imposed by *Kastigar*.

The *Garrity* rule is derived from the Fifth Amendment's privilege against self-incrimination, not the Due Process Clause's proscription on coerced or involuntary confessions.  *See, e.g.*, *Lefkowitz v. Turley*, 414 U.S. 70, 80-82 (1973) (stating that *Garrity* and its progeny stem from "the well-recognized policies behind the privilege of self-incrimination"); *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation*, 426 F.2d 619, 624 (2d Cir. 1970) (identifying *Garrity* as a Supreme Court opinion "dealing directly with the privilege against self-incrimination").  As such, the *Garrity* rule has been recognized as providing a form of immunity over statements compelled under threat of dismissal.  *See, e.g.*, *Maness v. Meyers*, 419 U.S. 449, 475 (1975) (White, J., concurring) (stating that *Garrity* provides a witness "immunity from being incriminated by his responses to his interrogation"); *Lefkowitz*, 414 U.S. at 82 (indicating that *Garrity* "specifically prohibited" the government "to compel testimony that had not been immunized").  This immunity is conferred automatically by the very act of threatening an employee with an adverse employment action in order to compel him to make statements. *Uniformed Sanitation Men*, 426 F.2d at 626 (stating that, in *Garrity*, "the very act of the attorney general in telling the witness that he would be subject to removal if he refused to answer was held to have conferred . . . immunity"); *see also Lefkowitz*, 414 U.S. at 85 ("[A]nswers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence.  Hence, if answers are to be required in such circumstances States must offer to the witness whatever

4

immunity is required to supplant the privilege and may not insist that the employee or contractor

waive such immunity."); *Sher v. Dep't of Veterans Affairs*, 488 F.3d 489, 501-02 & n.12 (1st Cir.

2007) ("*Garrity* . . . stand[s] for the proposition that a government employee who has been

threatened with an adverse employment action by her employer for failure to answer questions put

to her by her employer receives immunity from the use of her statements or their fruits in

subsequent criminal proceedings.").

 Accordingly, a defendant whose statements are compelled under *Garrity* is entitled to the

protections of *Kastigar* such that the Government bears the heavy burden of proving that it did not

use the compelled statements, as well as any evidence directly or indirectly derived therefrom, in

prosecuting the defendant.  The Supreme Court also made clear that *Kastigar* applies to compelled

statements generally in *United States v. Chavez*, 538 U.S. 760 (2003) (plurality opinion), stating

that:

> [O]ur cases provide that those subjected to coercive police interrogations have an
> *automatic* protection from the use of their involuntary statements (or evidence
> derived from their statements) in any subsequent criminal trial.  This protection is,
> in fact, coextensive with the use and derivative use immunity mandated by *Kastigar*
> when the government compels testimony from a reluctant witness.

*Id.* at 769-70 (citations omitted) (emphasis original).  And the Second Circuit has also made clear

that *Kastigar* applies to *Garrity*-covered statements specifically, stating that:

> Pursuant to *Garrity* . . . and *Kastigar*, the government may not use in a criminal
> prosecution any statements that were made by an employee during an internal
> investigation and subject to a grant of immunity, nor any information derived from
> such statements.

*United States v. Pendergrass*, 648 F. App'x 29, 32 (2d Cir. 2016).  Other circuits have reached the

same conclusion.  *See, e.g.*, *United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019) (stating

that if the prosecution accessed the defendant's "*Garrity*-protected statements," "there is no

constitutional violation if the government can establish 'a legitimate source wholly independent of

the compelled testimony' for the evidence") (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)); *United States v. Moten*, 551 F.3d 763, 766 (8th Cir. 2008) ("The Fifth Amendment privilege against self-incrimination extends to statements a government employee is compelled to make under the threat of removal from public office. . . . Therefore, if a criminal defendant . . . demonstrates that she was compelled to testify by her government employer, the government must show that any evidence used or derived has a 'legitimate source wholly independent of the compelled testimony.'") (citing *Garrity* and quoting *Kastigar*, 406 U.S. at 460) (additional citation omitted); *In re Grand Jury*, 478 F.3d 581, 583-84 (4th Cir. 2007) (stating that a defendant who believed that his *Garrity*-protected statements "were used to indict him . . . would be entitled to a *Kastigar* hearing, at which the government would bear the burden of 'prov[ing] that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony'") (alteration in original) (quoting *Kastigar*, 406 U.S. at 460).   Ignoring settled precedent, the Government makes no mention of these cases and, as result, has no provided no reason why this Court should not follow precedent.

The Government's arguments as to why the *Kastigar* protections do not apply here are equally without merit.  Its reliance on *United States v. Ghailani*, 743 F. Supp. 2d 242, 251-53 (S.D.N.Y. 2010), and other cases addressing the Due Process Clause's prohibition on involuntary confessions is misplaced.  As noted above, the *Garrity* rule is derived from the Fifth Amendment privilege against self-incrimination, not the Due Process Clause.  Leaving aside the fact that the Second Circuit in *United States v. Allen*, 864 F.3d 63, called into question the continuing viability of *Ghailani*,[2] the Government has not identified a single case applying *Ghailani*'s fruit-of-the-

---

[2]      The *Allen* court noted that *Ghailani* appeared inconsistent with the Supreme Court's plurality opinion in *Chavez*, which, as noted above, stated the automatic protection applicable to coerced statements is "'coextensive with the use and derivative use immunity mandated by

poisonous tree analysis to determine whether the Government made improper derivative use of compelled statements obtained in violation of *Garrity*.  The only case that the Government cites that addresses this issue is *United States v. Krug*, 198 F. Supp. 3d 235, 246-47 (W.D.N.Y. 2016), which, as the Government notes, "appl[ied] *Kastigar* to a *Garrity* violation" (Opp. at 42).[3]  But in citing *Krug*, the Government fails to note that *Krug* relies on the D.C. Circuit's decision in *United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011), *see Krug*, 198 F. Supp. 3d at 246, which stated that a *Kastigar* hearing was "required" to address the Government's *Garrity* violation, *Slough*, 641 F.3d at 549.  In fact, the district court decision in that case—which was reversed on other grounds—found that courts "have uniformly held" that *Kastigar* protections apply to a *Garrity* violation.  *United States v. Slough*, 677 F. Supp. 2d 112, 133 (D.D.C. 2009) (collecting cases).  Based on these cases, the court concluded that "statements compelled under *Garrity* are entitled to the full panoply of protections that *Kastigar* provides to other immunized statements."  *Id.*

This extensive body of case law squarely applying *Kastigar* protections to *Garrity* statements similarly refutes the Government's unsupported attempt to liken a *Garrity* violation to a *Miranda* violation. (Opp. at 42.)  Moreover, the Supreme Court opted not to expand the exclusionary rule applicable to *Miranda* based, in part, on the very fact that *Kastigar* protections

---

*Kastigar.*'"  *Allen*, 864 F.3d at 90 n.121 (quoting *Chavez*, 538 U.S. at 769-70).  The *Allen* court also stated that "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably. . . .  More recently, in *Chavez v. Martinez*, the Supreme Court appeared to assume that both the Self-Incrimination Clause and the Due Process Clause applied to the coercive police questioning at issue in that case." *Id.* at 82 n.84.

[3]      The other cases cited by the Government did not address the issue because they either did not find a *Garrity* violation (*see* Opp. at 42 (citing *United States v. Ferguson*, No. 06-DR-137, 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007))), or involved only motions to suppress (*see id.* (citing *United States v. Stein*, 440 F. Supp. 2d 315, 338 (S.D.N.Y. 2006) (granting several of the defendants' motions to suppress without addressing whether *Kastigar* applied); *United States v. Camacho*, 739 F. Supp. 1504, 1520 (S.D. Fla. 1990) (same)).)

apply to compelled statements. *United States v. Patane*, 542 U.S. 630, 638-40 (2004) (plurality opinion) ("We have repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.' . . . This . . . protection supports a strong presumption against expanding the *Miranda* rule any further.") (quoting *Chavez*, 538 U.S at 769).

Accordingly, under settled law—that the Government ignores—the Government's violation of Mr. Black's *Garrity* rights requires it to meet the heavy burden imposed by *Kastigar*.

### 2.   Mr. Black Did Not Waive His Rights Under *Kastigar*

The Government's argument that Mr. Black waived his rights under *Kastigar* by not raising the issue before trial (*see* Opp. at 50-52) is also refuted by settled law and binding precedent that the Government similarly fails to address.  Without citing a single case, the Government argues that the *Kastigar* issue is waived if not raised prior to trial pursuant to Federal Rule of Criminal Procedure Rule 12(b)'s requirement that a "defect" in the institution of the prosecution or in the indictment must be raised "before trial."  (Opp. at 50-51.)  The Government is wrong.

As reflected in the 1944 Advisory Committee Note that accompanied the adoption of the original rule, Rule 12(b) classifies pre-trial motions in two groups, one of which involves technical "defect[s]" to the proceeding that ***must*** be raised prior to trial to avoid waiver, and the other of which ***may*** be raised prior to trial "at the defendant's option."  Fed. R. Crim. P. 12(b)(1)-(2) advisory committee's note to 1944 adoption (the "1944 Committee Note").  The 1944 Committee Note also provides examples of the types of motions falling within each group, with the permissive group including "such matters as former jeopardy, former conviction, former acquittal, statute of limitations, ***immunity***, lack of jurisdiction, failure of indictment or information to state an offense,

etc." *Id.* (emphasis added).[4]  Thus, *Kastigar* and other motions relating to immunity-type defenses are not waived even if they are not raised before trial.  *United States v. Pelletier*, 898 F.2d 297, 301 (2d Cir. 1990) ("A challenge to an indictment on the basis that it was improperly obtained through use of immunized testimony is timely under rule 12(b) if presented either by pretrial motion or at trial.") (citing the 1944 Committee Note); *see also United States v. Jarvis*, 7 F.3d 404, 413-14 (4th Cir. 1993); *United States v. Brimberry*, 744 F.2d 580, 586-87 (7th Cir. 1984).

Based on this and the clearly established law that reflects that *Garrity* violations give rise to *Kastigar* protections, the Government should not have been "surprised" by the ramifications of its unconstitutional conduct.  (*See* Opp. at 51.)  In fact, the prevailing practice of district courts within the Second Circuit is to address any *Kastigar* issues after trial.  *See Allen*, 864 F.3d at 78. And the potential ramifications of the Government's conduct were immediately apparent to the Court:  "I'm truly prepared . . . to listen to whatever arguments you want to make about what this means in terms of *Kastigar* and *Garrity* . . . ."  [Tr. 1509:21-24.]

### 3.  The Court Should Reject the Government's Sky-Is-Falling Argument

The Court should also reject the Government's argument that the Court should excuse the Government's violation of Mr. Black's constitutional rights because the mandated relief would have "ruinous consequences for corporate governance and the investigation of corporate crimes." (Opp. at 52-54.)  The Government made the same type of sky-is-falling argument in *Allen*.  *See Allen*, 864 F.3d at 87 ("The Government also asserts that a prohibition on its use in U.S. courts of testimony compelled by a foreign authority 'could seriously hamper the prosecution of criminal

---

[4]      While Rule 12 has been amended multiple times, none of the amendments changed the meaning of the "defect[s]" that must be raised prior to trial.  *See, e.g.*, Fed. R. Crim. P. 12(b)(3) advisory committee's note to 2014 amendment ("The rule's command that motions alleging 'a defect in instituting the prosecution' and 'errors in the indictment or information' must be made before trial is unchanged.  The amendment adds a nonexclusive list of commonly raised claims under each category to help ensure that such claims are not overlooked.").

conduct that crosses international borders.'"").  The Second Circuit rejected it there, and the Court

should reject it here.  As the Supreme Court stated in denying a similar argument in connection

with a Confrontation Clause violation:

> [The State] asks us to relax the requirements of the Confrontation Clause to
> accommodate the "'necessities of trial and the adversary process.'"  It is not clear
> whence we would derive the authority to do so.  The Confrontation Clause may
> make the prosecution of criminals more burdensome, but that is equally true of the
> right to trial by jury and the **_privilege against self-incrimination_**.  The
> Confrontation Clause—like those other constitutional provisions—is binding, and
> **_we may not disregard it at our convenience_**.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325 (2009) (emphasis added).  Put simply, the

"need[] to fight corporate crime . . . does not justify the means" of violating a defendant's

constitutional rights.  *Stein*, 440 F. Supp. 2d at 338; *see also Allen*, 864 F.3d at 87-88 ("The

practical outcome of our holding today is that the risk of error in coordination falls on the U.S.

Government (should it seek to prosecute foreign individuals), rather than on the subjects and

targets of cross-border investigations.").

Moreover, while not relevant to decide this motion, enforcing Mr. Black's constitutional

rights will not cause the predicted ruinous consequences for either corporate America or the

Government.  At most, it will incentivize the Government to do more of its own investigative work

and continue the process of returning to the status quo that existed prior to the Government's

adoption of its onerous corporate cooperation policies.  But regardless of the consequences,

individual rights such as the right to counsel, *see United States v. Stein*, 541 F.3d 130, 158 (2d Cir.

2008), the right to disclosure of exculpatory evidence under *Brady* [*see* ECF Nos. 416-001,

416-002 (Orders in *United States v. Blumberg*, 14-CR-458 (D.N.J.))], and the privilege against

self-incrimination, *see supra*, should not be sacrificed on the altar of Government expediency.[5]  As

this Court stated:

> [T]he implications for Mr. Black are different, because Mr. Black gave statements.
> And he gave statements in interviews that I was told were the product of an internal
> investigation that was conducted in the way I naively thought internal
> investigations -- parallel internal investigations were conducted.   Look, I was
> practicing law when the *Salomon* case happened and when the *NASD* case
> happened.   And yes, there were parallel investigations.   The regulators were asking
> questions.   The regulators were conducting interviews.   The regulators were serving
> us with document demands, and we did stuff in-house too.   Right.   It wasn't the
> regulators were telling us to go and do their first-line work for them and produce
> the stuff that you would expect the FBI to be getting for you so that you could build
> your case.   ***And if that's what the whole world has become, then maybe the whole
> world is going to come crashing down.***

[Tr. 2317:11-2318:3 (emphasis added).]

Finally, the only "ruinous consequences" at issue here are those that would flow from the

failure to hold the Government responsible for its actions in this case.   As relevant to the

*Garrity*/*Kastigar* motion, it is the Prosecution Team that chose to outsource its investigative

responsibilities to Deutsche Bank.   And it is the Prosecution Team that chose to direct Deutsche

Bank to interview Mr. Black under compelled circumstances and to disclose to the Prosecution

Team both Mr. Black's statements and evidence and information derived therefrom.   Rather than

accept how *Garrity* and *Kastigar* apply straightforwardly to these actions, the Government has

---

[5]     *See The Thompson Memorandum's Effect on the Right to Counsel in Corporate
Investigations*, S. Hr'g. 109-835 Before the Comm. on the Judiciary, 109th Cong. 3 (Sept. 12,
2006) (statement of Paul J. McNulty, Deputy Attorney General, U.S. Department of Justice)
("[T]here are many ways for Government investigators to get the facts in a corporate fraud
investigation, to find out who did what when.   Some ways are faster and more productive than
others.   One of the most productive ways to get the facts is for a cooperating corporation to tell the
Government what it knows.   It is not the only way for the Government to learn the truth, but,
generally speaking, disclosing the results of the company's internal investigation is one of the best
ways.   Let's face it.   Searching for hot documents in rooms full of paper or on servers filled with
computer files is much slower than looking through a three-ring binder or a CD-ROM identifying
the most relevant evidence."), *available at* https://www.govinfo.gov/content/pkg/CHRG-
109shrg34117/pdf/CHRG-109shrg34117.pdf.

repeatedly argued that the Court should disregard Mr. Black's fundamental constitutional rights and, as reflected in Defendants' pending motion to dismiss for prosecutorial misconduct, the Government has made a series of misrepresentations concerning its interactions with Deutsche Bank and other Prosecution Team members in furtherance of that effort. [*See* ECF No. 398 at 26-37, 41-49, 63-67.] Accordingly, what will lead us to ruin is if the Government is not held accountable for its actions in this case and is permitted to violate Mr. Black's—and future defendants'—constitutional rights with impunity.

### B.     THE GOVERNMENT HAS NOT MET ITS HEAVY BURDEN UNDER *KASTIGAR*

The Government's unsupported assertions concerning the lack of taint to the grand jury proceedings and the trial are insufficient to meet its heavy burden under *Kastigar*. *See Allen*, 864 F.3d at 91 (noting the Government's "'affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony'") (quoting *Kastigar*, 406 U.S. at 460); *United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995) (stating that the "mere 'assertion that the immunized testimony was not used'" is insufficient) (quoting *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977)). The Government has not met this burden on the papers, and given its refusal to abide the Court's suggestion to supplement the record with any evidence about what it did to investigate the case, the Government simply falls short. [*Compare* ECF No. 406 (stating that the Government's response to the *Garrity* and *Kastigar* motion "will likely require the Government to offer a great deal of evidence about what it (not Deutsche Bank/Paul Weiss) did to investigate this case between 2010 and 2015"), *with* Opp. at 57 ("The Government will not seek to supplement the record on this issue . . . .")]

Further, the Government's argument that Mr. Black's statements are limited to what it characterizes as "exculpatory falsehoods" (*see* Opp. 55) is belied by its own admissions and the

record.  As the Government admits, at the time of the initial interviews with Mr. Black, Deutsche

Bank's counsel knew very little about LIBOR and used Mr. Black to educate themselves about the

LIBOR submission process and to identify evidence.  (*Id.* at 32-33.)  The Government states:

> [D]uring the early stages of the internal investigation, Mr. Ricciardi and his team
> were still learning about LIBOR, and they were trying to figure out how the
> benchmark worked:  "the process was initially we had no idea what we were doing,
> so we started talking to people about how did LIBOR work, how does the
> submission process work, who's involved with that, and we started talking to
> people involved with the process.  And then we learned that there's also trading
> related to it, and we started interviewing traders."
>
> At the other end of the table sat Gavin Black, the well-educated, greatly
> experienced, and highly compensated career swaps trader at an elite bank who knew
> more about LIBOR, and the derivatives to which it was linked, than almost anyone
> else on the planet.

(*Id.* (quoting Tr. 1485 (Ricciardi)).)  Thus, even the limited record demonstrates that Deutsche

Bank used Mr. Black's compelled statements to investigate and build the case that the Government

used to indict and try Mr. Black—and obtained cooperation credit for its efforts.  [*See* GX 1-751

¶ 4a (stating that, through its internal investigation, Deutsche Bank "disclos[ed] much of the

misconduct described in the Information and Statement of Facts" and "collected, analyzed, and

organized voluminous evidence, data, and information").]

Moreover, the Government again ignores settled law in arguing that it is permitted to use

Mr. Black's compelled statements, and evidence derived directly and indirectly therefrom, against

him so long as it characterizes those statements as false.  (*See* Opp. at 55 (citing *United States v.

Kurzer*, 534 F.2d 511, 518 (2d Cir. 1976).)  In fact, the Second Circuit specifically rejected the

Government's argument in the case cited by the Government, stating that:

> [T]he ordinary remedy for the Government when an immunized witness lies or fails
> to cooperate fully is a prosecution for perjury or for contempt, rather than
> abrogation of the immunity agreement and use of the information truthfully given
> by the immunized witness to prosecute him for other offenses. . . . But the
> Government's argument . . . would permit the use, if the prosecutor felt the
> immunized witness was not truthful in all respects, not only of the false testimony,

but also of the truthful and incriminatory information given by the witness, contrary to the reasoning of *Tramunti*.  We decline to go so far.

*Kurzer*, 534 F.2d at 518 (citing *United States v. Tramunti*, 500 F.2d 1334, 1345 (2d Cir. 1974)); *see also Nanni*, 59 F.3d at 1431 (stating that immunity that is co-extensive with the Fifth Amendment's privilege against self-incrimination "not only prohibits use against the witness of his truthful testimony that is self-inculpatory, but also, except to the extent that the testimony amounts to perjury, prohibits the use of negative inferences drawn from his false testimony which, if believed, would tend to exculpate him") (citations omitted).

By refusing to introduce any evidence about what it did to investigate the case and what use it made of the materials and information that it received from Deutsche Bank, the Government has not met its heavy burden to affirmatively prove that its access to both Mr. Black's compelled statements and evidence derived therefrom did not taint the grand jury proceeding and trial in this case.  Accordingly, to the extent the Government does not present such evidence during a post-trial hearing, the Court should dismiss the Indictment against Mr. Black.

## II.  THE COURT SHOULD VACATE MR. BLACK'S CONVICTION AND DISMISS THE CASE BASED ON THE GOVERNMENT'S FAILURE TO PROVE LACK OF TAINT FROM HIS FCA TESTIMONY OR HOLD A SECOND *KASTIGAR* HEARING ON HIS FCA TESTIMONY

There is no dispute that the Government offered no evidence from the CFTC—one of its key investigative partners—at the first *Kastigar* hearing.  There is similarly no dispute that the CFTC received materials containing compelled testimony and had numerous interactions with the FCA that the Government has still failed to address.  But the Government was not required to account for these contacts because it made a series of misrepresentations concerning the nature and extent of its interactions with the other governmental agencies involved in the global LIBOR investigation, including the CFTC and the FCA.  [*See* ECF No. 398 at 26-37.]

The Government ignores the evidence of substantial coordination in arguing that there is nothing new in the record that warrants either a finding that dismissal is required based on the taint from Mr. Black's compelled FCA testimony or, at the very least, that the Court should hold a second *Kastigar* hearing.   (*See* Opp. at 60-62.)   While some of the Government's misrepresentations had been revealed at the time of the hearing [*see* ECF No. 398 at 29-34], the Court was still under the misimpression—based on the Government's false statements—that the Government and its investigative partners had conducted separate, parallel investigations [*see* ECF No. 274 ¶¶ 1, 3], and that the Government had not outsourced its investigative responsibilities to other entities, including Deutsche Bank [*see, e.g.*, Tr. 2316:3-14, 2317:11-2318:3].  On the basis of these misrepresentations, the Court limited the issues on which it required the Government to present evidence at the first *Kastigar* hearing.  [*See, e.g.*, April 24, 2018 *Kastigar* Hr'g (the "Apr. 24 Hr'g") Tr. 293:18-21 (rejecting the argument that the Government was required to produce affidavits from the CFTC).]

The Government's arguments in its Opposition provide further evidence of these misrepresentations.  For example, and as shown in Defendants' motion to dismiss for prosecutorial misconduct, the Government understated the number of joint interviews that it conducted with the other governmental agencies investigating LIBOR, including the CFTC, SEC, and SFO, prior to the first *Kastigar* hearing.  [*See* ECF No. 398 at 34-35.]  After these misrepresentations were revealed, the Government defended its actions on the ground that its disclosure was limited to interviews related to only the Deutsche Bank portion of the global LIBOR investigation.  [ECF No. 130 at 18-19.] The Government continued to use this same defense of these misrepresentations in its response to Defendants' motion to dismiss based on prosecutorial misconduct, which the Government filed on the same date as its Opposition.  [*See* ECF No. 413 at 29.]

15

But in arguing in its Opposition that it did not outsource its entire investigation to Deutsche Bank, the Government relies on joint interviews that it conducted of employees at other banks investigated in the joint LIBOR investigation.  (*See* Opp. at 7 & Exs. 11, 12 (ECF Nos. 409-11, 409-12).)  Specifically, the Government wrote:

> And it was clear to all parties that the DOJ and CFTC were not going to simply rely on Paul Weiss interviews even before Gavin Black was interviewed by Paul Weiss because the DOJ had already begun conducting its own interviews in the other LIBOR investigations.  *See* Exhibit 11, Interviews Before November 22, 2010.  The DOJ conducted an additional approximately 22 interviews before Gavin Black's second interview with Paul Weiss.  *See* Exhibit 12, Additional Interviews Before August 25, 2011.

(Opp. at 7.)  Based on the Government's redactions, it appears that all but three of the employees whose interviews are documented in the two exhibits referenced in this excerpt worked at Barclays or UBS. [6]  [*See* ECF Nos. 409-11 and 409-12.]  None of these employees worked at Deutsche Bank.  This is yet another example of the Government deliberately massaging the facts:  when it serves the Government, the LIBOR investigation spans many banks; when it does not, the investigation is limited to Deutsche Bank.  Thus, the Government either misled the Court at the first *Kastigar* hearing or has failed to rebut the evidence of outsourcing its investigation now.  In either case, it has failed to carry its *Kastigar* burden.

Moreover, additional facts revealed since the first *Kastigar* hearing, including the evidence of Government outsourcing introduced at the *Garrity* hearing, refute the Government's assertion that there is no new evidence that bears on the taint stemming from Mr. Black's compelled FCA testimony.  While the full extent of the Government's interactions with other members of the Prosecution Team remains unknown because Mr. Black has received limited discovery concerning

---

[6]      The three other interviews involved two individuals who worked at Bloomberg and one who worked for the Bank of England.  [*See* ECF No. 409-12 at 2, 10, 22.]

the issue, even the limited evidence that has been produced demonstrates the shortcomings in the Government's position.

The Government also wrongly claims that, on the current record, it met its heavy burden of showing that Deutsche Bank and its counsel did not have access to Mr. Black's compelled FCA testimony or evidence derived therefrom. The Government primarily relies on the declaration of Patrick Meaney in support of this assertion. (*See* Opp. at 61 (relying on ECF No. 170-2 ¶¶ 4-5).) But prior to submitting this declaration, the Government received an August 30, 2017 letter from Mr. Meaney ("FCA Letter") [ECF No. 241-1 at 2-3], concerning the interactions between the FCA, the Government, and the CFTC, that all parties agree was replete with false representations. [*See* ECF No. 398 at 46-47; ECF No. 413 at 41 ("The government acknowledges that [Mr. Meaney's] August 30 letter was, regrettably, not completely accurate in all respects.").] Indeed, during the April 2018 *Kastigar* hearing, Mr. Prange conceded that Mr. Meaney's statements in the FCA Letter were false. [Apr. 24 Hr'g Tr. 86:17-24, 92:15-22.] Similarly, the FCA itself filed an additional letter with the Court distancing itself from Mr. Meaney and his representations, explaining that, at that time, Mr. Meaney was "no longer employed by the FCA" and that, contrary to his representations in the FCA Letter, "an excerpt of the draft Warning Notice was sent by the FCA to the [CFTC] on 12 February 2015." [ECF No. 244-1.] Notably, Mr. Meaney's "clarifying" declaration neither mentioned nor corrected his false statements in the FCA Letter. [ECF No. 170-2.]

Moreover, the Meaney declaration's list of the individuals and entities with whom he shared Mr. Black's compelled testimony, either formally or informally, is also suspect. Several weeks prior to the Government's filing of the Meaney declaration, Mr. Meaney admitted in an interview with the Government that he "may have discussed topics from compelled testimony,

17

and/or provided transcripts of the testimony to DB's defense council during court proceedings." [ECF No. 399-33 at 4.] Although, in a subsequent proffer, Mr. Meaney retracted his statement about providing a formal transcript of Mr. Black's compelled testimony to Deutsche Bank's counsel [ECF No. 399-59 at 1], he did not make any retraction regarding his informal discussion of the substance of Mr. Black's testimony with Deutsche Bank [*id.*; *see also* ECF No. 399-33 at 4 ("Formal sharing resulted from a written request, while informal sharing was usually verbal.")].

In addition, contrary to the Government's suggestion, Mr. Prange did not testify that U.K. law prevented the FCA from disseminating the transcript of Mr. Black's compelled testimony to Deutsche Bank. (*See* Opp. at 61.) Instead, Mr. Prange testified that he believed (but was unsure) that U.K. law makes it a crime to violate the confidentiality provisions contained in the Financial Services and Markets Act Section 348 applicable to the FCA's taking of compelled testimony, but he did not explain—and did not believe that he had ever read—Section 348's requirements. [Apr. 24 Hr'g Tr. 11:8-17.] Mr. Meaney, however, advised that Section 348 permitted the FCA to provide Mr. Black's testimony, either formally or informally, to Deutsche Bank, subject to Deutsche Bank's compliance with Section 348's confidentiality requirements. [*See* ECF No. 399-33 at 4.] Mr. Prange similarly acknowledged that the FCA had a practice of informally sharing compelled testimony with other parties by paraphrasing it, and that U.K. law did not bar the FCA from so doing. [Apr. 24 Hr'g Tr. 255:5-257:25.] In fact, during a call in July 2015, Mr. Prange advised the Government that he did not recall whether he formally or informally shared portions of Mr. Black's testimony with Deutsche Bank but "would have to check." [Apr. 24 Hr'g DX-215 at 1-2.] Accordingly, to the extent Government argues that this Court should rely on Mr. Meaney and Mr. Prange as the sources of evidence of the interactions between the FCA and Deutsche Bank, it has not met its heavy *Kastigar* burden and the Court should dismiss the Indictment.

The Court should also reject the argument that Mr. Black's statement that the Government must "negate[] the possibility" of taint somehow overstates the *Kastigar* burden. (*See* Opp. at 62.) If anything, Mr. Black understates the Government's burden. The *Allen* court stated:

> When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." ***This burden is "not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."***

864 F.3d at 91 (emphasis added) (footnote omitted) (quoting *Kastigar*, 406 U.S. at 460, 461-62).

Accordingly, it is clear that the Government neither understands nor has met its burden with respect to the taint attributable to Mr. Black's compelled FCA testimony. This Court should dismiss the Indictment on the current record or, alternatively, hold a second *Kastigar* hearing.

## CONCLUSION

For the foregoing reasons, the Court should vacate Mr. Black's conviction, dismiss this case and grant such further relief that it deems just and proper.

Dated: New York, New York
       March 25, 2019

Respectfully Submitted:

By: /s/ Scott B. Klugman
    Seth L. Levine
    Scott B. Klugman
    Miriam L. Alinikoff

**LEVINE LEE LLP**
650 Fifth Avenue, 13th Floor
New York, New York 10019
Telephone:  (212) 223-4400
Facsimile:  (212) 223-4425
slevine@levinelee.com
sklugman@levinelee.com
malinikoff@levinelee.com

*Attorneys for Defendant Gavin Campbell Black*