**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

MATTHEW CONNOLLY and
GAVIN CAMPBELL BLACK

*Defendants.*

No. 16 Cr. 0370 (CM)

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT GAVIN BLACK'S MOTION FOR *KASTIGAR* RELIEF

Black moves for relief under *United States v. Kastigar*, 406 U.S. 441 (1972), on the basis

that statements obtained by his employer, Deutsche Bank AG ("Deutsche Bank"), in the course

of what purported to be an internal investigation into the possible manipulation of the London

Inter-Bank Offered Rate ("LIBOR"), are fairly attributable to the Government within the

meaning of *Garrity v. New Jersey*, 385 U.S. 493 (1967). Black argues that, in light of Deutsche

Bank's close relationship with the Government, two conclusions follow:

First, that his prosecution was predicated on and infected by those statements, such that

the indictment against him must be dismissed, pursuant to the Second Circuit's ruling in *United

States v. Allen*, 864 F.3d 63 (2d Cir. 2017).

Second, the Court's earlier *Kastigar* decision—in which it determined that statements

compelled by the United Kingdom's Financial Conduct Authority ("UK FCA") did not taint the

Government's grand jury presentation—was erroneous because it was predicated on incorrect

information about the relationship between Deutsche Bank and the Government entities

investigating it, and so raises the specter that other evidence used by the Government was tainted.

Black has made a rather convincing showing that Deutsche Bank and its outside counsel, Paul Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), were *de facto* the Government for *Garrity* purposes; more important, the Government has made an utterly unpersuasive case in rebuttal. There remain holes in the record, however, and a full-bore *Garrity* hearing would be a fascinating exercise—especially because there are profound implications if the Government, as has been suggested elsewhere, is routinely outsourcing its investigations into complex financial matters to the targets of those investigations, who are in a uniquely coercive position *vis-à-vis* potential targets of criminal activity. *See, e.g.*, Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann. Rev. Crim. Proc. iii (2011). The Court is deeply troubled by this issue.

But the Court is not eager to put the parties through a purely academic exercise. And in this case, holding a *Garrity* hearing would be a purely academic exercise because, even if Deutsche bank and Paul Weiss were agents of the Government, Black's *Kastigar* rights were not violated. The motion is, therefore, denied.

I.      **Factual Background**

The following facts reflect what the Court knows about Deutsche Bank's LIBOR investigation.

A.      **The Government's Launch of a LIBOR investigation into Deutsche Bank**

In or about October 2008, the United States Commodity Futures Trading Commission ("CFTC") opened an investigation into LIBOR manipulation by two financial services firms— Barclays PLC ("Barclays") and UBS Group AG ("UBS")—both of which were LIBOR panel

submitting banks. (United States' Resp. to Def. Gavin Black's Mot. for Kastigar Relief,

("Gov't's Kastigar Br."), Exs. 1 & 3, Dkt. No. 409.)

In 2010, the Government started looking at another LIBOR panel member, Deutsche

Bank. (Trial Tr. at 2236:22-24.) The United States Securities and Exchange Commission

("SEC") was the first federal agency to open an investigation into Deutsche Bank's role in

LIBOR manipulation. (*Id.* at 1490:5-19.) The Bank retained Paul Weiss sometime in "early

2010" to respond to the SEC's inquiry. (*See id.* at 1490:19; *see also* Gov't's Kastigar Br. Ex. 4

at DB-SFO-DOJ_02131090.)

On April 19, 2010, the CFTC sent a letter to Deutsche Bank's General Counsel for the

Americas, Joseph Polizzotto, stating that it, too, intended to look into whether Deutsche Bank

had submitted false or misleading LIBOR reports. (Defs.' Trial Ex. 9072 at 1.) The CFTC

advised Deutsche Bank that it "expect[ed]" the Bank to "cooperate fully" with its investigation.

It then went on to explain exactly what cooperation would look like:

> Accordingly, the Division requests that Deutsche Bank Securities Inc. (and its parent,
> subsidiaries, affiliates and divisions, collectively referred to as "Deutsche Bank")
> voluntarily conduct by **external** counsel a full review of Deutsche Bank's U.S. Dollar
> LIBOR reporting for the relevant time period, and report on an on-going basis the results
> of that review to the Division, with the review to be completed by no later than
> September 1, 2010. Further, the Division requests that Deutsche Bank certify that it was
> in compliance with the Act and Regulations with respect to its reporting of LIBOR and
> related trading.

(*Id.* (emphasis in original).)

Appended to the CFTC's letter was a CFTC Enforcement Advisory Memorandum titled

"Cooperation Factors in Enforcement Division Sanction Recommendations." (*Id.* at 3–7.) This

memorandum stated that a corporate cooperator might receive cooperation credit if, among other

things, it "utilize[s] all available means to [] make employee testimony or other relevant

corporate documents available in a timely manner." (*Id.* at 4.) It also noted that the quality of a

corporation's cooperation might depend upon whether the company "avoid[ed] entering into joint defense agreements with counsel for employees[.]" (*Id.*)

Deutsche Bank expanded Paul Weiss's representation to include conducting the so-called "voluntary" investigation that was demanded (not requested) by the CFTC. (Trial Tr. 1493:20-23.) According to Walter Ricciardi, the Paul Weiss partner who headed the Bank's internal investigation into LIBOR from its inception until January 2013, there was nothing "voluntary" about the investigation that followed the CFTC letter; given the draconian consequences that would likely ensue if it did not accept the agency's invitation, Deutsche Bank's only choice was about its "level of cooperation" with the Government, not about whether to cooperate. (Trial Tr. at 1499:8-9.) Accordingly, Deutsche Bank immediately decided that it would go all-in with cooperation. (*See, e.g.*, Trial Tr. 1499:24-25, 1500:19-22; *see also* Defs.' Trial Exs. 9076, 9080.)

On the record presently before the Court, it is clear enough that, for five years, Deutsche Bank and its outside counsel coordinated extensively with the three Government agencies—the SEC, the CFTC, and eventually the United States Department of Justice ("DOJ")—that were looking into possible LIBOR manipulation. Indeed, it is apparent that the Government was kept abreast of developments on a regular basis, and that the federal agencies gave considerable direction to the investigating Paul Weiss attorneys, both about what to do and about how to do it. The issue raised by Black's motion is just exactly how much the investigation conducted by Paul Weiss was a substitute for investigative efforts by Government attorneys.

### B.   Beginning Stages of Deutsche Bank's Investigation

In the early days of the CFTC's investigation, counsel for Deutsche Bank and the CFTC held a series of telephone meetings during which they laid out the framework for the Bank's initial investigatory steps. The CFTC proposed, and Deutsche Bank expressly agreed, to take certain immediate actions, including specifically, "Interview[ing] [] all relevant Bank staff,

including those who had knowledge/approval/oversight of, input on or discussions regarding the setting and submission of the Bank's LIBOR[.]" (Defs.' Trial Ex. 9080 at 02634011.)

In a letter "set[ting] forth" the actions Deutsche Bank had "agreed" to undertake, the CFTC also conveyed the Government's expectation that counsel would regularly provide updates on its internal investigation:

> [A]s we discussed, the CFTC and the SEC further envision regular updates, initially occurring weekly, from Counsel concerning the status and progress of the internal investigation. These updates will include simultaneous productions of responsive documents and information uncovered in the internal investigation.

(*Id.* at 02634013.) The Court will assume that the CFTC and SEC received the weekly reports demanded in the July 14, 2010 letter, especially since Ricciardi testified that, while he did not recall the CFTC's specific request for ongoing updates, he "probably didn't pay much attention to it because that's just the standard way it's always done." (Trial. Tr. 1501:5-7.)

At the same time that the CFTC opened its investigation, the DOJ submitted an "Access Request Letter" to the CFTC, asking it to provide DOJ with all documents it obtained as part of its investigation into LIBOR manipulation generally. (Dkt. No. 51 at 10 (Gov't's Br. on the Scope of the Prosecution Team).) As a result of this access request letter, DOJ ultimately "received [from CFTC] hundreds of thousands of documents throughout the course of its investigation of Deutsche Bank[.]" (*Id.* at 11.)

On November 4, 2010, Paul Weiss lawyers and representatives of Deutsche Bank's legal department met in person with CFTC representatives in order to provide a summary of the Bank's investigation to date. (Defs.' Trial Ex. 9075.) Prior to that meeting, Paul Weiss lawyers had conducted telephone interviews with several people at Deutsche Bank who ended up being part of this case, including James King and Michael Curtler (both of whom eventually testified at

Black's trial). (*Id.*) They had also interviewed David Nicholls, an individual who oversaw Deutsche Bank's global finance and currency forward-trading desks from London. (*Id.*)

At the November 4 meeting, the CFTC "asked" (*i.e.*, instructed) Paul Weiss to "interview King, Curtler, and Nicholls again, this time in person, before Thanksgiving, *and that at the same time, to the extent [Paul Weiss] learn[s] that King or Curtler regularly interact with or obtain information from others, on the same desk or other desks, [Paul Weiss] interview those individuals as well*[.]'") (*Id.* at DB-SFO-DOJ_02618646 (emphasis added).) Deutsche Bank identified Gavin Black as an individual who fell within the parameters of the Government's interview request. (*See* Decl. of Seth L. Levine in Supp. of Def. Black's *Kastigar* Relief ("Levine *Kastigar* Decl.") Ex. 1, Dkt. No. 396.) The Government concedes "for the purposes of this motion" that the "certain employees" it expected Paul Weiss to interview included Gavin Black. (Gov't's *Kastigar* Br. at 14 n.2.)

Paul Weiss lawyers, acting on behalf of Deutsche Bank, interviewed Black on November 22, 2010. (*See* Trial Tr. 1486:7-13.) Black did not have discretion to refuse to talk to the investigative team. Deutsche Bank's employee policy, titled "Global Compliance Core Principles," provides that an employee "*must* fully cooperate with Compliance and other appropriate Deutsche Bank departments (*e.g.*, Legal, Group Audit, etc.) handling internal and external examinations, investigations and other reviews involving Deutsche Bank, its customers and other related company activities." (Gov't's *Kastigar* Br. Ex. 17 at DOJ-SFO-DB-00002682 (emphasis added).) Although the policy did not explicitly provide for termination if employees did not comply—it only states, "Employees who violate Deutsche Bank's policies *may* be subject to disciplinary action up to and including termination of employment[]" (*id.* at DOJ-SFO-DB-0002680 (emphasis added))—Ricciardi testified, credibly, that any employee who did not

cooperate with the investigation would have lost his job. (*See* Trial Tr. 1527:14-15 ("The choice is too cooperate or find new employment, basically.").) Moreover, Black himself has submitted a declaration in which he avers that "[he] did not believe that [he] had any choice but to agree to meet with Paul Weiss lawyers and answer their questions[,]" and that, "had [he] refused to do so, it would have resulted in [his] termination from Deutsche Bank." (Declaration of Gavin Black ("Black Decl.") ¶ 3, Dkt. No. 234.) In light of Ricciardi's testimony, Black's subjective understanding is what any reasonable employee of Deutsche Bank would have understood.

### C.   Developments in Deutsche Bank's Investigation

As the Paul Weiss investigation continued, Deutsche Bank representatives and counsel continued to update the Government about their findings and coordinate next steps, as to Black and others. The Government gave Deutsche Bank/Paul Weiss marching orders during these meetings. For example, on December 4, 2014, a Government official directed Roberto Finzi, a Paul Weiss partner, to "approach [an employee] interview as if he were a prosecutor"—a request with which Finzi complied by giving his "word." (Dkt. No. 233-4 at DOJ-DB-KAST-00003527.) It is not clear whether the Government followed a similar protocol with respect to some or all of Paul Weiss's earlier interviews of Deutsche Bank employees. Other evidence indicates that the UK FCA—which was conducting a LIBOR investigation of its own—required Paul Weiss to provide it with an "interview plan and a list of documents" before it was permitted to interview another Deutsche Bank employee. (Dkt. No. 233-5 at DOJ-DB-KAST-0003528.)

Nonetheless, the Court has only a limited picture of Black's interactions with Paul Weiss and Deutsche Bank. It knows even less about the Government's role in those interactions.

### 1.   Black's Interviews with Paul Weiss

Paul Weiss lawyers interviewed Black a second time on August 25, 2011 and a third time on June 19, 2012. (*See* Gov't's Ex. 3500-WR-11 at 10–11, 13; Black Decl. ¶ 2; *see also* Trial

7

Tr. 1484:2-8.)  Black was not represented by counsel at either of these interviews—just as he had

not been represented at the November 22, 2010 interview.  (*See* Trial Tr. 1486:7-13, 1487:17-20,

1510:24-1511:1; Black Decl. ¶ 2.)  Nor does it appear that he was provided with any advance

information about what to prepare (or be prepared for) at these interviews.  (*Id.* at 1511:2-15.)

He was given standard *Upjohn* warnings at all interviews.  (Gov't's Kastigar Br. Ex. 22 at DOJ-

A-0000495 (August 25, 2011 interview); *id.* at DOJ-A-0013117 (noting that Black was provided

with "detailed *Upjohn* warnings at the outset of Ricciardi's first and second interviews of Black,"

and that "Ricciardi did not attend a third interview of Black, but the general practice of

Ricciardi's firm was to have *Upjohn* warnings repeated even if the witness had been previously

interviewed"); *accord* Trial Tr. 1487:7-1488:17 (Ricciardi's testimony that counsel administered

*Upjohn* warnings to Black).)[1]

   The record does not contain any information about what was said at the initial November

22, 2010 interview.  Paul Weiss attorney Joyce Huang, who conducted that interview (Trial Tr.

1486:7-13; *accord* Govt's Kastigar Br. Ex. 22 at DOJ-A-0000495), did not testify at trial, so the

Court does not have the benefit of 3500 material to review.

---

[1]      An "*Upjohn* warning" is the notice an attorney (in-house or outside counsel) provides a company employee
to inform her that the attorney represents only the company and not the employee individually. An attorney cautions
a company employee with an *Upjohn* warning when the company is involved in litigation or conducting an internal
investigation. Providing an employee with an *Upjohn* warning should make it clear that:

-   The attorney-client privilege over communications between the attorney and the employee belongs solely
    to, and is controlled by, the company.

-   The company may choose to waive the privilege and disclose what the employee tells the attorney to a
    government agency or any other third party.

The term originated with *Upjohn Co. v. United States*, 449 U.S. 383 (1981), in which the Supreme Court held that
the attorney-client privilege is preserved between the company and its attorney when its attorney communicates with
the company's employees, despite the rule that communications with third parties constitute a waiver of the
attorney-client privilege.

The record does, however, contain some evidence about Black's 2011 and 2012 interviews.   The clearest picture of what was said at those interviews comes from the Government's FD-302 forms ("302s") recording its conversations with Ricciardi.   (*See* Gov't's Kastigar Br. Ex. 22 (documenting seven Ricciardi interviews).)

According to Ricciardi, both the 2011 and 2012 interviews proceeded in a similar fashion, and Black gave similar statements at both.   In addition to explaining his role at Deutsche Bank, the Bank's LIBOR submission process generally, and specifically how it related to his trading (Govt's Kastigar Br. Ex. 22 at DOJ-A-0000496), Black denied that he ever attempted to improperly influence LIBOR.   (*Id.* at DOJ-A-0000497; *id.* at DOJ-0013108–09.)   When confronted with potentially incriminating emails—only some of which are in the record[2]—Black always denied wrongdoing, and, in so doing, clarified that his seemingly incriminating statements were in fact innocuous, in that they provided "market color" or were simply "jokes." (*See, e.g., id.* at DOJ-0013109–10, 12, 20, 22.)

Certain exchanges are illustrative.

One document, bearing Bates Number DBGJ 00001637, reflects an internal Deutsche Bank chat, dated February 5, 2005, between Black and an individual named Gurjit Dehl, who was then a vice president at the Bank:

Black: Can we have a high 6mth libor today pls gezzer?

Dehl: sure dude, where wld you like it made?

Black: think it should be 095?

Dehl: cool, was going 9, so 9.5 it is

Black: super – don't get that level of flexibility when curtler is in the chair fyg!

---

[2]       Ricciardi's 3500 material cites the Bates Numbers of certain emails, but the Court was not able to locate every email referenced therein, making it difficult to contextualize Ricciardi's statements about Black's interviews. That said, the Court was able to cross-reference certain emails with other items in the record.

(Levine Kastigar Decl. Ex. 5.)  Ricciardi recalls that Black told him that the reference to "flexibility" was a joke.  (Gov't's Kastigar Br. Ex. 22 at DOJ-A-0013110.)

Another document, bearing Bates Number DBGJ 00002395, contains an internal Deutsche Bank message, dated September 26, 2005, from Curtler to Black, Dehl, and King, in which Curtler asked the group: "[L]ibors any requests?"  (Levine Kastigar Decl. Ex. 5.) According to Ricciardi, "Black said that Curtler was just asking for market color," not seeking input from traders about setting LIBOR at a position that was helpful to their trading positions. (Gov't's Kastigar Br. Ex. 22 at DOJ-A-0013110.)  Black provided a similar defense when confronted with his own message, dated June 4, 2009, in which Black asked Curtler: "Geez – will you be moving 3mth libor lower tom?"  (*Compare* Gov't's Kastigar Br. Ex. 22 at DOJ-A-0013112 (Ricciardi recalling Black's response) *with* Levine Kastigar Decl. Ex. 5 (containing text of Black's email).)

A final document, bearing Bates Number DBGJ 00002407, is an exchange, dated September 26, 2007, between Black and an individual named Lee Stewart, who worked at Rabobank.  (*See* Gov't's Kastigar Br. Ex. 22 at DOJ-A-0018469.)  In this conversation, Black reached out to Stewart, who was his friend, to gauge where Rabobank might publish its 3 Month LIBOR submission.  (*Id.*)  Black also expressed concern that certain panel banks might "forget" that "it is even a turn fix[,]" (Levine Kastigar Decl. Ex. 5 at DBGJ 00002407), meaning that they might submit "LIBORs without looking at their own circumstances."  (Gov't's Kastigar Br. Ex. 22 at DOJ-A-0013110.)  "Black said [that] it was [okay] to talk to other banks to find out what trades were going on in the market."  (*Id.*)

Ricciardi reported that he did not have the general "impression" that Black "wanted to be helpful in his answers."  (*Id.* at DOJ-A-0000497 (2011 interview); *accord id.* DOJ-A-0013112

(stating that Ricciardi believed Black was "very militaristic" in answering questions at 2012 interview).)

### 2. Coordination Between Deutsche Bank and the Government During the Bank's Investigation

The limited record reflects that the Government and Paul Weiss discussed Black, in real time and at least to a limited extent, as the Bank's internal investigation progressed.[3]  It does not, however, provide much information about the content of those discussions.  Nor does it indicate what the Government did with that information in connection with its investigation into Gavin Black.

Government email records reflect that, on August 26, 2011, Ricciardi telephoned a Government attorney (whose name is redacted) to tell that person that Paul Weiss had interviewed Black the day before.  (Gov't Ex. 3500-WR-11 at 13.)  This particular email states that Paul Weiss offered "to give [the Government] a presentation whenever [the Government] want[s], but [Paul Weiss] [is] of the opinion that it would be more fruitful in about a month when [the Government] (hopefully) ha[s] the documents and [Paul Weiss] ha[s] completed their next round of interviews."  (*Id.*)  The record does not indicate if a presentation ever took place.

In October 2012, Paul Weiss provided the CFTC with "interview summaries" of the interviews it had conducted to date—which, of course, would have included a summary of counsel's interviews of Black.  (Gov't Ex. 3500-WR-11 at 10.)  Those summaries were then forwarded to the DOJ.  (*See id.*)

On December 5, 2012, DOJ representatives from the antitrust and criminal divisions met with Paul Weiss attorneys to discuss the status of the Bank's ongoing investigation and learn

---

[3]        According to the 3500 material, the earliest date that Ricciardi met and shared information with the Government was August 11, 2016, which is after Black was indicted.  His 3500 material therefore does not provide any evidence of what the Bank contemporaneously shared with the Government as its own investigation progressed.

about what "submitters" and "traders" shared with Paul Weiss. (*See* Levine Kastigar Decl. Ex. 6 at DOJ-A-0009956 (Government notes of meeting with Paul Weiss).) Notes from that meeting indicate that the parties talked about Black. (*Id.*) These notes suggest that Paul Weiss shared Black's exculpatory statements about his emails and other messages with Government lawyers. (*Id.* ("Black – seeking mkt [*sic*] color or to move real rate").)

After the Bank interviewed Black for the third time in 2012, its lawyers met with the Government in person to provide a "download," meaning an exhaustive summary, of Black's statements to Paul Weiss attorneys. (*See* Levine Kastigar Decl. Exs. 2–4; *see also* Trial Tr. 1515:8-15 (describing meaning of "download").) Government notes from the "download" meeting corroborate the version of events that Ricciardi subsequently provided to the Government, *viz*, that Black's interviews with Paul Weiss largely consisted of his denying any wrongdoing. (*See* Levine Kastigar Decl. Ex. 2 at DOJ-A-0009862–64.) They also reflect some willingness by Paul Weiss to help the Government investigate Black, should it ever come to that point:

> Gavin, if you choose to interview him, may recall only one or two e-mails presented before him; beyond that he does not recall any email exchanges. He will be exceptionally clear and straightforward with his answers. That said, he does not recall communication entirely. At best 3-4 occasions, which the emails may cover, are recalled. [O]ne communication where a setter asks: "Any Requests" Black would not interpret this to be soliciting a LIBOR request at that time, nor would he see anything wrong with that statement today. There is no nefarious meaning behind it, he would say.

(*Id.* at DOJ-A-0009864 (bullet points removed for clarity).)

According to Black's counsel, the Government ultimately used the information it learned from this "download" meeting to question Black during his proffer session (Def.'s Br. in Supp. Kastigar Relief ("Def.'s Kastigar Br.") at 9, Dkt. No. 395),[4] which took place in London on

---

[4]     Black does not provide a citation to support this assertion.

October 1, 2013—long after Deutsche Bank, through Paul Weiss, had interviewed Black and then relayed his statements to the Government. (*See* Gov't's Ex. 3500-MM-2 (Government notes of Black's proffer session).)

On September 9, 2014, as the Bank's internal investigation was drawing to a close, Deutsche Bank's counsel sought the Government's "permission" to interview Gavin Black, who still worked at the Bank, for a fourth time—which is to say, Deutsche Bank *asked the Government for "permission" to interview its own employee.* (Dkt. No. 233-6 at DOJ-DB-KAST-0003459.) The Government asserts in its brief that Paul Weiss interviewed Gavin Black on December 4, 2014, at which interview Black was represented by counsel. (Gov't's Kastigar Br. at 12.) While the Government does not provide a citation to the record to support this assertion (*id.*), and the Court has not located other evidence to corroborate this assertion, it will accept the Government's representation.

### D.    The Paul Weiss White Paper

On January 21, 2015, Paul Weiss submitted a report, known colloquially as the Paul Weiss "White Paper," summarizing the findings of its LIBOR investigation and laying out a roadmap of the case against Deutsche Bank and various individuals who worked for the Bank. (*See* Defs.' Trial Ex. 0862.)

Among other things, the White Paper provides an exhaustive overview of the Bank's substantial cooperation with the Government during its LIBOR investigation. During the course of Deutsche Bank's nearly five-year internal investigation, Paul Weiss lawyers conducted nearly 200 interviews of more than fifty Bank employees—including, of course, of Black—and shared the results of these interviews with the Government. (Defs.' Trial Ex. 0862 at 44.) In addition to conducting interviews, Paul Weiss extracted and reviewed 158 million electronic documents, as

well as listened to 850,00 audio files, or over hundreds of thousands of hours of audio tapes. (*Id.* at 44, 47.)

Despite complicated data privacy and other restrictions in Germany and elsewhere, Deutsche Bank provided the Government with all "the facts necessary to allow the DOJ to complete its investigation and reach its own conclusions about the misconduct at issue." (*Id.* at 5–6.) The White Paper stated:

> We believe that these efforts . . . have provided the DOJ with a full and complete picture of the facts. Indeed, we expect that *much (if not most) of the information that will ultimately be used in making charging decisions . . . will have come from the Bank's identification of notable communications and its having brought those communications to the DOJ's attention.*"

(*Id.* at 6 (emphasis added).) Deutsche Bank would not have been eligible for cooperation credit had it not done these things. (*See* Dkt. No. 233-1 (Filip Memorandum §§ 9-28.700, 9-28.720(a)) (stating that a corporation's failure to provide relevant facts "means that the corporation will not be entitled to mitigating credit for cooperation").)

As the investigation proceeded, counsel "interacted with [the Government] on hundreds if not thousands of occasions." (Defs.' Trial Ex. 0862 at 5.) This included some 230 phone calls and 30 in-person meetings with Government officials. (*Id.* at 49.) For the final 14 months of the Bank's internal investigation, counsel held joint "weekly update calls" to provide the Government with the latest developments and afford it an opportunity to "make new requests." (*Id.*) Included on these calls were, among others, representatives from the DOJ Antitrust Division (Alison Anderson and Ryan Fitzpatrick); the DOJ Criminal Division (Richard Powers and Paul Park); the CFTC (Jonathan Huth and Jason Wright); and the Federal Bureau of Investigations ("FBI") (Michael McGillicuddy). (*See, e.g.*, Defs.' Trial Ex. 9061.)

14

The Bank's "efforts to cooperate . . . [were] not [] limited to the raw transmission of documents and data." (Defs.' Trial Ex. 0862 at 48.)  In other words, Deutsche Bank did not simply respond to Government document requests by producing responsive documents for the Government's review.  Instead, Deutsche Bank flagged "'notable' . . . evidence or information that [it] believed would be of particular interest" to the Government.  (*Id.* at 45.)  It also "complement[ed] [document] productions with facts learned from [Deutsche Bank's] own interviews of relevant employees."  (*Id.* at 48.)  To that end, Paul Weiss provided the Government with real time updates about facts gleaned from employee interviews.  (*Id.* at 49 ("the Bank has sought to keep the DOJ apprised of all relevant facts, including 'relevant factual information' acquired through its dozens of interviews.").)  And it did "everything in its power to facilitate the [Government's own] interviews of relevant current and former Deutsche Bank employees[,]" which included "actively encourag[ing] its employees (current and former) to participate in interviews with regulators[.]"  (*Id.* at 49–50 (citing Filip Memorandum § 9.28-720(a) n.2).)

The White Paper was candid about the context in which all of this occurred, as well as the substantial pressure Deutsche Bank faced to cooperate in every conceivable way with the Government:

> Like all banks, especially large banks subject to heightened supervision by multiple regulators, Deutsche Bank cannot operate in its core business except with the blessing of its regulators.  If [Deutsche Bank] were required, unlike any of the other settling banks, to plead guilty to a felony conviction with the resolution of these investigations, its ability to operate in significant segments of its business would be in jeopardy.  Such an outcome with be unfair, and the brunt of it would be borne by innocent stakeholders—employees, investors, clients, and counterparties—who played no role in and had no knowledge of the misconduct sought to be punished.

(*Id.* at 58–59.)  The Bank ticked off the dangers that could set off a series of cascading harmful events:  A guilty plea would have forced the Bank's operating subsidiaries to lose key licenses

and authorizations in the United States, which would have wreaked substantial regulatory uncertainty overseas in the more than 70 countries that Deutsche Bank does business. (*Id.* at 59.) Because "there is no need for a fiduciary concerned with its own reputation or liability to transact with an entity that has pled guilty to a felony when there are a multitude of other options available[,]" the Bank would have lost business in virtually all aspects of its operations. (*Id.* at 60.) A guilty plea also would have affected Deutsche Bank's ability to raise money on the capital markets, which, in turn, would have prompted credit agencies to downgrade the company's credit rating. (*Id.* at 61–62.) The White Paper concluded, "The point is not that any particular parade of horrible collateral consequences would be certain to occur in the event of a guilty plea by Deutsche Bank. The point is that what would occur cannot be foreseen with any clarity and could be severe." (*Id.* at 62.)

When all was said and done, the LIBOR investigation was the largest and most expensive internal investigation in the respective histories of both Deutsche Bank and Paul Weiss. (*Id.* at 5 (largest in Deutsche Bank's history); Trial Tr. at 1502:22-1503:4 (largest in Paul Weiss's history); 1516:25-1517:1 (Ricciardi testimony that Deutsche Bank investigation was "larger by ten times any [investigation] [he has] ever been involved with").)

But the investigation was a conspicuous success for Deutsche Bank. On April 23, 2015, Deutsche Bank entered into a deferred prosecution agreement ("DPA") with DOJ, under which Deutsche Bank agreed to (*i*) pay $775 million in criminal penalties; (*ii*) continue cooperating with the Government in its ongoing investigation; and (*iii*) retain a corporate monitor for the three-year term of the agreement. (*See* Gov't's Kastigar Br. Ex. 27 (Deutsche Bank DPA).) In addition, one of Deutsche Bank's subsidiaries, Deutsche Bank Group Services (UK) Limited, agreed to plead guilty to one count of wire fraud and pay its own fine. (*Id.*)

In the DPA, DOJ touted the benefits of the cooperation that Deutsche Bank and Paul Weiss provided:

> Although Deutsche Bank did not self-disclose this misconduct, upon being alerted to an investigation by the Department and other regulatory authorities, Deutsche Bank commenced an internal investigation and cooperated with authorities, including disclosing much of the misconduct described in the Information and Statement of Facts. *Deutsche Bank collected, analyzed, and organized voluminous evidence, data, and information, and did so in a way that saved the Department significant resources* by identifying certain documents and segments of audio files and providing translations for certain documents where applicable. *Deutsche Bank also assisted and facilitated the Department's interviews of current and former employees*, including foreign employees and Deutsche Bank communicated with and updated the Department with increasing frequency as the investigation progressed.

(*Id.* ¶ 4a (emphases added).)

In addition to the DPA, Deutsche Bank entered into a consent order with the New York Department of Financial Services ("NYDFS"), in which Deutsche Bank avoided prosecution for violations of New York anti-money laundering laws by, among other things, agreeing to terminate certain employees who were allegedly involved in LIBOR manipulation. (Defs.' Trial Ex. 9084.) *See also* Deutsche Bank Consent Order (Jan. 30, 2017) *available at* https://www.dfs.ny.gov/docs/about/ea/ea170130.pdf.

Gavin Black was fired in early 2015 at the insistence of the NYDFS.

### E.     What the Government Was Doing During Deutsche Bank's Internal Investigation

One critically important issue is just what the Government was doing during the five years between the sending of the CFTC's April 2010 letter and Deutsche Bank's eventual entry into a DPA with DOJ on April 23, 2015.  Did the Government conduct a substantive parallel investigation to the "internal" investigation at Deutsche Bank, or did it simply give direction to

Deutsche Bank/Paul Weiss, take the results of their labor (which appears to have been fully disclosed to Government lawyers), and save itself the trouble of doing its own work?[5]

On the record presently before it, the Court would have to conclude the latter. The Government—which has never treated this matter with the seriousness it deserves—did not provide the Court with much information about any independent investigative activities it may have undertaken during those years. Indeed, it has declared that it has no need to do so. (Gov't's Kastigar Br. at 57 ("The Government will not seek to supplement the record on this issue [.]").)

The Government—first the SEC on April 4, 2010, then the DOJ on June 27, 2011—subpoenaed Deutsche Bank for documents. (*See* Gov't's Kastigar Br. Exs. 8–9.) However, the Government does not appear to have interviewed any witnesses from Deutsche Bank—at least, not until after Paul Weiss interviewed those witnesses and passed information gleaned from those interviews on to the Government—or taken any investigative depositions, or reviewed anything that had not first passed through the maw of Paul Weiss's five-year, $10 million investigative machine and been fully digested for the Government by the target of the investigation. The first 302s that the Court has reviewed in the 3500 material provided during the trial are dated three years after Paul Weiss started its investigation, and well after the firm interviewed Black during the 2010–2012 period. The lion's share of 302s were generated from interviews held after Paul Weiss submitted its White Paper in 2015. It is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map

---

[5]     The Court places the word "internal" in quotation marks, because internal investigations are commissioned by boards of directors, with the results reported to boards of directors—not commissioned by the Government with regular reports to the Government. While the Court imagines that Deutsche Bank's board was kept abreast of developments in the investigation, by no standard known to this Court can the investigation that Paul Weiss conducted be accurately characterized as an "internal" investigation.

that Paul Weiss provided—illuminating just how the Government should "investigate" the case against certain Deutsche Bank employees, including Black.

In short, while the record before the Court is incomplete (at the Government's choice), everything I have read suggests that the United States outsourced its investigation to Deutsche Bank and its lawyers. The inference one draws from a lack of evidence from the Government is not an inference that is favorable to the Government.

It is against this backdrop that Black makes his *Kastigar* motion.

## II.   Discussion

Black asks the Court to vacate his conviction and dismiss the indictment against him on the grounds that his interview statements to Paul Weiss were both "fairly attributable" to the Government and "compelled," thereby violating his constitutional right against self-incrimination, as first articulated by the Supreme Court in *Garrity v. New Jersey*. These statements, he argues, constitute "compelled testimony" within the meaning *Kastigar v. United States*, which the Government then improperly "used" in prosecuting him. Moreover, he submits that the Bank's close relationship with the Government requires the Court to revisit its earlier *Kastigar* decision, in which it determined that Black's compelled statements to the UK FCA did not taint the Government's presentation to the grand jury.

Before turning to the two bases for Black's *Kastigar* motion, the Court will address Black's *Garrity* argument.

### A.   For Purpose of this Motion, the Court Finds that the Deutsche Bank "Internal" Investigation is "Fairly Attributable to the Government"

The Fifth Amendment provides in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. An individual claiming a violation of the privilege against self-incrimination must prove that the statements at issue were

both the product of coercion and attributable to the government. *See, e.g., Garrity*, 385 U.S. at 497.

In *Garrity*, the Supreme Court held that the statements obtained from police officers under threat of termination of employment were involuntary and therefore inadmissible against them in a criminal trial. 385 U.S. at 496–97. Justice William O. Douglas, writing for the majority, reasoned that the "fear of being discharged under [New Jersey's public employment forfeiture statute] for refusal to answer on the one hand and the fear of self-incrimination on the other hand was 'a choice between the rock and the whirlpool,'" *id.* at 496 (quoting *Stevens v. Marks*, 383 U.S. 234, 243 (1966)). Subjecting employees to that Hobson's choice violates the Constitution. *Id.* at 500.

While *Garrity* involved the conduct of a government employer, the *Garrity* rule applies with equal vigor to private conduct where the actions of a private employer in obtaining statements are "fairly attributable to the government." *United States v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008) ("*Stein II*"). Private conduct is attributed to the government when "there is a sufficiently close nexus between the state and the challenged action." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (internal quotation marks and citation omitted); *Stein II*, 541 F.3d at 146–47.

As the Second Circuit explained in *Stein II*, a close nexus of state action exists between a private entity and the state when a governmental actor (*i*) exercises coercive power; (*ii*) is entwined in the management or control of the private actor; (*iii*) provides the private action with significant encouragement, either over or covert; (*iv*) engages in a joint activity in which the private actor is a willful participant; (*v*) delegates a public function to the private actor; or (*vi*) entwines the private actor in governmental policies. *Stein II*, 541 F.3d at 147 (citing *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005)).

It is not enough, however, that there be a close nexus between the state and the actions undertaken by a private entity; the Government must influence the specific conduct of which the party complains. *See Desiderio v. Nat'l Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 206–07 (2d Cir. 1999) (quoting *Blum*, 457 U.S. at 1004–05). The "controlling factor" is not whether the state directed the constitutionally prohibited conduct, but whether the state "involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement." *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974), *cert. denied*, 419 U.S. 1027 (1974). The defendant bears the initial burden of showing that his interview statements are subject to *Garrity* protection. *See, e.g., D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 161 (2d Cir. 2002); *accord United States v. Stein*, 440 F. Supp. 2d 315, 327–29 (S.D.N.Y. 2006) ("*Stein I*").

There is no question in the Court's mind that Black was compelled, upon pain of losing his job, to sit for at least three, probably four, interviews with Paul Weiss. Ricciardi testified that the "choice" facing an employee asked to sit for an interview "is to cooperate or find new employment, basically[.]" (Trial Tr. at 1527:14-15.) Black has stated that "[he] did not believe that [he] had any choice but to agree to meet with Paul Weiss lawyers and answer their questions[,]" and that, "had [he] refused to do so, it would have resulted in [his] termination from Deutsche Bank." (Black Decl. ¶ 3.) And, as prominent practitioners have noted:

> [T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be, and the government knows all to [*sic*] well that it can then use its leverage over the company to compel the company to tell it what the employees say, even if that requires the waiver of the attorney-client privilege or work product doctrine.

Lowell & Man, *supra* at 2, 40 Geo. L.J. Ann Rev. Crim. Proc. at xiii n.75 (internal citation omitted). As a result, the only real issue for the Court to consider under *Garrity* is whether

Deutsche Bank's internal investigation—and, specifically, the investigatory steps it took with respect to Gavin Black—can be attributed to the Government.

Over the past three years, Black has mounted an increasingly persuasive case that Deutsche Bank's internal investigation, conducted by its outside counsel, Paul Weiss, was neither voluntary nor internal to Deutsche Bank.

The record, which is limited (the responsibility for which falls squarely on the Government), contains compelling evidence that Deutsche Bank's investigation is fairly attributable to the Government. Among other things, it suggests that the Government directed Deutsche Bank to investigate Gavin Black on its behalf. The Bank's first interview of Black was conducted at the behest of the Government. Although there is no evidence either way about whether the fruits of that interview were shared with the Government agencies investigating Deutsche Bank, it is plausible—if not likely—that they did, since the record reflects that Paul Weiss was eager to share information about Black's subsequent two interviews. Record evidence also establishes that, as Deutsche Bank's investigation progressed, the Government continued to discuss Black by name in meetings with Bank investigators. All of this occurred well before any representative of the Government made any effort to speak with Black; that did not occur until the fall of 2013, three and a half years after Deutsche Bank's "internal" investigation began.

Of course, it is not enough under *Garrity* that Deutsche Bank's investigation was *generally* fairly attributable to the Government. The Bank's interviews of Black must have been Government-engineered interviews. The evidence certainly points in that direction. There is no evidence suggesting that Black's interviews were conducted on some different footing than were the interviews of other Deutsche Bank employees. During the period when Paul Weiss

22

conducted the first three (of four) interviews of Black, the Government told Deutsche Bank whom to interview and when. It told Deutsche Bank to interview Gavin Black. Moreover, even as late as 2014—when the investigation was in its fourth year—the Government was still directing Paul Weiss's activities. When Paul Weiss wanted to interview Gavin Black on September 9, 2014, it sought the Government's permission to do so. (Dkt. No. 233-6 at DOJ-DB-KAST-0003459.) And the Government did not simply give permission; it directed an experienced Paul Weiss partner and former Assistant U.S. Attorney for the Southern District of New York on the precise manner in which he should ask his questions. (*See* Dkt. No. 233-4 at DOJ-DB-KAST-00003526–27 (instructing Roberto Finzi to "approach [an] interview [of Bank employee Michele Faissola] as if he were a prosecutor," given the concern that Paul Weiss "will put the key document to him and he will manufacture an explanation for it.").) For its part, rather than simply producing documents and providing interview summaries, Paul Weiss, in full (and understandable) aid of its client's (*i.e.*, Deutsche Bank's) interests, digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect should they finally interview Black on their own. Not surprisingly, when it came time to resolve its case against Deutsche Bank, the Government credited Paul Weiss for its extensive support of its own investigative efforts. (Deutsche Bank DPA ¶ 4(a).)

The only conclusion one can draw from this evidence is that, rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to Deutsche Bank—the original target of that investigation—and then built its own "investigation" into specific employees, such as Gavin Black, on a very firm foundation constructed for it by the Bank and its lawyers. This was no ordinary "outside" investigation. Deutsche Bank did not respond to the Government's subpoenas by turning over

documents without comment, and its employees were not subjected to government or regulatory depositions on notice, at which they were defended by company counsel. Indeed, Deutsche Bank did the opposite—it effectively deposed their employees by company counsel and then turned over the resulting questions and answers to the investigating agencies.

In other words, Paul Weiss did everything that the Government could, should, and would have done had the Government been doing its own work. The fact that the record contains very little evidence about the Government's own independent investigative efforts during the first three years of Deutsche Bank's "voluntary" investigation renders that inference all the more compelling—and means that the Government did not do enough (indeed, has not done much of anything at all) to rebut Black's contention that the actions of Deutsche Bank and Paul Weiss were fairly attributable to the Government within the meaning of *Garrity*.

For the past three years, the Government has had every opportunity to rebut this inference by demonstrating, at the very least, that it was conducting a parallel investigation into Deutsche Bank's LIBOR-setting practices. Not only has the Government not taken this opportunity to rebut that inference; it has explicitly refused to do so. In responding to Black's present motion, the Government stated:

> While the Court noted in its December 19, 2018 order that it anticipated that the Government would supply additional facts relevant to the issue of what the CFTC and DOJ did to investigate this case aside from receiving materials from Paul Weiss, the Government will not seek to supplement the record on this issue as, in this case and as discussed above, the issue of whether the DOJ or CFTC "outsourced their investigations" is not relevant or necessary to deny the Defendant's motion.

(Gov't's Kastigar Br. at 57.) This post-trial motion was the Government's opportunity to make its *Garrity* case. It certainly knew the Court was interested in the issue and was troubled by the fair implication of the evidence. Nonetheless, it chose to remain all but silent.

The Government points to the LIBOR-related interviews it conducted prior to the date of Gavin Black's first interview with Paul Weiss as proof that it conducted a meaningful investigation that ran parallel to the Bank's. (Gov't's Kastigar Br. at 7 (citing *id.* Ex. 11).) What the Government fails to mention is that those interviews—four in total—were conducted in connection with its investigation into *another panel bank.* (Gov't's Kastigar Br. Ex. 11 (identifying interviews of Barclays employees).) Their relevance to the issue of whether Deutsche Bank was used by the Government to discharge its own responsibility to conduct a parallel investigation is at best *de minimis.* Moreover, given the massiveness and complexity of the inquiry that was required of Deutsche Bank (let alone the other panel Banks whose activities were under review), the fact that the Government can point to just four such interviews is far more suggestive of outsourcing than it is of some genuine parallel Government investigation.

As additional proof of its own investigative efforts, the Government points to the fact that it conducted an additional twenty-two interviews before August 25, 2011, the date of Gavin Black's second interview with Paul Weiss. (Gov't's Kastigar Br. at 7 (citing *id.* Ex. 12).) Once again, the Government makes Black's point for him. Of those interviewed, none appear to have been employees of Deutsche Bank; these were interviews of employees at Barclays, UBS, Bloomberg, and the Bank of England. (Gov't's Kastigar Br. Ex. 12.) The 302s that the Government submitted in this case corroborate this sequence of events. They establish that the Government did not interview anyone at Deutsche Bank until late 2013—three and a half years after the Government first opened an investigation into the Bank.

Since the Government has refused to give the Court much of a window into its investigatory conduct prior to its receipt of the Paul Weiss White Paper, there is little evidence to support the Government's contention that it conducted a parallel investigation into Deutsche

Bank.[6]  Without the benefit of an evidentiary showing on the part of the Government, the Court

is left with this:  Deutsche Bank's investigation pretty much *was* the Government's investigation

until January 21, 2015, the date that Paul Weiss issued its White Paper.  The Government's

investigatory strategy up to that point was to let the Bank carry its water for it.

Having declined to offer much by way of evidence, the Government falls back on

strained legal and policy arguments that are not just unconvincing, but unworthy.

The Government (repeatedly) argues, for example, that Deutsche Bank could not have

shared a close enough nexus with the Government, because its fiduciary duty diverged from the

Government's, in that Deutsche Bank—as a public company—owed its duty to shareholders, and

Paul Weiss—as counsel to Deutsche Bank—owed a duty of loyalty to its client. (Gov't's

Kastigar Br. at 5–6, 38, 52, 53 & n.12.)  It is hard to take this argument seriously.

The Second Circuit noted in *Stein II* that, "The threat of [ruinous indictment] brings

significant pressure to bear on corporations, and that threat 'provides a sufficient nexus' between

a private entity's employment decision at the government's behest and the government

itself." *See Stein II*, 541 F.3d at 151 (citing Lisa Kern Griffin, *Compelled Cooperation and the

New Corporate Criminal Procedure*, 82 N.Y.U. L. Rev. 311, 367 (2007)).  According to

Ricciardi, Deutsche Bank was facing the threat of ruin, such that the only "choice" facing

Deutsche Bank when it received the CFTC's letter was the "level of cooperation" it would

provide to the Government—because not cooperating was not an option.  (Trial Tr. at 1499:8-

9.)  Viewed in that light, the CFTC's request that Deutsche Bank conduct a "voluntary"

investigation was a classic "Godfather offer"—one that could not be refused.  And Deutsche

---

[6]        We know that the Government interviewed Deutsche Bank witnesses, including Black (who proffered), in the fall of 2013—eighteen months before the White Paper was delivered but years after Paul Weiss reported on its first three Black interviews.

Bank's interest in cooperating was perfectly aligned with the Government's interest in outsourcing its investigative functions (if that is indeed what occurred in this case). This massive amount of pressure is highly relevant to any assessment of the sufficiency of the nexus between the Government and Deutsche Bank's "internal" investigation.

Of course, it is beyond cavil that Deutsche Bank had its own interests and responsibilities when it undertook to conduct the investigation that was "requested" by the CFTC. It is equally indisputable that Deutsche Bank was vindicating those purely private interests and responsibilities by cooperating with the Government to the uttermost. The same was also true in *Cromwell*, 279 F.3d at 163, and *United States v. Solomon*, 509 F.2d 863, 869 (2d Cir. 1975)—both cases in which non-governmental regulators (the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE"), respectively) required employees of member institutions to submit to interviews in connection with investigations they were undertaking.

The critical difference between this case and *Solomon* or *Cromwell* is that, in those cases, the NASD and the NYSE—the regulators, the entities that stood in the shoes occupied by the CFTC/SEC/DOJ here—were *actually conducting parallel investigations*. They asked their own questions; they did not have the interviewee's employer, the regulated firm that was under investigation, do so for them. *Cromwell*, 279 F.3d at 156–58; *Solomon*, 509 F.2d at 864–65. *See also Stein II*, 541 F.3d at 150 (quoting Lisa Kern Griffin, *supra* at 26, 82 N.Y.U. L. Rev. at 369 ("observing that *D.L. Cromwell* and *Solomon* 'turned in in large part on the fact that requests for interviews" were not "generated by governmental persuasion or collusion'").)

Nor does *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69 (2d Cir. 2016), dispose of Black's *Garrity* claim. *Gilman* differs from this case in one critical aspect: In that case, the

Second Circuit explicitly found, "There [was] no evidence that [the New York Attorney General] 'forced' Marsh to demand interviews, 'intervened' in Marsh's decisionmaking, 'steered' Marsh to request interviews, or 'supervised' the interview requests." *Id.* at 76. This Court cannot reach the same conclusion on the record before it. On the contrary, the limited record suggests that Deutsche Bank was told by the Government to conduct an investigation into a particular matter, to do so in a particular fashion, to interview particular people (including Black), to share its findings with the Government on a regular basis, and to carry out governmental investigative demands that were generated by its earlier efforts. Deutsche Bank, facing ruin, complied with the Government's directives in every particular.

Finally, the Government urges that the Court must not conclude that there was a sufficiently close nexus between it and Deutsche Bank, because doing so will hamper law enforcement by curtailing the Government's ability to encourage cooperation, which will prove a bad idea as a matter of policy.

The Court does not doubt that it saves the Government considerable time and precious resources to permit counsel for the target of an investigation to do the heavy lifting of ferreting out the truth—especially in a case like this one, which is so large, technical, and complicated. But this is a court of law, not a court of policy. The Court is not concerned with whether the outsourcing of investigations to private parties makes life easier for the Government or for the taxpayers; it is concerned with the protection of the defendant's constitutional right against self-incrimination, and so with the constitutional implications, if any, of such outsourcing. That concern trumps the Government's interest in convenience.

In conclusion, given the Government's deliberate choice not to create a record that would allow for a contrary finding, the record presently before the Court establishes that the

Government violated *Garrity*, because Deutsche Bank's interviews of Gavin Black, for which he was compelled to sit under threat of termination, are fairly attributable to the Government. *See Stein II*, 541 F.3d at 152 n.11.

The Court is fully aware that this ruling may have implications that extend well beyond this particular case. Were it of the slightest moment, I might even give the Government one more chance to acquit itself by demonstrating what it needs to demonstrate (assuming, of course, that the evidence that the Government declined to present to me would support its position).

But it would be a waste of this Court's time and resources to hold a full-bore *Garrity* hearing, because Black can only obtain the relief he seeks—vacatur of his conviction and dismissal of the indictment—if, as a result of any *Garrity* questions or otherwise, he is able to establish a *Kastigar* violation.

On this point, the record is considerably clearer and more complete. There was no *Kastigar* violation.

## B.    Black is Not Entitled to *Kastigar* Relief

Any use, direct or indirect, of a defendant's compelled statements is unconstitutional under the Fifth Amendment's self-incrimination clause. *Kastigar*, 406 U.S. at 453. Under *Kastigar*, the Government bears the burden of affirmatively proving, by a preponderance of the evidence, that "the evidence it proposes to use is derived from a legitimate source wholly independent of compelled testimony." *Id.* at 460. The Government's burden "is not limited to a negation of taint." *Id.* Rather, the Fifth Amendment's "total prohibition" on the use, or derivative use, of compelled testimony encompasses a range of impermissible "uses," including "obtaining [an] indictment" based on tainted evidence, *United States v. Hubbell*, 530 U.S. 27, 45 (2000); "preparing [the Government's case] for trial," *id.*; and presenting tainted evidence to the

grand jury. *United States v. Poindexter*, 951 F.2d 369, 377 (D.C. Cir. 1991) (internal citation omitted).

There is some uncertainty in the law about the precise breadth of *Kastigar*. In *United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973), the Eighth Circuit wrote that *Kastigar*'s prohibition "could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *Id.* at 311. The Second Circuit, while not explicitly rejecting this formulation, has instructed courts not to read *McDaniel* broadly. "To the extent that *McDaniel* can be read to foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial, we decline to follow that reasoning." *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988). In one case decided shortly after *Mariani*, the Second Circuit cited *McDaniel* with approval in warning against the "disquiet[ing]" effect of even "non-evidentiary use of [] compelled testimony." *United States v. Schwimmer*, 882 F.2d 22, 26 (2d Cir. 1989). But in *United States v. Rivieccio*, 919 F.2d 812 (2d Cir. 1990), the Circuit reaffirmed its holding in *Mariani*, saying that "merely tangential" non-evidentiary uses of compelled testimony do not violate *Kastigar*. *Id.* at 815 & n.3, *abrogation on other grounds recognized by United States v. Allen*, 864 F.3d 63, 99 (2017).

Reading *Mariani*, *Schwimmer*, and *Rivieccio* together counsels that, in this Circuit, the outer bounds of *Kastigar* are broad but not limitless.

Asking whether compelled testimony has only a "tangential"—and, thus, constitutionally inoffensive—effect on the government's case is not a self-defining inquiry. The Second Circuit has promulgated the following articulation to give courts guidance:

> In determining whether the immunized testimony could have influenced the government's decision to pursue its line of investigation, if it appears that that pursuit could have been motivated by both tainted and independent factors, the court must determine whether the government would have taken the same steps "entirely apart from the motivating effect of the immunized testimony."

*United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995) (quoting *United States v. Biaggi*, 909 F.2d 662, 689 (2d Cir. 1990)).

Having dispensed with the applicable legal standards, the Court ordinarily would turn to a *Kastigar* analysis. The Government, however, raises two threshold arguments for why there could be no *Kastigar* violation in this case.

### 1. *Kastigar* is Applicable to the Instant Case

*First*, the Government argues that *Kastigar* is inapplicable because the remedy for a *Garrity* violation is suppression, not use and derivative use immunity. It reasons that the sort of statements elicited in the *Garrity* context are akin to other custodial confessions elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The remedy for the latter is suppression; so too, the Government argues, should suppression apply to the former. (Gov't's Kastigar Br. at 40–45.)

The problem with the Government's argument is that an overwhelming body of law says that it is wrong—a fact that the Government fails to even acknowledge.[7] Numerous authorities, including courts in the Second Circuit, have concluded that immunity automatically follows when a public employer obtains statements from an employee under threat of termination in violation of *Garrity*.

This theory of *Garrity* first originated in *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of the City of N.Y.*, 426 F.2d 619 (2d Cir. 1970), *cert. denied*, 406 U.S. 961 (1972).

---

[7] The Court recognizes that some courts, including this one, have considered the remedy of suppression in response to pre-trial *Kastigar* motions.

There, the Second Circuit stated that when an employee is confronted with the threat of an adverse employment action for refusing to answer a question, "the very act of . . . telling the witness that he would be subject to removal if he refused to answer *was held to have conferred such immunity.*" *Id.* at 626 (emphasis added). In so concluding, the court reasoned that immunity under *Garrity* "followed from the very language of the Fifth Amendment," because "the threat of removal constitute[s] the kind of compulsion against which the constitutional privilege was directed." *Id.* at 624.

Even though *Uniformed Sanitation Men* predated *Kastigar*, several courts have found the Second Circuit's reasoning to be persuasive in a post-*Kastigar* world. For instance, the First Circuit has interpreted *Uniformed Sanitation Men* to mean that "testimony compelled by the threat of adverse employment action *automatically* triggers a grant of immunity under *Garrity*." *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 502 n.12 (1st Cir. 2007) (emphasis added). "Under the[] circumstances [of *Garrity*], no specific grant of immunity is necessary: 'It is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity.'" *Id.* at 502 (quoting *Gulden v. McCorkle*, 680 F.2d 1070, 1075 (5th Cir. 1982)); *see also United States v. Veal,* 153 F.3d 1233, 1239 n.4 (11th Cir. 1998), *overruled on other grounds by Fowler v. United States*, 563 U.S. 668 (2011) ("The Fifth Amendment protection afforded by *Garrity* to an accused who reasonably believes that he may lose his job if he does not answer investigation questions *is Supreme Court-created and self-executing; it arises by operation of law; no authority or statute needs to grant it.*") (emphasis added). In a subsequent decision, the First Circuit re-affirmed the principle that "*Garrity* immunity automatically attache[s]" where an employer makes a sufficiently clear and direct

threat that it will take an adverse employment action against a public employee. *United States v. Palmquist*, 712 F.3d 640, 646 (1st Cir. 2013).

Various other appellate courts—federal and state—have similarly concluded that a public employer's threat of adverse employment action operates as an automatic grant of immunity once the employee answers, meaning that the statements elicited from her are deemed "compelled testimony" and not merely involuntary or coerced confessions. *See, e.g., Aguilera v. Baca*, 510 F.3d 1161, 1177–78 (9th Cir. 2007); *Grand Jury Subpoenas Dated Dec. 7 & 8*, 40 F.3d 1096, 1102–03 (10th Cir. 1994); *United States v. Koon*, 34 F.3d 1416, 1433 n.13 (9th Cir. 1994), *rev'd in part on other grounds*, 518 U.S. 81 (1996); *In re Fed. Grand Jury Proceedings (FGJ 91-9), Cohen*, 975 F.2d 1488, 1490 (11th Cir. 1992) (per curiam); *Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 777 n.7 (4th Cir. 1995); *Confederation of Police v. Conlisk*, 489 F.2d 891, 895 n.4 (7th Cir. 1973); *Benjamin v. City of Montgomery*, 785 F.2d 959, 960–61 (11th Cir. 1986); *Hester v. City of Milledgeville*, 777 F.2d 1492, 1496 (11th Cir. 1985); *Nat'l Acceptance Co. v. Bathalter*, 705 F.2d 924, 928 (7th Cir. 1983); *Evangelou v. D.C.*, 901 F. Supp. 2d 159, 165 (D.D.C. 2012); *Hank v. Codd*, 424 F. Supp. 1086, 1087 (S.D.N.Y. 1975); *Carney v. City of Springfield*, 532 N.E.2d 631, 634 n.5 (Mass. 1988); *Spielbauer v. Cnty. of Santa Clara*, 199 P.3d 1125, 1131 (Cal. 2009); *Matt v. Larocca*, 518 N.E.2d 1172, 1174 (N.Y. 1987).

The Court sees no reason to depart from this body of law. It therefore rejects the Government's first threshold objection.

*Second*, the Government argues that *Kastigar* does not apply in this case, because Black's interview statements purportedly consisted solely of false exculpatory statements, *i.e.*, "false denials." (Gov't's Kastigar Br. at 55–56.) This argument proceeds in two parts: (*i*) that *Kastigar* does not contemplate immunity for false exculpatory statements, since such statements

33

are not part of what the Government bargains for when it grants immunity; and (*ii*) even if immunity could attach to false denials, such denials cannot be "used" within the meaning of *Kastigar*. (*Id.*)

Although these arguments are distinct, they fail for the same reason: they depend upon the incorrect legal premise that the privilege against self-incrimination does not apply to false exculpatory statements.

The applicability of the Fifth Amendment's privilege against self-incrimination does not depend upon the truth or falsity of an accused's statements. *See Rogers v. Richmond*, 365 U.S. 534, 544 (1961) (whether privilege against self-incrimination applies is "to be answered with complete disregard of whether or not [the accused] in fact spoke the truth"); *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 351 & n.10 (1963) (concluding that although the self-incrimination clause did not prohibit prosecutorial use of false statements made pursuant to a voluntary disclosure policy, "[a] quite different case would be presented if an offer of immunity had been specifically directed to petitioners in the context of an investigation, accusation, or prosecution" because "the truth or falsity of such a disclosure would then be irrelevant to the question of its admissibility."). This is so because "incrimination" under the Fifth Amendment is defined broadly so as to encompass not only "answers that would in themselves support a conviction . . . but likewise . . . those which would furnish a link the chain of evidence needed to prosecute the [defendant]." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). "Compelled testimony that communicates information that may 'lead to incriminating evidence' is privileged even if the information itself is not inculpatory." *Hubbell*, 530 U.S. at 38 (quoting *Doe v. United States*, 487 U.S. 201, 208 n.6 (1988)).

The foregoing principle applies with equal force in the *Garrity/Kastigar* context. As the Supreme Court stated in *Kastigar*, the Fifth Amendment privilege against self-incrimination "protects against any disclosures that the witness reasonably believes could be use in a criminal prosecution or could lead to other evidence that might be so used." 406 U.S. at 445. Immunity under *Kastigar* therefore turns, not on whether a defendant's statements were true, but the ways in which they influenced the Government's case. *See United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990) *opinion withdrawn and superseded in part on reh'g on other grounds*, 920 F.2d 940 (D.C. Cir. 1990) ("*Kastigar* addresses 'use,' not 'truth.'").

Indeed, courts have concluded that false compelled testimony is still susceptible to *Garrity* protection and, thus, potential immunity under *Kastigar*. *See Veal*, 153 F.3d at 1242; *United States v. Slough*, 677 F. Supp. 2d 112, 143 (D.D.C. 2009), *vacated on other grounds*, 641 F.3d 544 (D.C. Cir. 2011) (citing cases where false exculpatory statements still subjected to a *Kastigar* analysis).

Accordingly, despite the Government's contention to the contrary, false exculpatory statements may be "used" within the meaning of *Kastigar*. The Second Circuit expressly said so in *United States v. Hinton*, 543 F.2d 1002 (2d Cir. 1976). There, the court stated that the fact that immunized testimony consists of false denials "does not preclude the possibility of improper use against" a defendant, because there are situations in which their use would put the defendant in a less advantageous position than if he had chosen to remain silent. *Id.* at 1009. A false denial can be "'used' against [defendants] in the sense that" such denials might "provide[] the motivation for" cooperating witnesses to testify. *Biaggi*, 909 F.2d at 689. Exculpatory statements also might tip off a grand jury that a defendant's testimony is not credible. *See United States v. Cortese*, 568 F. Supp. 119, 131–32 (M.D. Pa. 1983).

35

This is not to say, however, that the fact that a defendant's statements consisted mostly of false denials is factually irrelevant.  On the contrary, courts have made factual findings that a defendant's false statements left prosecutors with nothing to "use."  *See, e.g., United States v. Gallo*, 863 F.2d 185, 190 (2d Cir. 1988); *United States v. Harloff*, 807 F. Supp. 270, 282 (W.D.N.Y. 1992).  But as a matter of law, the fact that a defendant's statements are false and exculpatory does not put them outside the ambit of *Kastigar*.[8]

The Court thus rejects the Government's second objection to a *Kastigar* analysis.

### 2.  Whether the Government Violated *Kastigar*

Black argues that, if the Government obtained his testimony in violation of *Garrity*, he is automatically entitled to *Kastigar* relief.  Specifically, he claims that the case against him was tainted, because, "As the Government concedes, Deutsche Bank and its counsel relied on their initial interviews with Mr. Black to gain an understanding of the LIBOR process, identify evidence, and develop investigative leads."  (Gavin Black's Second Partial Reply Mem. of Law in Supp. of *Kastigar* Relief ("Def.'s Kastigar Reply") at 2, Dkt. No. 424; *see also id.* at 12–13.)

The Court disagrees.

#### i.  Black's Theory of *Kastigar* Taint

A defendant who seeks *Kastigar* relief must first articulate the purported violation with enough specificity to permit the Government to respond.  This entails a showing that there is a

---

[8]       The Government's remedy for a defendant's making false exculpatory statements under a grant of immunity is not the abrogation of immunity—it is charging the defendant with perjury.  "[T]he ordinary remedy for the Government when an immunized witness lies or fails to cooperate fully is a prosecution for perjury or for contempt, rather than abrogation of the immunity agreement and use of the information truthfully given by the immunized witness to prosecute him for other offenses."  *United States v. Kurzer*, 534 F.2d 511, 518 (2d Cir. 1976) (citing *United States v. Tramunti*, 500 F.2d 1334, 1345 (2d Cir.), *cert. denied*, 419 U.S. 1079 (1974)); *see also McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005) ("As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation.  However, *Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it.").

"sufficient nexus between the immunized testimony and the federal prosecution." *United States v. Fuller*, 149 F. Supp. 2d 17, 26 (S.D.N.Y. 2001) (citing *United States v. Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991)); *see also United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998) (quoting *Kastigar*, 406 U.S. at 460) (must show that one's "immunized testimony 'pertained to matters related to the federal prosecution'"). Put otherwise, "The defendant is not entitled to a *Kastigar* hearing merely because he has, at some point in the past, provided *Garrity* statements." *United States v. Krug*, 198 F. Supp. 3d 235, 246 (W.D.N.Y. 2016) (quoting *Blau*, 159 F.3d at 72).

To be sure, the defendant's burden of articulation is not heavy. But it is still a burden. "[A]n insubstantial and speculative possibility of taint" does not trigger *Kastigar*. *Harloff*, 807 F. Supp. at 282. "[F]ailure to show the requisite factual relationship [is] sufficient to end the inquiry[.]" *Blau*, 159 F.3d at 72 (citing *United States v. Mariani*, 851 F.2d at 599–600).

The clearest articulation of Black's theory of taint is found in his final reply brief. There, he states, "As the Government concedes, Deutsche Bank and its counsel relied on their initial interviews with Mr. Black to gain an understanding of the LIBOR process, identify evidence, and develop investigative leads." (Def.'s Kastigar Reply at 2; *see also id.* at 12–13.) Indeed, as Black points out, the Government (in its customary careless fashion) unwittingly gave Black the fodder for his argument; in its opposition papers, the Government states:

> [D]uring the early stages of the internal investigation, Mr. Ricciardi and his team were still learning about LIBOR, and they were trying to figure out how the benchmark worked: "the process was initially we had no idea what we were doing, so we started talking to people about how did LIBOR work, how does the submission process work, who's involved with that, and we started talking to people involved with the process. And then we learned that there's also trading related to it, and we started interviewing traders."

> At the other end of the table sat Gavin Black, the well-educated, greatly experienced, and highly compensated career swaps trader at an elite bank who knew more about LIBOR, and the derivatives to which it was linked, than almost anyone else on the planet.

(Gov't's Kastigar Br. at 32–33 (citing Trial Tr. at 1485) (Ricciardi testimony).)  This passage indeed suggests—as Black's theory of taint so describes it—that Paul Weiss relied (at least in part) on Gavin Black to teach them about the LIBOR submission process, which, in turn, led to the collection of evidence that was used against him in his prosecution.

Following is the relevant excerpt of Ricciardi's testimony on direct examination:

Q. As part of that investigation, did you interview Deutsche Bank employees?

A. Yes.

Q. Did that include Gavin Black?

A. Yes.

Q. What was your purpose for interviewing Deutsche Bank employees?

A. Well, they're a public company, and I believe that as a responsible public company, they wanted to know if there was any wrongdoing going on, and, if so, take appropriate remedial steps and also cooperate fully with the government's investigations.

Q. Why did you—what brought you to interview Gavin Black specifically?

A. Well, the process was initially we had no idea what we were doing, so we started talking to people about how did LIBOR work, how does the submission process work, who's involved with that, and we started talking to people involved with the process. And then we learned that there's also trading related to it, and we started also interviewing the traders.

Q. Did the Department of Justice specifically ask you to interview Gavin Black?

A. No.

(Trial Tr. 1485:2-24.)

One way to read this testimony is that, contrary to Black's contention, Paul Weiss attorneys only spoke to Black after others educated them about the LIBOR submission process and pointed the firm in Black's direction.  If that is indeed what occurred, the distinction would be critical, because it lies at the very heart of *Kastigar*:  How the Government (in the person of

Deutsche Bank/Paul Weiss, which ultimately fed the Government its information) may have "used" Black's compelled statements against him.

But the Court concedes that an equally fair reading is the one supplied by Black (as aided by the Government): That Paul Weiss truly relied upon Black to educate its attorneys about the LIBOR submission process and develop investigatory leads. While this theory of *Kastigar* taint is not particularly compelling, it is still a cognizable theory of taint.

Given the minimal burden a defendant must shoulder to state a plausible *Kastigar* violation, *see, e.g., Harloff*, 807 F. Supp. at 282, the Court concludes that Black has articulated a sufficient nexus between his compelled interview statements to Paul Weiss and his prosecution such that his *Kastigar* motion may proceed forward. In other words, tie goes to the defendant.

However, that Black has stated a viable *Kastigar* claim does not automatically entitle him to a hearing on the matter. "[T]o be entitled to a hearing on whether immunized testimony" tainted the Government's case, "a defendant must lay a firm 'foundation' resting on more than 'suspicion' that this may in fact have happened." *North*, 920 F.2d at 949 n.9 (quoting *Lawn v. United States*, 355 U.S. 339, 348–49 (1958) (affirming lower courts' denials of defendants' request for a "full-dress hearing" to enable them to determine whether immunized testimony had tainted grand jury proceedings, because petitioners "laid no foundation" other than mere suspicion)); *see also Biaggi*, 908 F.2d at 689–90; *Harloff*, 807 F. Sup at 283 (citing cases).

As the Court told the parties in connection with Black's earlier *Kastigar* motion, "[N]othing in *Kastigar* suggests that the mere invocation of that word by a defendant compels the Government to try to prove a negative." (Dkt. No. 274 at 18.) That statement remains true today. The Court will not abide a full-on fishing expedition where a *Kastigar* motion can be resolved on the papers.

That is exactly the case here.

## ii.   The Government's "Use" of Black's Interview Statements

As stated earlier, the Fifth Amendment prevents the Government from making any use, direct or indirect, of a defendant's compelled statements. *Kastigar*, 406 U.S. at 453.  The Government must affirmatively prove by a preponderance of the evidence that the evidence it "used" was derived from a source that was "wholly independent" of Black's compelled testimony. *Id.* at 460.  Prohibited "uses" of compelled testimony include "obtaining [an] indictment" based on tainted evidence, *Hubbell*, 530 U.S. at 45; "preparing [the Government's case for trial," *id.*; and presenting tainted evidence to the grand jury. *Poindexter*, 951 F.2d at 377.  *Kastigar* does not, however, encompass "merely tangential" non-evidentiary uses of compelled testimony, *Rivieccio*, 919 F.2d at 815 & n.3, such as evidence that does not "influence[] the [G]overnment's decision to pursue its line of investigation." *Nanni*, 59 F.3d at 1432.

None of Black's interview statements was introduced into evidence at his trial.  In fact, the Government, in view of the looming *Garrity/Kastigar* issue, declined to call Ricciardi as a prosecution witness at the last possible moment—which it initially planned to do for the sole and exclusive purpose of getting Black's false denials before the jury, so the Government could argue that they were completely at odds with the literal text of his emails and chats.

Nor did the Government make indirect use Black's false exculpatory statements at trial. There is not a single item of trial evidence that would not have come in but for Black's interview statements to Paul Weiss.  Black does not identify, and the Court cannot find, a single question that was asked that otherwise would not have been asked.

In addition to the trial record (which is part of the Government's affirmative showing), the Government has produced 3500 material for every witness it called; that included notes from

every interview the Government itself conducted with those witnesses. None of that 3500 material contains any information indicating that the Government discussed or used Black's statements to Paul Weiss in any way in its dealings with its cooperators or other witnesses as it prepared them for trial.

The Government thus did not violate *Kastigar* at Black's trial.

The Government also did not make direct or indirect use of any of Black's interview statements before the grand jury. As found in the Court's Order Denying the Pretrial Motion of Defendant Gavin Black to Dismiss the Indictment for Alleged Violations of *Kastigar*, dated May 29, 2018, the Government identifies an independent source other than Black's interviews (whether with the UK FCA or with Paul Weiss) for everything that FBI Special Agent Jeffrey Weeks (the only grand jury witness) presented to the grand jury—either in the form of documents, cooperators, or information received from Deutsche Bank. (*See* Dkt. No. 274 at 7– 16.) Indeed, in connection with the Court's prior *Kastigar* opinion, the Court reviewed the Government's alternative source material for *every line* of grand jury testimony; all were accounted for, and none derived, directly or indirectly, from Black.

In this respect, Black's case is very different from the parallel Rabobank case, *United States v. Allen*, 864 F.3d 63 (2d Cir. 2017). There, the indictment was dismissed pursuant to *Kastigar* because the Government plainly presented evidence to the grand jury that could only have been derived from the defendants' UK FCA-compelled testimony. 864 F.3d at 100. The compelled testimony from defendants Allen and Conti was reviewed by Paul Robson, Allen and Conti's coworker, before Robson became a cooperator. The evidence demonstrated that Robson learned things from reviewing the defendants' compelled testimony that he had no other way of knowing. Robson was then debriefed by Special Agent Weeks, and gave Weeks information that

Robson had learned only from reading Allen's and Conti's compelled testimony, for which Weeks had no other source. Weeks then transmitted some of that information to the grand jury when the case was presented. This, the Second Circuit held, meant that Weeks had presented compelled testimony to the grand jury, which required dismissal of the indictment unless the Government could prove beyond a reasonable doubt the grand jury would have indicted Allen and Conti absent that testimony. The Government failed to meet its burden, and the indictment was dismissed.

Here, unlike in *Allen*, the Government learned about "the LIBOR submission process, identif[ied] evidence, and develop[ed] investigative leads" (Def.'s Kastigar Reply. at 2) from a variety of sources and using various methods—chief among them being Deutsche Bank itself and the assistance of the three cooperators. Deutsche Bank employees King, Curtler, and Timothy Parrieti provided Paul Weiss with all of the same information as Black did. To the extent Black's interview statements overlapped with the information they provided to the Government in preparation for grand jury proceedings, everything presented to the grand jury was sourced independently.

Finally, the Government did not make direct or indirect non-evidentiary use of Black's statements during its investigation in violation of *Kastigar*.

For one thing, even if the Court were to accept Black's theory of taint—that the Government relied on Paul Weiss' initial interviews with Black to gain an understanding of the LIBOR process, identify evidence, and develop investigative leads—those actions are the sort of "merely tangential" non-evidentiary uses that, according to the Second Circuit, do not violate *Kastigar*. *Mariani*, 851 F.2d at 600; *accord Rivieccio*, 919 F.2d at 815.

For another, it bears repeating that anything that the Government (through Deutsche Bank or Paul Weiss) heard from Black about the matters underlying his prosecution was told to it by untainted cooperators and documents provided directly from Deutsche Bank, including Black's messages. In view of that evidence, there is no doubt that the Government would have indicted Black, even if he had remained silent and refused to talk to Paul Weiss.

Finally, it appears that, during his October 2013 proffer session with Government lawyers, Black told the Government everything that he told Paul Weiss. (*See* Gov't's Ex. 3500 MM-2.) During his proffer, Black discussed LIBOR and how it affected his work; he explained certain seemingly incriminating emails as either being jokes or proper discussions of "market color" with colleagues; and he flatly denied any wrongdoing. (*Id.*) Accordingly, any investigatory leads that the Government may have derived from Black's compelled statements to Paul Weiss were independently sourced.

The Government did not violate *Kastigar*.

### iii.  Harmless Error

Even assuming that the Government violated *Kastigar*, any such *Kastigar* violation would constitute harmless error.

As the Second Circuit recently instructed, even where the government fails to establish by a preponderance of the evidence that it did not use a defendant's immunized testimony, a court may not vacate or reserve a conviction where the error was harmless. *Allen*, 864 F.3d at 97. The Government bears the burden of proving that the error was harmless beyond a reasonable doubt. *Id.*; *Nanni*, 59 F.3d at 1443; *United States v. Gallo*, 859 F.2d 1078, 1082–84 (2d Cir. 1988); *Poindexter*, 951 F.2d at 377; *United States v. Serrano*, 870 F.2d 1, 16 (1st Cir. 1989); *United States v. Byrd*, 765 F.2d 1524, 1529 n.8 (11th Cir. 1985); *United States v. Beery*, 678 F.2d 856, 860 n.3, 863 (10th Cir. 1982). For purposes of harmless error analysis,

inferences are not drawn in favor of the Government. *See United States v. Mejia*, 545 F.3d 179, 199 n.5 (2d Cir. 2008).

"Where . . . immunized evidence emerges early in the investigation, the court must determine whether the government 'would have taken the same steps entirely apart from the motivating effect of the immunized testimony.'" *United States v. Ponds*, 454 F.3d 313, 328 (D.C. Cir. 2006) (quoting *Nanni*, 59 F.3d at 1433). "The government cannot escape its error simply by showing the availability of 'wholly independent' evidence from which it *might* have procured indictment or convictions had it not used the immunized testimony." *United States v. Pelletier*, 898 F.2d 297, 303 (2d Cir. 1990) (emphasis added). Instead, it must demonstrate that the prosecution would have been vigorously pursued, and the same investigative steps taken, had the government not relied on immunized material. *Ponds*, 454 F.3d at 329–330. If, in light of evidence obtained from independent sources, *Kastigar* evidence was "so unimportant and insignificant and has so little, if any, likelihood of having changed the result of the proceeding[,]" it "may be deemed harmless." *Id.* at 329 (quoting *Gallo*, 859 F.2d at 1082) (internal quotation marks and alterations omitted).

The Government has persuaded the Court that any improper use of Black's compelled statements was harmless. As should be readily clear to the parties by now, the Court—having sat through a lengthy trial and reviewed the evidence on numerous occasions—does not doubt that Black would have been indicted and convicted even if Paul Weiss lawyers had never spoken to him. The evidence that the Government obtained against Black from its many independent sources was overwhelming.

Moreover, Black's primary theory of *Kastigar* taint—that Paul Weiss (in the person of the Government) relied upon Black to teach it about LIBOR—lends itself to finding harmless

44

error. If, as Black speculates, Paul Weiss indeed relied upon him to educate the firm about LIBOR, that reliance is simply "too insignificant and has so little, if any, likelihood of having changed the result of th[is] proceeding[.]" *Ponds*, 454 F.3d at 329 (quoting *Gallo*, 859 F.2d at 1082). Certainly, Paul Weiss—a sophisticated, multinational law firm—could have turned elsewhere, within Deutsche Bank and outside of it, to learn about how USD LIBORs were set. The record plainly reveals that it did so.

Once again, this case is a far cry from *Allen*. There, the Second Circuit had "no trouble concluding that [the Government's] error was not harmless beyond a reasonable doubt," since Robson testified to damning information at trial and supplied "essential" tainted information to the FBI agent who presented the case to the grand jury. *Allen*, 864 F.3d at 97–98, 100. Here, by contrast, the Government did not offer Black's statements to Paul Weiss at trial or to the grand jury.

Indeed, this case is much closer to *Gallo*, whose reasoning is instructive even if the facts are dissimilar.

In *Gallo*, the defendant's immunized grand jury testimony had been used inadvertently to support a wiretap application. This grand jury testimony had been given in 1980 and related to events that occurred in the 1970's. The defendant was indicted and charged with crimes that occurred between 1981 and 1983. The defendant moved to dismiss the indictment or, in the alternative, to suppress evidence on the grounds that his immunized 1980 grand jury testimony was used to develop evidence that led to his indictment for crimes he committed after this testimony was given. The Government argued that because the crimes committed by the defendant occurred after he gave his immunized testimony, the use of that testimony in securing

the indictment and his conviction violated neither the Fifth Amendment nor the immunity statute. *Gallo*, 859 F.2d at 1081.

In an opinion authored by Judge Winter, the court determined that, even though the Government violated *Kastigar*, that violation was harmless, because it "had no effect on the course of events leading to his indictment and conviction." *Id.* at 1082. "While it is of utmost importance that the government respect and scrupulously observe restrictions on the use of immunized testimony, I see no reason to set aside an otherwise valid conviction because of an error that had no effect on the course of events." *Id.* at 1084. The case against the defendant was "not a borderline case," *id.* at 1083; the defendant's immunized testimony "was of negligible significance . . . in light of independent evidence" coming from "reliable FBI informants other than appellant, and from direct surveillance." *Id.* at 1082–83.

In so concluding, the court "bolstered" its "analysis" by analogizing the case to *Murray v. United States*, 487 U.S. 533, 108 (1988), a Fourth Amendment case in which the Supreme Court held that the "independent source" doctrine permits the admission of evidence initially discovered during an unlawful search but later obtained independently from lawful activities. "The *Murray* holding clearly is apposite to the instant case, where neither the government's decision to seek the expanded wiretap order nor the judge's decision to grant it was affected by the use of the small portion of immunized testimony." *Id.* at 1084.

As in *Gallo*, Black's interview statements "had no effect on the course of events leading to his indictment and conviction." *Id.* at 1082. As stated numerous times, the Government's case against him was strong. It depended, not on any investigatory lead derived from Black's Paul Weiss interviews, but rather on his incriminating messages and the testimony of cooperators—none of which was tainted. Moreover, Black's decision to proffer, in which he

apparently told the Government everything that he told Paul Weiss, is akin to the situation described in *Murray*: The Government may have initially obtained evidence in violation of his constitutional rights, but later obtained the same evidence through perfectly lawful means. In a case like this, the Court shares Judge Winter's sentiment—there is "no reason to set aside an otherwise valid conviction because of an error that had no effect on the course of events." *Id.* at 1084.

For all the reasons discussed above, Black's motion for *Kastigar* relief is denied.

### C.   The Court Will Not Revisit its Earlier *Kastigar* Decision Regarding Black's UK FCA Testimony

Black also moves for *Kastigar* relief on the basis that compelled statements to the UK FCA, which conducted a parallel investigation into LIBOR manipulation, possibly tainted the Government's case against him.

This issue was the subject of a prior *Kastigar* motion. After conducting an evidentiary hearing and holding oral argument on the matter, the Court denied Black's earlier *Kastigar* motion, because it concluded that Black's UK FCA testimony did not taint the Government's presentation of evidence to the grand jury. (*See* Dkt. No. 274.)

Now, Black asks the Court to revisit its earlier *Kastigar* ruling in light of new revelations about the close relationship between various Government entities and Deutsche Bank while the Bank conducted its "internal" investigation. Black posits that Deutsche Bank may have collected certain evidence as a result of what it learned from the UK FCA while the two (plus counsel) were interacting during the regulator's investigation. Since Deutsche Bank ultimately provided the Government with much of the evidence it used at trial, the Government, Black argues, now must affirmatively prove that none of the evidence it used was based on Black's UK FCA testimony or anything derived therefrom.

The Court declines Black's invitation to revisit its earlier *Kastigar* decision. Black's motion is nothing more than a second lunge at the apple. It rests on a singular contention: That the interactions between Deutsche Bank (and its counsel) with the UK FCA may have tainted the Government's case. But this contention is mere conjecture. Black is well aware of the contents of his own compelled testimony, yet he has failed to point to a single example of evidence introduced at trial that was purportedly tainted by his UK FCA testimony. As the Court instructed in its earlier *Kastigar* hearing, "[I]n the absence of a much stronger and more plausible showing of possible taint than Black has been able to mount to date, the [C]ourt does not anticipate engaging in this exercise again." (Dkt. No. 274 at 18.) Black's showing is no more plausible today than it was last year. Thus, the Court sees no reason to engage in the same exercise that consumed it last year.

Moreover, the record on which the Court ruled in Black's earlier *Kastigar* motion sufficiently addresses the issue of taint through Deutsche Bank or its counsel. As the declarations of Patrick Meaney on behalf of the UK FCA and Louise van der Straeten on behalf of the United Kingdom's Serious Fraud Office ("UK SFO") make clear, the UK FCA and the UK SFO provided Gavin Black's compelled testimony to a limited list of recipients, none of whom worked for Deutsche Bank or its counsel. (*See* Dkt. No. 170 Exs. 1–2.) These affidavits also make clear that, under United Kingdom law, it is a crime to share confidential compelled testimony without taking certain steps to ensure its confidentiality. (*Id.* Ex. 1 ¶ 8, *id.* Ex. 2 ¶ 4.) This sworn testimony, coupled with the law governing the confidentiality of Black's compelled UK FCA testimony, establishes that Deutsche Bank and its counsel did not receive Gavin Black's UK FCA-compelled testimony or a summary thereof from either the UK FCA or UK SFO.

Black's request that the Court either dismiss the indictment or hold another *Kastigar*

hearing examining whether his UK FCA testimony tainted the Government's case is denied.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Black's motion for *Kastigar* relief.  The

Clerk of Court is respectfully requested to close the open motion at Dkt. No. 394.

This constitutes the decision and order of the Court.

Dated:  May 2, 2019

_____

Chief Judge

BY ECF TO ALL PARTIES