JAO7CONS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          16 Cr. 370 (CM)

MATTHEW CONNOLLY
and GAVIN CAMPBELL BLACK,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 24, 2019
                                        10:30 a.m.


Before:

                    HON. COLLEEN MCMAHON

                                        District Judge


                        APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   MICHAEL KOENIG
      CHRISTINA BROWN
      ALISON ANDERSON
      KATHRYN HOLBROOK
      CAROL SIPPERLY
      Assistant United States Attorneys

KENNETH BREEN
PHARA GUBERMAN
      Attorneys for Defendant Matthew Connolly

SETH LEVINE
SCOTT KLUGMAN
MIRIAM ALINIKOFF
      Attorneys for Defendant Gavin Campbell Black

1           (In open court)

2           THE COURT:  Good morning.

3           (Case called)

4           MR. KOENIG:  Good morning, your Honor.  Michael Koenig

5      on behalf of the United States.  With me is Christina Brown,

6      Alison Anderson, Kathryn Holbrook and Carol Sipperly.

7           THE COURT:  Good morning.

8           MR. BREEN:  Good morning, your Honor.  Ken Breen and

9      Phara Guberman on behalf of Matt Connolly, who is with us here

10     in court today.

11          THE COURT:  Good morning.

12          MR. LEVINE:  Good morning, your Honor.  Seth Levine

13     and Scott Klugman and Miriam Alinikoff on behalf of Mr. Black,

14     and Mr. Black is here with us today.

15          THE COURT:  Good morning.

16          This matter is on for sentencing under docket number

17     16 Cr. 370, United States of America v. Matthew Connolly and

18     Gavin Campbell Black, Mr. Connolly having been found guilty of

19     one count of conspiracy to commit wire fraud and bank fraud and

20     two counts of wire fraud, all are class B felonies, carrying

21     statutory maximum penalties of 30 years' imprisonment, five

22     years' supervised release, $1 million fine and a mandatory $100

23     special assessment; Mr. Black having been found guilty of one

24     count of conspiracy to commit wire fraud and one count of wire

25     fraud, those crimes being class B felonies and carrying the

JAO7CONS

1   same statutory maximum penalties.

2           In connection with today's proceedings I have received

3   and reviewed the following, I have laid it out all very

4   carefully:  Presentence investigation reports prepared by

5   United States Probation Officer Johnny Kim for Mr. Connolly.

6   That's document 438 on the docket, filed on September 24, 2019;

7   and for Mr. Black, document number 437 filed on September 23,

8   2019.

9           In connection with Mr. Connolly, I have a sentencing

10  memorandum on behalf of Mr. Connolly.  Exhibits A through L to

11  that sentencing memorandum are letters from members of his and

12  his wife's family.  Exhibits M and N are letters from the Paul

13  Hastings law firm to Mr. Kim concerning the objections to the

14  PSR, as to which I will rule shortly.

15          I have a sentencing memorandum from the United States

16  regarding defendant Matthew Connolly.  There are as exhibits to

17  that sentencing memorandum Exhibit A, a document authored by

18  Mr. Connolly; Exhibit B, a declaration of Special Agent Michael

19  McGillicuddy, and there is attached to that an exhibit, Exhibit

20  1, which is document 446-2.  I asked for a modification of that

21  exhibit, and I received that, and I'm going to call that

22  Exhibit 1A to Agent McGillicuddy's affidavit, and I have that

23  as well.  Exhibit C is the plea agreement of someone I never

24  heard of until yesterday named Takiyuki Yugami.  Exhibit D are

25  his 80-plus page sentencing minutes before Judge Rakoff.

JAO7CONS

1    Exhibit 5 are the sentencing minutes of Mr. Parietti.

2              In connection with Mr. Black, I have received a number

3    of memoranda:  A sentencing memorandum from the firm of Levine

4    & Lee.  By my count Exhibit 1 consists of 45 letters -- I may

5    have miscounted the number of blue pages -- but at least 45

6    letters, many of them two, three or four pages long from

7    family, friends, coworkers, his parents, his in-laws in New

8    Zealand and his wife.

9              There is also a declaration of Seth Levine in support

10   of Mr. Black's sentencing memorandum, and attach thereto are

11   Exhibits A through Q.

12             In addition, Mr. Levine submitted a submission

13   regarding the applicable sentencing guidelines and a

14   declaration of Mr. Levine in support of that, together with

15   Exhibits A, B, C, D and E.

16             I have a letter received October 22 and filed under

17   seal concerning certain nonpublic matters.

18             I have received in response to my inquiry from the

19   government a letter dated October 21, 2019 and a follow-up

20   e-mail dated October 22, 2019 regarding the prisoner transfer

21   program.  I have also reviewed my own research on the subject,

22   including a document called Guidelines for the Evaluation of

23   Transfer Requests Submitted by Foreign Nationals that we found

24   on the Internet; a transfer inquiry and review document that we

25   found on the Internet; and a document from the law offices of

JAO7CONS

1    Alan Ellis in San Francisco and New York that describes that

2    program.

3              In addition and with respect to both defendants, I

4    have reviewed some rather more salient sentencing minutes from

5    the Rabobank case, Judge Rakoff's sentencing of Messrs. Allen

6    and Conti from Mr. Stewart.  I have rereviewed the presentence

7    report of Mr. Curtler and reviewed for the first time of

8    Mr. Parietti.  I have consulted a number of portions of the

9    transcript and exhibits that were introduced during the course

10   of the trial.

11             Is there anything else I should have received in

12   writing prior to today's proceedings from the government?

13             MR. KOENIG:  No, your Honor.

14             THE COURT:  From Mr. Connolly?

15             MR. BREEN:  No, your Honor.

16             THE COURT:  From Mr. Black?

17             MR. LEVINE:  No.  Thank you, your Honor.

18             THE COURT:  Thank you.

19             Has the government reviewed the presentence report?

20             MR. KOENIG:  We have, your Honor.

21             THE COURT:  Any additions, deletions or corrections?

22             MR. KOENIG:  Yes.  These are in connection to our

23   reducing the number of requests that we originally told

24   probation about.

25             THE COURT:  I'm working with the number 130.

JAO7CONS

1          MR. KOENIG:  Yes, yes, but the number became 130 after

2     the probation --

3          THE COURT:  Yes, I understand that, but I'm working

4     with the number 130.

5          MR. KOENIG:  OK.  And then it changes also the

6     intended loss.

7          THE COURT:  Oh, there are a lot of changes.  Believe

8     me, there are a lot of changes.

9          MR. KOENIG:  That's everything.

10          THE COURT:  OK.  Mr. Breen, have you reviewed the

11     presentence report and gone over it with your client?

12          MR. BREEN:  Yes, your Honor.

13          THE COURT:  I will be hearing argument and will be

14     reviewing the PSR, and I'm obviously going to make rulings on

15     some objections.

16          Same question to you, Mr. Levine.  Have you reviewed

17     it and gone over it with your client?

18          MR. LEVINE:  I have, your Honor.  Thank you.

19          THE COURT:  I have a specific question that I want to

20     ask before we get into this, and that is with respect to Agent

21     McGillicuddy's chart.

22          Am I correct that on page 2 -- by the way, I'm working

23     with the chart that has the number I asked to be added to the

24     end.

25          MR. KOENIG:  Yes.

JAO7CONS

| | |
|---|---|
| 1 | THE COURT:  Am I correct that the sixth entry on -- |
| 2 | the fifth and sixth entries actually -- the sixth and seventh |
| 3 | entries on this chart relate to Exhibit 7-001 and deal with a |
| 4 | count of acquittal as to Mr. Connolly, namely Count Ten? |
| 5 | MR. KOENIG:  Yes, your Honor. |
| 6 | THE COURT:  Thank you.  Am I correct that the entry on |
| 7 | the next page, the third page, the third entry dated 9/26/2007 |
| 8 | relating to Exhibit 7-001, deals -- I'm sorry -- the first |
| 9 | one -- the first one deals with Count Eight; is that correct? |
| 10 | MR. KOENIG:  On page 3? |
| 11 | THE COURT:  Page 2.  Let's go to page 2.  The entry is |
| 12 | dated 9/26/2007. |
| 13 | The first page the first entry is 2/21/2005.  The |
| 14 | second page the first entry is 8/12/2007.  The third page, the |
| 15 | first entry is 10/18/2007.  The third page, the first entry is |
| 16 | 9/25/2008. |
| 17 | Let's just go to the first page.  The first page, |
| 18 | about two thirds of the way down there is an entry dated |
| 19 | 7/20/2006 and the relevant exhibit is 8-001.  Am I correct that |
| 20 | that relates to Count Eight, a count of acquittal of |
| 21 | Mr. Connolly? |
| 22 | MR. KOENIG:  Yes. |
| 23 | THE COURT:  And am I correct that the entries dated |
| 24 | 9/26/2007, Exhibit 7-001, relate to Count Ten, a count of |
| 25 | acquittal of Mr. Connolly? |

JAO7CONS

1          MR. KOENIG:  Yes.

2          THE COURT:  Thank you.  I just wanted to clear that

3     up.

4          OK.  So, I think the logical thing to do is to hear

5     the defendants' objections to the presentence report and to

6     hear the government's response to that first.  And I will start

7     with Mr. Connolly and then Mr. Black.

8          MR. BREEN:  Your Honor, we have a myriad of

9     objections.

10         THE COURT:  Yes, I know.

11         MR. BREEN:  But I will cut to the chase.  We think

12    that the nature and circumstances of the offense are atypical

13    given that there was open and pervasive conduct, no steps to

14    conceal and no profit demonstrated by Mr. Connolly.

15         THE COURT:  I should say you can rest assured I have

16    been immersed in the arguments that you've made in writing,

17    both of you, just so you know that.  That said, you may say

18    whatever you want.

19         MR. BREEN:  Well, I will reference the discussion we

20    had on the loss amount.  The loss amount is completely

21    incalculable.  It completely ignores how swaps work in the

22    market, how swaps are meant to offset risk, and the zero sum

23    game is just a ridiculously ill-informed way of describing a

24    swap, because most of the market that is in swaps is derisking.

25    And you heard that from every witness who talked about why they

JAO7CONS

hedged, what is hedging the market.  And the simplistic

argument that if somebody has hedged, that that loss was passed

down the line to somebody else makes no sense and is not

something that could be used here, because that victim of

somebody down the line, they haven't shown that it wasn't

Deutsche Bank who eventually was the one who isn't in a

completely hedged position, or any of the other banks that have

pled guilty to manipulating LIBOR.  They haven't proved any

loss.  The numbers that they prove is a methodology that's

completely made up, I mean based on numbers that --

THE COURT:  They usually are in these kinds of cases,

Mr. Breen.

MR. BREEN:  Right.  But usually there is actual data

that is trustworthy, that the government didn't say itself that

we couldn't use it because it was so not trustworthy, and then

they turn around and use it themselves, which is what they did.

Usually it's not a situation where there is a presumption that

every submission that they say was an ask was moved from a

reasonable range or moved from a number that would be a real

supportable number to something else.  No testimony at all in

the case from any of the cooperators or anybody else whether

the submission moved, whether or not the fixing moved.

They proved nothing.  They didn't prove victims

either, right?  How do you prove -- the victims they presented

in the indictment weren't the same victims that they presented

JAO7CONS

1    at trial, aren't the same victims that they presented in

2    sentencing.  Again, you know, presenting victims, they

3    acknowledge at Mr. Parietti's sentencing hearing that in order

4    to determine a real loss or an actual loss you would have to

5    figure out their hedging position.  Well, of course, the whole

6    case has been about that.

7              So, there shouldn't be any ten victims.  They proved

8    zero victim, zero loss.  The idea that Matt Connolly is a

9    supervisor and deserves an enhancement for that is

10   preposterous.  First, given the active role he played,

11   supervisor only in name, not supervising to Parietti, who made

12   more money than him always, who was a managing director when

13   Matt wasn't, Matt not even being a trader but in name being on

14   the desk.

15             So, not only that, fact specific to Matt Connolly, but

16   you look at the government's position they took with Curtler,

17   Mr. Curtler was a supervisor of a submissions desk and

18   supervised Mr. King and really was the kingpin of the entire

19   submissions situation that was happening in London.  I mean

20   they can't take a position that is so disparate and say that

21   Mr. Curtler was not a supervisor but Mr. Connolly is.

22             THE COURT:  Well, they can, but I might not find it

23   very appealing.

24             MR. BREEN:  Right.  And because they took that

25   position and that's the sentence, you know, if you were to

JAO7CONS

sentence Mr. Connolly with that enhancement, it would be

disparate, and that's something that the guidelines seek to

avoid.

        With regard to intended loss, they assume with the

loss number that every loss was intended.  But how is the loss

intended if you thought the other side was hedged, like 99

percent of the marketplace?

        We didn't present it at trial, but we heard from our

expert that 99.9 percent of the risk in the market -- in the

spot market -- dissipates by hedges if you take .01 percent.

        Abuse of trust?  Abuse of truss is not an enhancement

that should apply.  I mean that's something that usually

applies in the fiduciary context, not in a situation where you

have you a counterparty.  I haven't seen any authority that

says that they have a fiduciary duty to a counterparty in a

trade, to Deutsche Bank?  Abuse of position of trust?  Deutsche

Bank pled guilty here -- I'm not sure -- and paid enormous

fines.  I'm not sure there is a fiduciary duty to a bank that

knew about it, put everything in place, had no rules against

it, encouraged the spot desk to sit next to the money market

desk.  There is just no enhancement there.

        Abuse of trust to BBA?  They had no rules until after

Matt Connolly left the bank voluntarily.  I'm not sure how that

could ever form any kind of relationship -- fiduciary or

otherwise -- that could be abused by what happened here.

JAO7CONS

1          None of those enhancements should apply.  There

2     shouldn't be any loss amount that is on top.

3          I missed one:  Activity happened in a foreign

4     jurisdiction.  An enhancement that's based around the idea that

5     when people move their operations offshore to avoid detection,

6     that that's an enhancement at sentencing.  There was no moving

7     anything offshore.  The LIBOR desk was always in London.  You

8     know, that enhancement and several other enhancements are

9     already baked into the base offense, and there can't be

10     enhancement for that reason.

11          Your Honor, you heard all about this case and Matt

12     Connolly's role, three or four e-mails.

13          THE COURT:  Can we limit right now to the objections

14     to the PSR?  Because I want to rule on those.  And then I will

15     give you an opportunity to argue the other stuff on behalf of

16     your client.

17          MR. BREEN:  Just a final point then on loss amount.

18          THE COURT:  Thank you.

19          MR. BREEN:  The jury acquitted on the Parietti-related

20     accounts.

21          THE COURT:  Yes, it did.  Indeed it did.

22          MR. BREEN:  And that was very significant.

23          THE COURT:  It was to me.

24          MR. BREEN:  He had a side agreement.  You know, the

25     government is making an appeal to try to aggregate the Court

JAO7CONS

1    about Mr. Connolly.  They're taking a position that's not -- on

2    all these issues -- that's inconsistent with Mr. Parietti's and

3    Mr. Curtler's positions, and they shouldn't be allowed to do

4    that.  They told Judge Engelmayer that they wouldn't, but

5    they're doing it anyway.  Thank you.

6              THE COURT:  OK.

7              Mr. Levine, are you arguing for Mr. Black?

8              MR. LEVINE:  Yes, your Honor, thank you.

9              With respect to our objections to the guidelines, we

10   have, as you know from our papers, several primary objections:

11             First, the loss calculation.  The loss calculation, we

12   believe that the government -- the intended loss, I should

13   say -- should be disregarded entirely because it is purely

14   speculative and without basis.

15             We start first with the government's main witness, Mr.

16   Curtler, who said at sentencing, in his submission, that the

17   methodology was "absurd" and ignored -- I'm summarizing -- the

18   realities of the market.  If Mr. Curtler, as he has been, is to

19   be credited, he should be credited here as well because in this

20   matter he is entirely right that this methodology bears no

21   relationship to any kind of reasonable methodology that could

22   achieve a number that's reasonable.

23             Now always in complex cases, complex financial cases,

24   you have to make an analyses which involve all kinds of

25   sophisticated means of looking at data, and estimating, and

JAO7CONS

1    making the best judgment you can make.  Protection cannot be

2    the enemy of good.  But here, your Honor, you don't have it.

3    What you have is a methodology that literally counts only a

4    counterparty's losses and not their wins.  So, I think what you

5    end up having is not only are you disregarding the hedging but

6    you're also disregarding the realities of that counterparty

7    over these days.

8         We think that this methodology is so flawed that it

9    really has no providence at all, and I think we're prepared

10   certainly to present on that extensively and go through all of

11   the reasons -- I put them in our brief -- but let me just talk

12   about another piece of it from this chart.  Because what the

13   chart says, your Honor, if you look at it, is that after ten

14   years and dozens of banks paying money, and lots of banks doing

15   whatever the government told them to do, and all of the

16   analysis, after all of this and this trillion dollar scandal

17   that they talked about, their best estimate is $4 million on

18   the intended loss on the whole thing.  But, as the Court knows,

19   the intended loss calculation doesn't work that way; it has to

20   be intended loss of this man.  And if you take their chart and

21   you just break it down, what you find out, your Honor, is that

22   the portion -- there are 16 instances --

23        THE COURT:  I've done the math.

24        MR. LEVINE:  I know you have.  I have a chart I can

25   show to you if you want, but I don't think it was necessary

JAO7CONS

1  because I knew you had done it.

2          What it shows is the $166,000.  So, we stand here

3  today talking about intended loss, and I'm going to say so it's

4  clear four the record, the intended loss calculation here is

5  literally absurd, so as far as I'm concerned I am now through

6  the looking glass.  But even in Wonderland.

7          THE COURT:  Got it.  You thought you were there for a

8  long time, Mr. Levine.

9          MR. LEVINE:  Yes.  But let's talk about the internal

10  logic of what they've done.  16 instances.  And if you notice,

11  Judge, on their chart, as I know you've seen, there are these

12  dashes sometimes.

13          THE COURT:  I assume that means no intended loss.

14          MR. LEVINE:  Yes.

15          THE COURT:  That's what I assume that means.

16          MR. LEVINE:  I take it that way.  And while we can't

17  know exactly how they did this, based on our efforts I'll tell

18  you that's what it means.

19          What is interesting for Mr. Black -- since we're

20  talking about intended loss -- of the 16 instances, four of

21  them, 25 percent have no loss.  OK?  So if we cherrypick in --

22  they've cherrypicked the ripest cherry possible.  But even if

23  you were going to give them their rate, they have a 25 percent

24  miss rate after ten years.  So 25 percent of them, including

25  exhibits they presented at trial, they cannot show even now

JAO7CONS

1    that there was any intention to create any loss.

2           So, this case is now about $166,000, and 25 percent

3    rate is zero.  OK.  Well, what happens if one looks at the

4    counterparties that are the losses that are represented and

5    just says over the 16 days that they say Mr. Black should be

6    held accountable, what happens if you just take their gains or

7    losses for those 16 days and net them, just the counterparty?

8    We've done just the counterparties who we believe these losses.

9    The number drops to 80,000.

10          Now, they claim that you should assume a one basis

11   point adjustment which translates to an eighth of a basis

12   point.  That's wrong, because again Mr. Curtler didn't testify

13   to that.  He said maybe a half, and there is a question of what

14   happens after the financial crisis.  I will footnote financial

15   crisis for a second because let's forget about that for a

16   second.  And about 125 or so of these are before the crisis.

17   So, it's half a basis point.  Now the 80 is somewhere around

18   $40,000.

19          So, if we're going to take this seriously -- and I

20   don't think you should because I think this is madness -- but

21   that's fine.  If you're going to take them seriously, the

22   intended loss on this chart should be at the most 40 grand.

23   It's still more than it should be, but it's $40,000.

24          Frankly, if you add up all the gains and losses of all

25   the counterparties on Gavin's days, not just the counterparties

JAO7CONS

1  who papered a loss, it gets down to about $25,000, and if you

2  cut that in half it's $12,000.

3          So, my point to you, your Honor, is you have something

4  that is flawed.  But even on the "this is the best they can do"

5  model, what it reflects, I think, is something very profound,

6  that even under the government's best view of this case, after

7  the many miles we've walked together on this, we're talking

8  about a case that's between zero and $166,000; and I without

9  any big math, just looking at what they've done, have it at, to

10 be kind, 40 or less.  Now, that means that were this Court to

11 adopt any of this, the loss amount should be less than in my

12 view $40,000.  So, we object entirely.

13         There is also, your Honor -- and life is short, but

14 there is an affidavit here.

15         THE COURT:  You have all the time you want.

16         MR. LEVINE:  There is an affidavit here, your Honor,

17 from Special Agent McGillicuddy.  Well, that's testimonial.  We

18 received no information, no data where this has been provided.

19 It's testimonial, and you've ruled on that.  Can I have the

20 3500?  They can give it to me right now.

21         THE COURT:  Is there 3500 in connection with Agent

22 McGillicuddy's affidavit?

23         MR. KOENIG:  Not that I know of.

24         THE COURT:  OK, let's keep going.

25         MR. LEVINE:  But my point, your Honor, is I don't

JAO7CONS

1   think this affidavit was written without all kinds of

2   calculations and graphs, so I think Mr. Koenig memory or

3   knowledge might be limited, but on that basis alone you can

4   strike the whole thing.  But if you keep it -- if you keep

5   it -- we're talking about 40 grand or less -- I actually think

6   it's even less than that; I think it's about 12 -- so it

7   actual -- so, actually the enhancement that's being applied by

8   the 18 points does not count at all, and it should be a much,

9   much lower enhancement.

10           THE COURT:  Well, if you were right, and if it were

11   $12,000, the enhancement would be two points?

12           MR. LEVINE:  Yes.  Yes.

13           THE COURT:  If it were 40,000, it would be either four

14   or six points.

15           MR. LEVINE:  And I will say that one thing that's very

16   interesting about this is you then get to -- so basically if

17   that's right -- and that's their best estimate, and I don't

18   think I've done anything here than some math and basically

19   apply the testimony -- I think that is very consistent with the

20   instinct of probation, which looked at these numbers and fairly

21   said, look, this is not for us given the complexity, but just

22   looking at this we think we're over here and nowhere over here.

23   So, I think even if you give the government whatever it's due,

24   we start there.

25           You also note, your Honor, that in one part of the

JAO7CONS

1    affidavit, but there was some estimate of a market impact of

2    $500 million.  There is no calculation for that.

3              THE COURT:  Trust me, Mr. Levine, that is not going to

4    factor into anything I do here today.

5              MR. LEVINE:  So then we get to the last piece of this

6    loss, which is there are now apparently victims that we've

7    never known about before -- which is my second objection, which

8    is about the victims enhancement.  As the Court is aware, the

9    victims enhancement applies only for actual loss.  There is no

10   showing of actual loss in this case.  It is conceded that there

11   is no actual loss, so the victims enhancement does not apply at

12   all.

13             THE COURT:  And the section of the guidelines that so

14   states is?  I'm going to make you sing for your supper,

15   Mr. Levine.

16             MR. LEVINE:  Just give me one second, your Honor.  I

17   believe it's 2B1.1.  And it is also recognized in this Circuit

18   by a case called Skys, 637 F.3d 146.

19             THE COURT:  Can we find it?

20             MR. LEVINE:  Sure.  2B1.1(b)(2)(A)(i) and comment 1.

21             THE COURT:  Which says, "Victim means any person who

22   sustained any part of the actual loss determined under the

23   subsection (b)(1) or any individual who sustained bodily injury

24   as a result of the offense."

25             MR. LEVINE:  So we would argue -- and the comment,

JAO7CONS

1    your Honor --

2            THE COURT:  So, it's your position that because the

3    government admits it can't prove actual loss and has instead

4    relied on intended loss, that the victim enhancement has to

5    drop out because victims are only people who suffer actual

6    loss.

7            MR. LEVINE:  Correct.  That's correct.

8            THE COURT:  And your Second Circuit citation for that

9    is?

10           MR. LEVINE:  It is the Skys case.  It is 637 F.3d 146.

11   The pin cite is 153 to 154.  I would also command to the

12   Court's attention -- which I know the Court has already seen --

13   we covered this in our brief, on page 15 and 16 of our

14   guidelines brief.

15           So, I think the victims should be out from that alone,

16   however, I then took a look at what Special Agent McGillicuddy

17   says the victims are.  Now, I know that the government put a

18   website out that requested victim impact statements by October

19   1.  We have been provided no statements; I assume that there

20   are no such statements.

21           THE COURT:  Are there any victim impact statements?

22           MR. KOENIG:  Not that I am aware of.

23           THE COURT:  Thank you.

24           MR. LEVINE:  And, your Honor, I don't know whether or

25   not the government had the opportunity to speak to these

JAO7CONS

1    purported victims that we've never heard of before.  Obviously,

2    if they did and they told them that they don't want to be

3    victims, that would be something that would be useful to know

4    right now, but I don't know if there is any contact with these

5    folks at all.  I'm curious.

6              I note that of these victims at least four of them are

7    LIBOR panel members on at least some LIBOR panel, including

8    Bank of Nova Scotia, which not only was a panel member, a bank

9    that actually our expert witness worked at and was prepared to

10   testify that there is no victim there.  So, I don't know what

11   the good faith basis is -- even if there was actual loss -- for

12   putting up any of these folks.

13             I would also note that of three of the victims that

14   are European banks -- Union Credit, ING, Stenzka -- I'm sure I

15   pronounced that incorrectly -- they were members of the Euribor

16   panel.  So, again we have --

17             THE COURT:  Everybody was in the game.

18             MR. LEVINE:  Right.  So, your Honor, I find it to be

19   troubling that we're at sentencing, and in an affidavit that

20   wasn't even provided to probation -- even though this

21   calculation must have been done before Mr. Parietti and Mr.

22   Curtler's sentencings -- why we're now seeing new victims and

23   seeing folks that on their face don't really seem to be

24   consistent with the letter or the spirit of the intended loss

25   guideline, and therefore I think that they are not an

JAO7CONS

appropriate basis to issue the victims enhancement, but they

are an appropriate basis I think for this Court to again look

at the methodology that the government has arrived at to

suggest a sentence and for you to arrive at that again

undermines the pillars of what the loss could or couldn't be or

who was harmed here.

I'm not rearguing what is not to be argued.  I'm just

saying for the purpose of assessing the loss today and the

victims, these guys ain't it, and so I would ask that the

victims enhancement not apply.

And I will tell you, your Honor, for some of these

victims -- for example, they put in Standard Charter and

Merrill as one of the victims.  What is really interesting is

if you actually take the chart, if you actually take the time

and you look at the few trades that Standard Charter was

involved in, there are four days in which they have some trade

position of the 16 of my client's, they have them netted as I

think a $400 loss.  Because if you notice in several of these

the loss on the big day is $400, $1500, very small.  We just

looked.  What was Standard Charter's experience on the days

that they said Mr. Black did something that caused a loss?

Just those four days.  It turns out if you net them they made

$2700; they didn't lose $400.  And frankly if you do this with

some of these other victims like Merrill -- which is also

attributed to a day that they want to talk about my client, an

JAO7CONS

1    actual loss -- you find out that the numbers just by looking at

2    that customer and the days they've caught in total go way down.

3          So, again, my concern here is that not only are they

4    wrong on the law but they're presenting facts in a way which do

5    not achieve any ability to make even a reasonable estimate of

6    loss or victimhood.  So, I think that those all should be

7    disregarded.  And I'm happy to show you the charts if you'd

8    like.

9          I think we then get to the third enhancement to which

10   we object, which is sophisticated means.  Here there are a

11   couple of elements.  First is whether there has been a

12   concealment.  The evidence in this trial, as this Court has

13   pointed out -- one thing we didn't have in this trial was

14   concealment; everything was out in the open.  There was never a

15   dispute of what happened in terms of the conversations.  There

16   is a dispute as to characterization but nothing was concealed.

17   So, that doesn't apply.

18         And then we get to the one that I find the most sort

19   of ironic, which is that my client -- who has virtually no

20   experience in the United States, who was sitting on the desk in

21   London trading LIBOR, which is literally the London market

22   rate -- somehow is going to be additionally penalized because

23   he somehow took this outside the United States.  Plainly he did

24   not do that.  He plainly had no intention of concealing

25   something like we see with someone who moves an investment

JAO7CONS

scheme offshore to avoid authorities.  So, you see to me the
application of that here leads to an absurd result in the sense
that it's a London metric, a London trader, a London desk.
It's not even U.S. dollar cash market; it's the London market
for U.S. cash.

          So, while that's not an argument about all the
jurisdictional issues -- we've never contested that -- it's
just not a reasonable thing to do to apply that standard.  It's
inconsistent with good sense and the realities.  So I don't
think it's applicable.

          The final specific objection we have is the abuse of
trust enhancement.  The abuse of trust enhancement, as my
colleague has said, simply doesn't apply, and it doesn't apply
because that enhancement is designed to penalize conduct that
involves fiduciary duties among the people and counterparties
where a person has broken their trust.

          There is no dispute in this case that every
transaction was arms length.  We presented, as you've seen -- I
have showed it more than probably you care to see -- the
contract is the master agreement, which disclaims reliance,
fiduciary duty and all of those things.  I think the law is
quite clear that you need to have an abuse of trust.  None of
the witnesses we've heard, no one has testified that that's an
abuse of trust here.

          Further, if you wanted to even overlook that fatal

JAO7CONS

1  defect, then you have to ask, well, is this the kind of

2  discretionary activity in which you might still want to apply

3  abuse of trust.  The answer is for Mr. Black he did not have

4  discretion.  We all agree he had no supervisory role, he had no

5  authority over these.  He didn't even have access to the

6  computer to submit these things.  His conduct is entirely based

7  on what communications he had with those folks.  There is no

8  discretion.  So the abuse of trust element is getting at those

9  kinds of relationships.  And, obviously, given that this

10  conduct was throughout not only this bank at Deutsche, but as

11  the government says in their briefs repeatedly all of these

12  other banks, the notion that for this purpose that Mr. Black by

13  following the instructions of his seniors doesn't dismiss the

14  problem that we have, but it does say that that's not an abuse

15  of trust.  And again it's another guideline calculation which

16  the government offered no real justification for.  Probation

17  put it in because they said this is their position.  I will say

18  the probation department footnoted every single one of their

19  enhancements and recalculated each time, and I will say for the

20  record I am very grateful for them for that, because I think

21  they really tried to --

22        THE COURT:  Mr. Kim is an extraordinary officer in

23  cases like this.

24        MR. LEVINE:  Yes.  And I think that he took it not

25  only very seriously, but he gave the Court a report.

JAO7CONS

1          So, I don't know why the government is pushing for

2     these enhancements.  They just don't apply.  This is not a

3     matter of debate.  And obviously under the guidelines, though

4     we submitted a second brief on guidelines, while they're

5     significant, we don't think they are the main story here.

6          THE COURT:  Oh, you are so correct about that.

7          MR. LEVINE:  But again, where we are in a position

8     where we see things that are clear errors of law we are obliged

9     to point them out to this Court.

10          So, if you apply all those objections, then we think

11     exactly what we said in our brief, which is the appropriate

12     guideline calculation here is level 7, which yields a zone A

13     sentencing range of zero to six.

14          Now I will talk later about the factors and things

15     like the Court is more interested in, but the wisdom of the

16     probation report is that whichever way you want to look at it

17     from their perspective we come out the same place, but I do

18     think for purposes of the order, and Rule 32 and the rules,

19     that these enhancements are not established.  And certainly a

20     loss in victimhood we think cannot be applied.  It certainly

21     cannot be applied without a thorough Fatico hearing, which I

22     think would be a thorough waste of the Court's time in light of

23     the record and in light of what the government's position is.

24     So, we would suggest those enhancements should all be struck.

25          Now, I know the Court is aware -- and Mr. Kim

JAO7CONS

1   documented this meticulously -- we made a series of other

2   objections to the report.  You know, many of those things are

3   matters that -- and Mr. Kim actually accepted many of our

4   objections and made modifications, including, for example, that

5   Bank of America is not a victim.  So, when they say Merrill is

6   a victim and, yeah, it was premerger, but the one victim is out

7   who has the successor right to the other victim that they're

8   now asserting, it just sort of gets a little silly.  But what I

9   would say to you is we would stand on the objections that are

10  in our letter.  I don't think ultimately because they're

11  factual matters of which is quite familiar -- I'm happy to go

12  through them, but they really are objecting to the language in

13  various parts of the description of conduct to conform with

14  what we think the evidence showed, but I don't know that the

15  Court is necessarily going to quarrel with any of those.  You

16  may not agree with our characterizations, but that's what they

17  are.  So, I am happy to go through them.  We do stand on them

18  as a matter of law.  So again I would ask you to properly

19  calculate Mr. Black's guidelines as level 7 and zone A.  Thank

20  you, your Honor.

21       MR. BREEN:  Just for completeness before the

22  government goes.

23       THE COURT:  Yes, Mr. Breen.

24       MR. BREEN:  If we applied the methodology that

25  Mr. Levine set forth -- which we think is the applicable

JAO7CONS

methodology –– with the six entries on Exhibit 1A that deal
with Matt Connolly they add up to $47,000.

THE COURT:  I know.

MR. BREEN:  With the methodology it's less than
$3,000, and it puts it at a level below $6500 where there is no
enhancement.

THE COURT:  And I think, am I correct that Agent
McGillicuddy's chart does not include Count Three, the Count
Three communication?

MR. KOENIG:  That's correct.

MR. BREEN:  And the rest that had to do with Mr.
Parietti, it's our position ––

THE COURT:  Oh, well, we will talk about Mr. Parietti.
Don't worry, I have plenty to say about Mr. Parietti.

MR. BREEN:  Thank you.

MR. LEVINE:  So, your Honor, I haven't gone through
today all the details, but our brief goes through
systematically all the reasons the loss amount makes no sense.
Thank you very much.  I appreciate it.

THE COURT:  Mr. Koenig.

MR. KOENIG:  Thank you, your Honor.  I would like to
address a few points.

THE COURT:  Just address the objections to the
presentence report.  Don't address any other points.  Address
the objections to the presentence report.

JAO7CONS

1         MR. KOENIG:  OK.  Well, on the loss amount they have a

2    big section in their brief about how the 2015 amendment made it

3    so you can only look as what Gavin Black did himself, or what

4    Matt Connolly did himself, and that is simply not the law in

5    this Circuit.  The 2015 amendment didn't change the law in this

6    Circuit.  In fact, the 2015 amendment adopted the law of this

7    Circuit.

8         And, importantly, I think it's important to point out

9    that the amendment did not change Section 1B1.3, which says

10   that your guideline calculation is made based on your acts and

11   those of your coconspirators.  And the Second Circuit has

12   recognized that, and so I don't think you can just pick out the

13   ones where a defendant is listed as the one who is the

14   requester.

15        As far as the Skys case goes --

16        THE COURT:  You know, "Without any determined amount

17   of actual loss to financial institutions, the District Court

18   inappropriately included the institutions as victims under

19   Section 2B1.1(b)(2)."  That's the Second Circuit.  I'm kind of

20   bound by what they say.

21        MR. KOENIG:  Well, to the extent that they were

22   arguing that because we used intended loss instead of actual

23   loss, I don't think the case stands for the proposition that

24   you can't also look at actual victims.

25        THE COURT:  Yes, but you said to me -- and I believe

JAO7CONS

```
1    you -- that you can't calculate actual loss.  It's been
2    repeatedly said in this courtroom -- you weren't here -- that
3    you can't calculate actual loss.  So, OK, if the government is
4    now saying but we can calculate actual loss as to Merrill
5    Lynch, I don't buy it.  OK?  I don't believe it.  You can't
6    talk out of both sides of your mouth.
7           MR. KOENIG:  And I don't think we are talking out of
8    both sides of our mouth.
9           THE COURT:  Good.
10          MR. KOENIG:  When we are talking about restitution,
11   for example --
12          THE COURT:  Restitution is not applicable in this
13   case.  Excuse me while I go to Mr. Parietti's sentencing
14   minutes.  Restitution is not applicable in this case.
15          MR. KOENIG:  I understand that, and that is -- I
16   raised it because that's the context in which we made that
17   argument.
18          Let's just take the example of when someone gets their
19   car stolen.  Right?  Your car is stolen, you're still the
20   victim, you don't get restitution in the amount that you're
21   insured for, but the person who steals the car is still tagged
22   with the intended loss of the value of the car.
23          THE COURT:  The District Court -- my friend Judge
24   Pauley, an absolutely brilliant judge in cases like this,
25   rarely makes a mistake.  "The District Court inappropriately
```

JAO7CONS

```
 1   included the institutions as victim under Section 2B1.1(b)(2)."
 2   It's like really plain English.  It's really plain English.
 3          MR. KOENIG:  But do you see my point though that you
 4   can have loss that's calculable on contracts, but the fact that
 5   they're hedged doesn't mean that that's still not a loss.
 6          THE COURT:  I'm sorry.  Ms. Sipperly and Ms. Anderson
 7   said ad nauseum that you can't calculate the loss in this case.
 8   And if you can't, then I'm saying you can't calculate it for
 9   any one individual on any one trade.  You can't calculate the
10   loss.  OK?  Let's move on.
11          MR. KOENIG:  All right.  Another thing that I'd like
12   to address is the abuse of trust.  And they're talking about
13   this as though it's just based on your counterparty and arms
14   length transaction, and there has to be --
15          THE COURT:  No, they had an argument about Deutsche
16   Bank.
17          MR. KOENIG:  True.  But the position of trust here was
18   that, you know, the BBA and the marketplace put in them to do a
19   fair and honest --
20          THE COURT:  Excuse me.  There is no evidence in this
21   case -- if you want to have a Fatico hearing on this, I will be
22   happy to.  There is no evidence in this case that the BBA
23   trusted anyone to do anything.  You shied away from it.
24          MR. KOENIG:  OK.  Well, there still was trust --
25          THE COURT:  For good reason.
```

JAO7CONS

1        MR. KOENIG:  There still was trust placed in them by

2    the marketplace generally, by their employer.

3        THE COURT:  No, no, no, no.  OK.

4        MR. KOENIG:  It's not vis-a-vis the counterparty.  The

5    Barrett case we cited in our brief says you don't have to have

6    a fiduciary relationship.  I mean it's just common sense that

7    when you are charged with submitting numbers to this very

8    important financial benchmark there is an element of trust by

9    the market.  Whoever you want to say it is, they are entrusted

10   to do it.  And in every single case that we have sentenced so

11   far, the abuse of trust enhancement has been given.

12       THE COURT:  Well, I'm not every single judge.  And let

13   me just say one thing right off the bat -- and I will say it

14   again in a few minutes -- the findings I made in cooperator

15   cases with no challenge weren't findings at all; they were an

16   empty exercise.

17       MR. KOENIG:  Understood.  Understood.

18       THE COURT:  In this case the exercise has been

19   anything but empty.

20       MR. KOENIG:  I agree.  I definitely agree.

21       Well, you know, I think for the rest of it we can just

22   rest on our papers; that's pretty much what we have.

23       THE COURT:  Your papers are fairly comprehensive.

24       MR. KOENIG:  Yes.

25       THE COURT:  OK.  I want to take a five minute break,

JAO7CONS

1    because I need a five minute break, and I will be right back.

2              (Recess)

3              THE COURT:  OK.  I've already done this, but I had

4    intended to begin this part of the sentencing with a tender of

5    tremendous thanks to probation officer Johnny Kim.  Mr. Levine

6    gave me an opening.

7              Officer Kim is the probation officer who is assigned

8    to complex financial cases.  He is assigned to those cases for

9    a reason, both because he is willing to undertake an analysis

10   of the complexities and because he candidly and conspicuously

11   points out to judges where the holes might be, and he has done

12   that in spades in connection with these presentence reports,

13   and I simply could not be more grateful to him for all the hard

14   work that he has done.

15             So, I am required to calculate the sentencing

16   guidelines.  Officer Kim has calculated the guidelines using

17   most though not all of the government's suggested enhancements.

18   He has carefully reviewed the defendants' challenges to the use

19   of those enhancements and has in several cases advised me that

20   I should make the final call because he cannot realistically

21   advise on the question.  And that is particularly true as to

22   intended loss amount.  I'm not sure can I do any better than

23   he, but I will do my duty.

24             I wish to emphasize something that I said during the

25   government's presentation.  In each such instance Officer Kim

JAO7CONS

1    reminded the Court that I had made findings consistent with the

2    government's position in connection with the sentencing of

3    those cooperators whom I was permitted to sentence.  That is of

4    no moment to me today.

5          The cooperators did not challenge the government's use

6    of enhancements or its calculation of loss amount except to

7    note for the purposes of the record that loss amount could not

8    be calculated -- a position with which I wholeheartedly agree.

9    Therefore, nothing that was done in connection with the

10   sentencing of the cooperators can be taken as an indication

11   that I have previously considered and rejected the arguments

12   that are being made by Messrs. Connolly and Black, or that I

13   believe myself bound by "findings" made in connection with

14   cooperators' sentencings.  I am not so bound.

15         I begin in exactly the same place that Judge Rakoff

16   began in his sentencing of the Rabobank defendants that went to

17   trial:  The guidelines, no matter how they are calculated, are

18   so fundamentally flawed that they cannot be relied upon to come

19   up with a sentence that is sufficient but not greater than

20   necessary to effectuate the goals of the sentencing statute.

21   That is true no matter how you calculate the intended loss

22   amount.  And because my faith in the guidelines is so

23   attenuated in these sorts of cases, it is really absurd for me

24   to have to go through this exercise.

25         The government and both defendants agree that the base

JAO7CONS

offense level for these convictions is 7.  The government seeks

a two point enhancement to the guidelines for each defendant

for use of sophisticated means.  And, specifically, as I read

in the government's brief filed in connection with

Mr. Connolly's sentencing -- portions of which were also deemed

applicable to Mr. Black -- it relies on Section 2B1.1(b)(10)(B)

of the guidelines, which provides that an enhancement is

appropriate if "a substantial part of the fraudulent scheme was

committed from outside the United States."  Defendants have

argued this morning that this subsection applies when

extraterritorial conduct was undertaken for the purpose of

concealing the offense, as when operations are moved offshore

from the United States with conduct targeting residents of the

United States.

         Now, that caveat does not appear in the language of

the statute, and if I may quote Justice Kagan's rather

prescient remark from her confirmation hearing, we are all

textualists now.

         The argument propounded by Mr. Levine and Mr. Breen

relies on the instruction in Section 6(c)(2) of Public Law

105-184 rather than on the text of the law itself, and the

argument fails even if one considers the legislative history,

because the legislative history directs the Sentencing

Commission to "provide an additional appropriate sentencing

enhancement if the offense involved a sophisticated means,

JAO7CONS

1    including but not limited to sophisticated concealment efforts

2    such as perpetrating the offense from outside the United

3    States."  It could not be clearer from that language that

4    sophisticated means enhancement is available for conduct other

5    than sophisticated offshore concealment efforts.  There were no

6    such efforts in this case.

7         The crime was committed abroad.  Nothing about that

8    fact makes this a sophisticated crime.  The London Interbank

9    Rate is -- no surprise here -- set in London, not in the United

10   States.  All the submissions that were used in calculating the

11   various LIBORs were made to an entity called the British

12   Bankers Association which -- no surprise here -- is

13   headquartered in London.  Certainly, at Deutsche Bank the

14   submissions were made from its submitting desk in its offices

15   in London, by an individual who worked in London.  So, the fact

16   that efforts were made to manipulate LIBOR in London just

17   doesn't make it sophisticated.

18        Yet there can be no question that "sophisticated

19   means," as the dictionary and I understand that phrase, were

20   used in the commission of the offense.  The word

21   "sophisticated" is defined in the dictionary as developed to a

22   high degree of complexity.  As far as the Sentencing Commission

23   is concerned, the degree of complexity that's needed to qualify

24   a crime as one using sophisticated means is actually quite low.

25   When an offense is carried out repeatedly over a long period of

JAO7CONS

1    time, when the essence of the offense is lying -- in this case

2    about a submitting bank's anticipating borrowing costs for a

3    particular currency over a particular tenor -- and when a

4    coordination is required to carry the scheme out, courts in

5    this Circuit and elsewhere have readily applied the

6    sophisticated means enhancement -- not the one cited by the

7    government and Mr. Kim but the one in Section 2B1.1(b)(10)(C).

8    The offense otherwise involved sophisticated means and the

9    defendant intentionally engaged in or caused the conduct

10   constituting sophisticated means.

11           Even those factors are the least of the sophistication

12   inherent in this particular crime.  The setting of LIBOR fixes

13   was an inherently sophisticated exercise.  It involved the

14   evaluation by highly educated individuals at 16 different

15   submitting banks of masses of financial, political and economic

16   information and trends, the distillation of that information

17   into an estimate of each submitting bank's borrowing cost in

18   multiple currencies across multiple tenors five days a week

19   every single week and the transmission of that information

20   worldwide.  At times during the relevant period the submissions

21   also involved evaluating rather strange requests made by the

22   Bank of England, which were addressed to the submitting bank in

23   an effort -- whether misguided or not, I cannot say -- to

24   stabilize a crumbling worldwide financial market.  The setting

25   of LIBOR is an intrinsically sophisticated exercise, therefore

JAO7CONS

1    any effort to manipulate LIBOR by introducing forbidden factors

2    into a submitting bank's submission qualifies in my book as

3    using sophisticated means to commit the crime -- far more

4    sophisticated than if they had been running a telemarketing

5    scam from Canada.  The two point enhancement applies.

6          The government seeks the government seeks a two point

7    enhancement as to both defendants for abuse of trust.  The

8    enhancement is most emphatically denied.

9          Abuse of trust, as I understand the term, means

10   putting one over on someone to whom you owe some sort of

11   special duty, if not always a fiduciary duty, then at least

12   some duty recognized at law some enhanced duty.  The defendants

13   owed no special duty whatever to Deutsche Bank's trading

14   counterparties.  They were in the antithesis of a relationship

15   of trust with those counterparties, and the very terms of their

16   arrangement, as set forth in the ISDA agreement among trading

17   institutions makes that crystal clear.  Caveat emptor says that

18   agreement -- let the trader beware.  And traders are indeed

19   distrustful, hence the hedging of bets on all sides.

20         And while defendants may have owed Deutsche Bank a

21   fiduciary duty of acting in their employer's best interest,

22   they can hardly have been said to have abused that trust.

23   Defendants didn't put anything over on Deutsche Bank.  What was

24   going on was no secret, and was -- from all the evidence I have

25   seen and heard -- encouraged, if not orchestrated, by senior

1   officials at the bank for the benefit of the bank.  You can't

2   abuse the trust your employer places in you if your employer is

3   fully aware of and actively encourages what you are doing

4   because your employer believes that your actions will, if

5   successful, enhance its interests.  Neither Mr. Connolly nor

6   Mr. Black advanced his own personal interest at the expense of

7   Deutsche Bank.  And before anyone suggests that Deutsche Bank

8   was betrayed because it incurred untold millions of dollars in

9   penalties and legal fees to clear up this mess, I reject the

10  notion that this can or should be laid at the feet of Matt

11  Connolly and Gavin Black.  The very idea of Deutsche Bank as a

12  victim in this scenario is absurd to me.

13          As further proof that the abuse of trust enhancement

14  is not warranted, let us consider that Gavin Black continued to

15  work at Deutsche Bank for seven years after the Wall Street

16  Journal first published rumors about LIBOR manipulation and

17  through five years of intensive investigation by the Paul Weiss

18  law firm.  Moreover, it appears he would have continued to be

19  employed by Deutsche Bank but for the insistence of the New

20  York State Department of Finance that he specifically be fired.

21  If at any time during the course of a five year investigation

22  that was costing it millions of dollars Deutsche Bank felt that

23  Gavin Black had abused its trust, it would hardly have kept him

24  on as an employee.  Financial institutions are not in

25  eleemosynary in nature.  People who are caught abusing the

JAO7CONS

1    trust of the institution are cut loose at the earliest

2    opportunity, and the institution does not need to wait for a

3    command from the government to get rid of them.

4            The government also seeks three-point enhancement for

5    Mr. Connolly on the ground that he acted as a manager and

6    supervisor of the criminal activity.  The basis for this

7    request is that Mr. Connolly "set himself apart by explicitly

8    directing his subordinate Mr. Parietti to make manipulation

9    requests on behalf of Deutsche Bank's pool trading desk in New

10   York."

11           Probation declined to apply the enhancement.  I agree

12   wholeheartedly with Officer Kim's assessment of the matter,

13   albeit for somewhat different reasons.

14           I was unable to discharge myself of my opinion about

15   Mr. Parietti at his sentencing.  That's because Judge

16   Engelmayer sentenced Mr. Parietti.  He did so because the

17   government failed to do what has been the practice in this

18   district for longer than I have been on this bench -- it failed

19   to notify both the judge who took Mr. Parietti's plea and the

20   judge who heard the man testify so that they, judge to judge,

21   could decide which judge was better positioned to sentence the

22   cooperator.

23           Judge Engelmayer asked the government about this at

24   Mr. Parietti's sentencing, because he was mystified that no

25   such letter had been sent and that I was unaware that Mr.

JAO7CONS

1    Parietti was about to be sentenced –- which I was, totally and

2    completely unaware.

3              Ms. Brown, I believe you have never been an assistant

4    in this district; is that correct?

5              MS. BROWN:  That is correct, your Honor.

6              THE COURT:  Ms. Brown stood up and said she thought I

7    was aware that Judge Engelmayer was going to sentence Mr.

8    Parietti, and that the team misunderstood my level of

9    understanding about what was going on, and that the government

10   was not engaged in judge shopping.  Ms. Sipperly and

11   Ms. Anderson –- both veteran prosecutors who served as

12   assistant United States Attorneys in this district for many

13   years -- not Ms. Anderson -- Ms. Sipperly.  I apologize.  I

14   apologize, Ms. Anderson –- sat silently and said nothing in

15   response to Judge Engelmayer's question, which, by the way,

16   which was "Why didn't you send Judge McMahon and me a letter?"

17   Not "What was your understanding of Judge McMahon's state of

18   mind?"

19             MS. SIPPERLY:  I was sitting right next –-

20             THE COURT:  Sit down, Ms. Sipperly.  My turn.

21             And so we come to the concept of quibbling.  Quibbling

22   is saying something that is less than a lie but not quite the

23   truth.  It is lying by evasion.  It's a concept that would have

24   been quite familiar to Mr. Parietti because he was a West

25   Pointer, and quibbling is quite explicitly a violation of the

JAO7CONS

1    West Point Cadet's Honor Code in which a cadet promises not to

2    lie, cheat or steal, or tolerate those who do -- something Mr.

3    Parietti did repeatedly for many years.

4            In responding to Judge Engelmayer -- and I put this

5    charitably -- the government at the very least quibbled.  Or,

6    if I may rephrase what I just said in language that's probably

7    more familiar to federal prosecutors, the government in the

8    person of Ms. Brown -- who knew nothing -- omitted to state

9    something necessary to make her response to Judge Engelmayer's

10   question not misleading.  I wish I could say it was the first

11   such instance of at the very list quibbling by the government

12   during the course of this case, but the trial record reveals

13   that it was not.

14           In my opinion, Mr. Parietti -- who, per Agent

15   McGillicuddy's intended loss data was the most prolific

16   requester of LIBOR manipulation in all of Deutsche Bank -- 41

17   of the 130 written requests totaling almost $650,000 of the

18   government's calculation of intended loss from those

19   requests -- vastly more -- vastly more than either of the

20   defendants here -- was guilty of at least quibbling and quite

21   possibly outright lying at several points during his testimony.

22   The jurors were free to believe him or to disbelieve him, and

23   on my reading of the verdict sheet they did not believe him.

24   Mr. Connolly was acquitted an Counts Eight and Ten, both of

25   which involved submission requests made by Mr. Parietti.  He

was even acquitted on a count where the submission request was

allegedly made by him.  But he was acquitted in both instances

where the submitting conduct was attributable to his so-called

subordinate Mr. Parietti.

Mr. Connolly was not a manager or a supervisor of the

LIBOR manipulation scheme.  The evidence clearly showed that

the scheme was run out of London, and Connolly had very little

to do with LIBOR as part of his job.  To my ears, after sitting

on this case for three years, Matt Connolly was the person who

had the least to do with the manipulation of LIBOR in all of

Deutsche Bank -- certainly, of all the actors with which I

became acquainted.  The evidence does not support the

government's contention that Mr. Connolly was by virtue of his

nominal supervision of the trading desk at Deutsche Bank in a

position to stop LIBOR manipulation that was taking place out

of the London office of Deutsche Bank where he did not work and

did not supervise anyone.  Many persons who were in a position

to stop what was going on -- some of whom were deeply involved

in the activity while at Deutsche Bank, others who tolerated

it -- were not indicted.  The evidence from Mr. Parietti, I

believe, was to the effect that senior management at the bank

directed this activity.  This part of his testimony I believe.

I don't believe he did what he did because Matt Connolly told

him to -- and neither did the jury -- but I do believe his

testimony that senior management at the bank directed this

JAO7CONS

1    activity.  And Matt Connolly was not part of the senior

2    management at Deutsche Bank.

3           He was not unaware of what was going on.  He was aware

4    as far back as 2005 of what was going on.  I can cite

5    Government Exhibit 1-023.  And he did participate in the

6    conspiracy to a very limited extent of making a total of six

7    written submissions, but he was anything but a manager or a

8    supervisor.

9           I note that the government did not argue for such an

10   enhancement for Michael Curtler, who actually was a manager or

11   supervisor of the scheme, and who had the undoubted power to

12   stop it just by saying no and refusing to entertain the

13   requests of his coworkers.  Officer Kim rightly picked up on

14   this discrepancy in recommending that I not apply this

15   enhancement.  I will be guided by his advice.  Mr. Connolly

16   will be punished for his conduct and his conduct alone; he will

17   not be punished instead of punishing Mr. Parietti or Mr.

18   Curtler, and he will not be punished for their conduct; and he

19   will not be punished for going to trial, which is what the

20   government seeks by not enhancing the guideline of a cooperator

21   who was manifestly was a manager but trying to enhance the

22   guidelines of a noncooperator who was not.

23          Now we come to the most ridiculous part of this

24   exercise which was the calculation of the intended loss amount.

25          In the real world, which is to say, the pre-guidelines

JAO7CONS

world, the judges would simply recognize what was obvious:  It

was the intent of the defendants and their coconspirators it

make all the money they possibly could from trading, and that

money necessarily had to be made at the expense of the

counterparties to their trade.  And while the actual loss in

this case cannot possibly be calculated -- it is impossible to

calculate -- the government concedes as much -- the effort to

swing LIBOR fix in a particular favorable direction went on for

years, and there were billions of dollars in trades during that

period, and it is inevitable that Deutsche Bank benefited on

some of those trades as a result of tainted fixes submitted by

its traders that swung LIBOR in a particular direction for a

particular tenor on a particular day.  I can't prove which

ones, but I can't help but think of this whole endeavor as some

financial services version of the so-called infinite monkey

theorem:  Hit keys at random long enough and the monkey will

eventually recreate the works of Shakespeare.

          That is the essence of the LIBOR scheme.  It all came

out in the wash, because the other submitting banks were doing

exactly the same thing to try to benefit their trading

positions, including banks that were counterparties to Deutche

Bank, and everyone, including people who did not work for the

submitter banks, hedged their bets because nobody trusted

anybody.  And since many of the other submitting banks were

doing the same thing that Deutsche Bank was doing -- on some

JAO7CONS

occasions shading a submission -- Deutsche Bank's efforts on behalf of its traders had to have been canceled out in many instances by the efforts of other banks.  But that does not mean that there was no intended loss.

I agree with the government's contention that this was not a victimless crime.  Defendants hoped to benefit Deutche Bank's trades to the detriment of its counterparties.  The swaps market is indeed a zero sum market, and if the coconspirators were not trying to win at trades vis a vis counterparties, there would have been no reason for the cash traders to communicate their desires to the LIBOR submitters. Traders do things that they think will in the end make them money.  They do not waste their time doing things they don't believe will make them money.

So, while each trade was worth just fractions of pennies, and while it is the net value of the trader's book, not any individual trade, that is ultimately relevant to the bank's and the trader's bottom line, the intended loss -- the amount of the intended loss -- was not zero.

A word needs to be said about the trim.  The scheme charged has always struck me as particularly unlikely to achieve tremendous success -- except in the infinite monkey theorem variety -- precisely because the participants had no control over its likelihood of success.  The BBA's formula for calculating LIBOR for a particular currency at a particular

JAO7CONS

tenor -- the trim, the averaging of the eight middle
submissions out of the 16 total submissions -- was designed to
eliminate or minimize the ability of any one submitting bank to
manipulate the fix.  There was simply no way for these
defendants and their fellow Deutsche Bank employees to
guarantee that a particular day's submission would move the fix
in a particular direction.

        But that didn't stop the submitting banks -- including
Deutsche Bank -- from trying to move the fix.  The reason they
tried to move the fix was to win at trades.  It was a long shot
but, who knows, if everything lined up just right it just might
help.  I therefore reject the notion that the existence of the
trim negates the possibility that the defendants intended any
loss.

        The defense argues that the government has not met its
burden to prove the amount of intended loss.  And the defense
is correct in the respect that because of the way the market
works, neither the government nor this Court can make an
accurate assessment of the amount that's properly attributable
to the defendants' scheme.  The government candidly admits that
it cannot calculate actual loss; it does not have the
information that would be necessary to make such a calculation,
which would involve knowing things like the overall exposure of
the counterparty to LIBOR on any particular day on which
Deutsche's Bank's submission of a fix actually ended up moving

JAO7CONS

1    LIBOR in a particular direction.  The government might have to

2    take into account counterparty hedging in order to calculate

3    actual loss, although it is correct that the defendants don't

4    get to benefit from those hedges, even though their knowledge

5    that everyone was hedging -- just as they were hedging -- is

6    part of any trader's daily calculus.  The government would have

7    to take into account any manipulation of LIBOR by other banks

8    on the same day at the same tenor because only Deutsche Bank's

9    manipulation would matter for these defendants, and as

10   government acknowledged, this practice was widespread.  Indeed,

11   at certain times, such as during the height of the 2008

12   financial crisis, submissions were actually being manipulated

13   at the request of the Bank of England.

14        So the government has come up with a proxy formula for

15   calculating intended loss.  The government's methodology can be

16   attacked as inaccurate for all the reasons proffered by the

17   defendants.  And as will be seen, I actually take issue with

18   some of what the government has done, but the government does

19   not need to prove intended loss with mathematical precision,

20   and the mere fact that it does not do so does not zero out

21   intended loss.

22        Now, the usual thing that happens in cases like this

23   is that the Court accepts the government's calculation of

24   intended loss amount all the while bemoaning its inadequacy --

25   as Judge Rakoff did at the Rabobank sentencing -- and then

JAO7CONS

proceeds to ignore the resulting guideline, which is always
astronomically high, and sentences on some far more rational
basis.  It's a wonder to me that district judges should be put
in this position, but we are.

I have looked at the government's calculation.  I have
tried to address some things in it that I found troubling.  In
so doing I took into account the November 2015 amendment to the
guideline.  Mr. Koenig is correct, contrary to the defendants'
argument, Section 2B1.1, comment note 3 (A)(ii) did not work a
radical change to the intended loss guidelines in the context
of conspiracies or limit the intended loss calculation to
losses related to the conduct of a particular defendant.  I
don't deny that the conduct attributable to a particular
defendant is -- and for me always is -- an important factor in
the sentence that is imposed, but the amendment in 2015 did not
make it impossible to consider the losses of coconspirators or
the actions of coconspirators in doing an intended loss
calculation.

The amendment clarified that the sentencing court had
to make a subjective inquiry into the amount of loss intended
by the defendant -- whether through his own acts or the acts of
his coconspirators -- rather than relying on some sort of
objective test, which had apparently been the law in some
circuits.

That the amendment of Section 2B1.1 did nothing more

JAO7CONS

1  than what I just said is underscored by the fact that at the

2  very same time the Commission also amended Section 1B1.3 of the

3  guidelines concerning jointly undertaken criminal activity.

4  That amendment stated that a defendant could be held

5  accountable for the conduct of others in a jointly undertaken

6  criminal enterprise if the conduct fell within the scope of the

7  enterprise, the conduct of others was in furtherance of that

8  criminal activity, and the conduct of others was reasonably

9  foreseeable to the defendant.  The Commission specifically

10 noted this amendment was "not intended as a substantive change

11 in policy."  The amendment to Section 2B must be read in the

12 context of this statement made simultaneously by the

13 Commission.

14       Finally, I found no Second Circuit law suggesting that

15 anything changed after November of 2015, which itself suggests

16 that the 2015 amendments were not as portentous as the

17 defendants insist they were.  I know that the Eleventh Circuit

18 has at least on one occasion resisted the siren call of

19 limiting intended loss in connection with jointly undertaken

20 criminal activity to the portion of loss that was caused by the

21 defendant's own actions rather than those of his

22 coconspirators.  That was in United States v. Leyva, 752 Fed.

23 App'x 825, a 2018 case from the Eleventh Circuit.

24       So I cannot agree with the defense that the government

25 is not allowed to include the activities of other traders who

1    asked Messrs. King and Curtler to move Deutche Bank's

2    submissions under the Gavin Black intended loss umbrella or the

3    Matt Connolly intended loss umbrella.  All the testimony at

4    trial was to the effect that everyone knew what was going on

5    and everyone to a greater or lesser degree participated -- with

6    many traders making occasional requests and with Mr. Parietti

7    making the most by a wide margin, and not at the direction of

8    Mr. Connolly.  They were all in it together.  Deutsche Bank

9    coconspirators intended to benefit their collective trading

10   positions to the detriment of their counterparties.  Thus, it

11   is entirely reasonable to hold these two defendants responsible

12   for the collective intended loss, and there is no need to

13   resort to some "they wanted to enhance the bonus pool"

14   argument, as to which there is no evidence other than Mr.

15   Parietti's statement, which appears to have been injected into

16   his testimony by the government, and which I don't believe.

17          The government has identified 130 instances starting

18   on February 21, 2005 and ending on March 17, 2010, in which

19   Deutsche Bank traders in the U.S., London and on the Continent

20   made written requests to the Deutsche Bank submitter to skew

21   the USD fix, on dates in which Deutsche Bank's submission was

22   one of the eight submissions that survived the trim.  16 of

23   those written requests, with the government-estimated intended

24   loss amount totaling $166,740.41, were made by Mr. Black; six

25   with an intended loss amount of $47,036.39, per the

JAO7CONS

government's formula, were made by Mr. Connolly.  43 of the 130

requests occurred after Mr. Connolly left Deutsche Bank.  He

withdrew from the conspiracy, and they will not be factored

into his intended loss amount.  Additionally, two more which

relate to four or five trades of Mr. Parietti's, relate to

counts of acquittal, and I don't sentence people for conduct

for which they were acquitted, even if it was part of the

conspiracy, and those too must be backed out.  All 130 will be

factored into Mr. Black's intended loss amount because he at

all relevant times worked at Deutsche Bank.

Now, there was testimony that requests were

occasionally made orally, not by mail.  The government has

invented 74 oral requests, of which there are by definition no

record -- they cannot be tied to specific dates, they cannot be

tied to requesters, or to any certainty that Deutsche Bank was

one of the eight submissions surviving the trim.  And the

government uses the average of all 130 written requests as a

proxy for the amount by which these hypothetical requests led

to an intended loss, which is itself problematic as the

intended loss numbers assigned to the 130 written requests

range from zero on four days attributable to Mr. Black to

$261,000, and including the two or three very large intended

loss days in the calculation with a whole lot of smaller

numbers wildly inflates the bottom line.

I am unconvinced by the government's presentation.

JAO7CONS

The government is required to prove intended loss by evidence that is reliable and specific, and while it need not be proved with precision, I cannot use the kind of hypothetical numbers relating to hypothetical conversations as a basis on which to sentence these two men.  Moreover, lacking dates, I cannot account for Mr. Connolly's departure from the bank's employ. And as he did not work in London, and there is no evidence that he or anybody else ever made a request by telephone, I can't attribute any of the verbal requests to Mr. Connolly.  I thus decline to rely on any of the 74 verbal requests in calculating intended loss for either defendant.

Mr. Black argues that the government cannot even reliably calculate the intended loss to his counterparties because it cannot reliably identify his trades let alone his net position.  To support his argument, he relies on the government's admission that Deutsche Bank's book-to-trader mapping and the corresponding net notional analyses were so imperfect that the government could not rely on them at trial.

The government did indeed admit that these analyses "may well be unreasonable and inadmissible," and it is tempting to hoist the government on its own petard.  However, it is the case that intended loss calculation need not rely on evidence that would have been admissible at trial, and that the defendant cannot avoid an intended loss calculation that relies on the best data available -- even if the data is incomplete.

1          I equally reject the defense argument that the

2     defendants could have intended no loss because even if an

3     alleged counterparty victim lost a small amount of money on a

4     particular swap as a result of an alleged request, it likely

5     earned offsetting profits on other swaps transactions.

6     Defendants are not entitled to benefit from hedges that

7     counterparties fortuitously happened to have.  Perhaps in an

8     actual loss scenario they might get a credit, but certainly not

9     in an intended loss scenario.

10          So, I will calculate intended loss by applying the

11    government's methodology as set out at pages 15-16 of its

12    sentencing memorandum and in Special Agent McGillicuddy's

13    affirmation to the 130 written requests in the case of

14    Mr. Black and to fewer than 87 of the 130 requests in

15    Mr. Connolly's case, because I have to back out the counts of

16    acquittal.  I acknowledge that the government's formula is far

17    from perfect.  It is a Rube Goldberg sort of algorithm.  But

18    the guidelines do not require accuracy; they require that there

19    be a reason for the algorithm.  And the government has come up

20    with a methodology that works for me, given my conclusion that

21    some loss was intended.

22          The government will no doubt protest that the Court's

23    calculation understates the culpability of these defendants,

24    especially Mr. Black.  Indeed, the government argues

25    vociferously that its $4.7 million estimate understates their

JAO7CONS

1    culpability.   To which I say this on the subject of loss:

2    After hearing all the evidence in this case, my best guess is

3    that Mr. Black and Mr. Connolly, and the whole crew at Deutsche

4    Bank, and at Bank of America, and Rabobank, and at Citibank,

5    and everywhere else, were acting so much at cross purposes that

6    if we could actually reconstruct the losses suffered in

7    connection with trades done by all of the cash traders at

8    submitting banks, they would end up canceling each other out,

9    which means the ultimate actual loss from the scheme would be

10   negligible if it existed at all.

11        This does not excuse or cancel out the misbehavior

12   that was committed here.  It does, however, suggest that the

13   government's $4.7 million intended loss number for these two

14   defendants -- and even the somewhat lower number that I have

15   calculated -- is way out of line with any actual loss that may

16   have been suffered by anyone.

17        The ten victim enhancement will not be imposed.

18   United States v. Skys, the Second Circuit, made it perfectly

19   clear that a victim for purposes of this enhancement must be

20   someone who suffers actual loss.  The government has attempted

21   to prove actual loss for ten people.  I am unconvinced that the

22   government can prove actual loss for anyone in this case in any

23   instance.  I cannot and will not rely on those numbers.

24   Furthermore, since I do not intend to issue a guideline

25   sentence in this case, it would be a waste of time to have the

JAO7CONS

Fatico hearing to which Mr. Levine would undoubtedly be
entitled if I were to do anything other than decide not to
impose that particular enhancement.

Mr. Black's guidelines calculation is, therefore as
follows:  Base offense level 7, intended loss from the
conspiracy totaling $2,613,214, which leads to a 16 point
enhancement under the utterly ridiculous fraud guidelines chart
at 2B1.1(i), a two point enhancement for sophisticated means,
for a total offense level of 25.  His Criminal History Category
is I; guideline range 57 to 71 months, much of which is
attributable to the fact that the fraud enhancement chart is
heavily weighted toward increasing the number of enhancement
points at the lower end -- a fact that has been criticized on
more than one occasion by this and other courts and has always
made me highly skeptical of the chart.

I note that the government's estimate of loss -- the
government's estimate -- not Mr. Levine's estimate -- but the
government's estimate of loss actually attributable to
Mr. Black would not add 16 points but would add 12, because it
would be under subsection G, and it's just above subsection F
which tops out at 150,000, which would add ten points.  This
chart is just so ridiculous it's incomprehensible.

Probation recommends that Mr. Black serve a period of
five months' incarceration followed by two years of supervised
release, and that he pay a fine of $300,000.

JAO7CONS

1          I now turn to Mr. Connolly.  The government has

2     behaved throughout this prosecution as though Mr. Connolly and

3     Mr. Black are in exactly same position.  From where I sit

4     they're not.  For one thing, Mr. Connolly left Deutsche Bank in

5     early 2008.  Yet the government inexplicably assigns the exact

6     same loss amount to him as to Mr. Black, who remained employed

7     at Deutsche Bank for another seven years, including the last

8     two years of the alleged scheme.

9          43 of the written requests on the government's chart

10    occurred after Connolly left the bank, and so withdrew from the

11    conspiracy as far as this Court is concerned.  I will not

12    include them in calculating his total intended loss, which

13    deducts $1,128,803.03 from the intended loss amount that was

14    applied to Mr. Black.  And I am also deducting the amounts

15    relating to Counts Eight and Ten, which are the counts of

16    acquittal.  So, the amount comes out to $1,411,733.73.

17         Mr. Connolly's total offense level is calculated as

18    follows:  Seven points for the base offense level, 14 point

19    enhancement for the intended loss of $1.411 million.  His much

20    lesser intended loss amount doesn't give him much credit under

21    the fraud chart, and even that is extraordinarily excessive.  I

22    want to do the same exercise for him that I just did for

23    Mr. Black.  $46,000 is attributable to requests made by him.

24    That's a six point add, not a 14 point add.  A two point

25    enhancement for sophisticated means.  Total offense level of

JAO7CONS

1    23, Criminal History Category I, guidelines 46 to 57 months.

2            Again, probation treating him in the same way as

3    Mr. Black was treated recommends a five month sentence followed

4    by two years supervised release and a $300,000 fine.

5            OK, you all have your exceptions.

6            Yes, I did.  I said seven points for the base offense,

7    14 point enhancement for 2B1.1(b) for intended loss of $1.411

8    million, which is much in excess of the six point add-on for

9    what he actually did.  OK?

10           All right.  So, now we've gone through that exercise,

11   and I have told you that I don't intend to give a guideline

12   sentence -- and I don't.  So, I guess I'll hear the government

13   on sentencing.

14           MR. KOENIG:  Thank you, your Honor.  I won't be long.

15   In spite of what the Court said about the difficulty in

16   estimating loss, what the defendants engaged in was a big

17   deal -- it was a really big deal.  They had privileged access

18   to the very, very important financial benchmark, and they

19   abused it.  And this wasn't just slip some money out of the

20   church collection plate.  This was something where the harm

21   went beyond Deutsche Bank and their counterparties.  So, you

22   know, were they the only ones to do it?  No.  But their conduct

23   was significant and it cannot be ignored.  It went on for

24   years, and it went on over and over.  So, a significant period

25   of incarceration and a significant fine will send a message

JAO7CONS

1   that that kind of conduct will not be tolerated, and it also

2   will change the calculus for anybody who is out there who

3   thinks that maybe I should engage in a fraud.

4          THE COURT:  How succinct.

5          MR. KOENIG:  Thank you.

6          THE COURT:  I thank the government.

7          Mr. Breen?

8          MR. BREEN:  Your Honor, as the Court has recognized,

9   the guideline calculation is wildly skewed.

10          THE COURT:  Yes, whatever it is, I'm not applying it,

11   so let's talk about your client.

12          MR. BREEN:  OK.  You saw the letters we submitted on

13   behalf of Mr. Connolly.  You know that he is a loving family

14   person committed to his family, his children, his wife.  He is

15   the backbone of that close-knit family and his extended family

16   as well, his sisters, his brothers, his nieces and nephews.  He

17   is a humble man and has shown that he is not a flashy Wall

18   Street person; he is somebody who went and did his job until he

19   left it.  He is somebody whose family cares for him deeply and

20   who need him around.  I think that should count in your

21   consideration.

22          In terms of the sentence here, the vast number of

23   people who have been sentenced in the LIBOR cases have gotten

24   very little or no time.  And some of those people -- you know,

25   the example of the person who received the most as somebody who

JAO7CONS

1    had -- the spider network guy, the book, had people at

2    different banks, and they were moving rates by working together

3    and colluding and doing all those things, you know, that's not

4    really an example that has any relevance here.

5            Out of all the defendants in all the cases, we

6    struggle to find anybody whose conduct was as narrow as

7    Mr. Connolly's -- you know, people who were actively involved.

8    I think to the extent that Mr. Parietti talked about Matt

9    Connolly being his boss was unbelievable, I think, to the jury.

10           THE COURT:  Well, you you've already heard what I

11   think of it.  And I read into the jury's acquittal on the

12   Parietti counts that the jury didn't believe it either.

13           MR. BREEN:  Because they didn't believe that, I mean

14   what is there to believe about what Matt Connolly did?  It's

15   only his own e-mails, right?

16           THE COURT:  Well, his own e-mails are his own e-mails,

17   you know.

18           MR. BREEN:  And the jury convicted him presumably on

19   his own e-mails, but that's really it.  The rest of the scheme

20   should be viewed as acquitted conduct for that reason.

21           THE COURT:  Well, no, come on, he was convicted of

22   conspiracy.

23           MR. BREEN:  Well, he was.  Technically he was.

24           THE COURT:  He was convicted of conspiracy.

25           MR. BREEN:  But he wasn't convicted of anybody else's

JAO7CONS

1    conduct.

2              THE COURT:  I agree with you that his participation in

3    this conspiracy was -- as far as my reading of the evidence is

4    concerned -- negligible, far smaller than that of anybody else

5    at Deutsche Bank.  And I've kind of scoured the Rabobank stuff,

6    and it appears to be a lot less than anybody at Rabobank.  I

7    haven't kept track of what was going on in the London cases.  I

8    know some people got off, and I know some people got small

9    sentences, and there is some guy who committed obstruction of

10   justice and bribed people, and he got five and a half years

11   apparently.

12             MR. BREEN:  Right.  Of course none of that -- and that

13   was our review too.

14             THE COURT:  And on the great scheme of things if he is

15   like the worst person in the whole thing, Mr. Connolly is down

16   here, I will grant you that.  OK?

17             MR. BREEN:  So, your Honor, we ask that he be

18   sentenced appropriately, given that, and that he be sentenced

19   to a period of nonincarceration and a modest fine.  I think

20   there is eight out of 24 of the defendants who received no time

21   at all, nonincarceratory sentences.  Granted, some of those

22   were cooperators, we understand that, but, you know,

23   cooperators who on that scale are at the highest level

24   receiving no time.  The government's request for a fine of $3

25   million is that's just hugely disproportional, and I think the

JAO7CONS

```
 1    request for any time at all is disproportional.  So, we ask for
 2    a nonincarceratory sentence and a modest fine.
 3              THE COURT:  Thank you, Mr. Breen.
 4              Mr. Levine?
 5              MR. LEVINE:  May I speak from here, your Honor.
 6              THE COURT:  You always did.
 7              MR. LEVINE:  Thank you very much.
 8              THE COURT:  I think of that as your spot in my
 9    courtroom.
10              MR. LEVINE:  Your Honor, the purpose of today is
11    punishment.  That's what we're here for.  Mr. Black respects
12    this country's legal process, he respects what is going to
13    happen here today, and just as he has years ago since years ago
14    when he agreed to come here and waive extradition --
15              THE COURT:  Mr. Levine, you are going to have to move
16    over there.  Either speak up or use the microphone.  Shout.
17              MR. LEVINE:  What I was saying, your Honor, was
18    that -- I will start again, to make sure you've heard it.
19              THE COURT:  I heard it.
20              MR. LEVINE:  OK.  The point is that Mr. Black has
21    subjected himself to the jurisdiction of this court and
22    respects this process.  I hope given the special health
23    circumstances that Mr. Black is going through that the Court
24    appreciates -- I'm sure you do -- that he has come today, not
25    sought an adjournment, and done everything he could to be in
```

JAO7CONS

1   this court today.

2           We ask today for only one thing, and that is fair,

3   proportionate and just punishment.  And obviously the standard

4   here is what punishment is sufficient but not greater than

5   necessary to achieve the ends of sentencing.  And our

6   recommendation, the Court knows -- which we spent considerable

7   time on, recognizing the seriousness and the nature of this

8   case -- is that the appropriate sentence that is certainly

9   sufficient would be to sentence Mr. Black to a term of

10  supervised release, with a special condition potentially of

11  home confinement.  And as we outlined to the Court, we have

12  made efforts to ensure that that home confinement can be served

13  on the same terms as served in the United States, including

14  electronic monitoring or any other kind of circumstance the

15  Court deems appropriate to provide Mr. Black an equal

16  opportunity to the same sentences that he would have if he was

17  a United States resident.

18          How do we get there?  Well, we start where I imagine

19  the Court would like to start, the work of the probation

20  department and Mr. Kim.  And obviously there is a wide range

21  here of available sentences, and after thoughtful

22  consideration, professional consideration, you know, Mr. Kim

23  and the probation department as a whole determined that this

24  sentence should fall at the very low end of the range of

25  sentences that are available, a short period of incarceration

1    in the United States followed by supervised release and

2    substantial fine.

3         While we agree with probation in terms of where you

4    situate the appropriate place to sentence in this case, we

5    think they have that right, and we think it's based on

6    obviously you have seen the factors included in their

7    recommendation, which includes disparate impact, the conduct

8    and looking at this, stepping become a little bit and looking

9    at this whole picture.

10        And there is a meaningful difference obviously between

11   what we're asking for and what probation recommends, because we

12   are recommending if there is a form of confinement it should be

13   in the United Kingdom where Mr. Black is from.  I recognize

14   there is hey difference between that and institutional

15   confinement -- there is no question.  What we think -- and I

16   will talk about it a little today -- that when you factor in

17   all that happened, the punishment that will be meted out by the

18   court, and the other factors, including health factors and

19   issues of non-U.S. resident being incarcerated, the other

20   situations including the complete loss of Mr. Black's career,

21   the public shaming that has occurred, and other factors, that

22   that modest change -- and it is a modest change -- is fully and

23   wholly justified here, because it still provides more than a

24   sufficient sentence.

25        You know, I think, your Honor, that just starting out

JAO7CONS

1  with going through the factors, there is no dispute here that

2  Mr. Black is a first-time offender.  There is obviously no

3  violence or public threat here.  There is no history of any

4  misconduct.  In fact, the probation department notes -- and I

5  will talk about the letters in a bit -- but you have other

6  evidence that Mr. Black has otherwise lived a well-lived, law

7  abiding, and in many respects very laudable life.  We are not

8  making any excuses today, but I'm simply asking that Mr. Black

9  be sentenced -- as I know the Court will -- based as an entire

10  human being and how he has behaved for the years he has been on

11  this earth, and not just based on the verdict, which is the

12  worst thing he has done.

13          There is clearly no question that Mr. Black is someone

14  who can conform his conduct to the law, which is an important

15  factor here.  He has been on bail now for over three years.

16  Those conditions -- which has been agreed by everyone -- and he

17  has had no issues whatsoever.  And that includes that fact that

18  we've all adjudged he didn't even need to be supervised; he has

19  traveled back and forth to the United States frequently in

20  fact.  He's been here every time.  There is no issue about his

21  conduct or any other reason that there is a concern about

22  antisocial behavior, which obviously this Court has to consider

23  in making a determination.

24          Similarly, the probation department clearly says it

25  believes there is no risk of recidivism here; there is no

JAO7CONS

1    concern that he needs to be personally deterred.

2            You know, you have already commented on these things,

3    so I'm not going to go through them all, but just looking at

4    the case, we're not offering any excuses today.  We gave you a

5    view of this case but the jury spoke, and we certainly

6    understand that.

7            As you said, Mr. Black behaved within a system of

8    Deutsche Bank, but this conduct was not limited to him; it was

9    obviously part of not only this bank but many, many banks.  It

10   was encouraged, it was not concealed.  And also very

11   importantly, although Mr. Black was in London, he of course was

12   not only a submitter, but he had no ability to control the

13   submissions, he had no ability to input the submissions; those

14   decisions were made by those senior to him, and frankly his

15   requests to be rejected.

16           So, I would say when you look at across the board,

17   Mr. Black's conduct also falls -- you know, of all the people,

18   of all the LIBOR gin joints in this particular case -- and

19   there are dozens and dozens and scores of people that are

20   involved, according to government -- Mr. Black is on the very,

21   very low end, in fact in this case, the very, very bottom of

22   that.

23           The task force has thought about offenders like this.

24   The guideline comment from 2018, we respectfully submit that at

25   least with respect to how we think about the loss -- and I'm

JAO7CONS

1   not challenging the court's ruling -- we think he really is of

2   the type of offender, first time conduct, otherwise no reasons

3   to believe he will reoffend, that should be the kind of person

4   in which a term of nonincarceration should be seriously

5   considered.  I say nonincarceration.  There is no doubt about

6   punishment.  Mr. Black has and will be punished here, punished

7   very severely.  The only question is how much is needed.

8           You commented on this a little, Judge, but I want to

9   talk about one factor that I really think looms incredibly

10  large here, and that is the requirements under 3553 to not

11  impose sentences that have disparate effect.

12          Plainly for Deutsche Bank for this part nobody is

13  suffering a sentence of imprisonment.  The more senior folks,

14  the decision makers, we have Mr. Curtler, he obviously has been

15  sentenced to a nonincarceratory term; Mr. King, who is a

16  decision maker, the recommendation notes Mr. King's role.  It's

17  not a question of imprisonment.  He obviously has not been

18  charged at all.  He hasn't suffered any penalty whatsoever

19  other than the fact that he had to come and testify.  That's

20  very significant because this is a case which is not common

21  where the government cooperated down quite frankly.

22          THE COURT:  You think it's not common?  You should do

23  more drug cases, Mr. Levine.

24          MR. LEVINE:  Well, when I did drug cases, I didn't do

25  that.

1          Mr. Parietti also -- who as the Court pointed out had

2     a very robust -- under the government's analysis -- set of

3     requests, he also is facing no time of incarceration.  But that

4     only begins to tell the disparate story.

5          As this Court has noted today, and as the government's

6     own settlement with Deutsche Bank notes -- and frankly as the

7     testimony notes -- this is not about just Mr. Black.  He is a

8     trader on the desk.  You have the senior folks -- including

9     senior folks that are listed on this loss -- Mr. Nichols,

10    Mr. Clody, Mr. Jane, the entire Deutsche Bank organization --

11    that are absolutely responsible, I would argue much more

12    culpable than Mr. Black.

13         I'm not making any excuse today for his conduct, but

14    I'm saying let's look at the context.  Those people, they're

15    not thinking about prison, they're thinking about nothing.

16    There is no sanction to them of a criminal nature at all.  So,

17    Mr. Black is already going to absorb an enormous amount of

18    punishment that the people that one who think the government

19    would find more culpable are walking away with nothing.

20         Which brings me to the chart we talked about before,

21    the people that you've looked at for loss.  There is a couple

22    of observations I'd like to make, your Honor, because we also

23    know that Deutsche Bank did a massive investigation.  They

24    fired lots of people -- not Mr. Black.  He sat on the desk

25    trading for years.  But even if you look at their chart, your

JAO7CONS

1   Honor, the disparate impact is difficult to not consider.  For

2   example, on the chart we have Ms. Mackler and a man named

3   Pasquele Fluant.  They're not coconspirators.  They're not on

4   the government's list of coconspirators.  But their losses are

5   nonetheless attributed -- not only are they not charged,

6   they're not even conspirators.  And I note that Ms. Mackler has

7   a loss of almost the identical amount as Mr. Black.  OK, we're

8   not talking about the culpability here, we're talking about

9   relative punishment, no charge.

10          Mr. Rickman on the chart, he is a coconspirator,

11   $363,000 of loss, not charged, will face no sanction.

12   Mr. Nichols will face no sanction.  Mr. Pastorella, he was

13   actually someone who shared a trading book with Mr. Black.  He

14   is on this chart, again no sanction whatsoever.

15          So, I'm not here arguing, Judge, or asking do not

16   punish Mr. Black.  You should punish him today under our system

17   and on this stage. But what I'm saying is basic fairness

18   informs that the way that this is being done is that

19   Mr. Black's culpability is taken into account.  But none of

20   these other folks who the government even says are how you get

21   to this harm.

22          Now, of course our view is that because the different

23   traders didn't know each other's net positions, it's hard to

24   say Mr. Black knew anything that should be attributed by these

25   other people, because he doesn't know what their position is,

JAO7CONS

1    so their requests don't necessarily affect him.  But, fine, all

2    I'm saying is none of these folks are going to get any

3    punishment.

4            If you look at it, 65 percent of the chart is the

5    cooperators.  If you include Mr. King in the noncharged people,

6    that's 36 percent of the charge.  So, you are talking about

7    Mr. Black has six percent of it.  OK.  If you're going to mete

8    out punishment, I'm just saying it needs to be proportionate to

9    that.  Now that also does not take into account.

10           You have seen Rabo.  I'm he happy to talk about Rabo.

11   None of the people that went to trial are going to jail at all.

12   Whether that's right or wrong, that's the fact.  And those

13   people were far more culpable; they were like Curtler and King;

14   they were submitters with decision making authority and

15   everything else.

16           Mr. Thompson who pled guilty, fought extradition up

17   the wazoo, got 60 days in prison after all that, couldn't be

18   tried with the Rabo folks; I don't think he is similarly

19   situated.  The other Rabo people, no jail time, no jail time at

20   all.

21           THE COURT:  Well, two of them because of the Kastigar

22   problem.

23           MR. LEVINE:  But the point is if you're looking at it

24   relatively, I'm not here today to ask you not to punish

25   Mr. Black; I'm just asking you for proportional punish.

JAO7CONS

1          Then we move on to the other issue which the Court has

2     mentioned today:  What about all of these other banks,

3     Barclays, Citibank?  All have these agreements, those

4     agreements all reference numerous individuals -- depending on

5     which agreements you look at, 40 to 100 names.  Not one -- not

6     traders, not senior executives, no one.

7          So, if I take Mr. Koenig's comments, you know, about

8     what we need to do here, there is no sense in which the

9     government's approach suggests that they believe that there is

10    the need for all of this punishment for these two frankly

11    base-level nonsupervisory folks that's going to somehow make

12    things better.  I don't think that general deterrence as we

13    pointed out, and the DOJ said in our research, is achieved when

14    people have an interaction with law enforcement.  The actual

15    punishment is not the key point.  There is none of these

16    people -- I will make a wager, Judge, that if we contacted --

17    if the government contacted all of the banks and said send us

18    to this courtroom right now every single one of those scores of

19    people that have not been prosecuted and asked them would you

20    change places with Mr. Black and Mr. Connolly, I think they're

21    going to say, oh, my God.  I think the conduct has been

22    deterred.

23          Similarly, the government has always tried to suggest

24    that this is this very narrow piece of LIBOR conduct.  They

25    don't want to talk about low balling; they want to talk about

JAO7CONS

1     the Bank of England.  They don't want to talk about the actual

2     events during the crisis, because that leads to a massive

3     inquiry about the things that really did cause an issue for

4     LIBOR.  OK, but you can't have it both ways.  You can't make,

5     as they do in their papers, these guys the face of that, when

6     you recognize that even under their scenario this is not the

7     big case.  This is conduct that should not have happened based

8     on the jury's verdict, but it is not the overall LIBOR story.

9     And that story the government has fought to not tell.  That's

10    fine.  We're still culpable based on the verdict, and we have

11    to answer for it, but let us answer for what we actually did

12    and not all of these other folks who the government decided not

13    to prosecute for conduct which is much more complicated and

14    more serious.

15            It is notable Mr. Black is not a man -- like a lot of

16    people -- he didn't have a lot of jobs; he basically had this

17    job.  He sat on the desk for years.  That career is completely

18    gone.  Effectively he will never work in the financial services

19    industry again.  It's going to be very difficult for him to

20    work.  He hasn't worked since 2015.  That is a very heavy

21    sanction for any person.  It's not the end of it, but it is

22    ironic that Deutsche Bank did a whole investigation -- which

23    the government the Court has found had a hand in, and in their

24    judgment, even with all the pressure they were under, of all

25    the people they fired, including getting rid of Curtler and all

JAO7CONS

1    of these other guys, he is still sitting on his desk.

2            So, all I'm saying is in terms of relative

3    culpability, if you credit what Deutsche did -- because the

4    government sponsored it and they were going to put witnesses on

5    about it -- then credit it.  And their view is of all the

6    people around here we're not going to fire him; we're going to

7    give him a letter.  But who are we punishing?  And how are we

8    punishing?  Again I'm not making excuses; I'm talking about

9    relative culpability.

10           Now let me talk about what I really think come down to

11   the factors that ultimately I hope the Court will allow the

12   adjustment that we're asking for.

13           First, Mr. Black is, as you know, a noncitizen; he is

14   really a stranger in this country.  He knows this country

15   because he has been spending a lot of time on this case.  He

16   will not, based on the policy, be eligible to put in a camp or

17   another institution.  He is going to be designated it appears

18   to a private prison facility.  Obviously, this administration

19   has changed course from the previous administration in deciding

20   that that's something they want to do for noncitizens.  We take

21   the Office of Inspector General's reports very seriously.

22   These places are very harsh.  Mr. Black obviously is going to

23   be put in a facility which is higher security than he would be

24   designated simply because he happens to not be from the United

25   States.  And there is more than a reasonable basis to believe

JAO7CONS

1    that Mr. Black will not obtain proper medical or other care in

2    such a facility.  And we will talk about in a moment that

3    issue.

4         But in terms of disparate impact treatment, that's a

5    very harsh reality -- because of things that have nothing to do

6    other than the fact he was brought here as opposed to the UK --

7    that Mr. Black should suffer an additional heaping of

8    punishment above what others will suffer in places that are

9    really not doing honor to our system.

10        Now, I understand that we have situations here and we

11   have other kinds of offenders that are not here, that are out

12   here, but there are limits to what the Court can do, and there

13   are other considerations -- safety and other things -- where we

14   have to use these kinds of places -- but it's not necessary for

15   Mr. Black, and I think respectfully it's not fair for

16   Mr. Black.

17        Also, there will be then an indeterminate period of

18   detention for removal, which of course is -- Mr. Black only

19   came here because he was asked to come here.

20        THE COURT:  Well, it's actually a question I asked

21   myself.  He is not illegally in the country.

22        MR. LEVINE:  I will tell you there are some things

23   that one just has to sometimes -- I have to accept.  And while

24   it makes no sense to me, and we will obviously consent to

25   removal, he is happy to leave now and not come back, but it's a

JAO7CONS

1    bureaucratic process that is one that is also, in addition to

2    being a difficult one -- right now overburdened in a way that

3    our country's immigration system has never been overburdened,

4    so adding another person who doesn't need to be in it I think

5    not only is harmful to Mr. Black -- because as you have also

6    seen the condition of some of these places is, as has been said

7    by the reports, deplorable, adding another body that doesn't

8    need to be there I think as a matter of social policy is also

9    not necessarily a positive good.

10           And with all of these issues, the other additional

11   heaping of cruelty here is that Mr. Black has nobody here

12   except us.  He has no family here -- they're all overseas --

13   and effectively he will not see them; he have no contact with

14   them.

15           I do thank two of Mr. Black's family members, his

16   sister and brother-in-law have really graced us to come here,

17   and we are really appreciative.  But that's not going to be the

18   case if he is incarcerated, and that isolation is an additional

19   penalty which is over and above what I think is necessary.

20           Now, your Honor, I want to address the medical

21   condition, but I also have privacy concerns so I will do it

22   generally.  I will be happy to answer more specific questions

23   at side bar.

24           We have a real problem.  Mr. Black is one of those

25   clients who doesn't like to complain, who doesn't like to

JAO7CONS

1   necessarily tell us when he doesn't feel good because he feels

2   it's his job to sort of soldier on.  But we have a real

3   problem; he has a serious heart condition.

4           I will tell you we have gone to great efforts to

5   advance appointments, but his current condition -- you've seen

6   the letters -- is not good.  We are hopeful that it can be

7   brought under control.  It's not right now.  The procedures he

8   has had -- he has had two -- he is going to have a much more

9   serious procedure we think in about two months.  That's sort of

10  where we are.

11          But, you know -- and having spoken to his doctors,

12  this is an existential problem.  If not brought under control,

13  or if not given absolutely appropriate adequate care, this will

14  substantially reduce Mr. Black's life expectancy.  One of our

15  biggest concerns here is just the possibility of not adequate

16  care, and there is a real risk of that.

17          Additionally, I will tell you Mr. Black is not the man

18  that we know.  Even now he is walking, takes breaks and he has

19  a problem.  I think it's not being cute to say this case has

20  literally broken his heart.  He is ill; he is also dealing with

21  other nonphysical issues, which while not uncommon here are

22  nonetheless just as real, they're pronounced, and this has been

23  a difficult process.  Therefore, we think our sentence is also

24  fully justified under the factor that allows for

25  rehabilitation -- as medical care is part of that

JAO7CONS

1    rehabilitation -- but we're asking frankly to not have

2    Mr. Black use resources in a U.S. facility for medical care but

3    he will obtain those resources at home in a way that his

4    doctors think is appropriate.

5           I can't tell you that I'm more concerned about

6    something in part because Mr. Black is not a person that

7    complains, but this is a real problem, and it manifests in a

8    lot of ways.

9           So, I think that those two factors alone, what we're

10   asking for here -- I'm not asking for him not to be punished or

11   pay a fine.  I'm simply saying we can adequately confine him

12   and punish him in a way that is not unnecessarily difficult

13   both on the immigration side and frankly on the medical side.

14          And I think when you look at those factors -- and then

15   there is one other thing.  I haven't said anything about it,

16   and this is really the last point I will make -- then I ask, as

17   I did at the beginning, look at this man as a whole.  A lot of

18   defendants come before you -- I know you get dozens and dozens

19   of submissions -- but I respectfully think Mr. Black has lived

20   otherwise a very good life.  The letters that you have received

21   that span really his whole life from people who have known him

22   for 40, 50 years all the way in time paint a remarkably

23   consistent picture of a man that is humble in the right sense.

24   He is caring and thoughtful and forthright with people.

25          And the letters are not, as you often see, a series of

JAO7CONS

platitudes; they are very specific repeated examples over a

long life of consistent behavior of frankly true thoughtfulness

and concern and doing what you do because it's the right thing,

not for praise.  He is actually described by everyone as very

self-effacing, there is no bragging in him.  And his dedication

to people as a father, as a husband, a son, brother, uncle and

as a friend is really I think, your Honor, special here.

         You know, you see in these letters so many anecdotes

that to me it's not the big stuff, it's the little things he

does that shows who he is.  He's the man that when your child

is having an emergency problem he's the one that's there to

help the child and help the parents.  When there is a boy who

as a young man there was a young man challenged in the town,

he's the young man that brings him to the game to get him

involved to change his life.  He's the guy who doesn't forget

his old mates in his town just because he is now a banker.  He

is there to play with them in part of their crew.  He's the man

that close family, distant family, and even new friends, talk

about as the man to come to when you have a crisis, when you

need help or, more importantly he's the one that checks in and

asks how you're doing and is the rare person that genuinely

wants to hear the answer; he generally wants to know.

         And frankly, your Honor, these letters were so

consistent, and they come from across the world.  You know,

these are people that have a very different way of speaking,

JAO7CONS

but they come through in a way that to me at least is

incredibly powerful because it's incredibly consistent with who

he is.

            And there is some intangible quality to people, and a

lot of different names for people who do something that is good

with others.  You can call it the golden rule.  You can call it

categorical imperative.  Whatever you call it, these letters

are testament to who this man is.

            You know, you have seen, your Honor, the letter from

his wife and the explanation of why she is not here today.  I

don't want to go into that.  I just want to say this:

Mr. Black has also raised an amazing family.  He has an amazing

three young women, his wife, they are glowingly described and

not in simple euphemisms about who they are.  And his decision

on how to behave today and whether or not to involve them here

to me as a father is one of the most fatherly things that I

have seen.  And I think there is no question that when you look

at what has happened here -- and regardless of the reason,

there are consequences -- Mr. Black, as you read in these

letters, he has already endured serious punishment in terms of

his career, in terms of the emotionally crushing effects this

has had on him.  It's not sufficient, but I think if we read

these letters of close family and friends, listen to how Mr.

Black has changed, he's struggling.  Whatever the need is for

punishment, that has and will continue to be extracted through

JAO7CONS

1    that.  There is a torture of this that has occurred that is the

2    outgrowth of the activity, but it's real and it's occurred.

3           So, the question then becomes, Judge, what are we

4    really asking for?  We're simply asking for him to be able to

5    serve a sentence in the UK.  And the Court ordered us to

6    address that in our submissions, and we did.  There is not --

7    we don't think given the probation department's

8    recommendation -- the transfer program doesn't work, and

9    frankly, according to the most recent e-mail, it is impossible

10   to gauge.  We think that a sentence that would even make it

11   relevant would be inappropriate, so I'm not going to bother

12   talking about that, because I think it's not just something we

13   can count on in any way.

14          What we did, your Honor, was we asked the question,

15   OK, let's simply figure out how Mr. Black can receive the same

16   kind of sentence he could receive if he was a U.S. resident.  I

17   don't want special treatment, I just want equally available

18   options.

19          So, what we believe -- because we think home

20   confinement here is an appropriate sentence -- special

21   condition -- is we said how do we do that.  Well, first, given

22   the technological world, if you want to have a similar system

23   to make sure we know where he is and he is confined and he is

24   suffering those penalties, that's fine.  I mean the technology

25   is on all of our desktops.  There is GPS, Skype, e-mailing

JAO7CONS

1    every day.  All of those things are completely available, and

2    they're reliable, and because of the time difference if they

3    want to make sure that Mr. Black is at 9 o'clock is home, the

4    day isn't even over, you can do it that way.  But we didn't

5    think that was a sufficient answer.

6          So, what we did was in the UK any kind of electronic

7    monitoring is actually not done by the UK government; it's

8    contracted out.  So, we got another very reputable firm with

9    major law enforcement credentials, and we said to them we need

10   you to tell us can you confine somebody with electronic

11   monitoring, these are the conditions, and you have to report

12   directly to the Court and the probation department.  And we've

13   given you their report; we've given you their -- they are

14   serious law enforcement people, and they will confine Mr. Black

15   and ensure that he follows whatever conditions this Court

16   orders.

17         Now, I think the record shows that Mr. Black is going

18   to do that anyway.  I don't think any of us have a serious

19   concern about noncompliance.  But to the extent the Court wants

20   a robust additional punishment that sends a clear message under

21   these circumstances, we have provided that option.  We have

22   talked about it with probation; I think that they will be

23   guided by what the Court does.  But there is no technological

24   or issue with doing it.  And it's not special.  It's simply the

25   same as Mr. Black has -- it's the same as it would be if

JAO7CONS

1    Mr. Black was a U.S. citizen or resident.

2            Your Honor, we've traveled a long road here, but I

3    think today, as you've said repeatedly, you need to have

4    punishment but you need to have proportionality, you need to

5    have a sense that Mr. Black is being punished for what he did

6    and not all this other stuff.  You need to look at how this

7    system -- this is not about prosecution, it's about

8    punishment -- is being applied.

9            And, frankly to make these two men the tip of the

10   spear -- given what we know about all these facts -- they

11   should be punished, but they shouldn't be punished more than is

12   necessary.

13           Therefore, this is a humbling day, and with humility I

14   say to you, Judge, I truly submit that the sentence that is

15   sufficient but no greater than necessary is a sentence that

16   allows Mr. Black to be punished but to do it where he belongs,

17   in the UK, because even if you impose a short sentence here

18   it's going to have a scathing set of potential consequences and

19   potential results that are so bad that no one here, a fair

20   minded person, would feel that that is the right thing to have

21   happened.

22           So, I thank the Court for its many courtesies, and I

23   respectfully ask please grant our request.  Thank you for your

24   time and attention, your Honor.

25           THE COURT:  Mr. Connolly, do you have anything you

JAO7CONS

1    want to say?

2                THE DEFENDANT:  No, your Honor.

3                MR. BREEN:  Respectfully, your Honor, because of a

4    appellate issues --

5                THE COURT:  I quite understand.

6                Mr. Black, do you have anything you want to say?

7                DEFENDANT BLACK:  Yes, please, your Honor.

8                Thank you for the opportunity to speak, your Honor.

9    As I believe you are aware, this process has completely

10   shattered me.  I have come to this country voluntarily because

11   I believe in the process and the law, and I would like to thank

12   your Honor.

13               I am devastated by the fact I ended up here before

14   you.  I feel incredible remorse for my involvement in these

15   events and so profoundly for my wife an children and those that

16   rely on me and believe in me.

17               My life will never be the same.  I am committed to my

18   family and all those who supported me over these past many

19   years.  I ask for leniency, your Honor, because I want to be

20   able to spend the rest of my days making it up to them.

21               I would like to take a moment to express my thanks to

22   these people:  I want to thank my attorneys for their skill and

23   the phenomenally hard work over the last few years.  Their

24   dedication to my cause is an inspiration.  I also want to thank

25   my sister Lindsay and brother-in-law Douglas for taking the

JAO7CONS

1    time out of their lives and responsibilities to fly across the

2    ocean and support me here.  And I want to thank my many friends

3    and family who took the time to write on my behalf.  And most

4    importantly, I want to thank my wife and children whose love

5    and support is my entire world.

6          Thank you very much, your Honor.

7          THE COURT:  Okay.  I have to turn to the elephant in

8    the room because it is raised without being named by everyone's

9    presentation.

10         Mr. Connolly -- who was lucky that I don't bear him a

11   grudge for the silly thing he did last summer -- stole my

12   thunder on this one.  He called his self-published screed

13   "Scapegoat."  It is a word that I have thought of often over

14   the past three years.  The Levitical scapegoat was a real goat,

15   which was is sent out into the wilderness after the high priest

16   had symbolically laid the sins of the people on its back.

17         We have syncretized this ancient religious image, and

18   today we use it to refer to people who are blamed for the

19   wrongdoings, mistakes and faults of others -- especially for

20   reasons of expediency.

21         Mr. Connolly believes that he and Mr. Black are being

22   made scapegoats here, to which I say:  Yes and no.

23         Gavin Black and Matthew Connolly were participants

24   along with many other people, a few of whom have been indicted

25   here and abroad, most of them have not, in a massive effort,

JAO7CONS

one that went on at many if not all of the submitting banks
over a course of years to manipulate LIBOR to benefit the
banks' trading positions.

So, it's not quite fair, gentlemen, to say that you're
being blamed for the wrongdoing of others.  The scapegoat was
sinless; you are not.  You haven't done nothing wrong.  You
were found guilty by a jury of 12, and there is evidence to
support their verdict, and you should be sentenced for what you
did.

But I do think it is fair to say that the government
has used Mr. Connolly and Mr. Black, as well as a few other
people -- none of whom was at the highest levels -- as proxy
wrongdoers, to make them an example for the wrongdoings of
those two institutions, Deutsche Bank and Rabobank in this
court, and for similar wrongdoing of other unindicted
institutions as well.

Now, I quite understand that the government could not
possibly prosecute all of the people who were involved at any
time with attempts to manipulate U.S. dollar LIBOR.  It was
expedient for the government to focus on a few people at a
limited number of institutions, and the government did so.  But
the government -- and to its credit Mr. Koenig has been
perfectly honest -- now asks the Court to impose excessively
large punishments relative to the actual wrongdoing perpetrated
by these two individuals on Mr. Connolly and Mr. Black because

JAO7CONS

of a far more widespread problem in which hundreds of other

people at Deutsche Bank and elsewhere were also wrongdoers, and

the government asks that I do that to make an example of them.

The government's really sole basis among the 3553 factors for

asking for the sentence it seeks -- it's a guideline

sentence -- is general deterrence.  I yet cannot make

Mr. Connolly and Mr. Black scapegoats for the sins of the

entire industry.  They stand convicted of crimes for which they

will be punished, and that is all they will be punished for.

Turning specifically to the Section 3553(a) factors:

The crime was serious and not victimless, but the defendants,

these two men, were very minor participants in that crime.

This is especially true of Mr. Connolly, and it's also true of

Mr. Black when looked at relative to others.  Mr. Levine is not

incorrect when he says that the government cooperated down in

this case.

The defendants have lived otherwise exemplary lives.

The letters that I have received, and I have a read them, are

genuinely moving.  They present no risk of recidivism and no

danger to the public.

Under Section 3553, I must of course consider the

sentencing guidelines -- as I have labored to calculate them --

but I, like probation Officer Kim, find them to be inconsistent

with the parsimony principle that governs sentencing.

The flaws in the fraud guideline, as articulated by

JAO7CONS

1    Judge Rakoff in the Rabobank sentencings, and by many other

2    judges of this and other courts -- including me on other

3    occasions -- make a guideline sentence way out of line with

4    respect to these two men, and they would be even more out of

5    line if I had fully accepted the government's calculation of

6    intended loss.

7         The guidelines sentences for these defendants are also

8    out of line with similarly situated defendants who have

9    committed the same crime.  The only fair comparators in my

10   estimation are others who were involved in the similar effort

11   to nudge LIBOR in one direction or the other.  The two Rabobank

12   traders who went to trial before Judge Rakoff, who were much

13   more involved at their bank with this exercise than Messrs.

14   Connolly and Black were at Deutsche Bank, were given relatively

15   modest below guideline sentences, which of course they ended up

16   not serving because of the Kastigar reversal and the vacatur of

17   their convictions.  As far as I know, nobody else has gone to

18   prison, with the exception of this person Mr. Hayes, whom I

19   know nothing about, except what I read in the sentencing

20   transcript for the Rabobank case, and what I read there does

21   not make him anything like a genuine comparator to Mr. Connolly

22   and Mr. Black.  He apparently bribed people, he obstructed

23   justice, all way beyond anything that went on here, and he

24   ended up serving -- his sentence was 11 years but he ended up

25   serving in England, so he ended up serving five and a half

JAO7CONS

1    years.  These defendants were bit players by comparison and

2    would have to be sentenced to significantly less than that for

3    their sentences to be fairly proportional.

4         A guideline sentence is terribly out of whack

5    comparing in particular Mr. Connolly, who made just six

6    documented requests -- and I think there is no real basis on

7    which the government could even allege seriously that he made

8    any other requests -- with Mr. Parietti, who was far more

9    culpable and who got away with not only no jail time but he got

10   to keep his $9 million bonus that was earned during the period

11   of the conspiracy.  I recognize that he was a cooperator but,

12   as I've already said, I personally had some issues with his

13   testimony, and the jury apparently did too since it acquitted

14   Mr. Connolly of the counts involving Mr. Parietti's activity.

15   I prefer to sentence Mr. Connolly for his own proven

16   misconduct, which in this case consists of the six requests

17   that he made.

18        I thus reject a guideline sentence as appropriate for

19   either defendant.

20        The government -- knowing full well that neither of

21   these defendants needs to be punished any more than they

22   already has been in order to fulfill the goal of specific

23   deterrence, extols the goal of general deterrence -- extols the

24   goal of general deterrence as justification for imposing a

25   lengthy term of incarceration on these two men.

JAO7CONS

1          Now, it turns out I've had to think about judicial

2     philosophy recently both because I was teaching a class and

3     because I was simultaneously working on this sentence, and I

4     realized that I'm not a big fan of general deterrence as a

5     driving factor in punishment.  If you want to refer to the

6     great philosophers of punishment, I'm more a Kantian than

7     Beccarian; I'm a retributivist than a utilitarian.  What that

8     means is I'm more interested in punishing someone for what he

9     did than making him an example to others so that they will not

10     do the same.  It's a matter of personal philosophy.

11          But general deterrence is a Section 3553(a) factor,

12     and I do have to consider it, and I have considered it.  And

13     I've considered it in light of everything that you all have

14     said here and that you have written before saying it, and I

15     have considered it in the way that Judge Rakoff considered it

16     at the Rabobank sentencing.  And he is a great scholar in this

17     area, and he is really much more interested in these things as

18     a philosophical matter than I think I am naturally, and he

19     really does read a lot of stuff about this.  And I thought

20     about it also in the context of what I know about the financial

21     services industry and the people who work in it.  And here is

22     what I conclude:

23          To the extent that the players in the market are

24     capable of being deterred by what has happened to these two

25     men -- including specifically those players in the market who

JAO7CONS

1   thank God every night before they go to bed that they got away

2   with what Matt Connolly and Gavin Black were convicted of --

3   and there are quite a few of them out there -- a long period of

4   incarceration for these defendants is simply not needed to

5   accomplish the goal of general deterrence.  The players in the

6   market have witnessed their arrest, the years spent in

7   chancery -- which are not over yet -- the loss of jobs and

8   employability, the financial stress on them and their families,

9   the loss of status in the community, and at least in

10  Mr. Black's case the development of a serious health issue, all

11  collateral consequences that play into general deterrence.

12          All other things being equal, I would sentence

13  Mr. Black to a modest, short term of imprisonment, probably

14  quite in line with probation Officer Kim's recommendation --

15  his very thoughtful recommendation -- and I would sentence

16  Mr. Connolly to a lesser sentence because these two men are not

17  equivalent in the great LIBOR scheme of things.  They're both

18  low on the totem pole, but Connolly is lower than Black.

19          The problem here is that all other things aren't

20  equal.  And I've struggled with this for weeks.  I did my own

21  research.  And Eric Silverberg, my former law clerk, is here

22  today; he worked on this for me.  If there were a way that I

23  could sentence Mr. Black to serve a term of incarceration in

24  the United Kingdom, I would do it, but there is no way.  There

25  is a procedure for transferring a prisoner from the United

JAO7CONS

1    States to the United Kingdom.  It is lengthy.  It is

2    cumbersome.  It is uncertain of result.  And it is impossible

3    to invoke it until you are serving a sentence in an institution

4    in the United States.  If I could sentence Mr. Black to a term

5    of incarceration -- a brief term of incarceration -- knowing

6    that he would go to a facility appropriate to his criminal

7    conduct, I would do it.  But I know that I can't.  I know that

8    simply because he is a noncitizen -- and I use that term

9    advisedly.  He is not an illegal alien.  But because he is a

10   non-citizen, he will not be eligible to serve his sentence in

11   the same way that any American citizen who stood convicted of

12   this crime would serve.  And that's not right.

13          And for reasons that are incomprehensible to me, were

14   I to sentence him to a short term of imprisonment -- which

15   would be served in a private facility and not at some place

16   like FCI Allenwood, or not at a medical facility, which I think

17   I would strongly recommend, given what I know about Mr. Black's

18   medical condition -- for reasons I cannot comprehend, at the

19   end of that term he could not walk out the door and be picked

20   up by Mr. Levine and taken to the airport.  He would be treated

21   like an illegal alien, and he would be released into the

22   custody of ICE, and at some point long after my intended

23   sentence had expired he would be deported.  And that's not

24   right.

25          I have gone back and forth, and back and forth, and

JAO7CONS

back and forth on this, but when I look at this chart,

McGillicuddy Exhibit 1, and look at the number of instances out

of 130 in which Gavin Black made a request of a submitter to

try to move LIBOR, and the amount of money that the government

estimates was intended to be lost -- and I've accepted the

government's formula, not without thinking that there is a lot

wrong with it -- though I appreciate your effort -- I can't

bring myself to impose a sentence of incarceration in the

United States for Mr. Black.  And since I can't impose a

sentence of incarceration to be served in the United Kingdom on

Mr. Black -- which as I said I would do -- I am remitted to

sentencing him to some form of home confinement to be served in

his native country, and I do that because -- while, Mr. Black,

I don't like the way you played the game -- you were really a

bit player in this.

     Mr. Connolly was barely a player at all.  And given

what has happened to everybody else in this case, and what has

not happened to a lot of people who aren't in this case -- and

aren't in other cases -- it would be a travesty to sentence

Matt Connolly to a term of incarceration.

     And certainly if I'm not going to sentence Mr. Black

to one because of the unusual "all other things are not equal"

collateral consequence of his not being a United States

citizen, I can't mete out a sentence of imprisonment on

Mr. Connolly, who truly -- I have been through this evidence --

 1    is the least culpable person I have heard about.

 2            So that I suppose is the consequence of cooperating

 3    down, as Mr. Levine put it.  The real sentence here began three

 4    years ago and will last for the rest of your lives.  It will

 5    include the payment of a substantial fine -- one that will

 6    exceed the dollar amount of intended loss as calculated by the

 7    government for which you are personally liable but which will

 8    come nowhere close to the $3 million fine sought by the

 9    government -- limit all restrictions on your liberty for a

10    while, and will involve the certain knowledge that nothing can

11    give you back your old lives, that in that sense what you have

12    described to me as a nightmare never ends.

13            I emphasize that for me the proportionality to others

14    involved is a really important consideration in sentencing.  It

15    just is.  I'm always uncomfortable when I'm asked in any

16    context -- it usually happens in the drug context -- to

17    sentence the low man on the totem pole while the big guy goes

18    free.

19            I have reviewed the presentence report.  I'm going to

20    ask Mr. Kim -- who has done such yeoman service -- to revise

21    them to reflect the findings that the Court has placed on the

22    record today.  With those revisions I will accept and adopt

23    them as my findings.  I have already given you the guideline

24    calculations.

25            Mr. Connolly, will you please rise.  Docket number 16

JAO7CONS

1    Crim. 370.  I hereby sentence you to time served, plus a term

2    of two years' supervised release, to include a term of six

3    months' home confinement.  That's on each count.  The sentence

4    is to run concurrently.  And I sentence you to pay a fine of

5    $100,000.  This fine is payable due and payable immediately,

6    together with the special assessment of $300.  That's $100 per

7    count.

8              During the term of your supervision you must not

9    commit another federal, state or local crime; you must not

10   unlawfully possess a controlled substance; and you must refrain

11   from the unlawful use of a controlled substance, submitting to

12   one drug test within 15 days from your release from

13   imprisonment, and at least two periodic drug tests thereafter

14   as determined by the court.  You must cooperate in the

15   collection of DNA as directed by the probation officer.  You

16   must pay the assessment imposed in accordance with 18 United

17   States Code Section 3013; and you must pay the fine, and the

18   fine is due and payable within 60 days.  You must notify the

19   court of any material change in your economic circumstances

20   that might affect your ability to pay the fine or the special

21   assessment.  And you must comply with the standard conditions

22   that have been adopted by this Court, which will be given to

23   you.  You will look at them, and you will sign off on them.

24   And until such time as the fine has been fully paid, you must

25   comply with the special condition of providing your probation

JAO7CONS

officer with access to any financial information that the

probation officer requests.

          Restitution is not an issue in this case.  Forfeiture

is not applicable.

          You may be seated, sir.

          Mr. Black, under docket number 16 Crim. 370, I hereby

sentence you to a term of time served, plus three years of

supervision, to include a term of nine months' home confinement

to be served in the United Kingdom, under such circumstances

and in accordance with such providers as the probation

department shall contract with; or, if the probation department

deems that to be inappropriate, then from abroad by our

probation department.  I don't know really if that's

electronically feasible or not, and that's why I have to leave

it to probation in the first instance to explore that topic.

          I should say -- and this applies to both of you --

during the period of home confinement you must remain in your

residence, and you may not leave -- in your case for six

months; in your case for nine months -- for any purpose except

the following:  To attend medical appointments, to attend

religious services, to attend any further court appearances

that may be necessary.  I rather imagine there will be an

appeal in this case, so...

          The idea is you're a prisoner in your own home.  And I

assure you that after six months in your case, Mr. Connolly, or

JAO7CONS

1    nine months in your case Mr. Black -- and I've heard this from

2    people -- you will hate the sight of your own home, and you

3    will be very, very happy to get out.

4          Mr. Black, I impose upon you a fine of $300,000, as

5    recommended by the probation department, and a $200 special

6    assessment.  The fine is due and payable in 60 days.  The

7    special assessment is due and payable immediately.

8          The same conditions of supervision.  You have a nine

9    month period of home confinement, and during that period and

10   for the rest of your term you must not commit another crime,

11   federal, state or local; you must not unlawfully possess a

12   controlled substance; and you must refrain from the unlawful

13   use of controlled substances.  I am suspending the mandatory

14   drug testing condition.  I gather that Mr. Black is going to be

15   under rather constant medical care in the United Kingdom.  You

16   must cooperate in the collection of DNA as directed by the

17   probation officer, pay the assessment imposed in accordance

18   with 18 United States Code, Section 3013, and pay your fine

19   within 60 days, notifying the Court of any material change in

20   your economic circumstances that might affect your ability to

21   do either of those things.  You must comply with the standard

22   conditions of supervision, which will be given to you for your

23   review and you will sign off on them.  And you must provide the

24   probation officer with access to any requested financial

25   information while the fine remains unpaid.

JAO7CONS

1          Restitution is not an issue.  Forfeiture is not being

2     sought.

3          You may be seated.

4          Matthew John Connolly and Gavin Campbell Black, you

5     have the right to take an appeal from the verdict of the jury

6     and from the sentence that has been imposed upon you.  You have

7     a right to counsel in connection with any appeal that you may

8     choose to file, and if you do not have the funds with which to

9     hire an attorney, counsel will be appointed to represent you.

10          Mr. Connolly, do you understand that?

11          DEFENDANT CONNOLLY:  Yes, I do, your Honor.

12          THE COURT:  Mr. Black, do you understand that?

13          DEFENDANT BLACK:  Yes, your Honor.

14          THE COURT:  It is possible given the sentence that I

15     have imposed that the government may decide to take an appeal.

16     If it does, you have the same right to representation and the

17     right to a publicly financed lawyer if you cannot afford to

18     hire private counsel.  Do you understand, sir?

19          DEFENDANT CONNOLLY:  Yes, your Honor.

20          THE COURT:  Do you understand, sir?

21          DEFENDANT BLACK:  Yes, your Honor.

22          THE COURT:  OK.  What else do we have from the

23     government?

24          MS. ANDERSON:  I just wanted to clarify.  If for some

25     reason probation does not have a set-up to do this and they do

JAO7CONS

1      go privately, is this going to be a cost -- are you ordering

2      the cost borne by the defendant?

3                  THE COURT:  Yes, costs have to be borne by the

4      defendant.

5                  Thank you, Ms. Anderson.  Thank you.

6                  Anything else from the government?

7                  MR. KOENIG:  Nothing further.

8                  THE COURT:  Thank you, Mr. Koenig.

9                  Mr. Breen, anything else from Mr. Connolly?

10                 MR. BREEN:  Your Honor, the issue of bail pending

11     appeal.

12                 THE COURT:  Oh, please.  Sentence stayed pending

13     appeal.  I knew I would forget something.  Also for Mr. Black.

14     Anything else from Mr. Black?

15                 MR. LEVINE:  No, your Honor.  Thank you very much.

16                 THE COURT:  OK.  A difficult case in every respect.

17                 These proceedings are closed.

18                                      - - -

19

20

21

22

23

24

25